**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE XL FLEET CORP. SECURITIES LITIGATION | Case No. 1:21-cv-02002-LGS |
| | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | **JURY TRIAL DEMANDED** |

# <u>TABLE OF CONTENTS</u>

I.     NATURE OF THE ACTION AND OVERVIEW ............................................................ 1

II.     JURISDICTION AND VENUE .................................................................................... 13

III.     PARTIES .................................................................................................................... 13

IV.     RELEVANT NON-PARTIES ...................................................................................... 20

V.     SUBSTANTIVE ALLEGATIONS ............................................................................. 21

      A.     Special Purpose Acquisition Companies ............................................................ 21

      B.     Background Of Pivotal ...................................................................................... 23

      C.     Pivotal Faced Pressure To Complete A Qualifying Business Combination By The January 16, 2021 Deadline .................................................................................. 26

      D.     Pivotal Announces Its Execution Of A Merger Agreement With XL And Misleadingly Touts XL's Growth Potential, Pipeline, Supply Chain Production Capacity, And Overall Prospects .......................................................................... 29

           1.     Background Of XL Hybrids.................................................................... 30

           2.     XL's Need For Financing Gave Defendants An Incentive To Exaggerate Its Sales Pipeline And Revenue Projections ............................................ 31

           3.     XL's Pipeline Inflation Scheme.............................................................. 33

           4.     Prior To The Pivotal Transaction, XL Had Been Experiencing Supply Chain Problems That Impeded Its Ability To Timely Fill Existing Orders..................................................................................................... 37

           5.     XL's Customers Had Low Reorder Rates And Many Of The XL Customers Touted In The Investor Presentation Were Inactive .............. 40

           6.     The Quality And Benefits Of XL's Technology Were Overstated And That Technology Did Not Provide The MPG Savings Or ROI To XL's Customers That XL Represented ............................................................ 42

           7.     XL's Revenue Projections Were Materially Misleading And Lacked A Reasonable Basis ................................................................................... 45

      E.     Defendants Aggressively Promoted The Proposed Merger Following Its Announcement ................................................................................................... 46

F.      Completion Of The Merger Between Pivotal And XL Hybrids ........................... 54

G.      Following the Merger, Defendants Continued To Make Misleading Positive Statements About XL's Business ................................................................................ 55

H.      The Truth Emerges ........................................................................................... 58

VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ...................................................................................................... 65

A.      Defendants' False And Misleading Statements Made On September 18, 2020 ... 65

B.      Defendants' False And Misleading Statements Made On September 21, 2020 ... 72

C.      Defendants' False And Misleading Statements Made In The October 2, 2020 Registration Statement ............................................................................................ 73

D.      Defendants' False And Misleading Statements Made In The October 26, 2020 Press Release And Form 8-K ................................................................................... 83

E.      Defendants' False And Misleading Statements Made In The October 26, 2020 SPACInsider Webinar And October 28, 2020 Form 8-K .................................... 84

F.      Defendants' False And Misleading Statements Made In The November 12, 2020 Press Release And SEC Filing ................................................................................. 86

G.      Defendants' False And Misleading Statements Made In The November 12, 2020 Amendment To The Registration Statement ........................................................ 86

H.      Defendants' False And Misleading Statements Made In The November 16, 2020 Press Release And Form 8-K ................................................................................... 91

I.      Defendants' False And Misleading Statements Made In The November 16, 2020 IPO Edge Webinar And November 19, 2020 Form 8-K ..................................... 92

J.      Defendants' False And Misleading Statements Made In Hynes' November 23, 2020 Interview With TD Ameritrade And The November 27, 2020 Form 8-K ... 92

K.      Defendants' False And Misleading Statements Made In The December 1, 2020 Amendment To The Registration Statement And The December 8, 2020 Proxy/Prospectus .................................................................................................... 93

L.      Defendants' False And Misleading Statements Made In The December 11, 2020 Press Release And Form 8-K ................................................................................... 94

M.      Defendants' False And Misleading Statements Made In The December 22, 2020 Press Release ........................................................................................................... 94

N.    Defendants' False And Misleading Statements Made In Hynes' December 23, 2020 CNBC Interview .......................................................................... 95

O.    Defendants' False And Misleading Statements Made in The January 13, 2021 Registration Statement And January 22, 2021 Prospectus ................................... 96

P.    Defendants' False And Misleading Statements Made In The March 8, 2021 Press Release .......................................................................................................... 98

VII.   ADDITIONAL SCIENTER ALLEGATIONS ................................................................ 99

A.    The XL Individual Defendants' Job Roles And Activities Support A Strong Inference Of Scienter ...................................................................................... 100

B.    Pivotal's Due Diligence Supports A Strong Inference Of Scienter As To The Pivotal Individual Defendants ........................................................................... 101

C.    The Individual Defendants Held Themselves Out As Knowledgeable .............. 104

D.    Motive And Opportunity ................................................................................... 106

        1.    Defendants Ledecky, Griffin, and Brady ................................................. 106

        2.    Defendants Kazarinoff And Hynes ......................................................... 113

E.    Core Operations ............................................................................................... 120

F.    Executive Departure Following The Muddy Waters Report ............................. 121

G.    Defendants' Deceptive Pattern Of Disclosures Concerning Supply Issues Support A Strong Inference Of Scienter ........................................................................... 121

H.    Corporate Scienter ........................................................................................... 124

VIII.  LOSS CAUSATION ..................................................................................................... 126

A.    Investors Suffered Significant Losses Due To The Materially Misleading Statements Issued During the Class Period ....................................................... 126

B.    Pivotal Shareholders Suffered Damages .......................................................... 127

        1.    Pivotal Shareholders Would Have Rejected The Business Combination And/Or Exercised Conversion Rights .................................................... 127

        2.    Pivotal's Failure To Consummate A Qualifying Business Transaction And Failure To Properly Distribute The IPO Proceeds From The Trust Account ................................................................................................... 128

IX.    CLASS ACTION ALLEGATIONS .............................................................................. 129

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ................................................................................................. 132

XI.   NO SAFE HARBOR ................................................................................................. 134

XII.  CAUSES OF ACTION ............................................................................................. 135

XIII. PRAYER FOR RELIEF ............................................................................................ 142

XIV.  JURY TRIAL DEMANDED ..................................................................................... 143

Lead Plaintiff Delton Rowe and additional plaintiffs Jeffrey Suh, Carl Enslin, Simone Heridis and Soraya Matamoros (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon their personal knowledge.  Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by XL Fleet Corp., ("XL Fleet," "XL," or the "Company")[1] with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by XL Fleet; and (c) review of other publicly available information concerning XL Fleet.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a federal securities class action brought on behalf of persons and entities that purchased or otherwise acquired XL Fleet securities[2] between September 18, 2020 and March 31, 2021, inclusive (the "Class Period"), excluding Defendants, seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    XL Fleet was formerly known as Pivotal Investment Corporation II ("Pivotal") a special-purpose acquisition company ("SPAC"), which was incorporated on March 20, 2019 for

---

[1] The terms "XL Fleet" or "Company" are used herein to refer specifically to XL Fleet Corp. The term "XL" is used herein to refer interchangeably to XL Fleet or XL Hybrids, Inc. ("XL Hybrids").  XL Hybrids is currently a subsidiary of XL Fleet and, prior to December 21, 2020, XL Hybrids was the parent company of the business now owned and operated by XL Fleet.

[2] As used herein, the term "XL Fleet securities" includes all outstanding securities (including units, common stock, warrants, convertible promissory notes, and options) of XL Fleet and its predecessor Pivotal.

the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or entities.

3.      SPACs are publicly traded companies with no business activities, formed specifically to acquire an existing operating company.  SPACs typically raise capital for the acquisition through an initial public offering ("IPO"), and that capital is held in trust for a specific period of time, often 18 to 24 months.  If a merger or acquisition is successfully made within the allocated time frame, founders and managers of the SPAC can profit through their ownership of the SPAC's securities.  However, if an acquisition is not completed within that time frame, then the SPAC is dissolved and the money held in trust is returned to investors, with no compensation paid to the founders and managers of the SPAC.  Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the benefits of that transaction for the public shareholders of the SPAC are dubious.

4.      Amidst a recent boom in SPAC IPOs and acquisitions, SEC officials have noted widespread concerns including "risks from fees, conflicts, and sponsor compensation, . . .  and the potential for retail participation drawn by baseless hype."[3]  Similarly, SEC Chairman Gary Gensler recently testified to Congress, "the surge of SPACs raises a number of policy questions. First and foremost, are SPAC investors being appropriately protected? Are retail investors getting the appropriate and accurate information they need . . . ?"[4]  As detailed below, the facts of this case exemplify the conflicts of interest faced by SPAC managers, as Defendants were

---

[3] John Coates, Acting Director, SEC Division of Corporation Finance, Apr. 8, 2021, SPACs, IPOs and Liability Risk under the Securities Laws, *available at* https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws.

[4] Gary Gensler, May 26, 2021, Testimony Before the Subcommittee on Financial Services and General Government, U.S. House Appropriations Committee, *available at* https://www.sec.gov/news/testimony/gensler-2021-05-26.

incentivized to, and did, persuade Pivotal's public shareholders to consummate a business combination with XL that was not in their best interests.

5.      On July 16, 2019, Pivotal completed its IPO of 23,000,000 units ("Units").  Each Unit consisted of one share of Class A common stock, and one-third of one redeemable warrant, with each whole warrant entitling the holder to purchase one share of Class A Common Stock at a price of $11.50 per share.  The Units were sold at an offering price of $10.00 per Unit, generating gross proceeds of $230,000,000 that were placed into a trust account.  Simultaneously with the consummation of the IPO, Pivotal consummated the private placement of 4,233,333 warrants ("Private Warrants") at a price of $1.50 per Private Warrant, generating total proceeds of $6,350,000.  The Private Warrants were purchased by Pivotal Investment Holdings II LLC ("Pivotal Investment" or the "Sponsor"), which was Pivotal's sponsor and an affiliate of certain of Pivotal's officers and directors.  Pivotal's units, Class A common stock and warrants were listed on the New York Stock Exchange (the "NYSE") under the symbols PIC.U, PIC and PIC WS, respectively.

6.      While Pivotal had considerable discretion in identifying and consummating a business combination, there were three general limitations identified in Pivotal's Registration Statement filed on June 7, 2019.

- First, as required by NYSE rules, Pivotal had to complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account at the time of its signing a definitive agreement in connection with its initial business combination.

- Second, Pivotal only had eighteen months to complete a business combination from the closing date of the IPO.  If Pivotal did not complete a business

combination in time (*i.e.*, by January 16, 2021), its corporate existence would cease, except for purposes of winding up its affairs and liquidating.  As such, Pivotal was required to hold the approximately $230 million of proceeds from its IPO in a trust account, and these funds were to be released only upon the consummation of a business combination or liquidation.

- Third, if Pivotal's stockholders approved an amendment to the amended and restated certificate of incorporation that would affect the substance or timing of Pivotal's obligation to redeem 100% of the public shares if Pivotal did not complete a business combination on time, Pivotal was required to provide the holders of its public shares with the opportunity to redeem all or a portion of their public shares upon approval of any such amendment.

7.     Prior to the IPO, Pivotal's Sponsor owned 95.7% of the initial shares of Pivotal. The Sponsor's members were (1) Ironbound Partners Fund, LLC, an affiliate of Defendant Jonathan J. Ledecky, Pivotal's Chief Executive Officer and Chairman of its board of directors, and (2) Pivotal Spac Funding II LLC, an entity that is affiliated with and controlled by Defendant Kevin Griffin, a Pivotal director.  In addition, Defendant James H.R. Brady, Pivotal's Chief Financial Officer, owned 1.7% of Pivotal's initial shares, and Pivotal directors Sarah Sclarsic, Efrat Epstein, and Katrina Adams each owned less than 1% of Pivotal's initial shares. Collectively, the individuals and entities identified in this paragraph are referred to as the "Pivotal Initial Stockholders."

8.     The Pivotal Initial Stockholders held themselves out to investors as highly experienced businesspeople who had worked in finance and strategy, with successful track records in acquiring and growing businesses.

9.     The Pivotal Initial Stockholders acquired a significant interest in Pivotal prior to the IPO.  Pivotal Initial Stockholders issued themselves 5,750,000 shares of Class B common stock for an aggregate price of $25,000.00, and the Sponsor purchased 4,233,333 Private Warrants, each exercisable to purchase one share of Class A common stock at $11.50 per share, simultaneously with the IPO for an aggregate price of approximately $6.35 million (or $1.50 per warrant).   The Pivotal Initial Stockholders agreed to waive their right to participate in a liquidation distribution with respect to their initial shares if Pivotal did not complete a business combination by the deadline.   Thus, if Pivotal did not meet its deadline, the Pivotal Initial Stockholders' shares and warrants would be rendered worthless.

10.     Following Pivotal's IPO, Pivotal's Initial Stockholders owned or controlled 20% of Pivotal's common stock, with the Sponsor owning or controlling approximately 19% of Pivotal's common stock, and Defendant Brady and the Pivotal directors, excluding Defendants Ledecky and Griffin, collectively owning or controlling approximately 1% of Pivotal common stock.

11.     On September 18, 2020, with time running out to complete a business combination before Pivotal's January 16, 2021 deadline, Pivotal issued a press release announcing that it had entered into a Merger Agreement (the "Merger Agreement") with XL Hybrids, Inc. (commercially known as XL Fleet), a provider of fleet electrification solutions for Class 2-6 commercial vehicles in North America.   In the press release announcing the Merger Agreement, Pivotal stated that "XL has strong demand momentum with a *$220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021*."[5]   Defendant Ledecky further stated in the press release that "XL's revenues are expected

---

[5] Unless otherwise noted all emphasis used in this Complaint is added.

to more than triple in 2021, cementing its status as the leading provider of vehicle electrification solutions for commercial and municipal fleet vehicles."

12.    The Merger Agreement provided that the parties would enter into a multi-step business combination (the "Business Combination"), which would involve the following steps:

- First, PIC II Merger Sub Corp., a wholly-owned subsidiary of Pivotal and created for the purpose of facilitating the merger, would merge with and into XL Hybrids, with XL Hybrids surviving the merger (the "Merger");

- Second, XL Hybrids would become a wholly-owned subsidiary of Pivotal, with the securityholders of XL Hybrids becoming securityholders of Pivotal;

- Third, an aggregate of 100,000,000 shares of Pivotal stock were issued or reserved for issuance to XL Hybrids' securityholders.

13.    The September 18, 2020 press release stated that "[t]he Pivotal and XL Boards of Directors have unanimously approved the proposed merger and the related transactions, which are expected to be completed in the fourth quarter of 2020, subject to, among other things, the approval by Pivotal's and XL's stockholders of the proposed merger and satisfaction or waiver of other customary closing conditions."

14.    In soliciting the requisite shareholder approval for the proposed transaction, Pivotal and its board of directors aggressively touted XL Hybrids' market opportunity and growth profile, proven technology, supply chain production capacity, strong position in its industry, compelling valuation, and scalable revenue model.  Investors were told that XL Hybrids had a "Low Risk Path to Dramatic Growth" that could be achieved by "[s]elling existing products to existing customers through existing channels."  Pivotal claimed that XL Hybrids had more than 200 customers, that its average order size had grown from 350 units in 2019 to 1,100

units in 2020, that XL had $220 million in its sales pipeline for 2021, and that it expected a 300% increase in revenue growth over 2020. Further, Pivotal and its board emphasized XL Hybrids' strong, experienced management team, including the extensive, industry-specific background of Defendant Dimitri Kazarinoff, XL Hybrids' Chief Executive Officer, and Defendant Thomas J. Hynes III, its founder and Chief Strategy Officer. Pivotal also touted XL Hybrids' unique and highly scalable production model and differentiated product portfolio, claiming that it had garnered it world-class partnerships and awards and was "positioned to leverage the production, supply chain and customer base we have in place today." Pivotal claimed that with the funding available if the Business Combination was approved, XL Hybrids could achieve greater than $1.3 billion in revenue by 2024.

15.     Pivotal and its board of directors further boasted to investors of their own professional and educational backgrounds. For example, Pivotal stated that Defendant Ledecky had an MBA from Harvard Business School, had executed hundreds of acquisitions across multiple industries, had raised over $20 billion in debt and equity, and that he would serve as a director of XL Fleet until 2023. Pivotal stated that Defendant Griffin had received a BSBA in Finance from Georgetown, had originated and invested more than $4 billion across the capital structure in middle market businesses, and that he would serve as a director until 2022. Pivotal and its board described to investors the extensive efforts they put into due diligence and negotiations with XL Hybrids which had started on July 24, 2020 and continued through at least September 17, 2020 when the Merger Agreement was signed.

16.     Only holders of record of Pivotal's common stock at the close of business on the December 7, 2020 record date were entitled to vote on the Business Combination at the December 21, 2021 annual meeting of Pivotal stockholders. As of the record date, Pivotal's

Initial Stockholders owned or controlled Pivotal common stock and warrants with an aggregate market value of approximately $109.5 million, which would be rendered worthless if the Business Combination was not approved.

17.     As described herein, certain Defendants solicited votes from stockholders necessary to complete the Business Combination by means of: (1) Pivotal's October 2, 2020 Registration Statement, which was declared effective on December 8, 2020; (2) the December 8, 2020 definitive proxy statement and prospectus ("December 8, 2020 Proxy/Prospectus"); and (3) other public statements that touted XL Hybrids' financial performance and operations, the extensive due diligence Pivotal purportedly conducted on XL Hybrids, and XL Hybrids' prospects for rapid growth.  While the October 2, 2020 Registration Statement and December 8, 2020 Proxy/Prospectus recited potential risks that could arise in connection with the merger with XL Hybrids, it provided no reasons to suspect that Pivotal had failed to reasonably investigate such risks (or any indication that any of these potential risks had already substantially materialized).   In short, Pivotal's shareholders had no reason to doubt the Defendants' characterization of XL Hybrids as a valuable business with strong future potential and a "Low Risk Path to Dramatic Growth."

18.     On or about December 22, 2020, the Company issued a press release announcing that the merger of XL Hybrids and Pivotal closed, resulting in the formation of XL Fleet, listed on the NYSE under the symbol "XL."  The press release stated in relevant part:

> "Today is a significant milestone for XL Fleet and our employees and an important step forward for the commercial vehicle industry as we transform commercial fleets to build a more sustainable world," said Dimitri Kazarinoff, XL Fleet's Chief Executive Officer. "The closing of our merger with Pivotal will empower us to accelerate our growth strategy and bolster the industry's most comprehensive fully integrated fleet electrification platform, encompassing real-time data monitoring and analytics, propriety powertrain technology, power management, charging and storage. ***Our tested products, strong presence in the***

*U.S. and Canada, firmly-established supply chain, and deep OEM relationships position XL Fleet as the partner-of-choice for our blue-chip customer base who recognize us as a key partner in helping them to meet their sustainability goals efficiently and at a lower cost*."

\*\*\*

"We appreciate the overwhelming support received from shareholders of Pivotal, including 99.88% votes cast in favor of the merger between Pivotal and XL Fleet," said Mr. Ledecky. "We are exceptionally proud of XL Fleet's success to date and are excited to continue to support the Company and its talented team as it transitions to the public markets. *With thousands of proven systems on the road today, millions of miles driven by hundreds of customers in mission-critical applications, and an asset light, highly scalable business model, I believe that XL Fleet is poised to realize its vision of becoming a world leader in fleet electrification*."

19.     After the Business Combination, Defendants continued to present an optimistic picture about XL Fleet's business, operations, and prospects.

20.     For example, on January 13, 2021, the Company filed a Registration Statement and preliminary Prospectus on Form S-1 with the SEC completing its remaining registration obligations arising from the Business Combination with Pivotal.[6]   On January 22, 2021, the January 13, 2021 Registration Statement became effective and XL Fleet filed a related Prospectus.  Both the January 13, 2021 Registration Statement and January 22, 2021 Prospectus continued to tout XL Fleet's technology, sales pipeline, customer base, scalable production, supply chain capacity, and revenue growth, as indicators of future performance, as did Defendants' other public statements made after the closing of the Business Combination.

21.     The truth began to come to light on March 3, 2021, when Muddy Waters Research ("Muddy Waters") published a report (the "Muddy Waters Report") entitled "XL Fleet Corp. (NYSE: XL): More SPAC Trash," alleging, among other things, that XL's salespeople

---

[6] The January 13, 2021 Registration Statement did not register the issuance of any new shares of common stock except for those shares of common stock issuable upon exercise of warrants that have previously been issued.

"were pressured to inflate their sales pipelines materially in order to mislead XL's board and investors" and that "customer reorder rates are in reality quite low" due to "poor performance and regulatory issues."[7]   Citing interviews with former employees, the report alleged that "at least 18 of 33 customers XL featured were inactive."   Muddy Waters revealed that XL lost its California Air Resources Board ("CARB") approval in 2019 and failed to regain approval in 2020, and was unlikely to be approved in 2021, and thus XL could not sell in California.  Muddy Waters also claimed that XL had "weak technology" and that "XL's announcement of future class 7-8 upfits seems highly promotional" because the task is "too technologically complex for XL engineers to deliver on the promised timeline."  On March 4, 2021, XL Fleet issued a press release which claimed that the Muddy Waters Report "contains numerous factual inaccuracies, misleading statements, and flawed conclusions" and stated that "[t]he Company intends to respond in due course."

22.    On news of the Muddy Waters Report, XL's share price fell $2.09, or 13%, to close at $13.86 per share on March 3, 2021, on unusually heavy trading volume.  The share price continued to decline by $2.69, or 19.4%, over two consecutive trading sessions to close at $11.17 per share on March 5, 2021, on unusually heavy trading volume.

23.    Then on March 8, 2021, XL issued another press release[8] reiterating its prior response to the Muddy Waters Report. This press release generally promoted XL's business and vaguely cast aspersions on the Muddy Waters report, while entirely failing to respond to many of Muddy Waters' core allegations. For example, XL's March 8, 2021 press release failed to deny that former employees had been instructed to inflate sales pipeline numbers.

---

[7] A copy of the Muddy Waters Report is attached to this Complaint as Exhibit 5 and incorporated by reference herein.

[8] A copy of XL's March 8, 2021 press release is attached to this Complaint as Exhibit 6 and incorporated by reference herein.

24.     XL's partial denials did not assuage market concerns.  The Company's share price fell $0.69, or 6.2%, to close at $10.48 per share on March 8, 2021, on unusually heavy trading volume.

25.     On March 31, 2021, XL held an earnings call to discuss its full year and Q4 2020 financial results. Defendant Kazarinoff claimed that as a result of the COVID-19 pandemic, which had been ongoing for more than a year at that point, "[m]any municipal departments, corporate clients and prospects who had planned fleet orders in 2020, particularly late in the year, postponed these potential orders due to major budget shortfalls. Together, this has impacted orders for shipment in the first and second quarters of this year."  In addition, Kazarinoff stated, "multiple production shutdowns during the pandemic, and the recent microchip and other shortages that caused major OEMs to shut-off fleet orders, creat[ed] a lengthy period early in the year without any new vehicle orders possible …. [I]t is possible that the impacts of these issues remain in place for a significant period of time."

26.     Defendant Kazarinoff also announced that XL only expected Q1 2021 revenues of approximately $1 million (substantially below analysts' consensus expectations of $7.9 million) and that the Company would no longer be providing guidance for the full year 2021, after previously having forecasted $75 million revenue for 2021.  Specifically, Defendant Kazarinoff stated:

> [W]e are currently forecasting first quarter 2021 revenue to be roughly $1 million or roughly flat as compared to the first quarter of last year, driven by the ongoing OEM delays, amid microchip and other shortages.  Given this ongoing uncertainty and the potential for extended industry-wide issues, combined with typical seasonal patterns in our orders and a significant majority of revenues focused on the second half, we are not currently providing formal full year 2021 financial guidance.

27.     On this news, XL's share price fell $1.09, or 12.1%, to close at $7.89 per share on April 1, 2021, on unusually heavy trading volume.

28.     The market interpreted the disappointing 2020 results and the withdrawal of XL Fleet's 2021 guidance as effectively a confirmation of the allegations of the Muddy Waters Report.  For example, On April 8, 2021, Mad Money host Jim Cramer was asked by a caller how he "feel[s] about the Company XL Fleet."  Cramer responded, "they came on here,[9] they told a decent story, but right after a guy [who] does a lot of good work, Carson Block,[10] said that this thing was not a good stock and that you should sell and then they proceeded to not do well.  And so I have to tell you when a short seller says things are going to happen and then the things happen, well it makes me say let's stay away."

29.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (a) XL had materially manipulated and overstated its pipeline figures, (b) XL had been experiencing supply chain problems that impeded its ability to timely fill existing orders, (c) a large number of the customers touted by XL were inactive and no longer ordering XL products, (d) the quality and benefits of XL's technology were overstated and that technology did not provide the miles-per-gallon ("MPG") savings to customers that XL represented, and (e) as a result of these omissions, Defendants' rosy assessment of XL's prospects and projections of future revenue were wildly overstated.

---

[9] On March 2, 2021, Defendant Hynes appeared on Cramer's show to discuss the Company.

[10] Carson Block is the founder of Muddy Waters and a well-known investor and short-seller.

30.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

31.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

32.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

33.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

34.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

35.     Lead Plaintiff Delton Rowe, as set forth in the previously filed certification (Dkt. No. 22-2), incorporated by reference herein, purchased XL Fleet securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

36.     Plaintiff Jeffrey Suh, as set forth in the previously filed certification (Dkt. No. 1), incorporated by reference herein, purchased XL Fleet securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

37.     Plaintiff Carl Enslin, as set forth in the attached certification (Exhibit 1), purchased XL Fleet securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

38.     Plaintiff Simone Heridis, as set forth in the attached certification (Exhibit 2), purchased XL Fleet securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

39.     Plaintiff Soraya Matamoros, as set forth in the attached certification (Exhibit 3), purchased XL Fleet securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

40.     Defendant XL Fleet provides vehicle electrification solutions for commercial and municipal fleets in North America.  It offers hybrid and plug-in hybrid electric drive solutions. The Company was previously known as Pivotal Investment Corporation II and XL Hybrids.  It is incorporated under the laws of Delaware with its principal executive offices located in Boston, Massachusetts.  Pivotal's units, warrants and Class A common stock were previously traded on the New York Stock Exchange ("NYSE") under the symbols "PIC.U", "PIC WS" and "PIC", respectively.  Pivotal's units commenced public trading on July 12, 2019, and the warrants and

Class A common stock commenced separate trading on September 6, 2019.  Following the

Business Combination on December 21, 2020, Pivotal's name changed to XL Fleet Corp. (XL

Fleet was XL Hybrids' commercial name), and its common stock and warrants, began trading on

the NYSE under the symbols "XL" and "XL WS".

