**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE XL FLEET CORP. SECURITIES LITIGATION | Case No. 1:21-cv-02002-LGS |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ........................................................................ 1

II.     STATEMENT OF FACTS ............................................................................. 1

        A.      Background Of The Pivotal SPAC .......................................................... 1

        B.      Background Of The XL Hybrids Operating Business ........................................... 2

        C.      Defendants Solicited Approval Of The Merger With Materially Misleading
                Statements About XL's Business And Prospects ...................................... 3

        D.      Completion Of The Merger And Post-Merger Statements ..................................... 5

        E.      XL's Stock Price Declined Precipitously As The Truth Was Revealed ................. 5

        F.      Post-Class Period Developments ................................................................ 6

III.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION ........... 7

IV.     THE COURT MUST CREDIT PLAINTIFFS' ALLEGATIONS BASED ON FORMER
        EMPLOYEE INTERVIEWS AND THE MUDDY WATERS REPORT ........................ 8

        A.      Plaintiffs' FEs Are Reliable ..................................................................... 8

        B.      The Muddy Waters Report Is Reliable ................................................... 11

V.      DEFENDANTS' MISREPRESENTATIONS ARE ACTIONABLE .............................. 12

        A.      Defendants' Pipeline Statements Were Materially False And Misleading........... 12

        B.      Defendants' Supply Chain Statements Were Materially False And Misleading.. 17

        C.      Defendants' "Customer Base" Statements Were Materially Misleading ............. 20

        D.      Defendants' Statements About XL's Technology Were Materially Misleading.. 21

        E.      Defendants' CARB Certification Statements Were Materially Misleading ......... 22

        F.      Defendants' Revenue Projections Were Materially Misleading........................... 23

VI.     THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER .................... 23

        A.      Piern's Data Manipulation Supports A Strong Inference Of Scienter.................. 24

        B.      The Nature And Pattern Of Defendants' Selective Denials Of The Muddy Waters
                Report Support A Strong Inference of Scienter................................................. 24

i

C.    XL's Pattern Of Supply Chain Disclosures Support An Inference of Scienter .... 25

D.    Pivotal's Due Diligence Supports A Strong Inference Of Scienter ...................... 26

E.    Defendants Had A Motive And Opportunity To Defraud .................................... 27

F.    Additional Factors Support A Strong Inference Of Scienter ............................... 30

G.    The Complaint Pleads A Strong Inference Of Corporate Scienter ...................... 32

VII.    THE COMPLAINT STATES CLAIMS UNDER 10b-5(a) & (c)................................... 34

VIII.    CONCLUSION .......................................................................................................... 35

## TABLE OF AUTHORITIES

### CASES

*Akerman v. Arotech Corp.*,
608 F. Supp. 2d 372 (E.D.N.Y. 2009) ..................................................................... 24

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
2020 WL 4734989 (S.D.N.Y. Aug. 14, 2020) .............................................................. 9

*Arnlund v. Deloitte & Touche LLP*,
199 F. Supp. 2d 461 (E.D. Va. 2002) ...................................................................... 31

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008) ............................................................. 32

*Central Bank, N.A. v. First Interstate Bank, N.A.*,
511 U.S. 164 (1994) ............................................................................................... 35

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc.*,
2021 WL 3434875 (E.D.N.Y. Aug. 3, 2021) ............................................................. 15

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012) ..................................................................... 24

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020) ..................................................................... 10

*Cohen v. Kitov Pharms.*,
2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) ........................................................... 16

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015) ........................................................................... 7, 10, 11

*Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019) ....................................................................... 32

*Frater v. Hemispheric Biopharma, Inc.*,
996 F. Supp. 2d 335 (E.D. Pa. 2014) ...................................................................... 30

*Hawaii Structural Ironworkers Pension Trust Fund v. AMC Entm't Holdings*,
422 F. Supp. 3d 821 (S.D.N.Y. 2019) ..................................................................... 27

*Ho v. Duoyuan Global Water, Inc.*,
887 F. Supp. 2d 547 (S.D.N.Y. 2012) ..................................................................... 11

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
298 F.R.D. 116 (S.D.N.Y. 2014) ........................................................................... 10

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)..................................................................... 20

*In re Am. Apparel, Inc. S'holder Litig.*,
2013 WL 10914316 (C.D. Cal. Aug. 8, 2013).......................................................... 29

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010)..................................................................... 17

*In re Atlas Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)..................................................................... 32

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)..................................................................... 15

*In re BHP Billiton Ltd. Sec. Litig.*,
2017 WL 3822755 (S.D.N.Y. Aug. 29, 2017).......................................................... 33

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005)..................................................................... 33

*In re Cognizant Tech. Solutions Corp. Sec. Litig.*,
2020 WL 3026564 (D.N.J. June 5, 2020) .......................................................... 34, 35

*In re Computer Assocs. Class Action Sec. Litig.*,
75 F. Supp. 68 (E.D.N.Y. 1999) ........................................................................... 14

*In re DDi Corp. Sec. Litig.*,
2005 WL 3090882 & n.14 (C.D. Cal. July 21, 2005)................................................ 21

*In re Facebook, Inc. IPO Sec. and Deriv. Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)..................................................................... 17

*In re Insys Therapeutics Sec. Litig.*,
2018 WL 2943746 (June 12, 2018) ........................................................................ 27

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
251 F. Supp. 3d 596 (S.D.N.Y. 2017)..................................................................... 12

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ......................................................... 9, 11

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)........................................................................... 33

*In re Mylan N.V. Sec. Litig.*,
    379 F. Supp. 3d 198 (S.D.N.Y. 2019)............................................................................. 9

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 622 (S.D.N.Y. 2014)............................................................................ 32

*In re Salix Pharms. Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)............................................................... 32

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)........................................................................... 33

*In re Silvercorp Metals, Inc. Sec. Litig.*,
    26 F. Supp. 3d 266 (S.D.N.Y. 2014)..................................................................... 25, 27

*In re SLM Corp. Sec. Litig.*,
    740 F. Supp. 2d 542 (S.D.N.Y. 2010)......................................................................... 30

*In re Stillwater Capital Partners Inc. Litig.*,
    858 F. Supp. 2d 277 (S.D.N.Y. 2012)......................................................................... 29

*In re Tenaris S.A. Sec. Litig.*,
    493 F. Supp. 3d 143 (E.D.N.Y. 2020) ........................................................................ 17

*In re VEON Ltd. Sec. Litig.*,
    2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017)............................................................ 33

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)......................................................................................... 25

*Knurr v. Orbital ATK Inc.*,
    294 F. Supp. 3d 498 (E.D. Va. 2018) .......................................................................... 34

*Lea v. TAL Educ. Grp.*,
    837 F. App'x 20 (2d Cir. 2020) ................................................................................... 11

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ..................................................................................... 10

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)........................................................................... 9

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019) ................................................................................ 34, 35

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    513 F.3d 702 (7th Cir. 2008) ............................................................................ 30

*Mateo v. Bristow*,
    2013 WL 3863865 (S.D.N.Y. July 16, 2013) ...................................................... 8

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ............................................................................................... 7

*McIntire v. China MediaExpress Holdings, Inc.*,
    927 F. Supp. 2d 105 (S.D.N.Y. 2013) ............................................................... 11

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014) .............................................................................. 22

*Mild v. PPG Indus., Inc.*,
    2018 WL 6787351 (C.D. Cal. December 21, 2018) ........................................... 24

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ....................................................................... passim

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
    874 F. Supp. 2d 341 (S.D.N.Y. 2012) ............................................................... 33

*Patel v. L-3 Communications Holdings Inc.*,
    2016 WL 1629325 n.38 (S.D.N.Y. Apr. 21, 2016) ............................................ 33

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015) ................................................................. 32

*Rosen v. Textron, Inc.*,
    321 F. Supp. 2d 308 (D.R.I. 2004) .................................................................... 21

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ................................................................................ 31

*Rudani v. Ideanomics, Inc.*,
    2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020) ................................................... 26

*SEC v. Conaway*,
    2006 WL 2828569 (E.D. Mich. Sept. 29, 2006) ............................................... 26

*SEC v. Gabelli*,
   653 F.3d 49 (2d Cir. 2011)...................................................................................... 22

*SEC v. Hurgin*,
   484 F. Supp. 3d 98 (S.D.N.Y. 2020)........................................................................ 15

*Shah v. Zimmer Biomet Holdings, Inc.*,
   348 F. Supp. 3d 821 (N.D. Ind. 2018) ..................................................................... 26

*Skiadas v. Acer Therapeutics Inc.*,
   2020 WL 3268495 (S.D.N.Y. June 16, 2020) .......................................................... 29

*Speakes v. Taro Pharm. Indus., Ltd.*,
   2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018).......................................................... 10

*Spitzberg v. Houston Am. Energy Corp.*,
   758 F.3d 676 (5th Cir. 2014) ................................................................................... 27

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta,*
   *Inc.*, 552 U.S. 148 (2008)........................................................................................ 35

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015)....................................................................................... 12

*Tchatchou v. India Globalization Capital Inc.*,
   2021 WL 307415 (D. Md. Jan. 29, 2021).................................................................. 30

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008)................................................................................ 32, 33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................................ 23, 24

*Universal American Corp. v. Partners Healthcare Solutions Holdings, L.P.*,
   176 F. Supp. 3d 387 (D. Del. 2016)................................................... 15, 16, 24, 25

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
   2008 WL 879023 (D. Colo. March 28, 2008)............................................................ 14

## **STATUTES**

15 U.S.C. §78u-4(b)(1)(B)................................................................................................ 12

15 U.S.C. §78u–4(b)(2) ................................................................................................... 23

## **RULES**

Fed. R. Civ. P. 15(a)(2) .................................................................................................... 35

