# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 05-cv-01265-PSF-MEH
(Consolidated with 05-cv-01344-PSF-MEH)

WEST PALM BEACH FIREFIGHTERS' PENSION FUND,
On Behalf of Itself and All Others Similarly Situated,

      Plaintiff,

v.

STARTEK, INC., et al.,

      Defendants.

---

**PLAINTIFFS' CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS**

---

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................1

SUMMARY OF THE ACTION................................................................................................5

JURISDICTION AND VENUE ..............................................................................................22

THE PARTIES.........................................................................................................................22

FACTS RAISING A STRONG INFERENCE OF SCIENTER.................................................27

INSIDER SELLING ...............................................................................................................44

DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS
        DURING THE CLASS PERIOD ..................................................................................50

LOSS CAUSATION/ECONOMIC LOSS ..............................................................................93

FIRST CLAIM FOR RELIEF ................................................................................................95

        Against Defendants Meade, McKenzie, Stephenson and Morgan for Violation of
            §11 of the Securities Act.........................................................................................95

SECOND CLAIM FOR RELIEF ...........................................................................................97

        Against the Individual Defendants for Violations of §15 of the Securities Act ................97

THIRD CLAIM FOR RELIEF................................................................................................97

        Against All Defendants for Violation of §10(b) of the Exchange Act and Rule
            10b-5 ......................................................................................................................97

FOURTH CLAIM FOR RELIEF ..........................................................................................100

        Against All Defendants for Violation of §20(a) of the Exchange Act ...........................100

CLASS ACTION ALLEGATIONS ......................................................................................100

PRAYER FOR RELIEF .......................................................................................................101

JURY DEMAND..................................................................................................................102

## INTRODUCTION

1.　　This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of StarTek, Inc. ("StarTek" or the "Company" or "SRT") between February 26, 2003 and May 5, 2005 (the "Class Period") for violations of §§11 and 15 of the Securities Act of 1933 (the "Securities Act"), §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC").  The defendants are StarTek, A. Emmet Stephenson, Jr. ("Stephenson"), co-founder and Chairman of the Board of the Company, and his wife Toni Stephenson and sister Pamela S. Oliver (who together beneficially owned approximately 66.3% of the stock of the Company, elected the entire Board of Directors and controlled the Company), Michael Morgan ("Morgan"), the other co-founder and Vice Chairman of the Board, William E. Meade ("Meade"), the CEO, and Eugene L. McKenzie, Jr. ("McKenzie"), the CFO of the Company.

2.　　By issuing false statements about strong existing demand for StarTek's outsourced services from *four of the Company's customers (that accounted for 90% of revenue)*, the Company's healthy sales pipeline, and the completion of a management transition and restructuring plan, defendants artificially inflated StarTek's stock price from $23 on February 25, 2003 the day before the start of the Class Period to over $36 on August 18, 2003.  Defendants took advantage of this artificial inflation and unloaded 85,800 shares of StarTek stock between August 19, 2003 and September 17, 2003, reaping over $3.1 million in insider trading proceeds.  On the heels of these sales, in October 2003, defendants represented that "to handle the increased demand from its targeted markets," StarTek had opened several new telecommunication facilities.  One month later, defendants said that "[d]emand for these services now appears to be larger than we previously

- 1 -

expected, which requires opening a fourth new facility this year to keep up." In response to this statement, StarTek's stock climbed over 3.6% to $34.41 per share. In November, the StarTek Board of Directors declared an increase in its quarterly cash dividend to $0.37 per share, payable November 25, 2003. Stephenson said that "*StarTek's business grew significantly during the September quarter as previously opened facilities ramped up on time and within budget*." In response to defendants' highly positive but false statements, StarTek's stock price increased to over $40 in December 2003. Defendants again took advantage of this higher stock price and sold 79,400 shares of their StarTek stock between November 6, 2003 and January 9, 2004, for an average price of over $41 per share for insider trading proceeds of over $3.2 million.

3. But defendants faced serious obstacles to selling off more of their own StarTek stock because restrictions under SEC Rule 144 sharply limited the number of "unregistered" shares StarTek's insiders could sell into the open market. To take advantage of the artificial inflation in StarTek's stock and circumvent SEC Rule 144 volume restrictions on stock sales, defendants decided to undertake a large *SEC-registered public offering of millions of shares of StarTek stock*. On February 17, 2004, StarTek filed a Registration Statement for a pubic offering of 3.2 million shares (the "Public Offering") with a proposed maximum aggregate value of $146.5 million to be received by the selling shareholders.

4. But after StarTek filed its Registration Statement with the SEC for the Public Offering, Cingular announced that it was acquiring AT&T Wireless Services, Inc. ("ATT"), jeopardizing the Public Offering. To salvage the Public Offering and complete their insider bailout, defendants caused StarTek to renegotiate its contract with ATT and told investors in a revised S-3 filed on April 13, 2004, that StarTek's contract with ATT was extended until December 31, 2006,

- 2 -

and was not subject to termination for convenience or without cause.  But defendants failed to disclose that StarTek was forced to ***drastically reduce its pricing in return for the contract extension***.  This enabled StarTek's insiders to complete an insider bailout, selling off a total of over 5.3 million shares of their StarTek stock during the Class period and ***pocketing $175 million in illegal insider trading proceeds***.

5.      On February 18, 2005, StarTek issued a press release entitled "StarTek, Inc. Announces Management Change," which stated that defendant Meade had resigned as President and Chief Executive Officer of the Company.  Analysts were stunned and StarTek's stock dropped almost 24% from $25.75 to $19.60 per share because the market believed that Meade's ouster confirmed earlier reports that StarTek's earnings would be weak and that the Company's sales pipeline was not as strong as investors were led to believe.  The next day, StarTek's stock dropped another 4.8% to $18.65.  The market's fears were realized on March 3, 2005, when StarTek disclosed that "[f]ully diluted earnings per share including discontinued operations decreased by 44% to $0.30, compared to $0.54 for the same period in 2003."

6.      Defendants explained that "[t]he gross margin decline of 9.7% points from 29.7% to 20.0%, was largely the result of greater costs from the launching of new call center capacity to handle anticipated volume growth that materialized at lower levels than our clients forecasted, continuing decreases in revenue and margins in our supply chain management platform, and increased volume billed at lower agent rates due to our tiered incentive pricing model."  In other words, Startek's revenues declined because StarTek was forced to drastically reduce its pricing in return for the contract extension with ATT.  After this news, StarTek stock continued to fall from

- 3 -

almost $18 on March 2, 2005 to $15.54 on April 8, 2005.  However, the stock continued to be inflated during the remainder of the Class Period.

7.        Then, on May 6, 2005, StarTek announced that its first quarter 2005 "earnings per share from continuing operations decreased . . . to $0.18 compared to $0.49 for the first quarter of 2004."  The Company also announced that its revenues declined 14.2% from the same period in 2004.  On this news, StarTek's stock price fell over 18% from a closing price on May 5, 2005 of $15.20 to $12.40 per share on May 6, 2005, as shown by the following chart:



## SUMMARY OF THE ACTION

8.      Prior to its initial public offering in June 1997 (the "IPO"), all of the outstanding capital stock of the Company was owned or controlled by Stephenson, Chairman of the Board of the Company, and his family.  Even after the IPO, Stephenson and his family beneficially owned approximately 66.3% of the common stock of the Company.  As a result, Stephenson and his family were able to elect the entire Board of Directors and control the Company.

9.      On June 19, 1997, StarTek completed its IPO at $15 per share.  In the IPO, StarTek sold 3 million shares for net proceeds of $41.9 million, but insiders sold only 666,667 of the more than 4.6 million StarTek shares they held for net proceeds of $9.3 million.  Thus, they were very focused on the stock's performance. During 2000, StarTek's stock fell from a high of $74 per share to a low of about $12 per share. In 2001, StarTek's average trading price was about $18 per share. This was of great concern to StarTek's insiders who had only sold a small percentage of their personal holdings up to this point and had a material part of their net worth tied up in StarTek stock.

10.     As a result of StarTek's poor stock price performance, in June 2001, co-founder and CEO Michael Morgan was replaced by Meade and Morgan was named Vice-Chairman of the Board. Then the CFO, Dennis Swenson, "retired" and was replaced by David Rosenthal in August 2001. Meade and Rosenthal instituted a number of changes.  Meade and Stephenson explained in StarTek's 2002 Annual Report that "[f]rom a management and infrastructure perspective, 2002 was a year of great transition in which we added many new people and retained key talent in the organization. These personnel additions and creation of two new functions were designed to strengthen and deepen our relationships with existing and new clients and are important components of our future

strategic direction." Despite these changes, in 2002, StarTek's stock price averaged only approximately $23 per share.

11. In desperation, defendants began to issue highly positive but false statements concerning existing demand for its services and the sales pipeline for new contracts in order to push StarTek's stock price to much higher levels. For example, at the start of the Class Period on February 26, 2003, Stephenson said in a press release: "This month we have announced the opening of two new facilities . . . to handle growing demand for our superior outsourced services. Although expenses will increase this quarter related to the start up of these operations, the demand for this additional capacity brightens the outlook for more growth in future quarters." Based upon these positive statements, StarTek's stock increased over 4% to $24 per share, because the market believed that StarTek opened the new facilities in response to strong existing demand. Indeed, defendants told the market that StarTek "*leveraged capacity very, very effectively, we're not in a . . . we will build and hope they come type of environment. . . . [B]ecause of our conservative nature . . . you could be pretty much assured that somewhere right behind that there is a client in the pipeline. So that's the best leading indicator of our capacity and how the capacity relates to growth*." In fact, the opposite was true. StarTek opened new facilities not to service existing demand for current customers, but in the vain hope that demand would materialize in the future. And defendants knew that there was not sufficient future demand to fully utilize these new facilities because StarTek's customers were *contractually obligated to provide* a twelve month, rolling call volume forecast, and a monthly daily call volume forecast. Defendants later admitted: "*We launched three new call centers in anticipation of a lot greater volume, with a couple of the clients that we signed last year. That didn't materialize last year* . . . ."

- 6 -

12.      Defendants also told investors that the problems that plagued the Company in 2000-2001 were fixed and behind the Company. For example, Meade and Stephenson explained in StarTek's 2002 Annual Report distributed in late February 2003 that "[t]he management transition, redirection, and refocus is largely complete. The new team is in place to implement against our strategic plan, and we are optimistic about our potential." Unfortunately for investors these statements were false. Indeed, Near the end of the Class Period, on March 3, 2005, defendants admitted that StarTek was forced to hire another new head of sales in October 2004 who completely revamped the sales force during the course of the fourth quarter, and during January 2005. And at the end of the Class Period, defendants admitted that "the sales team that's in place today is still fairly new. Most of them came on board November, December, January time frame." The management transition *was not* largely complete. In fact, the sales force was in complete disarray and the Company was still in the process of hiring key executives. There were only two sales reps at StarTek who had been with the Company for the long-term, and over 17 sales reps came and went. Four different people held the top sales position at StarTek, Senior VP of Sales, during the Class Period. StarTek created the SVP of Sales position in October 2000, when it hired Michael Burke to assume this position. Burke remained StarTek's SVP of Sales for just under two years. Following Bill Meade's appointment as StarTek's new CEO in May 2001, Meade undertook an effort to bring in a senior management team with more experience in the teleservices industry. This management restructuring led Meade to fire Burke as SVP of Sales around September 2002 and to hire Blake Willardsen as StarTek's new SVP of Sales in June 2003. In the eight months between Burke's departure and Willardsen's hiring, CEO Bill Meade served as Acting SVP of Sales in addition to his role as the company's CEO. Willardsen only lasted in the position of SVP of Sales for 10 months,

and he left StarTek in early April 2004.  From April 2004 to October 2004, StarTek had no SVP of Sales, and thus no sales leadership for its Business Process Management ("BPM") (teleservices) division that the Company was heavily relying on to generate new accounts and corresponding revenues to meet forecasted revenues and earnings during 2004.  It was not until six months after Willardsen's April 2004 departure that StarTek hired Michael Griffith as StarTek's new SVP of Sales.  StarTek never informed the public that it had lost Willardsen as its SVP of Sales six months earlier, or of the fact that there was no sales leadership during the second or third quarters of 2004.  In fact, it did not publicly announce that it had retained Griffith as its new SVP of Sales in October of 2004, until March 3, 2005, during an investor and analyst conference call.

13.     The crux of the management restructuring effort that Meade initiated after being appointed CEO in May 2001, and which Meade represented throughout the Class Period was facilitating improved cost efficiencies and increased sales revenues, was to bring in a new senior management team with more experience in the teleservices industry.  However, none of Meade's new hires had prior teleservices experience, and there was a significant amount of turnover at the executive level.  Meade himself had no prior teleservices industry experience, having joined StarTek after two years as President and CEO of WebMiles, a "customer loyalty" startup, and 13 years in several business development positions with American Express.  Among the new hires Meade made during the Class Period were SVP of Sales Blake Willardsen in June 2003, COO Lance Zingale in June 2002, and CFO David Rosenthal in August 2001.  Willardsen came to StarTek from a company called Duexo, which was a provider of automated marketing and sales process applications wholly unrelated to teleservices.  Willardsen had been with Deuxo for only a year before joining StarTek.  Prior to Deuxo, Willardsen worked for a year with No Magic, a software modeling tool company.

- 8 -

Before No Magic, Willardsen held marketing and sales positions in the customer relationship management, enterprise resource planning, and financial planning industries.

14.     Willardsen only served as StarTek's SVP of Sales for ten months, leaving in early April 2004.  StarTek did not hire a replacement for Willardsen until October 2004, and thus went without a SVP of Sales for two critical quarters during the Class Period.  Additionally, Meade hired Lance Zingale to be StarTek's COO in June 2002.  Zingale came to StarTek after three years at Stonehenge Telecom and several years with  AT&T before Stonehenge.  While Zingale had some telecommunications industry experience, he did not have exposure in these prior positions to the business process outsourcing services industry that SRT is in.  Zingale left StarTek in September 2005.  Meade also hired David Rosenthal as StarTek's CFO in late August 2001.  Rosenthal's prior experience was as CFO of Celestial Seasonings, a seller of herbal teas, and as CFO of Hauser, Inc., a maker of refrigerated cabinets.  Rosenthal stepped down as StarTek's CFO in late October 2003, and was replaced by defendant McKenzie in early November 2003.  McKenzie had been StarTek's Controller for only about 18 months at the time, and had joined StarTek from his position as Director of Finance and Information Technology at International Paper Company.  McKenzie stepped down as CFO after only 11 months, resigning October 1, 2004.  StarTek named Rod Granger as McKenzie's replacements as CFO at that time, after having only joined StarTek in July 2004 as a VP of Finance.  Granger only held the CFO position for three months.  On January 3, 2005, StarTek announced the hiring of Steven Butler as its new CFO.  Then, when Bill Meade resigned as StarTek's CEO in late February 2005 and Butler became acting CEO as well as CFO, Granger stepped in again as Acting CFO, and was eventually formally appointed CFO again in August 2005. In short, far from the stability and driver of growth that Meade portrayed his restructuring effort

during the Class Period, the lack of industry experience and turnover in these executive positions had no positive impact on improving StarTek's performance during the Class Period.

15.     In addition to the executive management restructuring, Meade's restructuring effort also involved dividing the sales organization into two divisions:  Client Services and Sales.  The Client Services division handled contract implementation with new and existing customers and new orders from existing customers, while Sales was responsible for generating new contracts with new clients.  This reorganization was a detriment to the Company's overall sales performance.  The expenses associated with overhauling the sales organization were "significant and didn't result in increased sales."  After StarTek secured a new contract with TXU in March 2004, the account was handed over to the Client Services division for implementation, which caused a shift in responsibility for the account and a change in who TXU was dealing with at StarTek.  The TXU contract was lost in September 2004, only six months after it was secured.

16.     Despite the undisclosed sales force and management transition problems, to foment investor interest, on August 5, 2003, StarTek declared its first ever quarterly cash dividend of $0.36 per share.  At the same time, Stephenson told the market that two new facilities were now open and "we are happy to report that both came in on time and within budget. Currently, our revenue is growing at the new facilities, and we expect the increase will continue to ramp over the coming quarters.  At full capacity, these two facilities would employ 1,400 people.  Overall, we see business conditions gradually improving for our company as they have for the last 7 quarters in a row."  The market responded favorably to these statements sending StarTek's stock up over 5.5%.

17.     Defendants' highly positive but false statements artificially inflated StarTek's stock price from $23 on February 25, 2003 – the day before the start of the Class Period – to over $36 on

August 18, 2003.  Defendants took advantage of this artificial inflation and unloaded 85,800 shares of StarTek stock between August 19, 2003 and September 17, 2003, reaping over $3.1 million in insider trading proceeds.

18.     On the heels of these sales, in October 2003, defendants represented that "to handle the increased demand from its targeted markets," StarTek had opened several new telecommunication facilities.  One month later, defendants said that "[d]emand for these services now appears to be larger than we previously expected, which requires opening a fourth new facility this year to keep up."  In response to this statement, StarTek's stock climbed over 3.6% to $34.41 per share.  Also in November, the StarTek Board of Directors declared an increase in its quarterly cash dividend to $0.37 per share, payable November 25, 2003.  Stephenson said that "*StarTek's business grew significantly during the September quarter as previously opened facilities ramped up on time and within budget*."  Business was so good that Stephenson exclaimed that StarTek was "*opening two more facilities that will ultimately employ nearly 1,000 additional new employees when fully staffed in 2004.  Currently, we expect next year to offer opportunity for growth in our technical support and business process management services platforms, and we will be fully prepared to capture that additional growth*."  The market again reacted positively.  StarTek's stock rose almost 5.5% to $36.50.  Based upon these representations, analysts told investors that StarTek "initiated multiple new projects with new and existing clients based on growing wireless portability-related demand, necessitating the opening of two new call centers . . . in 4Q03, of which one will initially be a dedicated wireless portability call center for a large client.  We believe SRT will see margin expansion after the two new call centers ramp in 4Q03 and start-up costs lessen . . . ."  In

- 11 -

response to defendants' highly positive but false statements, StarTek's stock price increased to over $40 in December 2003.

19.     But then rumors began to circulate that Cingular was planning to acquire StarTek's biggest client, ATT, which accounted for 38% of StarTek's revenue.  If Cingular took over ATT, in accordance with certain contractual provisions, Cingular would be free to cancel ATT's contract with StarTek.  As one analyst put it, since Cingular was not a client of StarTek "we believe it is relatively possible that [StarTek] could lose up to 40% of its revenue base by the end of 1Q05."

20.     The possible loss of the ATT contract and the significant amount of excess capacity which resulted from the opening of four new facilities and the slackening of demand posed a significant danger to StarTek and to the Individual Defendants, who owned significant amounts of StarTek stock and had thus far only been able to sell off a small percentage of their StarTek shares. StarTek's insiders knew that if these negative conditions continued or worsened, they would have a very adverse impact on StarTek's growth and profitability and when these adverse trends became publicly known would cause StarTek's stock to decline.  Thus, defendants realized that they had only a short time to capitalize on StarTek's apparent strong profitable growth to sell off large amounts of their own StarTek stock at high prices.

21.     The Individual Defendants, however, faced serious obstacles to selling off more of their own StarTek stock.  For example, restrictions existed under SEC Rule 144 which sharply limited the number of "unregistered" shares StarTek's insiders could sell into the open market. Further, they knew that if StarTek's top insiders started to sell off even the permitted number of shares into the market at or about the same time, this would disrupt the market and cause StarTek's

- 12 -

stock to decline – thus undercutting their goal of maximizing the price at which they sold off their StarTek stock and their own personal profits.

22.     In order to pocket millions in insider-trading proceeds for themselves *before* the negative information about StarTek, which they alone knew, became public and to enable them to sell off much larger amounts of their StarTek stock than they could legally sell via open market sales of unrestricted shares under SEC Rule 144, the Individual Defendants decided to undertake a large *SEC-registered public offering of millions of shares of StarTek stock*.  In a registered secondary offering, StarTek's insiders could sell shares *without* the Rule 144 volume restrictions and in transactions where underwriters would help them sell the stock *and* stabilize the market trading price of StarTek stock *while these large stock sales were taking place*.  By selling shares in this way, the Individual Defendants could maximize their stock sale proceeds.  First, they could condition the market for the stock offering by issuing very positive reports and forecasts and push the stock up to higher levels, including making Roadshow presentations just before the Public Offering to disseminate very favorable information to potential stock purchasers to create demand for the stock. Also, they could use the underwriters to help merchandize the stock and rely upon the underwriting firms' "firm commitment" purchase obligations to buy *all* their shares and then resell them while the underwriters used special marketing techniques, only allowed to be used in registered stock offerings, to "stabilize" the stock price – *supporting* the market price of the stock via techniques that would not be legal in normal open-market stock trading.  This plan would enable StarTek's insiders to sell larger amounts of stock, many more shares than they could have sold in open-market sales, because the stock sold would be registered with the SEC and thus exempt from the volume

restrictions of Rule 144, without disrupting the market. Refusing to go along with the scheme, David Rosenthal, the CFO, resigned.

23. Undeterred by Rosenthal's resignation, StarTek's controlling shareholders and insiders hurried to complete the Public Offering, as they realized that the adverse facts concerning StarTek's business could not be long concealed and if those facts became known, it would prevent a successful offering and prevent them from selling their own StarTek stock at inflated prices.

24. On February 17, 2004, StarTek filed a Registration Statement for a public stock offering of 3.2 million shares at a proposed maximum price of $39.82 per share and a proposed maximum aggregate value of $146.5 million to be received by the selling shareholders. The market responded favorably to defendants' representations in the Registration Statement sending StarTek's stock up 5.3% to over $42 per share. For example, in the Registration Statement, defendants represented that "*[f]or our capacity deployment strategy, we seek to maintain enough available capacity to meet our clients' sudden surges in demand while maintaining high capacity utilization levels throughout our organization*." This statement, however, was false or misleading because StarTek did not have high utilization rates. The Company had a tremendous amount of excess capacity due to the fact that defendants opened four facilities on the mere hope that demand would materialize.

25. After StarTek filed its Registration Statement with the SEC, Cingular announced that it was acquiring ATT. Cingular's announcement jeopardized the Public Offering. As one analyst wrote: "AT&T Wireless (AWE) represents about 35% of SRT's revenue. We believe the proposed AT&T Wireless/Cingular merger could therefore have a potentially significant impact on SRT's revenue and earnings in 2005 and beyond . . . . With the acquisition of AWE, Cingular may choose

- 14 -

to bring the AWE call center work inhouse, and consolidate it with its existing internal infrastructure." In response to the merger announcement, StarTek stock declined from $42.05 on February 17, 2004, to $37.62 on February 23, 2004. It was doubtful that defendants would be able to successfully complete the Public Offering, and on March 19, 2004, StarTek announced that the "offering of 3.2 million shares expected to price Thursday via Lehman Brothers Inc. was postponed due to market conditions."