41.     Defendant Jonathan J. Ledecky ("Ledecky") was the Chairman and CEO of

Pivotal since its inception in March 2019.  Ledecky remained a director of XL Fleet after the

Business Combination.   Ledecky participated in the Merger negotiations and due diligence,

signed or authorized the signing of the September 18, 2020 Form 8-K and the attached exhibits,

including the September 18, 2020 press release and the September 18, 2020 Investor

Presentation,[11] the October 2, 2020 Registration Statement and the November 12, 2020 and

December 1, 2020 amendments thereto, and the related December 8, 2020 Proxy/Prospectus, the

January 13, 2021 Registration Statement and the related January 22, 2021 Prospectus, numerous

Form 8-K's filed during the Class Period, and spoke about the Company at investor conferences.

Ledecky is a seasoned businessman with over 35 years of investment and operational experience

and has served as chairman of Ironbound Partners, a private investment management fund, since

March 1999.  Ledecky served as Chairman and CEO of Pivotal Acquisition Corp. ("Pivotal I"), a

blank check company similar to Pivotal, from its inception in August 2018 until it consummated

its initial business combination with KLDiscovery in December 2019.  Ledecky has continued to

serve the board of directors of the combined company since that time.  Ledecky also served as a

member of the board of directors of Propel Media, Inc. from January 2015 to January 2019 and

has executed hundreds of acquisitions across multiple industries and raised over $20 billion in

debt and equity.   Ledecky also served as a director or executive for numerous blank check

---

[11] A copy of XL's September 18, 2020 investor presentation is attached to this Complaint as
Exhibit 4 and incorporated by reference herein.

companies, including Newtown Lane Holdings, Inc., Endeavor Acquisition Corp., Victory Acquisition Corp., Triplecrown Acquisition Corp., Grand Slam Acquisition Corp., Performance Acquisition Corp. and Endeavour International Acquisition Corp.  Ledecky founded U.S. Office Products in October 1994 and served as its CEO until November 1997 and as its Chairman until its sale in June 1998.  From 1999 to 2001, Ledecky was vice chairman of Lincoln Holdings, owners of the Washington sports franchises in the NBA, NHL and WNBA.  In addition to the foregoing, Ledecky served as chairman of the board and chief executive officer of Consolidation Capital Corporation from February 1997 until March 2000.  He has been a co-owner of the National Hockey League's New York Islanders franchise since 2014 and a was prior owner of the Washington Wizards and the Washington Capitals.  Ledecky received a B.A. (cum laude) from Harvard University in 1979 and a MBA from the Harvard Business School in 1983.

42.     Defendant James H.R. Brady ("Brady") has served as Pivotal's Chief Financial Officer ("CFO") since September 2018.  Brady participated in Merger negotiations, signed the Merger Agreement, signed or authorized the signing or filing of the September 18, 2020 Form 8-K and the attached exhibits, including the September 18, 2020 press release and the September 18, 2020 Investor Presentation, the October 2, 2020 Registration Statement and the November 12, 2020 and December 1, 2020 amendments thereto, and the related December 8, 2020 Proxy/Prospectus.  Since 2014, Brady was the CEO of Brady Enterprises, which provides financial, legal and strategic services to growth companies.  Since 2017, he served as CFO of Airside Mobile, a technology company.  From 2014 to 2017, Brady was Vice President for VSL Pharmaceuticals.  From 2013 to 2014, Brady was the CFO and General Counsel of Sweetgreen, from 2011 to 2013, Brady was Executive Vice President – Finance and Legal for Audax Health Solutions, and from 2009 to 2011, he was Executive Counsel of ODIN Technologies.  Brady

previously served as a corporate and securities attorney with the firms of Hogan & Hartson and Hunton & Williams. Brady received a BA from the College of William and Mary, a JD from the George Washington National Law Center and an MBA from Darden Graduate School of Business at the University of Virginia.

43.     Defendant Kevin Griffin ("Griffin") was, at all relevant times, CEO of Pivotal Spac Funding II LLC, a member of Pivotal's sponsor, Pivotal Investment Holdings II LLC. Griffin was, all relevant times, a director of Pivotal and later XL Fleet after the Business Combination.  Griffin participated in the Merger negotiations and due diligence, signed or authorized the signing or public filing of the September 18, 2020 Form 8-K and the attached exhibits, including the September 18, 2020 press release and the September 18, 2020 Investor Presentation, the October 2, 2020 Registration Statement and the November 12, 2020 and December 1, 2020 amendments thereto, and the related December 8, 2020 Proxy/Prospectus, and the January 13, 2021 Registration Statement and the related January 22, 2021 Prospectus. Griffin is the co-founder, CEO and Chief Investment Officer of MGG Investment Group, LP ("MGG"), a private investment firm managing long-term committed capital on behalf of leading endowment, foundation, pension, insurance and high net worth investors globally.  Griffin has originated and invested over $4 billion across the capital structure of middle market businesses and has served on numerous boards of directors.  Prior to launching MGG, Griffin was a Managing Director with Highbridge Principal Strategies from January 2010 to June 2014, and was the Head of Private Investing for Octavian Funds from 2007 to 2009.  From 2003 to 2007, Griffin was part of Fortress Investment Group and prior to Fortress, Griffin was an investor with American Capital.  Griffin began his career with Houlihan Lokey Howard & Zukin's Investment Banking Division.  In May 2015, the M&A Advisor named Griffin a winner of its 40 Under 40

Emerging Leaders Award.  The Hedge Fund Journal, in association with Ernst & Young, in December 2016 named Griffin one of 50 "Tomorrow's Titans".  Griffin received a B.S.B.A. in Finance from Georgetown University.

44.     Ledecky, Brady, and Griffin are referred to herein, collectively, as the "Pivotal Individual Defendants."

45.     Defendant Thomas J. Hynes III ("Hynes") is the founder of XL Hybrids.  He served as Chief Strategy Officer of XL Hybrids from October 2019 until the Merger when he became the President and a director of XL Fleet.  Hynes previously served as CEO of XL Hybrids from July 2009 through October 2019.  Hynes served on the board of directors of Woodwell Climate Research Center, a non-profit organization committed to conducting climate change research, since June 2018.  Hynes has also been a Senior Lecturer at M.I.T. since 2008, and he received his B.S. in management science from M.I.T.  Hynes participated in the Merger negotiations and due diligence, made public statements about the Company at investor conferences, and signed or authorized the signing or filing of the September 18, 2020 Form 8-K and the attached exhibits, including the September 18, 2020 press release and the September 18, 2020 Investor Presentation, and the January 13, 2021 Registration Statement and related January 22, 2021 Prospectus.

46.     Defendant Dimitri Kazarinoff ("Kazarinoff") was the CEO of XL Hybrids and became CEO and director of XL Fleet following the Merger.   Prior to his service with XL Fleet, from September 2011 through July 2019, he served as President of AVL Powertrain Engineering, Inc. and from January 2008 through April 2011, he served as the V.P. & GM of Eaton's Hybrid Power Systems Division.  Kazarinoff holds a B.S. M.E. from the M.I.T. and a Masters of Management degree from the Kellogg Graduate School of Northwestern University.

Kazarinoff participated in the Merger negotiations and due diligence, signed the Merger Agreement, made public statements about the Company at investor conferences, and signed or authorized the signing or filing of the September 18, 2020 Form 8-K and the attached exhibits, including the September 18, 2020 press release and the September 18, 2020 Investor Presentation, and the January 13, 2021 Registration Statement and the related January 22, 2021 Prospectus.

47. Defendant Brian Piern ("Piern") was XL's Vice President of Sales and Marketing from January 2019 through May 2021. During his time at XL, Piern initially reported to Hynes and later reported to Kazarinoff. Prior to Piern's employment at XL, he served as Senior Vice President of Sales at Element Fleet Management from September 2015 to December 2018. Piern previously held the same position at GE Capital, leading the development and execution of multimillion-dollar sales strategies. Piern also served in senior roles at Schneider National, Lockheed Martin, and Citicorp. Piern has a BS in Marketing from Towson University and an MBA with a concentration in Marketing from the University of Phoenix.

48. Hynes, Kazarinoff and Piern are referred to herein, collectively, as the "XL Individual Defendants."

49. The Pivotal Individual Defendants and XL Individual Defendants (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of

their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

50.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## IV.     RELEVANT NON-PARTIES

51.     Former Employee 1 ("FE1")[12] was the XL Regional Sales Manager of Central region from May 2019 until June 2020.  FE1 reported to Piern.  During the time that FE1 worked at XL, Piern initially reported to Hynes and later to Kazarinoff.

52.     Former Employee 2 ("FE2") was XL's Channel Partner Manager for fleet management companies from June 2020 until February 2021.  FE2 was the first person to hold this position at XL and reported to Piern.  During the time FE2 worked at XL, Piern reported to Kazarinoff.   Fleet  management  companies  ("FMCs")  help  companies  manage  commercial vehicle fleets for various companies, such as Amazon.  FE2 described FMCs as a "cottage industry"  with  a  small  group  of  key  players,  which  handle  maintenance,  routing  and  even housing the fleet in a warehouse.  FE2 had contacts in the FMC industry through FE2's previous work  experience,  and  was  tasked  with  identifying  potential  XL  customers  and  using  FE2's contacts to pitch XL products to those end-user customers.

53.     Former Employee 3 ("FE3") was an XL Regional Sales Manager from November 2018 until June 2020.  FE3 had had weekly one-on-one meetings with Piern.  FE3 confirmed that

---

[12] The pronouns "she" and "her" will be used to refer to former employees regardless of their actual gender in order to conceal their identities.

FE3 is the Former Employee A referenced in the Muddy Waters Report, and that statements attributed to FE3 as Former Employee A in the Muddy Waters Report are correct and accurate.

54.     Former Employee 4 ("FE4") was an XL Regional Sales Manager from July 2019 until March 2020. She reported to Piern. FE4 was initially a Regional Sales Manager for the East Coast but later her region changed to Southeast.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Special Purpose Acquisition Companies

55.     A "blank check company" is a company that has no specific established business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company, entity or person. One type of blank check company is a special purpose acquisition company, or SPAC. A SPAC is a publicly-traded company created specifically to pool funds through an initial public offering for the purpose of completing an acquisition or other business combination with an existing company.

56.     In order to create a SPAC, founders must invest the initial capital to recruit an investment bank to structure capital raising terms, prepare and file initial public offering documentation, and pre-market the investment offering to interested investors. A target company cannot be identified before the SPAC initial public offering is completed. Once capital is raised through the initial public offering, the proceeds must be deposited into a trust account. An appointed management team (typically the SPAC's founders) then has a specified time period, typically between 18 and 24 months, in which to identify an appropriate target to complete the merger or acquisition.

57.     Typically, common stockholders of the SPAC are granted voting rights to approve or reject the business combination proposed by the management team. Thus, when the

management team identifies a target, a merger proxy statement must be distributed to all SPAC stockholders, which includes the target company's complete audited financials and the terms of the proposed business combination. To this end, stockholders in SPACs depend on management to honestly provide accurate information about any contemplated transactions.

58.     A SPAC shareholder may vote for or against a proposed business combination. A SPAC shareholder may decide to retain ownership of his or her SPAC shares, may request that the SPAC redeem their shares for his or her proportionate interest in the SPAC's trust funds, or may sell his or her shares on the open market.

59.     If a merger or acquisition is successfully made within the allocated time frame, shareholders and management of the SPAC can profit through their ownership of the common stock and any related securities (it is common for SPAC initial public offerings to include "units" consisting of both stock and out-of-the-money warrants). However, if an acquisition is not completed within the time period specified when the SPAC is organized, then the SPAC is automatically dissolved and the money held in trust is returned back to investors. No salaries, finder's fees or other cash compensation are paid to the founders and/or management team if they fail to consummate a successful business combination.

60.     Accordingly, the founders and management team of a SPAC, who typically own approximately 20% of the company through founders' shares and invest significant resources in the formation of the company and identifying acquisition targets, are highly incentivized to complete a qualifying transaction approved within the operating deadline.

61.     Indeed, numerous commentators have noted the conflict of interest between SPAC management and shareholders with respect to the completion of a business combination. For example, in a paper forthcoming in the Yale Journal on Regulation, law professors at

Stanford and New York University address "misaligned incentives inherent in the SPAC structure," including that "the sponsor has an incentive to enter into a losing deal for SPAC investors if its alternative is to liquidate."[13]   Based on empirical research of post-merger returns to SPAC shareholders, that paper goes on to conclude that "SPAC sponsors have proposed losing propositions to their shareholders, which is one of the concerns raised by the incentives built into the SPAC structure. . . . [S]ponsors do quite well, even where SPAC shareholders have experienced substantial losses."

62.     As set forth herein, Pivotal and XL exemplify the inherent conflicts with SPACs. The Defendants here were incentivized to, and did, persuade public investors to consummate the Business Combination between Pivotal and XL that was not in investors' best interests, by making material misstatements and omissions about XL Hybrids' business.

**B.     Background Of Pivotal**

63.     Pivotal was a blank check company organized for the purpose of effecting a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization, or other similar business combination with one or more businesses or entities.   Pivotal's Sponsor was Pivotal Investment, whose members are Ironbound Partners, an affiliate of Ledecky, and Pivotal Spac Funding II LLC, an affiliate of Griffin.

64.     Pivotal was led by its Chairman and CEO, Ledecky, a seasoned businessman with over 35 years of investment and operational experience.   Ledecky had executed hundreds of acquisitions across multiple industries, including through several other blank check companies, and raised over $20 billion in debt and equity.

---

[13] Klausner, Michael D. and Ohlrogge, Michael and Ruan, Emily, A Sober Look at SPACs (Oct. 28, 2020) Yale Journal on Regulation, Forthcoming, *Available at*: https://ssrn.com/abstract=3720919.

65.     Griffin served as a director of Pivotal.  He also served as the CEO of Pivotal Spac Funding II LLC, one of the members of the Sponsor.  He was also the CEO and CIO of MGG Investment Group, LP, a private investment firm managing long-term committed capital on behalf of leading endowment, foundation, pension, insurance and high net worth investors globally.  Over the course of Griffin's career, he originated and invested over $4 billion across the capital structure of middle market businesses and served on numerous boards of directors.

66.     Pivotal was incorporated on March 20, 2019 and on April 25, 2019 it filed a Draft Registration Statement with the SEC.  The Registration Statement for its Class A common stock and warrants was filed with the SEC on Form S-1 on June 7, 2019, and on July 11, 2019, it was declared effective.   On July 15, 2019, Pivotal's final Prospectus (the "July 2019 Prospectus") was filed with the SEC, and on July 16, 2019, Pivotal completed its IPO.

67.     Pivotal stated in its July 2019 Prospectus:

While we may pursue an initial business combination target in any industry or geographic location, we intend to focus our search on companies in North America in industries ripe for disruption from continuously evolving digital technology and the resulting shift in distribution patterns and consumer purchase behavior. Most of these middle market and emerging growth companies will ultimately need to consolidate to achieve the scale necessary to attain high revenue growth and attractive profitability. We believe that acquiring a leading, high-growth participant will provide a public currency to fund consolidation and fuel growth. Segments we might explore include, but are not limited to, logistics technology and "last mile" delivery services, business technology services, on-line cyber   security   and off-line physical   security   services,   media   and entertainment services and franchise businesses.

68.     The July 2019 Prospectus further stated, "[w]hile we may pursue an initial business combination target in any industry or geographic location, we intend to focus our search on companies exploiting disruptive smart phone technology and the resultant rapidly changing distribution patterns and evolving consumer purchase behavior."

69.     Pivotal's July 2019 Prospectus claimed, "we possess several competitive strengths to successfully source, evaluate and execute an initial business combination. We believe that the background, operating history and experience of our management team and special advisors have equipped us not only to provide access to a broad spectrum of investment opportunities, but also to significantly improve upon the operational and financial performance of a target business." It also stated that "[w]e intend to maximize our potential target investments by proactively approaching our extensive network of contacts, including private equity and venture capital sponsors, executives of public and private companies, merger and acquisition advisory firms, investment banks, capital markets desks, lenders and other financial intermediaries. We believe the prior investment experience and track record of our team will give us a competitive advantage when sourcing potential initial business combination opportunities."

70.     As detailed in the July 2019 Prospectus, while Pivotal had considerable discretion in identifying and consummating a business combination, there were three general limitations:

- First, as required by NYSE rules, Pivotal had to complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (net of amounts previously disbursed to management for tax obligations and excluding the amount of deferred underwriting discounts held in trust) at the time of its signing a definitive agreement in connection with its initial business combination. Pivotal stated in its April 25, 2019 Draft Registration Statement that if its board of directors was not able to independently determine the fair market value of the initial business combination, it would obtain an opinion from an independent investment banking

firm, or another valuation or appraisal firm that commonly renders fairness opinions with respect to the satisfaction of such criteria.

- Second, Pivotal had only eighteen months to complete a business combination from the closing date of the IPO.  If Pivotal did not complete a business combination in time (i.e., by January 16, 2021), its corporate existence would cease, except for purposes of winding up its affairs and liquidating.  As such, Pivotal was required to hold the approximately $230 million of proceeds from its IPO in a trust account, which were to be released only upon the consummation of a business combination or liquidation.

- Third, if Pivotal's stockholders approved an amendment to the amended and restated certificate of incorporation that would affect the substance or timing of Pivotal's obligation to redeem 100% of the public shares if Pivotal did not complete a business combination on time, Pivotal was required to provide the holders of its public shares with the opportunity to redeem all or a portion of their public shares upon approval of any such amendment.

C.    **Pivotal Faced Pressure To Complete A Qualifying Business Combination By The January 16, 2021 Deadline**

71.    Due to the Pivotal Individual Defendants' ownership interests in Pivotal and the terms and financial structure of Pivotal as a SPAC, the Pivotal Individual Defendants possessed strong financial incentives to complete a qualifying transaction by the January 16, 2021 deadline. As that deadline grew nearer, the Pivotal Individual Defendants faced increasing pressure to complete a transaction, irrespective of the merits of that transaction for Pivotal's public shareholders.

72.     Pivotal's Sponsor, Pivotal Investment, owned 95.7% of Pivotal's initial shares. The members of Pivotal Investment were Ironbound Partners, an entity affiliated with and controlled by Ledecky, and Pivotal Spac Funding II LLC, an entity affiliated with and controlled by Griffin.  Ledecky and Griffin, therefore, were the ultimate owners of Pivotal's initial shares held by Pivotal Investment.  Brady owned 1.7% of Pivotal's initial shares and the Pivotal Directors, excluding Ledecky and Griffin, each owned less than 1% of Pivotal's initial shares. Following Pivotal's IPO, Pivotal Investment would own approximately 19% of Pivotal's shares, and Brady and the Pivotal Directors, excluding Ledecky and Griffin, would collectively own approximately 1% of Pivotal shares.

73.     If a Business Combination was not consummated by January 16, 2021 (or a later date if approved by Pivotal's stockholders), Pivotal would cease all operations except for the purpose of winding up, redeeming 100% of the outstanding public shares for cash and, subject to the approval of its remaining stockholders and its board of directors, dissolving and liquidating. In such event, the 5,750,000 shares held by the Sponsor and Pivotal's directors and officers, which were acquired for an aggregate purchase price of $25,000 prior to Pivotal's initial public offering, would be worthless because the holders were not entitled to participate in any redemption or distribution with respect to such shares.

74.     In addition, the Sponsor purchased an aggregate of 4,233,333 private warrants from Pivotal for an aggregate purchase price of approximately $6.35 million (or $1.50 per warrant).  These purchases took place via a private placement that occurred simultaneously with the consummation of Pivotal's initial public offering.  According to the December 8, 2020 Proxy/Prospectus, the Pivotal Initial Stockholders' common stock and warrants had an aggregate market value of approximately $109.5 million on the record date of December 7, 2020.  All of

the proceeds Pivotal received from these purchases were placed in the trust account.  The Pivotal Initial Stockholders agreed to waive their right to participate in a liquidation distribution with respect to their initial shares if Pivotal did not complete a business combination the January 16, 2021 deadline.  ***Thus, if Pivotal did not meet its deadline, the shares and warrants held by the Pivotal Initial Stockholders would be rendered worthless***.

75.     As the January 16, 2021 deadline drew closer, the pressure on the Pivotal Individual Defendants to complete a qualifying business combination increased.  Between Pivotal's July 16, 2019 IPO and September 17, 2020 (*i.e.*, the first fourteen months of the eighteen month period), Pivotal identified and met with various potential target businesses to discuss a possible business combination, yet none of these discussions resulted in an executed letter of intent (other than the negotiations with XL Hybrids, described *infra*).[14]  From July 16, 2019 IPO through at least March 30, 2020, Pivotal stated in multiple SEC filings, "*we intend to focus our search on companies exploiting disruptive smart phone technology*."[15]  As such, XL Hybrids did not fit Pivotal's stated profile for a target company, or at least what Pivotal claimed to be its "focus" for the first nine and a half months of the eighteen month period.

76.     Moreover, identifying a merger target, completing negotiations, finalizing merger documentation, and obtaining required shareholder approvals, is an extremely time consuming process that requires at least several months to complete.  For example, discussions between Pivotal and XL Hybrids began in July 2020, but the Business Combination was not completed until December 22, 2020, just weeks before its January 16, 2021 deadline.

---

[14] *See* Pivotal's December 8, 2020 Proxy/Prospectus at 80.

[15] *E.g.*, Pivotal Form S-1 filed June 7, 2019 at 66; Pivotal IPO Prospectus filed July 15, 2019 at 66; Pivotal Form 10-K filed Mar. 30, 2020 at 1.

D.   **Pivotal Announces Its Execution Of A Merger Agreement With XL And Misleadingly Touts XL's Growth Potential, Pipeline, Supply Chain Production Capacity, And Overall Prospects**

77.   The Class Period begins on September 18, 2020, when Pivotal and XL announced in a joint press release that they had entered into a merger agreement, subject to approval by Pivotal's and XL's stockholders (the "Merger Agreement").  According to the press release, the merged entity would have "an anticipated implied enterprise value of approximately $1 billion and no material debt expected to be outstanding."

78.   Additionally, on September 18, 2020, Pivotal filed with the SEC a Form 8-K that contained further information about the proposed merger transaction.  Among other things, the Form 8-K included as attachments a copy of the September 18, 2020 press release, a copy of the Merger Agreement, and an investor presentation (the "Investor Presentation") that contained additional representations about XL's business.  On the same day, Defendants conducted a conference call to discuss the proposed merger and Defendant Hynes appeared on CNBC's Squawk Box to provide further information to investors.

79.   Through these various channels, Defendants aggressively touted XL's growth potential, pipeline, supply chain production capacity, and overall prospects.  For example, the September 18, 2020 press release stated that "XL has strong demand momentum with a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021."  The press release also stated that "[t]housands of XL units [were] already on the road and over 130 million miles [had been] driven by its more than 200 customers, including FedEx, The Coca-Cola Company, PepsiCo, Verizon, the City of Boston, Seattle Fire Department, Yale University, and Harvard University." The Investor Presentation stated that XL Hybrids had a "Low Risk Path to Dramatic Growth" that could be achieved by "[s]elling existing products to existing customers through existing channels."  Defendant Hynes stated on Squawk

Box that "we have the established supply chain production capacity. We have a very low risk and low cost production process compared to other companies the industry." The Investor Presentation also stated that the XL hybrid product could "[i]mprove MPG (~25%)," and that XL plug-in was "capable of driving up to 50% savings in MPG."

80.     As detailed below, these statements and others made by Defendants were materially false and misleading because they failed to disclose, *inter alia*, that (a) XL had materially manipulated and overstated its pipeline figures, (b) XL had been experiencing supply chain problems that impeded its ability to timely fill existing orders, (c) a large number of the customers touted by XL were inactive and no longer ordering XL products, (d) the quality and benefits of XL's technology were overstated and that technology did not provide the miles-per-gallon savings to customers that XL represented, and (e) as a result of these omissions, Defendants' rosy assessment of XL's prospects and projections of future revenue were wildly overstated.

### 1.     Background Of XL Hybrids

81.     XL Hybrids was founded in 2009 by its President and Chief Strategy Officer, Tod Hynes, and is a provider of fleet electrification solutions for Class 2-6 commercial vehicles in North America.[16]  Hynes and XL Hybrids' Chief Executive Officer, Dimitri Kazarinoff, claimed to have decades of leading energy innovation, automotive, and electric vehicle ("EV") experience.  XL Hybrids claimed that since its founding, it had deployed its hybrid and plug-in hybrid electric drive systems, along with its cloud-based on-board telematics solution, on thousands of vehicles across hundreds of fleets throughout the United States and Canada.

---

[16] Class 2-6 vehicles includes vehicles generally classified as light duty (less than 10,000 pounds) and medium duty (between 10,000 pounds and 26,000 pounds) under the gross vehicle weight rating system, such as utility vans, pick-up trucks, mini-bus, box trucks.

82.     XL Hybrids claimed to be a trusted brand for over 200 of the largest commercial and municipal fleets in North America, with more than 3,200 XL systems deployed and over 130 million miles driven by customers as of December 8, 2020.  XL Hybrids claimed that its customer base included FedEx, The Coca-Cola Company, PepsiCo, Verizon, the City of Boston, Seattle Fire Department, Yale University, and Harvard University, among other blue-chip companies, municipalities, and institutions.

83.     A September 18, 2020 press release announcing the Merger Agreement asserted that XL Hybrids had "developed a flexible proprietary electrification powertrain platform that transforms traditional fossil fuel-powered fleet vehicles into hybrid and plug-in hybrid electric vehicles as they are manufactured.  XL systems are available on a wide variety of Class 2-6 vehicles manufactured by Ford, Chevrolet, GMC, and Isuzu, and the Company is on track to provide its systems in Class 7-8 vehicles in 2022."[17]

84.     The September 18, 2020 press release stated that in addition to XL's electric powertrain platform, "XL provides real-time data monitoring and analytics, and will expand its 'Electrification-as-a Service' solution, which includes power management, charging infrastructure, and onsite power and storage offerings.  XL is also developing all electric offerings.  The Company's rapidly deployable technology solutions position it for long-term growth in a total addressable market that is greater than $1 trillion, which incorporates the money spent on energy consumption and vehicle costs for commercial fleets globally."