Fed. R. Civ. P 12(g) ............................................................................................................ 8

| Glossary of Defined Terms | |
|---|---|
| **Term** | **Definition** |
| Brady | Defendant James H.R. Brady |
| CARB | California Air Resources Board |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| *City of Hollywood* Complaint | Amended Complaint in *City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc.*, Case No. 2:19-cv-05530-GRB-RLM (E.D.N.Y. filed May 21, 2020) [Exhibit 3 to Spencer Declaration] |
| Class Period | September 18, 2020 through March 31, 2021, inclusive. |
| Complaint | Amended Class Action Complaint for Violations of the Federal Securities Laws in *In re XL Fleet Corp. Sec. Litig.*, Case No. 1:21:cv:02002-LGS (S.D.N.Y. filed July 20, 2021) (Dkt. No. 72) |
| Defendants | XL Fleet Corp., Jonathan J. Ledecky, Kevin Griffin, James H.R. Brady, Thomas J. Hynes III, Dimitri Kazarinoff, and Brian Piern |
| Exchange Act | The Securities Exchange Act of 1934 |
| Ex. | Exhibit |
| Griffin | Defendant Kevin Griffin |
| Hynes | Defendant Thomas J. Hynes III |
| Individual Defendants | Jonathan J. Ledecky, Kevin Griffin, James H.R., Brady, Thomas J. Hynes III, Dimitri Kazarinoff, and Brian Piern |
| IPO | Initial Public Offering |
| Ironbound Partners | Ironbound Partners Fund, LLC |
| Kazarinoff | Defendant Dimitri Kazarinoff |
| Ledecky | Defendant Jonathan J. Ledecky |
| MGG | MGG Investment Group, LP |
| MTD | Memorandum In Support of Defendants' Motion to Dismiss the Amended Class Action Complaint, filed August 26, 2021 (Dkt. No. 85) |
| Muddy Waters or MW | Muddy Waters Research |
| MW Report | Report by Muddy Waters Research entitled "*XL Fleet Corp. (NYSE: XL): More SPAC Trash*" and dated March 3, 2021 |
| NYSE | New York Stock Exchange |
| OEM | Original equipment manufacturer |
| Plaintiffs | Delton Rowe, Jeffrey Suh, Carl Enslin, Simone Heridis, and Soraya Matamoros |
| Piern | Defendant Brian Piern, XL's Vice President of Sales and Marketing |
| Pivotal | Pivotal Investment Corporation II |
| Pivotal Individual Defendants | Jonathan J. Ledecky, Kevin Griffin, James H.R. Brady |
| PSLRA | Private Securities Litigation Reform Act |
| SPAC | Special purpose acquisition company |
| Spencer Declaration or Spencer Decl. | Declaration of Garth A. Spencer in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss |
| Sponsor | Pivotal Investment Holdings II LLC |

| Glossary of Defined Terms | |
|---|---|
| **Term** | **Definition** |
| *Universal* Complaint | Amended Complaint in *Universal American Corp. v. Partners Healthcare Solutions Holdings, L.P.*, Case No. 1:13-cv-01741-RGA (D. Del. filed Sept, 22, 2014) [Exhibit 4 to Spencer Declaration] |
| *West Palm Beach* Complaint | Consolidated Complaint in *West Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, Case No. 05-cv-01265-PSF-MEH (D. Colo. filed March 24, 2006) [Exhibit 2 to Spencer Declaration] |
| XL Fleet | XL Fleet Corp. |
| XL or the Company | XL Fleet Corp. and/or XL Hybrids, Inc., as applicable |
| XL Hybrids | XL Hybrids, Inc. |
| XL Individual Defendants | Thomas J. Hynes III, Dimitri Kazarinoff and Brian Piern |

## I.   PRELIMINARY STATEMENT

This securities fraud class action centers on a special-purpose acquisition company called Pivotal and its acquisition of a company called XL Hybrids, which after merging with Pivotal became known as XL Fleet.[1] In order to secure shareholder approval of the transaction, the management of both companies made materially misleading statements concerning XL's business and prospects. As a result of these misrepresentations, investors have suffered massive damages.

## II.   STATEMENT OF FACTS

### A.   Background Of The Pivotal SPAC

XL Fleet was formerly known as Pivotal Investment Corporation II ("Pivotal"). ¶2. Before the merger with XL Hybrids, Pivotal was a special-purpose acquisition company ("SPAC"), created for the sole purpose of raising investor capital to be used to acquire an operating business. *Id.*[2] The key individuals behind Pivotal were its Chairman and CEO Defendant Ledecky, its CFO Defendant Brady, and its director Defendant Griffin. *See* ¶¶41-43.

Pivotal raised $230 million for a prospective acquisition in its July 2019 initial public offering ("IPO"). ¶5. Under the terms of its governing documents, Pivotal had eighteen months (*i.e.*, until January 16, 2021) to complete a business combination that satisfied certain conditions. ¶¶6, 70.[3] If Pivotal failed to complete a qualifying business combination, it would have to wind up

---

[1] Capitalized terms not defined herein are defined in the Glossary. *See supra* at ix. Unless otherwise indicated, (i) citations in the form of "¶__" refer to the Complaint, (ii) citations in the form of "Ex. __" refer to the Exhibits to the Complaint, (iii) "MTD" refers to Defendants' memorandum in support of their motion to dismiss (Dkt No. 85), (iv) all emphasis has been added, and (v) all internal citations, quotation marks, and alterations have been removed.

[2] SPACs are publicly traded companies with no business activities, formed to acquire an existing operating company. SPACs typically raise capital for an acquisition through an initial public offering, and that capital is held in trust for a specified period of time. If an acquisition is completed within the time frame, founders and managers of the SPAC can profit through their ownership of the SPAC's securities. However, if an acquisition is not completed within the time frame, the SPAC is dissolved and the money held in trust is returned to investors, with no compensation paid to the founders and managers. The mechanics of the SPAC structure and its propensity to create perverse incentives and a conflict of interests on the part of SPAC management is detailed at ¶¶3-4, 55-62, 337-60 and Section VI.E, *infra*.

[3] NYSE rules and Pivotal's July 2019 Prospectus required Pivotal to complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (net of certain amounts) at the time of Pivotal's signing of a definitive agreement in relation to its initial business combination. *Id.*

its affairs and return investors' money, and the substantial ownership interests in Pivotal securities of Defendants Ledecky, Griffin, and Brady would become worthless. ¶¶6, 9; *see infra* at Sec. VI.E.

Pivotal's July 2019 IPO prospectus stated that it intended to focus its search for an acquisition target "on companies exploiting disruptive smart phone technology." ¶75. But Pivotal failed to find such a target, and as the January 16, 2021 deadline drew closer, Pivotal's backers grew increasingly desperate to complete a deal so that they could profit from their substantial ownership of Pivotal securities. *Id.* On September 18, 2020 Pivotal announced that it had entered into an agreement to merge with XL Hybrids, which merger was planned to be completed, subject to shareholder approval, just barely in advance of Pivotal's January 2021 deadline. *See* ¶11.

### B.    Background Of The XL Hybrids Operating Business

XL Hybrids provided electrification for commercial fleets of light to mid-sized trucks. ¶40. At the time of the merger, XL's only two products converted conventional gasoline-powered trucks manufactured by other companies into electric vehicles by adding a battery and electric motor. ¶276; Ex. 4 at slides 13-15. These products were "XL hybrid," which generates electricity through the truck's brakes, and "XL plug-in," which charges the battery by plugging into a charging station. ¶40. Key figures at XL were its Chief Strategy Officer Defendant Hynes, its CEO Defendant Kazarinoff, and its VP of Sales and Marketing Defendant Piern. ¶¶45-47. Prior to the proposed transaction, Hynes of XL had been a long-time family friend of Ledecky of Pivotal. ¶385.

Founded by Hynes in 2009, XL Hybrids remained a small startup in September 2020, with only 60 full-time employees. ¶307. XL was in a precarious financial position leading up to its merger with Pivotal. ¶¶85-86. It had incurred multi-million dollar losses in 2019 and 2020 and had limited cash on hand. *Id.* As the time the transaction was proposed, management acknowledged that there was "substantial doubt about XL's ability to continue as a going concern." ¶86.

2

**C.** **Defendants Solicited Approval Of The Merger With Materially Misleading Statements About XL's Business And Prospects**

On September 18, 2020, Pivotal and XL issued a joint press release announcing the proposed acquisition of XL, in which Defendants aggressively touted XL's growth potential, pipeline, supply chain production capacity, and prospects. The press release stated that "XL has strong demand momentum with a *$220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021*." ¶79. The release highlighted XL's impressive roster of clients, including FedEx, Coca-Cola, Pepsi, and Verizon. *Id.*

On the same day, Pivotal filed a Form 8-K with the SEC that included a copy of the merger agreement and an investor presentation with additional information. The presentation represented that XL had a "Low Risk Path to Dramatic Growth" that could be achieved by "[s]elling existing products to existing customers through existing channels." ¶14. It stated that XL's hybrid product could improve miles-per-gallon ("MPG") by around 25% and that XL's plug-in product was "capable of driving up to 50% savings in MPG." ¶79. During an appearance on CNBC's Squawk Box that day, Hynes stated that XL had an "*established supply chain production capacity*" and "a *very low risk and low cost production process* compared to other companies the industry." *Id.*

During the weeks that followed, Defendants made numerous additional statements in press releases, SEC filings, and various media appearances, touting XL's revenue projections, sales pipeline, backlog of committed orders, supply chain production capacity, and the benefits of its technology. ¶¶88-141. These statements were materially false and misleading, because they failed to disclose numerous adverse material facts about XL's business.

As set forth in greater detail in Sections V.A-F, *infra*, Defendants' misrepresentations and omissions fell into several distinct (albeit partially overlapping) categories, including:

- *Sales Pipeline Inflation*. Between September 18, 2020 and December 8, 2020,

3

Defendants repeatedly told investors that XL had a $220 million 12-month sales pipeline and that this figure represented an "important indicator" of XL's future performance. *See, e.g.*, ¶¶11, 97, 144, 151, 164, 166, 214, 217, 226, 236, 258, 268, 271, 281. Defendants did not disclose, however, that this figure was materially inflated by data manipulations entered into XL's Salesforce sales tracking system by Piern or other employees at Piern's instruction. ¶¶90-95, 99. As one former XL employee stated, "I was paid to lie. I was paid to falsify and exaggerate my pipeline." ¶98.