26.      Then, to salvage the Public Offering and complete a massive insider bailout, StarTek renegotiated its contract with ATT.  In a revised S-3 filed on April 13, 2004, StarTek told investors that its contract with ATT was extended until December 31, 2006, and was not subject to termination for convenience or without cause.  Analysts told the market that "the AWE/Cingular merger created uncertainty about the future of SRT's relationship with its largest client that negatively impacted the stock over the past few weeks.  We think that this contract extension significantly mitigates this risk. In addition, we believe that SRT is AWE's best-performing and lowest-cost supplier of call center based business process management services, thereby positioning the company to take share from competitors Convergys (CVG) and West Corp. (WSTC) after the completion of the AWE/Cingular merger as Cingular looks for cost synergies. . . .  We are reiterating our Buy rating on SRT in light of the pullback in valuation (from $40.50 at 3/1/04 to $34.35 currently) and the removal of the AWE/Cingular concern."  But the revised Registration Statement and all of defendants' statements concerning the new contract with ATT were false or misleading because defendants failed to disclose that StarTek was forced to ***drastically reduce its pricing in return for the contract extension.  Later, in StarTek's 2004 annual report filed on Form 10-K, defendants admitted that*** "***Our cost of services as a percentage of revenue increased primarily due to underutilized capacity***

- 15 -

*associated with lower than forecasted volumes and the tiered pricing structure set in place by our agreement with Cingular [ATT], which results in decreased revenue rate at higher levels of volume*."

27.   Lehman Brothers was originally the lead underwriter for the Public Offering, but after conducting a due diligence investigation in which it discovered the terms of the new contract with ATT, Lehman Brothers withdrew from the offering.

28.   To stem the decline in its stock price, defendants announced on May 5, 2004 an increase in the quarterly cash dividend to $0.39 per share, and issued more optimistic but false statements. For instance, defendant Stephenson said, "We are very pleased with the results for the first quarter of 2004 in which revenue growth accelerated as we more fully utilized the new Business Process Management Services capacity we added last year." He also represented that the Company's "sales efforts have produced our first meaningful client in the utility industry, a new industry vertical market" and  "that continued growth in our Business Process Management Services platform and strategic diversification of our client base will considerably reduce the historical seasonality of our stream of revenue and earnings this year and in the future."

29.   Then, on June 10, 2004, StarTek announced the pricing of a public offering of 3.8 million shares of common stock at $33.00 per share by three of its stockholders.  The press release noted that the selling stockholders increased the offering by 600,000 shares from their 3.2 million share offering announced February 17, 2004, and that the Company would receive no proceeds from the sale of the common stock.  The release also said that SunTrust Robinson Humphrey was acting as the lead manager and sole book running manager for the deal.  William Blair & Company and

Thomas Weisel Partners LLC were acting as co-managers. The press release did not mention that Lehman Brothers withdrew from the offering.

30.     To put some distance between the Public Offering and a stock price decline they knew was coming, on July 29, 2004, defendants hosted their ***first conference call*** with analysts and investors to disseminate more misleading statements to the market. For example, defendant Meade exclaimed that "*[w]e continue to be encouraged by the activity in our sales pipeline.  As I stated, we are currently in the middle of ramping two new clients which were secured earlier this year. We are encouraged by our recent close rates and the size of our sales pipeline. We anticipate replicating the success we had during the first half of 2004 with two new key client acquisitions during the second half of 2004, and we are very pleased with the ongoing positive response from both our existing clients and our newer clients and that they continue to reward us with more of their business*."  Analyst repeated these representations to the market stating that "***Management has characterized the current pipeline as among the healthiest ever***."  These statements were also false. In fact, the sales pipeline was weak and the sales force was in complete disarray.  Near the end of the Class Period, on March 3, 2005, defendants admitted that StarTek was forced to hired another new head of sales in October 2004 who completely revamped the sales force during the course of the fourth quarter, and during January 2005.  And at the end of the Class Period, defendants admitted that "the sales team that's in place today is still fairly new.  Most of them came on board [in the] November, December, January time frame."

31.     Then, two months after the upbeat July 28, 2004 conference call, StarTek filed an 8-K with the SEC on October 4, 2004, which stated that on October 1, 2004, defendant McKenzie had

- 17 -

resigned as Executive Vice President, Chief Financial Officer, Secretary and Treasurer for "personal reasons."

32.     One month later, on November 4, 2004, StarTek announced disappointing results in a press release entitled, "StarTek, Inc. Reports Third Quarter Earnings and Raises Dividend; Board Authorizes Stock Repurchase Program Up to $25 Million," which disclosed that StarTek's "fully diluted earnings per share from continuing operations decreased 21 percent for the quarter ended September 30, 2004, to $0.34 compared to $0.43 for the third quarter of 2003." To blunt the negative stock market reaction, defendants announced that *the Board of Directors declared an increase in the Company's quarterly cash dividend to $0.41 per share, and that the Company's Board of Directors authorized the repurchase of up to $25 million of StarTek's common stock*.  Meade also put a positive false spin on the quarter by stating:  "*While we are disappointed with the Company's results for this quarter when compared with last year, we are confident the decisions and investments we have made in the quarter will support continued profitable growth*" and "*[w]e're undertaking this stock buy-back program with high confidence in our current operational performance . . . .  Our fundamentals are strong, and our capital position affords us the opportunity to repurchase stock at an attractive market price.  We see this as an excellent investment opportunity that's in the best interests of our shareholders*."  These false statements and the announcement of the increase in the dividend and share repurchase had their intended effect – StarTek stock did not fall in response to the bad news.

33.     The same day, StarTek held a conference call for analysts, money and portfolio managers, institutional investors and large StarTek shareholders.  During the call, defendant Meade stated:  "*Now we could have made staff reductions[,] but because of our optimism and confidence*

*in both the near term and the mid term in really our visibility in the solid demand for incremental seats during the late third quarter and also moving into the fourth quarter, . . . our assessment was not to make cuts*." He also reiterated that "*the pipeline is the strongest its been since I've been CEO which is 3 plus years[,] and we feel good about the incremental revenue that will be coming from new signings*."

34.     The market was surprised by the poor financial results. As one analyst noted, "StarTek reported third-quarter results this morning. *Revenue came in slightly ahead of our expectations but EPS of $0.34 fell well short of our estimate of $0.43 and the consensus of $0.45. The big surprise in the quarter was a significant drop in gross margins, which was driven by a larger than expected price decline at AT&T Wireless and one-time expenses for retraining employees and facility startup costs*."

35.     In early January 2005, StarTek's stock declined 11% as information that StarTek's fourth quarter would be weak and that the Company's sales pipeline was not as strong as investors were led to believe began to leak into the market.  Defendants denied that there were any problems at the Company.  As one analyst report noted:  "Management last night confirmed that there was [sic] no new occurrences announced either by the company or from client-related actions.  SRT was down 11% in the past three days on no news, declining 7% yesterday on twice normal volume."  The report explained that:

> the stock weakness may primarily reflect three investor concerns: (1) that 4Q will be weaker than expected; (2) that SRT was not able to secure the 3 RFPs [Request for Proposals] in the 4Q pipeline; and/or (3) that SRT will not be able to offset a potential decline in AWE revenue and meet '05 Street estimates & dividend payments.

36.     After weeks of denying that there were any problems at the Company, on February 18, 2005, StarTek issued a press release entitled "StarTek, Inc. Announces Management Change," which stated that defendant Meade had resigned as President and Chief Executive Officer of the Company.  The release disclosed that "Meade and the company's board of directors mutually agreed that a change in leadership is in the best interests of StarTek's stockholders, and Mr. Meade has tendered his resignation to the board to pursue other interests." Analysts were stunned and StarTek's stock dropped almost 24% from $25.75 to $19.60 per share.  On February 22, 2005, William Blair & Company, issued a report on StarTek entitled "Lowering Estimate Amid Uncertainty," which stated that "StarTek announced the resignation of its CEO, Bill Meade.  This news came as a surprise and leads us to believe that other issues could be on the horizon."  The next day, StarTek's stock dropped another 4.8% to $18.65.

37.     Then the market's fears were realized when on March 3, 2005, StarTek disclosed that "[f]ully diluted earnings per share including discontinued operations decreased by 44% to $0.30, compared to $0.54 for the same period in 2003. ***The gross margin decline of 9.7% points from 29.7% to 20.0%, was largely the result of greater costs from the launching of new call center capacity to handle anticipated volume growth that materialized at lower levels than our clients forecasted, continuing decreases in revenue and margins in our supply chain management platform, and increased volume billed at lower agent rates due to our tiered incentive pricing model***."   On the same day, StarTek held a conference call for analysts and Steven Butler, the Company's CFO and acting CEO, admitted that "***We launched three new call centers in anticipation of a lot greater volume, with a couple of the clients that we signed last year.  That didn't materialize last year*** . . . ."  Then Troy Mastin, an analyst with William Blair & Co., asked:

- 20 -

"*And then on the new business pipeline, there has been a lot of discussion over the last 6-9 months that it was healthy. It's characterized as the strongest ever.  You didn't mention any new clients on the call, can you give us up an update on any landed in the quarter, and what the pipeline looks [like] today in your assessment?*"  In response, Butler disclosed for the first time that StarTek  "*hired a new head of sales in October, who completely revamped the sales force during the course of the fourth quarter, and during the course of January*.  I cannot announce any clients today."  After this news StarTek stock continued to fall from almost $18 on March 2, 2005 to $15.54 on April 8, 2005.  However, the stock continued to be inflated during the remainder of the Class Period.

38.    Finally, on May 6, 2005, StarTek announced that its first quarter 2005 "earnings per share from continuing operations decreased . . . to $0.18 compared to $0.49 for the first quarter of 2004."  The Company also announced that its revenues declined 14.2% from the same period in 2004.  Subsequent to the release of its quarterly results, StarTek told analysts on a conference call that "[i]n looking at gross profit, our total gross profit for the first quarter of '05 compared to the first quarter of '04 fell 35% or $6.4 million to 11.7 million."  The "tiered pricing incentives and reduced supply chain volume accounted for approximately $4 million of this change."  In other words, Startek's revenues declined because StarTek was forced to *drastically reduce its pricing in return for the contract extension with ATT*.  Defendants also admitted that "[t]he sales team that's in place today is still fairly new.  Most of them came on board [in the] November, December, January time frame."  Defendants also admitted that there was "excess capacity" throughout the Company.

39.    On this news, StarTek's stock price fell over 18% from a closing price on May 5, 2005 of $15.20 to $12.40 per share on May 6, 2005.

- 21 -

## JURISDICTION AND VENUE

40.     Jurisdiction exists pursuant to §22 of the Securities Act, 15 U.S.C. §77v, §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.  The claims asserted arise under §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o, §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5.

41.     Venue is proper in this district pursuant to §22 of the Securities Act, 15 U.S.C. §77v, §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b).  Many of the acts giving rise to the violations complained of occurred in this district.

42.     Defendants used the instrumentalities of interstate commerce, the U.S. mail and the facilities of the national securities markets.

## THE PARTIES

43.     Lead Plaintiffs Wayne County Employees' Retirement System, West Palm Beach Firefighters' Pension Fund, Anthony Zigmont and Stewart L. Horn ("Plaintiffs") purchased or otherwise acquired StarTek's common stock at artificially inflated prices during the Class Period and suffered damages when StarTek's stock price fell as the truth was revealed to the market, as detailed in the previously attached certifications.

44.     Defendant StarTek is a Delaware corporation, headquartered in Denver, Colorado, with principal executive offices located at 100 Garfield Street, Denver, Colorado 80206.  StarTek was founded in 1987 as StarPak, a small product packaging and fulfillment company.  On December 30, 1996, StarTek was incorporated in the state of Delaware.  Effective January 1, 1997, stockholders of StarPak, Inc. exchanged all of their outstanding shares of capital stock for shares of common stock of the Company, and StarPak, Inc. became a wholly-owned subsidiary of the

Company. Effective January 29, 1997, shareholders of StarPak International, Ltd. contributed all of their outstanding shares of capital stock to the Company, and StarPak International, Ltd. became a wholly-owned subsidiary of the Company. Accordingly, the Company became a holding company for the businesses conducted by StarPak, Inc. and StarPak International, Ltd. On June 19, 1997, StarTek completed its IPO at $15 per share. In the IPO, StarTek sold 3 million shares for net proceeds of $41.9 million and insiders sold 666,667 shares for net proceeds of $9.3 million.

45.     StarTek is a provider of business process outsourced services, which consist of business process management and supply chain management services. The Company's business process management services include provisioning management, wireless telephone number porting, receivables management, wireless telephone activations, and high-end technical support and customer care services. The supply chain management services include packaging, fulfillment, marketing support and logistics services. StarTek's four largest customers, ATT, Microsoft Corporation, T-Mobile, a subsidiary of Deutsche Telekom, and AT&T Corporation, accounted for about 90% of revenue. In 2003, ATT accounted for 38.1% of revenue, Microsoft for 21.7%, T-Mobile for 16.1% and AT&T Corporation for 13.1%. In 2002, ATT accounted for 26.3% of revenue, Microsoft for 34.4%, T-Mobile for 12.2% and AT&T Corporation for 13.3%.

46.     Defendant A. Emmet Stephenson, Jr. ("Stephenson") co-founded the Company in 1987 and has served as Chairman of the Board of the Company since its formation. Defendant Stephenson enjoyed a special relationship with StarTek because: (i) he co-founded the Company; (ii) he was StarTek's largest shareholder; (iii) he held 23.2% of StarTek's stock during the Class Period; and (iv) he, along with his wife, had the power to appoint StarTek's entire Board of Directors.

47. Defendant William E. Meade, Jr. ("Meade") served as the Company's President and Chief Executive Officer from June 2001 until his resignation on February 16, 2005. In the two year period prior to the Class Period, Meade sold no shares of StarTek stock. During the Class Period, Meade sold 15,000 shares of StarTek stock, 100% of his holdings, for proceeds of $570,677.00.

48. Defendant Michael W. Morgan ("Morgan") co-founded the Company in 1987 and has served as Vice Chairman of the Board of the Company since June 2001 and as a director of the Company since January 1997. In the two year period prior to the Class Period, Morgan sold 397,800 shares of StarTek stock, 68.64% of his holdings at the time, for proceeds of approximately $7.8 million. During the Class Period, Morgan sold 142,600 shares of StarTek stock, 71.53% of his holdings, for proceeds of approximately $5 million. Although Morgan sold more shares during the two years prior to the Class Period, the average weighted price per share was only $19.84 compared to $35.73 per share during the Class Period.

49. Defendant Eugene L. McKenzie, Jr. ("McKenzie") served as Executive Vice President and Chief Financial Officer since November 2003 and prior to that served as Vice President and Corporate Controller since June 2002.

50. Defendant Toni E. Stephenson ("Toni Stephenson") is the wife of defendant Stephenson. From the inception of StarPak, Inc. and StarPak International, Ltd. until January 23, 1997, Toni Stephenson was a director of StarPak, Inc. and StarPak International and continued to act as a vice president of such companies, without compensation. Defendant Toni Stephenson enjoyed a special relationship with StarTek because: (1) she was the wife of the co-founder of the Company; (2) she was StarTek's second largest shareholder; (3) she held 22.9% of StarTek's stock during the Class Period; and (4) she, along with her husband, had the power to appoint StarTek's entire Board

of Directors. In the two year period prior to the Class Period, Stephenson sold no shares of StarTek stock. During the Class Period, Stephenson sold 3,158,551 shares of StarTek stock, 83.29% of her holdings, for proceeds of approximately $100 million.

51. Defendant Pamela S. Oliver ("Oliver") is the sole trustee of the FASSET Trust and MASSET Trust and has sole voting power and investment power with respect to the common stock held by the trusts. Defendant Oliver is defendant Stephenson's sister. From the inception of StarPak, Inc. and StarPak International, Ltd. until January 23, 1997, defendant Oliver was a director of each such company, and continued to act as a vice president of StarPak, Inc. and StarPak International, without compensation. Defendant Oliver enjoyed a special relationship with StarTek because: (1) she was the sister of the co-founder of the Company; (2) she was StarTek's third largest shareholder; and (3) she held 13.7% of StarTek's stock during the Class Period. During the two year period prior to the Class Period, the Masset and Fasset Trusts sold no share of StarTek stock. During the Class Period, the Masset and Fasset Trusts sold approximately one million shares of StarTek stock each, 100% of their holdings, for proceeds of approximately $34 million each.

52. The individuals named as defendants in ¶¶46-51 are referred to herein as the "Individual Defendants." Because of their positions and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants, by reason of their stock ownership or positions with StarTek or representation on StarTek's Board, were controlling persons of StarTek. These controlling persons are each liable under §20(a) of the Exchange Act and §15 of the Securities Act.

- 25 -

53.     Defendants Stephenson, Meade, Morgan and McKenzie, because of their positions with the Company, possessed the power and authority to control the contents of StarTek's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Defendants Stephenson, Meade, Morgan and McKenzie were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Defendants Stephenson, Meade, Morgan and McKenzie are liable for the false statements pleaded herein at ¶¶99-100, 102-104, 106, 109-110, 113, 115-120, 132-133, 142, 145-146, 149, as those statements were each "group-published" information, the result of the collective actions of the officers and directors.

54.     During the Class Period, defendants Stephenson, Meade, Morgan and McKenzie knew the adverse material facts specified herein because they reviewed daily, weekly and monthly operating and sales reports and attended periodic meetings with the executive officers and their direct reports.  For example, the Company used a three-year strategic plan that incorporated five main objectives: growth, operations, technology, people, and offshore opportunities. The strategic plan was implemented through weekly meetings among the CEO, CFO, and COO; weekly revenue reviews; biweekly reviews of customer and other issues; monthly conference calls with the contact centers; and quarterly face-to-face meetings with front-line supervisors. Stephenson conveyed the adverse material information to defendants Toni Stephenson and Oliver.

55.     Each of the defendants is liable for making false and misleading statements, and/or for willfully participating in a scheme and course of business that operated as a fraud on purchasers of StarTek stock and damaged Class members in violation of the federal securities laws.  All of the

defendants pursued a common goal, *i.e.*, inflating the price of StarTek stock, by making false and misleading statements and concealing material adverse information.  The scheme and course of business was designed to and did: (i) deceive the investing public, including plaintiffs and other Class members; (ii) artificially inflate the price of StarTek common stock during the Class Period; and (iii) cause plaintiffs and the other members of the Class to purchase StarTek common stock at inflated prices and to sustain damages.

### FACTS RAISING A STRONG INFERENCE OF SCIENTER

56.     Confidential Witness Number One ("CW 1") was a Vice President of Sales at StarTek from approximately 1993 until late 2003.  He reported to the Senior Vice President of Sales Mike Burke and later Blake Willardsen.  Between Burke's and Willardsen's appointment to this position, Defendant Bill Meade served as Acting Senior Vice President of Sales, and CW 1 reported to Meade during this interim period, from September/October 2002 through June 2003.  According to CW 1, "[t]he biggest thing [senior management] struggled with was the sale's team's ability to forecast sales."  CW 1 explained that business process outsourcing services involves a long sales cycles, in part because making a sale depends on many complex factors.  According to CW 1, on average the sales cycle takes 18 to 24 months.

57.     According to CW 1, there were weekly sales meetings that were attended by Meade, all of the sales representatives, and the Senior VP of Sales.  These meetings were held on Monday mornings at 10:00 a.m. in the third floor conference room at the "Garfield" headquarters in Denver. At these meetings, Meade was "very fixated on the call center pipeline" status because call center sales were becoming an increasingly large part of StarTek's sales revenue stream.  In the weekly sales meetings, Meade took notes and asked questions as each sales rep presented his portion of the

pipeline report. It was clear that Meade presented the sales pipeline numbers to Emmet Stephenson for approval.

58. At these meetings Meade and the sales representatives went over the "Pipeline Report." The Pipeline Report was updated on a weekly basis. The form of the report was prepared by the sales organization's sales administrator in an Excel spreadsheet format, and then each sales representative "populated" the form with their respective sales prospects in the pipeline. The Pipeline Report contained seven columns listing the sales executive, the target customer, the customer's industry, prospective revenue, anticipated "go live" date, the number of seats/units/revenue projections, and comments/strategy/next steps. The Pipeline Report also listed the probability of signing the contract within the particular quarter. At the start of the class period, there were no contracts on the Pipeline Report with a 90% probability, six contracts with a 50% probability with projected revenues of $8.1 million, 19 contracts with a 30% probability with projected revenues of $7.7 million, and a number of contracts with only a 10% probability with projected revenues of $22.8 million. A Pipeline Report is attached hereto as Exhibit A. According to CW 1, in reality a new contract with a 50% probability would actually take another six months to get signed. Pipeline Reports were distributed to StarTek's "senior leadership team," which was comprised of the operational senior vice presidents, COO Lance Zingale, the CFO (David Rosenthal during the Class Period, until November 2003, when Eugene McKenzie replaced Rosenthal), and CEO Bill Meade.

59. After the weekly sales pipeline meetings, the Finance Department held a meeting to discuss the numbers that came out of the weekly sales meetings. The Finance Department was comprised of the CFO (David Rosenthal, and later Defendant Gene McKenzie), the Controller (Gene

McKenzie, and later Kevin Comstock), the Finance Manager Kevin Comstock, and a couple of assistants.

60.     According to CW 1, the company knew whether it would have a problem meeting projected revenues for the year by August each year because by that time, in the teleservices industry, companies that outsource call center business always sign new contracts, or place new orders on existing contracts, for whatever call center services they need for October through December, which are the busiest months of the year in the industry.  According to CW 1, if StarTek had not signed a contract with a prospective customer by August, there was no way StarTek could implement the contract (by placing the required number of seats in its call centers) before the October-December busy season.  StarTek did not generate new contract revenues until it actually began fielding calls for customers in its call centers.  Thus, by August each year StarTek knew what its new contract revenue stream would be through the end of the year, as well as additional revenues from existing customers through the end of the year and, accordingly, whether it would meet the projected annual revenue figure.