### 2.     XL's Need For Financing Gave Defendants An Incentive To Exaggerate Its Sales Pipeline And Revenue Projections

85.     Since at least 2019, XL had been regularly recording losses, and by the middle of

---

[17] Class 7-8 vehicles are heavier trucks between 26,001 and 33,000 pounds, and over 33,000 pounds, respectively, and usually have three axles or more, such as refuse vehicles, city transit buses, tractor trailers, and fire trucks.

2020, XL was experiencing a serious cash shortage and needed outside funds to continue as a going concern.  Accordingly, the XL Individual Defendants had a strong incentive to exaggerate XL's sales pipeline and revenue projections in order to obtain additional financing or to present XL as an attractive target for a potential acquirer.

86.     As Pivotal acknowledged in its December 8, 2020 proxy statement and prospectus, at the time the Merger Agreement was executed, XL had a substantial working capital deficit, it was not generating profits and expected to continue to incur net losses, and substantial doubt existed about XL's ability to continue as a going concern:

> As of September 30, 2020, XL had a working capital deficit of $27.6 million and an accumulated deficit of $87.6 million. XL incurred a net loss of $20.0 million for the nine months ended September 30, 2020 and a net loss of $14.9 million for the year ended December 31, 2019.
>
> XL expects to continue to incur net losses in the short term ....
>
> XL's ability to access capital when needed is not assured and, if capital is not available when, and in the amounts needed, it could be required to delay, scale back or abandon some or all of its development programs and other operations, which could materially harm XL's business, prospects, financial condition and operating results. Because of this uncertainty, there is substantial doubt about XL's ability to continue as a going concern ....
>
> While management believes the funds to be raised in the Business Combination will alleviate the conditions that raise substantial doubt, it is not expected that such doubt can be alleviated prior to the consummation of the Business Combination.

87.     According to FE1, XL was always looking for investors and trying to raise money during her tenure at the Company (May 2019 through June 2020).  According to FE2, when she was hired at XL Hybrids (in or around June 2020), she was informed that the company had enough financing to last until the end of 2020.  FE2 stated that she was aware that XL was seeking further financing and needed such financing to continue operations.

### 3.    XL's Pipeline Inflation Scheme

88.    Even before Pivotal had identified XL as a potential acquisition target and started discussions concerning a potential merger in or around July 2020,[18] XL engaged in practices that caused its sales pipeline figures and revenue projections to be materially overstated.

89.    XL's pipeline figures and revenue projections were based on data collected by its sales team and entered into the Salesforce software system, a system for tracking sales opportunities with existing and potential customers.  As described in Pivotal's Form S-4/A filed with the SEC on November 12, 2020:

> XL's sales and marketing team uses a software tool to track all sales opportunities to existing and potential customers, identifying specific vehicles and XL systems for such vehicles. This is used by XL management to create projections about future aggregate sales pipeline opportunities for its existing products. XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections.

90.    As detailed by a number former employees, XL manipulated the data in the Salesforce system in a variety of ways, causing the Company's reported pipeline figures to be materially overstated.  During a period that extended from at least Q4 2019 through Q3 2020, Defendant Piern, XL's Vice President of Sales and Marketing, would regularly instruct employees to (a) enter sales opportunities for particular customers in the Salesforce system without a reasonable basis, (b) record inflated percentage likelihoods of sales, and (c) maintain pre-existing entries in the Salesforce system after customers indicated that they would not be ordering products in the amounts recorded in Salesforce (or at all).  In addition, Piern would frequently override and alter entries in the Salesforce system made by sales personnel to

---

[18] Relevant details concerning the origins of the Business Combination, the timing of Pivotal's and XL's merger discussions, and Pivotal's due diligence into XL are set forth in Section VII.B, *infra*.

exaggerate and artificially inflate the percentage likelihood of a sale.

91.     For example, according to FE1, in November 2019, FE1 and Piern attended a National Association of Pupil Transportation conference.  At this conference, FE1 and Piern spoke with five or six original equipment manufacturers ("OEMs") of school buses.  These conversations were general in nature and not detailed enough to expect the OEMs to place orders with XL Hybrids.  Nonetheless, Piern instructed FE1 to enter a five percent sales opportunity into XL's Salesforce.com sales tracking software for 100 units (equivalent to approximately $1.6 million in potential sales) for each of these OEMS, totaling 500-600 units (equivalent to approximately $8.0-$9.6 million in potential sales).

92.     As another example, at a weekly sales meeting, Piern instructed FE1 to identify large commercial fleets and enter those as sales opportunities even if FE1 had not spoken to anyone at those companies.  Piern gave FE1 such instructions irrespective of whether or not the companies in question even had vehicles that were compatible with XL Hybrids' products.

93.     According to FE1, all the sales opportunities entered into the Salesforce.com software became part of XL Hybrids' sales pipeline.

94.     FE1 also recalled an instance in which one of XL's customers, Pepsi, after purchasing 10 units as a trial run, communicated to XL that it would not be ordering additional XL products.  FE1 stated that Piern knew that Pepsi had no intention of making any additional purchases.  After a meeting with Pepsi in which FE1 was informed that Pepsi would not be buying any additional XL products, FE1 updated XL's Salesforce.com software to note this information, and to reflect a zero percent chance of Pepsi ordering additional products.  FE1 later saw that the Salesforce data had been changed to reflect a sales opportunity with a five percent likelihood for Pepsi.  FE1 stated that Piern often changed the percentages associated with

possible sales that had been entered by sales people in XL's Salesforce software. In the experience of FE1, Piern's changes always reflected an increased likelihood of completing a sale.

95.     FE2 also recounted an instance in which Piern directed the artificial maintenance of a sales probability in Salesforce even after information received from a customer indicated that the sales probability lacked a reasonable basis. For example, in the third quarter of 2020, an individual employed by a potential customer in the elevator industry informed FE2 that the elevator company might be interested in purchasing 400 units of XL products (representing approximately $6 million in sales). FE2 entered this sales opportunity into Salesforce.com for 2021 with a 75% probability. However, FE2's contact then left the elevator company, and it became clear to FE2 from ongoing conversations that any purchase from the elevator company would be spread out over a multiple year period, as the company had a five-year plan to achieve certain sustainability goals. As such, FE2 informed Piern before the end of 2020 that this opportunity should no longer be reflected in Salesforce as a 75% probability of a 400 unit purchase in 2021. Nonetheless, Piern told FE2 to maintain this sales opportunity as a 75% probability in Salesforce.

96.     According to FE2, one practice used to increase XL's pipeline figure was the transmission of pricing information to potential customers. FE2 stated that if pricing was sent to a potential customer, the sales opportunity was increased from 5% to 25% in Salesforce, even if the potential customer did not indicate a lot of interest. Therefore, FE2 would often send quotes to potential customers to increase the reported probability of a sale in Salesforce.

97.     FE2 recalled that the sales pipeline was approximately $220 million during her time at XL (between June 2020 and February 2021).[19]   FE2 stated the sales pipeline was a weighted average of all the opportunities, based on the assigned percentages in Salesforce.  FE2 believed that the sales pipeline was overstated due to the practices described above.

98.     The Muddy Waters Report provides additional accounts of former employees that further corroborate XL's pipeline inflation practices.  According to Muddy Waters, Former XL Employee A stated, "I was paid to lie.  I was paid to falsify and exaggerate my pipeline."  The same employee further stated:

> Once a quarter before board meetings, I would find that a bunch of my deals with larger [potential sales] numbers behind them would have been exaggerated substantially in their probability to close: from 25% up to 75%. For that brief week when the board was in town, my deals were at 75%, and I would have nothing to do with that. That was [manager name redacted]. A minimum of four times a year he would exaggerate my pipeline substantially to report to the board.

Muddy Waters Report at 8.

99.     As mentioned *supra*, FE3 confirmed that she was the individual identified as Employee A in the Muddy Waters Report, and that the statements attributed to her are correct and accurate.  FE3 also stated that Piern often increased the percentages entered into Salesforce and sometimes made up "bogus" companies and entered opportunities for those companies. In addition, FE3 said Piern had her enter sales opportunities for companies in California, which were all false because XL could not sell in California because it had lost CARB (California Air Resources Board) approval.[20]

---

[19] This amount was reported as XL's sales pipeline for 2021 in multiple public statements from Defendants between September 18, 2020 and December 8, 2020.

[20] In its March 8, 2021 response to the Muddy Waters Report, XL admitted, "In fact, while XL Fleet did lose CARB approval status in 2019 and was unable to secure re-approval in 2020 due in part to the COVID-19 pandemic, the Company expects to receive CARB re-approval in 2021."

100.     According to Muddy Waters, Former XL Employee B stated, "Even if [potential customers] have no interest, my boss tells me to go into Sales force and create an opportunity for 100 chassis with hybrid systems in it ... You're talking another $1 million or $2 million that goes into the pipeline that's really not there."

101.     According to Muddy Waters, Former XL Employee C stated, "I was told to [exaggerate my pipeline], but I didn't do it.   That was, yes, it wasn't that good for me." According to Muddy Waters, Former XL Employee C was subsequently laid off.

**4.     Prior To The Pivotal Transaction, XL Had Been Experiencing Supply Chain Problems That Impeded Its Ability To Timely Fill Existing Orders**

102.     While Hynes stated on his September 18, 2020 appearance on Squawk Box that XL had an "established supply chain production capacity" and a "very low risk and low cost production process compared to other companies in the industry," in fact XL lacked reliable access to essential supplies, and this was known to XL management.   These supply problems prevented XL from timely filling orders to customers and converting its existing backlog into revenue, discouraged customers from placing new orders, and rendered XL's revenue projections unrealistic and misleading.

103.     One of the key components of XL's hybrid electric vehicle and plug-in hybrid electric vehicle products is a lithium ion battery pack.   According to FE1, XL's products could not be shipped to customers unless they included batteries, because without batteries the products would be incomplete and the customers would not pay for them.

104.     During the first week that FE1 worked at XL Hybrids in May 2019, she traveled to Boston for a sales team meeting, at which Piern informed the sales team that XL Hybrids was having issues getting batteries from its supplier LG.   Then-CEO Hynes was present at this meeting.

105.    According to FE1, during her tenure at XL Hybrids (May 2019 to June 2020), XL Hybrids did not make its own batteries, but contracted with third-party supplier LG to provide them.  FE1 explained that the same batteries used by XL Hybrids were used by Chrysler for its Pacifica hybrid electric minivan, and that LG viewed supplying Chrysler as a priority over XL Hybrids.  During FE1's tenure, XL Hybrids could sometimes obtain one or two batteries at a time from LG, but was only able to obtain a minimal amount of batteries.

106.    According to FE1, battery supply was essential to XL Hybrids' ability to make sales, and customers who had placed purchase orders but not received them due to XL Hybrids' delays in obtaining batteries were hesitant to make additional purchases from XL Hybrids.

107.    According to FE4, when she was hired in May 2019, she specifically asked about the supply chain and how well it operated.  FE4 was concerned that since XL was a "small fish," it might not be able to get the components it needed to build the product.  She was assured that the supply chain was not an issue.  By September 2019, however, she was informed that the company was having challenges obtaining batteries because a larger company was taking priority.  FE4 said LG was XL's battery supplier.  FE4 stated that XL could not fulfill purchase orders without batteries and that she would inform affected customers that there would be delays and tried to provide approximate timeframes for when the orders would be fulfilled.  FE4 stated that the supply chain issue impacted her ability to meet her sales quota.  According to FE4, XL's difficulty in obtaining batteries continued at least until the time she left the company in March 2020.

108.    Supply chain difficulties persisted into the Class Period.  According to FE2, during her tenure at XL (June 2020 to February 2021), XL continued to have problems obtaining parts which led to backlogged orders not being delivered.  FE2 recalled difficulties obtaining

batteries, and hearing that XL's battery supplier had informed XL that larger customers ordering more batteries were a priority over XL.

109.    The accounts of former employees in the Muddy Waters Report further corroborates the existence of serious supply chain problems.  As detailed in the Muddy Waters Report, Former Employee A stated, "All of 2019 there were essentially zero batteries delivered. In the first six months of 2020, they got line of sight on maybe 90 ... to the point where as soon as they got them, they would go to the most pissed off customer: 'Okay, you can have five batteries.'"

110.    Similarly, according to Muddy Waters, Former Employee B stated:

When I started, they were using LG batteries in all their stuff.  Chrysler took all the allocation for all their batteries.  They were testing and retesting and trying to validate … by the time I left, they still didn't have a decent supply chain of the battery to get it going where it was.  The whole time I was there, they didn't have a battery.

111.    According to Muddy Waters, Former XL Employee C stated:

Deliveries weren't happening ... It's like, 'Can you tell me the truth, so I can get my fleets in order?' ... It caused angst with me, because I think that there were some things in the supply chain that they [management] just really knew ... 'Oh, just let them know it'll be 30 days.' Then 30 days passes. 'Well, let them know it'll be another 30 days.'

112.    Due to these supply chain problems, XL's backlog of orders remained stagnant and did not efficiently convert into revenue.  According to FE1, XL Hybrids' order backlog remained at roughly similar levels during her tenure, without old orders shipping (due mostly to lack of battery supplies), and without new orders coming in.  As such, FE1 believed that order backlog was not an accurate representation of XL Hybrids' actual capability to generate future revenue.  While Defendants did not report a backlog figure in their public statements on September 18, 2020, Defendants subsequently did report a backlog figure in multiple public

statements between October 2, 2020 and January 22, 2021, and misleadingly touted this figure as an indicator that XL's future revenues were likely to be robust. *See infra* at ¶166.

113.    Independent of the role that XL's backlog played as a stand-alone metric that was misleading to investors as an economic indicator in its own right, XL's backlog also was factored into Defendants' revenue forecast, and Defendants' failure to disclose XL's ongoing supply chain problems rendered that forecast materially misleading.  Indeed, Defendants' forecast of $75 million in revenue for 2021 assumed both a massive increase in new orders being **placed** and an even greater increase in both new and old orders being **filled**.  That forecast was incredibly unrealistic in light of the persistent supply chain difficulties that XL faced in satisfying a much smaller volume of orders.

114.    While Defendants did offer certain risk warnings and other disclosures concerning battery supply issues during the Class Period, those disclosures were themselves highly misleading.  As detailed *infra*, Defendants in those disclosures Defendants portrayed the supply issues as limited in scope, related solely to COVID, and, most importantly, having been resolved by the second half of 2020.  In reality, the supply problems were severe, longstanding (predating COVID by almost a year), related to XL's lack of market power and leverage as a buyer in the battery market, and ongoing throughout the Class Period. *See infra* at ¶¶156, 160.  Accordingly, Defendants' failure to disclose the true nature and magnitude of XL's supply chain problems caused investors to substantially underestimate the enormous risks inherent in Defendants' revenue forecast for 2021.

### 5.    XL's Customers Had Low Reorder Rates And Many Of The XL Customers Touted In The Investor Presentation Were Inactive

115.    Although Defendants portrayed XL Hybrids as a "[t]rusted brand helping fleets drive decarbonization today," and specifically identified 33 high profile customers by name in

the investor presentation published on September 18, 2020, many of these customers had ceased doing business with XL, in many cases because they found XL's technology to deliver poor results on their prior purchases.

116.    FE1 confirmed that certain companies touted as customers in Defendants' statements were no longer active customers and did not intend to purchase additional XL products. FE1 stated that two of her customers, Pepsi and Safelite, had only purchased 10 units as a trial run to verify performance, and that both companies had communicated to XL Hybrids that they would make no further purchases, and that FE1's supervisor Piern knew these customers had no intention of making further purchases.

117.    FE2 similarly confirmed that many of the purported customers identified in XL's investor presentation had not ordered products from XL in several years. FE2 stated that Comcast, Verizon, AT&T, UPS and FedEx had not ordered XL products in approximately seven years, and that they would not be ordering XL's hybrid products in the future because they were planning to purchase fully electric vehicles instead.

118.    The Muddy Waters report likewise confirmed that XL's customers had low reorder rates and many of the XL customers touted in the September 18, 2020 investor presentation were inactive.

119.    The Muddy Waters Report quoted "Former XL Employee A" as stating "Almost no one reorders . . . it's maybe 10%."

120.    Based on interviews with three former XL employees, Muddy Waters reported that 18 of 33 advertised "customers" had not ordered any XL products over at least 2019 through the first half of 2020. These inactive customers included: Alabama Power, DHL, Ferguson, Clark Public Utilities, CalVans, Southern California Edison, SDGE, Portland General Electric, Coca-

Cola, Verizon, ThyssenKrupp, Stanley Black & Decker, ComEd, Hawaiian Electric, Safelite, City of Seattle, DTE Energy, and Pepsi.

121.    The Muddy Waters report also quoted former XL employees and a former XL customer discussing specific purported "customers" that had only purchased XL products for small pilot programs and never made follow-up purchases. For example, Muddy Waters quoted one such source as saying regarding Ferguson, "Just a pilot, two or three trucks; they haven't repeated the order and it's been three to four years."

> **6.    The Quality And Benefits Of XL's Technology Were Overstated And That Technology Did Not Provide The MPG Savings Or ROI To XL's Customers That XL Represented**

122.    Although the Defendants publicly touted supposedly impressive mileage gains and return on investment to customers using XL Hybrids' products, in reality XL Hybrids' customers often experienced minimal mileage gains and negative returns on their investments.

123.    FE2 stated that she sold zero products during her tenure with the Company, due in substantial part to the fact that XL products were too expensive, such that the return on investment was not enough to make the cost worthwhile for potential customers. According to FE1, some XL Hybrids customers complained that their vehicles' realized miles per gallon of fuel decreased after purchasing XL Hybrids products.

124.    FE4 explained that for some customers, XL products did not make sense. For example, customers in rural areas might not see a return on investment. FE4 stated that fleet managers would not purchase products unless they would receive a return on investment, meaning that the purchase has to result in overall cost savings for the fleet. Some customers to whom FE4 tried to sell additional XL products were not interested because they did not obtain sufficient ROI on their prior purchases from XL, and XL had increased its product prices thus making customers' expected ROI on new purchases even lower.

125.    FE1 questioned some of the assumptions underlying the return on investment example calculations presented by Defendants to investors (and reproduced in Pivotal's SEC filings).  FE1 noted that the assumed $3.00 per gallon of gasoline was high for most areas of the country at the time.  FE1 also believed that the "Driver Productivity Savings" metric used in XL's ROI example calculation was useless and just an effort to make XL's marketing look appealing.

126.    According to FE2, the ROI information provided in the Seattle case study referenced in XL Hybrids' investor presentations (and reproduced in Pivotal's SEC filings) does not seem accurate, and FE2 could not figure out how the company arrived at the numbers presented in that case study.  FE2 explained that the customer that was the subject of that case study had received a substantial volume discount, and that the fuel cost assumptions used seemed high.  FE2 did not trust the numbers from XL about product performance, and so FE2 calculated her own numbers when presenting to potential customers.

127.    The Muddy Waters Report likewise confirmed that benefits of XL's technology were overstated and that its technology did not provide the MPG savings or ROI to XL's customers that XL publicly represented.

128.    The Muddy Waters Report quoted "Former XL Employee A" regarding XL's MPG and ROI claims, who stated "[t]heir numbers are based upon a bare-boned F-150 on a dyno [dynamometer] in optimal, optimal circumstances, but the second you add weight or a passenger or human error to that, it all goes out the window."  Regarding XL's claims of up to 50% MPG improvement from its plug-in product, Muddy Waters quoted "Former XL Employee A" as stating, "Never would you come across 50% on the plug-in ... The 50%, it's insane that it's advertised ... You might see a decrease in MPG because you're adding 800 pounds of batteries to

the back of an F-150 and expecting it to achieve performance." Muddy Waters further quoted

"Former XL Employee A" regarding her interactions with customers:

> You do have fleet managers that are very savvy and they check their fuel spending. It's the guys that don't care about the PR, they care about performance. Those guys would be calling me daily being like, 'Dude, this thing's broken down. I'm not seeing any improvement, if anything maybe 1% to 2% per $25,000.' There's no return on investment, zero.

129.    The Muddy Waters Report quoted multiple former XL employees as stating that

XL's publicly touted MPG gains were based on optimal conditions, and that real-world use of

XL's products resulted in dramatically lower MPG gains. For example, although XL advertised

up to 50% MPG savings for its plug-in product, a former employee stated that average MPG

gains for this product were only 25-35%. And while XL advertised approximate MPG

improvement of 25% for its hybrid product, another former employee stated that outside of an

optimal city drive cycle MPG savings for this product were probably only 5-10%.

130.    The Muddy Waters report identified specific former XL customers that had

experienced poor ROI and had ceased ordering XL products, such as Portland General Electric,

Pepsi, and Alabama Power.  Muddy Waters also quoted former XL employees as stating that a

lot of customers complained about poor results, lack of return on investment, and failure to meet

expectations.  Muddy Waters quoted a Fleet Manager and Former XL Customer as stating,

"[s]omeone would probably not save money at $13k [per kit] on a pure fuel basis."

131.    Muddy Waters reported that XL took steps to conceal the performance of its

products from customers who had purchased them, quoting former employees as stating that XL

refused to give customers access to the XL Link system that recorded data on the products'

performance, and that XL employees would try to make this data seem better than it was when

discussing it with customers, and to deflect blame for poor performance.

### 7. XL's Revenue Projections Were Materially Misleading And Lacked A Reasonable Basis

132. For all of the reasons set forth in Sections V.D.3 – V.D.6, *supra*, Defendants' forecast of $75 million in revenue for 2021 was materially misleading and lacked a reasonable basis.

133. According to Defendants, XL's sales pipeline was a critical input into its revenue forecast. As described in Pivotal's Form S-4/A filed with the SEC on November 12, 2020, "XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections." Accordingly, the inclusion of non-viable sales opportunities in the pipeline and the exaggeration of the recorded likelihood of sales had the effect of not only inflating the sales pipeline figure but also inflating the revenue forecast upon which it was based.

134. Similarly, XL's supply chain problems, low customer reorder rates, large number of inactive customers, and the weakness of its technology (including the inability to deliver the MPG savings and ROI that XL represented to its customers) all operated to render XL's revenue forecast unrealistic and undermine the assumptions upon which that forecast was based. Defendants' failure to disclose these factors caused the market to materially underestimate the risk that XL's forecast would not be achieved.

135. Additional facts support the conclusion that XL's revenue forecast lacked a reasonable basis and was likely unachievable. According to FE2, FE2 was not able to sell any products during her tenure at XL, which she attributes in part to the fact that these products were too expensive for their emission reduction capabilities, and that the return on investment was not enough to make the cost worthwhile for customers.

136.    FE2 was given a sales target of $12 million for 2021, even though she had never been able to sell an XL product, and even though the entire company had only $20.3 million in 2020 revenues.  This sales target was not based on identified sales opportunities, but rather was simply imposed by XL executives.

137.    According to FE2, Hynes and Kazarinoff told Piern that the sales team as a whole needed to sell $75 million for 2021, and the sales team was not allowed to offer any feedback on whether this target was achievable.  According to FE2, Piern then simply divided up the $75 million total sales target among the sales team, assigning FE2 $12 million of the total without much reasoning other than the need to divide up the total target.

138.    Leading up to the Business Combination, XL repeatedly disclosed its projection of $75 million in 2021 revenue.

139.    FE2 did not believe that her $12 million 2021 sales target was possible to meet with only hybrid products to offer.  XL projected that hybrid products would account for substantially all of its 2021 sales.

140.    Similarly, according to FE1, during her tenure at XL Hybrids, neither she nor anyone else met their sales goals.

141.    Taken together, the foregoing facts tended to seriously undermine the accuracy of XL's revenue forecast and the failure to disclose these facts rendered the issuance of the forecast and Defendants' related statements materially misleading.

**E.    Defendants Aggressively Promoted The Proposed Merger Following Its Announcement**

142.    From Defendants' first public announcement of the proposed Merger on September 18, 2020 up to the Merger's completion on December 21, 2020, Defendants aggressively and misleadingly promoted the proposed Merger and XL Hybrids' business

prospects in numerous public statements, in an apparent effort to build investor support for the Merger.

143.    XL Hybrids issued at least eight, highly promotional press releases during this period, each of which promoted the proposed Merger and touted XL Hybrids' technology and customer base.

144.    For example, XL Hybrids issued a September 30, 2020 press release titled "XL Fleet to Accelerate Rapid Growth and Expand Fleet Electrification Solutions Through Proposed Merger with Pivotal Investment Corporation II."  XL Hybrids stated in an October 26, 2020 press release that it was "revenue-generating today with strong demand momentum, including a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021."  In a November 1, 2020 press release titled "XL Fleet Generates Record Third Quarter 2020 Revenue," XL Hybrids reiterated its $220 million sales pipeline and $75 million 2021 revenue forecast, in addition to promoting "record quarterly total GAAP revenue of $6.3 million for the third quarter of 2020."

145.    XL Hybrids issued similarly promotional press releases on November 16, 2020, November 23, 2020 ("XL Fleet Expects its Largest Partner to Double Orders in 2021"), December 1, 2020, December 11, 2020, and December 16, 2020 ("XL Fleet Expands Electrification Solutions Portfolio to Ford F-550 Chassis to Meet Strong Customer Demand").

146.    Simultaneously with this barrage of promotional press releases, Defendant Hynes and other Individual Defendants, gave multiple interviews to financial media, apparently as part of the public relations strategy to build investor support for the proposed Merger. As with XL Hybrids' press releases, the Individual Defendants in these interviews promoted the proposed

Merger, and touted XL Hybrids' technology, customer base, sales pipeline, and revenue projections.

147. On October 26, 2020 Defendants Hynes and Kazarinoff, as well as Pivotal representative Greg Racz, appeared in a webinar hosted by SPACInsider to promote XL Hybrids and the proposed Merger. Defendant Kazarinoff stated, "Our individual order sizes have been growing rapidly as we're seeing folks go from trial to actual adoption, and we've got a 12 months sales pipeline that now is over $240 million, which we feel is going to support our forecast for next year of $75 million in revenue."

148. On November 12, 2020, Defendant Hynes gave an interview on Bloomberg TV similarly touting XL Hybrids' business prospects. He stated, "We're growing extremely rapidly already . . . we're already experiencing tremendous growth." Defendant Hynes likewise aggressively promoted XL Hybrids' prospects in a November 16, 2020 webinar hosted by IPO Edge and a November 23, 2020 interview with TD Ameritrade. During the November 23, 2020 interview, Hynes stated, "We're putting more units on the road now than any of our competitors and we've got some great customers coming back to buy more and we're really scaling up across the country."