- *Supply Chain Capacity*. Defendants repeatedly touted XL's "established supply chain production capacity" and "low risk" production process while failing to disclose severe and long-standing problems that it had in obtaining sufficient batteries to meet customer demand.[4] As a result of these supply chain problems, XL could not timely fill customers' orders and had serious difficulty in converting backlog into revenue. ¶¶106-12. While Defendants offered certain risk warnings and other disclosures concerning XL's battery supply issues, these statements were themselves misleading because they misstated the scope, duration, and severity of the shortages and falsely suggested that the issues had been resolved. ¶¶114, 239, 242, 274, 277-78, 291, 300.

- *Inactive Customers And Low Reorder Rates*. Defendants promoted XL's "diverse" and "significant" base of "blue-chip" customers, but failed to disclose that its customers had very low reorder rates and many customers had not purchased any XL product for years. ¶¶115-21, 214, 226, 294. Of the 33 customers that Defendants chose to highlight in XL's Investor Presentation, 18 had not ordered any XL product during all of 2019 and the first half of 2020. ¶120.

- *Overstated MPG Gains*. Defendants claimed that XL's products provided customers with significant MPG savings and a substantial return on investment ("ROI"). *E.g.*, ¶227 (claiming hybrid product improved MPG by around 25% and plug-in product improved MPG by

---

[4] ¶¶104-14, 224, 229, 245, 261, 265, 268, 294, 303.

up to 50%); ¶232 (claiming XL customers could obtain a 55.7% ROI). But these calculations were not based on real-world driving conditions, and XL's customers often experienced minimal MPG gains and a negative ROI. ¶¶122-31; 189.

- *CARB Approval Status*. Hynes claimed that XL's vehicles were "getting built and then shipped to the end customer … **anywhere in the U.S.**" and that XL had a presence "in about every state except for Alaska at this point." ¶263. Defendants, however, failed to disclose that XL had lost its California Air Resources Board ("CARB") approval status in 2019, was unable to secure re-approval in 2020, and was therefore unable to sell cars in California. ¶¶21, 99 n.20.

- *Revenue Projections*. As a result of the foregoing, Defendants' forecast of $75 million in revenue for 2021 lacked a reasonable basis and was materially overstated. ¶¶132-34. Additional defects undermined the basis for XL's projections. ¶¶135-41; *see infra* at Sec. V.F.

### D.      Completion Of The Merger And Post-Merger Statements

Pivotal's shareholders voted to approve the proposed merger on December 21, 2020. ¶167. Following the completion of the merger, Defendants continued to misleadingly tout XL's business in SEC filings, press releases, and other public statements. ¶¶174-83, 294-302. For example, on December 23, 2020, Hynes appeared CNBC's Squawk on the Street television program. ¶296. In response to a question about XL's $75 million revenue forecast for 2021, Hynes said "we're tripling our revenue in the middle of a pandemic" and "we have a great pipeline going into 2021." *Id.* He stated that XL was "shipping hundreds of units per month," and concluded that "we're in a great position to … really expand with the market which clearly has a lot of demand." *Id.*

### E.      XL's Stock Price Declined Precipitously As The Truth Was Revealed

On March 3, 2021, short-seller Muddy Waters ("MW") published a report that partially revealed the truth about XL's business. ¶185. Based on interviews with former employees, MW revealed that (1) XL's sales pipeline was inflated; (2) XL was unable to procure batteries for its

products and lacked supply chain capabilities; (3) XL's customers had low reorder rates, and many of the customers XL touted had not ordered XL products in years; (4) XL's technology was incapable of delivering the advertised MPG gains and ROI; (5) XL had lost its regulatory approval to sell into California; and (6) XL's revenue projections were overstated and lacked a reasonable basis. ¶¶186-90; Ex. 5. On this news, XL's stock price fell by 13.1% to close at $13.86 per share on March 3, 2021 and continued to drop over the following two trading sessions. ¶¶191, 193.

On March 8, 2021 XL issued a press release responding to the MW Report. ¶194. While this release challenged certain of the allegations, it did not address others, implicitly confirming their truth. ¶¶194-95. For example, XL did not deny that its pipeline numbers were falsely exaggerated. ¶195. XL did not dispute that it suffered battery supply disruptions and in fact admitted that XL was "impacted by a component shortage that affected battery supply" in 2019. *Id.* XL's combination of partial admissions and weak denials did not reassure the market, and XL's stock price fell by 6.2% to close at $10.48 per share on March 8, 2021. ¶196.

On March 31, 2021, XL announced its Q4 and full year 2020 results. ¶203. Defendants admitted that a large portion of XL's 2020 revenue was attributable to belatedly filling orders that had been backlogged due to a lack of battery supplies. ¶204. And despite having recently hyped XL's growth prospects, Defendants now forecast only $1 million of revenue for Q1 2021 and stated that they would no longer provide any revenue guidance for the full year 2021, withdrawing their forecast of $75 million. ¶205. Investors were shocked by the sudden reversal in XL's projections, and XL's stock price fell by 12.1% to close at $7.89 per share on April 1, 2021. ¶210.

**F.      Post-Class Period Developments**

XL's continuing financial performance following the end of the Class Period only further validates MW's analysis. On May 17, 2021, XL announced that it generated only $675,000 of

revenue in Q1 2020. ¶392. This amount was even smaller than the $1 million Defendants forecast on March 31, 2021. *See* ¶205. On August 12, 2021, XL announced that it generated only $3.7 million of revenue in Q2 2021.[5] Of that $3.7 million, only $1.3 million was generated by XL's pre-existing business of selling drive systems, whereas $2.4 million was generated from a newly acquired business called World Energy.[6] Thus, for the entire first half of 2020, XL generated only $4.4 million of revenue, and only $2.0 million of that revenue was organic.[7] After XL's Q2 2020 results were announced, XL's stock price fell by 13.8% to close at $6.12 per share on August 13, 2021. XL's severely disappointing results over a multi-quarter period following the completion of the merger strongly suggests that MW's analysis of the Company's pipeline and supply chain capabilities was spot-on and that the $75 million forecast never had a reasonable basis.

## III.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION

On a motion to dismiss a court must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). While the pleading of scienter is subject to a strong inference standard, every other element of a securities fraud claim is subject to a plausibility standard. *See id.*, 794 F.3d at 304, 307 (applying plausibility standard to falsity).

To state a claim under §10(b) and Rule 10b-5(b), a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Defendants contest only falsity and scienter. (With respect to Plaintiffs' claims under Rule 10b-5(a) and (c), Defendants also challenge the scope of primary liability.) As

---

[5] See Spencer Decl., Ex. 1.

[6] See *Id.*

[7] By way of comparison, XL generated $3.1 million of revenue during the first half of 2020, which indicates that organic revenue declined by roughly 35% year-over-year. ¶155.

detailed *infra*, the Complaint sufficiently alleges each of the requisite elements of its claims.[8]

## IV. THE COURT MUST CREDIT PLAINTIFFS' ALLEGATIONS BASED ON FORMER EMPLOYEE INTERVIEWS AND THE MUDDY WATERS REPORT

As a preliminary matter, Defendants argue that the Court should discount or disregard the Complaint's allegations based on confidential witnesses and the MW Report. MTD 4-7. Defendants' arguments ignore established law in this Circuit and likewise ignore the Complaint's mutually reinforcing factual sources, including Defendants' own admissions.

### A. Plaintiffs' FEs Are Reliable

Plaintiffs may rely on confidential sources if *either* (i) they are described with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," *or* (ii) other facts corroborate their statements. *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000). Here, both tests are satisfied.

The Complaint relies on the accounts of four former employees interviewed by Plaintiffs' investigator, identified in the Complaint as FE1, FE2, FE3, and FE4. ¶¶51-54. For each former employee, the Complaint identifies the individual's title/position, her dates of employment,[9] and to whom the former employee reported. Unlike many cases in which a plaintiff's confidential witnesses are low-level employees who are several layers removed from the Defendants, in this case all of the FEs reported directly to Piern and/or interacted with Piern on a one-on-one basis with respect to the entry of opportunities in XL's Salesforce database. ¶¶51-54, 91-95, 99, 137. The information provided by the FEs are corroborated by the accounts of the other FEs, as well as the accounts of other former employees interviewed by MW, and Defendants' own admissions.

---

[8] Defendants waived their right to challenge any element other than those addressed in their opening papers, and these non-contested elements are not addressed herein. *See* Fed. R. Civ. P 12(g); *Mateo v. Bristow*, 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013) ("a court should not consider arguments that are raised for the first time in a reply brief").
[9] Plaintiffs refer to the former employees with the pronouns "she" and "her" regardless of their gender. *See* ¶51 n.12.

8

Defendants raise several objections with respect to the Complaint's use of confidential witnesses. First, Defendants argue that the Complaint is deficient because it does not specify whether Plaintiffs' counsel personally interviewed the witnesses. MTD 5. This is irrelevant. Even Defendants' own cases acknowledge that a plaintiff may rely on the accounts of witnesses interviewed by investigators. *See, e.g.*, *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 802 (S.D.N.Y. 2020) (approving a case in which, "'plaintiffs' *investigators* independently corroborated these [short-seller] reports through similar interviews'") (quoting *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *2 (S.D.N.Y. Jan. 27, 2014)).[10]

Moreover, as Defendants acknowledge, the Complaint differentiates between Plaintiffs' own confidential witnesses (referred to as FE1, FE2, *etc.*) and the separate set of witnesses interviewed by MW or its investigators (referred to as Former Employee A, Former Employee B, *etc.*). *See* MTD 4 n.2.[11] Thus, the Complaint makes clear which allegations are based on interviews of FEs by Plaintiffs' own investigators and which are based on the MW Report.

Defendants next argue that many of the FE allegations are based on hearsay. MTD 5. While certain of the FE allegations are based on hearsay, many of the core allegations (particularly those relating to the sales pipeline) are based on firsthand knowledge and the FEs' direct interactions with Piern. In any event, there is no rule that requires the Court to disregard confidential witness allegations based on hearsay. Rather, under Second Circuit precedent, confidential witness

---

[10] *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 2020 WL 4734989 (S.D.N.Y. Aug. 14, 2020) (cited by MTD at 5) is not to the contrary. Its quotation about "secondhand" information refers to plaintiffs' reliance on confidential witness statements *made in third-party complaints*, not to counsel's use of investigators to interview confidential witnesses. *See Altimeo*, 2020 WL 4734989, at *11 (citing *In re Lehman Bros. Sec. & Erisa Litig.*, at *3 (S.D.N.Y. July 31, 2013)). In any event, to the extent that *Altimeo* holds that a plaintiff may not rely on statements made in third-party complaints, it is against the weight of authority. *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214 (S.D.N.Y. 2019).