61.     StarTek prepared an Income Statement per Major Customer each year.  These were generated in an Excel spreadsheet by Kevin Comstock in the Finance Department and contained a vertical list of every customer in the left-hand column in order of revenue contribution for the current year, followed by  a column reflecting each customer's revenue contribution for the current year, a column for the customer's revenue contribution for the prior year, and a column showing the percent change in revenue from the prior to the current year.  The Income Statements were distributed to StarTek's top executives including CEO Meade, CFO Rosenthal (and then Defendant CFO Gene McKenzie), COO Lance Zingale, the SVP of the BPM Sales Blake Willardsen, the SVP

of Client Services Bob Forsyth, and SVP of Supply Chain Management ("SCM") operations Frank Santistevan.

62.     Additionally, according to CW 1, there were weekly operations meetings within the SCM division.  StarTek's SVP of Supply Chain, Frank Santistevan, headed these meetings with the SCM sales and operations employees, and then Santistevan's report from this meeting went up the ladder to CEO Meade, COO Lance Zingale, and CFO David Rosenthal (Gene McKenzie from November 2003 on).

63.     During 2002, StarTek's SCM contract with Microsoft generated $71.5 million in revenue for the company, according to StarTek's Revenue Concentration per Customer Report for the Twelve Months Ended December 31, 2002.  The Revenue Concentration per Customer Report for the Twelve Months Ended December 31, 2002 is attached hereto as Exhibit B.  According to CW 1, StarTek lost the existing SCM contract with Microsoft in early 2003.  In early 2003, Microsoft notified StarTek that it had decided not to renew the contract and that Microsoft was opening a Request for Proposal ("RFP") process for the contract.  According to CW 1, this notification occurred in a meeting between Microsoft's representative for StarTek and Frank Santistevan, StarTek's VP of Operations for the SCM division at the time.

64.     During the Class Period, StarTek's operations were broken down into two primary operating divisions:  Supply Chain Management Services and Business Process Management Services.  The SCM division engaged in software manufacturing and packaging services for such customers and Microsoft Corporation.  The BPM division engaged in call center services such as customer care, technical support, receivables management, and porting services for such customers as T-Mobile and ATT.

65.     In StarTek's 2002 Annual Report on Form 10-K, StarTek represented that Microsoft Corporation accounted for 34.4% of the Company's total revenues in 2002, which were reported to be $207.8 million.  These figures are supported by StarTek's internal "Pivot Table" spreadsheet reflecting revenues from all customers for the years 1998 through 2002.  According to the Pivot Table, at year-end 2002, total revenues company-wide were $207.8 million, and the Microsoft contract for SCM services contributed approximately $71.5 million in annual revenues to StarTek, or 34.4%.  The Pivot Table spreadsheet is attached hereto as Exhibit C.  According to CW 1, the Microsoft contract accounted for 90% of the SCM division's total annual revenues at the time.  Thus, when Microsoft informed StarTek in early 2003 that it would not renew its SCM contract with StarTek, StarTek knew that 34.4% of its total annual revenues, and 90% of the entire SCM division's annual revenues, would disappear by early to mid 2004.

66.     According to CW 1, SRT's Supply Chain Management "pipeline was dead" by October 2003 and the teleservices side of the business (BPM) "was on life support."  With respect to the SCM division, CW 1 attributed the business decline to two main factors:  A failure to invest adequate capital to bring the division's operations in line with its competitors, and the loss of the Microsoft contract in early 2003.

67.     There were three phases of the RFP process for Microsoft's SCM services business: Submission of an initial bid; selection of a "short list" of potential SCM vendors; and final selection of the winning bidder.  According to CW 1, SRT did not even make it past phase one because it was not included on Microsoft's short list.  StarTek learned this sometime in late 2003.  As a result, by no later than late 2003, CW 1 confirmed that StarTek knew that its SCM business with Microsoft would dry up completely within the next several months. CW 1 explained that there was a transition

- 31 -

period of about 10-12 months following SRT's elimination from the RFP process until all of Microsoft's business disappeared. During that time, SRT received no new projects from Microsoft, was only completing preexisting projects, and did not receive any re-orders on existing projects.

68. CW 1 noted that, based on a review of the company's press releases and SEC filings, SRT never disclosed the loss of this contract to the public. According to CW 1, SRT's executive management "absolutely knew" that the Microsoft business was lost by early 2003 because "it came up in discussions with Meade about how to replace that revenue during the weekly sales pipeline meetings in 2003." To make matters worse, in its 2003 10-K, SRT described a decrease in SCM services provided to Microsoft, said it expected Microsoft's business to continue to decline and that Microsoft has decreased the number of SCM vendors it uses, and expressly acknowledged the expiration of its contract with Microsoft for SCM services in Singapore and the U.K. However, there is no mention of the fact that the domestic SCM services agreement with Microsoft was not renewed, and thus its business with Microsoft would not just continue to decline but would disappear altogether.

69. According to CW 1, who kept in contact with other executives after leaving the company, in order to secure the amended BPM services agreement with ATT that was announced in April 2004, which extended SRT's agreement with ATT through December 31, 2006, SRT had to cut its pricing with ATT and had to make an upfront payment to ATT of one million dollars "to get the deal done." The primary players in the negotiations for SRT were COO Lance Zingale, Senior VP Client Services Bob Forsyth, and Dan Farley, who worked for Forsyth.

70. According to CW 1, after CEO Meade was brought in, "Meade's mission was to increase management's expertise across the board." COO Lance Zingale was one of the new

executives Meade hired to accomplish this.  Additionally, Meade split SRT's sales organization into two groups, one of which handled only existing client accounts, and the other handled generation of new business.  Bob Forsyth, mentioned above, was brought in to manage existing accounts in what CW 1 referred to as the "Relationship Management" group, and Forsyth hired others to work for him in this new group.

71.     CW 2 was a Senior Vice President at StarTek from early 2003 until early to mid-2004.  According to CW 2, Blake Willardsen negotiated the call center contract with Verizon Wireless ("Verizon") along with COO Lance Zingale.  They obtained Verizon's signature on the contract in October 2003, and then began working on the "Statement of Work" ("SOW").  The Verizon contract was for $14 million annually and 400 seats, which were to be in the new call center in Alexandria, VA.  CW 2 said the SOW is what really starts the process rather than the signing of the contract, called a Master Service Agreement.  The SOW contains all the details about the billing, the hourly rate, and the number of seats.  The hourly rate in the contract was based on call volumes.  Right when they began working on the SOW in early November 2003 is when Verizon cancelled the 400 seat order.  It did not cancel the contract outright, but rather the order was cancelled, and the contract remained valid.  StarTek announced in early November 2003 that this call center was open, but in its 2003 10-K filed in March 2004, it stated that this facility's operations were delayed until February 2004.  According to CW 2, Lance Zingale received the notice from Verizon's representative.

72.     According to CW 2, just after Zingale received notice from Verizon, there was a discussion among StarTek's "Executive Panel" about the cancellation of Verizon's 400 seats to go into the new Alexandria, LA facility.  The Executive Panel was comprised of CEO Bill Meade, CFO

David Rosenthal (and then Eugene McKenzie from November 2003 on), COO Lance Zingale, and the heads of every company department. The meetings took place at StarTek's Denver office on Garfield Street in the third floor conference room. The Executive Panel met formally twice a month and informally in between on an as-needed basis. The Executive Panel meetings covered a blanket agenda, *i.e.*, performance and problems with each department of the company. The meetings usually took place in the morning and lasted between three and six hours. The meetings that occurred toward the end of a quarter lasted on the longer side of this range because there was more to cover in order to close out the quarter. Bill Meade was in charge of these meetings. CW 2 attended these meetings and recalled discussing at the Executive Panel meeting in early November 2003 that StarTek had incurred around $100,000.00 in ramp-up expenses for hiring staff, equipment and supplies when Verizon cancelled the order, in addition to having built the Alexandria facility. The Executive Panel members determined that they needed to find a way to fill at least some of the seats in the Alexandria facility in order to open it.

73.     In late 2003 and early 2004, StarTek was in the process of closing three new call center services contracts with Qwest, TXU, and Cricket Communication (aka Leap Wireless). According to CW 2, the Cricket Communication contract was signed in late 2003, and StarTek began earning revenues from the deal in early 2004. The contract called for 150 seats and total annual revenues of around seven to eight million dollars. The contract involved a lot of wireless porting services, which is the process of transferring an existing cell phone number from one provider to another provider. Within six months of the start of the contract, StarTek learned that the contract would only generate about half of the total projected annual revenues in 2004 because the volume of wireless porting business was not as great as Cricket Communication had forecasted. CW

2 said this was due to inadequate marketing of Cricket Communication's services. StarTek was aware of this during the first half of 2004.

74. CW 3 worked for StarTek from mid to late 2001 through early 2004 as a Sales Director in the BPM group. During this time, CW 3 reported to a series of people due to turnover in the Senior VP of Sales position. Initially, he reported to SVP Michael Burke. Burke was let go around September 2002, at which time CW 3 began reporting to senior sales manager Rick Wright, who reported to Bill Meade while he was the interim acting SVP of Sales following Burke's termination. Meade hired Blake Willardsen as the new SVP of Sales around June 2003, and at that point CW 3 began reporting directly to Willardsen.

75. According to CW 3, during 2003, the BPM sales group "had very minimal success" in securing new contracts. Of all the accounts CW 3 was trying to land a contract with in 2003, only one came to fruition; it was with Arts & Entertainment Television ("A&E") for in-bound customer care and in-bound sales of primarily videos of programs that A&E televised. The contract closed in late 3Q03 or early 4Q03. It was a very small contract for about one million dollars in annual sales. However, A&E decided not to move forward with StarTek. According to CW 3, from mid to late 2001 through early 2004, there were only two or three new customer contracts that came through, and the rest of StarTek's call center revenues came from existing customers.

76. CW 4 worked for StarTek for almost 12 years beginning in mid 1993 and ending in early 2005. During the Class Period, CW 4 was a director of sales in the BPM division. CW 4 reported to Mike Morgan, who was CEO until stepping down in 2001. Thereafter, CW 4 reported to a series of people who held the position of SVP of Sales including Michael Burke, Bill Meade, Blake Willardsen, and Mike Griffith.

- 35 -

77.     According to CW 4, when Michael Burke was hired as SVP of Sales, "there was a lot of focus on the sales pipeline," but all the effort to predict when a sale would close and how much revenue it would generate in a particular quarter was speculative.  According to CW 4, CEO Bill Meade overemphasized the number of new business prospects in the pipeline and seemed to believe that a larger number of prospective new accounts that StarTek was talking to would translate into a larger number of new contracts per quarter.  "Just because you have 10 new customers in the pipeline doesn't mean you'll end up with two new contracts."  CW 4 said the call center industry sales cycle is long and often takes up to two years to land a new account.

78.     According to CW 4, as a result of the 2004 contract renegotiations with ATT, StarTek's revenues became based on a tiered-pricing structure whereby as call center volumes increased, the price ATT paid for StarTek's services decreased.  According to CW 4, the original contract with ATT called for one price, and that price never changed (up until the 2004 renegotiation).

79.     According to CW 4, "relationship building" with Verizon began in  2002, and StarTek was awarded a Master Services Agreement ("MSA") with Verizon in the fall of 2003.  The MSA called for 400 seats and represented $14 million in annual revenues to StarTek.  However, within a week after the parties signed the MSA, Verizon notified StarTek that its anticipated demand had dried up and that it would have to delay implementation of the 400 seats with StarTek.  It was not until 2005 that StarTek received a new order for call center services from Verizon, and therefore no revenues derived from this contract until 2005.

80.     StarTek publicly referenced a new potential call center contract with a health care company in a conference call with analysts on November 4, 2004.  "[W]e are one of three finalists in

a service bid with a health care company which would be a new vertical for us." CW 4 said this health care company was McKesson and that StarTek was a finalist in its RPF process at that time. The McKesson RFP was for around 150-200 seats. However, before Christmas 2004, McKesson had withdrawn its RFP and notified the finalists that it had decided not to outsource to call centers.

81.     In November 2004, CEO Meade stated at an analyst conference call that StarTek's pipeline was "the strongest it's ever been" in the three years he had been with the Company. There was also a statement about "two new telecom/utilities clients" in the 2004 pipeline, referring to Verizon and Bell Canada according to CW 4. CW 4 said business with these two accounts did not come in to StarTek until sometime in 2005, however, and these accounts "were no closer in November 2004 than they had been in the prior months of 2004." Therefore, disclosure of these as "two new telecom/utilities clients" in November 2004 was not an indication that they were any closer to being finalized at that point than they had been at any earlier time in 2004.

82.     The Alexandria, Louisiana call center, which StarTek announced on November 3, 2003, initially was filled with about 100-200 seats from T-Mobile. However, according to CW 4, these seats were in part existing capacity moved from other StarTek call center sites. According to CW 4, StarTek had planned to also put the 400 seats from Verizon in Alexandria, but that contract was not implemented until sometime in 2005 and on a smaller scale. As a result, StarTek ended up putting TXU's 130 seats there. However, by early 2005, those seats were eliminated and the contract cancelled following Cap Gemini's acquisition of TXU's call center business.

83.     According to CW 4, the Lynchburg, VA call center, which was announced as opened in October 2004, was initially populated with Qwest seats. StarTek intended to put seats from McKesson in this call center as well, but as explained above, McKesson withdrew its RFP before

choosing a finalist (StarTek was one of three finalists) shortly before Christmas 2004 and decided not to outsource call center services.

84.    According to CWs 1, 2, 3 and 4, there was significant turnover in the leadership of the BPM Sales organization during the Class Period.  Just before the beginning of the Class Period, Michael Burke was the SVP of Sales for BPM, but CEO Bill Meade fired Burke in mid to late 2002.  Meade then served as Acting SVP of BPM Sales for several months until hiring Blake Willardsen in this position around June 2003.  Willardsen remained in this position until early April 2004 and then left StarTek.  Thereafter, StarTek did not hire a new SVP of BPM Sales until October 2004, when Mike Griffith was appointed to the position.  As a result, the BPM Sales division, which the Company was heavily relying on to generate new accounts and corresponding revenues to meet forecasted revenues and earnings throughout 2004, had no leadership during the second and third quarters of 2004.  StarTek did not disclose that it had hired a new SVP of Sales in October 2004 until March 3, 2005 during a conference call with analysts on fourth quarter 2004 and year-end 2004 results.

85.    CW 5 worked for StarTek from late 2003 through mid 2005.  During this time, CW 5 held several  different positions, some of which were simultaneous.  CW 5 handled a variety of responsibilities in the finance department, including financial analysis, "compliance and reengineering functions," "process improvements," Sarbanes-Oxley Act of 2002 compliance, and internal audit.  CW 5 held a VP level position during the last year of CW 5's employment.  CW 5 reported to StarTek's CFOs David Rosenthal, Gene McKenzie, and finally Steven Butler.

86.    According to CW 5, CFO Gene McKenzie was traveling with Board Chair Emmet Stephenson for investor road shows for the 2004 stock offering during his first six months as CFO.

Upon his return to the office in early July 2004, CW 5 presented the quarterly results for 2Q04 to McKenzie, which "didn't line up with the forecasts" for that quarter. When McKenzie saw the actual results, he commented to CW 5, "We can't have that," and then he called Accounting Manager Kevin Comstock and directed Comstock to "change the numbers" by "pulling funds out" of a particular account. By doing this, StarTek was able to report that it met revenue and earnings projections for 2Q04. CW 5 had also called CEO Bill Meade while he was traveling for the road show for the June 2004 offering and informed him that StarTek had lost $11 million in business from T-Mobile that would negatively impact 2Q04 results.

87. At the same time that CW 5 informed McKenzie of the 2Q04 earnings shortfall, CW 5 also informed McKenzie that StarTek was not going to be able to meet the 3Q04 or 4Q04 projections.

88. CW 6 worked for StarTek as a Customer Care Supervisor in the Greeley, CO call center from mid 2004 through early 2005. The Greeley call center building was referred to by company employees as "Greeley North," since there were two other buildings in Greeley called "Greeley East" and "Greeley West." During CW 6's employment, CW 6 managed about 10-20 customer service representatives who fielded calls from ATT customers. Greeley North serviced ATT customers exclusively. CW 6 reported to Carol Lewelling, who was the Customer Care Operations Manager for Greeley North until late 2004, when she was laid off and replaced by Pam O'Brien.

89. According to CW 6, around September or October 2004, Human Resources Manager Tina Garcia held a meeting in the Greeley North call center with all Greeley North employees and announced that in order to "help with restructuring" at StarTek and cut labor costs, StarTek was

offering to allow call center staff and managers to take an unpaid leave of absence until the end of 2004.  According to CW 6, six to seven call center supervisors at Greeley North took advantage of the unpaid leave of absence at that time.  In addition, the Company cut the number of hours that each customer service representative was working during the last few months of 2004 and reduced some employees to part-time status in order to "save on labor costs."

90.  According to CW 6, around the end of November or early December 2004, Lewelling informed all of the customer care supervisors at Greeley North that the facility would be converted from a customer care call center to a receivables management call center.  Instead of firing all of the customer service representatives at Greeley North, StarTek retained these employees and retrained them on handling receivables collections for ATT instead.  The customer service business that Greeley North had handled for ATT up to that point was entirely eliminated from StarTek's book of business, and it was not transferred to another call center.  The ATT receivables management business that Greeley North took on was not new AT&T business for StarTek, but was transferred to this call center from the Enid, OK facility.  The transition from customer care to receivables management took a couple of months; Greeley North began operating as a receivables management call center in February 2005.

91.  According to CW 6, after the ATT-Cingular merger took place in the fall of 2004, StarTek did not receive any new call center business from the original Cingular side of the business, and all of StarTek's business with the merged company was legacy ATT business.

92.  CW 7 worked for StarTek in the Accounting Department from late 2002 until early to mid 2005.  During this time, CW 7 held positions as General Ledger Accountant, General Ledger Manager, and Cash Manager.  CW 7 initially reported to GL Manager Rich Hannon who reported to

Controller Aaron Babl. Later, CW 7 reported to CFO Gene McKenzie. In the Cash Manager role, CW 7 managed the local bank accounts set up for each of the call centers.

93.    Based on CW 7's position as Cash Manager, CW 7 knew that StarTek received a monthly payment from ATT during the third week of each month of around $10 million pursuant to the call center services agreement between the companies. According to CW 7, "cushions" were set up in the Accounts Payable ("AP") budget so that StarTek could "wring out $500,000 to a million [dollars] per quarter in costs" and thereby "turn a slight loss into a profit for the quarter." CW 7 recalled this in 3Q03/4Q03. By having over-accrued for AP expenses, StarTek was able to reduce the actual AP expense figure for a given quarter and improve the total profit that StarTek reported.

94.    Additionally, according to CW 7, during weekly accounting staff meetings during 3Q04 it was reported that StarTek was having a bad quarter and would not meet its projected earnings.

95.    According to CWs 1 through 4, throughout the Class Period, StarTek suffered from significant turnover and instability in its sales force and top leadership. There were only two sales reps at StarTek who had been with the Company for the long-term, and over 17 sales reps came and went. Four different people held the top sales position at StarTek, Senior VP of Sales, during the Class Period. StarTek created the SVP of Sales position in October 2000, when it hired Michael Burke to assume this position. Burke remained StarTek's SVP of Sales for just under two years. Following Bill Meade's appointment as StarTek's new CEO in May 2001, Meade undertook an effort to bring in a senior management team with more experience in the teleservices industry. This management restructuring led Meade to fire Burke as SVP of Sales around September 2002 and to hire Blake Willardsen as StarTek's new SVP of Sales in June 2003. In the eight months between

- 41 -

Burke's departure and Willardsen's hiring, CEO Bill Meade served as Acting SVP of Sales in addition to his role as the company's CEO.  Willardsen only lasted in the position of SVP of Sales for 10 months, and he left StarTek in early April 2004.  From April 2004 to October 2004, StarTek had no SVP of Sales, and thus no sales leadership for its BPM (teleservices) division that the Company was heavily relying on to generate new accounts and corresponding revenues to meet forecasted revenues and earnings during 2004.  It was not until six months after Willardsen's April 2004 departure that StarTek hired Michael Griffith as StarTek's new SVP of Sales.  StarTek never informed the public that it had lost Willardsen as its SVP of Sales six months earlier, or of the fact that there was no sales leadership during the second or third quarters of 2004.  In fact, it did not publicly announce that it had retained Griffith as its new SVP of Sales in October of 2004, until March 3, 2005, during an investor and analyst conference call.

96.     According to CWs 1 through 4, the crux of the management restructuring effort that Meade initiated after being appointed CEO in May 2001, and which Meade represented throughout the Class Period was facilitating improved cost efficiencies and increased sales revenues, was to bring in a new senior management team with more experience in the teleservices industry.  However, none of Meade's new hires had prior teleservices experience, and there was a significant amount of turnover at the executive level.  Meade himself had no prior teleservices industry experience, having joined StarTek after two years as President and CEO of WebMiles, a "customer loyalty" startup, and 13 years in several business development positions with American Express.  Among the new hires Meade made during the Class Period were SVP of Sales Blake Willardsen in June 2003, COO Lance Zingale in June 2002, and CFO David Rosenthal in August 2001.  Willardsen came to StarTek from a company called Duexo, which was a provider of automated marketing and sales process

applications wholly unrelated to teleservices.  Willardsen had been with Deuxo for only a year before joining StarTek.  Prior to Deuxo, Willardsen worked for a year with No Magic, a software modeling tool company.  Before No Magic, Willardsen held marketing and sales positions in the customer relationship management, enterprise resource planning, and financial planning industries. Willardsen only served as StarTek's SVP of Sales for ten months, leaving in early April 2004. StarTek did not hire a replacement for Willardsen until October 2004, and thus went without a SVP of Sales for two critical quarters during the Class Period.  Additionally, Meade hired Lance Zingale to be StarTek's COO in June 2002.  Zingale came to StarTek after three years at Stonehenge Telecom and several years with  AT&T before Stonehenge.   While Zingale had some telecommunications industry experience, he did not have exposure in these prior positions to the business process outsourcing services industry that SRT is in.  Zingale left StarTek in September 2005.  Meade also hired David Rosenthal as StarTek's CFO in late August 2001.  Rosenthal's prior experience was as CFO of Celestial Seasonings, a seller of herbal teas, and as CFO of Hauser, Inc., a maker of refrigerated cabinets.  Rosenthal stepped down as StarTek's CFO in late October 2003, and was replaced by defendant McKenzie in early November 2003.  McKenzie had been StarTek's Controller for only about 18 months at the time, and had joined StarTek from his position as Director of Finance and Information Technology at International Paper Company.  McKenzie stepped down as CFO after only 11 months, resigning October 1, 2004.  StarTek named Rod Granger as McKenzie's replacements as CFO at that time, after having only joined StarTek in July 2004 as a VP of Finance.  Granger only held the CFO position for three months.  On January 3, 2005, StarTek announced the hiring of Steven Butler as its new CFO.  Then, when Bill Meade resigned as StarTek's CEO in late February 2005 and Butler became acting CEO as well as CFO, Granger

- 43 -

stepped in again as Acting CFO, and was eventually formally appointed CFO again in August 2005. In short, far from the stability and driver of growth that Meade portrayed his restructuring effort during the Class Period, the lack of industry experience and turnover in these executive positions had no positive impact on improving StarTek's performance during the Class Period.