149. At the same time that Defendants carried out this media blitz promoting XL Hybrids and the proposed Merger, they and their advisors were preparing the required SEC filings, investor disclosures, and other legal documentation for the proposed Merger.

150. On October 2, 2020 Pivotal filed a Registration Statement on Form S-4 with the SEC containing a preliminary prospectus supplement and proxy statement for Pivotal's annual meeting to be held later in the year, in order to register up to 100 million shares of Pivotal's stock to be issued to XL Hybrids' shareholders in connection with the proposed Merger. In the

October 2, 2020 Registration Statement, Pivotal first disclosed XL's backlog of existing purchase orders, stating:

> *As of September 25, 2020, XL has a backlog of 961 firm purchase orders representing $12.3M in revenue*. This backlog reflects the manner in which XL believes its customers currently purchase commercial vehicles, with a typical 3 to 6 month lead time. All XL orders are designed to meet a specified OEM vehicle chassis (VIN level), with production and shipment coordinated to meet simultaneously via the industry standard ship-thru process. XL systems are sourced and built to exacting specifications in line with OEM production timelines and customer installation preferences, and supply is sourced to meet these timelines.

151.    Pivotal further stated, "XL believes that the size of its sales opportunity pipeline and committed backlog are important indicators of future performance."

152.    These statements were materially misleading because they failed to disclose the severe supply chain problems detailed in Section V.D.4, *supra*, which prevented XL from timely converting backlog into revenue.  As such, XL's backlog presented a misleading indicator of future performance, because Defendants lacked the supplies necessary to fill existing purchase orders within the 3 to 6 month lead time indicated by Pivotal's statement.

153.    While Defendants did provide certain risk warnings and other disclosures concerning battery supply issues, these disclosures were themselves misleading because they failed to disclose the extent to which the risks had already materialized and they understated the severity, scope and duration of the existing shortages.  For example, in the Risk Factors section of the October 2, 2020 Registration Statement, Pivotal stated:

> *Increases in costs, disruption of supply or shortage of XL's components, particularly battery cells, could harm its business.*
>
> In the production of its electrified powertrain solutions, XL may experience increases in the cost or a sustained interruption in the supply or shortage of its components. Any such increase or supply interruption could materially negatively impact XL's business, prospects, financial condition and operating results. The prices for XL's components fluctuate depending on market conditions and global demand and could adversely affect its business, prospects, financial condition and

operating results. … Any disruption in the supply of battery cells could temporarily disrupt production of XL's electrified powertrain solutions until a different supplier is fully qualified.

154.    This statement was materially misleading, because it suggested that an interruption in supply or a shortage in components were eventualities that XL "may experience," but did not disclose that XL was already experiencing these supply disruptions and that they were already severely impacting XL's ability to fill existing customer orders.

155.    In the October 2, 2020 Registration Statement, Pivotal also made the following disclosure concerning battery supply issues:

> Revenues decreased by $1.2 million, or 27.6%, from $4.3 million in the six months ended June 30, 2019 to $3.1 million in the same period in 2020. *The decrease was primarily due to disruptions in battery supply and disruptions in OEM vehicle production due to the COVID-19 pandemic. XL and its suppliers and OEMs have made improvements in XL's supply chain during the second half of 2020 that XL believes will mitigate the supply disruptions experienced during the first half of 2020*.

156.    This partial disclosure gave investors some indication that XL had already experienced supply shortages, but the statement was also highly misleading because it only gave a small part of the story.  According to former employees, XL had been experiencing severe battery shortages going back to May 2019, long before COVID-19 began to impact the global supply chain.  *See supra* at ¶¶104-11.[21]  For the entire second half of 2019 and the entire first half of 2020, XL had an incredibly limited supply of batteries and was unable to fill the vast majority of customer orders.  *See id*.  As recounted by the former employees, the principal reason

---

[21] Initial reports of a cluster of pneumonia cases of unknown origins in Wuhan (later to be identified as COVID-2019) did not begin to emerge until December 2019, and the COVID-19 pandemic did not start to meaningfully impact global travel and markets until February 2020. *See, e.g.*, T. Carvalho, *The first 12 months of COVID-19: a timeline of immunological insights*, Nature Reviews Immunology, Mar. 15, 2021, available at https://www.nature.com/articles/s41577-021-00522-1; AJMC Staff, *A Timeline of COVID-19 Developments in 2020*, American Journal of Managed Care, updated Jan. 1, 2021, available at https://www.ajmc.com/view/a-timeline-of-covid19-developments-in-2020.

that XL could not obtain batteries was because of XL's status as a "small fish" in the market and the priority that was given to larger customers by third-party battery suppliers. *See id*. While Defendants claimed that XL and its suppliers had taken steps to "mitigate" the supply disruptions, Defendants failed to adequately describe the severity, the scope, and the longstanding duration of the problem. Moreover, XL's revenue forecast of $75 million for 2021 assumed that revenues would more than triple between 2020 and 2021, which meant that production would also need to more than triple and XL would need to obtain a much higher number of batteries to meet its revenue target. Without disclosing the long-standing nature of XL's problems in obtaining batteries and by portraying the issue as a temporary problem relating to COVID-19, Defendants' representations concerning XL's "scalable business model" and "established supply chain production capacity" were materially misleading and caused investors to materially underestimate the magnitude of the risks inherent in XL's revenue forecast.

157.   Pivotal amended its Registration Statement on November 12, 2020, December 1, 2020, and December 4, 2020. Each amended version of the Registration Statement was materially false and misleading for similar reasons as the original version filed on October 2, 2020.

158.   In its Form S-4/A dated November 12, 2020 (which amended the October 2, 2020 Registration Statement), Pivotal made two new relevant disclosures concerning the supply chain and battery supply issues. First, Pivotal stated:

> In the first half of 2020 as result of the COVID-19 pandemic, XL experienced multiple supply and service disruptions impacting XL's HEV product line. XL's primary battery test facility, halted testing of XL's HEV battery, preventing the validation of a newly designed battery. After several weeks, XL was able to find an alternate test facility, to restart the battery validation. This required sourcing, contracts, test plan development, training, and movement of essential hardware and equipment from the original location in New York to California resulting in a several month delay. Both test facility service providers are procured under a

purchase order service arrangement.

Further, an XL battery supply partner, operating under a multi-year non-exclusive supply agreement with volume and pricing commitments, had significant supply disruptions in the April-May timeframe due to sub-supplier impacts on the Indiana and Michigan labor forces. In addition, Ford Component Sales (FCS), with whom we procure battery components under a month to month purchase order, had battery supply disruptions with a temporary closure of its manufacturing plant in Rawsonville, Michigan. This closure impacted the supply of HEV batteries to XL by several weeks.

159.    Second, Pivotal stated:

Revenues increased by $2.5 million, or 36.6%, from $6.9 million in the nine months ended September 30, 2019 to $9.5 million in the same period in 2020. The increase was primarily due to ***the resolution of battery supply issues***, increased end customer demand and increased order sizes. During the quarter ended September 30, 2020, XL, its suppliers and OEMs made improvements to XL's supply chain, including sourcing an additional battery supplier, which helped to counteract the negative impact of the COVID-19 pandemic on XL's business in prior quarters. Of the $9.5 million in revenue for the nine months ended September 30, 2020, approximately $6.4 million of revenue was recognized during the three months ended September 30, 2020, which was primarily due to the resolution of battery supply issues. ***Resolving the battery supply issues allowed XL to increase production and fulfill orders in its outstanding backlog. Based upon XL's current production throughput and its current backlog of orders, and subject to any further unforeseen supply chain disruptions caused by the COVID-19 pandemic, XL anticipates revenues for the year ending December 31, 2020 to be approximately $21 million***.

160.    These statements were materially misleading for the same reasons that the statements in the October 2, 2020 Registration Statement were misleading as described in ¶¶152-56, *supra*. By characterizing the battery supply issues as principally due to the impact of the COVID-19 pandemic and failing to disclose the severity, scope and duration of the battery supply issues arising from XL's lack of market power and leverage in the battery market, Defendants materially misled investors as to nature and likely persistence of the problem. Worse still, the statements in the November 12, 2020 Amended Registration Statement suggested that the battery supply problem had been "resolv[ed]" and that in the absence of "any further unforeseen supply chain disruptions," XL was on track to meet its forecast of $21 million in

revenue for 2020.  The November 12, 2020 Amended Registration Statement also repeated the forecast of $75 million in revenue for 2021.  As discussed in Section VII.G, *infra*, the facts support a strong inference that by November 12, 2020, it was already clear that XL did not have access to a sufficient number of batteries to meet the 2021 revenue forecast of $75 million, and that the purportedly new and unexpected shortages that Defendants would disclose just a few months later were not "unforeseen" but merely a continuation of a long-standing supply chain problems that existed well before COVID-19.

161.    The SEC issued a notice of effectiveness for Pivotal's Registration Statement on Form S-4 as of December 8, 2020. On that date, Pivotal filed with the SEC its definitive proxy statement for the annual meeting, now scheduled to be held on December 21, 2020, and its prospectus for the issuance of up to 100 million shares of stock to XL Hybrids' shareholders in connection with the proposed Merger. The proxy statement provided that holders of record of Pivotal stock at the close of business on December 7, 2020 would be entitled to vote at the annual meeting, on matters including the proposed Merger and certain ancillary proposals necessary to complete the proposed Merger.

162.    In its December 8, 2020 definitive proxy statement and prospectus, Pivotal provided information regarding XL Hybrids' order backlog, sales pipeline, and revenue forecasts, and explained the difference between these distinct but interrelated concepts.

163.    Regarding backlog, Pivotal repeated that, "[a]s of September 25, 2020, XL has a backlog of 961 firm purchase orders representing $12.3M in revenue. This backlog reflects the manner in which XL believes its customers currently purchase commercial vehicles, with a typical 3 to 6 month lead time."

164.    Regarding the sales pipeline, Pivotal repeated that XL Hybrids had a "a $220 million 12-month sales pipeline," and that "XL's sales and marketing team uses a software tool to track all sales opportunities to existing and potential customers, identifying specific vehicles and XL systems for such vehicles. This is used by XL management to create projections about future aggregate sales pipeline opportunities for its existing products."

165.    Regarding revenue forecasts, Pivotal disclosed revenue forecasts for XL Hybrids of $21 million for 2020, $75 million for 2021, $281 million for 2022, $648 million for 2023, and $1.4 billion for 2024. Pivotal further explained that "XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections."

166.    Pivotal stated that that "XL management believes that its revenue estimates and committed backlog are important indicators of expected future performance," and, similarly, that "XL believes that the size of its sales opportunity pipeline and committed backlog are important indicators of future performance."

**F.    Completion Of The Merger Between Pivotal And XL Hybrids**

167.    On December 21, 2020, Pivotal held its annual meeting as planned, and Pivotal shareholders voted to approve the proposed Merger and ancillary proposals necessary to complete the proposed Merger.

168.    As a result of these shareholder approvals, on December 21, 2020, XL Hybrids merged with a wholly-owned subsidiary of Pivotal.  The outstanding securities of XL Hybrids were converted into securities of Pivotal. And Pivotal changed its name to XL Fleet Corp.

169.    Pivotal directors Efrat Epstein and Katrina Adams resigned effective December 21, 2020, and Defendant Kazarinoff, Defendant Hynes, Debora M. Frodl, Declan P. Flanagan, Defendant Griffin, Christopher Hayes, Defendant Ledecky, Niharika Ramdev, and Sarah Sclarsic

were appointed to serve as directors on the board of directors of XL Fleet Corp.  The board appointed Defendant Kazarinoff as CEO, Principal Financial Officer and Principal Accounting Officer, and appointed Defendant Hynes as President.  Defendants Ledecky and Brady resigned as officers of Pivotal.

170.    Also on December 21, 2020, certain investors purchased shares of Pivotal/XL Fleet Corp. for gross proceeds totaling $150 million in a private placement.

171.    On December 21, 2020 Pivotal's Units automatically separated into their component stock and warrant securities. On December 22, 2020 Pivotal's stock and warrants ceased trading on the NYSE under the PIC and PIC WS ticker symbols, and began trading as XL and XL WS, respectively.

172.    Following the completion of the merger, XL Fleet Corp. reported that Defendant Ledecky beneficially owned 7.3% of its common stock, Defendant Griffin beneficially owned 7.7%, Defendant Hynes beneficially owned 5.6%, and Defendant Kazarinoff beneficially owned 1.0%, making these individuals among XL Fleet Corp.'s largest shareholders.

173.    On December 22, 2020 XL Fleet Corp. issued a press release announcing the completion of the merger. The press release stated that XL Fleet received approximately $350 million in cash proceeds in connection with the merger, and touted the Company's technology, customer base, and future growth prospects. The press release contained a hyperlink through which readers could watch video of XL Fleet's leadership celebrating completion of the merger by ringing the opening bell at the New York Stock Exchange on the morning of December 23, 2020.

G.      **Following the Merger, Defendants Continued To Make Misleading Positive Statements About XL's Business**

174.    After the completion of the Business Combination between Pivotal and XL

Hybrids, Defendants continued to aggressively and misleadingly tout XL Fleet's business.

175. As XL Hybrids had done leading up to the merger, XL Fleet continued issuing numerous press releases, publishing at least nine in January and February of 2021 alone. Each of these press releases described XL as follows, or in substantially similar terms:

> XL Fleet is a leading provider of vehicle electrification solutions for commercial and municipal fleets in North America, with more than 145 million miles driven by customers such as The Coca-Cola Company, Verizon, Yale University and the City of Boston. XL Fleet's hybrid and plug-in hybrid electric drive systems can increase fuel economy up to 25-50 percent and reduce carbon dioxide emissions up to 20-33 percent, decreasing operating costs and meeting sustainability goals while enhancing fleet operations. XL Fleet's plug-in hybrid electric drive system was named one of TIME magazine's best inventions of 2019.

176. For example, XL Fleet issued press releases on February 4, 2021 ("XL Fleet Partnering with Curbtender to Develop All-Electric and Plug-in Hybrid Refuse Trucks"), and February 25, 2021 ("XL Fleet Becomes Electric Transportation Partner of UBS Arena and the New York Islanders, Plans to Deploy 1,000 EV Charging Stations").

177. Once again, the press releases were accompanied by frequent media appearances from Company leadership. For example, on December 23, 2020 Defendant Hynes gave an interview to CNBC's Squawk on the Street television program. When asked about XL Fleet's revenue forecasts, Defendant Hynes emphasized the Company's "great pipeline" and "tremendous interest from customers" in a "trillion dollar global industry," and that XL was "shipping hundreds of units per month," before concluding that "we're in a great position to … really expand with the market which clearly has a lot of demand."

178. XL Fleet announced that members of its executive leadership team including Defendants Hynes and Kazarinoff would participate in investor conferences including the FORCE Family Office & Roth Capital Partners EV Symposium on Friday, January 8, 2021, the 23rd Annual Needham Growth Conference on Wednesday, January 13, 2021, the Northland

Securities SPAC Investor Conference on Tuesday, January 19, 2021, and the BTIG Energy Transition EV Day on February 23, 2021.

179.    Defendant Hynes appeared on the CNBC television program Mad Money with Jim Cramer on March 2, 2021 to further promote XL Fleet's previously announced plans to partner with UBS Arena and the New York Islanders professional hockey team with respect to electric vehicle charging stations, and he once again touted XL Fleet's technology.

180.    Amidst Defendants' continued media blitz following the completion of the Business Combination, Defendants and their advisors prepared additional SEC filings, investor disclosures, and other legal documentation, necessitated by the recently completed Business Combination and private placement.

181.    On January 14, 2021 XL Fleet filed with the SEC a Registration Statement on Form S-1 and preliminary prospectus, to register 55.8 million shares of common stock and 4.2 million warrants. The securities to be registered related to (i) XL shares issuable on the exercise of warrants issued by Pivotal at the time of its July 2019 IPO, (ii) XL warrants issued in the December 2020 private placement, and (iii) XL shares issued or issuable in connection with the December 2020 Business Combination to private placement investors, XL Hybrids' directors and officers, and private placement investors.

182.    The January 14, 2021 Registration Statement repeated much of the information regarding XL's business contained in Pivotal's October 2, 2020 Registration Statement on Form S-4 (as amended), and was materially false and misleading for similar reasons. The January 14, 2021 Registration Statement continued to misleadingly tout XL's business prospects, for example, stating that "[w]e are one of only a few companies that have deployed thousands of xEV powertrains in the Class 2-6 commercial fleet market in the U.S. and Canada, so we have

established significant experience, data and relationships enabling scalable production, supply chain and service compared to competitors with relatively few systems in operation. We also have established global customers and suppliers."

183.    On January 22, 2021 XL Fleet filed a prospectus, which formed part of its Form S-1 Registration Statement, which the SEC declared effective that day. This prospectus was materially false and misleading for similar reasons as the Registration Statement filed on January 14, 2021.

184.    On February 26, 2020 XL Fleet's board of directors voted to approve large salary and target bonus increases for Defendants Kazarinoff and Hynes, based in substantial part on their 2020 performance. Kazarinoff's 2021 base salary was increased to $440,000, representing 150% of his 2020 base salary of $292,500.  Kazarinoff's 2021 target bonus would be 70% of his (now greatly increased) base salary, as compared to the previous 30%.  Hynes's 2021 base salary was increased to $372,500, representing 165% of his 2020 base salary of $225,000. Hynes's 2021 target bonus would be 50% of his base salary (*i.e.*, $186,250), more than double his 2020 target bonus of $80,000.

### H.    The Truth Emerges

185.    On March 3, 2021 Muddy Waters published a report titled "XL Fleet Corp (NYSE XL): More SPAC Trash." The report contained a number of revelations exposing Defendants' fraud, based on interviews with former XL employees.

186.    For instance, the Muddy Waters report quoted a person it identified as Former XL Employee A, as stating "I was paid to lie. I was paid to falsify and exaggerate my pipeline," and quoted a Former XL Employee B as stating that she was instructed to record million-dollar sales opportunities for customers who had no interest in XL's products.

187.    Muddy Waters reported that XL was plagued by undisclosed supply chain failures, including an inability to procure the batteries that were vital components of all XL products, and without which XL could not deliver its products to customers. Muddy Waters quoted Former XL Employee A as stating that XL received almost zero batteries during 2019, and only a small number during the first half of 2020.

188.    Muddy Waters also revealed that at least 18 of 33 high profile "customers" touted by XL in investor presentations had not ordered any XL products from at least 2019 through the first half of 2020, and that only 10% of XL customers placed follow-up orders due to disappointment with the actual results delivered by XL's over-hyped and misleadingly exaggerated technology.

189.    Muddy Waters exposed XL's falsification of customer mileage gains and return on investment, as XL had advertised to prospective customers and in investor presentations. While XL claimed that customers experienced gains of approximately 25% in miles per gallon with XL's hybrid product, Muddy Waters quoted former XL employees as stating that this figure was based on testing conditions designed to maximize MPG, and that in real world conditions customers usually experienced only 5-10% MPG improvement. Muddy Waters similarly revealed that although XL advertised a 55.7% ROI for customers, this was based on falsified MPG savings and other inputs, and that customers often experienced zero or negative ROI with XL products.

190.    And Muddy Waters reported that former XL employees "literally laughed out loud at XL's revenue projections."

191.   Following publication of the Muddy Waters report, on March 3, 2021 XL's stock closed at $13.86 per share, 13.1% lower as compared to the prior day, on exceptionally high trading volume.

192.   On March 4, 2021 XL published a press release titled "XL Fleet Responds to Recent Short-Seller Report," in which the entirety of the Company's rebuttal of the highly detailed and incriminating Muddy Waters report was to say "[t]he report contains numerous factual inaccuracies, misleading statements, and flawed conclusions. The Company intends to respond in due course."

193.   Following XL's exceptionally weak response to the Muddy Waters report, on March 4, 2021 XL's stock closed at $12.00 per share, down 13.4% as compared to the prior day, on unusually high trading volume. On Friday March 5, 2021, XL's stock price continued to fall, closing at $11.17 per share, down 6.9% as compared to the prior day, again on unusually high trading volume.

194.   On the next trading day, Monday March 8, 2021 XL finally issued its promised rebuttal to the Muddy Waters report, in a press release titled "XL Fleet Refutes Grossly Inaccurate and Misinformed Report by Short-Seller." While this press release generally promoted XL's business and vaguely cast aspersions on the Muddy Waters report, it entirely failed to respond to many of Muddy Waters' core allegations.

195.   For example, while faulting Muddy Waters for confusing the terms "backlog" and "pipeline," XL did not deny that its pipeline numbers were falsely exaggerated. XL failed to dispute Muddy Waters' battery supply chain allegations, and in fact implicitly confirmed them by stating that in 2019 XL was "impacted by a component shortage that affected battery supply." XL did not deny that any of the 18 of the 33 customers featured in its investor presentation were

inactive. While XL quibbled with Muddy Waters' MPG allegations, it effectively conceded that real-world results lagged the advertised 25% improvement, by providing excuses such as "as with any motor vehicle, actual customer MPG performance heavily depends on a range of factors related to how the vehicle is used."

196.    Following XL's still exceptionally weak response to the Muddy Waters report, on March 8, 2021 XL's stock closed at $10.48 per share, down 6.2% as compared to the prior day, on high trading volume.

197.    On March 10, 2021 Muddy Waters published a follow-up report titled "XL Fleet: Not Denying Much, Still SPAC Trash,"[22] pointing out the XL had failed to deny many of the key allegations from Muddy Waters' initial March 3, 2021 report.

198.    XL has never issued any further rebuttal of the March 3, 2021 Muddy Waters report, or any response to the March 10, 2021 Muddy Waters follow-up report.

199.    Independent market observers viewed Muddy Waters' allegations as credible and tied to the substantial declines in XL's stock price.

200.    Reuters published an article on March 3, 2021, titled "XL Fleet shares tumble after Muddy Waters takes short position."  The article noted that shares had fallen as much as 19.5% that day, and that Muddy Waters claimed the Company had "significantly exaggerated its order backlog, that the return on investment for its products was likely negative, and that it would not be able to compete with big car makers on electrification."

201.    The following day, March 4, 2021, Business Insider published an article titled "XL slumps 205 as famed investor Carson Block goes short, says the market is in a SPAC bubble full of 'garbage.'"  The article stated that "Block alleged XL Fleet was misleading

---

[22] A copy of Muddy Waters' March 10, 2021 report is attached to this Complaint as Exhibit 7 and incorporated by reference herein.

investors with an inflated sales backlog."  Carson Block is the founder and principal of Muddy Waters.

202.    XL itself later admitted that the fall in its publicly traded stock price was caused by the Muddy Waters Report. For example XL stated in its 2020 annual report on Form 10-K that "[i]n March 2021, an entity published an article containing certain allegations against us. This article and the public response to such article, as well as other negative publicity, have adversely affected our brand and reputation as well as our stock price," and that "in March 2021, an entity published an article containing certain allegations against us that we believe has negatively impacted the trading price of our Common Stock."

203.    On March 31, 2021, after the close of trading, XL Fleet announced its fourth quarter 2020 and full year 2020 financial results, issuing a press release, and filing a current report on Form 8-K and an annual report on Form 10-K with the SEC.  In addition, on March 31, 2021, the XL Fleet management team held a public conference call to discuss these results with investors.

204.    Defendants reported $10.9 million in fourth quarter 2020 revenue, and $20.3 million in full-year 2020 revenue. As XL Fleet admitted in its annual report, much of this revenue was attributable to belatedly filling orders previously delayed and backlogged due to a lack of battery supplies, stating that "[o]f the $20.3 million in revenue for the year ended December 31, 2020, approximately $17.2 million of revenue was recognized during the second half of the year, which was primarily due to the resolution of battery supply issues and seasonality in the order and delivery of fleet vehicles," and that "[r]esolving the battery supply issues allowed us to increase production and fulfill orders in our outstanding backlog."

205.    Although Defendants had recently forecast $75 million in 2021 revenue, XL announced that it now expected first quarter revenue of only $1 million, and stated that it would no longer provide full-year 2021 revenue guidance. Although Defendants had recently hyped XL Fleet's purportedly dramatic growth prospects, they admitted in the press release that the $1 million of first quarter 2021 revenue guidance as "roughly flat versus the prior year quarter."

206.    Defendants attempted to deflect blame for this dramatic about-face by making excuses in their press release, quoting Defendant Kazarinoff as stating:

> "The world is electrifying – however, economies and businesses around the world continue to face ongoing impacts of the COVID-19 pandemic. As a result, we continue to experience significant friction including OEM delays amid microchip and other shortages, and currently forecast first quarter 2021 revenue of approximately $1 million, or roughly flat versus the prior year quarter."

> "Given this ongoing uncertainty and the potential for extended industry-wide issues, combined with typical seasonal patterns in our orders and a significant majority of revenues focused on the second half as in prior years, we are not currently providing formal full-year 2021 financial guidance. As these pressures abate, we expect to see a stronger market environment emerge later this year. In this scenario, we would expect to realize significant revenue growth in 2021, accompanied by even more pronounced seasonality and therefore weighting to the second half of the year."

207.    On XL Fleet's March 31, 2021 earnings call, Canaccord Genuity analyst Jed Dorsheimer questioned the severe drop off in projected revenues:

> I'm trying to reconcile the 90% drop in revenues Q4 to Q1. Could you maybe help with the backlog? Because backlog shouldn't be affected. And if I look at the shortages from a chip perspective, I'm not seeing a drop that significant in terms of industry numbers. So . . . were things pulled into Q4 [2020] or are they just being pushed out into Q3 [2021]?

In response, Defendants Kazarinoff and Hynes essentially dodged these questions, while deflecting blame onto the COVID pandemic and seasonal ordering patterns. Dorsheimer responded, implicitly noting that the drop-off in revenues was inconsistent with the tremendous growth recently touted by Defendants, "I just think that from a seasonality perspective, the

expectation is that this is more of a growth story than a value story. And that's why – that's where my questions were coming from."

208.    On April 1, 2021, Canaccord Genuity issued a report lowering its price target for XL Fleet from $30 to $10 "to reflect the lack of 2021 visibility."  The report stated that "XL provided guidance for Q1 sales of $1M, versus consensus expectations of $7.9M. The company attributes the shortfall to the auto industry's chip shortage and COVID-19 headwinds. Given this is the company's first quarter as a public company, this comes as a major disappointment."