[11] Defendants claim that only one employee belongs to both groups, and the others are different, non-overlapping employees. *See id.* This is not necessarily correct. More accurately, Plaintiffs were able to reliably match FE3 with MW Former Employee A, whereas other FEs may have been interviewed by MW's investigators, but Plaintiffs could not reliably match those FEs with specific former employees quoted in the MW Report.

9

testimony should be credited if the alleged facts "support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. "This liberal standard make sense; the heightened demands of the PSLRA will often require plaintiffs to rely on the testimony of confidential sources, ***even where those sources offer indirect knowledge, that is, information and belief that is hearsay but plausible***." *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't*, 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020).[12]

Even for the FE allegations based on secondhand information, the FEs were in a position to possess the information alleged. As sales executives, the FEs interacted with customers, received customer complaints concerning unfilled orders, and were involved in the Company's rationing out of batteries to the angriest customers. *See, e.g.*, ¶¶105-11. The FEs were therefore in a position to know about the scope, duration, and magnitude of XL's supply chain problems and the impact those problems had on XL's ability to fill orders. Moreover, the accounts of FEs are corroborated by one another, as well as the MW witnesses and the Company's own admissions.[13]

Finally, Defendants argue that FEs who left XL before the Class Period must be disregarded, but "the Second Circuit has held that allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period." *Blanford*, 794 F.3d at 307. FE2 worked at XL during the Class Period, FE1 and FE3 left just three months before the Class Period, and FE4 left six months before the Class Period, so their knowledge is highly relevant. ¶¶51-54; *see Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *11 (S.D.N.Y. Sept. 24, 2018) ("that one of the confidential witnesses left Taro a mere three months before the Class Period does not … undermine the utility of that witness' observations").

---

[12] *See also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) ("[T]he fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus.").

[13] *See Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 126 (S.D.N.Y. 2014) ("Because [the confidential witnesses] report a consistent pattern of behavior, the Court has more faith in their accuracy.").

### B.        The Muddy Waters Report Is Reliable

As numerous courts have held, short seller reports in general, and MW's reports in particular, are reliable sources of factual allegations that cannot be disregarded at the motion to dismiss stage. *See, e.g.*, *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) ("the Court *must* accept the factual allegations contained in the Citron Report and the Muddy Waters Report as sufficiently reliable as a factual source for Plaintiffs' allegations") (collecting cases).[14] Neither Defendants' press release "rebuttal" of MW (Ex. 6) nor Defendants' instant motion meaningfully challenges MW's key findings that are incorporated into the Complaint (*e.g.*, XL's inflated pipeline, loss of California regulatory approval, inactive customers).

Defendants' sole argument for disregarding the MW Report is that it quotes unnamed sources, who Defendants say are insufficiently described because MW does not identify their titles or reporting lines. This argument ignores the clear holding of *Novak* that confidential sources need not be described with particularity where their statements are corroborated by other allegations. *Novak*, 216 F.3d at 314; *see also Longwei Petroleum*, 2014 WL 285103, at *3 (short seller report's use of unnamed sources reliable where "independent ... factual allegations corroborate the confidential sources' statements"). Here, the statements of MW's sources are corroborated by the FEs and Defendants' own admissions. *See Blanford*, 794 F.3d at 301-04, 307-08 (securities fraud adequately pled based on mutually corroborating confidential witness statements, short seller report, and defendant's admissions).[15] Moreover, FE3, who was "an XL Regional Sales Manager from November 2018 until June 2020," confirmed that she was Former Employee A quoted in the

---

[14] *See also Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012) (rejecting argument that plaintiffs' allegations based on a MW report should be disregarded due to MW's bias, because "the reliability of the report is question of fact"); *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 23-24, 27-28 (2d Cir. 2020) (securities fraud pled based in part on allegations derived from MW report).

[15] In addition, the confidential source statements in the MW Report are sufficiently identified as "former salespeople" (Ex. 5 at slide 3) and are reliable on their face insofar as they relate highly specific, first-hand information.

MW Report and that the statements attributed to her in that report are accurate. ¶53. The MW Report and the FEs are highly reliable and are properly considered at the pleading stage.

## V.    DEFENDANTS' MISREPRESENTATIONS ARE ACTIONABLE

Under Section 10(b) of the Exchange Act, defendants are liable for material misstatements or omissions. An omission is actionable if "a statute or regulation requir[es] disclosure," or if "a corporate statement … would otherwise be inaccurate, incomplete, or misleading." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). Under the PSLRA and Rule 9(b), a plaintiff adequately pleads falsity if he or she "specif[ies] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). Whether a statement is false or misleading "is generally a question reserved for the trier of fact." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017). Disputes concerning falsity should not be decided on a motion to dismiss, "unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that ***reasonable minds could not differ*** on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made." *Id.*

### A.    Defendants' Pipeline Statements Were Materially False And Misleading

Throughout the Class Period, Defendants repeatedly represented that XL had a 12-month sales pipeline of $220 million or more.[16] Defendants claimed that this figure was a reflection of "strong demand momentum" and an "important indicator[]" of expected future performance. ¶¶214, 236, 258, 271. Defendants also cited the $220 million pipeline as a key factor relied on by Pivotal's board of directors in determining that the 80% fair market value test was satisfied without obtaining an independent third-party valuation. *See* ¶¶70, 281; note 3, *supra*. Following the

---

[16] ¶¶214, 217, 226, 258. On October 26, 2020, Kazarinoff stated that the pipeline "now is over $240 million" (¶261), but on November 12, 2020, Defendants reverted to the $220 million figure. ¶268 ("$220 million as of today"). ¶281.

completion of the merger, when asked how XL arrived at its $75 million revenue forecast for 2021, Hynes responded by referring to XL's "great pipeline going into 2021." ¶296.

These statements were misleading, because they failed to disclose that XL's pipeline was materially overstated due to data manipulations by XL management to exaggerate the probability of sales opportunities. *See* ¶¶88-101. According to former employees, Piern would regularly instruct them to (i) enter opportunities into Salesforce[17] without a reasonable basis, (ii) record inflated percentage likelihoods of sales, and (c) maintain pre-existing entries in Salesforce after customers indicated they would not be ordering products. ¶¶91-95, 99. Piern also overrode and altered entries made by sales personnel to exaggerate the percentage likelihood of a sale. ¶¶94-99.

While Defendants challenge the FEs' allegations as vague and conclusory (MTD 8-10), Defendants fail to address specific examples of this misconduct. For example, according to FE2, in Q3 2020, a customer in the elevator industry indicated that the company might be interested in purchasing 400 units of XL products, representing roughly $6 million in sales. ¶95. FE2 entered this into Salesforce as a sales opportunity for 2021 with a 75% probability. *Id.* However, FE2's contact then left the company, and based on FE2's subsequent conversations with the company, it became clear that it would not be purchasing the 400 units in 2021, and any purchase would be spread out over a multi-year period. *Id.* FE2 informed Piern before the end of 2020 that this 400 unit opportunity should no longer be represented in Salesforce as a 75% probability for 2021, but Piern insisted that FE2 maintain the entry in Salesforce without modification. *Id.*[18]

---

[17] Salesforce was a software tool used to track sales opportunities. ¶89. Sales reps would record opportunities for specific customers or potential customers, along with a dollar amount and a percentage likelihood that a sale would close within a particular timeframe. *See, e.g.*, ¶95. XL's sales pipeline was a weighted average of these opportunities, based on the assigned percentages. ¶97.

[18] In another instance, after a meeting with Pepsi in which FE1 was informed that Pepsi would not be buying any additional XL product, FE1 updated Salesforce to reflect a zero percent sales probability. ¶94. FE1 later discovered that the Salesforce data had been changed to reflect a 5% probability for Pepsi. *Id.* FE1 stated that Piern often changed the percentages associated with particular sales entered into Salesforce by the sales reps and that in her experience, these changes always increased the reported likelihood of completing a sale. *Id.*

13

According to FE1, Piern instructed her to enter sales opportunities for companies with whom she had only very general discussions and even companies to whom FE1 had not spoken at all. ¶¶91-92. According to FE2, another technique used to artificially increase the pipeline was to send pricing information to a prospective customer, even if the customer did not indicate a lot of interest, because the sales opportunity in Salesforce was changed from 5% to 25% for any customer to whom XL sent pricing information. ¶96. According to FE3, Piern (1) increased percentages entered into Salesforce, (2) made up "bogus" companies and entered opportunities for those companies, and (3) instructed her to enter sales opportunities for companies in California, even though XL could not sell in California because it had lost CARB approval. ¶99; *see infra* at Sec. V.E. The former employees interviewed by MW provided similar accounts. *See* ¶¶98, 100-01.

Defendants argue that their statements concerning XL's pipeline are not actionable because the term "pipeline" is "a vague measure of sales opportunities not subject to uniform definition." MTD 8. Multiple courts, however, have held that representations of a "strong" or "healthy" pipeline can predicate a securities fraud claim if defendants fail to disclose material facts that undermine those representations. *See, e.g.*, *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 WL 879023, at *4, *8-*9, *12 (D. Colo. March 28, 2008) (statements that pipeline was "strong[]" and "healthy"[19] was actionable where pipeline "contained few contracts with a high probability"); *In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 68, 71, 73-74 (E.D.N.Y. 1999) (statement that company's pipeline was "strong" was actionable where the company "front loaded sales … at the expense of future periods").