97.     In addition to the executive management restructuring, CWs 1 and 4 explained that Meade's restructuring effort also involved dividing the sales organization into two divisions:  Client Services and Sales.  The Client Services division handled contract implementation with new and existing customers and new orders from existing customers, while Sales was responsible for generating new contracts with new clients.  CWs 1 and 4 both viewed this reorganization as a detriment to the Company's overall sales performance.  As CW 1 noted, the expenses associated with overhauling the sales organization were "significant and didn't result in increased sales."  CW 4 indicated that after StarTek secured a new contract with TXU in March 2004, the account was handed over to the Client Services division for implementation, which caused a shift in responsibility for the account and a change in who TXU was dealing with at StarTek, and CW 4 received "an angry call or two from TXU" in the first few months after the contract was signed about the implementation of the contract.  According to CWs 1, 3 and 4, the TXU contract was lost in September 2004, only six months after it was secured.

### INSIDER SELLING

98.     While StarTek's top insiders were issuing favorable statements, StarTek's insiders sold more than 5.3 million shares of stock for more than $175 million in illegal trading proceeds to personally profit from the artificial inflation in StarTek's stock price.  Notwithstanding their access to material non-public information and their duty to disclose all material facts before trading in

- 44 -

StarTek stock, they sold significant amounts of their StarTek stock at artificially inflated prices.  The

insider selling during the Class Period is detailed below:

| NAME | DATE | PRICE | SHARES SOLD | PROCEEDS |
|---|---|---|---|---|
| OLIVER/FASSET TRUST | 1/6/04 | $41.90 | 100 | $4,190 |
| | 1/6/04 | $42.00 | 300 | $12,600 |
| | 1/6/04 | $42.03 | 300 | $12,609 |
| | 1/6/04 | $41.94 | 400 | $16,776 |
| | 1/6/04 | $41.85 | 1,000 | $41,850 |
| | 1/6/04 | $41.84 | 2,000 | $83,680 |
| | 1/6/04 | $41.95 | 4,900 | $205,555 |
| | 1/6/04 | $41.80 | 6,000 | $250,800 |
| | 1/6/04 | $41.60 | 10,000 | $416,000 |
| | 1/7/04 | $41.87 | 300 | $12,561 |
| | 1/7/04 | $41.80 | 500 | $20,900 |
| | 1/7/04 | $41.91 | 500 | $20,955 |
| | 1/7/04 | $41.85 | 1,000 | $41,850 |
| | 1/7/04 | $41.88 | 1,700 | $71,196 |
| | 1/7/04 | $41.94 | 2,200 | $92,268 |
| | 1/7/04 | $41.89 | 2,600 | $108,914 |
| | 6/15/04 | $33.00 | 993,462 | $32,784,246 |
| | | **Total** | **1,027,262** | **$34,196,950** |
| | | | | |
| OLIVER/MASSET TRUST | 1/8/04 | $41.94 | 100 | $4,194 |
| | 1/8/04 | $41.96 | 100 | $4,196 |
| | 1/8/04 | $41.88 | 300 | $12,564 |
| | 1/8/04 | $41.95 | 300 | $12,585 |
| | 1/8/04 | $41.87 | 400 | $16,748 |
| | 1/8/04 | $41.92 | 400 | $16,768 |
| | 1/8/04 | $41.97 | 600 | $25,182 |
| | 1/8/04 | $41.89 | 700 | $29,323 |
| | 1/8/04 | $41.91 | 1,100 | $46,101 |
| | 1/8/04 | $41.86 | 1,300 | $54,418 |
| | 1/8/04 | $41.93 | 1,300 | $54,509 |
| | 1/8/04 | $41.98 | 1,300 | $54,574 |
| | 1/8/04 | $41.90 | 2,300 | $96,370 |
| | 1/8/04 | $41.99 | 2,900 | $121,771 |
| | 1/9/04 | $41.58 | 100 | $4,158 |
| | 1/9/04 | $41.99 | 100 | $4,199 |
| | 1/9/04 | $41.32 | 200 | $8,264 |
| | 1/9/04 | $41.37 | 200 | $8,274 |

| NAME | DATE | PRICE | SHARES SOLD | PROCEEDS |
|---|---|---|---|---|
| | 1/9/04 | $41.39 | 200 | $8,278 |
| | 1/9/04 | $41.43 | 200 | $8,286 |
| | 1/9/04 | $41.49 | 200 | $8,298 |
| | 1/9/04 | $41.78 | 200 | $8,356 |
| | 1/9/04 | $41.79 | 200 | $8,358 |
| | 1/9/04 | $41.81 | 200 | $8,362 |
| | 1/9/04 | $41.95 | 200 | $8,390 |
| | 1/9/04 | $41.36 | 300 | $12,408 |
| | 1/9/04 | $41.38 | 300 | $12,414 |
| | 1/9/04 | $41.87 | 300 | $12,561 |
| | 1/9/04 | $41.97 | 300 | $12,591 |
| | 1/9/04 | $41.56 | 400 | $16,624 |
| | 1/9/04 | $41.96 | 400 | $16,784 |
| | 1/9/04 | $41.85 | 500 | $20,925 |
| | 1/9/04 | $41.80 | 700 | $29,260 |
| | 1/9/04 | $41.92 | 800 | $33,536 |
| | 1/9/04 | $41.40 | 3,100 | $128,340 |
| | 1/9/04 | $40.10 | 11,600 | $465,160 |
| | 6/15/04 | $33.00 | 993,462 | $32,784,246 |
| | | **Total** | **1,027,262** | **$34,177,375** |
| | | | | |
| MEADE, WILLIAM | 9/15/03 | $35.00 | 100 | $3,500 |
| | 9/15/03 | $35.05 | 100 | $3,505 |
| | 9/15/03 | $35.00 | 2,200 | $77,000 |
| | 9/17/03 | $35.00 | 800 | $28,000 |
| | 11/6/03 | $37.00 | 3,500 | $129,500 |
| | 11/28/03 | $39.14 | 3,300 | $129,162 |
| | 12/8/03 | $40.00 | 5,000 | $200,000 |
| | | **Total** | **15,000** | **$570,667** |
| | | | | |
| MORGAN, MICHAEL | 8/19/03 | $36.43 | 100 | $3,643 |
| | 8/19/03 | $36.49 | 100 | $3,649 |
| | 8/19/03 | $36.52 | 100 | $3,652 |
| | 8/19/03 | $36.55 | 100 | $3,655 |
| | 8/19/03 | $36.44 | 400 | $14,576 |
| | 8/19/03 | $36.45 | 600 | $21,870 |
| | 8/19/03 | $36.46 | 600 | $21,876 |
| | 8/19/03 | $36.56 | 600 | $21,936 |
| | 8/19/03 | $36.66 | 600 | $21,996 |
| | 8/19/03 | $36.51 | 700 | $25,557 |
| | 8/19/03 | $36.47 | 900 | $32,823 |
| | 8/19/03 | $36.50 | 3,100 | $113,150 |
| | 8/19/03 | $36.65 | 5,400 | $197,910 |

- 46 -

| NAME | DATE | PRICE | SHARES SOLD | PROCEEDS |
|------|------|-------|-------------|----------|
| | 8/20/03 | $36.28 | 100 | $3,628 |
| | 8/20/03 | $36.31 | 100 | $3,631 |
| | 8/20/03 | $36.45 | 100 | $3,645 |
| | 8/20/03 | $36.35 | 200 | $7,270 |
| | 8/20/03 | $36.36 | 200 | $7,272 |
| | 8/20/03 | $36.49 | 200 | $7,298 |
| | 8/20/03 | $36.34 | 400 | $14,536 |
| | 8/20/03 | $36.27 | 600 | $21,762 |
| | 8/20/03 | $36.29 | 600 | $21,774 |
| | 8/20/03 | $36.30 | 700 | $25,410 |
| | 8/20/03 | $36.26 | 800 | $29,008 |
| | 8/20/03 | $36.25 | 1,000 | $36,250 |
| | 8/20/03 | $36.40 | 1,100 | $40,040 |
| | 8/21/03 | $36.58 | 100 | $3,658 |
| | 8/21/03 | $36.60 | 100 | $3,660 |
| | 8/21/03 | $36.61 | 100 | $3,661 |
| | 8/21/03 | $36.63 | 100 | $3,663 |
| | 8/21/03 | $36.72 | 100 | $3,672 |
| | 8/21/03 | $36.90 | 100 | $3,690 |
| | 8/21/03 | $36.95 | 100 | $3,695 |
| | 8/21/03 | $37.00 | 100 | $3,700 |
| | 8/21/03 | $37.03 | 100 | $3,703 |
| | 8/21/03 | $36.81 | 200 | $7,362 |
| | 8/21/03 | $36.84 | 200 | $7,368 |
| | 8/21/03 | $36.86 | 200 | $7,372 |
| | 8/21/03 | $36.89 | 200 | $7,378 |
| | 8/21/03 | $36.93 | 200 | $7,386 |
| | 8/21/03 | $36.78 | 300 | $11,034 |
| | 8/21/03 | $36.71 | 400 | $14,684 |
| | 8/21/03 | $36.80 | 400 | $14,720 |
| | 8/21/03 | $36.98 | 400 | $14,792 |
| | 8/21/03 | $36.99 | 400 | $14,796 |
| | 8/21/03 | $36.66 | 600 | $21,996 |
| | 8/21/03 | $36.67 | 600 | $22,002 |
| | 8/21/03 | $36.79 | 700 | $25,753 |
| | 8/21/03 | $36.94 | 800 | $29,552 |
| | 8/21/03 | $36.88 | 2,000 | $73,760 |
| | 8/21/03 | $36.75 | 3,100 | $113,925 |
| | 8/21/03 | $36.70 | 3,800 | $139,460 |
| | 8/21/03 | $36.68 | 4,200 | $154,056 |
| | 8/21/03 | $36.65 | 10,400 | $381,160 |
| | 8/22/03 | $36.40 | 100 | $3,640 |
| | 8/22/03 | $36.25 | 200 | $7,250 |

- 47 -

| NAME | DATE | PRICE | SHARES SOLD | PROCEEDS |
|---|---|---|---|---|
| | 8/22/03 | $36.28 | 200 | $7,256 |
| | 8/22/03 | $36.60 | 300 | $10,980 |
| | 8/22/03 | $36.29 | 400 | $14,516 |
| | 8/26/03 | $36.60 | 100 | $3,660 |
| | 8/26/03 | $36.65 | 100 | $3,665 |
| | 8/26/03 | $36.68 | 100 | $3,668 |
| | 8/26/03 | $36.70 | 100 | $3,670 |
| | 8/26/03 | $36.71 | 100 | $3,671 |
| | 8/26/03 | $36.76 | 100 | $3,676 |
| | 8/26/03 | $37.05 | 100 | $3,705 |
| | 8/26/03 | $35.70 | 200 | $7,140 |
| | 8/26/03 | $35.75 | 200 | $7,150 |
| | 8/26/03 | $35.98 | 200 | $7,196 |
| | 8/26/03 | $35.77 | 300 | $10,731 |
| | 8/26/03 | $35.85 | 300 | $10,755 |
| | 8/26/03 | $36.78 | 300 | $11,034 |
| | 8/26/03 | $36.85 | 300 | $11,055 |
| | 8/26/03 | $35.80 | 400 | $14,320 |
| | 8/26/03 | $36.09 | 500 | $18,045 |
| | 8/26/03 | $36.00 | 1,000 | $36,000 |
| | 8/26/03 | $35.76 | 1,300 | $46,488 |
| | 8/26/03 | $35.96 | 1,400 | $50,344 |
| | 8/26/03 | $36.50 | 4,300 | $156,950 |
| | 8/27/03 | $36.30 | 200 | $7,260 |
| | 8/27/03 | $36.39 | 200 | $7,278 |
| | 8/27/03 | $36.36 | 400 | $14,544 |
| | 8/27/03 | $36.38 | 400 | $14,552 |
| | 8/27/03 | $36.51 | 400 | $14,604 |
| | 8/27/03 | $36.25 | 1,000 | $36,250 |
| | 8/27/03 | $36.40 | 1,800 | $65,520 |
| | 8/28/03 | $36.61 | 100 | $3,661 |
| | 8/28/03 | $36.55 | 200 | $7,310 |
| | 8/28/03 | $36.54 | 300 | $10,962 |
| | 8/28/03 | $36.56 | 4,700 | $171,832 |
| | 8/28/03 | $36.64 | 4,700 | $172,208 |
| | 8/29/03 | $36.30 | 100 | $3,630 |
| | 8/29/03 | $36.36 | 100 | $3,636 |
| | 8/29/03 | $36.45 | 100 | $3,645 |
| | 8/29/03 | $36.28 | 200 | $7,256 |
| | 8/29/03 | $36.35 | 400 | $14,540 |
| | 8/29/03 | $36.40 | 600 | $21,840 |
| | 8/29/03 | $36.25 | 1,700 | $61,625 |
| | 9/3/03 | $36.31 | 100 | $3,631 |

- 48 -

| NAME | DATE | PRICE | SHARES SOLD | PROCEEDS |
|---|---|---|---|---|
| | 9/3/03 | $36.40 | 100 | $3,640 |
| | 9/3/03 | $36.42 | 100 | $3,642 |
| | 9/3/03 | $36.45 | 100 | $3,645 |
| | 9/3/03 | $36.47 | 100 | $3,647 |
| | 9/3/03 | $36.65 | 100 | $3,665 |
| | 9/3/03 | $36.67 | 100 | $3,667 |
| | 9/3/03 | $36.48 | 200 | $7,296 |
| | 9/3/03 | $36.55 | 200 | $7,310 |
| | 9/3/03 | $36.60 | 200 | $7,320 |
| | 9/3/03 | $36.52 | 400 | $14,608 |
| | 9/3/03 | $36.53 | 400 | $14,612 |
| | 9/3/03 | $36.57 | 400 | $14,628 |
| | 9/3/03 | $36.32 | 500 | $18,160 |
| | 3/26/04 | $34.71 | 100 | $3,471 |
| | 3/26/04 | $34.76 | 100 | $3,476 |
| | 3/26/04 | $34.69 | 200 | $6,938 |
| | 3/26/04 | $34.77 | 200 | $6,954 |
| | 3/26/04 | $34.64 | 400 | $13,856 |
| | 3/26/04 | $34.63 | 500 | $17,315 |
| | 3/26/04 | $34.80 | 500 | $17,400 |
| | 3/26/04 | $34.62 | 1,100 | $38,082 |
| | 3/26/04 | $34.70 | 2,100 | $72,870 |
| | 3/29/04 | $34.71 | 100 | $3,471 |
| | 3/29/04 | $34.89 | 100 | $3,489 |
| | 3/29/04 | $34.87 | 300 | $10,461 |
| | 3/29/04 | $34.65 | 600 | $20,790 |
| | 3/29/04 | $34.64 | 2,600 | $90,064 |
| | 3/29/04 | $34.63 | 51,100 | $1,769,593 |
| | **Total** | | **142,600** | **$5,095,894** |
| STEPHENSON, TONI | 6/15/2004 | $33.00 | 1,813,076 | $59,831,508 |
| | 6/18/2004 | $33.00 | 570,000 | $18,810,000 |
| | 11/22/2004 | $29.53 | 775,275 | $22,893,870 |
| | **Total** | | **3,158,351** | **$101,535,378** |
| | **Grand Total** | | **5,370,475** | **$175,576,264** |

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS
AND OMISSIONS DURING THE CLASS PERIOD**

99.     On February 26, 2003, StarTek issued a press released, entitled "StarTek, Inc. Fourth

Quarter Earnings Per Share Grow," which stated:

StarTek, Inc. today reported net income for the fourth quarter of $6.5 million, or $0.45 earnings per fully diluted share, excluding a non-cash investment impairment charge, which is up 23% from $5.3 million, or $0.37 earnings per fully diluted share, also excluding an investment impairment charge, in the fourth quarter of 2001. Revenue in the fourth quarter of 2002 was $66.5 million up from $64.9 million in the same quarter last year . . . .

For the year ended December 31, 2002, net income for the year grew 32% to $19.0 million, or $1.32 earnings per fully diluted share, excluding the investment charge, compared to $14.4 million, or $1.02 in 2001, also excluding an investment impairment charge.  Revenue increased 14% to $207.9 million for 2002 compared to $182.6 million for last year . . . .

Chairman A. Emmet Stephenson, Jr. said, "We are very pleased with the results of 2002, a year of growth and transition for the company.  In a difficult economic environment, we attained all time record high revenue for StarTek with growth of 14% year-over-year and increased operating profit by 49% over 2001.  Both fourth quarter revenue and operating earnings per share were the highest in StarTek's history.  Our margins improved due to a focus on improved productivity and a better mix of services provided.  Our new management team has been in place during this period and deserves full credit for these good results."

"This month we have announced the opening of two new facilities to add 100,000 square feet of call center space to handle growing demand for our superior outsourced services.  Although expenses will increase this quarter related to the start up of these operations, the demand for this additional capacity brightens the outlook for more growth in future quarters."

100.    On May 7, 2003, StarTek issued a press release, entitled "StarTek Reports First

Quarter Results," which stated:

StarTek, Inc. today reported results for the first quarter ended March 31, 2003.  Net Income was $4.2 million, or $0.29 earnings per fully diluted share, compared to $4.0 million, or $0.28 earnings per fully diluted share in the first quarter of 2002. Revenue in the first quarter of 2003 was $50.5 million, up from $46.0 million in the same quarter last year.

- 50 -

Chairman A. Emmet Stephenson, Jr. said, "As expected, *our growth in the first quarter was only modest as we concentrate on adding new capacity for identifiable client demand in the second half of the year.  Currently, we are still absorbing start up costs, Including training expense, for the two new facilities, one of which will start generating revenue late this quarter with the second one becoming operational shortly thereafter*.  The year seems to be developing similarly to our historical seasonal pattern, and we expect to be more satisfied with the second half of 2003 than the sluggish first half."

101.    On May 8, 2003, SunTrust Robinson Humphrey, issued a report entitled "SRT: 1Q03

In Line EPS of $0.29 vs. $0.29; Strong Performance Continues," which stated:

Outlook

*We believe SRT is successfully maneuvering the challenging industry environment through targeting of smaller projects in the $5mm-$10mm range while its competitors are battling over the $50-$100mm deals.  These smaller deals receive less competition and pricing pressure, are more plentiful, and have shorter ramp-up times and start-up costs.  In addition, SRT is growing revenue through diversification (from both providing new services to new clients and from extending breadth of projects and services for existing clients), new contract wins, positive mix shift to higher margin revenue, and continued cost control.  Two existing tech support clients are expanding contracts to be serviced out of two new facilities: a 500-seat facility in Regina, Saskatchewan, Canada (beginning operations at the end of May 2003) and a 250-seat facility in Decatur, Illinois (beginning operations at the end of June 2003) which, in our view, underscores the growing demand for SRT's services.  In connection with these expansions, SRT is in process of hiring over 1,000 people.  We believe SRT may need a third new center in mid-2003 as current projects become fully ramped and continue to expand.  We expect the new centers, together with upgrades to SRT's technology and communications platform, will raise capex in 2003 to about $14mm versus $6mm in 2002 and lower margins in 2Q03 from start-up costs, but expect the two new centers to begin contributing meaningful revenue in 3Q03*.  In addition, we expect to see incremental positive revenue impact from several new projects for SRT's largest SCM client, and SRT is expanding its relationship with its largest TSPM client by leveraging off its existing customer record database to provide first party/pre-chargeoff collections services.

102.    On August 5, 2003, StarTek issued a press release, entitled "StarTek, Inc. Initiates

Quarterly Cash Dividend and Reports Second Quarter Earnings," which stated:

- 51 -

StarTek, Inc. reports revenue increased 25% for the second quarter to $54.5 million from $43.3 million for the same quarter in 2002. Net income for the second quarter was $4.2 million, or $0.29 earnings per fully diluted share, compared to $4.0 million, or $0.28 earnings per fully diluted share in the second quarter of 2002.

For the six months ended June 30, 2003, revenue was $105.1 million compared to $89.3 million for the same period last year, an increase of 17%. For the first six months of 2003, net income was $8.3 million, or $0.57 earnings per fully diluted share, compared to $8.0 million, or $0.56 earnings per fully diluted share in the same period last year.

The StarTek Board of Directors is pleased to declare its first ever quarterly cash dividend of $0.36 per share, payable August 29, 2003, to StarTek holders of record on August 15, 2003. More than 3,100 StarTek stockholders will receive these new quarterly dividends.

***Chairman A. Emmet Stephenson, Jr. said, "We are pleased with the increase in our revenue, but as announced in May, we have been absorbing the costs of opening new facilities in Decatur, Illinois, and Regina, Saskatchewan, Canada, over the last few months. Both facilities are now open, and we are happy to report that both came in on time and within budget. Currently, our revenue is growing at the new facilities, and we expect the increase will continue to ramp over the coming quarters. At full capacity, these two facilities would employ 1,400 people. Overall, we see business conditions gradually improving for our company as they have for the last 7 quarters in a row***.

"In recognition of the new 15% maximum tax on dividends recently enacted by Congress and signed by President Bush, the StarTek Board has decided to begin returning to stockholders profits earned by the company in the form of a quarterly cash dividend. The great attraction of StarTek's business model, which is cash generating, self financing, and produces high returns on invested capital, can now manifest itself in dividend payments to our stockholders. In the future the Board will consider the results produced by our company and determine the appropriate cash dividend for each period, while providing funds for the capital expenditures and reinvestment needed to fuel our continued growth."

103.    On October 15, 2003, StarTek issued a press release, entitled "StarTek, Inc.

Announces Opening of 18th Facility," which stated:

StarTek, Inc. announced plans to open a 40,000 square foot teleservices facility in Sarnia, Ontario, Canada.  The center will operate 24 hours per day, 7 days per week and will employ over 500 people when fully staffed. The hiring of new associates will commence shortly, and the company expects to be fully operational later this year. ***In order to give existing and new clients outstanding service, StarTek will fit***

*the building with state-of-the-art telecommunications systems to handle the increased demand from its targeted markets*.

*A. Emmet Stephenson, Jr., Chairman of the Board of StarTek stated, "Our decision to open still another facility in Canada in a short period of time reflects our continuing gains in market share in our teleservices platform. We operate two facilities in Kingston, one each in Cornwall and Regina and are opening our fifth Canadian facility in Sarnia*."