209.    The shockingly weak first quarter 2021 revenue guidance now provided by Defendants, and the withdrawal of XL's recently issued revenue forecast of $75 million for the full-year 2021, were direct results of, and further revealed the truth regarding, XL's falsely inflated pipeline, backlog, and revenue forecasts, and also represented the materialization of risks previously concealed by Defendants' false statements.

210.    Following XL's release of fourth quarter and full-year 2020 earnings after the close of trading on March 31, 2021, on April 1, 2021 XL's stock closed at $7.89 per share, 12.1% lower as compared to the prior day, on exceptionally high trading volume.

211.    Independent market observers interpreted the disappointing 2020 results and the withdrawal of XL Fleet's 2021 guidance as effectively a confirmation of the allegations of the Muddy Waters Report. For example, On April 8, 2021, Mad Money host Jim Cramer was asked by a caller how he "feel[s] about the Company XL Fleet."  Cramer responded, "they came on here, they told a decent story, but right after a guy [who] does a lot of good work, Carson Block, said that this thing was not a good stock and that you should sell and then they proceeded to not do well.  And so I have to tell you when a short seller says things are going to happen and then the things happen, well it makes me say let's stay away."

212.    Similarly, independent market observers continued to note XL's failure to deny the majority of Muddy Waters' allegations. On April 27, 2021 Mr. Cramer stated on his show, "[t]he short report about it was difficult and I'd like to have XL back to answer the short report, otherwise I can't recommend it."

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.    Defendants' False And Misleading Statements Made On September 18, 2020

213.    The Class Period begins on September 18, 2020 when the Company announced the Merger Agreement had been entered into by and among Pivotal, Merger Sub, and XL Hybrids.  On that day, Pivotal and XL Hybrids jointly issued a press release.  This press release was also attached as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC on September 18, 2020.

214.    The September 18, 2020 press release stated that XL's "rapidly deployable technology solutions position it for long-term growth in a total addressable market that is greater than $1 trillion[.]"  The press release also stated, "XL has strong demand momentum with a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021."  The press release also stated that "[t]housands of XL units [were] already on the road and over 130 million miles [had been] driven by its more than 200 customers, including FedEx, The Coca-Cola Company, PepsiCo, Verizon, the City of Boston, Seattle Fire Department, Yale University, and Harvard University."  Ledecky was quoted in the press release as stating, "XL's revenues are expected to more than triple in 2021, cementing its status as the leading provider of vehicle electrification solutions for commercial and municipal fleet vehicles."

215.    The statements in ¶214 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts:

(a)  XL's reported sales pipeline of $220 million was materially overstated, as detailed in Section V.D.3, *supra*;

(b)  XL had been experiencing supply chain problems that impeded its ability to timely fill existing orders, as detailed in Section V.D.4, *supra*;

(c)  XL's customers had low reorder rates, and its customer base was overstated because a large number of the customers touted by XL were inactive, as detailed in Section V.D.5, *supra*;

(d)  the quality and benefits of XL's technology were overstated and that technology did not provide the MPG savings or ROI that XL represented to its customers, as detailed in Section V.D.6, *supra*;

(e)  XL's revenue forecasts lacked a reasonable basis, omitted facts tending to seriously undermine the accuracy of the projections, and were materially overstated for the reasons set forth in Sections V.D.7, *supra*; and

(f)  As a result of the foregoing omissions, the challenged statements presented a materially misleading impression of XL Fleet's financial prospects, growth potential, and risk profile.

216.    In addition, the statements in ¶214 were materially false and/or misleading when made because:

(a)  XL's technology was not "rapidly deployable" in light of XL's supply chain problems detailed in Section V.D.4, *supra*; and

(b) XL's technology did not "position" XL for "long-term growth" because XL had materially overstated its technology's capabilities when in fact this technology produced weak results and led to substantial customer attrition, as detailed in Sections V.D.5 - V.D.6, *supra*; and

(c) The list of significant customers in the press release was misleading in light of the fact that several of the most prominent customers (including FedEx, The Coca-Cola Company, PepsiCo, and Verizon) were inactive and no longer ordering XL products, as detailed in Section V.D.5, *supra*.

217.    On September 18, 2020, the Company also held a conference call (the "September 18, 2020 Call") to discuss the Merger. A transcript of the call was attached as Exhibit 99.3 to a Form 8-K signed by Ledecky and filed with the SEC by Pivotal on September 18, 2020.  On the September 18, 2020 Call, Kazarinoff stated:

> We are proud of our differentiated position, with more units sold and more models available to meet customer needs. We have more than 3,200 units on the road today and are experiencing great momentum. ***We are shipping hundreds of additional units every month, putting us on target to deploy more than 4,000 systems by year-end and almost 10,000 units by the end of 2021***. Additionally, our 9 available models today means we are more than double our closest competitor in offering the optionality and customization that the customer base really requires. Together with our ***scaled production capacity*** and ***significant customer base***, we believe this establishes our leadership position in the market and a ***de-risked path to electrification***.
>
> ***
>
> ***We have a 12-month rolling sales pipeline of more than 220 million dollars in potential new business opportunities***, and we are on target to triple our 2020 revenues versus last year. More importantly from our perspective is the growth we've been realizing in average order size, with our largest order in 2020 growing by more than 3x versus last year. This is reflective of what we refer to as a transition from trial to adoption. Traditionally, this is a very conservative industry – only adopting new technology after it's been proven and is trusted, and we believe our order momentum is indicative of this transition for us and our customers.

218.    On the September 18, 2020 Call, Kazarinoff touted the Company's ability to increase its production capacity in very little time and claimed this would allow XL Fleet to "scale at a rapid pace" to achieve "revenue up to approximately 1.5 billion dollars by 2024":

> Through our approach, ***we can significantly increase our own production capacity in very little time***. For example, we can obtain an additional 10,000 units of capacity for less than 500 thousand dollars in about 6 months – and we can get up to 100,000 units of capacity for under 5 million dollars in less than 18 months. This is tremendous leverage, ***allows us to scale at a rapid pace***, and differentiates us versus the competition.… ***We forecast to scale our revenue up to approximately 1.5 billion dollars by 2024***, which reflects approximately 6 percent of the total market.

219.    Hynes stated on September 18, 2020 Call, "We have intentionally developed a ***very scalable***, asset-light business model that leverages the existing installation capacity of the industry and provides maximum flexibility to our continued growth. Overall, we believe this positions us as a lower-risk path to electrification, providing electrification-as-a-service to our customers as we deliver reliability, sustainability and financial returns."

220.    The statements in ¶¶217-19 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(a)-(f), *supra*.

221.    In addition, the statements in ¶217-19 were materially false and/or misleading when made because:

(a) The representations that XL's business model was "very scalable" and that XL could "scale at a rapid pace" was materially false and misleading due to XL's severe supply chain problems, as detailed in Section V.D.4, *supra*, which prevented XL from significantly increasing its production capacity in a short period of time; and

(b) The representation that XL faced a "de-risked path to electrification" misleadingly

omitted the significant risks that XL faced concerning its supply chain, inactive customers, and the quality and reliability of its technology as detailed in Sections V.D.4 – V.D.6, *supra*.

222.   On September 18, 2020, the Company also issued an Investor Presentation which was attached as Exhibit 99.2 to a Form 8-K signed by Ledecky and filed with the SEC on September 18, 2020.[23]   A copy of the Investor Presentation is attached hereto as Exhibit 4 and incorporated by reference herein.   The September 18, 2020 Investor Presentation stated that XL had a "Broad portfolio of established, proven, cost-effective solutions for numerous classes/segments with *rapid product development capabilities*" and its "Established production *can scale to 100,000+ units annually* and XL's capital efficient operating model is ready to scale and drive profitably."

223.   The September 18, 2020 Investor Presentation stated that XL's "Power Train Platform Is Proven, Flexible and Scalable" and emphasized that its platform allowed:

Unique rapid integration of hardware and software
- <1 month to integrate new OEM battery into vehicles
- <3 months to production (including crash testing)
Quickly scaling across vehicle classes, OEM platforms and applications
- <1 month to develop HEV for new OEM chassis
- <6 months to production

224.   The Investor Presentation also stated that XL Hybrids had a "Low Risk Path to Dramatic Growth" that could be achieved by "[s]elling existing products to existing customers through existing channels."

225.   The September 18, 2020 Investor Presentation provided the Company's financial projections for each year from 2020 through 2024, when it projected revenue reaching

---

[23] As indicated in the December 8, 2020 Proxy/Prospectus, the September 18, 2020 Investor Presentation was discussed and finalized by both Pivotal and XL Hybrids.

approximately $1.4 billion, as detailed in the slide copied below:

## Summary Financials

Implies 6% penetration of North American Class 2 – 8 commercial vehicle market

| (in millions) | 2019A [1] | 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|---|
| Revenue | $7.2 | $21.0 | $75.3 | $281.1 | $647.7 | $1,377.1 |
| % Growth | NA | 192% | 258% | 273% | 130% | 113% |
| Cost of Goods Sold | $8.1 | $18.6 | $58.2 | $212.6 | $490.1 | $1,037.1 |
| Gross Profit | ($0.9) | $2.4 | $17.1 | $68.5 | $157.6 | $340.0 |
| % Margin | (12%) | 12% | 23% | 24% | 24% | 25% |
| EBITDA | ($13.1) | ($9.9) | ($15.4) | $30.7 | $117.3 | $308.1 |
| % Margin | (182%) | (47%) | (20%) | 11% | 18% | 22% |

25   (1) 2019 financials reflect the Company's AICPA audit for fiscal year ended December 31, 2019     Confidential     XLFleet

226.    The September 18, 2020 Investor Presentation also touted 33 purported "customers" of XL while emphasizing XL's supposed sales pipeline of $220 million, as detailed in the slide copied below:

[slide on next page]



227.    The September 18, 2020 Investor Presentation also touted MPG gains of approximately 25% for XL hybrid, and up to 50% for XL plug-in, as detailed in the slide copied below:



228.    The statements in ¶¶222-27 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(a)-(f), *supra*.

229.    On September 18, 2020, Hynes was interviewed on CNBC's Squawk Box.  A transcript of this interview was filed as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed by Pivotal with the SEC on September 21, 2020.  During the interview, Hynes stated that XL's "established supply chain production capacity" would enable it to scale and reach $75 million in revenue in 2021:

> We're growing at 3X this year. ***We'll do over 75 million in revenue next year***…. So, you know, we have the ***established supply chain production capacity***, we have a very low risk and low cost production process compared to other companies in the industry. So, we don't have to invest hundreds of millions or billions of dollars into factories. ***We're actually leveraging the existing production infrastructure and enabling us to scale*** without huge amounts of capital to build out that capacity.

230.    The statements in ¶229 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(a)-(f), *supra*.

**B.    Defendants' False And Misleading Statements Made On September 21, 2020**

231.    On September 21, 2020, the Company filed with the SEC an Updated Investor Presentation as attachment 99.2 to a Form 8-K signed by Ledecky repeating the misstatements in ¶¶222-27, which were materially false and/or misleading for the reasons stated in ¶228.

232.    The September 21, 2020 Updated Investor Presentation also added a new slide representing that customers could obtain a 55.7% return on investment, as detailed in the slide copied below:



233.    The statements in ¶232 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(d), *supra*.

**C.     Defendants' False And Misleading Statements Made In The October 2, 2020 Registration Statement**

234.    On October 2, 2020, Pivotal filed a registration statement on Form S-4 with the SEC signed by Ledecky, Brady, and each member of Pivotal's board of directors (including Griffin), seeking shareholder approval of the Merger.

235.    The October 2, 2020 Registration Statement claimed XL had "a backlog of 961 firm purchase order representing $12.3M in revenue," that XL's customers make purchases "with a typical 3 to 6 month lead time" and that "supply is sourced to meet these timelines":

> ***As of September 25, 2020, XL has a backlog of 961 firm purchase orders representing $12.3M in revenue***. This backlog reflects the manner in which XL believes its customers currently purchase commercial vehicles, with a typical ***3 to 6 month lead time***. All XL orders are designed to meet a specified OEM vehicle chassis (VIN level), with production and shipment coordinated to meet

simultaneously via the industry standard ship-thru process. XL systems are sourced and built to exacting specifications in line with OEM production timelines and customer installation preferences, and *supply is sourced to meet these timelines*.

236.    The October 2, 2020 Registration Statement also stated that the Company's "sales opportunity pipeline and committed backlog are important indicators of future performance":

> Key factors affecting XL's operating results include its ability to increase sales of its current product offerings and expand its product offerings in the future and customer demand for such product offerings. *XL believes that the size of its sales opportunity pipeline and committed backlog are important indicators of future performance*.

237.    The statements in ¶¶235-36 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(a)-(b) and (e)-(f), *supra*.

238.    In addition, the statements in ¶¶235-36 were materially false and/or misleading when made because:

(a) Backlog presented a misleading indicator of future performance due to XL's severe supply shortages, which prevented XL from timely converting backlog into revenue, as detailed in Sections V.D.4 and V.E, *supra*.

(b) XL lacked the supplies necessary to fill existing purchase orders within the "3 to 6 month lead time" that XL represented to be "typical."

239.    In the Risk Factors section of the October 2, 2020 Registration Statement, the Company warned that harm to XL's business that could be caused by supply disruptions and potential shortages of XL's components:

> *Increases in costs, disruption of supply or shortage of XL's components, particularly battery cells, could harm its business.*

In the production of its electrified powertrain solutions, XL may experience increases in the cost or a sustained interruption in the supply or shortage of its components. Any such increase or ***supply interruption <u>could</u> materially negatively impact XL's business, prospects, financial condition and operating results***. The prices for XL's components fluctuate depending on market conditions and global demand and could adversely affect its business, prospects, financial condition and operating results. For instance, XL is exposed to multiple risks relating to price fluctuations for battery cells. These risks include:

• the inability or unwillingness of current battery manufacturers to build or operate battery cell production facilities to supply the numbers of battery cells required to support the growth of the electric vehicle industry as demand for such cells increases;
• disruption in the supply of cells due to quality issues or recalls by the battery cell manufacturers; and
• an increase in the cost of raw materials.

Any disruption in the supply of battery cells ***<u>could</u>*** temporarily disrupt production of XL's electrified powertrain solutions until a different supplier is fully qualified. Moreover, battery cell manufacturers may refuse to supply electric vehicle manufacturers if they determine that the vehicles are not sufficiently safe. Furthermore, fluctuations or shortages in petroleum and other economic conditions may cause XL to experience significant increases in freight charges. Substantial increases in the prices for raw materials may increase the cost of XL's components and consequently, the costs of products. There can be no assurance that XL will be able to recoup increasing costs of its components by increasing prices, which could reduce its margins.

240. The statements in ¶239 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(b) and (f), *supra*.

241. In addition, the statements in ¶239 were materially false and/or misleading when made because:

(a) The risk warnings presented as mere hypothetical risks adverse events that had already materialized; and

(b) The risk warnings failed to disclose specific facts concerning XL's pre-existing shortages and supply problems (as detailed in Section V.D.4, *supra*) that were

necessary for investors to understand the magnitude of the risks at issue.

242. The October 2, 2020 Registration Statement also stated that XL and its suppliers and OEMs had made improvements in XL's supply chain during the second half of 2020 that XL believed would "mitigate the supply disruptions experienced during the first half of 2020" due to the COVID-19 pandemic:

> Revenues decreased by $1.2 million, or 27.6%, from $4.3 million in the six months ended June 30, 2019 to $3.1 million in the same period in 2020. ***The decrease was primarily due to disruptions in battery supply and disruptions in OEM vehicle production due to the COVID-19 pandemic. XL and its suppliers and OEMs have made improvements in XL's supply chain during the second half of 2020 that XL believes will mitigate the supply disruptions experienced during the first half of 2020***.

243. The statements in ¶242 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(b) and (f), *supra*.

244. In addition, the statements in ¶242 were materially false and/or misleading when made because:

(a) The statements misleadingly implied that COVID-19 was solely or principally responsible for the battery shortages experienced by XL during the first half of 2020 and failed to disclose that XL had been suffering from severe battery shortages going back to at least May 2019, as detailed in Sections V.D.4 and V.E, *supra*;

(b) The statements failed to disclose that the battery shortages were due to XL's lack of market power and leverage in the battery market, which was unrelated to COVID;

(c) The statements failed to disclose the severity, scope, and longstanding duration of the battery shortages; and

(d) The statements failed to disclose that XL's "mitigation" efforts were insufficient to

secure enough batteries for the massive expansion of production that was contemplated by XL's revenue forecast for 2021.

245.    The October 2, 2020 Registration Statement claimed its relationships "enabl[ed] scalable production, supply chain and service compared to competitors" and touted its "established global customers and suppliers:"

> XL is one of only a few companies that have deployed thousands of xEV powertrains in the Class 2-6 commercial fleet market in the U.S. and Canada, so XL has established significant experience, data and relationships **enabling scalable production, supply chain and service compared to competitors** with relatively few systems in operation. XL also has **established global customers and suppliers**.

246.    The statements in ¶245 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(b), (f), *supra*.

247.    The October 2, 2020 Registration Statement noted the environmental standards that XL was subject to and stated that "violations may also result in the suspension or revocation of permits and licenses":

> Environmental standards applicable to XL are established by the laws and regulations of the countries in which it operates, standards adopted by regulatory agencies and the permits and licenses that it holds. Each of these sources is subject to periodic modifications and increasingly stringent requirements. Violations of these laws, regulations or permits and licenses may result in substantial civil and criminal fines, penalties, orders to cease the violating operations or to conduct or pay for corrective works. In some instances, **violations may also result in the suspension or revocation of permits and licenses**.

248.    The October 2, 2020 Registration Statement stated that XL's systems are fitted to vehicles that have been certified to meet the requirements of the California Air Resources Board ("CARB") and that XL had obtained the requisite Executive Orders ("EOs") for prior model

years and was in the process of EOs for future products.  Specifically, the October 2, 2020

Registration Statement stated:

### CARB Emissions Compliance and Certification

The XL hybrid and plug-in hybrid systems are fitted to vehicles that have been certified to meet the requirements of U.S. Environmental Protection Agency (the "EPA") and California Air Resource Board ("CARB"). The OEMs are responsible for ensuring compliance with the appropriate regulations for the base vehicle for emissions, fuel economy and on board diagnostics.

CARB classifies the XL system as an aftermarket fit system / device. As such, CARB requires that an Executive Order ("EO") is obtained for the sale of the system intended for use on a vehicle to be operated in the state of California. In order to obtain the EO, XL is required to submit an application to CARB for each vehicle group or family, which is required for each model year. The vehicle models included in a group or family are determined by the level of commonality of vehicle systems on both the base vehicle and the hybrid or plug in hybrid systems that are fitted.

*** 

*XL has obtained a number of EOs for prior model years and is in the process of conducting testing against CARB issued test orders for future products to be introduced into the Californian market*. EOs issued by CARB to XL are public record and are available to view on the CARB database for aftermarket, performance, and add-on parts. EOs also include requirements to collect data from vehicles in the field (in use data).

249.    The statements in ¶¶247-48 were materially false and/or misleading when made

and/or omitted to state material facts necessary to make the statements not misleading, because

they failed to disclose that:

(a) XL had lost its CARB certification in 2019 and had been unable to secure re-approval

in 2020, so XL could not sell its products in California;

(b) The risk warning concerning the potential revocation of permits or licenses presented

as mere hypothetical risks adverse events that had already materialized; and

(c) The inclusion of California sales opportunities in XL's sales pipeline, when XL was

not permitted to sell its products in California, resulted in an artificial inflation of the pipeline and the revenue forecasts based on those pipeline figures, as detailed in Sections V.D.3 and V.D.7, *supra*.

250.    The October 2, 2020 Registration Statement touted the purported mileage gains resulting from use of XL's products:

> XL's hybrid systems (branded as "XLH™") have been proven to **improve MPG by up to 25%** over standard gas-powered vehicles, while reducing $CO_2$ emissions by up to 20%. Its plug-in hybrid system, branded as "XL Plug-In™" or "XLP™," was named one of TIME magazine's The 100 Best Inventions of 2019. It offers an even more significant improvement in these metrics, demonstrating **up to a 50% MPG improvement** and up to a 33% reduction in emissions.

251.    The statements in ¶250 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(d), *supra*.

252.    The October 2, 2020 Registration Statement stated that in the judgment of Pivotal's board of directors, XL's value was at least 80% of the assets held in Pivotal's trust account.  While acknowledging that Pivotal's board did not obtain a third-party valuation of XL, the Registration Statement emphasized the "significant due diligence" conducted by Pivotal's board and concluded that the business experience of Pivotal's directors entitled them to conclude that the transaction was fair to Pivotal's stockholders and the 80% test was satisfied:

> **Pivotal's board of directors did not obtain a third-party valuation or fairness opinion** in connection with its determination to approve the Business Combination. Accordingly, investors will be relying solely on the judgment of Pivotal's board of directors in valuing XL and assuming the risk that the Pivotal board may not have properly valued the business. **However, Pivotal's officers and directors have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and have substantial experience with mergers and acquisitions. Furthermore, in analyzing the Business Combination, Pivotal's board of directors conducted significant due diligence on XL. Based on the foregoing, Pivotal's board of directors concluded** that its members' collective experience and backgrounds,

together with the experience and sector expertise of Pivotal's advisors, enabled it to make the necessary analyses and determinations regarding the Business Combination, including *that the Business Combination was fair from a financial perspective to its stockholders and that XL's fair market value was at least 80% of the assets held in the trust account* (excluding the deferred underwriting commissions and taxes payable on interest earned on the trust account) at the time of the agreement to enter into the Business Combination. There can be no assurance, however, that Pivotal's board of directors was correct in its assessment of the Business Combination.

***

After consideration of the factors identified and discussed in the section entitled "The Business Combination Proposal—Pivotal's Board of Directors' Reasons for Approval of the Business Combination," Pivotal's board of directors concluded that the Merger met all of the requirements disclosed in the prospectus for Pivotal's initial public offering, including that XL has a fair market value equal to at least 80% of the balance of the funds in the trust account (excluding the amount of deferred underwriting commissions held in trust) at the time of the execution of the Merger Agreement.

253.    In addition, the October 2, 2020 Registration Statement stated:

**Satisfaction of 80% Test**

It is a requirement under Pivotal's current amended and restated certificate of incorporation that any business acquired by Pivotal have a fair market value equal to at least 80% of the balance of the funds in the trust account (excluding the deferred underwriting commissions and taxes payable) at the time of the execution of a definitive agreement for an initial business combination. *Based on the financial information used to approve the Business Combination described herein, Pivotal's assessment that XL's valuation was attractive compared to its competitive peers and the other information described herein, Pivotal's board of directors determined that this requirement was met.* In reaching this determination, Pivotal's board of directors concluded that it was appropriate to base such valuation on a number of qualitative factors, such as management strength and depth, competitive positioning, customer relationships and technical skills, as well as quantitative factors, such as the historical performance of XL and the *potential for future growth in revenues* and profits of XL, rather than rely on any one factor. Pivotal's board of directors believes that the financial skills and background of its members qualify it to conclude that the acquisition met the 80% requirement.

***

**Recommendation of Pivotal's Board of Directors**

After careful consideration of the matters described above, particularly XL's position in its industry, potential for growth and profitability, the experience of XL's management and XL's competitive positioning, its customer relationships and technical skills, ***Pivotal's board determined unanimously that each of the business combination proposal and the other proposals to be presented at the annual meeting are fair to and in the best interest of Pivotal's stockholders*** …. Pivotal's board of directors has approved and declared advisable and unanimously recommend that you vote or give instructions to vote "FOR" each of these proposals and "FOR" each of nine director nominees identified in this proxy statement/prospectus to serve as directors of the combined company.

254.   The statements in ¶¶252-53 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts:

(a) XL's value was not equal to at least 80% of the balance of funds in Pivotal's trust account, for all of the reasons set forth in ¶215(a)-(f);

(b) For the same reasons, the proposed business combination was not in the best interests of Pivotal's stockholders;

(c) The determinations by Pivotal's board of directors concerning XL's valuation and the fairness of the transaction lacked a reasonable basis, because Pivotal's directors either knew the adverse facts or would have known those facts had they engaged in the extensive due diligence that they claimed they conducted; and

(d) For the additional reasons set forth in Section VII, *infra*, Pivotal's directors, including Ledecky and Griffin, knew or were severely reckless in not knowing the adverse facts that seriously undermined XL's putative value and the accuracy of XL's projections.

255.   The October 2, 2020 Registration Statement claimed that XL's management believed that the assumptions and estimates on which the XL's revenue forecast was based were reasonable and based on the best then-currently available information:

Although the assumptions and estimates on which the forecasts for revenue and costs are based are believed by XL's management to be ***reasonable and based on the best then-currently available information***, the financial forecasts are forward-looking statements that are based on assumptions that are inherently subject to significant uncertainties and contingencies, many of which are beyond XL's control.

256.    The October 2, 2020 Registration Statement incorporated XL management's forecast that XL would achieve revenues of approximately $21 million in 2020 and revenues of approximately $75 million in 2021.   The Registration Statement also claimed that XL's management prepared its projections on a "reasonable basis" which "reflects the best currently available estimates and judgments":

XL does not as a matter of course make public projections as to future sales, earnings or other results. However, XL's management has prepared the prospective financial information set forth below to present the key elements of the forecasts provided to Pivotal. The accompanying prospective financial information was not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of XL's management, was ***prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of management's knowledge and belief***, the expected course of action and the expected future financial performance of XL.