Moreover, the representation of a specific sales pipeline figure can be materially misleading, even if the precise methodology for calculating that number is not disclosed, if

---

[19] *See* Spencer Decl., Ex. 2 (*West Palm Beach* Complaint) at ¶136 ("**[T]he pipeline is the strongest its been since I've been CEO** …. [W]e've got a **healthy promising pipeline** of diverse prospects as we move into 2005.")

defendants omit material facts that make the realization of those sales unlikely. *See, e.g.*, *SEC v. Hurgin*, 484 F. Supp. 3d 98, 105, 110-112 (S.D.N.Y. 2020) (SEC adequately alleged that company's "backlog and pipeline figures" were materially misleading because management at the company's largest customer who agreed to make purchases were terminated: "It strains credulity to argue that [defendant] had no reasonable basis to think those terminations could endanger the potential orders and revenue from the police agency.").

Defendants rely heavily on *City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc.*, 2021 WL 3434875 (E.D.N.Y. Aug. 3, 2021) (cited by MTD at 7, 8, 10), but that case is inapposite. First, the only representations in *City of Hollywood* concerning the defendant's sales pipeline were qualitative, not quantitative.[20] In this case, Defendants represented a $220 million pipeline and claimed that this figure undergirded Defendants' $75 million revenue forecast and the board's approval of the merger. This context matters.[21] Second, *City of Hollywood* did not involve any allegations that defendants exaggerated the likelihood of sales opportunities or otherwise manipulated pipeline data. Thus, Defendants' citation to *City of Hollywood* in the context of their argument about "[o]ccasional disagreements among co-workers over which values to plug into an algorithm" (MTD 10) is misleading, because that case did not involve any such disagreements.[22]

A more apt pipeline case involving "disagreements" about the probabilities of sales opportunities is *Universal American Corp. v. Partners Healthcare Solutions Holdings, L.P.*, 176 F. Supp. 3d 387 (D. Del. 2016). In *Universal*, the plaintiff alleged that the probabilities of the sales

---

[20] *See* Spencer Decl., Ex. 3 (*City of Hollywood* Complaint) at ¶139 ("strong pipeline"); *id.* at ¶141 ("really robust pipeline"); *id.* at ¶149 ("very big pipeline").

[21] *See, e.g.*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 647 (S.D.N.Y. 2017) ("It is possible … that while challenged statements are mere puffery when viewed in isolation, the context in which they were made could lead a reasonable investor to rely on them as reflective of the true state of affairs at the company.").

[22] The pipeline allegations in *City of Hollywood* are relatively sparse: just five paragraphs in a 216-paragraph complaint. *See* Spencer Decl., Ex. 3 at ¶¶93, 139, 141, 149, 165. None of those allegations involve disagreements concerning the inputs into the pipeline calculation.

opportunities in the target company's Salesforce database were generated by the sales representatives "who were in direct contact with the customers and prospective customers."[23] The plaintiff further alleged that "instead of using the confidence levels assigned to the prospective contracts" by the sales representatives, the defendants "systematically and fraudulently inflated the probabilities of being awarded new business" before sending the pipeline data to the acquirer. *Id.* at ¶57. The court sustained plaintiff's allegations, denying the motion to dismiss as to two of the individual defendants and the holding company. 176 F. Supp. 3d at 393-97.

Defendants argue that "[n]othing in the Complaint suggests that the 'exaggerated' figures were ever used for any purpose other than Mr. Piern's reports [to the board of directors]." MTD 10. Not so. The Complaint alleges that "Piern inflated XL's sales pipeline knowing it would be incorporated into the Company's public statements and relied on by investors." ¶402. The multiple, mutually corroborating accounts of the FEs all suggest that Piern's manipulations of the Salesforce data was systematic and pervasive, not limited to reports to the board of directors.

Finally, Defendants argue that the Complaint does not adequately allege that the inflation of the pipeline was material. MTD 8-9. As this Court has recognized, however, a court may not dismiss a securities fraud claim on the grounds of materiality unless the omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Cohen v. Kitov Pharms.*, 2018 WL 1406619, at *4 (S.D.N.Y. Mar. 20, 2018). The manipulative practices engaged in by Piern are more than sufficient to overcome that hurdle. The practices were both qualitatively and quantitatively material, and Defendants' failure to disclose them rendered the pipeline statements materially misleading. The extreme shortfall between Defendants' revenue forecast and XL's actual financial results that followed

---

[23] See Spencer Decl., Ex. 4 (*Universal* Complaint) at ¶56.

16

serves as further confirmation of the materiality of the pipeline inflation. *See infra* at Sec. V.F.

**B.      Defendants' Supply Chain Statements Were Materially False And Misleading**

Defendants' misrepresentations concerning XL's supply chain and production capacity fall into three basic categories. First, Defendants made affirmative misrepresentations about XL's production capabilities, claiming that XL had an "established supply chain production capacity,"[24] that its technology was "rapidly deployable"[25] and "very scalable,"[26] that XL was ready to "immediately serve"[27] its market, and that XL therefore faced a "[l]ow [r]isk"[28] path to dramatic growth. These statements were materially misleading, because they failed to disclose significant supply chain problems that impeded XL's ability to timely fill customer orders. These problems caused a large backlog of orders that could not be timely converted to revenue and presented a serious risk that XL would not be able to grow its sales as projected. ¶¶102-14, 391-95.

Second, XL disclosed in its risk factors that XL "*may experience* … a sustained interruption in the supply or shortage of its components," including battery cells, which "*could* materially negatively impact XL's business." ¶239. This risk disclosure was materially misleading, because it failed to disclose that this risk had already materialized and it failed to provide concrete facts necessary for investors to meaningfully understand the scope of this risk going forward. *See, e.g.*, *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143 (E.D.N.Y. 2020) (hypothetical risk factors that failed to warn that contingent events already occurred were actionable misstatements).[29]

---

[24] ¶229; *see, e.g.*, ¶268 ("established supply chain partnerships"); ¶294 ("firmly established supply chain")

[25] ¶214; *see, e.g.*, ¶218 ("we can significantly increase our production capacity in very little time"); ¶222 ("rapid product development capabilities").

[26] ¶219; *see, e.g.*, ¶217 ("scaled production capacity"); ¶218 (can "scale at rapid pace"); ¶222 ("can scale to 100,000+ units annually"); ¶245 ("scalable production [and] supply chain … compared to competitors"); ¶265 ("very scalable"); ¶285 ("highly scalable production capacity"); ¶294 ("highly scalable business model").

[27] ¶283; *see, e.g.*, ¶292 (XL "perfect fit" for companies seeking to "immediately electrify their fleet vehicles").

[28] ¶224; *see, e.g.*, ¶217 ("de-risked path to electrification"); ¶229 ("very low risk and low cost production process").

[29] *See also In re Facebook, Inc. IPO Sec. and Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) (warning that factors "may" negatively affect revenue actionable where factors already "had" negatively affected revenue); *In re*

Third, while Defendants did provide certain specific disclosures concerning XL's battery supply issues, these statements were themselves misleading, because they misstated the severity, scope, causes, and long-standing duration of the shortages and falsely suggested that the problems were being successfully resolved. ¶¶242-44, 277-80, 300-05. For example, on October 2, 2020, XL disclosed that it had suffered "disruptions in battery supply" during the first six months of 2020 "due to the COVID-19 pandemic." ¶242. According to former employees, however, XL's battery supply problems began well before COVID-19 and were due to XL's status as a "small fish" and lack of market power. ¶¶104-11. For example, according to FE1, during a May 2019 meeting, Piern informed the sales team that XL was having difficulties getting batteries from its supplier LG. ¶104. Hynes was present at the meeting. *Id.* According to MW Former Employee A, "there were essentially zero batteries delivered" in all of 2019, and as soon as XL got any batteries, they would immediately go to the angriest customers. ¶109. According to FE2, these problems in obtaining batteries persisted into the Class Period. ¶108.

On November 12, 2020, Defendants disclosed that XL had "made improvements to XL's supply chain, including sourcing an additional battery supplier." ¶278. Defendants further stated that "[r]esolving the battery supply issues allowed XL to increase production and fulfill orders in its outstanding backlog" but warned that it might face "further unforeseen supply chain disruptions caused by the COVID-19 pandemic." *Id.* This statement misleadingly suggested that the battery supply problems had been "resolv[ed]" and that the principal cause of these problems had been an "unforeseen" shortage due to COVID, as opposed to a long-standing problem that predated COVID by at least a year and that directly contradicted Defendants' representations of an "established supply chain production capacity" and "very low risk … production process."

*Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) ("warnings of specific risks ... do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks").

18

Perhaps most egregiously, on March 8, 2021, in a press release responding to the MW Report, Defendants claimed that XL's management team had "a track record of successfully navigating global supply chain challenges." ¶303. The release acknowledged that XL Fleet had experienced battery shortages "in 2019," but claimed that XL "has since established a more robust and reliable supply chain." *Id.* Just three weeks later, however, on March 31, 2021, Defendants withdrew their revenue forecast for 2021, admitting that XL had not been able to fill any orders for "a lengthy period early in the year" due to "ongoing OEM delays, amid microchip and other shortages." ¶¶25-26, 206, 393. Whether these shortages related to batteries or other components, it was misleading for Defendants to deny MW's supply chain allegations by touting XL's new and improved supply chain without acknowledging that supply interruptions were at that very moment crippling XL's business. ¶305. At the time of the March 8 statement, Q1 2021 was more than 73% complete, and, as later revealed, XL only generated $675,000 million of revenue in that quarter.

Defendants attack the basis of the FEs' knowledge of XL's supply chain problems, claiming it is based on hearsay. MTD 11. But as discussed *supra* at Sec. IV.A, the Court may rely on hearsay statements of confidential witnesses if the facts support a probability that the witnesses were in a position to know the information alleged. Here, the FEs directly interacted with XL's customers and were in a position to know that orders were not being filled. FE1 was present at a meeting in May 2019 where Defendants admitted the battery supply problems. The battery supply problems, therefore, clearly predated COVID.