Bill Meade, StarTek's CEO commented, "We always target communities where there are many educated and motivated people available. We found this to be the case in recruiting initial associates for our first facility in Kingston, Ontario, and as a result we feel we will have the same success in staffing our fourth Ontario location."

104.     On November 3, 2003, StarTek issued a press release, entitled "Demand for Wireless

Number Portability Services Triggers Capacity Addition," which stated:

StarTek, Inc. announced plans to open a 42,000 square foot teleservices facility in Alexandria, Louisiana. The center will employ over 420 people when fully staffed and will operate 24 hours per day, 7 days per week. The company has begun adding new associates in order to be operational late this year with the ramp up continuing well into 2004.

A. Emmet Stephenson, Jr., Chairman of the Board of StarTek stated, "The November 24 initiation of Wireless Number Portability is creating a growing need for our market leading service platform. *Demand for these services now appears to be larger than we previously expected, which requires opening a fourth new facility this year to keep up*."

105.     On November 3, 2003, *Reuters* ran a release, entitled "StarTek opens 19th Facility –

Fourth new one this year," which stated:

StarTek, Inc. announced plans to open a 42,000 square foot teleservices facility in Alexandria, Louisiana. The center will employ over 420 people when fully staffed and will operate 24 hours per day, 7 days per week. The company has begun adding new associates in order to be operational late this year with the ramp up continuing well into 2004.

106.     On November 5, 2003, StarTek issued a press release, entitled "StarTek's Net Income

Up 31% in Third Quarter; Quarterly Dividend is Increased to $.37 Per Share," which stated:

StarTek, Inc. is pleased to report that fully diluted earnings per share increased 29% to $0.40 for the third quarter ended September 30, 2003, from $0.31 last year.  Net income increased 31% to $5.9 million from $4.5 million, and revenue grew 15% to $60.0 million this quarter compared to $52.1 million for the same quarter in 2002.

For the nine months ended September 30, 2003, net income was up 14% to $14.2 million, or $0.98 earnings per fully diluted share, compared to $12.5 million, or $0.87 earnings per fully diluted share in the same period last year. For the first nine months of 2003, revenue increased 17% to $165.1 million compared to $141.4 million for the same period last year.

The StarTek Board of Directors is pleased to declare an increase in its quarterly cash dividend to $0.37 per share, payable November 25, 2003, to StarTek holders of record on November 14, 2003. The previous quarter's dividend was $0.36 and was the company's first quarter of cash dividend payments.

Chairman A. Emmet Stephenson, Jr. said, "*StarTek's business grew significantly during the September quarter as previously opened facilities ramped up on time and within budget*.  Our new associates in Decatur and Regina have completed an excellent start up for our clients in those two new locations for which we are most appreciative. *We are currently opening two more facilities that will ultimately employ nearly 1,000 additional new employees when fully staffed in 2004. Currently, we expect next year to offer opportunity for growth in our technical support and business process management services platforms, and we will be fully prepared to capture that additional growth*.  After considering our capital needs to finance our growing business, the Board has decided to increase our quarterly dividend to share the cash flow from operations with our stockholders."

107.    On November 7, 2003, SunTrust Robinson Humphrey issued a report on StarTek,

entitled "SRT: Reiterating Overweight on Strong 3Q Results and Increasing Demand," which stated:

Outlook

*We believe SRT is successfully maneuvering the challenging industry environment by growing market share of existing clients through cross-selling and project expansions, positive mix shift, and continued cost control.  We expect incremental positive revenue impact from wireless portability (wireless clients representing over 50% of revenue) and expanded outsourced services to AT&T Wireless (we estimate at 38% of 3Q03 revenue).  In addition, SRT initiated multiple new projects with new and existing clients based on growing wireless portability-related demand, necessitating the opening of two new call centers (a 500-seat facility in Sarnia, Ontario, Canada and a 420-seat facility in Alexandria, Louisiana) in 4Q03, of which one will initially be a dedicated wireless portability call center for a large client.  We believe SRT will see margin expansion after the*

> *two new call centers ramp in 4Q03 and start-up costs lessen; however, we believe*
> *SRT will need to open additional call centers in 2004 as current projects become*
> *fully ramped and wireless portability demand continues to grow*.

108.   Defendants' statements issued in 2003 were false or misleading because:

(a)   Defendants knew there was insufficient existing and forecasted demand to efficiently utilize StarTek's capacity which was significantly increased by the opening of new facilities during the Class Period because StarTek's customers were *contractually obligated to provide* a twelve month, rolling call volume forecast, and a monthly daily call volume forecast;

(b)   The severe problems the Company experienced in 2000-2001 were not fixed and behind the Company and the management transition and restructuring plan was still not implemented during the Class Period, and indeed, there was significant turnover in the leadership of the BPM sales organization throughout the Class Period.  *See*, *e.g.*, ¶¶74, 84, and 95-97;

(c)   StarTek's sales pipeline was not strong and healthy as detailed in the weekly sales pipeline reports discussed every Monday in the Garfield headquarters.  *See*, *e.g.*, ¶¶57-58;

(d)   Defendants lacked an ability to track and forecast sales throughout the Class Period in the pipeline.  *See*, *e.g.*, ¶¶57-58;

(e)   Defendants failed to account for appropriate sales cycles, of as long as 18 to 24 months.  *See*, *e.g.*, ¶56;

(f)   StarTek's SCM revenue pipeline was "dead" by October 2003 and the teleservices revenue side of the business (BPM) was on "life support."  *See*, *e.g.*, ¶66;

(g)   Defendants failed to disclose that StarTek lost the SCM contract with Microsoft in early 2003.  *See*, *e.g.*, ¶¶66-68;

(h) Defendants were informed in early November 2003 that Verizon cancelled a 400 seat call center order. *See*, *e.g.*, ¶¶71, 72-79;

(i) In late 2003, StarTek was in the process of closing three new call center services contracts with Qwest, TXU, and Cricket Communication (aka Leap Wireless). *See*, *e.g.*, ¶73; and

(j) During 2003, the BPM sales group had very minimal success in securing new contracts and from mid to late 2001 through early 2004 there were only two to three new customer contracts with the rest of StarTek's call center revenues coming from existing customers. *See*, *e.g.*, ¶75.

109. On February 17, 2004, StarTek filed a Registration Statement relating to a proposed public offering of 3.2 million shares of common stock with the SEC offered by the selling stockholders. The Registration Statement was signed by defendants Meade, McKenzie, Stephenson and Morgan. The offering was managed by Lehman Brothers, SunTrust Robinson Humphrey and Thomas Weisel Partners. The selling stockholders granted the underwriters an option to purchase up to 480,000 additional shares for the purpose of covering over-allotments, if any. The Registration Statement stated:

> A. Emmet Stephenson, Jr., our Chairman of the Board and co-founder, his wife Toni E. Stephenson, and two trusts controlled by Mr. Stephenson's sister own 60.3% of our outstanding common stock currently. Following this offering, Mr. and Mrs. Stephenson will beneficially own an aggregate of approximately 38.0% of our outstanding common stock, or 34.6% if the underwriters' over-allotment option is exercised in full. As a result, Mr. Stephenson and his wife will continue to be our largest stockholders and together may be able to elect our entire Board of Directors and to control substantially all other matters requiring action by our stockholders.

\* \* \*

- Maintain a Disciplined Approach to Expansion. We plan to grow our revenue organically through staged expansion of the services we provide to our existing or potential clients, or through rapid deployment of capacity to assist our clients in responding to demand for their products or services. For our staged expansion strategy, we seek to obtain new clients or provide new services to existing clients by providing highly competitive pricing. Once engaged to provide a service, we seek to deliver service quality that exceeds our clients' value expectations, which should position us well to expand the scale and profitability of that project. For our capacity deployment strategy, we seek to maintain enough available capacity to meet our clients' sudden surges in demand while maintaining high capacity utilization levels throughout our organization.

\* \* \*

Beneficial Ownership of Shares

| Name of Stockholder | Before Offering | | No. of Shares Being Offered | After Offering | |
| | No. of Shares | Percentage | | No. of Shares | Percentage |
|---|---|---|---|---|---|
| Toni E. Stephenson | 3,313,882 | 23.1% | 1,213,076 | 2,100,806 | 14.6% |
| FASSET Trust | 993,462 | 6.9% | 993,462 | --- | --- |
| MASSET Trust | 993,462 | 6.9% | 993,462 | --- | --- |
| A. Emmet Stephenson, Jr. | 3,350,882 | 23.3% | --- | 3,350,882 | 23.3% |
| William E. Meade, Jr. | 65,000 | * | --- | 65,000 | * |
| Eugene L. McKenzie, Jr. | 2,000 | * | --- | 2,000 | * |
| Lawrence Zingale | 20,000 | * | --- | 20,000 | * |
| Pamela S. Oliver | 1,986,924 | 13.8% | --- | --- | --- |
| Michael W. Morgan | 119,243 | * | --- | 119,243 | * |
| Ed Zschau | 38,000 | * | --- | 38,000 | * |
| Hank Brown | 7,500 | * | --- | 7,500 | * |
| Michael S. Shannon | 19,000 | * | --- | 19,000 | * |
| Awad Asset Management | 779,279 | 5.4% | --- | 779,279 | 5.4% |
| All Directors and Executive Officers as a group (8 persons) | 3,621,625 | 24.9% | --- | 3,621,625 | 24.9% |

(Footnotes omitted.)

110.   On February 27, 2004, StarTek issued a press release, entitled "StarTek, Inc. Fourth

Quarter EPS Up 20%," which stated:

StarTek, Inc. today reported net income for the fourth quarter of 2003 of $8.0 million, which is up 22% from $6.5 million, excluding a non-cash investment

- 57 -

impairment charge in the fourth quarter of 2002. Fully diluted earnings per share rose 20% to $0.54 from $0.45 last year on more shares outstanding. Revenue in the fourth quarter of 2003 was $66.1 million compared with $66.5 million in the same quarter last year. During the fourth quarter of the prior year, the company recorded an impairment charge of $6.2 million for an "other than temporary" decline on its investment portfolio resulting in net income of $2.7 million, or $0.18 earnings per fully diluted share.

For the year ended December 31, 2003, net income for the year grew 17% to $22.2 million or $1.52 earnings per fully diluted share compared to $19.0 million, or $1.32 earnings per fully diluted share, excluding the investment impairment charge. Revenue increased 11% to $231.2 million for 2003 compared to $207.9 million for last year. Including investment impairment charges of $6.2 million in prior year 2002, net income for the year ended December 31, 2002 was $15.2 million, or $1.05 earnings per fully diluted share.

Chairman A. Emmet Stephenson, Jr. said, "*We are very pleased with the 2003 results, a year of continued growth for StarTek, as revenue, operating income, net income, and earnings per share reached all time record levels for the year. Our margins further improved due to a better mix of services provided and additional productivity gains as a result of our innovative process management. In the fourth quarter, our business process management services were particularly strong which was reflected in both gross margins and operating profits*."

"*We successfully opened four new facilities last year, which increased capacity significantly, to meet the growing demand for our outsourced services. As the economy has improved, our clients have responded with renewed emphasis on improving service to their customers and reducing costs, both of which lead to increased demand for StarTek's service offerings*."

111.    On March 19, 2004, *Dow Jones* ran a release, entitled "StarTek 3.2M/Shr Offering Delayed Due To Market Conditions," which stated:

StarTek Inc.'s offering of 3.2 million shares expected to price Thursday via Lehman Brothers Inc. was postponed due to market conditions.

112.    On March 31, 2004, it was announced that StarTek opened a Lynchburg, Virginia facility.

113.    On April 13, 2004, StarTek filed Amendment No. 2 to Form S-3 Registration Statement, which stated:

- 58 -

AT&T Wireless Services has announced that it has entered an agreement to be acquired by Cingular Wireless LLC. The term of our agreement with AT&T Wireless Services was recently extended to December 31, 2006 and is not subject to termination for convenience or without cause.

*     *     *

Beneficial Ownership of Shares

| | Before Offering | | | After Offering | |
|---|---|---|---|---|---|
| Name of Stockholder | No. of Shares | Percentage | No. of Shares Being Offered | No. of Shares | Percentage |
| Toni E. Stephenson | 3,313,882 | 23.1% | 1,213,076 | 2,100,806 | 14.6% |
| FASSET Trust | 993,462 | 6.9% | 993,462 | --- | --- |
| MASSET Trust | 993,462 | 6.9% | 993,462 | --- | --- |
| A. Emmet Stephenson, Jr. | 3,350,882 | 23.3% | --- | 3,350,882 | 23.3% |
| William E. Meade, Jr. | 65,000 | * | --- | 65,000 | * |
| Eugene L. McKenzie, Jr. | 2,000 | * | --- | 2,000 | * |
| Lawrence Zingale | 20,000 | * | --- | 20,000 | * |
| Pamela S. Oliver | 1,986,924 | 13.8% | --- | --- | --- |
| Michael W. Morgan | 119,243 | * | --- | 119,243 | * |
| Ed Zschau | 38,000 | * | --- | 38,000 | * |
| Hank Brown | 7,500 | * | --- | 7,500 | * |
| Michael S. Shannon | 19,000 | * | --- | 19,000 | * |
| Awad Asset Management | 779,279 | 5.4% | --- | 779,279 | 5.4% |
| All Directors and Executive Officers as a group (8 persons) | 3,621,625 | 24.9% | --- | 3,621,625 | 24.9% |

(Footnotes omitted.)

114.   On April 14, 2004, SunTrust Robinson Humphrey issued a report on StarTek, entitled

"SRT: SRT Extends AWE Contract Until 12/31/06," which stated:

CONTRACT EXTENSION: In a revised S-3 filed yesterday afternoon, SRT indicated that its contract with AT&T Wireless (AWE) (38.1% of '03 revenue) has been extended until 12/31/06 and is NOT subject to termination for convenience or without cause.

OUR TAKE: In our opinion, the AWE/Cingular merger created uncertainty about the future of SRT's relationship with its largest client that negatively impacted the stock over the past few weeks. We think that this contract extension significantly mitigates this risk. In addition, we believe that SRT is AWE's best-performing and lowest-cost supplier of call center based business process management services,

thereby positioning the company to take share from competitors Convergys (CVG) and West Corp. (WSTC) after the completion of the AWE/Cingular merger as Cingular looks for cost synergies.

*     *     *

RATING: We are reiterating our Buy rating on SRT in light of the pullback in valuation (from $40.50 at 3/1/04 to $34.35 currently) and the removal of the AWE/Cingular concern.

115.    On May 5, 2004, StarTek issued a press release, entitled "StarTek, Inc. First Quarter

EPS Up 59% on Revenue Increase of 28%; Increased Quarterly Dividend to $0.39," which stated:

StarTek, Inc. today reported that fully diluted earnings per share rose 59% to $0.46 for the first quarter of 2004 from $0.29 in the same quarter of last year. Net income was $6.9 million, up 65% compared to $4.2 million in the first quarter of 2003. Revenue in the first quarter of 2004 increased 28% over the same quarter last year, to $64.7 million from $50.5 million.

In addition, the Board of Directors declared an increase in its quarterly cash dividend to $0.39 per share, payable May 24, 2004, to StarTek holders of record on May 11, 2004. The dividend for the 1st quarter of 2004 was $0.38, which was increased from the 4th quarter 2003 dividend of $0.37.

Chairman A. Emmet Stephenson, Jr. said, "*We are very pleased with the results for the first quarter of 2004 in which revenue growth accelerated as we more fully utilized the new Business Process Management Services capacity we added last year. Two of our four new facilities were operational by the beginning of the second quarter of 2003 and a third one for the fourth quarter. The last one opened in November 2003 but is still in the early stages of its ramp. The dedication of our management team and associates to operational excellence, inherent in the StarTek Advantage System, has resulted in improved efficiency and cost effectiveness as reflected in the improvement in gross profit margins, operating margins, and bottom line results*.

*Our sales efforts have produced our first meaningful client in the utility industry, a new industry vertical market for StarTek. We believe that continued growth in our Business Process Management Services platform and strategic diversification of our client base will considerably reduce the historical seasonality of our stream of revenue and earnings this year and in the future*.   Our commitment to achieving client satisfaction keeps us focused on continuous improvement of our ability to deliver superior service to all our clients."

- 60 -

116. On May 18, 2004, StarTek filed Amendment No. 3 to Form S-3 Registration Statement, which stated:

A. Emmet Stephenson, Jr., our Chairman of the Board and co-founder, his wife Toni E. Stephenson, and two trusts controlled by Mr. Stephenson's sister own 59.9% of our outstanding common stock currently. Following this offering, Mr. and Mrs. Stephenson will beneficially own an aggregate of approximately 37.8% of our outstanding common stock, or 34.4% if the underwriters' over-allotment option is exercised in full. As a result, Mr. Stephenson and his wife will continue to be our largest stockholders and together may be able to elect our entire Board of Directors and to control substantially all other matters requiring action by our stockholders.

\* \* \*

- Scalable, Flexible Business Model. Upon a determination that business demand will support the opening of a particular business process outsourced services facility, we are generally able to develop and launch the new facility into operational status in 90 days. We believe our ability to rapidly deploy a new facility significantly differentiates us from our competitors. Our ability to quickly expand capacity allows our clients to rely on us to manage sudden changes in demand for their products. Additionally, we have developed a standardized approach to supply chain management services enabling us to assemble and package various types of products and rapidly change the type of product assembled and packaged.

\* \* \*

- Maintain a Disciplined Approach to Expansion. We plan to grow our revenue organically through staged expansion of the services we provide to our existing or potential clients, or through rapid deployment of capacity to assist our clients in responding to demand for their products or services. For our staged expansion strategy, we seek to obtain new clients or provide new services to existing clients by providing highly competitive pricing. Once engaged to provide a service, we seek to deliver service quality that exceeds our clients' value expectations, which should position us well to expand the scale and profitability of that project. For our capacity deployment strategy, we seek to maintain enough available capacity to meet our clients' sudden surges in demand while maintaining high capacity utilization levels throughout our organization.

\* \* \*

In 2002, AT&T Wireless Services accounted for 26.3% of our revenue, Microsoft Corporation accounted for 34.4%, T-Mobile, 12.2%, and AT&T Corporation, 13.3%.

AT&T Wireless Services has announced that it has entered an agreement to be acquired by Cingular Wireless LLC. The term of our agreement with AT&T Wireless Services was recently extended to December 31, 2006 and is not subject to termination for convenience or without cause.

*　　*　　*

The table below presents information as of May 7, 2004 regarding the beneficial ownership of shares of our common stock, as adjusted to reflect the shares of our common stock being offered hereby . . . .

*　　*　　*

Each selling stockholder is an affiliate of StarTek, Inc. and is therefore prohibited from engaging in short sales pursuant to Section 16(c) of the Exchange Act. . . .

Beneficial Ownership of Shares

| | Before Offering | | | After Offering | |
| Name of Stockholder | No. of Shares | Percentage | No. of Shares Being Offered | No. of Shares | Percentage |
|---|---|---|---|---|---|
| Toni E. Stephenson | 3,313,882 | 23.0% | 1,213,076 | 2,100,806 | 14.6% |
| FASSET Trust | 993,462 | 6.9% | 993,462 | --- | --- |
| MASSET Trust | 993,462 | 6.9% | 993,462 | --- | --- |
| A. Emmet Stephenson, Jr. | 3,350,882 | 23.2% | --- | 3,350,882 | 23.2% |
| William E. Meade, Jr. | 105,000 | * | --- | 105,000 | * |
| Eugene L. McKenzie, Jr. | 4,000 | * | --- | 4,000 | * |
| Lawrence Zingale | 40,000 | * | --- | 40,000 | * |
| Pamela S. Oliver | 1,986,924 | 13.8% | --- | --- | --- |
| Ed Zschau | 41,000 | * | --- | 41,000 | * |
| Hank Brown | 10,500 | * | --- | 10,500 | * |
| Awad Asset Management | 779,279 | 5.4% | --- | 779,279 | 5.4% |
| All Directors and Executive Officers as a group (8 persons) | 3,551,382 | 24.3% | --- | 3,551,382 | 24.3% |

(Footnotes omitted.)

117.    On May 25, 2004, StarTek filed Amendment No. 4 to Form S-3 Registration Statement, which stated:

Our largest stockholder, together with members of his family, will own 37.8% of our outstanding shares following this offering and will have the ability to significantly influence major corporate actions.

A. Emmet Stephenson, Jr., our Chairman of the Board and co-founder, his wife Toni E. Stephenson, and two trusts controlled by Mr. Stephenson's sister own 59.9% of our outstanding common stock currently. Following this offering, Mr. and Mrs. Stephenson will beneficially own an aggregate of approximately 37.8% of our outstanding common stock, or 34.4% if the underwriters' over-allotment option is exercised in full. As a result, Mr. Stephenson and his wife will continue to be our largest stockholders and together may be able to elect our entire Board of Directors and to control substantially all other matters requiring action by our stockholders.

*      *      *

- Scalable, Flexible Business Model. Upon a determination that business demand will support the opening of a particular business process outsourced services facility, we are generally able to develop and launch the new facility into operational status in 90 days. We believe our ability to rapidly deploy a new facility significantly differentiates us from our competitors. Our ability to quickly expand capacity allows our clients to rely on us to manage sudden changes in demand for their products. Additionally, we have developed a standardized approach to supply chain management services enabling us to assemble and package various types of products and rapidly change the type of product assembled and packaged.

*      *      *

- Maintain a Disciplined Approach to Expansion. We plan to grow our revenue organically through staged expansion of the services we provide to our existing or potential clients, or through rapid deployment of capacity to assist our clients in responding to demand for their products or services. For our staged expansion strategy, we seek to obtain new clients or provide new services to existing clients by providing highly competitive pricing. Once engaged to provide a service, we seek to deliver service quality that exceeds our clients' value expectations, which should position us well to expand the scale and profitability of that project. For our capacity deployment strategy, we seek to maintain enough available capacity to meet our clients' sudden surges in demand while maintaining high capacity utilization levels throughout our organization.

*      *      *

In 2002, AT&T Wireless Services accounted for 26.3% of our revenue, Microsoft Corporation accounted for 34.4%, T-Mobile, 12.2%, and AT&T Corporation, 13.3%.

AT&T Wireless Services has announced that it has entered an agreement to be acquired by Cingular Wireless LLC. The term of our agreement with AT&T Wireless Services was recently extended to December 31, 2006 and is not subject to termination for convenience or without cause.

*     *     *

Each selling stockholder is an affiliate of StarTek, Inc. . . . .