\*\*\*

The key elements of the forecasts provided to Pivotal, which assumes accelerating sales of XL's existing Class 2-6 hybrid electric vehicle and plug-in hybrid electric vehicle solutions bolstered by the commencement of sales of XL's all-electric solutions for Class 4-6 vehicles and xEV solutions for Class 7-8 vehicles in 2022, are summarized in the table below:

*Key Financial Metrics:*

| | Forecast | | | | |
| | Year Ended December 31, | | | | |
| | 2020E | 2021E | 2022E | 2023E | 2024E |
| | (in millions) | | | | |
| Total Revenue | $   21 | $   75 | $  281 | $  648 | $1,377 |
| Gross Profit | 2 | 17 | 69 | 158 | 340 |
| EBITDA | (10) | (15) | 31 | 117 | 308 |

257.    The statements in ¶¶255-56 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts:

(a) The revenue forecasts prepared by XL management lacked a reasonable basis, for all of the reasons set forth in ¶215(a)-(f);

(b) XL management was directly involved in the pipeline inflation scheme, as detailed in Section V.D.3, *supra*;

(c) XL management was aware of the supply chain disruptions and shortages, as detailed in Section V.D.4, *supra*;

(d) XL management was aware of low customer reorder rates and that many of the prominent customers they chose to tout had been inactive, as detailed in Section V.D.5, *supra*;

(e) XL management was aware that XL's technology did not provide the MPG savings or ROI to customers that XL represented, as detailed in Section V.D.6, *supra*;

(f) XL management was aware that XL's revenue projections lacked a reasonable basis and were materially overstated, as detailed in Section V.D.7, *supra*; and

(e)  For the additional reasons set forth in Section VII, *infra*, XL management, including Hynes, Kazarinoff, and Piern, knew or were severely reckless in not knowing the adverse facts that seriously undermined XL's putative value and the accuracy of XL's projections.

**D.    Defendants' False And Misleading Statements Made In The October 26, 2020 Press Release And Form 8-K**

258.    On October 26, 2020, Pivotal and XL issued a press release.  This press release was also attached as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC on

October 26, 2020.  The press release stated, "The Company is revenue-generating today with strong demand momentum, including a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021."

259.    The statement in ¶258 was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because it failed to disclose, among other things, the adverse facts set forth in ¶215(a)-(f), *supra*.

### E.    Defendants' False And Misleading Statements Made In The October 26, 2020 SPACInsider Webinar And October 28, 2020 Form 8-K

260.    On October 26, 2020, representatives of Pivotal and XL participated in a webinar hosted by SPACInsider.  Pivotal attached a copy of the transcript of the webinar as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC on October 28, 2020.

261.    At the October 26, 2020 webinar, Kazarinoff stated:

> *We've already got established scaled production, a scaled customer base*. So, we truly are in the lead here in North America and our position to keep that lead for years to come.
>
> ***
>
> Our individual order sizes have been growing rapidly as we're seeing folks go from trial to actual adoption, and *we've got a 12 months sales pipeline that now is over $240 million, which we feel is going to support our forecast for next year of $75 million in revenue*. We are currently tripling revenue here in the middle of this pandemic, despite some of those challenges and on track for $21 million in revenue in 2020.

262.    The statements in ¶261 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(a)-(f), *supra*.

263.    At the October 26, 2020 webinar, Hynes stated that "vehicles are getting built and then shipped to the end customer, again, anywhere in the U.S. or Canada" and "We're in about every state except for Alaska at this point."

264.    The statements in ¶263 were materially false and/or misleading when made and/or

omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that:

(a) XL had lost its CARB certification in 2019 and had been unable to secure re-approval in 2020, so XL could not sell its products in California.

(b) The inclusion of California sales opportunities in XL's sales pipeline, when XL was not permitted to sell its products in California, resulted in an artificial inflation of the pipeline and the revenue forecasts based on those pipeline figures, as detailed in Sections V.D.3 and V.D.7, *supra*.

265. Also, at the October 28, 2020 webinar, Kazarinoff stated that "we're leveraging that existing network and we can ramp-up our own preassembly and logistics operation to that 100,000 unit a year level with less than $5 million in investment in less than 18 months. So, we've already got an established business model that's very scalable."

266. The moderator at the webinar asked how the Company was able to achieve rapid installation for a large order and Kazarinoff replied, "our network of upfitters folks we already have agreements with. They've got over a hundred locations around North America with capacity to process large numbers of vehicles." Hynes added, "we have been getting increasingly large orders from major fleet customer over the years. So this is something that we've already done and *we can definitely scale and continue to accelerate with more and more customers who are buying at this size*."

267. The statements in ¶¶265-66 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(b), (f), *supra*.

**F.  Defendants' False And Misleading Statements Made In The November 12, 2020 Press Release And SEC Filing**

268.  On November 12, 2020, XL Fleet issued a press release announcing its third quarter 2020 financial results. This press release was also filed by Pivotal with the SEC pursuant to Rule 425 under the Securities Act of 1933 on November 12, 2020. The press release stated:

> Due to strong year-to-date results, XL remains on track to deliver on its full year 2020 revenue forecast of approximately $21 million. ***XL continues to grow its sales opportunity pipeline for 2021 to $220 million as of today, which supports XL's current revenue forecast of $75 million for fiscal year 2021***.
>
> ***
>
> "Fleet electrification is a massive long-term opportunity supported by favorable market and regulatory trends and an enduring focus on the decarbonization of operations by fleet owners globally," said Tod Hynes, Founder and Chief Strategy Officer of XL. "We are committed to delivering solutions that meet our customers' sustainability objectives and reliability requirements through products and services ***available today***. Moreover, XL's strong track-record, long-term relationships, ***and established supply chain partnerships continue to provide opportunities to further scale our business and broaden our product portfolio***."

269.  The statements in ¶268 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(a)-(f), *supra*.

**G.  Defendants' False And Misleading Statements Made In The November 12, 2020 Amendment To The Registration Statement**

270.  On November 12, 2020, Pivotal filed an amendment to the October 2, 2020 Registration Statement on Form S-4/A with the SEC (the "November 12, 2020 Amendment), which was signed by Ledecky and Brady, and signed by Ledecky as attorney-in-fact for each member of the Pivotal board of directors (including Griffin). The November 12, 2020 Amendment reiterated the statements in ¶¶247, 248, 250, and 256, *supra*.  Those statements were materially false and/or misleading for the reasons stated in ¶¶249, 251, and 257, *supra*.

271.    With respect to XL's backlog, the November 12, 2020 Amendment added the following language to the statement in ¶235:

> XL's sales and marketing team uses a software tool to track all sales opportunities to existing and potential customers, identifying specific vehicles and XL systems for such vehicles. This is used by XL management to create projections about future aggregate sales pipeline opportunities for its existing products. XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections. ***XL management believes that its revenue estimates and committed backlog are important indicators of expected future performance***.

272.    The statements in ¶271 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(a)-(b) and (e)-(f), *supra*.

273.    In addition, the statements in ¶271 were materially false and/or misleading when made because:

(a) Backlog presented a misleading indicator of future performance due to XL's severe supply shortages, which prevented XL from timely converting backlog into revenue, as detailed in Sections V.D.4 and V.E, supra.

(b) XL lacked the supplies necessary to fill existing purchase orders within the "3 to 6 month lead time" that XL represented to be "typical."

274.    With respect to battery supply, the November 12, 2020 Amendment revised the risk factor disclosure described in ¶239 to state:

> ***Increases in costs, disruption of supply or shortage of XL's components, particularly battery cells, could harm its business.***
>
> In the production of its electrified powertrain solutions, ***XL has experienced and in the future may again experience increases in the cost or a sustained interruption in the supply or shortage of its components***. Any such increase or supply interruption could materially negatively impact XL's business, prospects, financial condition and operating results. The prices for XL's components

fluctuate depending on market conditions and global demand and could adversely affect its business, prospects, financial condition and operating results. For instance, XL is exposed to multiple risks relating to price fluctuations for battery cells. These risks include:

•       the inability or unwillingness of current battery manufacturers to build or operate battery cell production facilities to supply the numbers of battery cells required to support the growth of the electric vehicle industry as demand for such cells increases;
•       disruption in the supply of cells due to quality issues or recalls by the battery cell manufacturers; and
•        an increase in the cost of raw materials.

Any disruption in the supply of battery cells could temporarily disrupt production of XL's electrified powertrain solutions until a different supplier is fully qualified. Moreover, battery cell manufacturers may refuse to supply electric vehicle manufacturers if they determine that the vehicles are not sufficiently safe. Furthermore, fluctuations or shortages in petroleum and other economic conditions have in the past and may again in the future cause XL to experience significant increases in freight charges. Substantial increases in the prices for raw materials have in the past and may again in the future increase the cost of XL's components and consequently, the costs of products. There can be no assurance that XL will be able to recoup increasing costs of its components by increasing prices, which could reduce its margins.

275.    The statements in ¶274 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(b) and (f), *supra*.

276.    In addition, the statements in ¶274 were materially false and/or misleading when made because the risk warnings failed to disclose specific facts concerning XL's pre-existing shortages and supply problems (as detailed in Section V.D.4, *supra*) that were necessary for investors to understand the magnitude of the risks at issue.

277.    The November 12, 2020 Amendment made two new additional disclosures concerning the supply chain and battery supply issues.  First, Pivotal stated:

In the first half of 2020 as result of the COVID-19 pandemic, XL experienced multiple supply and service disruptions impacting XL's HEV product line. XL's primary battery test facility, halted testing of XL's HEV battery, preventing the

validation of a newly designed battery. After several weeks, XL was able to find an alternate test facility, to restart the battery validation. This required sourcing, contracts, test plan development, training, and movement of essential hardware and equipment from the original location in New York to California resulting in a several month delay. Both test facility service providers are procured under a purchase order service arrangement.

Further, an XL battery supply partner, operating under a multi-year non-exclusive supply agreement with volume and pricing commitments, had significant supply disruptions in the April-May timeframe due to sub-supplier impacts on the Indiana and Michigan labor forces. In addition, Ford Component Sales (FCS), with whom we procure battery components under a month to month purchase order, had battery supply disruptions with a temporary closure of its manufacturing plant in Rawsonville, Michigan. This closure impacted the supply of HEV batteries to XL by several weeks.

278.    The November 12, 2020 Amendment also stated:

Revenues increased by $2.5 million, or 36.6%, from $6.9 million in the nine months ended September 30, 2019 to $9.5 million in the same period in 2020. The increase was primarily due to the resolution of battery supply issues, increased end customer demand and increased order sizes. ***During the quarter ended September 30, 2020, XL, its suppliers and OEMs made improvements to XL's supply chain***, including sourcing an additional battery supplier, which helped to counteract the negative impact of the COVID-19 pandemic on XL's business in prior quarters. Of the $9.5 million in revenue for the nine months ended September 30, 2020, approximately $6.4 million of revenue was recognized during the three months ended September 30, 2020, which was primarily due to the resolution of battery supply issues. ***Resolving the battery supply issues allowed XL to increase production and fulfill orders in its outstanding backlog***. Based upon XL's current production throughput and its current backlog of orders, and subject to any further ***unforeseen supply chain disruptions caused by the COVID-19 pandemic***, XL anticipates revenues for the year ending December 31, 2020 to be approximately $21 million.

279.    The statements in ¶¶277-78 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(b) and (f), *supra*.

280.    In addition, the statements in ¶¶277-78 were materially false and/or misleading when made because:

(a) The statements misleadingly implied that COVID-19 was solely or principally responsible for the battery shortages experienced by XL during the first half of 2020 and failed to disclose that XL had been suffering from severe battery shortages going back to at least May 2019, as detailed in Sections V.D.4 and V.E, *supra*;

(b) The statements failed to disclose that the battery shortages were due to XL's lack of market power and leverage in the battery market, which was unrelated to COVID;

(c) The statements failed to disclose the severity, scope, and longstanding duration of the battery shortages; and

(d) The statements misleadingly suggested that the battery supply issues had been "resolv[ed]" and failed to disclose that the "improvements to XL's supply chain" were insufficient to secure enough batteries for the massive expansion of production that was contemplated by XL's revenue forecast for 2021.

281.    With respect to the satisfaction of the test that XL's value be equal to at least 80% of the assets in Pivotal's trust account, the November 12, 2020 Amendment revised the statement in ¶253 to state:

**Satisfaction of 80% Test**

It is a requirement under Pivotal's current amended and restated certificate of incorporation that any business acquired by Pivotal have a fair market value equal to at least 80% of the balance of the funds in the trust account (excluding the deferred underwriting commissions and taxes payable) at the time of the execution of a definitive agreement for an initial business combination. The balance of the funds in Pivotal's trust account (excluding deferred underwriting commissions and taxes payable) at the time of the execution of the Merger Agreement with XL was approximately $223 million. In determining whether the 80% requirement was met, rather than relying on any one factor, Pivotal's board of directors concluded that it was appropriate to base such valuation on a number of qualitative factors, such as management strength and depth, competitive positioning, customer relationships and technical skills, as well as quantitative factors, such as the anticipated implied enterprise value of the combined company being approximately $1 billion with no material debt expected to be outstanding,

Pivotal's assessment that XL's valuation was attractive compared to its competitive peers, the historical performance of XL and the ***potential for future growth in revenues and profits of XL and a $220 million 12-month sales pipeline***. Based on the qualitative and quantitative information used to approve the Business Combination described herein, Pivotal's board of directors determined that the foregoing 80% fair market value requirement was met. Pivotal's board of directors believes that the financial skills and background of its members qualify it to conclude that the acquisition met the 80% requirement.

282.    The statements in ¶281 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts:

(a) XL's value was not equal to at least 80% of the balance of funds in Pivotal's trust account, for all of the reasons set forth in ¶215(a)-(f);

(b) The determination by Pivotal's board of directors concerning XL's valuation lacked a reasonable basis, because Pivotal's directors either knew the adverse facts or would have known those facts had they engaged in the extensive due diligence that they claimed they conducted; and

(c) For the additional reasons set forth in Section VII, *infra*, Pivotal's directors, including Ledecky and Griffin, knew or were severely reckless in not knowing the adverse facts that seriously undermined XL's putative value and the accuracy of XL's projections.

### H.    Defendants' False And Misleading Statements Made In The November 16, 2020 Press Release And Form 8-K

283.    On November 16, 2020, XL Fleet issued a press release entitled "XL Fleet Expands XLP™ Plug-in Hybrid Electric Drive System For Use in Multiple GM Fleet Applications." This press release was also attached as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC by Pivotal on November 16, 2020. Therein, the Company claimed it was able to "immediately serve this market:"

"Companies and municipalities are focused on electrifying a larger percentage of their fleets, while ensuring they uphold their performance and operational requirements," said Tod Hynes, Founder and Chief Strategy Officer of XL Fleet. "XL's ability to electrify a wide range of commercial applications from the world's leading vehicle manufacturers allows us to ***immediately serve this market*** with proven, high performance vehicles that are already designed and specified for the rigorous duty cycles of fleets."

284.     The statements in ¶283 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(b), (d), and (f), *supra*.

### I.     Defendants' False And Misleading Statements Made In The November 16, 2020 IPO Edge Webinar And November 19, 2020 Form 8-K

285.     On November 16, 2020, Hynes participated in a webinar hosted by IPO Edge.  On November 19, 2020, the Company attached a copy of the transcript of that webinar as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC.  Hynes stated at the webinar, "We have a very low cost and highly scalable production capacity that leverages the existing manufacturing capacity of the industry. So our systems get installed as the vehicles are manufactured and then shipped anywhere in the country and end up as brand new vehicles at the customer's location."

286.     The statements in ¶285 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(b) and (f), *supra*.

### J.     Defendants' False And Misleading Statements Made In Hynes' November 23, 2020 Interview With TD Ameritrade And The November 27, 2020 Form 8-K

287.     On November 23, 2020, Defendant Hynes participated in an interview with TD Ameritrade.  On November 27, 2020, Pivotal attached a copy of the transcript of that interview as Exhibit 99.1 to a Form 8-K, which was signed by Ledecky and filed with the SEC.  Hynes stated during the interview:

We're putting more units on the road now than any of our competitors and we've got some great customers coming back to buy more and ***we're really scaling up across the country*** and have a very low cost installation structure compared to others in the market who are trying to bring new products in.

***

So we're very excited, ***we're in a great position***. Again, we are a first mover; we have gotten great feedback from our customers and our installation partners. ***Other major players in the industry for example, batteries supply, we now have multiple battery suppliers for our technology***. So it is really exciting to be closing on this transaction having plenty of capital to really execute that in scale and ***extremely rapidly in 2021 and beyond***.

288.    The statements in ¶287 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(b) and (f), *supra*.

### K.    Defendants' False And Misleading Statements Made In The December 1, 2020 Amendment To The Registration Statement And The December 8, 2020 Proxy/Prospectus

289.    On December 1, 2020, Pivotal amended the October 2, 2020 Registration Statement by filing Form S-4/A with the SEC (the "December 1, 2020 Amendment"), which was signed by Ledecky and Brady, and signed by Ledecky as attorney-in-fact for each member of the Pivotal board of directors (including Griffin).

290.    On December 8, 2020, the October 2, 2020 Registration Statement (as amended) was declared effective and Pivotal released the December 8, 2020 Proxy/Prospectus for Pivotal's annual meeting to be held on December 21, 2020 where the Business Combination would be voted on.   The December 8, 2020 Proxy/Prospectus formed part of the October 2, 2020 Registration Statement (as amended). The December 8, 2020 Proxy/Prospectus contained a notice of annual meeting signed by Ledecky, "By Order of the Board of Directors" of Pivotal.

291.    The December 1, 2020 Amendment and the December 8, 2020 Proxy/Prospectus repeated the false and/or misleading statements in ¶¶247, 248, 250, 255, 256, 271, 274, 277, 278,

and 281, which were false and misleading for the reasons set for in ¶¶249, 251, 257, 272, 275, 279, and 282.

### L.   Defendants' False And Misleading Statements Made In The December 11, 2020 Press Release And Form 8-K

292.   On December 11, 2020, XL issued a press release entitled, "XL Fleet Launches Pilot Program with Essential Utilities, Inc. to Electrify its Utility Fleet."   In addition, on December 11, 2020, Pivotal attached a copy of the press release as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC.  The December 11, 2020 press release stated:

> "XL Fleet's electrified powertrain technology is a perfect fit for companies like Essential, who are looking to ***immediately electrify their fleet vehicles***, but also have demanding drive cycles and performance requirements that need to be met," said Brian Piern, Vice President of Sales and Marketing at XL Fleet.

293.   The statements in ¶292 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(b), (d), and (f), *supra*.

### M.   Defendants' False And Misleading Statements Made In The December 22, 2020 Press Release

294.   On December 22, 2020 Pivotal issued a press release entitled, "XL Fleet, a Leader in Commercial Vehicle Electrification, and Pivotal Investment Corporation II Announce Closing of Merger; XL Fleet to Trade on NYSE as 'XL'".   The press release touted the Company's "growth strategy," "firmly established supply chain, and deep OEM relationships," and "highly scalable business model":

> "Today is a significant milestone for XL Fleet and our employees and an important step forward for the commercial vehicle industry as we transform commercial fleets to build a more sustainable world," said Dimitri Kazarinoff, XL Fleet's Chief Executive Officer. "The closing of our merger with Pivotal will empower us to ***accelerate our growth strategy*** and bolster the industry's most comprehensive fully integrated fleet electrification platform, encompassing real-time data monitoring and analytics, propriety powertrain technology, power management, charging and storage. ***Our tested products, strong presence in the***

***U.S. and Canada, firmly-established supply chain, and deep OEM relationships position XL Fleet as the partner-of-choice*** for our blue-chip customer base who recognize us as a key partner in helping them to meet their sustainability goals efficiently and at a lower cost."

\*\*\*

"We appreciate the overwhelming support received from shareholders of Pivotal, including 99.88% votes cast in favor of the merger between Pivotal and XL Fleet," said Mr. Ledecky. "We are exceptionally proud of XL Fleet's success to date and are excited to continue to support the Company and its talented team as it transitions to the public markets. With thousands of proven systems on the road today, millions of miles driven by hundreds of customers in mission-critical applications, and an asset light, ***highly scalable business model***, I believe that XL Fleet is poised to realize its vision of becoming a world leader in fleet electrification."

295.   The statements in ¶294 were materially false and/or misleading when made and/or

omitted to state material facts necessary to make the statements not misleading, because they

failed to disclose, among other things, the adverse facts set forth in ¶215(a)-(f), *supra*.

**N.   Defendants' False And Misleading Statements Made In Hynes' December 23, 2020 CNBC Interview**

296.   On December 23, 2020, Hynes was interviewed on CNBC and was asked about

the Company's growth projections and Hynes touted the Company's sales pipeline and their

ability to meet the market's strong demand:

Q: I think 2020 forecasted revenue of 21 million, 2021 75 million, but then 2024 forecasted 1.4 billion. How do you get to that number? What is your expectation in terms of some of those different levers that you just laid out for growth?

Hynes: Well, we're growing extremely quickly; we're tripling our revenue in the middle of a pandemic, and I think we would we could have done more without the pandemic. So ***we have a great pipeline going into 2021*** and we also have a very good platform to build off of and introduce a lot more technology and product offerings. …

We're clearly leading, shipping hundreds of units per month right now. ***So we're in a great position to really expand with the market, which clearly has a lot of demand***.

297.    The statements in ¶296 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(a)-(f), *supra*.

**O.    Defendants' False And Misleading Statements Made in The January 13, 2021 Registration Statement And January 22, 2021 Prospectus**

298.    On January 13, 2021 the Company filed a Registration Statement on Form S-1 with the SEC and on January 22, 2021, the Company filed a related Prospectus with the SEC (the "January 22, 2021 Prospectus"), which formed part of the January 13, 2021 Registration Statement. The January 13, 2021 Registration Statement was signed by each member of the XL Fleet board of directors (including Kazarinoff, Hynes, Ledecky, and Griffin).

299.    Both of the January 13, 2021 Registration Statement and the January 22, 2021 Prospectus contained the same false and/or misleading statements[24] in ¶¶247, 248, 250, 271, 274, 277, and 278 above, which were false and misleading for the reasons set forth in ¶¶249, 251, 272, 275, and 279.

300.    The January 13, 2021 Registration Statement and the related January 22, 2021 Prospectus both stated:

> Revenues increased by $2.5 million, or 36.6%, from $6.9 million in the nine months ended September 30, 2019 to $9.5 million in the same period in 2020. The increase was primarily due to the ***resolution of battery supply issues***, increased end customer demand and increased order sizes. During the quarter ended September 30, 2020, ***we, along with our suppliers and OEMs, made improvements to our supply chain***, including sourcing an additional battery supplier, which helped to counteract the negative impact of the COVID-19 pandemic on our business in prior quarters. Of the $9.5 million in revenue for the nine months ended September 30, 2020, approximately $6.4 million of revenue was recognized during the three months ended September 30, 2020, which was primarily due to the resolution of battery supply issues. ***Resolving the battery supply issues allowed us to increase production and fulfill orders in our outstanding backlog***. Based upon our

---

[24] These statements in the January 22, 2021 Prospectus contained the same language except that "XL" was replaced with "we" and "XL's" was replaced with "our" given that the Business Combination had been finalized.

current production throughput and our current backlog of orders, and subject to any further *unforeseen supply chain disruptions caused by the COVID-19 pandemic*, we anticipate revenues for the year ending December 31, 2020 to be approximately $19 million to $21 million.

*** 

Revenues increased by $3.74 million, or 144.2%, from $2.59 million in the three months ended September 30, 2019 to $6.33 million in the same period in 2020. The increase was primarily due to the resolution of battery supply and in OEM vehicle production and due to increased end customer demand for our systems. *We and our suppliers and OEMs have been making improvements in our supply chain during the second half of 2020*, including sourcing an additional battery supplier, all of which have been impacted by the COVID-19 pandemic. This third quarter revenue increase was attributable to the *aforementioned resolution of the first and second quarter supply chain challenges*, which allowed us to ramp up production and ship an increasing number of kits to help fulfill our outstanding backlog of customer orders. *Based upon our current production throughput, we believe that we can produce and sell more kits in the fourth quarter than in the third quarter, which we believe will enable us to fulfill even more of our outstanding backorders*. This said, it is very difficult for us to precisely gauge the impact on us, our suppliers and our customers given the uncertainties surrounding the COVID-19 pandemic and the geo-political and economic climate. Based upon our current production throughput and its current backlog of orders, and subject to any further unforeseen supply chain disruptions caused by the COVID-19 pandemic, we anticipate revenues for the year ending December 31, 2020 to be approximately $19 million to $21 million.

301.    The statements in ¶300 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth in ¶215(b) and (f), *supra*.

302.    In addition, the statements in ¶300 were materially false and/or misleading when made because:

(a) The statements misleadingly implied that COVID-19 was solely or principally responsible for the battery shortages experienced by XL during the first half of 2020 and failed to disclose that XL had been suffering from severe battery shortages going back to at least May 2019, as detailed in Sections V.D.4 and V.E, *supra*;

(b) The statements failed to disclose that the battery shortages were due to XL's lack of

market power and leverage in the battery market, which was unrelated to COVID;

(c) The statements failed to disclose the severity, scope, and longstanding duration of the

battery shortages; and

(d) The statements misleadingly suggested that the battery supply issues had been

"resolv[ed]" and failed to disclose that the "improvements to XL's supply chain"

were insufficient to secure enough batteries for the massive expansion of production

that was contemplated by XL's revenue forecast for 2021.

**P.   Defendants' False And Misleading Statements Made In The March 8, 2021 Press Release**

303.   On March 8, 2021, the Company issued a press release responding to Muddy

Waters, which stated in part:

> In fact, ***XL Fleet's management team has a track record of successfully navigating global supply chain challenges*** and a highly competitive operating environment. For example, in 2019, XL Fleet, as well as major vehicle manufacturers, were impacted by a component shortage that affected battery supply. ***XL Fleet has since established a more robust and reliable supply chain***, and now has multiple battery suppliers and proprietary battery packs in place.

304.   The statements in ¶303 were materially false and/or misleading when made and/or

omitted to state material facts necessary to make the statements not misleading, because they

failed to disclose, among other things, the adverse facts set forth in ¶215(b) and (f), *supra*.

305.   In addition, the statements in ¶303 were materially false and/or misleading when

made because:

(a) At the time that XL made this statement, XL was experiencing severe supply

shortages that would cause XL to record only $675,000 in revenue for Q1 2021 and to

withdraw its full-year revenue forecast for 2021 of $75 million.  By the time this

statement was made, Q1 2021 was already more than two-thirds complete, so

Defendants already knew that the supply shortages were having a material adverse effect on XL's financial results. A little more than three weeks after XL issued this denial of the Muddy Waters allegations, XL was forced to admit that it had not able to fill any orders for "a lengthy period early in the year" due to "***ongoing OEM delays***, amid microchip and ***other shortages***."

(b) It was materially misleading for XL to aggressively deny Muddy Waters' allegations that XL suffered from serious supply chain problems at the very moment that XL was in the middle of a production shutdown due to supply chain problems.