Defendants argue that the allegations of three of the FEs are "anachronistic," because they left the Company before the Class Period and XL reported that it improved its battery supply chain in November 2020. MTD 12. But the accounts of these FEs demonstrate that XL's supply chain problems were long-standing and severe, and FE2 indicated that the supply chain problems

19

persisted into the Class Period. The ongoing nature of these problems is further corroborated by Defendants' admissions following the MW Report. All of these factors strongly support Plaintiffs' allegations and MW's central claims: that XL "had been subject to supply shortages for years" and "had significant supply chain woes indicative of a bit player." ¶¶305, 394. [30]

### C.    Defendants' "Customer Base" Statements Were Materially Misleading

XL touted its "significant customer base" and claimed it would achieve "Dramatic Growth" by selling to these "existing customers." ¶¶217, 224.[31] Its Investor Presentation listed 33 logos of high-profile customers on a slide which claimed that XL was a "trusted brand" and that it had an "[e]stablished, track-record with many of the largest fleet owners." ¶226. Pivotal also claimed that XL's "customer relationships" were among the qualitative factors that led its board of directors to conclude that XL's valuation met the 80% threshold. ¶253.

In reality, of the 33 customers listed on the slide, 18 had not ordered any XL product during all of 2019 and the first half of 2020. ¶120. These inactive customers included some of the most prominent names on the list, including FedEx, DHL, Coca-Cola, Pepsi, Verizon, ComEd, Southern California Edison, and Safelite. *Id.* According to MW's Former Employee A, "almost no one reorders … it's maybe 10%." ¶119. Defendants' omission of the low reorder rate and that many featured customers either had not placed an order in at least 18 months "affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005).

Defendants claim that the slide was not misleading because it did not state that these

---

[30] Defendants claim the Complaint's allegations concerning the conversion of backlog to revenue raises an accounting issue. MTD 13-14. They misunderstand the allegations. Plaintiffs are not alleging that XL's backlog was misstated or that "its books *must* be distorted" (MTD 13) (emphasis in original); they are alleging that the backlog presented a misleading indicator of future performance because XL failed to disclose the supply chain problems, which meant it would be difficult for XL to fill existing purchase orders in a timely manner and generate revenue from those orders.

[31] *See also* 245 ("established global customers"); ¶294 ("blue-chip customer base").

20

customers were "actively" purchasing products from XL. MTD 15. But the slide must be read in the context of Defendants' other statements, including the representation in the same slideshow that XL's path to growth was based on "selling existing products to existing customers through existing channels." ¶224. At the very least, reasonable minds could differ on whether these statements were misleading. *See, e.g.*, *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at \*2, \*12 & n.14 (C.D. Cal. July 21, 2005) (notwithstanding "quibble[s]" over definitions of "customer" and "customer base," defendants' representations that company had a "large and diverse customer base" and "over 2000 customers" were potentially actionable where plaintiff alleged that company had only 500 customers and had lost many of its largest customers).

### D.   Defendants' Statements About XL's Technology Were Materially Misleading

Throughout the Class Period, Defendants touted XL's "proven technology" based on purported MPG gains and the resulting ROI its products provided customers. *E.g.*, ¶¶217, 219, 222-223, 227, 232, 248, 250, 283, 294, 330. In fact, customers often experienced minimal and even negative mileage gains, stifling XL's ability to transition existing customers from trial to adoption. *See* ¶¶122-31. Contrary to Defendants' arguments (MTD 16), their statements were not puffery, but actionable statements based on objectively verifiable data upon which investors were entitled to rely. *See Rosen v. Textron, Inc.*, 321 F. Supp. 2d 308, 320 (D.R.I. 2004) ("Read in context, Campbell's discussion of the V–22 is more than mere puffery: it is a statement heralding the tilt-rotor technology … and the direct relationship between the V–22 and Textron's ability to increase its profit.").

Even if some of the statements could be seen as puffery in isolation, when viewed in the context of the totality of Defendants' representations, the statements became actionable misrepresentations. *See* note 21, *supra*. Defendants argue that they disclosed certain assumptions upon which the ROI calculations were based—such as a $3/gallon cost of gasoline (MTD 16), but

21

these disclosures did not correct the misleading impression created by Defendants' statements and omissions, including the failure to disclose that customers could not achieve the touted MPG gains under real world driving conditions.

### E.      Defendants' CARB Certification Statements Were Materially Misleading

Several of Defendants' statements were materially misleading for failing to disclose XL's loss of CARB approval status. First, in XL's 10/2/2020 Registration Statement, XL acknowledged that "CARB *requires* that an Executive Order ('EO') is obtained for the sale of the system intended for use on a vehicle to be operated in the state of California." ¶248. XL stated that it "had obtained a number of EOs for prior model years and is in the process of conducting testing against CARB issued test orders for future products to be introduced into the Californian market." *Id.*

These statements were misleading because they failed to disclose that XL lost CARB approval status in 2019 and was unable to secure re-approval in 2020, facts that XL *admitted* after the MW Report was released. ¶99 n.20. Even if XL's statements about EOs for prior model years were literally true, the failure to disclose the loss of CARB approval status gave a misleading impression as to XL's financial prospects in California and the risks it faced going forward. *See SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) ("[S]o-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud."), *reversed on other grounds*, 568 U.S. 442 (2013).[32]

Second, on October 26, 2020, Hynes stated "vehicles are getting built and then shipped to the end customer, again, *anywhere in the U.S.* or Canada" and "We're in *about every state except for Alaska at this point*." ¶263. These statements were affirmatively deceptive, because XL could not sell in California "at this point." Nevertheless, Defendants included sales opportunities for

---

[32] *See also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

22

companies in California in XL's pipeline, which rendered XL's pipeline figures misleading. ¶99.

Defendants argue that the statements were not misleading because XL obtained CARB approval in 2021 for several 2020 vehicles and thus Plaintiffs' prediction that XL was "unlikely to be approved in 2021" proved to be incorrect. MTD 18 (quoting ¶21). But XL did not gain this approval until June 2021. *See* Spencer Decl., Ex. 1 (8/12/2021 press release) (noting XL "[g]ained current CARB Executive Order status for the hybrid Ford Transit product in June 2021, *resuming XL Fleet's ability to serve the California market*"). Thus, at the time the challenged statements were made and for all of the of the Class Period, XL was not able to "serve the California market."

### F.        Defendants' Revenue Projections Were Materially Misleading

The Complaint alleges that XL's revenue projections lacked a reasonable basis and were materially overstated for all the reasons discussed *supra*. The Complaint also alleges additional process-based deficiencies in XL's revenue forecast and that the forecast was misleading for those additional reasons. ¶¶135-41, 215(e). Specifically, the Complaint alleges that the $75 million sales target was not based on identifiable sales opportunities and was an arbitrary target set by management with no feedback from the sales team. *Id.* The total amount was arbitrarily allocated to individual members of the sales team without any basis in historical results. *Id.* Defendants do not address these allegations and may not raise new arguments about them in their reply.

### VI.     THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER

In order to plead scienter, a plaintiff must allege facts that, viewed holistically, give rise to a "strong inference" that the defendants acted with "the required state of mind." 15 U.S.C. §78u–4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). A plaintiff may satisfy this standard "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307. Recklessness amounts to

23

actionable scienter if the conduct was "highly unreasonable" and an "extreme departure from the standards of ordinary care." *Id.* at 308. Recklessness can be shown by alleging that the defendants "knew facts or had access to information suggesting that their public statements were not accurate [or] failed to check information they had a duty to monitor." *Id.* at 311.

Scienter is adequately alleged if the facts give rise to an inference that Defendants intentionally or recklessly misled the public which is at least as compelling as an inference that Defendants acted non-culpably. *Tellabs*, 551 U.S. at 324. "When the competing inferences rest in equipoise, the tie goes to the plaintiff." *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009). The proper inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S at 322-23 & 326 (allegations are to be read "holistically").

### A.   Piern's Data Manipulation Supports A Strong Inference Of Scienter

The Complaint provides particularized allegations from former employees detailing how Piern altered data in Salesforce and pressured employees to exaggerate the probabilities of sales opportunities to inflate XL's pipeline. *See* Sec. V.A, *supra*; ¶¶90-101. These allegations support a strong inference of scienter. *See Universal Am.*, 176 F. Supp. 3d at 395 (seller's provision of modified pipeline data to buyer and withholding of "real pipeline" data based on confidence levels assigned to prospective deals by sales representatives supported strong inference of scienter).[33]

### B.   The Nature And Pattern Of Defendants' Selective Denials Of The Muddy Waters Report Support A Strong Inference of Scienter

In XL's March 8, 2021 response to the MW Report, XL denied certain allegations and

---

[33] *See also City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 370-371 (S.D.N.Y. 2012) (strong inference of scienter where defendant "pressured" employee to misrepresent backlog figure even after employee told defendant that the proposed backlog figure "was not reasonable" and defendant then "ignored [the employee] and changed the backlog figures, grossly overstating the actual backlog"); *Mild v. PPG Indus., Inc.*, 2018 WL 6787351, at *5-6 (C.D. Cal. December 21, 2018) (strong inference of scienter where defendant "directed his subordinates to improperly override internal controls in order to enter improper accounting adjustments").

failed to address others. ¶¶194-95; Ex. 5. The nature and pattern of XL's selective denials support an inference of scienter. With respect to the pipeline inflation allegations, XL criticized MW for confusing the terms "backlog" and "pipeline," but failed to deny the most serious allegation: that management manipulated the data in Salesforce to artificially inflate sales probabilities. ¶195. This non-denial was a tacit admission. *See In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266 (S.D.N.Y. 2014) (defendant's "non-denial" of allegations raised in public reporting about the defendant's and company's conduct "provide a strong inference of scienter").

With respect to MW's allegation that XL suffered long-standing supply chain problems, XL admitted that it suffered a battery shortage in 2019, but portrayed the problem as a thing of the past, claiming that XL "has since established a more robust and reliable supply chain." ¶¶303, 305. Just three weeks later, however, XL would admit that it was suffering from severe supply chain issues that would cause it to withdraw its $75 million revenue forecast for 2021 and generate only $1 million in Q1. ¶394. The short time between XL's false assurance and the corrective disclosure is strong evidence of scienter. *See Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 271 (3d Cir. 2009) ("temporal proximity" of defendants' denials to revelation of the truth supports inference of scienter); *Universal Am.*, 176 F. Supp. at 395-396 (similar).