Beneficial Ownership of Shares

| | Before Offering | | | After Offering | |
|---|---|---|---|---|---|
| Name of Stockholder | No. of Shares | Percentage | No. of Shares Being Offered | No. of Shares | Percentage |
| Toni E. Stephenson | 3,313,882 | 23.0% | 1,213,076 | 2,100,806 | 14.6% |
| FASSET Trust | 993,462 | 6.9% | 993,462 | --- | --- |
| MASSET Trust | 993,462 | 6.9% | 993,462 | --- | --- |
| A. Emmet Stephenson, Jr. | 3,350,882 | 23.2% | --- | 3,350,882 | 23.2% |
| William E. Meade, Jr. | 105,000 | * | --- | 105,000 | * |
| Eugene L. McKenzie, Jr. | 4,000 | * | --- | 4,000 | * |
| Lawrence Zingale | 40,000 | * | --- | 40,000 | * |
| Pamela S. Oliver | 1,986,924 | 13.8% | --- | --- | --- |
| Ed Zschau | 41,000 | * | --- | 41,000 | * |
| Hank Brown | 10,500 | * | --- | 10,500 | * |
| Awad Asset Management | 779,279 | 5.4% | --- | 779,279 | 5.4% |
| All Directors and Executive Officers as a group (6 persons) | 3,551,382 | 24.3% | --- | 3,551,382 | 24.3% |

(Footnotes omitted.)

118.    On June 10, 2004, StarTek issued a Prospectus which stated:

| | Per Share | Total |
|---|---|---|
| Public Offering Price | $33.00 | $125,400,000 |
| Underwriting Discounts and Commissions | $1.65 | $ 6,270,000 |
| Proceeds to Selling Stockholders (before expenses) | $31.35 | $119,130,000 |

One of the selling stockholders identified in this prospectus has granted the underwriters a 30-day option to purchase up to 570,000 additional shares of our common stock at the public offering price, less the underwriting discount, solely to cover over-allotments.

*     *     *

- 64 -

Our largest stockholder, together with members of his family, will own 33.6% of our outstanding shares following this offering and will have the ability to significantly influence major corporate actions.

A. Emmet Stephenson, Jr., our Chairman of the Board and co-founder, his wife Toni E. Stephenson, and two trusts controlled by Mr. Stephenson's sister own 59.9% of our outstanding common stock currently. Following this offering, Mr. and Mrs. Stephenson will beneficially own an aggregate of approximately 33.6% of our outstanding common stock, or 29.6% if the underwriters' over-allotment option is exercised in full. As a result, Mr. Stephenson and his wife will continue to be our largest stockholders and together may be able to elect our entire Board of Directors and to control substantially all other matters requiring action by our stockholders.

\*       \*       \*

- Scalable, Flexible Business Model. Upon a determination that business demand will support the opening of a particular business process outsourced services facility, we are generally able to develop and launch the new facility into operational status in 90 days. We believe our ability to rapidly deploy a new facility significantly differentiates us from our competitors. Our ability to quickly expand capacity allows our clients to rely on us to manage sudden changes in demand for their products. Additionally, we have developed a standardized approach to supply chain management services enabling us to assemble and package various types of products and rapidly change the type of product assembled and packaged.

\*       \*       \*

- Maintain a Disciplined Approach to Expansion. We plan to grow our revenue organically through staged expansion of the services we provide to our existing or potential clients, or through rapid deployment of capacity to assist our clients in responding to demand for their products or services. For our staged expansion strategy, we seek to obtain new clients or provide new services to existing clients by providing highly competitive pricing. Once engaged to provide a service, we seek to deliver service quality that exceeds our clients' value expectations, which should position us well to expand the scale and profitability of that project. For our capacity deployment strategy, we seek to maintain enough available capacity to meet our clients' sudden surges in demand while maintaining high capacity utilization levels throughout our organization.

\*       \*       \*

In 2002, AT&T Wireless Services accounted for 26.3% of our revenue, Microsoft Corporation accounted for 34.4%, T-Mobile, 12.2%, and AT&T Corporation, 13.3%.

AT&T Wireless Services has announced that it has entered an agreement to be acquired by Cingular Wireless LLC. The term of our agreement with AT&T Wireless Services was recently extended to December 31, 2006 and is not subject to termination for convenience or without cause.

\*      \*      \*

Beneficial Ownership of Shares

| | Before Offering | | | After Offering | |
| Name of Stockholder | No. of Shares | Percentage | No. of Shares Being Offered | No. of Shares | Percentage |
|---|---|---|---|---|---|
| Toni E. Stephenson | 3,313,882 | 22.9% | 1,813,076 | 1,500,806 | 10.4% |
| FASSET Trust | 993,462 | 6.9% | 993,462 | --- | --- |
| MASSET Trust | 993,462 | 6.9% | 993,462 | --- | --- |
| A. Emmet Stephenson, Jr. | 3,350,882 | 23.2% | --- | 3,350,882 | 23.2% |
| William E. Meade, Jr. | 105,000 | * | --- | 105,000 | * |
| Eugene L. McKenzie, Jr. | 4,000 | * | --- | 4,000 | * |
| Lawrence Zingale | 40,000 | * | --- | 40,000 | * |
| Pamela S. Oliver | 1,986,924 | 13.7% | --- | --- | --- |
| Ed Zschau | 41,000 | * | --- | 41,000 | * |
| Hank Brown | 10,500 | * | --- | 10,500 | * |
| Awad Asset Management | 779,279 | 5.4% | --- | 779,279 | 5.4% |
| All Directors and Executive Officers as a group (6 persons) | 3,551,382 | 24.3% | --- | 3,551,382 | 24.3% |

\*      \*      \*

| Underwriters | Number of Shares |
|---|---|
| SunTrust Capital Markets, Inc. | 2,280,000 |
| William Blair & Company, L.L.C. | 760,000 |
| Thomas Weisel Partners LLC | 760,000 |
| Total | 3,800,000 |

\*      \*      \*

Over-Allotment Option

Toni E. Stephenson, one of the selling stockholders, has granted to the underwriters an option to purchase up to an aggregate of 570,000 shares of common stock, exercisable to cover over-allotments, if any, at the public offering price less the underwriting discounts and commissions shown on the cover page of this prospectus.

(Footnotes omitted.)

119.    On June 10, 2004, StarTek issued a press release, entitled "StarTek, Inc. Announces

Pricing of Common Stock in Public Offering by Selling Stockholders," which stated:

StarTek, Inc. today announced the pricing of a public offering of 3,800,000 shares of common stock at $33.00 per share by three of its stockholders. The selling stockholders increased the offering by 600,000 shares from their 3,200,000 share offering announced Feb. 17, 2004. The company will receive no proceeds from the sale of the common stock. . . . The anticipated settlement date is June 15, 2004.

SunTrust Robinson Humphrey, is acting as the lead manager and sole book running manager for the deal. William Blair & Company and Thomas Weisel Partners LLC are acting as co-managers.

120.    On July 28, 2004, StarTek issued a press release, entitled "StarTek, Inc. Reports

Second Quarter Earnings Increase of 52%," which stated:

For the quarter ended June 30, 2004, StarTek, Inc. is pleased to report fully diluted earnings per share rose 51.7% to $0.44 compared to $0.29 for the second quarter of 2003. For the six months ended June 30, 2004, fully diluted earnings per share increased 57.9% to $0.90 from $0.57 for the same period last year.

For the three months ended June 30, 2004, gross profit increased 30.0% on a revenue increase of 17.7% over the second quarter of 2003. The revenue increase was primarily due to continued growth in the Company's Business Process Management Services platform, both with its core telecommunications clients as well as developing clients in new industries. The 2.5 percentage point increase in gross margin, from 23.4% to 25.9%, was primarily due to a greater proportion of the Company's revenue portfolio being generated within the higher-margin Business Process Management Services platform. Operating margin increased 4.3 percentage points, from 10.2% to 14.5%. Selling, general and administrative expenses remained relatively flat for the period and total operating expense as a percent of total revenue decreased by 1.9 percentage points thus increasing operating margin even more than gross margin.

*        *        *

In addition, the Board of Directors declared an increase in its quarterly cash dividend to $0.40 per share, payable August 24, 2004, to StarTek shareholders of record as of August 11, 2004. The dividend per share for the 2nd quarter of 2004 was $0.39, which was increased from the 1st quarter 2004 dividend of $0.38. Revenue growth was slightly stronger in Q1 compared to Q2 due to the slower pace of

wireless number porting volumes seen across the overall marketplace. In addition, the Supply Chain Management Services business continued to decline in overall volume.

William E Meade, Jr., President and Chief Executive Officer said, "By leveraging our model of operational excellence, StarTek continues to be rewarded with additional business. Our clients and our shareholders benefit from our focus on customer-centric service and dedication to delivering ongoing operational efficiencies."

121.    On July 30, 2004, SunTrust Robinson Humphrey issued a report on StarTek which

stated:

- NEW BUSINESS OUTLOOK ENCOURAGING:  Management indicated that its new client pipeline is the strongest in 3 years, and we expect SRT to announce two large new clients (in utilities and/or telecon verticals) some time in 2H04 and to have off-shore (Philippines) capacity in place by the end of '04.

- 2Q04 EARNINGS & IMPLICATIONS: 2Q04 revenue and gross margin trends reflected (1) a deceleration in wireless portability volumes, (2) lower pricing associated with the 4/1/04 renewal of SRT's AWE contract, (3) ramp-up expenses from 1H04's new *clients* (Qwest and TXU), and (4) trough seasonal slowness.  We expect wireless portability volumes to remain weak and so trimmed our 3Q04 EPS from $0.47 to $0.46 on 7/28/04.  In 4Q04, however, we expect revenue and earnings to benefit from (1) the fully-ramped contribution of Qwest and TXU, (2) higher volumes and improved productivity at AWE, and (3) peak seasonal strength.

- NEW IR POLICY: We are encouraged by SRT's first-ever earnings conference call and view it as a positive.  We believe, however, that investors do expect management to provide financial guidance, especially as it relates to ramp-up of new projects and impact of price concessions on gross margin.

- OUR TAKE: We are reiterating our Buy rating based on strong fundamentals and compelling valuation.  Introducing $45 price target (20 x '05E EPS of $2.25).

122.    On July 29, 2004, subsequent to the release of its quarterly results, StarTek held a

conference call for analysts, money and portfolio managers, institutional investors and large  StarTek

shareholders.  During the call, defendant Meade stated:

- 68 -

*We are pleased with the – we are very pleased with the very strong results of our second quarter, performance.  As you can see from the earnings release yesterday, our growth continues. Overall we grew revenue 18% over Q2 last year and our forward momentum on the business process management services side of our business continues. Our revenue growth demonstrates the proof of our operational excellence model and contributes to our ongoing strong EPS growth*. With this, we believe our business model continues to distinguish us.  Our solid service offerings coupled with fair pricing and crisp execution continues to be able [to] distinguish us from our competition.  *Both Q2 and Q1 and Q2 combined benefited from the capacity we brought online and operationally at this tine last year*.

*During Q2, we . . . continued our successful process of ramping up slowly and deliberately two new clients, one in utilities and an addition is another key telecommunication's client*.  In the quarter, porting volumes for wireless number portability were not as strong as in the previous two quarters.  This trend is concurrent with that in the overall industry which has experienced lower volumes compared to an initial consumer forecast and certainly slower than wireless number portability was first introduced to consumers in November of 2003.  In our supply chain management services, volume with our largest client is continuing to slow relative to the work we do for them and is trended to be a smaller and smaller percentage of our total revenue.  *We continue to be encouraged by the activity in our sales pipeline. As I stated, we are currently in the middle of ramping two new clients which were secured earlier this year.  We are encouraged by our recent close rates and the size of our sales pipeline.  We anticipate replicating the success we had during the first half of 2004 with two new key client acquisitions during the second half of 2004, and we are very pleased with the ongoing positive response from both our existing clients and our newer clients and that they continue to reward us with more of their business. We firmly believe this is testament to the success and value of our operational excellence model*.  Our focus on people and process has been the foundation of this excellence. We believe delivering servicing quality day-in and day-out is what our clients value the most, and if we do this we will be rewarded with incremental business and gain share in the marketplace.

123.    In response to a question from Lehman Brothers analyst Kristen Cooper, defendant

Meade stated:

[C]urrently we have got 20 physical locations or what we call 19 operational sites. We have a site in process right now terms of ramping [sic] which again will bring us to 20 operational sites. In the near term, we are continuing to look and have in our plans for this year having a presence offshore in Asia and having seat capacity most likely in the Philippines by year end and then again, *based on the pipeline, we could anticipate perhaps an additional facility by year end*.

124.     On the same call, Bill Warmington, the analyst for SunTrust Robinson asked: "I want to see how the two new clients you mentioned were ramping in the second quarter?  How are they ramping, and did they contribute anything in the second quarter?  Is that really something that's going to happen more in the third and fourth quarters?"  Defendant McKenzie responded:

> Yeah, Bill, both those clients are coming online and I think it is – you know, our historical practice particularly as it relates to nailing our operational excellence model, we tend to bring that but just slowly making sure again we have really got the quality and focus. So, there was a revenue contribution in Q2, but you know relatively small, you know from comparative standpoint, but again you know the good news is about both of those clients particularly as we [go] forward over the next couple of years as there are besides where we think we can replicate the strong growth we've had with some of our existing clients.

125.     Then Warmington asked: "And so how are things going on with your existing clients and demand there?"  Defendant Meade replied:

> *I think, you know, it's going very well. I would say that again our operational excellence model[,] and just refresh what we mean by that for people, our operational excellence model is we believe we can ramp capacity faster than any of our competitors in a quality way. We believe we are delivering quality and service day in and day out better than any of our competitors*.  And then thirdly, it's the way we staff.  Our staffing model relative to 15 minute intervals, and we I think, you know, again we are certainly experiencing continued growth with the majority of our large clients within the business process management services area.

126.     Arnold Ursaner, an analyst for CJS Securities, asked:

> [T]he one number in your release that was disappointing to me and I want to focus on it, if I can, is your operating margin, your EBIT margin, and it appears we have two key factors that are affecting it; expenses to ramp-up to new clients and your new tier pricing, the impact of the renewal on the expanded contract; is it fair to say those are the two key factors and can you give us a little better help in understanding whether they will continue to be a problem going forward?

127.     Defendant McKenzie replied:

> Yeah, Arnie, those two are key factors, clearly when we ramp they will, as is the case in our industry there will always be that impact when we are ramping, so you short-term impact, long-term gain and the answer to the second part of the question is yes

we do have the operational excellence model, we do intend to improve productivity to play against the period pricing and the lower margins.  The third thing I would point to in Q2 over Q1 is that we do have higher mix of supply change business relative to Q1. Arnie and still the only other I had is over the duration of contract we do focus on improving productivity year-over-year so as we move forward we hope to offset some of the margin degradation with productivity increase, but certainly Q2 was the first[,] you know[,] the first quarter that the pricing change was effective.

128.    Finally David Grossman, the analyst for Weisel Partners, asked: "[O]n the capacity side, is [sic] there any kind of rules . . . you can give us perhaps that you have provided in the past about, you know, current capacity utilization and as you add clients should we at least at this point assume that you will need to add new facilities to service new clients or is there anyway for us to gauge – some metric to gauge capacity utilization as you add new clients?"  Meade responded:

You know, again we'd very [sic] shy away from providing, you know, the financial guidance all [amount] of that.  I think, you know, we are [a] very conservative company. *We leveraged capacity very, very effectively, we're not in a, you know, we will build and hope they come type of environment.  Usually the best leading indicator of what goes on is just [to] follow press releases closely.  Usually what happens to us is when we identify a location or a site we want to go to, the [Mayor] or the Head of Economic Development and the Community gets [a] little bit . . . excited and gets ahead of us relative to saying StarTek is coming to town because of our conservative nature when that happens, you could be pretty much assured that somewhere right behind that there is a client in the pipeline. So that's the best leading indicator of our capacity and how the capacity relates to grow*.

129.    On August 9, 2004, it was announced that StarTek opened a Collinsville, Virginia facility.

130.    On August 18, 2004, *PR Newswire* ran a release, entitled "William Blair & Company Initiates Coverage of StarTek, Inc. With Market Perform Rating," which stated:

William Blair & Company today announced that it initiated research coverage of StarTek, Inc. ($30.40), a leading provider of business process outsourcing services, with a Market Perform rating and company profile of Core Growth.

Analyst Troy Mastin estimated that the company – which has a network of 20 contact centers throughout the United States, Canada, and the United Kingdom

- 71 -

offering services including provisioning management, wireless number portability, receivables management, customer care, and activation – would earn $1.89 per share in 2004 and $2.26 per share in 2005.

"StarTek has shown an ability to grow meaningfully when pursuing new clients or new industries," Mastin said. "The company's impressive penetration into the telecommunications industry and its rapid growth with its largest clients are clear evidence of this success. This record of success provides a favorable backdrop for growth in the future, in our opinion, and recent progress has been encouraging."

Mastin also said he believes industry trends are favorable for StarTek, as many companies are turning to third parties to outsource customer-care functions including customer and technical support and fulfillment. "We view the opportunities for outsourcing as vast and growing, as the return to global economic growth, combined with an increase in mergers, acquisitions, and divestitures, likely will lead to an increase in outsourcing activity."

131.    On August 18, 2004, William Blair & Company, issued a report on StarTek, entitled

"Initiating Coverage of a Leader in Business Process Outsourcing," which stated:

- The company has multiple avenues for growth, including existing customers, new clients in existing industries, and new verticals such as retail, utilities, financial services, and health care. The company has had recent success in landing new clients with two major additions in the first half of 2004, including one on the utilities vertical. ***Management has characterized the current pipeline as among the healthiest ever***.

- We are initiating coverage with 2004 and 2005 EPS estimates of $1.89 and $2.26 and revenue estimates of $268 million and $307 million, respectively.

132.    On October 4, 2004, StarTek filed an 8-K with the SEC announcing the resignation of

defendant McKenzie.  The 8-K stated that McKenzie had "resigned as Executive Vice President,

Chief Financial Officer, Secretary and Treasurer for personal reasons. The Company has appointed

Mr. Rodd Granger, 39, as Chief Financial Officer of the Company on an interim basis, and has

commenced a search for Mr. McKenzie's permanent replacement."

133.    On November 4, 2004, StarTek issued a press release, entitled "StarTek, Inc. Reports

Third Quarter Earnings and Raises Dividend; Board Authorizes Stock Repurchase Program Up to

$25 Million," which stated:

> StarTek Inc. reported that fully diluted earnings per share from continuing operations decreased 21 percent for the quarter ended September 30, 2004, to $0.34 compared to $0.43 for the third quarter of 2003. Fully diluted earnings per share including discontinued operations decreased by 45 percent to $0.22, compared to $0.40 for the same period in the prior year. For the nine months ended September 30, 2004, fully diluted earnings per share from continuing operations increased 24 percent to $1.29 from $1.04 for third quarter of 2003. Fully diluted earnings per share including discontinued operations increased 14 percent to $1.12 compared to $0.98 for the same period in the prior year. Discontinued operations consist of operations in the United Kingdom, which as previously reported were sold on September 30, 2004.

> For the quarter ended September 30, 2004, revenue increased 13.9 percent while gross profit decreased 8.0 percent over the third quarter of 2003.  The revenue increase was primarily driven by the continued strong growth in business process management services.  The 5.1 percentage point decrease in gross margin, from 26.5 percent to 21.4 percent, was primarily due to:

> –    the previously disclosed incentive tiered-price reduction with our largest client that generated increased volume at lower prices,

> –    investments in launching an additional facility, and

> –    re-deploying resources that required a one-time re-training expense to service incremental growth.

> Selling, general and administrative expenses decreased by 0.1 percentage point as a percent of total revenue. The dollar increase in selling, general and administrative expenses was primarily attributed to the addition of three new sites over the prior year and costs associated with Sarbanes-Oxley compliance efforts.

> For the nine months ended September 30, 2004, gross profit increased 23.5 percent on a revenue increase of 20.3 percent over the same period last year. The revenue increase was primarily due to the continued strong demand for our operational excellence model and the consistent delivery of service performance.

> ***In addition, the Board of Directors declared an increase in the Company's quarterly cash dividend to $0.41 per share***, payable November 24, 2004, to StarTek shareholders of record as of November 11, 2004. The dividend per share for the 3rd

quarter of 2004 was $0.40, which was increased from the 2nd quarter 2004 dividend of $0.39.

"*While we are disappointed with the Company's results for this quarter when compared with last year, we are confident the decisions and investments we have made in the quarter will support continued profitable growth*," said William E. Meade Jr., President and Chief Executive Officer of StarTek.

*StarTek also announced that the Company's Board of Directors has authorized the Company to repurchase up to $25 million of StarTek's common stock. The repurchase program is effective immediately and will remain in effect until terminated by the Board of Directors. The repurchase program will allow the company to repurchase its shares from time to time in accordance with the requirements of the Securities and Exchange Commission on the open market, in block trades and in privately-negotiated transactions, depending on market conditions and other factors. Any repurchased shares will be held as treasury stock and will be available for general corporate purposes*.

"*We're undertaking this stock buy-back program with high confidence in our current operational performance," Meade said. "Our fundamentals are strong, and our capital position affords us the opportunity to repurchase stock at an attractive market price. We see this as an excellent investment opportunity that's in the best interests of our shareholders*."

134.    On September 13, 2004, William Blair & Company issued a report on StarTek,

entitled "StarTek, Inc., A Fast Growing Leader in Business Process Outsourcing," which stated:

StarTek has strong management and a demonstrated ability to execute. Over the past four years, StarTek has posted impressive annual growth of more than 50% in business process management services (BPMS). During this time, management successfully transitioned to these higher-margin services because of its ability to meet or exceed client expectations where competition often failed. The company has industry-leading growth, margins, and returns.

The company has attractive growth opportunities in existing and new verticals. StarTek has multiple avenues for growth, including existing customers, new clients in existing industries, and new industries. The company has had recent success in landing new clients, with two major additions in the first half of 2004. *Management has characterized the current new business pipeline as strong, and we expect several new client additions in the near future*.

*       *       *

- 74 -

Successful transition to higher-margin services. A good illustration of the strength of StarTek's management is the successful repositioning away from low-margin supply chain management (SCM) services with a highly concentrated customer base to higher-margin business process management services (BPMS) with a more diverse set of clients. Specifically, in 2000 about 70% of the company's revenue was derived from Microsoft, while today nearly 80% of revenue is derived from three BPMS clients, with Microsoft accounting for less than 10% of revenue.