(c) The context of Muddy Waters' allegations rendered XL's statements particularly misleading. Muddy Waters had claimed that XL "had significant supply chain woes indicative of a bit player" and that "XL has been subject to supply shortages for years." XL responded by claiming it had "a track record of successfully navigating global supply chain challenges" and that, notwithstanding battery supply problems in 2019, XL had "since established a more robust and reliable supply chain." Even if the battery supply issues had been completely resolved and the Q1 2021 supply issues related entirely to different components (and the facts do not support this conclusion, as detailed *infra* at Section VII.G), XL's touting of its supply chain capabilities misled investors as to present, known conditions that directly undermined Defendants' revenue projections.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

306.   As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding XL Fleet, their control over, and/or receipt and/or modification of XL Fleet's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning XL Fleet, participated in the fraudulent scheme alleged herein.

**A.**     **The XL Individual Defendants' Job Roles And Activities Support A Strong Inference Of Scienter**

307.    XL is a small organization.  As of September 24, 2020, XL had only 60 full time employees, which allowed Kazarinoff and Hynes to have in-depth knowledge of all aspects of XL's operations.

308.    Piern, who directly participated in the fraud alleged herein, reported directly to then-CEO Hynes up until October 2019, and thereafter to his replacement, Kazarinoff. According to FE2, Kazarinoff met with Piern weekly to discuss the company's sales pipeline.

309.    FE1 stated that Piern held a weekly sales meeting, and at these meetings Piern would present three to four slides to the sales team, which Piern informed them were the same slides Piern presented to the XL Hybrids board of directors, including Hynes and Kazarinoff. These slides always included information about the sales pipeline, including the total amount of the sales pipeline.

310.    As detailed in Section V.D.3, *supra*, based on the direct accounts of former employees, Piern directly participated in the sales pipeline inflation scheme by either instructing employees to enter sales opportunities into Salesforce without a reasonable basis, instructing

employees to record inflated percentage likelihoods of sales, instructing employees to maintain pre-existing entries into Salesforce after customers indicated that they would not be ordering products, or personally overriding or altering entries into Salesforce to inflate the percentage likelihood of sales.

311. With respect to the supply chain issues, direct and circumstantial evidence supports the conclusion that the XL Defendants were aware of the battery shortages and the impact they had on XL's ability to fill orders. According to FE1, during a sales meeting in May 2019, Piern informed the sales team that XL Hybrids was having issues getting batteries from its supplier LG. Then-CEO Hynes was present at this meeting. As the most senior officers of XL, Hynes and Kazarinoff had to have known that supply shortages were preventing XL from filling customer orders, as they knew that the Company had a substantial backlog of orders and very little revenue was recognized during all of 2019 and the first half of 2020. The "mitigation" efforts described in the October 2, 2020 Registration Statement indicates a consciousness of the supply disruptions on the part of management and a deliberate plan to remedy those disruptions.

### B. Pivotal's Due Diligence Supports A Strong Inference Of Scienter As To The Pivotal Individual Defendants

312. As Pivotal directors and officers, and as the primary beneficial owners of Pivotal's sponsor, Defendants Ledecky, Griffin, and Brady were substantially involved in all aspects of Pivotal's merger with XL Hybrids, including Pivotal's due diligence. From Pivotal's substantial due diligence activities, the Pivotal Individual Defendants had access to detailed information revealing the truth about XL Hybrids' business.

313. In the December 8, 2020 Proxy/Prospectus, Pivotal represented to investors that "in analyzing the Business Combination, Pivotal's board of directors conducted significant due diligence on XL."

314.    On July 24, 2020, XL Hybrids and Pivotal entered into a non-disclosure agreement, after which XL Hybrids began providing financial projections and other due diligence materials to Pivotal, including through an electronic data room.  From July 24, 2020 through the September 17, 2020 signing of the merger agreement between XL Hybrids and Pivotal, representatives of Pivotal and its legal counsel conducted due diligence of XL Hybrids through document review and numerous telephone conference calls with representatives of XL Hybrids and its legal counsel.

315.    According to the December 8, 2020 Proxy/Prospectus, "Pivotal's diligence covered various areas, including, among others, commercial operations and contracts, financial results, litigation, legal compliance, intellectual property, tax and general corporate matters," and "Pivotal conducted further diligence, including calls with XL suppliers, customers, and investors, as well as competitors and industry experts, which diligence focused on, among other things, XL's products, market share, and future prospects, as well as the outlook for the sector more generally." Based on this initial due diligence process, Pivotal decided to pursue further diligence.

316.    On August 6, 2020, Pivotal submitted a list of preliminary diligence requests to XL Hybrids.  From August 6, 2020 through the September 17, 2020 signing of the merger agreement between XL Hybrids and Pivotal, "representatives of Pivotal and its advisors conducted further analysis and held conference calls with representatives of XL regarding XL's business plan, financial projections, technology and addressable market and continued their extensive business, financial, accounting, tax and legal due diligence investigations of XL."

317. Defendants Ledecky and Griffin, among others, participated in video conference meetings on July 27-28, 2020 between Pivotal and XL Hybrids, and their respective legal and financial advisors, at which XL Hybrids' business was discussed.

318. On September 16, 2020, at a video conference meeting at which Defendants Brady and Griffin were present, Defendant Ledecky gave an extensive presentation about the proposed merger of Pivotal and XL Hybrids to Pivotal's board of directors, and such presentation focused on matters "including potential risks relevant to XL's business."

319. Pivotal continued its due diligence after the Merger Agreement was signed, investigating and evaluating XL Hybrids' business operations and prospects and ensuring the Merger closing conditions were met, including "the accuracy of the representations and warranties of XL Hybrids (subject to certain bring-down standards)."

320. In late November 2020 or early December 2020, prior to the December 21, 2020 vote on the Business Combination, FE3 was contacted by an individual who represented himself as an attorney for Pivotal, who claimed to be conducting due diligence related to the Merger.

321. FE3 told Pivotal's attorney about the XL Hybrids' overstated sales pipeline and issues with XL Hybrids' products. Pivotal's attorney asked if he could have more people on the call and call FE3 right back. FE3 was contacted a short while later with approximately four or five other people on the phone and talked to them for a total of 90 minutes.

322. FE3 said the main topics discussed on the Pivotal call were issues with the ROI (meaning the miles per gallon misrepresentations which indicated the technology did not work as promised), the overstated sales pipeline, and how XL Hybrids could not sell its products in California due to losing its CARB certification.

323.   FE3 was told the Pivotal representatives would be contacting FE3 again in the future and possibly a number of times; however, FE3 was not contacted again by any Pivotal representatives.

324.   On information and belief, Plaintiffs allege that the information conveyed by FE3 to the Pivotal representatives was collected as part of the due diligence procedures conducted in relation to the merger, and, in the normal course, this information would have transmitted to Pivotal management.   Accordingly, the material information provided by FE3 to Pivotal regarding XL's Hybrids' inflated sales pipeline, technology and operations constituted a red flag that should have, at the very least, prompted further investigation by Pivotal before it consummated the merger.   That the Pivotal Individual Defendants went ahead with the consummation of the merger, therefore, constitutes severe recklessness at a minimum, if not deliberate fraud.

### C.   The Individual Defendants Held Themselves Out As Knowledgeable

325.   The Individual Defendants repeatedly held themselves out as knowledgeable regarding the operational details of XL and the subject matter of the various misrepresentations and omissions alleged herein, which gives rise to a strong inference of their scienter.

326.   For example, on the September 18, 2020 Call, Ledecky stated:

We believe XL is the most proven and most trusted company in fleet electrification today, with more commercial customers, more miles driven and a broader product offering than anyone else in the market. By leveraging its proprietary technology and first-mover advantage, XL is experiencing significant growth. We believe XL Fleet is best positioned to take advantage of the dramatic shift toward fleet electrification expected over the next two decades. XL will take many of their existing 200 plus customers on the journey to full electrification.

327.   Ledecky thereby held himself out to investors as knowledgeable about XL Hybrids' products, technology, customer base, growth prospects, and even the extent to which customers "trusted" XL Hybrids.

328.     On October 26, 2020, representatives of Pivotal and XL Hybrids participated in a webinar hosted by SPACInsider to discuss the proposed Business Combination. In that webinar, Kazarinoff stated:

> So, Tod mentioned over 130 million customer miles, more than 3,000 systems on the road. Our individual order sizes have been growing rapidly as we're seeing folks go from trial to actual adoption, and we've got a 12 months sales pipeline that now is over $240 million, which we feel is going to support our forecast for next year of $75 million in revenue. We are currently tripling revenue here in the middle of this pandemic, despite some of those challenges and on track for $21 million in revenue in 2020.

329.     Ledecky thereby held himself out to investors as knowledgeable about XL Hybrids' customers, their product ordering behavior including the extent to which they proceeded from "trial" to "actual adoption," the XL Hybrids sales pipeline, and the pipeline's significance for future revenues.

330.     On November 16, 2020, Hynes participated in a webinar hosted by IPO Edge, a transcript of which was filed with the SEC by Pivotal.  In that webinar, Hynes stated:

> [A]nd XL Fleet already has over 130 million, almost 140 million customer miles across North America. Just to put that in perspective, Tesla had about 4 million miles under their belt when they went public. So we've got really good insight into how our customers are using their vehicles, with our hybrid product and now plug-in hybrid product. And that gives us really good insight into as far as what technologies to bring to market, what's the return on investment of a certain battery technology or certain charge rate based on, again, how those vehicles are being used in the real world.

331.     Hynes thereby held himself out to investors as knowledgeable about XL Hybrids' technology, how customers were using their XL Hybrids' products, and the customers' return on their investment in XL Hybrids' products as used "in the real world."

332.     In a November 23, 2020 press release, XL Hybrids quoted Piern as stating:

> Farmbro has been an exceptional partner for XL Fleet, as we have greatly expanded our reach into the Canadian fleet market over the past 18 months . . . They have been an integral part of our continued growth and success, and an obvious choice to be recognized as our partner of the year. We look forward to

continue ramping up our production volume with them in 2021 and beyond, as XL Fleet continues to expand its Canadian customer base, electrify new vehicles and enter new markets.

333.     In a December 11, 2020 press release, XL Hybrids quoted Piern as stating:

XL Fleet's electrified powertrain technology is a perfect fit for companies like Essential, who are looking to immediately electrify their fleet vehicles, but also have demanding drive cycles and performance requirements that need to be met . . . We are excited to be partnering with Essential as they begin their journey toward a more sustainable fleet.

334.     By these statements, Piern held himself out to investors as knowledgeable about XL Hybrids' customers, sales opportunities, technology, and how customers were using their XL Hybrids' products.

335.     In the foregoing statements, the Individual Defendants' other statements as alleged herein, and other public statements made by the Individual Defendants throughout the Class Period, the Individual Defendants repeatedly held themselves out to investors as knowledgeable regarding the subject matter of the misrepresentations and omissions alleged herein.

### D.     Motive And Opportunity

336.     The Individual Defendants possessed strong personal financial motives to complete the Business Combination between Pivotal and XL Hybrids, and therefore to cover up problems at XL Hybrids and misleadingly inflate its apparent future prospects.  As the key executive officers of Pivotal and XL Hybrids, the Individual Defendants had ample opportunity to do so.

### 1.     Defendants Ledecky, Griffin, and Brady

337.     A litany of financial incentives motivated Defendants Ledecky, Griffin, and Brady to seek approval of the Business Combination, regardless of the merits of the transaction or the true value of XL Hybrids.

338.     Pivotal Investment is a Delaware limited liability and was the sponsor of Pivotal. The Sponsor is ultimately controlled by Ledecky and Griffin, who were also directors of Pivotal. One of the two managing members of the Sponsor is Ironbound Partners, a private investment management fund that is an affiliate of Ledecky.  The other managing member of the Sponsor is Pivotal SPAC Funding II LLC, an affiliate of Griffin.  Securities directly owned by the Sponsor are reported as beneficially owned by Defendants Ledecky and Griffin.

339.     Pivotal completed its IPO on July 16, 2019, and had 18 months (i.e., until January 16, 2021) to complete a business combination, or it would be forced to cease operations and distribute all of its assets in redemption of its publicly traded shares.

340.     Leading up to the Business Combination, the Sponsor owned 5.5 million shares of Pivotal Class B common stock, each of which would convert into one share of Pivotal's Class A common stock upon the closing of the Business Combination.  Pivotal reported these 5.5 million shares as beneficially owned by Ledecky and Griffin, who had shared dispositive and voting control over the shares.

341.     Leading up to the Business Combination, the Sponsor also owned 4,233,333 warrants of Pivotal, exercisable for stock after the closing of the Business Combination.  Pivotal reported these 4,233,333 shares issuable upon exercise of the warrants as beneficially owned by Ledecky and Griffin, who would have shared dispositive and voting control over the shares.

342.     As admitted in the December 8, 2020 Proxy/Prospectus, if Pivotal did not complete the Business Combination or another business combination by January 16, 2021, then the 5.5 million Pivotal shares and the 4,233,333 warrants owned by the Sponsor would be worthless because the Sponsor had agreed to waive its rights to participate in any distribution with respect to such securities.  Based on the December 7, 2020 closing price of $16.00 per share

of Pivotal, the Sponsor's 5.5 million shares had an aggregate market value of $88 million.  Based on the December 7, 2020 closing price of $4.12 per warrant of Pivotal, the Sponsor's 4,233,333 warrants had an aggregate market value of $17.4 million.  As such, the Sponsor stood to lose $105.4 million if no qualifying transaction was completed by the deadline.

343.    Based on information and belief, if Pivotal did not complete the Business Combination or another business combination by January 16, 2021, then Ledecky and Griffin each stood to lose tens of millions of dollars via their beneficial interests in Pivotal securities owned by the Sponsor.

344.    Similarly, leading up to the Business Combination Defendant Brady owned 100,000 shares of Pivotal Class B common stock, and he had waived his rights to participate in any distribution with respect to these shares in the event that Pivotal did not complete a business combination by January 16, 2021.  Based on the December 7, 2020 closing price of $16.00 per share of Pivotal, Defendant Brady's stock had an aggregate market value of $1.6 million, which he stood to lose if the Business Combination with XL Hybrids was not completed.

345.    From the time that Ledecky and Hynes began discussing, on or about July 24, 2020, a potential merger of Pivotal and XL Hybrids, up until the completion of the Business Combination on or about December 21, 2020, Pivotal lacked feasible opportunities to complete a business combination by its January 16, 2021 deadline, apart from a merger with XL Hybrids.

346.    As admitted in Pivotal's December 8, 2020 Proxy/Prospectus, from Pivotal's July 16, 2019 IPO through September 17, 2020 Pivotal identified and met with various potential target businesses to discuss a possible business combination.   However, none of these discussions resulted in an executed letter of intent other than the discussions with XL Hybrids.

347.    Identifying a merger target, completing negotiations, finalizing merger documentation, and obtaining required shareholder approvals, is an extremely time consuming process requiring at least several months to complete.  For example, discussions between Pivotal and XL Hybrids began in July 2020, but the Business Combination was not completed until December 2020, approximately five months later.

348.    Therefore, if the Business Combination between Pivotal and XL Hybrids was not approved by Pivotal shareholders, Pivotal lacked feasible alternatives to complete a business combination by its January 16, 2021 deadline, and would be forced to cease operations and liquidate, and the Pivotal securities owned by the Sponsor (and beneficially owned by Ledecky and Griffin) and by Defendant Brady would become worthless.

349.    In addition to the substantial value of their beneficial interests in Pivotal securities, Ledecky, Griffin, and Brady possessed numerous other financial incentives to complete the Business Combination, as admitted in Pivotal's December 8, 2020 Proxy/Prospectus.  For example, if Pivotal did not complete a business combination, then the Sponsor (in which Ledecky and Griffin owned substantial economic interests) would be personally liable for certain Pivotal debts.  If Pivotal did not complete a business combination, then the Sponsor, Ledecky, Griffin, Brady, and their affiliates may not have been able to recover certain expenses for which Pivotal would otherwise be required to reimburse them.  If the Business Combination closed, Ledecky and Griffin were to serve as directors of XL Fleet, and so stood to receive potentially substantial director compensation from XL Fleet.

350.    Defendant Griffin possessed an additional financial motive to seek the approval of the Business Combination regardless of its merits. Defendant Griffin was the CEO and Chief Investment Officer of MGG Special Opportunities Fund LP, and MGG subscribed for 630,000

shares of Pivotal Class A common stock in the PIPE Transaction, to be purchased at a price of $10 per share, for a total of $6.3 million.[25] The closing of the PIPE Transaction was conditioned on the approval of the Business Combination. The $10 per share price to be paid by MGG was substantially lower than the publicly traded market value of Pivotal stock around the time of the Business Combination. For example, based on the closing price of $16.00 per share on December 7, 2020, the shares to be acquired by MGG were worth $10,080,000, thus representing a $3,780,000 windfall to MGG and to Defendant Griffin if, and only if, the Business Combination were to be approved.

351.    That the foregoing powerful financial incentives motivated Ledecky, Griffin, and Brady to cause Pivotal to complete a business combination regardless of its merits is evidenced by Pivotal's own admissions in its December 8, 2020 Proxy/Prospectus, for example:

> The Sponsor and Pivotal's officers and directors own common stock and warrants that will be worthless and have incurred reimbursable expenses that may not be reimbursed or repaid if the Business Combination is not approved. *Such interests may have influenced their decision to approve the Business Combination with XL.*

352.    The December 8. 2020 Proxy/Prospectus further admitted:

> The Sponsor, which is ultimately controlled by Jonathan J. Ledecky and Kevin Griffin, is liable under certain circumstances to ensure that proceeds of the trust are not reduced by vendor claims in the event the Business Combination is not consummated. *Such liability may have influenced the decision of Messrs. Ledecky and Griffin to approve the Business Combination with XL.*

353.    In addition, that the foregoing financial incentives motivated Ledecky, Griffin, and Brady to cause Pivotal to complete a business combination regardless of its merits is further evidenced by the fact that XL Hybrids did not fit the profile of Pivotal's stated target companies, and so appears to have been selected out of necessity simply in order to achieve any business

---

[25] In connection with and at the same time as the Business Combination, Pivotal issued 15,000,000 shares of its Class A common stock in a private placement at a price of $10.00 per share, for an aggregate purchase price of $150,000,000 (the "PIPE Transaction").

combination. From Pivotal's July 16, 2019 IPO through at least March 30, 2020 it publicly disclosed that:

> While we may pursue an initial business combination target in any industry or geographic location, *we intend to focus our search on companies exploiting disruptive smart phone technology* and the resultant rapidly changing distribution patterns and evolving consumer purchase behavior.

354.    Furthermore, according to Pivotal's December 8, 2020 Proxy/Prospectus, the decision by Pivotal's board (of which Ledecky was the Chairman and Griffin was a director) to approve the Business Combination gave considerable weight to comparisons with alternative business combinations, but apparently failed to consider whether Pivotal shareholders would have been better served by no business combination at all and the redemption of their Pivotal shares:

> Pivotal's board of directors believes, after a thorough review of other business combination opportunities reasonably available to Pivotal, that the Merger represents the best potential business combination for Pivotal and the most attractive opportunity for Pivotal based upon the process utilized to evaluate and assess other potential combination targets, and Pivotal's board of directors' belief that such process has not presented a better alternative.

355.    That Pivotal, Griffin, and Ledecky failed to consider the option of not executing any business combination is further evidenced by the fact that Pivotal's board did not obtain an independent valuation of XL Hybrids or a fairness opinion to determine whether the Business Combination was fair to Pivotal shareholders.  In addition, Pivotal's board merely determined that XL Hybrids' fair market value "was at least 80%" of the value of Pivotal's assets; however, if no business combination took place then Pivotal shareholders would receive 100% of Pivotal's assets in redemption of their shares.

356.    Therefore, Ledecky's, Griffin's, and Brady's numerous financial incentives, including beneficial interests in millions of dollars of Pivotal securities that they stood to lose if the Business Combination were not completed, gave them strong motives to cover up problems

at XL Hybrids and misleadingly inflate its future prospects so that the Business Combination would be completed. Such motives apparently caused Ledecky, Griffin, and Brady to fail to even consider the possibility that Pivotal should not complete a business combination.

357.    Ledecky had ample opportunity to cover up problems at XL Hybrids and misleadingly inflate its future prospects.  Ledecky had substantial authority to control the contents of Pivotal's SEC filings and other public statements regarding the Business Combination.  As Pivotal's CEO and Chairman, one of the two primary beneficial owners of Pivotal's Sponsor, and one of only two Pivotal officers, Ledecky was at all times intimately involved in Pivotal's activities regarding potential business combinations, including the decision to merge with XL Hybrids. Ledecky and Hynes had the initial discussions leading to the Business Combination, and Ledecky was heavily involved in the subsequent meetings and discussions leading to the Business Combination.  Ledecky signed the merger agreement with XL Hybrids on behalf of Pivotal, and signed Pivotal's Registration Statement relating to the Business Combination.  On September 16, 2020, Ledecky gave an extensive presentation about the proposed merger of Pivotal and XL Hybrids to the Pivotal board of directors, and such presentation focused on matters:

> including potential risks relevant to XL's business, the implied valuation of XL, the pro forma ownership of the post-closing combined company, the fairness to Pivotal and its stockholders of the consideration to be paid by Pivotal in the transaction and the value of XL as a whole being at least equal to 80% of the amount held in Pivotal's trust account (excluding deferred underwriting commissions).

358.    Due to his substantial involvement in the Business Combination negotiations, and due to his control over Pivotal's public statements, Ledecky had the opportunity to cover up problems at XL Hybrids and misleadingly inflate its future prospects.

359.    Griffin also had ample opportunity to cover up problems at XL Hybrids and misleadingly inflate its future prospects.  Griffin had substantial authority to control the contents of Pivotal's SEC filings and other public statements regarding the Business Combination.  As a Pivotal director, and one of the two primary beneficial owners of Pivotal's Sponsor,  Griffin was substantially involved in Pivotal's activities regarding potential business combinations, including the decision to merge with XL Hybrids. Griffin signed Pivotal's Registration Statement relating to the Business Combination. Due to his substantial involvement in the Business Combination, and due to his control over Pivotal's public statements, Griffin had the opportunity to cover up problems at XL Hybrids and misleadingly inflate its future prospects.

360.    Brady also had ample opportunity to cover up problems at XL Hybrids and misleadingly inflate its future prospects.  Brady had substantial authority to control the contents of Pivotal's SEC filings and other public statements regarding the Business Combination.  As Pivotal's CFO and one of only two Pivotal officers, Brady was at all times substantially involved in Pivotal's activities regarding potential business combinations, including the decision to merge with XL Hybrids. Brady signed Pivotal's Registration Statement relating to the Business Combination.  Due to his substantial involvement in the Business Combination, and due to his control over Pivotal's public statements, Brady had the opportunity to cover up problems at XL Hybrids and misleadingly inflate its future prospects.

### 2.    Defendants Kazarinoff And Hynes

361.    Kazarinoff and Hynes also possessed strong financial motives to cover up problems at XL Hybrids and misleadingly inflate its future prospects, so that the Business Combination with Pivotal would be completed.

362.    Leading up to the Business Combination, XL Hybrids had liabilities substantially greater than its assets and was losing money at a rapid rate.  As such, XL Hybrids needed to raise a large amount of capital from investors in order to survive.  As admitted in Pivotal's December 8, 2020 Proxy/Prospectus:

> As of September 30, 2020, XL had a working capital deficit of $27.6 million and an accumulated deficit of $87.6 million. XL incurred a net loss of $20.0 million for the nine months ended September 30, 2020 and a net loss of $14.9 million for the year ended December 31, 2019.
>
> XL expects to continue to incur net losses in the short term . . .
>
> XL's ability to access capital when needed is not assured and, if capital is not available when, and in the amounts needed, it could be required to delay, scale back or abandon some or all of its development programs and other operations, which could materially harm XL's business, prospects, financial condition and operating results. Because of this uncertainty, there is substantial doubt about XL's ability to continue as a going concern . . .
>
> While management believes the funds to be raised in the Business Combination will alleviate the conditions that raise substantial doubt, it is not expected that such doubt can be alleviated prior to the consummation of the Business Combination.

363.    According to FE2, when FE2 was hired by XL Hybrids (in or about June 2020) FE2 was informed that the company had enough financing to last until the end of 2020, and FE2 was aware that the company was seeking and needed further financing.

364.    Therefore, the continued operation of XL Hybrids, and the continued employment and compensation of Kazarinoff as its CEO and Hynes as its Chief Strategy Officer, required XL Hybrids to immediately raise a large amount of capital.

365.    Based on information and belief, apart from the Business Combination with Pivotal, XL Hybrids lacked feasible alternatives to obtain the funding necessary for its continued operations.  As admitted in the December 8, 2020 Proxy/Prospectus, "XL may need to raise additional funds, which may not be available to XL on favorable terms or at all."  As admitted in

XL Hybrids' unaudited financial statements as of September 30, 2019, "[a]dditional equity financing may not be available on favorable terms and could be dilutive to current stockholders. Debt financing, if available, may involve restrictive covenants and dilutive financing instruments."

366.    In the Business Combination, XL received approximately $350 million in cash proceeds.  However, in its entire history as a company from 2009 up until December 2020, XL Hybrids had only raised aggregate gross proceeds of $64 million, primarily through private placements of convertible preferred stock and issuance of convertible notes payable.  As reported by Muddy Waters and not denied by XL Fleet, XL Hybrids' most recent stock sale, its Series D funding round in 2017, valued it at only $73 million. In the nine months ended September 30, 2020, XL Hybrids raised only $8.1 million dollars through issuance of convertible promissory notes at a high interest rate of 8.00% and a short maturity of December 31, 2020.  In May 2020 XL Hybrids received a $1.1 million loan under the federal government's Paycheck Protection Program, which required it to certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

367.    Over and above the ability to maintain their existing employment, compensation and attendant perquisites as officers and directors of XL, Kazarinoff and Hynes had strong personal financial incentives to complete the Business Combination with Pivotal in order to substantially increase their salary and bonus compensation.

368.    Hynes's 2019 salary from XL Hybrids, in his role as Chief Strategy Officer, was $250,000, and his 2020 salary was $225,000.  Hynes was eligible to receive annual bonuses from XL Hybrids, "based on established performance variables."  Hynes's bonus for 2019 was $40,000, and his target bonus for 2020 was $80,000.

369.     Kazarinoff joined XL Hybrids as its CEO and President in October 2019, and at that time entered into a letter agreement with XL Hybrids that provided for a $325,000 annual base salary in fiscal year 2019.  The letter provided that "[y]our base salary will be reviewed on a periodic basis in accordance with Company practices.  This role is eligible for the Company's annual merit program."  Kazarinoff's 2020 base salary was $292,500.