As to the remaining allegations, XL admitted that it lost CARB approval status in 2019 and failed to deny the allegation that 18 of the 33 customers featured in its investor presentation were inactive. ¶¶99 n.20, 195. While XL quibbled with MW's MPG claims, it essentially conceded that real-world results lagged the advertised 25% improvement. ¶195. This combination of admissions and weak denials did not impress the market, causing a further decline in XL's stock price (¶196), and it effectively confirmed the substance of MW's allegations.

**C.     XL's Pattern Of Supply Chain Disclosures Support An Inference of Scienter**

XL's disclosures about its supply chain throughout the Class Period bore strong hallmarks

of deliberate deception. *See* ¶¶242, 277-78, 300. XL consistently downplayed the severity, scope and long-standing duration of the supply chain problems, attempted to blame them on COVID, understated the persistence of the problems, and overstated XL's ability to mitigate and resolve the issues. ¶¶391-95. This pattern of disclosures, along with Defendants' repeated touting of XL's supply chain production capacity and "low risk" production process, suggests a conscious effort to mislead investors about the risks underlying XL's revenue forecast. *See Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 845-46 (N.D. Ind. 2018) (defendants' misleading explanation of reasons for supply shortages supported inference of scienter).[34]

### D.  Pivotal's Due Diligence Supports A Strong Inference Of Scienter

Pivotal claimed to have conducted "significant due diligence" on XL, including a review of XL's projections, document review, conference calls with XL and its legal counsel, and "calls with XL suppliers, customers, and investors, as well as competitors and industry experts." ¶¶313-15. Pivotal's due diligence also included interviews of former employees. ¶¶320-24.

In late November or early December 2020, FE3 was contacted by someone claiming to be a lawyer for Pivotal conducting due diligence related to the merger. ¶320. FE3 told this attorney about XL's overstated sales pipeline and issues with XL's products. ¶321. FE3 was recontacted shortly thereafter by a group including four or five other people and interviewed for 90 minutes. *Id.* The main topics discussed were problems with XL's ROI calculations, XL's overstated sales pipeline, and XL's inability to sell in California due to losing its CARB certification. ¶322.

It is a reasonable inference that the information from this call—serious allegations made by a regional sales manager that undermined representations in XL's investor presentation—was shared with senior Pivotal management. *See Rudani v. Ideanomics, Inc.*, 2020 WL 5770356, at *7

---

[34] *See also SEC v. Conaway*, 2006 WL 2828569, at *7 (E.D. Mich. Sept. 29, 2006) (CEO's creation of a "cover story" to "hide the nature, cause, and severity of the liquidity problem" supported inference of scienter).

(S.D.N.Y. Sept. 25, 2020) (imputing knowledge of target companies' financial data to CEO and Chairman of acquiring company because the data was made available during due diligence and critical to the acquisition).[35] The interview with FE3 presented a serious "red flag" that should have resulted in additional investigation. At the very least, the foregoing allegations support an inference of severe recklessness on the part of the Pivotal Individual Defendants.

### E.      Defendants Had A Motive And Opportunity To Defraud

Although motive is not necessary to plead scienter, motive allegations can "meaningfully enhance the strength of the inference." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 685 (5th Cir. 2014). Under the holistic analysis required by *Tellabs*, even weak allegations of motive can be combined with other allegations and "turn what might be a weak inference standing alone into a strong one." *Silvercorp*, 26 F. Supp. 3d at 275; *accord In re Insys Therapeutics Sec. Litig.*, 2018 WL 2943746, at *6 (June 12, 2018). In this case, both the Pivotal Individual Defendants and XL Individual Defendants had powerful financial incentives to overstate XL's prospects and understate XL's risks to the investing public.

*Pivotal Individual Defendants' Motive*. As observed by various commentators, the unique financial structure of SPACs creates a risk for conflicts of interest and "misaligned incentives," because "the sponsor has an incentive to enter into a losing deal for SPAC investors if its alternative is to liquidate." ¶61; *see also* ¶4 (noting comments from SEC officials). In this case, Ledecky and Griffin, through their ownership of Pivotal's Sponsor, obtained a 20% interest in Pivotal, consisting of 5,750,000 Class B shares, for the nominal sum of $25,000.[36] The Sponsor distributed a portion of those shares to Brady and the other Pivotal directors, leaving the Sponsor

---

[35] *See Hawaii Structural Ironworkers Pension Trust Fund v. AMC Entm't Holdings*, 422 F. Supp. 3d 821, 851 (S.D.N.Y. 2019) ("unfettered access" to data and "level of due diligence performed" supported inference of scienter).

[36] Pivotal's Sponsor, Pivotal Investment Holdings II, LLC, was controlled by its members, Ironbound Partners, which was also controlled by Ledecky, and Pivotal Spac Funding II LLC, which was controlled by Griffin. ¶72.

with 5,500,000 Class B shares, representing a 19% ownership interest in Pivotal. ¶¶72, 342.

The Class B shares held by the Pivotal Individual Defendants would convert into Class A shares if a qualifying business combination were approved. ¶¶73, 340. The Class B shares, however, did not entitle the holders to participate in any redemption or distribution if a business combination was not approved within the 18 month deadline. ¶73. Thus, if Pivotal did not find and complete a qualifying deal by the deadline, the Pivotal Individual Defendants' shares would be rendered worthless. ¶74. As of 12/7/2020, the Sponsor's Class B shares were valued at $88 million, and Brady's 100,000 Class B shares were valued at $1.6 million. ¶¶342, 344.

In addition, the Sponsor purchased 4,233,333 warrants in a private placement at the time of the Pivotal IPO for $6.35 million. ¶74. These warrants had an aggregate market value of $17.4 million as of 12/7/2020, but would become worthless if the merger were not approved, because the Sponsor had agreed to waive its rights to participate in any distribution with respect to these securities. ¶342. MGG, a firm controlled by Griffin, subscribed for 630,000 shares of Pivotal Class A common stock in a private placement (the "PIPE Transaction") for $6.3 million. ¶350. The PIPE Transaction was conditioned on approval of the merger, and the price paid by MGG was substantially lower than the publicly traded market value of Pivotal stock at the time. *Id*. These shares represented a $3.78 million windfall to MGG if, and only if, the merger were approved. *Id*.

Based on the foregoing, the Pivotal Individual Defendants had a concrete and tangible motive to obtain approval of the merger with XL, irrespective of the merits of the deal for Pivotal's public shareholders. This is not the same type of generic motive possessed by every corporate executive, because it is based on the unique financial structure of a SPAC, in which the founders receive a substantial ownership position at an extreme discount, and their shares only become valuable if a qualifying transaction is approved. Another court in this district has found that

28

plaintiffs adequately pled a motive under analogous circumstances. *See In re Stillwater Capital Partners Inc. Litig.*, 858 F. Supp. 2d 277, 288 (S.D.N.Y. 2012) ("The desire to avoid impending liquidation was also a motivating factor for the [SPAC's] officers.").

*XL Individual Defendants' Motive*. For their part, the XL Individual Defendants had their own financial incentives to complete the merger with Pivotal. Prior to and during the Class Period, XL was in a dire financial position and desperately needed cash to sustain its operations. *See supra* at Sec. II.B; ¶¶362-66. XL had been regularly recording losses since at least 2019 and at the start of the Class Period XL had a working capital deficit of $27.6 million and an accumulated deficit of $87.6 million. ¶¶85-86. Pivotal's 12/8/2020 proxy statement warned that "there is substantial doubt about XL's ability to continue as a going concern." ¶86. According to FE2, prior to the Pivotal transaction, XL only had enough funds to continue operations until the end of 2020. ¶87.

These circumstances gave the XL Individual Defendants' a motive to exaggerate XL's sales pipeline and its financial prospects in order to complete the merger and receive the cash necessary for XL to continue operations. *See, e.g.*, *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) ("The inference of scienter is also bolstered by the fact that Defendants admitted in their SEC filings that they needed to raise funds … to remain viable."). While Defendants argue that this type of motive is generic and applicable to all corporations, the issuance of a "going concern" qualifier is a unique circumstance that can create a concrete and particularized motive to make deliberate or reckless misrepresentations. *See id.* at *11-12 (company's "going concern" status gave defendants an "incentive to gamble" because "[a]n executive at a company that will go belly up if it fails to fundraise has different incentives from a generic corporate insider").[37] More broadly, courts have held that concrete allegations showing a

---

[37] *See In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *30 (C.D. Cal. Aug. 8, 2013) (motive to conceal data pled where auditor would have had "to issue a going concern qualification, which would have made it difficult,

particularized need for operating capital can support a pleading of scienter. *See, e.g.*, *Tchatchou v. India Globalization Capital Inc.*, 2021 WL 307415, at *9 (D. Md. Jan. 29, 2021) ("dire need for funds is probative and adds one more cautionary flag to the overall context within which the Court holistically views the inferences of scienter when compared to any competing inferences").[38]

Additionally, Defendants Hynes and Kazarinoff received substantial increases in their base salary and bonus compensation for their roles in the completion of the merger. *See* ¶¶367-76. These individuals also held significant amounts of XL Hybrids securities that would convert to publicly tradeable XL Fleet securities, which could be traded following the expiration of a lock-up agreement. ¶¶377-84. The lock-up agreement was set to expire within a year of the merger, but would expire earlier if XL's stock price remained at $15 or higher for a certain period. ¶383. These provisions gave Defendants an incentive to keep XL's stock price inflated long enough for the lock-up to expire. *See In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 557-58 (S.D.N.Y. 2010) (plaintiffs adequately pled scienter when defendant stood to receive multi-million dollar payment and stock options upon completion of merger if company's stock did not fall below certain trigger prices). That XL's stock price came crashing down before the XL Individual Defendants had a chance to cash in does not change the fact that they had a motive to conceal XL's risks from the market. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("[T]hat a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.").

### F.   Additional Factors Support A Strong Inference Of Scienter

Several additional factors support a strong inference of scienter, including:

---

if not impossible, to secure financing the company desperately needed").

[38] *See also Frater v. Hemispheric Biopharma, Inc*., 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) (motive pled where drug company was "sufficiently short on cash … that it could not afford to finance an additional clinical trial … heightening its need for a lucrative stock sale.").