The company's success in transitioning to higher-margin BPMS has been driven by its ability to execute better than competition and focus on higher-value-added services that are more challenging to complete. The complexity of these services creates more opportunities to excel versus competition through better management and execution, which ultimately results in higher margins. We believe StarTek experiences lower turnover and employment costs than many competitors as a result of the company's ability to select facility locations that are hungry for jobs, have plentiful skilled labor, and are willing to provide incentives to the company for locating in certain areas. *The company is able to open facilities quickly with a typical ramp-up of 90 days and an aggressive timeline of 60 days. Once up to speed, the company employs proprietary scheduling systems at its centers, which matches call demand with supply by scheduling reps in 15-minute intervals*.

\* \* \*

*Strong new business pipeline. This record of success provides a favorable backdrop for growth in the future, in our opinion, and recent progress has been encouraging. Specifically, the company started working with two new clients (TXU Corp. and Qwest) in the second quarter, which have the potential to be significant, perhaps on a scale similar to ATTW or T-Mobile. These two new clients likely provide the necessary visibility to maintain revenue growth in excess of 10% over the next several years. Higher growth is possible, in our opinion, as management has characterized its current pipeline as the healthiest it has ever been. If the company is able to land several meaningful new clients in the second half of 2004, we believe growth could reach the 15%-plus range in 2005*.

\* \* \*

We believe management has an effective process for setting goals, delegating responsibility, and implementing strategy. Specifically, the company works off a three-year strategic plan that incorporates five main objectives: growth, operations, technology, people, and offshore opportunities. The strategic plan is implemented through weekly meetings among the CEO, CFO, and COO; weekly revenue reviews; biweekly reviews of customer and other issues; monthly conference calls with the contact centers; and quarterly face-to-face meetings with front-line supervisors. We believe management's methodical approach to planning and implementing strategy

enables the company to be a nimble competitor that can quickly adapt to the changing demands of the industry.

135.    On October 25, 2004, SunTrust Robinson Humphrey issued a report on StarTek which stated:

> We see three potential near-term catalysts for SRT:
>
> (1)    We view the recent sale of SRT Europe as a positive and expect $0.08/share in annualized costs savings to offset the estimated $2mm loss in annualized revenue.
>
> (2)    SRT has a number of new client programs (Qwest, TXU, and two other large telecom/utilities clients) ramping. Management indicated on the 2Q04 call that the company's new business pipeline is the strongest it's ever been. In addition, the ramping of SRT's Philippines call center is targeted to be completed by the end of 2004.
>
> (3)    We believe SRT is well-positioned to win increased business from AWE/Cingular as a result of their merger based on SRT's current positive relationship with AWE, Cingular's intention to reduce costs, and volume incentives implied by the tiered pricing model.

136.    On November 4, 2004, subsequent to the release of its quarterly results, StarTek held a conference call for analysts, money and portfolio managers, institutional investors and large StarTek shareholders.  During the call, defendant Meade stated:

> *Now also the ramp of our two newest clients continues to go very well and we are also pleased in our contribution toward our over all growth now and moving forward.*
>
> . . . *We really only ramp a site[,] you know[,] [when] we're fairly and very solidly optimistic about the demand to fill it*. . . .
>
> . . . *Now we could have made staff reductions[,] but because of our optimism and confidence in both the near term and the mid term in really our visibility in the solid demand for incremental seats during the late third quarter and also moving into the fourth quarter[,] we made a conscious decision to retain staff*. . . .
>
> So our assessment was not to make cuts [or] to saw to the bone in our operations because while it might be an effective short term decision[,] we believe

that it was not the right thing to do really looking at both the growth we see in the near term and the long term. . . .  Now we also see the ramp of addition[al] capacity and seat [sic] continuing as we move through Q4 which is evidence we believe that our operational excellence model is working and we're being rewarded with incremental volume and we believe we are also continuing to gain share of market.

\* \* \*

*Now we continue to believe and see that the pipeline is the strongest its been since I've been CEO[,] which is 3 plus years[,] and we feel good about the incremental revenue that will be coming from new signings as we go forward and[,] to be a little more specific about some of the opportunities we see relative to our pipeline right now, we are 1 of 3 finalists in a service bid with a health care company which would be a new vertical for us. . . .  So based upon the health of our pipeline we could envision our new site planning process and having perhaps to bring on another 2-3 additional sites in 2005*. . . .

. . . Coming back to the gross profit margin, it was down 5.1 percentage points year over year from the 26.5% to 21.4[,] but again this is really driven by three factors during the quarter.  As we previously disclosed, we have an incentive tiered price reduction with our largest client and the good news in that though is that's working exactly the way we hoped it would.  It is generating incremental volume for us while we had had a lower price.

\* \* \*

*Due to strong client demand[,] we are ramping a new site and we may yet need another site in early '05.  The growth combined with the training revenue in our tiered pricing volume model confirms our views that we move into 2005 with very strong momentum*. . . .

\* \* \*

*As I stated earlier in the call, we've got a healthy promising pipeline of diverse prospects as we move into 2005*.

137.    On November 5, 2004, William Blair & Company issued a report on StarTek, entitled

"Results Weak Due to Pricing, Retraining, Facility Ramp-up," which stated:

Summary

*StarTek reported third-quarter results this morning. Revenue came in slightly ahead of our expectations but EPS of $0.34 fell well short of our estimate of $0.43 and the consensus of $0.45. The big surprise in the quarter was a*

- 77 -

*significant drop in gross margins, which was driven by a larger than expected price decline at AT&T Wireless and one-time expenses for retraining employees and facility startup costs. We likely saw the full impact of the company's renegotiated contract with AT&T Wireless in the second quarter (previously estimated at 5%), which appears to be higher than we expected – perhaps as high as 10% – due to an outright cut in price and a tiered pricing structure that likely drove a significant boost in volume but at lower margins*.

While we were encouraged by the strong top-line growth in the quarter, it is coming mostly from AT&T Wireless at the cost of margin. The company's other large clients are not experiencing as robust growth, while recently added clients don't appear to have the potential to become as large as we once thought as quickly as we had hoped. The company is experiencing a strong new business pipeline, but much of this is anecdotal at this point, and a potential revenue impact is too early to predict. However, revenue growth should continue to be stable (we are forecasting growth of 10% next year) and the company expects to add two to three new centers next year based on expected demand from existing and new clients.

Given our lower growth outlook and the larger than expected decline in pricing at AT&T Wireless, we are revising our estimates. We are lowering our fourth-quarter EPS estimate to $0.48 from $0.57 and decreasing our 2005 estimate to $1.98 from $2.26. We believe shares are somewhat attractive at current levels, as they are trading at 14 times our revised 2005 EPS estimate, which is in line with comparable companies. We believe shares should trade at a slight premium to comps, and we recommend opportunistic purchase.

Financial Results

EPS of $0.34 declined from $0.40 last year and came in well below our estimate of $0.43 and the consensus of $0.45. Revenue increased 11% to $67 million from $60 million last year and exceeded our estimate by 1.3%. Gross margins of 21.4% declined 450 basis points from 25.9% last year and fell short of our estimate of 26.1%. *The drop in margins was due to pricing declines at AT&T Wireless, one-time expenses for the retraining of employees that were shifted to another client, costs associated with the startup of a new facility, and an unfavorable currency impact. We estimate that the one-time items in the quarter accounted for over 60% of the margin decline while the remaining drop was due to the AT&T Wireless pricing, which will be ongoing*.

*While the significant decline in margins this quarter was discouraging, we expect margins to rebound somewhat next quarter*. . . .

. . . *The outlook for continued volume growth at AWS is positive, as management expects the client to reach the next volume tier in December.  The*

*company expects to build two to three new facilities next year, with a portion of this added capacity expected to be utilized for AWS*.

\*　　\*　　\*

Management seems committed to returning cash to shareholders, as the dividend was increased one cent to $0.41 and a new share repurchase program of $25 million was announced.  We view these moves as a potentially positive sign that management believes the shortfall this quarter was temporary and that result should improve going forward.

138.　On November 5, 2004, SunTrust Robinson Humphrey issued a report on StarTek, entitled "SRT: 3Q04 Comments and Forward Outlook," which stated:

- 3Q Shortfall – On a normalized basis, SRT's 3Q EPS were $0.32 vs. $0.43 (-26% y/y), $0.14 below our $0.46 estimate, excluding a $0.12 loss from StarTek Europe discontinuing ops and a $0.02 one-time tax benefit from the StarTek Europe sale.  GAAP EPS (including these items) were $0.22 vs. $0.40.  The EPS shortfall reflected negative gross margin leverage related to a significant expansion of SRT's Cingular contract – including a volume-driven tiered price reduction (50% of impact), employee training and ramp-up of an additional facility, and a 60-day headcount redeployment delay – in addition to $1mm in negative Canadian Fx.  Despite the substantial gross margin shortfall (21.4% vs. 26.4% and our 27% estimate), we note that gross profit declined just $1.2mm y/y to $14.3mm.

- 4Q Outlook – We expect a y/y EPS decline to reflect residual gross margin impact from employee training & tiered pricing, difficult y/y comps over a spike in wireless portability and reduced SCM revenue, and negative Fx impact.

139.　On November 8, 2004, Thomas Weisel Partners LLC issued a report on StarTek entitled "SRT: New Contract Drives Down Q3 Margin and EPS; Lowering 2005 Ests," which stated:

Technology Services-StarTek, Inc.-Peer Perform

\*　　\*　　\*

\*  Q3 revenue inline, but significant EPS miss because of revised AWS contract and investments in new facilities.  Thursday before the open, SRT reported 3Q04 revenue of $66.8mn, in line with TWP estimates of $66.0mn (consensus $66.2mn), and EPS of $0.34, which was significantly below our estimate of $0.44 and consensus ($0.45).  The company does not provide forward financial guidance,

- 79 -

which obviously increases the potential for divergence between reported results and consensus. Gross margins declined 450bp q-q to 21.4% due to the previously announced, newly negotiated tiered pricing agreement with AT&T Wireless (41% of revs); investments in a new facility and retraining costs; and foreign exchange losses, which represented 35%, 50% and 15% of the gross margin decline, respectively.

\*       \*       \*

3Q04 Margins were 21.4% vs. 25.9% in 2Q04. 3Q04 gross margins were impacted by the AT&T Wireless tiered pricing contract renewal, a new facility build-out in Collinsville, VA, foreign exchange losses, lower productivity due to employee transitioning and an unexpected rise in Supply Chain Management revenues. AT&T Wireless is in the process of being integrated into Cingular, which approved the extension of its contract with SRT through 12/31/06. According to StarTek management, Cingular currently does not outsource its call centers and its call center employees are unionized. The AT&T wireless agreement signed in June has been successful in driving volume (no volume guarantee) and the new Collinsville facility, which will fully ramp by mid-December and add 500-700 seats, will service incremental business from Cingular in accordance with the same tiered pricing terms as the AT&T Wireless contract. During the quarter, the company experienced ~$1mn of unfavorable variance due to the 5.2% y-y increase in the Canadian dollar. Approximately 50% of SRT's capacity is based in Canada. Recently the company began to hedge a portion of its exposure, which was obviously ineffective in the quarter. 3Q04 margins were also impacted by productivity declines of 18-20% vs. 1H04 as management decided to retrain and redeploy under-utilized staff to new contract volume (AWS/Cingular). In addition, the lower margin Supply Chain Management business, while down 28% y-y, actually rose 11% sequentially.

We anticipate gross margins to recover in 4Q04 and CY05. We anticipate margins improving from the 3Q04 level in 4Q04 and 2005 as the ramp of new volume with Cingular is completed (retraining and facility costs) and as new contracts such as Qwest and TXU increase volumes.

140.    On November 15, 2004, SunTrust Robinson Humphrey issued a report on StarTek,

entitled "SRT: Company Update; Adjusting Estimates," which stated:

- Cingular: We see Cingular, currently at 41% of revenue, as more of an opportunity than a risk for '05. First, we expect pricing to have stabilized by the end of 1Q05, coinciding with the ramp-up of 800 new seats for 2 new AWE projects. In addition, we believe SRT is well positioned to win incremental share as Cingular's CWA union agreement comes up for renegotiation in mid-2005.

- 80 -

\*          \*          \*

- • Reiterating Buy:  We reiterate our Buy rating and $40 price target on SRT based on the company's ability to deliver strong, internally funded, organic 20%-plus EPS growth while simultaneously offering an attractive free cash flow and 6% dividend yield.  At 14.7x '05E EPS of $1.97, SRT is currently trading 16% below its teleservices peer group, trading at 17.4x, and below its 17x 3-year mean on a 12-month rolling forward basis.

\*          \*          \*

Potential Growth Opportunities for 2005

In 2005, we believe SRT will focus on (a) focusing on smaller deals, (b) diluting its telecom vertical concentration and concentration of major clients, and (c) extending its service offerings.  SRT has a $75mm pipeline of new business with over 50% visibility, and is a finalist in three RPF's (McKesson, a healthcare company, and a telecom company) that we expect to be decided by the end of this year.

\*          \*          \*

Cingular an Opportunity for '05

We see Cingular/AWE, currently at 41% of revenue, as more of an opportunity that a risk for '05 based on stabilizing pricing, positive operating leverage, and potential incremental business wins. We expect SRT to hit one more price reduction in late November (impacting 1 month in 4Q04), after which we expect pricing to stabilize for the near term – enabling margins to return to 2Q04 levels.  In our opinion, the Cingular contract is not likely to hit an additional price reduction tier until Cingular awards an additional large (i.e., 800-seat) project to SRT.  SRT is currently ramping 800 new scats for Cingular – 500 seats in SRT's new Collinsville, VA facility, and another 300 seats in Canada.  The ramp up of this these [sic] should be complete by the end of 1Q05, and, after that, we should begin to see significant positive leverage as incremental volumes translate into higher revenue and margins – especially as Cingular transitions through the merger and beefs up its customer retention and marketing efforts.  In addition, we note that Cingular's CWA union agreement comes up for renegotiation in mid-'05. While the fate of Cingular's in-house unionized call centers remains uncertain, we believe SRT is well-positioned to win new projects as Cingular looks to improve customer retention and win share from Verizon while simultaneously trying to cut costs.

141.     Defendants' statements issued during 2004 were false or misleading because:

- 81 -

(a)     Defendants knew there was insufficient existing and forecasted demand to efficiently utilize StarTek's capacity which was significantly increased by the opening of new facilities during the Class Period because StarTek's customers were *contractually obligated to provide* a twelve month, rolling call volume forecast, and a monthly daily call volume forecast;

(b)     The severe problems the Company experienced in 2000-2001 were not fixed and behind the Company and the management transition and restructuring plan was still not implemented during the Class Period, and indeed, there was significant turnover in the leadership of the BPM sales organization throughout the Class Period. *See*, *e.g.*, ¶¶74, 84, and 95-97;

(c)     Defendants failed to disclose that StarTek had hired a new SVP of Sales in October 2004 until March 3, 2005 during a conference call with analysts on fourth quarter 2004 and year-end 2004 results. *See*, *e.g.*, ¶¶84, 95;

(d)     StarTek's sales pipeline was not strong and healthy as detailed in the weekly sales pipeline reports discussed every Monday in the Garfield headquarters, and indeed, things were so bad that StarTek was forced to hire another new head of sales in October 2004, who completely revamped the sales force during the course of the fourth quarter, and during the course of January 2005. *See*, *e.g.*, ¶¶57-58;

(e)     Defendants lacked an ability to track and forecast sales throughout the Class Period in the pipeline. *See*, *e.g.*, ¶¶57-58;

(f)     Defendants failed to account for appropriate sales cycles, of as long as 18 to 24 months. *See*, *e.g.*, ¶56;

(g)     StarTek's SCM revenue pipeline was "dead" by October 2003 and the teleservices revenue side of the business (BPM) was on "life support." *See*, *e.g.*, ¶66;

- 82 -

(h)     Defendants failed to disclose that StarTek was forced to drastically reduce its pricing in return for the contract extension with ATT..  *See*, *e.g.*, ¶¶4, 6, 26, 38, 114;

(i)     Defendants failed to disclose that StarTek lost the SCM contract with Microsoft in early 2003.  *See*, *e.g.*, ¶¶66-68;

(j)     Defendants were informed in early November 2003 that Verizon cancelled a 400 seat call center order.  *See*, *e.g.*, ¶¶71, 72, 79;

(k)     StarTek failed to disclose that within six months of the TXU contract being signed in March 2004, TXU fired StarTek.  *See*, *e.g.*, ¶97;

(l)     During 2003, the BPM sales group had very minimal success in securing new contracts and from mid-to late 2001 through early 2004 there were only two to three new customer contracts with the rest of StarTek's call center revenues coming from existing customers.  *See*, *e.g.*, ¶75;

(m)     In late 2003 and early 2004, StarTek was in the process of closing three new call center services contracts with Qwest, TXU, and Cricket Communication (aka Leap Wireless).  *See*, *e.g.*, ¶73;

(n)     Before Christmas 2004, McKesson had withdrawn its RFP for a call center and notified StarTek that it had decided not to outsource to call centers.  *See*, *e.g.*, ¶¶80, 83;

(o)     CFO McKenzie altered the 2Q04 financial results by directing an accounting manager to change the numbers by pulling funds out of a particular account, allowing StarTek to report that it met revenue and earnings projections for 2Q04.  *See*, *e.g.*, ¶86; and

(p)     By June 2004 StarTek had lost $11 million in business from T-Mobile and would be unable to meet 3Q04 or 4Q04 projections.  *See*, *e.g.*, ¶86.

142.    On January 6, 2005, StarTek issued a press release, entitled "StarTek Adds Seasoned

Strength to Executive Team," which stated:

> StarTek, Inc. announced two major additions to its executive team today with the appointments of Steve Butler in the position of Chief Financial Officer, and Steve Boyer as the company's Chief Information Officer. StarTek also announced company board member Ed Zschau's appointment as Vice Chairman of the Board.

143.    On January 6, 2005, SunTrust Robinson Humphrey issued a report on StarTek,

entitled "SRT: Fundamentals Unchanged Despite Recent Stock Weakness," which stated:

> - Stock Weakness: Management last night confirmed that there was [sic] no new occurrences announced either by the company or from client-related actions.  SRT was down 11% in the past three days on no news, declining 7% yesterday on twice normal volume.
>
> - Potential Concerns: We think the stock weakness may primarily reflect three investor concerns: (1) that 4Q will be weaker than expected; (2) that SRT was not able to secure the 3 RFPs in the 4Q pipeline; and/or (3) that SRT will not be able to offset a potential decline in AWE revenue and meet '05 Street estimates & dividend payments.

144.    On January 13, 2005, SunTrust Robinson Humphrey issued a report, entitled "SRT:

Thoughts Following Meeting with Management," which stated:

> - ***New Pipeline: The new client pipeline heading into '05 looks encouraging***. We believe new opportunities exist for SRT, particularly in customer service for wireless branding by entertainment companies (e.g., Virgin, Disney), cable/broadband, and VOIP.  We believe ramp-up of Philippines capacity to support new pipeline will help boost margins.

145.    On February 4, 2005, StarTek issued a press release, entitled "StarTek Increases

Quarterly Dividend to $0.42 Per Share," which stated:

> The StarTek, Inc. Board of Directors is pleased to declare an increase in its quarterly cash dividend to $0.42 per share, payable February 24, 2005, to StarTek shareholders of record on February 11, 2005.  This marks the sixth consecutive quarterly dividend increase.  The dividend for the 4th quarter of 2004 was $0.41, which was increased from the 3rd quarter dividend of $0.40.

146.    On February 18, 2005, StarTek issued a press release, entitled "StarTek, Inc.

Announces Management Change," which stated:

> StarTek, Inc. reported today that William E. Meade, Jr. has resigned as President and
> Chief Executive Officer of the company. Mr. Meade and the company's board of
> directors mutually agreed that a change in leadership is in the best interests of
> StarTek's stockholders, and Mr. Meade has tendered his resignation to the board to
> pursue other interests. Mr. Meade also resigned from his position as a director on the
> company's board.
>
>     The board of directors has appointed Steven D. Butler, StarTek's Executive
> Vice President, Chief Financial Officer, Secretary and Treasurer, as President and
> Chief Executive Officer on an interim basis. The board has also formed a special
> committee of its independent directors, chaired by Albert C. Yates, to initiate a
> search for a permanent Chief Executive Officer.

147.    On February 22, 2005, *Rocky Mountain News* ran an article, entitled "StarTek

Abruptly Ousts CEO; Drop in Stock Price, Poor Financial Results Preceded Resignation," which

stated:

>     William Meade has been unexpectedly ousted as chief executive of StarTek
> Inc.
>
> *      *      *
>
>     In a statement, StarTek said Meade and the board "mutually agreed that a
> change in leadership is in the best interests of StarTek's stockholders."

148.    On February 22, 2005, William Blair & Company, issued a report on StarTek,

entitled "Lowering Estimate Amid Uncertainty," which stated:

> •    Late Friday, StarTek announced the resignation of its CEO, Bill Meade.  This
>      news came as a surprise and leads us to believe that other issues could be on
>      the horizon.

149.    On March 3, 2005, StarTek issued a press release, entitled "StarTek Inc. Reports 2004

Earnings," which stated:

> StarTek Inc. reported that gross profit increased 5% on a revenue increase of 15% to
> $258 million for the year ended December 31, 2004 compared with $225 million for

the year ended December 31, 2003. Fully diluted earnings per share from continuing operations decreased to $1.59 from $1.60 for the same periods. Fully diluted earnings per share including discontinued operations decreased 7% for 2004 to $1.42 compared to $1.52 for 2003. Discontinued operations consisted of our operations in the United Kingdom which, as previously reported, were sold on September 30, 2004.

Business process management revenues increased 34% in 2004, while supply chain management revenues declined 40% versus the previous year. Business process management revenue now comprises 86% of total revenue compared to 73% for the previous year. The StarTek Advantage System, our operational excellence model, continues to produce excellent customer satisfaction which generates growing demand for our business process management services platform.

Selling, general and administrative expenses increased by 8% for the year ended December 31, 2004 compared to the prior year. The increase is attributable to the launch and staffing of three new call centers and expenses associated with the Sarbanes-Oxley Act of 2002. As a result of the new call centers and related infrastructure, depreciation expense increased $2.5 million over the prior year or by $0.17 per share.

For the quarter ended December 31, 2004, revenue was essentially flat at $64.8 million, and fully diluted earnings per share from continuing operations decreased 46% to $0.30 compared to $0.56 for the fourth quarter of 2003. Fully diluted earnings per share including discontinued operations decreased by 44% to $0.30, compared to $0.54 for the same period in 2003. ***The gross margin decline of 9.7% points from 29.7% to 20.0%, was largely the result of greater costs from the launching of new call center capacity to handle anticipated volume growth that materialized at lower levels than our clients forecasted, continuing decreases in revenue and margins in our supply chain management platform, and increased volume billed at lower agent rates due to our tiered incentive pricing model***.