370.     Kazarinoff's letter agreement also provided that Kazarinoff would be eligible for an annual bonus of 30% of base salary (*i.e.*, $97,500 based on the $325,000 annual salary), which bonus would typically vary between 70% and 130% of the target amount (*i.e.*, between 21% and 39% of base pay).  The bonus amount was to be determined "based on performance variables," in "mutually agreed upon and documented objectives developed between [Kazarinoff] and the XL Board of Directors."  For 2019 Kazarinoff received a bonus equal to 23.4% of his base pay.

371.     According to Pivotal's December 8, 2020 Proxy/Prospectus, for XL Hybrids' executives including Kazarinoff and Hynes, "[b]ase salary is set at a level that is commensurate with the executive's duties and authorities, contributions, prior experience and sustained performance," and "[c]ash bonus is also set at a level that is commensurate with the executive's duties and authorities, contributions, prior experience and sustained performance."

372.     On March 4, 2021, XL Fleet announced that Kazarinoff's 2021 base salary would be $440,000, representing 150% of his 2020 base salary of $292,500.  Kazarinoff's 2021 target bonus would be 70% of his (now greatly increased) base salary, as compared to the previous 30%.  In the same announcement, XL Fleet stated that Hynes's 2021 base salary would be $372,500, representing 165% of his 2020 base salary of $225,000. Hynes's 2021 target bonus

would be 50% of his base salary (*i.e.*, $186,250), more than double his 2020 target bonus of $80,000.

373.    On March 31, 2021, XL Fleet paid Kazarinoff a bonus of $358,000, and paid Hynes a bonus of $302,860, both "in connection with services provided in fiscal 2020." Hynes's bonus was 379% of his $80,000 target bonus for 2020. Kazarinoff's bonus was 408% of his $87,750 target bonus for 2020 (based on 30% of $292,500 base salary).

374.    There is no indication that the performance of Kazarinoff and Hynes in 2020, apart from their roles in obtaining $350 million of investment via the Business Combination, merited any compensation increases at all. In 2020, XL Fleet incurred worsening losses as compared to 2019. The Company's 2020 loss from operations was $15.3 million, as compared to a $13.6 million 2019 loss. The Company's net loss was $25.6 million, as compared to a $14.9 million 2019 loss.

375.    Based on information and belief, the extraordinary increases in base salary and bonus compensation provided to Kazarinoff and Hynes relating to their 2020 performance were due in substantial part to their key roles in the completion of the Business Combination, from which XL obtained a badly needed $350 million in cash from investors. Based on information and belief, throughout the negotiation and completion of the Business Combination, Kazarinoff and Hynes knew that the completion of a merger with Pivotal would have the effect of substantially increasing their base salary and bonus compensation.

376.    Therefore, Hynes and Kazarinoff possessed powerful financial incentives, to maintain and increase their lucrative executive compensation, giving them strong motives to cover up problems at XL Hybrids and misleadingly inflate its future prospects.

377.    Reinforcing these compensation-based motives was Defendant Hynes's and Kazarinoff's ownership of substantial interests in XL Hybrids' securities. Throughout 2020 and leading up to the Business Combination, Defendant Kazarinoff owned substantial amounts of XL Hybrids stock options, and Defendant Hynes owned substantial amounts of XL Hybrids' stock as well as options.

378.    As of year-end 2019, Defendant Hynes owned options to purchase approximately 1.5 million shares of XL Hybrids' stock, and Defendant Kazarinoff owned options to purchase approximately 5 million shares of XL Hybrids' stock.

379.    Based on Defendant Hynes' reported ownership of XL Fleet stock after the Business Combination,[26] and further based on the Exchange Ratio between XL Hybrids and Pivotal shares used in the Business Combination, Defendant Hynes owned approximately 8.2 million shares of XL Hybrids stock immediately prior to the December 21, 2020 Business Combination.

380.    As of December 7, 2020 there were 11,669,664 shares of XL Hybrids' common stock outstanding, and 99,481,040 shares of XL Hybrids' preferred stock outstanding.

381.    In the Business Combination, all outstanding XL Hybrids stock was converted into the right to receive Pivotal stock, and all options to purchase XL Hybrids stock were converted into options to purchase Pivotal stock.

382.    Defendants Hynes and Kazarinoff thus converted their substantial interests in XL Hybrids securities into publicly tradable XL Fleet securities. Following the Business Combination XL Fleet reported that Defendant Kazarinoff beneficially owned 1.0% of XL's

---

[26] Defendants have not publicly disclosed the amounts of XL Hybrids stock owned at any time prior to the Business Combination by Defendant Hynes or Defendant Kazarinoff.

outstanding common stock, and that Defendant Hynes beneficially owned 5.6% of XL's outstanding common stock.

383.    In connection with the Merger between XL Hybrids and Pivotal, certain of the shareholders of XL Hybrids entered into a lock-up agreement providing that they would not dispose of stock received in the Business Combination for a period of one year.  However, the lock-up agreement provided that if the Company's publicly traded stock price was greater than or equal to $15.00 for a certain period of time, then they would be allowed to sell their shares as early as approximately six months following the close of the Business Combination.  Pivotal's initial stockholders entered into lock-up agreements with identical terms.  Based on information and belief, each of the Individual Defendants agreed to these lock-up provisions.

384.    Therefore, Defendants Kazarinoff and Hynes had strong motives to take the cash-strapped XL Hybrids public through the Business Combination, and to attempt to deceive the market regarding the true state of XL's business long enough to reach the expiry of the lock-up period, when they would be able to sell their substantial interests in XL securities to unsuspecting public investors.

385.    Kazarinoff and Hynes had ample opportunity to cover up problems at XL Hybrids and misleadingly inflate its future prospects.  Kazarinoff and Hynes had substantial authority to control the contents of XL Hybrids' public statements regarding the Business Combination. Through their ability to control what information XL Hybrids gave to Pivotal, Kazarinoff and Hynes likewise had substantial influence over the contents of Pivotal's public statements regarding the Business Combination.  Kazarinoff, as XL Hybrids' CEO, President and director, and Hynes, as XL Hybrids' founder, Chief Strategy Officer, and director, were at all times intimately involved in XL Hybrids' activities regarding a potential merger with Pivotal.  Hynes

and Ledecky had the initial discussions leading to the Business Combination. These initial discussions resulted from the fact that Ledecky and Hynes, "have been business acquaintances for 10 years as a result of Mr. Ledecky's decades-long relationship with Mr. Hynes' family." Kazarinoff and Hynes were heavily involved in the subsequent meetings and discussions leading to the Business Combination. Kazarinoff signed the merger agreement with Pivotal on behalf of XL Hybrids. Due to their substantial involvement in the Business Combination negotiations, and due to their control over XL Hybrids' public statements, Kazarinoff and Hynes had the opportunity to cover up problems at XL Hybrids and misleadingly inflate its future prospects.

### E. Core Operations

386. Prior to the Business Combination, Pivotal had no business operations of its own, and its sole purpose was "entering into a merger, share exchange, asset acquisition, share purchase, recapitalization, reorganization or similar business combination with one or more businesses or entities." Therefore, the Business Combination with XL Hybrids was Pivotal's core, and indeed only, operation, which gives rise to a strong inference of Ledecky's scienter with respect to issues relating to XL Hybrids.

387. At all relevant times the business of XL has been providing "fleet electrification solutions for commercial vehicles in North America." Therefore, matters relating to this business such as its sales pipeline, customer base, technological capability, supply chain, and personnel, represent core operations for XL, and give rise to a strong inference of the scienter of Hynes and Kazarinoff with respect to these issues.

**F.       Executive Departure Following The Muddy Waters Report**

388.     VP of Sales and Marketing Brian Piern left XL Fleet in May 2021, shortly after Muddy Waters published its revelations regarding XL.  XL fleet did not publicly announce, or give any explanation for Piern's departure.

389.     As alleged above, Piern was personally involved in the fraud alleged herein and revealed by the Muddy Waters report.  Piern directed XL Fleet employees to falsify pipeline numbers, and Piern himself falsified pipeline numbers in XL Fleet's salesforce software.  Piern knew that prominent "customers" featured in XL Fleet's investor communications, such as Pepsi and Safelite, were inactive and had no intention of making further purchases.  Piern knew that XL had problems obtaining batteries necessary to deliver its customers' orders.  Piern imposed baseless sales targets on his sales team members, which appear to have provided the foundation for XL's false revenue projections.

390.     As such, Piern's departure closely following Muddy Waters' revelations is strongly indicative of his and XL's scienter.

**G.       Defendants' Deceptive Pattern Of Disclosures Concerning Supply Issues Support A Strong Inference Of Scienter**

391.     As detailed *supra*, Defendants issued a series of partial disclosures and half-admissions concerning supply shortages and supply chain disruptions, but those statements showed a consistent pattern of (a) failing to acknowledge the severity, scope and longstanding duration of the supply chain problems, (b) failing to acknowledge the origin of the shortages and the role that XL's lack of market power and leverage in the battery market played in driving the supply disruptions, (c) attempting to deflect the blame on COVID, when the supply problems existed well before the pandemic took hold, (d) understating the persistence of the problems, and (e) overstating XL's capacity to mitigate or resolve the problems.  *See supra* at ¶¶156, 160, 239-

44, 274-80, and 300-05.  All of these statements, by their very nature, served to mislead and are in themselves suggestive of deceptive intent.

392.    One indicator of the severity and the persistence of the problem was the inability of XL to fully clear its backlog (let alone process new orders) over more than a 6 month period, even after the battery component shortage was supposedly resolved.  XL represented in its October 2, 2020 Registration Statement that its backlog, as of September 25, 2020, consisted of 961 firm purchase orders representing $12.3 million in revenue.[27]  As of this date, many of the purchase orders comprising that backlog had been sitting unfulfilled for many months, as former employees have indicated that very few orders were processed during all of 2019 and the first half of 2021.  XL claims that it began to resolve the battery supply issues in Q3 2020 and that it recognized $6.4 million in revenue in that quarter "primarily due to the resolution of battery supply issues."  In Q4 2020, XL recognized approximately $10.9 million in revenue, again "primarily due to the resolution of battery supply issues."[28]  In Q1 2021, XL recognized only $675,000 in revenue.  Thus, the total amount of revenue recognized by XL over the two-quarter period consisting of Q4 2020 and Q1 2021 is approximately $11,541,000, roughly $759,000 shy of the $12.3 million backlog figure as of September 25, 2020.  While this miss may not seem huge (it represents about 6% of the backlog as of September 25, 2020), this calculation assumes that all of the revenue during those two quarters related to filling old orders, not new ones.  And, *most importantly, XL's revenue forecast for 2021 assumed that XL would be more than tripling revenue over 2021, which means that it would also need to more than triple order fulfillment*.

---

[27] XL later represented that this same amount of backlog existed as September 30, 2020, in a January 4, 2021 Form S-1.

[28] More precisely, XL recognized $10,866,000 in revenue in Q4 2020.

393.    XL blamed the disappointing Q1 2021 results on "ongoing OEM delays, amid microchip and other shortages."  It is not clear what "other shortages" means and whether or not that includes batteries, but XL presumably wants the investing public to believe that these new supply disruptions are different from the previously resolved battery shortages and that they were unanticipated (or at least that the scope of the shortages was unanticipated) at the times that XL announced and repeated its revenue estimate for 2021.

394.    Even if Defendants are given every reasonable benefit of the doubt, however, a clear indicator of Defendants' bad faith is their March 8, 2021 response to and denial of the Muddy Waters allegations.  That statement was made just three weeks before XL announced its shockingly bad Q1 2021 forecast (which Defendants initially represented to be roughly $1 million but later reported to be $675,000).  With more than two-thirds of Q1 2021 complete and $675,000 in revenue for the entire quarter, Defendants must have known by March 8, 2021 that severe supply shortages had once again shut down production and would force Defendants to withdraw their revenue forecast in the very first quarter after going public.  In responding to Muddy Waters, however, Defendants rejected its allegations that XL was a "bit player" with "significant supply chain woes" and said, "***In fact***, XL Fleet's management team has a track record of successfully navigating global supply chain challenges and a highly competitive operating environment."  Defendants acknowledged that there had been a component shortage in 2019 that affected battery supply, but insisted that "XL Fleet has since established a more robust and reliable supply chain, and now has multiple battery suppliers and proprietary battery packs in place."

395.    For Defendants to make those statements, when they knew that another major supply disruption had already thrown their revenue forecast off the rails (a forecast that they

repeatedly touted over a course of months in an aggressive, full bore media blitz), was a brazen act of dishonesty. Taken together, and reviewed against the backdrop of information provided by multiple former employees, Defendants' disclosures concerning XL's supply chain difficulties demonstrate a consistent pattern of bad faith and deception.

### H.    Corporate Scienter

396.    The misrepresentations and omissions of Pivotal and XL Fleet as alleged herein are of such a nature that they would have been approved by corporate officials sufficiently knowledgeable about the companies to know that those statements and omissions were misleading.

397.    The scienter of Ledecky is imputable to Pivotal and XL Fleet.  Ledecky was the Chairman and CEO of Pivotal and remained a director of XL Fleet after the Business Combination.   Ledecky signed many of the SEC filings at issue and made other public statements on behalf of Pivotal.  As a senior officer and director who was acting within the scope of his authority, his scienter is attributable to Pivotal and XL Fleet, respectively.

398.    The scienter of Brady is imputable to Pivotal (and to XL Fleet as Pivotal's successor with respect to statements made before the Business Combination).  Brady was the CFO of Pivotal.  Brady signed the October 2, 2020 Registration Statement and its subsequent amendments.  As a senior officer who was acting within the scope of his authority, his scienter is attributable to Pivotal (and to XL Fleet as Pivotal's successor with respect to statements made before the Business Combination).

399.    The scienter of Griffin is imputable to Pivotal and XL Fleet.  Griffin was a director of Pivotal and remained a director of XL Fleet after the Business Combination.  Griffin signed the October 2, 2020 Registration Statement and its subsequent amendments, either

directly or through his attorney-in-fact, Ledecky. Griffin also signed the January 13, 2021 Registration Statement. As a director who was acting within the scope of his authority, his scienter is attributable to Pivotal and XL Fleet, respectively.

400.    The scienter of Kazarinoff is imputable to XL Fleet. Kazarinoff was the CEO of XL Hybrids and became CEO and director of XL Fleet following the Merger. Kazarinoff made multiple public statements on behalf of XL. Kazarinoff also signed the January 13, 2021 Registration Statement. As a senior officer and director who was acting within the scope of his authority, his scienter is attributable to XL Fleet.

401.    The scienter of Hynes is imputable to XL Fleet. Hynes was the Chief Strategy Officer of XL Hybrids. Hynes made multiple public statements on behalf of XL. Hynes also signed the January 13, 2021 Registration Statement. After the Merger, he became the President and a director of later XL Fleet. As a senior officer and director who was acting within the scope of his authority, his scienter is attributable to XL Fleet.

402.    The scienter of Piern is imputable to XL Fleet. Piern was XL's VP of Sales and Marketing from January 2019 through May 2021. Piern made multiple public statements on behalf of XL. As a senior officer who was acting within the scope of his authority, his scienter is attributable to XL Fleet. Piern was a management-level employee who was authorized to speak on behalf of the Company and possessed sufficient seniority and managerial authority such that his scienter is attributed to the Company. Piern managed XL Fleet's sales and marketing department and reported directly to the CEO, with whom he had weekly meetings. In the promotional materials published by XL Hybrids and Pivotal in support of the Business Combination, Piern was one of only a handful of executives prominently featured under the heading "Leadership Team." Piern regularly presented to the XL Hybrids' directors at board

meetings. XL Hybrids featured Piern's comments in investor communications such as press releases issued on November 23, 2020 (headlined, "XL Fleet Expects its Largest Partner to Double Orders in 2021") and December 11, 2020 (headlined, "XL Fleet Launches Pilot Program with Essential Utilities, Inc. to Electrify its Utility Fleet"). Piern inflated XL's sales pipeline knowing it would be incorporated into the Company's public statements and relied on by investors.

## VIII.   LOSS CAUSATION

403.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

### A.     Investors Suffered Significant Losses Due To The Materially Misleading Statements Issued During the Class Period

404.     Throughout the Class Period, as detailed herein, Defendants made materially false and/or misleading statements and/or omissions. This course of wrongful conduct caused the price of XL Fleet securities to be artificially inflated. But for Defendants' misrepresentations and/or omissions, Plaintiffs and the other members of the Class would not have purchased XL Fleet securities or would not have purchased such securities at artificially inflated prices. Later, when Defendants' prior misrepresentations and/or omissions were disclosed to the market, the price of XL Fleet shares fell significantly as the prior artificial price inflation was dissipated. As a result of their purchases and/or acquisition of XL Fleet securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.* damages, under the Exchange Act. The timing and magnitude of the decline in the prices of the Company's shares negates any inference that the economic losses and damages suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' wrongful conduct.

405.   As detailed in Section V.D.H, *supra*, the truth regarding XL was revealed to the market and/or the previously concealed risks materialized through a series of partial disclosures, which removed the artificial inflation in XL's share price and caused economic loss to Plaintiffs and the Class.

## B.   Pivotal Shareholders Suffered Damages

### 1.   Pivotal Shareholders Would Have Rejected The Business Combination And/Or Exercised Conversion Rights

406.   In addition to the decline in XL Fleet securities caused by the corrective disclosures and materialization of concealed risks alleged in Section VIII.A, *supra*, Pivotal shareholders who were eligible to exercise their conversion rights or to receive a liquidating distribution have also been damaged as a result of the materially false and/or misleading statements about XL Fleet's operations and financial results.  Had the true financial condition and operations of XL Fleet been known, Pivotal shareholders would have voted against the Business Combination and/or exercised their conversion rights and would have received approximately $10.09 in cash per share of Pivotal stock.

407.   As a result, the Business Combination would not have been approved at the December 21, 2020 annual meeting and more likely than not, there would have been insufficient time for Pivotal to conduct another business transaction before January 16, 2021.  As such, Pivotal would have commenced liquidation, and members of the Class that were holding Pivotal stock would have received approximately $10.09 in cash for each share of Pivotal common stock held.  Instead, members of the Class, who would have received a pro rata distribution if Pivotal liquidated, retained their common stock which precipitously declined in value—and was trading substantially below the $10.09 conversion price by the end of the Class Period—as the true financial condition and operations of XL Fleet became known.

408.     It was foreseeable to the Defendants that the false and/or misleading statements about XL Fleet: (i) would cause those members of the Class that would have exercised conversion rights and/or held their shares until Pivotal's liquidation to keep their stock in lieu of receiving approximately $10.09 in cash per share; and (ii) would cause those members of the Class to instead receive substantially less for each share retained or sold at prices below the $10.09 per share conversion/liquidation value.

409.     As a result, the Defendants proximately caused foreseeable losses to members of the Class.

**2.     Pivotal's Failure To Consummate A Qualifying Business Transaction And Failure To Properly Distribute The IPO Proceeds From The Trust Account**

410.     In addition, Pivotal's shareholders have also been damaged due to Pivotal's failure to consummate a qualifying business combination within the prescribed time frame and Pivotal's improper distribution and use of the IPO funds in the trust account.

411.     Pivotal was formed specifically as a vehicle to effect a business combination with one or more businesses with an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of signing a definitive agreement for the initial business combination.  Further, Pivotal would continue in existence only until January 16, 2021, at which date, if Pivotal had not yet completed a business combination, its corporate existence would cease, except for the purposes of winding up its affairs and liquidating.  As such, Pivotal was required to hold the approximately $230 million proceeds from its IPO in a trust account, which were not to be released until the earlier of the consummation of a business combination or liquidation of Pivotal.

412.     It was foreseeable that the false and/or misleading statements about XL Fleet's operations would cause losses to members of the Class because, had XL's true financial condition been known, XL Hybrids' fair market value was less than 80% of the value of the assets held in the trust account.   As such, Pivotal would have failed to effect a business combination by January 16, 2021.   Thus, Pivotal improperly removed the IPO proceeds from the trust account, which were not to be released until the earlier of the consummation of a business combination or liquidation after January 16, 2021.   As such, members of the Class who held Pivotal common stock are entitled to the return of their pro rata distribution of the IPO proceeds.

## IX.     CLASS ACTION ALLEGATIONS

413.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired XL Fleet securities between September 18, 2020 and March 31, 2021, inclusive, and who were damaged thereby (the "Class"), seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

414.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, XL Fleet's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.   Millions of XL Fleet shares were traded publicly

during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by XL Fleet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

415.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

416.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

417.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of XL Fleet;

(c)    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(d)    whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(e)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

418.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

419.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   the Company's securities are traded in efficient markets;

(d)   the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)   the Company traded on the NYSE, and was covered by market analysts;

(f)   the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)   Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)   Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

420.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

421.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

422.    The market for XL Fleet's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, XL Fleet's securities traded at artificially inflated prices during the Class Period.  On December 23, 2020, the Company's share price closed at a Class Period high of $32.59 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of XL Fleet's securities and market information relating to XL Fleet, and have been damaged thereby.

423.    During the Class Period, the artificial inflation of XL Fleet's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about XL Fleet's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of XL Fleet and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the

Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

424.  At all relevant times, the market for XL Fleet's securities was an efficient market for the following reasons, among others:

(a)  XL Fleet shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)  As a regulated issuer, XL Fleet filed periodic public reports with the SEC and/or the NYSE;

(c)  XL Fleet regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)  XL Fleet was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

425.  As a result of the foregoing, the market for XL Fleet's securities promptly digested current information regarding XL Fleet from all publicly available sources and reflected such information in XL Fleet's share price.  Under these circumstances, all purchasers of XL Fleet's securities during the Class Period suffered similar injury through their purchase of XL Fleet's securities at artificially inflated prices and a presumption of reliance applies.

426.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    NO SAFE HARBOR

427.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of XL Fleet who knew that the statement was false when made.

## XII.   CAUSES OF ACTION

<u>COUNT I</u>
**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5 Promulgated Thereunder
<u>Against All Defendants</u>**

428.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

429.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase XL Fleet's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

430.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for XL Fleet's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

431.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about XL Fleet's financial well-being and prospects, as specified herein.

432.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of XL Fleet's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about XL Fleet and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

433.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants

was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

434.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing XL Fleet's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

435.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of XL Fleet's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired XL Fleet's securities during the Class Period at artificially high prices and were damaged thereby.

436.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that XL Fleet was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their XL Fleet securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

437.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

438.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT II**
**Violation Of Section 10(b) Of The Exchange Act**
**And Rule 10b-5(a) And (c) Promulgated Thereunder**
**Against The XL Individual Defendants**

439.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

440.    This Count is asserted against the XL Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) promulgated thereunder by the SEC.

441.    The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) in that they:

a.    employed devices, schemes and artifices to defraud; and/or

b.      engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of XL Fleet securities during the Class Period.

442.    The XL Individual Defendants' wrongdoing under this count includes, *inter alia*, the practice of inflating XL's sales pipeline by inflating the amount or likelihood of obtaining customer purchase orders, including customers who had indicated they would not make any future purchases, customers who had shown no interest in the products XL offered, and pulling forward the expected timing customers' orders when they knew it would not occur until a later date as outlined in Section V.D.3, *infra*.  The inflation of XL's sales pipeline constituted a deceptive act independent of the dissemination of the false statements to the public, but without which the scheme to defraud could not have been effectuated.  Without the false pipeline data in Salesforce system to back up XL's false representations concerning XL's pipeline and revenue forecasts, the Merger would not have closed and the false representations would never have been made public.

443.    The XL Individual Defendants' wrongdoing also includes the preparation of financial data (including pipeline data, revenue data, and backlog data) and other information to be included in Pivotal's offering materials and the Investor Presentation.  The XL Individual Defendants' preparation of these materials also constituted a deceptive act independent of the dissemination of the false statements to the public, but without which the scheme to defraud could not have been effectuated.  Without the false and misleading financial data, slides, narrative information and other materials provided by the XL Individual Defendants to the Pivotal Individual Defendants, the Pivotal Individual Defendants would not have been able to deceive Pivotal's public investors and consummate the Business Combination.

444.    The XL Individual Defendants acted with scienter in that XL Individual Defendants knew (or deliberately disregarded or were deliberately reckless in disregarding) that the public documents and statements issued or disseminated in the name of XL, as described above, were materially false and/or misleading; knew (or deliberately disregarded or were deliberately reckless in disregarding) that XL's sales pipeline was inflated and was used to formulate XL's financial projections and valuation in XL's pursuit to obtaining financing or to be acquired, as it was in the Business Combination, knowing that the Company and that such public statements or documents would be issued or disseminated to the investing public; and knowingly (or recklessly) and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

445.    The XL Individual Defendants, who were senior officers and/or directors of the Company, had actual knowledge of the truth regarding XL's prospects for revenue growth, including factors which limited its growth potential including XL's supply chain and production capacity constraints, lack of CARB certification keeping XL out of the massive California market, and the ROI customers experienced.  Furthermore, Piern controlled and manipulated the sales pipeline figures, and was aware that this information was false and/or misleading.  The XL Individual Defendants intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they employed the devices, schemes and artifices to defraud; and/or engaged in the acts, practices and a course of business described above.

446.    As a result of the foregoing, the market price of XL Fleet securities was artificially inflated during the Class Period.

447.     In ignorance of the falsity of the XL Individual Defendants' statements, and the schemes, acts and practices described above, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of XL Fleet securities during the Class Period in purchasing XL Fleet securities at prices that were artificially inflated as a result of the XL Individual Defendants schemes, acts, and practices.

448.     Had Plaintiffs and the other members of the Class been aware that the market price of XL Fleet securities had been artificially and falsely inflated by defendants, they would not have purchased XL Fleet's securities at the artificially inflated prices that they did, or at all.

449.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

450.     By reason of the foregoing, the XL Individual Defendants have violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of XL Fleet securities during the Class Period.

## COUNT III

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

451.     Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

452.     The Individual Defendants acted as controlling persons of XL Fleet within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had

the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

453.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

454.    As set forth above, XL Fleet and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: July 20, 2021

By: */s/ Garth Spencer*
**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Garth Spencer (GS-7623)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Lead Attorneys for Lead Plaintiff Delton Rowe,*
*additional Plaintiffs Jeffrey Suh, Carl Enslin,*
*Simone Heridis, and Soraya Matamoros,*
*and the putative Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On July 20, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 20, 2021.


*s/ Garth Spencer*
Garth Spencer