***Temporal Proximity And Magnitude Of Revenue Miss***. Defendants reaffirmed their $75 million revenue forecast for 2021 as late as 12/8/2020, two weeks before the merger. ¶291. After the merger, on 12/23/2020, when asked about the factors supporting the forecast, Hynes spoke glowingly about XL's pipeline and prospects and gave no sign of equivocation about the forecast. ¶296. Three months later, however, on 3/31/2021, XL withdrew the 2021 forecast and indicated that it expected to generate only $1 million in Q1 2021. ¶¶25-26. The temporal proximity of Defendants' reassurances to the withdrawal of the forecast supports an inference of scienter. *See, e.g.*, *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 483 (E.D. Va. 2002) ("The temporal proximity between financial viability on May 30 and financial expiration two or so months later supports an inference that can augment the other aspects of the scienter allegations here.").[39]

Similarly, the magnitude of the revenue drop-off as compared to the forecast further bolsters the inference of scienter. As detailed *supra*, XL only generated $675,000 in Q1 2021 and only generated $4.4 million of revenue over the first two quarters of 2021 (and only $2.0 million of that revenue was organic). *Cf. Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (magnitude of $73.8 million write-off "render[ed] less credible the proposition that … [defendant] believed it likely that it could recover those royalty advances through future sales").

***Core Operations***. The subject matter of Defendants' misrepresentations involved Pivotal's and XL's core operations. Pivotal's sole operation was the acquisition of XL. ¶386. XL's sales pipeline, supply chain and technological capabilities represented core operations of its business. ¶387. XL cited the $220 million pipeline as a key factor in determining the 80% value test was met. ¶281. XL claimed that its supply chain capacity, scalable technology, and low risk production processes were key elements to its growth strategy. *See* Sec. V.B, *supra*. Pursuant to the core

---

[39] As detailed *supra* at Sec. VI.B, this temporal proximity principle applies with even greater force to the three-week gap between XL's supply chain assurances on March 8 and its admission of crippling supply shortages on March 31.

operations doctrine, "knowledge of the falsity of a company's ... statements can be imputed to key officers who should have known of facts relating to the core operations of their company." *In re Atlas Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004).

While courts in this Circuit generally hold that the core operations doctrine does not, by itself, suffice to establish scienter, when a misrepresentation concerns a company's core operations, that fact does strengthen the inference of scienter. *See, e.g.*, *In re Salix Pharms. Ltd.*, 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016), at *16 ("that the alleged fraud concerned Salix's core operations … buttress[es] the allegations of scienter discussed above"); *Okla. Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16 (S.D.N.Y. 2019) (similar).[40]

***Piern's Departure***. Piern left XL in May 2021, shortly after MW published its revelations about the pipeline inflation scheme at XL. ¶388. XL fleet did not publicly announce, or give any explanation for, Piern's departure. *Id.* The timing and circumstances of Piern's departure further bolsters the already strong inference of scienter. *See Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 619 (S.D.N.Y. 2015) ("the timing and circumstances of individual defendants' resignations may add some further weight to an overall inference of scienter"); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 n.84 (S.D.N.Y. 2014) (collecting cases).

### G.     The Complaint Pleads A Strong Inference Of Corporate Scienter

To allege that a corporation has acted with scienter, a plaintiff must plead facts that "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "[I]t is possible to raise the required inference with regard to a

---

[40] A related factor supporting an inference of scienter is XL's small size. As of 9/24/2020, XL had only 60 full time employees. ¶307. *See, e.g.*, *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *12 (C.D. Cal. July 1, 2008) ("relatively small size" of company "with 80 to 100 employees" supported inference of scienter).

corporate defendant without doing so with regard to a specific individual defendant." *Id.*

Importantly, for purposes of corporate scienter, "the person whose state of mind is imputed to the corporate defendant need not also be the person who made the material misstatements at issue." *In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *10 (S.D.N.Y. Sept. 19, 2017).[41] Thus, **the scienter of Defendant Piern may be imputed to XL with respect to false or misleading statements made by the other Individual Defendants**. This is true even if the Court determines that Piern (i) did not make *any* false or misleading statement and (ii) did not engage in *any* deceptive act or participate in *any* scheme to defraud under Rule 10b-5(a) or (c).

Under well-established authority in this district, courts may attribute the scienter of "management-level" employees to a corporation.[42] While there is no bright-line rule as to who constitutes a "management-level" employee, courts have applied that designation to individuals occupying a variety of roles, including vice presidents, unit heads, and senior managers.[43] Piern was clearly a "management-level" employee. As XL's VP of Sales and Marketing, he reported directly to the CEO, with whom he had weekly meetings, and made regular presentations to the board. ¶¶308-09, 402. He managed XL's sales and marketing department, and XL's regional sales managers and channel partner manager reported directly to him. ¶¶51-54. He was quoted by XL in multiple public-facing press releases and was one of only a handful of executives prominently featured as part of the "Leadership Team" in the promotional materials for the merger. ¶402.

Furthermore, Piern deliberately inflated XL's sales pipeline knowing that this data would be incorporated into XL's public statements and relied on by investors. ¶402. This provides an

---

[41] *Accord Patel v. L-3 Communications Holdings Inc.*, 2016 WL 1629325, at *15 n.38 (S.D.N.Y. Apr. 21, 2016) (collecting cases); *In re BHP Billiton Ltd. Sec. Litig.*, 2017 WL 3822755, at *19 (S.D.N.Y. Aug. 29, 2017).

[42] *See, e.g.*, *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006).

[43] *See, e.g.*, *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 443 (S.D.N.Y. 2005) (regional vice president); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 408-09 (S.D.N.Y. 2016) (vice president of diabetes unit); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 371-72 (S.D.N.Y. 2012) (assistant vice president and senior managers).

independent basis for imputation, irrespective of Piern's seniority. *See Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 512 (E.D. Va. 2018) ("corporations can be held liable for § 10(b) violations where a lower-level corporate agent knowingly and intentionally furnishes false information to a corporate officer for inclusion in a public statement").

Additionally, the scienter of the other Individual Defendants also may be imputed to XL.

## VII.    THE COMPLAINT STATES CLAIMS UNDER 10b-5(a) & (c)

In addition to the Complaint's claims under Rule 10b-5(b) for false and misleading statements, the Complaint pleads claims against the XL Individual Defendants for deceptive acts and a scheme to defraud under Rule 10b-5(a) and (c). *See* ¶¶439-50; §240.10b-5(a) (unlawful to "employ any device, scheme, or artifice to defraud"); §240.10b-5(c) (unlawful to "engage in any act, practice, or course of business which operates as a fraud or deceit upon any person").

Specifically, the Complaint alleges that Piern entered (and/or caused to be entered) falsified pipeline data into XL's Salesforce system, which caused this falsified data to be transmitted to Pivotal in connection with the due diligence process and to be incorporated into Pivotal's offering materials and the investor presentation. ¶¶91-100, 225-26, 281, 442-43. These actions constituted deceptive acts that were independent of the dissemination of the false statements to the public, without which the scheme to defraud could not have been effectuated. ¶442.

Defendants argue that Piern is not alleged to have made, drafted, or disseminated any false statement. MTD 33. That is irrelevant. Subsections (a) and (c) of Rule 10b-5 "capture a wide range of conduct" and are not limited to the dissemination of false statements. *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019); *see In re Cognizant Tech. Solutions Corp. Sec. Litig.*, 2020 WL 3026564, at *17 (D.N.J. June 5, 2020) (*Lorenzo* "did not necessarily preclude from liability instances where the dissemination of a misstatement is ***preceded*** by *additional* allegedly deceptive conduct") (some emphasis in original). In *Cognizant*, the court held that a defendant could be liable under

34

subsections (a) and (c) where that defendant (1) devised a scheme to disguise the nature of bribery payments, (2) knew that the manner in which the payments were disguised would result in financial misstatements, and (3) caused the false financial information to be reported to investors by concealing the bribery scheme from the company's auditors. 2020 WL 3026564, at *17.

Defendants argue that Plaintiffs' theory amounts to an improper claim of "aiding and abetting" liability prohibited by *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994). MTD 24. But *Lorenzo* makes clear that *Central Bank* only circumscribes the boundaries for primary liability under Rule 10b-5(b), not subsections (a) and (c). 139 S. Ct. at 1104. Plaintiff is not alleging that Piern "aided and abetted" the other Defendants in making false statements but that he engaged in deceptive acts that were a necessary predicate in a scheme to defraud.[44]

The Complaint does, however, plead facts providing strong circumstantial evidence that Hynes and Kazarinoff also participated in the scheme to defraud. These facts include, *inter alia*, Kazarinoff's weekly meetings with Piern to discuss the pipeline (¶308), Kazarinoff's and Hynes' role in giving further misleading assurances and denials following the MW Report, the financial motivations of Kazarinoff and Hynes, and the importance of the pipeline to XL's core operations.

## VIII. CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.[45] In the event the Court grants all or part of Defendants' motion, Plaintiffs request an opportunity to re-plead. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

---

[44] Defendants argue that Plaintiffs' claims fail to establish the element of reliance. MTD 24-25 (citing *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148 (2008)). In *Stoneridge*, the claims involved sham transactions between a company and third-party vendors that helped a company mislead its auditor and thereby issue false financial statements. The Supreme Court held that the chain of causation was "too remote" to satisfy the reliance requirement. 552 U.S. at 161 In this case, Piern was not a third-party but an officer of XL. His actions were directly responsible for the transmission of false data to investors and did not constitute a mere aiding and abetting of fraud by others.

[45] Defendants' only argument concerning the Complaint's Section 20(a) claims is their contention that it fails to plead a primary violation under Section 10(b). MTD 25. Because the Complaint adequately pleads Section 10(b) claims, it also adequately pleads Section 20(a) claims.

Dated: October 4, 2021

By: */s/ Garth A. Spencer*
**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Garth A. Spencer (GS-7623)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Lead Attorneys for Lead Plaintiff Delton Rowe,*
*additional Plaintiffs Jeffrey Suh, Carl Enslin,*
*Simone Heridis, and Soraya Matamoros,*
*and the putative Class*

36

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On October 4, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 4, 2021.

*s/ Garth A. Spencer*
Garth A. Spencer