Selling, general and administrative expenses decreased by 7% for the fourth quarter of 2004 compared with 2003. This reduction would have been greater but for the offset of substantially increased costs attributable to the Sarbanes-Oxley Act of 2002.

"The last two quarters have not met our expectations. Although our business process management revenue has continued to grow over the past year, our focus in 2005 will be to improve our margins and to build new sources of revenue" said Steve Butler, Chief Financial Officer and Acting Chief Executive Officer of StarTek.

150.   On March 3, 2005, SunTrust Robinson Humphrey issued a report on StarTek, entitled

"SRT: Fourth Quarter Results," which stated:

- StarTek reported fourth quarter results.  The company is instituting a restructuring/realignment plan that could be in place by the end of the first quarter.  In addition to right-sizing the company to match current revenues, which should improve margins in the near term, StarTek is aiming to increase revenue by selling a greater suite of services across its existing client base.

- *During the fourth quarter, the company added services for the MVNO (mobile virtual network operator) market, however company-wide new client contract wins were below our expectations as favorable pricing on those contracts was unachievable.  In addition, with the company's largest client, Cingular, StarTek's tiered incentive pricing structure failed to increase profitability as volume grew*.

151.    On March 3, 2005, subsequent to the release of its quarterly results, StarTek held a conference call for analysts, money and portfolio managers, institutional investors and large StarTek shareholders.  During the call, the following transpired:

Steven Butler [the Company's new CFO]:  *We launched three new call centers in anticipation of a lot greater volume, with a couple of the clients that we signed last year.  That didn't materialize last year*, it could materialize this year in a lot greater way.  When you look at those things and you start to monitor your margins more carefully, that's what we're going to do.  We have to start to take some corrective action.  That's where we're at.

Troy Mastin [William Blair & Co. analyst]:  This is the #1 surprise is less volume than anticipated?

Steven Butler:  The delivery of that volume, yes.  Yeah, our largest client, obviously, delivered greater volume.  The tiered pricing structure affected us there to some extent.  A couple of other clients didn't deliver the volume we anticipated, having excess capacity for anticipated volume that wasn't there.  So we're starting to realign the capacity with the volume.

\*       \*       \*

Troy Mastin:  Okay.  *And then on the new business pipeline, there has been a lot of discussion over the last 6-9 months that it was healthy.  It's characterized as the strongest ever.  You didn't mention any new clients on the call, can you give us an update on any landed in the quarter, and what the pipeline looks [like] today in your assessment*?

- 87 -

Steven Butler:  . . . *We hired a new head of sales in October, who completely revamped the sales force during the course of the fourth quarter, and during the course of January*.  I cannot announce any clients today.

\*       \*       \*

Arnold Ursaner [CJS Securities analyst]:  I'll try to ask this question politely. Your stock is down 50 percent from where you did a public offering for a selling shareholder.   The idea that you'll make no comments whatsoever about the upcoming year, I speak on behalf of a lot of people that own your stock, they're not real pleased with that.  Your margins are down 35 percent.  Your revenues are pretty disappointing.  Your SG&A expenses are declining for one-time items like audits. The idea that you're giving no guidance at all, is pretty upsetting to your shareholders.  Can you give us some of the components of the earnings?

Steven Butler:  What I said at this point in time, we're not going to give any guidance.

152.    On May 6, 2005, before the markets opened, StarTek issued a press release, entitled

"StarTek Inc. Reports First Quarter Earnings," which stated:

StarTek Inc. reported fully diluted earnings per share from continuing operations decreased for the first quarter ended March 31, 2005, to $0.18 compared to $0.49 for the first quarter of 2004. . . .

For the first quarter of 2005, revenue declined 14.2% to $54.3 million from $63.3 million for the same period in 2004, which was primarily driven by a decline in our supply chain management services and partially due to our tiered incentive pricing model in our business process management services.  Gross margin declined in the first quarter to 21.6% from 28.6% for the same period in 2004.  This decline was attributed to a greater portion of client volume billed at lower rates, excess call center capacity, continuing decreases in revenue and margins in our supply chain management platform, and unfavorable foreign exchange.

Selling, general and administrative expenses increased by 14% for the first quarter of 2005 compared to the same period last year.  The increase is primarily due to costs associated with reductions in staff, recurring fixed costs of three new all centers opened in 2004, expenses related to investments in information technology infrastructure and costs associated with Sarbanes-Oxley Act of 2002.

In addition, the Board of Directors declared a quarterly dividend of $0.36 per share, payable on May 24, 2005, to our stockholders of record as of May 11, 2005. The reduced dividend is an initial step by management to strategically pursue growth opportunities in market and service diversification.

153.    Also on May 6, 2005, subsequent to the release of its quarterly results, StarTek held a

conference call for analysts, money and portfolio managers, institutional investors and large  StarTek

shareholders.  During the call, the following transpired:

[Steven Butler, the Company's CFO and Acting CEO]:  In looking at gross profit, our total gross profit for the first quarter of '05 compared to the first quarter of '04 fell 35% or $6.4 million to 11.7 million.  The change in foreign currency rates from the first quarter of '04 to the first quarter of '05 accounted for $1.3 million of this change.  In addition, our tiered pricing incentives and reduced supply chain volume accounted for approximately $4 million of this change.

Total gross margin for the first quarter of '05 to the first quarter of '04 fell 7% to 21.6%.  We attribute this decline to a greater portion of client volume billed at lower rates, some excess call center capacity, continuing decreases in revenue and margins at our supply chain management platform and an unfavorable foreign exchange shift from the first quarter of '04 to the first quarter of '05.

On the selling, general and administrative expense side for the first quarter of '05 compared to the first quarter of '04 these (indiscernible) was 14% or $1 million to 7.9 million.  The increase was primarily due to costs associated with reductions in staff, recurring fixed costs for the three new call centers we opened in 2004, expenses related to investments in information technology infrastructure and costs associated with Sarbanes-Oxley.

*          *          *

The sales team that's in place today is still fairly new.  Most of them came on board November, December, January time frame.  So we're obviously going to give them a shot.  And we have started to see increases in volume and we're picking up some new programs with some of our clients.  The excess capacity is throughout.

*          *          *

Rick D'Auteuil [Columbia Management Analyst]:  Just a comment. I looked back at my notes from the last conference call and I wrote down, and this was on March 3rd, that the Board supports a dividend policy and there's no plans to change it.  I may not have taken that down verbatim in my notes, but it seems to me if you guys want to start building credibility you can't give a message like that and then within 30 or 60 days do something contrary.

Steve Butler . . .:  No, but the dividend policy has always been one that you continuously evaluate it based on where your earnings and everything else are.  If everything went to hell in a hand basket would you say that the policy would be that

- 89 -

we would continue to pay a dividend at a current rate?  The policy is to evaluate where the Company is every quarter and within the context of what its strategy is going forward.  And I think we've always been very clear on trying to articulate the strategy of the Company as much as possible on any of these calls.

Rick D'Auteuil . . .:  And just a second comment.  Remember that was on March 3rd those comments were made.  And I don't know if maybe you would interpret things having gone to hell in a hand basket since March 3rd.  It doesn't feel like we're still sliding at the pace we were sliding anyway.

Steve Butler . . .:  The Board and the management seem still believe in the dividend.  It's just looking at what might be the future best way to look at possible growth for the Company and with the cash position we were in we felt that the dividend was very supportable.

154.    On this news, StarTek's stock fell from a closing price on May 5, 2005 of $15.20 to

as low as $12.15 on May 6, 2005, before closing at $12.40 per share.

155.    On May 9, 2005, Thomas Weisel Partners LLC issued a report on StarTek entitled

"Lowering Estimates on Slowing Revenue Growth and Margin Compress," which stated:

*        1Q EPS miss combination of revenue decline, margin compression and currency.  Friday before the open, SRT reported 1Q05 revenue of $54.3mn (down 14% y/y and 16% and 18% below our and consensus estimates of $64.6mn and $66.5mn, respectively) and EPS of $0.18 (versus our $0.27 estimate and $0.29 consensus).  The company does not provide guidance; therefore, reported results can vary significantly from estimates.  The revenue decline was attributed to new tiered pricing milestones reached with the company's largest customer (55% of revenue) and a sharp reduction in the supply chain management business ($1mn versus $6.8mn in 4Q04), both of which had been anticipated to some extent.  Revenue was also affected by the delay of anticipated new business with established customers.  The operating margin fell 270bp q/q, largely driven by the revenue issues mentioned above as well as excess capacity at three new call centers opened in 2004, $1.3mn of currency impact and a $0.7mn charge for headcount reduction, which is expected to yield $6mn in annualized cost savings.

*        Dividend reduced to $0.36 from $0.42.  As expected, SRT lowered its dividend to $0.36 from $0.42.  Our expectations were based on concerns that the dividend was not being covered by FCF [Free Cash Flow].  Management indicated that it had decided use cash to invest in growth and diversification opportunities, which would likely involve an acquisition.

\*      Reducing 2005 EPS estimates.  We are lowering our 2005 revenue estimate from \$270mn to \$243 and our EPS estimate from \$1.25 to a base case of \$1.16. Management said that the pipeline was strong, but that sales cycles were lengthening. No new clients were signed during 1Q05 and new projects that had been anticipated with established clients were delayed.  Key assumptions underlying our estimate are a 6% revenue decline (5% growth in the core call center business) and operating margins that decline to 10% from 13.0% last year.

156.    Defendants' statements issued during 2005 were false or misleading because:

(a)      Defendants knew there was insufficient existing and forecasted demand to efficiently utilize StarTek's capacity which was significantly increased by the opening of new facilities during the Class Period because StarTek's customers were  *contractually obligated to provide* a twelve month, rolling call volume forecast, and a monthly daily call volume forecast;

(b)      The severe problems the Company experienced in 2000-2001 were not fixed and behind the Company and the management transition and restructuring plan was still not implemented during the Class Period, and indeed, there was significant turnover in the leadership of the BPM sales organization throughout the Class Period.  *See*, *e.g.*, ¶¶74, 84, and 95-97;

(c)      Defendants failed to disclose that StarTek had hired a new SVP of Sales in October 2004 until March 3, 2005 during a conference call with analysts on fourth quarter 2004 and year-end 2004 results.  *See*, *e.g.*, ¶¶84, 95;

(d)      StarTek's sales pipeline was not strong and healthy as detailed in the weekly sales pipeline reports discussed every Monday in the Garfield headquarters, and indeed, things were so bad that StarTek was forced to hire another new head of sales in October 2004, who completely revamped the sales force during the course of the fourth quarter, and during the course of January 2005.  *See*, *e.g.*, ¶¶57-58;

(e)　　Defendants lacked an ability to track and forecast sales throughout the Class Period in the pipeline.  *See*, *e.g.*, ¶¶57-58;

(f)　　Defendants failed to account for appropriate sales cycles, of as long as 18 to 24 months.  *See*, *e.g.*, ¶56;

(g)　　StarTek's SCM revenue pipeline was "dead" by October 2003 and the teleservices revenue side of the business (BPM) was on "life support."  *See*, *e.g.*, ¶66;

(h)　　Defendants failed to disclose that StarTek was forced to drastically reduce its pricing in return for the contract extension with ATT..  *See*, *e.g.*, ¶¶4, 6, 26, 38, 114;

(i)　　Defendants failed to disclose that StarTek lost the SCM contract with Microsoft in early 2003.  *See*, *e.g.*, ¶¶66-68;

(j)　　Defendants were informed in early November 2003 that Verizon cancelled a 400 seat call center order.  *See*, *e.g.*, ¶¶71, 72, 79;

(k)　　StarTek failed to disclose that within six months of the TXU contract being signed in March 2004, TXU fired StarTek.  *See*, *e.g.*, ¶97;

(l)　　During 2003, the BPM sales group had very minimal success in securing new contracts and from mid-to late 2001 through early 2004 there were only two to three new customer contracts with the rest of StarTek's call center revenues coming from existing customers.  *See*, *e.g.*, ¶75;

(m)　　In late 2003 and early 2004, StarTek was in the process of closing three new call center services contracts with Qwest, TXU, and Cricket Communication (aka Leap Wireless).  *See*, *e.g.*, ¶73;

(n)     Before Christmas 2004, McKesson had withdrawn its RFP for a call center and notified StarTek that it had decided not to outsource to call centers.  *See*, *e.g.*, ¶¶80, 83;

(o)     CFO McKenzie altered the 2Q04 financial results by directing an accounting manager to change the numbers by pulling funds out of a particular account, allowing StarTek to report that it met revenue and earnings projections for 2Q04.  *See*, *e.g.*, ¶86; and

(p)     By June 2004 StarTek had lost $11 million in business from T-Mobile and would be unable to meet 3Q04 or 4Q04 projections.  *See*, *e.g.*, ¶86.

## LOSS CAUSATION/ECONOMIC LOSS

157.     During the Class Period, defendants artificially inflated StarTek's stock price by issuing false or misleading statements.  These false statements and omissions inflated StarTek's stock price to a Class Period high of over $40.  Later, however, when the truth began to leak into the market, StarTek's stock fell precipitously as the prior artificial inflation came out of StarTek's stock price, eventually falling to below $12 per share after the end of the Class Period.  As a result of their purchases of inflated StarTek stock during the Class Period and the subsequent removal of that inflation as the truth about the state of StarTek's business entered the market, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

158.     By issuing false or misleading statements, the defendants presented a misleading picture of StarTek's business and prospects. These statements caused and maintained the artificial inflation in StarTek's stock price throughout the Class Period and until the truth was revealed to the market. Defendants' false and misleading statements had their intended effect and caused StarTek stock to trade at artificially inflated levels throughout the Class Period.

159.     In early January 2005, StarTek's stock declined 11% from $28.45 to $25.25 per share as the truth began to leak into the market that StarTek's fourth quarter would be weak and that the Company's sales pipeline was not as strong as investors were led to believe.  As a result, some of the prior artificial inflation came out of StarTek's stock price, damaging investors.

160.     Then, on February 18, 2005, StarTek issued a press release entitled "StarTek, Inc. Announces Management Change," which stated that Meade had resigned as President and Chief Executive Officer of the Company.  The release disclosed that "Meade and the company's board of directors mutually agreed that a change in leadership is in the best interests of StarTek's stockholders, and Mr. Meade has tendered his resignation to the board to pursue other interests." Analysts were stunned and StarTek's stock dropped almost 24% from $25.75 to $19.60, removing more of the artificial inflation in the Company's stock.

161.     Investors' fears were confirmed on March 3, 2005, and more inflation was removed, when StarTek disclosed that "[f]ully diluted earnings per share including discontinued operations decreased by 44% to $0.30, compared to $0.54 for the same period in 2003.  The gross margin decline of 9.7% points from 29.7% to 20.0%, was largely the result of greater costs from the launching of new call center capacity to handle anticipated volume growth that materialized at lower levels than our clients forecasted, continuing decreases in revenue and margins in our supply chain management platform, and increased volume billed at lower agent rates due to our tiered incentive pricing model."  After this news, StarTek stock continued to fall from almost $18 on March 2, 2005 to $15.54 on April 8, 2005.  However, the stock continued to remain partially inflated.

162.     Finally, on May 6, 2005, StarTek announced that its first quarter 2005 "earnings per share from continuing operations decreased . . . to $0.18 compared to $0.49 for the first quarter of

2004." The Company also announced that its revenues declined 14.2% from the same period in 2004. The stock fell to $12.40 per share on this news.

163.    In sum, as the truth was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and plaintiffs and other members of the Class were damaged, suffering economic losses of up to $16.05 per share.

164.    The timing and magnitude of StarTek's stock price declines negate any inference that the loss suffered by plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. During the same period in which StarTek's stock price fell 56% from $28.45 in early January 2005, as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was essentially flat. The economic loss, *i.e.*, damages, suffered by plaintiffs and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate StarTek's stock price and the subsequent significant decline in the value of StarTek's stock when the truth was revealed to the market.

## FIRST CLAIM FOR RELIEF

### Against Defendants Meade, McKenzie, Stephenson and Morgan for Violation of §11 of the Securities Act

165.    Plaintiffs repeat and reallege ¶¶1-50, 54-164. Plaintiffs, for purposes of this claim, disclaim any allegations of fraud.

166.    This claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against defendants Meade, McKenzie, Stephenson and Morgan and is based upon defendants' negligence or theories of strict liability.

- 95 -

167.    The Registration Statement and Prospectus for the Public Offering was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed to adequately disclose material facts, as described above.

168.    The defendants named in this Claim each signed the Registration Statement.  None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, did not omit any material fact and were not misleading.

169.    Each of the defendants named in this claim issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, the market price of StarTek common stock was artificially inflated and plaintiffs and the Class suffered substantial damage in connection with their purchases of StarTek common stock when the stock declined.  By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

170.    At the times they purchased StarTek shares, plaintiffs and other members of the Class were without knowledge of the facts concerning the false or misleading statements or omissions alleged herein.  Less than one year has elapsed from the time that plaintiffs discovered, or reasonably could have discovered, the facts upon which this Complaint is based to the time that plaintiffs filed this Complaint.  Less than three years have elapsed from the time that the securities upon which this Claim is brought were sold to the public to the time of the filing of this action.

## SECOND CLAIM FOR RELIEF

### Against the Individual Defendants for Violations of §15 of the Securities Act

171.    Plaintiffs repeat and reallege ¶¶1-50, 54-170.  Plaintiffs, for purposes of this claim, disclaim any allegations of fraud.

172.    This Claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against the Individual Defendants.

173.    The Individual Defendants, by reason of their stock ownership or management position, and/or membership or representation on the Company's Board of Directors, were controlling persons of the Company and had the power and influence, and exercised the same, to cause StarTek to engage in the violations of law complained of herein.  These defendants are therefore liable under §15 of the Securities Act.

## THIRD CLAIM FOR RELIEF

### Against All Defendants for Violation of §10(b) of the Exchange Act and Rule 10b-5

174.    Plaintiffs incorporate by reference ¶¶1-173.

175.    Each of the Individual Defendants is liable for making false and misleading statements, or failing to disclose material adverse facts and acting directly or indirectly as a participant in a scheme and/or course of business which: (i) deceived the investing public regarding StarTek, its business, products and prospects; (ii) artificially inflated the price of StarTek common stock during the Class Period; (iii) caused Class members to purchase StarTek stock at inflated prices; and (iv) permitted defendants to sell shares of StarTek stock at inflated prices.

176.    The defendants' direct participation included the preparation and/or review of StarTek's false and/or misleading SEC filings, its Prospectus and/or misleading press releases, and

giving false information to securities analysts, money and portfolio managers and institutional investors in conference calls, on the Roadshow and in other presentations.

177.    As officers, directors and/or controlling persons of a publicly-held company and/or as sellers of StarTek stock, each of the Individual Defendants had a duty to disseminate accurate and truthful information promptly with regard to StarTek and to correct any previously issued statements that had become untrue, and to disclose any adverse trends known to them that would materially affect the operating results of StarTek, so that the market price of StarTek's stock would be based upon truthful and accurate information.  Notwithstanding their duty to refrain from selling StarTek stock while in the possession of material, adverse, non-public information concerning StarTek, defendants sold shares of the Company's stock,  thus personally profiting from their deliberate and dishonest acts.

178.    During the Class Period, the Individual Defendants knowingly participated in a fraudulent scheme and course of business that operated as a fraud and deceit upon purchasers of StarTek's common stock, which conduct included acts and practices which operated as a fraud and deceit upon plaintiffs and the other members of the Class, by making various untrue statements of material fact, or by making statements which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiffs and the other members of the Class.  Pursuant thereto, the Individual Defendants intentionally caused StarTek to make false and misleading statements of material fact and to omit to state material facts to their stockholders and the investing public.  These material misstatements and omissions are particularized herein.

179.     Despite their knowledge of StarTek's false and misleading statements, the Individual Defendants failed, throughout the Class Period, to disclose material adverse facts about the financial condition and business prospects of StarTek, which caused the Prospectus, press releases and other public statements issued during the Class Period to be materially false and misleading for the reasons particularized herein.  The Individual Defendants, directly and indirectly, knowingly engaged and participated in a fraudulent scheme and course of conduct to conceal adverse material information about the business, finances, financial condition and future business prospects of StarTek.

180.     As a result of the above described acts of the defendants, they have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made in light of the circumstances under which they were made not misleading; or (c) engaged in acts, practices and a course of business which operated as a fraud or deceit upon plaintiffs and the other members of the Class in connection with their purchases of StarTek stock.

181.     Plaintiffs and the other members of the Class, at the time of the misrepresentations and omissions, were ignorant of the falsity of these statements and believed them to be true.  In reliance upon the misrepresentations, the integrity of the market and the securities offering process, and the fidelity, integrity and superior knowledge of defendants, and in ignorance of the truth, plaintiffs and the other Class members were induced to and did purchase StarTek common stock. Had plaintiffs and the other members of the Class known the truth, they would not have bought their shares at the prices they paid.

## FOURTH CLAIM FOR RELIEF

### Against All Defendants for Violation of §20(a) of the Exchange Act

182.    Plaintiffs incorporate by reference ¶¶1-181.

183.    Defendants acted as controlling persons of StarTek within the meaning of §20(a) of the Exchange Act.  By reason of their positions as officers, directors or controlling shareholders of StarTek, defendants had the power and authority to cause StarTek to engage in the wrongful conduct complained of herein.  StarTek controlled each of its executive officers and all of its employees.

184.    By reason of such wrongful conduct, defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of StarTek common stock during the Class Period.

## CLASS ACTION ALLEGATIONS

185.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired StarTek common stock during the Class Period (the "Class").  Excluded from the Class are defendants.

186.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  StarTek had more than 14 million shares of stock outstanding, owned by hundreds of persons.

187.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the Securities Act and/or Exchange Act were violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    Whether the price of StarTek common stock was artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

188.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

189.    Plaintiffs will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

190.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to FRCP 23;

B.    Awarding plaintiffs and the members of the Class damages, including interest;

C.    Awarding plaintiffs' reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  March 24, 2006

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
EDWARD P. DIETRICH
DAVID A. THORPE


                    s/ EDWARD P. DIETRICH
                    EDWARD P. DIETRICH

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

KIP B. SHUMAN
DYER & SHUMAN, LLP
801 East 17th Avenue
Denver, CO  80218-1417
Telephone:  303/861-3003
303/830-6920 (fax)
E-mail: kshuman@dyershuman.com

Liaison Counsel

S:\CasesSD\Startek\cpt00029086-1.doc

- 102 -