# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM and PEMBROKE PINES PENSION FUND FOR FIREFIGHTERS AND POLICE OFFICERS, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br>     v.<br><br>HENRY SCHEIN, INC., COVETRUS, INC., STEVEN PALADINO, BENJAMIN SHAW, and CHRISTINE T. KOMOLA,<br><br>                Defendants. | Case No. 2:19-cv-5530 (GRB)(RLM)<br><br><u>CLASS ACTION</u> |

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................. 2

II.   PARTIES ........................................................................................................... 6

III.  JURISDICTION AND VENUE ...................................................................... 10

IV.  SUMMARY OF THE ACTION ...................................................................... 11

     A.     Company Background ............................................................................ 11

     B.     Defendants Recognized The HSAH Supply Chain Business, And The Integration Of Software And Sales Teams, As Concrete Lynchpins Of Covetrus's Success ...................................................... 13

     C.     During The Class Period, Defendants Claimed The HSAH Supply Chain Business Was Successful, And The Integration Of Software And Sales Teams Had Been Achieved, Driving Strong Sales And Financial Results .......................................................................... 15

     D.     Covetrus's New CEO Has Admitted That Defendants' Class Period Statements Promoting Achieved Integration Were False When Made ............................................................................................. 19

     E.     Numerous Former Covetrus Employees Confirmed That, Unbeknownst To Investors, Covetrus's Supply Chain Infrastructure Was Antiquated And Deeply Fragmented, The Company Was Not Integrated, And The Company's Performance Suffered As A Result .................................................................................. 21

          1.     Covetrus's Supply Chain Infrastructure And Software Platforms Were Antiquated and Fragmented ............................. 22

          2.     After the Merger: "We Were Working On A Veneer" ............. 27

          3.     Covetrus's Deficient Infrastructure, Systemic Fragmentation, And Lacking Integration Caused Immediate Sales Declines ........................... 35

     F.     Covetrus Reports Poor Results For Its First Quarter As A Public Company, But Defendants Continue To Conceal Covetrus's Problems ................................................................................ 44

     G.     The Truth Emerges: Covetrus Reports Disastrous Results For Its Second Quarter, The Stock Price Plummets, Analysts Question Defendants' Credibility, And Covetrus Fires Defendants Shaw And Komola While Pledging To "Rebuild Trust With Investors" .............................. 46

H.      Covetrus's New Management Team Admits The Blatant Falsity Of Defendants' Class Period Misrepresentations And Fabricated Excuses ............................................................................................. 54

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................. 57

VI.      ADDITIONAL SCIENTER ALLEGATIONS ............................................................. 75

VII.      LOSS CAUSATION .................................................................................................... 86

VIII.      CLASS ACTION ALLEGATIONS ............................................................................ 88

IX.      UNDISCLOSED ADVERSE FACTS ........................................................................ 90

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE ........................................... 91

XI.      NO SAFE HARBOR ................................................................................................... 92

XII.      COUNTS ..................................................................................................................... 93

XIII.      PRAYER FOR RELIEF ............................................................................................. 98

XIV.      JURY TRIAL DEMANDED ...................................................................................... 98

Lead Plaintiffs City of Hollywood Police Officers' Retirement System ("Hollywood Police") and Pembroke Pines Pension Fund for Firefighters and Police Officers ("Pembroke Pines F&P," and together with Hollywood Police, "Lead Plaintiffs") bring this action under the federal securities laws, individually and on behalf of all persons or entities that purchased or otherwise acquired Covetrus common stock from the start of regular-way trading on February 8, 2019 through August 12, 2019, inclusive, and were damaged thereby (the "Class"). This action asserts claims under the Securities Exchange Act of 1934 (the "Exchange Act") based on materially false and misleading statements made by Defendants during the period of December 26, 2018 through August 12, 2019 (the "Class Period").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the independent investigation of their undersigned counsel. The investigation includes review and analysis of: (a) public filings with the United States Securities and Exchange Commission ("SEC") made by Henry Schein, Inc. ("Henry Schein"), Covetrus, Inc. ("Covetrus" or the "Company"), and related parties; (b) press releases and other publications disseminated by Henry Schein, Covetrus, and related parties; (c) shareholder communications, conference calls and postings on Henry Schein's and Covetrus's websites concerning the companies' respective public statements; (d) news articles and reports by securities analysts concerning Henry Schein, Covetrus, and related parties; and (e) data reflecting the price of Covetrus's common stock; (f) interviews with former employees of Covetrus and Henry Schein; and (g) additional material and data concerning Henry Schein, Covetrus, related parties, and/or Defendants (as defined below).

## I.     INTRODUCTION

1.      Covetrus – a distributor of veterinarian products and software – was created in February 2019 as a result of a major spin-off and merger in the animal health industry.  Throughout the Class Period, the Company and its former top executives, including its Chief Executive Officer and Chief Financial Officer, materially misled investors regarding the status of its crucial merger-integration process and corresponding financial health.  When Covetrus's true condition was revealed, investors lost over $1 billion, and the Company's CEO and CFO were ousted.  Significantly, Covetrus's new management has now admitted that Defendants' statements during the Class Period were blatantly false when made, and has promised to "rebuild trust" with investors after Defendants' misrepresentations.

2.      Covetrus was created when Henry Schein, a distributor of medical and dental supplies, decided to offload its slow-growth, low-margin Henry Schein Animal Health business ("HSAH") and merge it with Vets First Choice ("VFC"), a high-growth start-up company that was burning cash and had never turned a profit.  While Defendants promised investors that the transaction would "unlock shareholder value," in reality, Covetrus was created in order for Henry Schein to rid itself of ailing supply chain and software businesses that were competitively pressured, internally fragmented, and in need of substantial infrastructure investments.  Henry Schein also arranged for a hefty payday in spinning off HSAH, receiving an immediate cash payout of over $1.1 billion that Henry Schein financed by saddling Covetrus with debt.

3.      During the Class Period, Defendants specifically assured investors that – after a year of "[s]ignificant planning and preparation" before the spin-off to integrate HSAH and VFC – Covetrus was operating as "one integrated organization" on "day 1" of its launch.  For example, during the Class Period, Defendant Shaw, Covetrus's CEO at the time, emphasized that it was

2

"very important" for investors to understand that, from "*day 1*," the Company had "*brought together these different business groups into a single face to customer*" and that they were no longer operating as "*standalone legacy businesses*." Defendants further claimed that they had "*achieved a deep integration*" in the Company's core operations critical to its financial health, and that they had "*brought our … 3 various sales organizations … together into a now tightly integrated, stood-up, aligned group that's now representing the total scope of our capabilities*." Defendants represented that because of such "deep integration" of software and sales forces, Covetrus already had rising sales in the second quarter of 2019 ("Q2 2019") and was outpacing the competition as it was in "share-gaining mode in the market."

4.     Recently, in self-described "honest" and "frank" admissions in March 2020, Covetrus's new CEO, Benjamin Wolin, exposed these and other representations as blatantly false when made. For example, in direct contrast to Defendant Shaw's claim that the integration had been so successful that "we're not managing the business day 1 or day 2 as standalone legacy businesses" – a fact that Defendant Shaw emphasized was "very important for investors to understand" – Wolin made clear that the exact opposite was true: in reality, more than a year after the spin-off, the two companies were "*still transacting along the way that we did when they were separate entities*," and "*we have a ways to go, to be honest, on … getting the value of a combined asset*." Wolin further admitted that, rather than the various sales organizations being a "now tightly integrated, stood-up, aligned group," the sales force integration had not even started, stating that "*[w]e're not trying to do all of that sales force integration in terms of pushing the 2 sales forces together* …. We're going to have *coordination, not integration* right now." Wolin also acknowledged that, even as late as March 2020, Covetrus was only "*starting to see some integration* of prescription management into [practice management software]"—an admission that

3

directly contradicted his predecessor's claims.

5. The recent admissions of Covetrus's new CEO are corroborated by the detailed accounts of numerous former Company employees, all of whom similarly attest that not only was Covetrus unintegrated, but management did not even *attempt* to integrate HSAH and VFC in any significant way during the Class Period. In marked contrast to Defendants' claim that the integration was complete on "day 1," Covetrus's own employees explicitly confirmed that the exact opposite was true: as they explained, at the time of its launch, the Company was "*absolutely not integrated*," was not "*even integrating [its software platforms] yet*," and had not yet even devised a *plan* to integrate. In short, Defendants' efforts to portray the Company to investors as an integrated entity were, as Covetrus's former employees confirmed, "*papering*" and "*a veneer*."

6. Given the stark disparity between Defendants' false assurances to investors and the internal truth at Covetrus, the Company quickly suffered poor financial results. In May 2019, *just three months* after the merger, Defendants disclosed extremely disappointing financial results for the first quarter of 2019. Instead of disclosing the truth about the Company's failed integration and poor supply chain, however, Defendants continued to artificially prop up the stock price by showering investors with false affirmations that the integration was a success and that the Company had already booked strong revenues in the second quarter, particularly in North America.

7. By the close of the second quarter, Defendants could no longer hide the truth. On August 13, 2019, Covetrus reported disastrous financial results and was forced to reveal that not only were HSAH and VFC *not* integrated, but even legacy HSAH businesses that were purportedly well-integrated long before the merger – including core operations such as the Company's supply chain and inventory management business and its practice management software – *had still not been integrated*, as the Company had only "*started to roll out those capabilities*." Investors were

4

stunned by the disclosures and sent the Company's shares into an immediate tailspin. Covetrus's share price plummeted by nearly *50%*, falling from $23.19 to $12.35 per share, in a massive two-day decline that destroyed over *$1.2 billion* in shareholder value on the highest trading volume since the Company's shares began regular trading in February 2019.

8. In the wake of the August 13 corrective disclosures, securities analysts excoriated the Individual Defendants, stating that "*there are now serious questions around the merger and management's credibility*."[1] Industry observers specifically noted that despite Defendants' claims of success as late as May 2019, in truth, "*[b]ehind the scenes, ... Covetrus was falling short of its projections, a situation that became public knowledge in August*." Notably, while Defendants attempted to blame market-wide factors for Covetrus's abysmal Q2 2019 financial results, securities analysts saw through the fiction and called their attempted blame-shifting "*counter to our views of the sector*" and simply "*inconsistent*" with reality.

9. The fallout from the fraud continues to this day. After the Class Period, the Company was forced to take a massive write-down of nearly $1 billion, admitted that its statements to investors during the Class Period lacked "transparency," pledged a new culture of "accountability," and conducted an executive-level housecleaning. Less than a year after the merger, and mere months after the close of the Class Period, Covetrus terminated both Defendants Shaw and Komola while admitting that it was "*critical for the management team and the company to rebuild trust with our investors*." The Company pledged "*a new approach where we are … being as transparent as possible with… our investors*." Meanwhile, analysts continued to emphasize that "management credibility" was "damaged" by Defendants' lack of candor. To this

---

[1] Unless otherwise noted, all emphasis is added.

day, the Company's stock price has not recovered, and currently hovers around $15 per share –a

**65%** decline from its initial post-merger trading price of nearly $43.

## II.      PARTIES

10.      Lead Plaintiff Hollywood Police provides retirement benefits to police officers in Hollywood, Florida.  As of March 2020, Hollywood Police managed approximately $296 million in assets on behalf of approximately 665 members and retirees.  As set forth in the certification attached to the Consolidated Class Action Complaint filed on February 21, 2020 (ECF No. 23), Hollywood Police purchased Covetrus common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.  On December 23, 2019, the Court appointed Hollywood Police as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. §78u-4(a)(3)(B).  ECF No. 22.

11.      Lead Plaintiff Pembroke Pines F&P provides retirement benefits to firefighters and police officers in Pembroke Pines, Florida.  As of March 2020, Pembroke Pines F&P managed more than $617 million in assets on behalf of approximately 761 active members and retirees.  As set forth in the certification attached to the Consolidated Class Action Complaint filed on February 21, 2020 (ECF No. 23), Pembroke Pines F&P purchased Covetrus common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.  On December 23, 2019, the Court appointed Pembroke Pines F&P as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. §78u-4(a)(3)(B).  ECF No. 22.

12.      Defendant Henry Schein is a provider of health care products and services to dental and medical practitioners.  Henry Schein devised, planned, and effectuated the "spin-merger" transaction by which the Henry Schein Animal Health Business was spun-off and combined with VFC to form Covetrus.  From HSAH's founding until the time of its spin-off, Henry Schein was

6

in direct control of the operation and management of HSAH as its parent organization, and filed

multiple documents with the SEC on behalf of HS Spinco, Inc. ("Spinco"), Covetrus's predecessor,

as its reporting owner. Additionally, the Board of Directors for Spinco, which was a wholly owned

subsidiary of Henry Schein "formed… in order to effect" the spin-merger, was comprised entirely

of officers and directors from Henry Schein, including Defendant Steven Paladino ("Paladino").[2]

In addition to his position as a director, Defendant Paladino acted as Spinco's President, Treasurer,

and CFO. Each member of the Spinco Board of Directors signed the three Registration Statements

filed by Henry Schein through Spinco containing false and misleading statements alleged herein.

*See* ¶¶118-20. Additionally, several officers and directors of Covetrus are current and former

officers and directors of Henry Schein.[3] Accordingly, Henry Schein had the requisite power to

directly or indirectly control or influence Covetrus and Spinco. Henry Schein's principal executive

offices are located in Melville, New York.

13. Defendant Covetrus is an animal-health technology and services company. On

February 8, 2019, following the merger described herein, Covetrus common stock began regular-

---

[2] The rest of Spinco's Board included: Michael S. Ettinger ("Ettinger"), Henry Schein's Senior Vice President, Corporate & Legal Affairs, Chief of Staff and Secretary since 2015; Mark E. Mlotek ("Mlotek"), Henry Schein's Executive Vice President and Chief Strategic Officer since 2012, and Director since 1995; and Walter Siegel ("Siegel"), Henry Schein's Senior Vice President and General Counsel since 2013.

[3] Two Covetrus directors have longstanding ties to Henry Schein, including Defendant Paladino, who has served on the board of Henry Schein since 1994, and Philip A. Laskawy, who has served on Henry Schein's board since 2002. Furthermore, several executive officers described in Covetrus's Registration Statements previously served as officers of Henry Schein, including: Russell Cooke, Covetrus's Operational Chief Financial Officer, who previously served as CFO Global Animal Health at Henry Schein since July 2016; David Christopher Dollar, Covetrus's President, Global Software Services, who previously served as a President of HSAH since September 2015; Francis Dirksmeier, Covetrus's President, North America, who previously served as a President of HSAH since January 2015; Michael Ellis, Covetrus's President, Europe, who previously served as CFO, General Manager, and Vice President, Europe at HSAH since April 2009; Anthony Providenti, Covetrus's SVP, Corporate Development, who previously served a number of management positions at Henry Schein since 2003; and David Hinton, Covetrus's Head of APAC and Emerging Markets, who previously served as Managing Director of Animal Health in Australia and New Zealand for Henry Schein until February 2019.

way trading on the NASDAQ under the symbol "CVET." Covetrus's principal executive offices are located in Portland, Maine.

14. Defendant Paladino has served as Henry Schein's CFO since 1993, as Executive Vice President and CFO since 2000, and as a director since 1994. Defendant Paladino also serves on the board of directors of Covetrus. Paladino was heavily involved in HSAH's business and operations before, during, and after the spin-merger. Paladino served as a director of HSAH subsidiaries; was responsible for responding to SEC requests regarding HSAH; was responsible for fielding investor inquiries about HSAH's acquisitions; was responsible for providing financial solutions for HSAH's acquisitions; and served as President, Treasurer, CFO, and a director of Spinco, which held the legacy HSAH assets through the spin-merger.

15. Defendant Benjamin Shaw ("Shaw") served as Covetrus's CEO and President from February 2019 to October 2019. Previously, Shaw was VFC's Chief Executive Officer and Co-Founder from May 2010, and President of VFC from August 2018. Shaw also served as a member of the Covetrus board of directors from February 2019 to October 2019.

16. Defendant Christine T. Komola ("Komola") served as Covetrus's Chief Financial Officer and Executive Vice President from February 2019 to December 2019. Previously, Komola served as VFC's Chief Financial Officer and Executive Vice President from October 2018. Komola was hired by VFC to assist with its merger into HSAH and the formation of Covetrus.

17. Defendants Paladino, Shaw, and Komola are referred to collectively as the "Individual Defendants."

18. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Covetrus and/or Henry Schein, were privy to confidential, proprietary and material adverse non-public information concerning Covetrus, its operations, finances, financial

8

condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Covetrus's business.

20. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

21. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and is traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Covetrus's financial condition and performance, growth, operations, financial

9

statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Covetrus common stock would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22. The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Covetrus's publicly traded common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.

## III. JURISDICTION AND VENUE

23. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

24. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 27 of the Exchange Act (15 U.S.C. §78aa).

25. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b), Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Henry Schein, which effectuated the spin-off of HSAH, its merger with VFC, and the creation of Covetrus, maintains its principal executive office in this Judicial District in Melville, New York, and many of the acts charged herein, including the dissemination of materially false and/or misleading information, including in the Registration Statements and thereafter, occurred in substantial part in this Judicial District.

## IV.    SUMMARY OF THE ACTION

### A.    Company Background

26.    Covetrus is an animal-health company that sells a wide variety of products and software to veterinarians.  The Company was created when Henry Schein spun off its business selling products and services to veterinarians (HSAH), then merged it with VFC.

27.    Before the merger, HSAH was a high-revenue, slow-growth, low-margin business comprised principally of a veterinary supply chain and distribution business and a practice management software business.  The supply chain business sold and distributed virtually all of the products required to run a veterinary clinic.[4]  It included over 80 different animal health organizations, which relied on a sales force of over 1,200 representatives with direct business ties at the practice level.  Of these 80 disparate organizations, over a dozen were acquired and rolled-up by Henry Schein in the six-year period before HSAH's spin-off.  HSAH was also the largest provider of practice management software (also referred to as "practice information management software," or "PIMS") for companion animal clinics, with approximately 20,000 PIMS customers worldwide, and market penetration of over 50% of the veterinary practices in the United States. HSAH's practice management software products provided veterinarians with electronic medical records, treatment history, billing, accounts receivable analyses and management, appointment calendars, electronic claims processing and word processing programs.  Covetrus's most prominent and widely accepted PIMS were AVImark, eVetPractice, ImproMed and ImproMed Equine in North America.

---

[4] A supply chain is the system through which an organization acquires raw materials, produces products, and distributes the products to its customers.  It concerns the channeling of raw materials through production processes, inventory management, and distribution, and ends at the point of sales to the customer.  Supply chain professionals seek to optimize how products are sourced and delivered.

28.     VFC, by contrast, was a small, fast-growing business that provided prescription management and other technology-enabled services that were intended to drive improved engagement and medical compliance by pet owners, and higher revenues for veterinarians.  At the time of the merger, VFC's revenues were miniscule compared to HSAH's revenues.  For example, as of Q1 2018, VFC had just $45 million in revenues, less than 5% of the revenues generated by Henry Schein's Animal Health business in the same period.

29.     By the end of 2017, Henry Schein was actively exploring ways to sell or otherwise divest itself of HSAH, which, unbeknownst to investors, had an antiquated and unintegrated supply chain and distribution business.  As discussed further below (*e.g.*, ¶¶50-54, 56-57, 59, 87-88), the supply chain business was in decline, with outdated infrastructure and frequent delays for customers that caused numerous complaints.  Henry Schein found a partner in VFC.  In Henry Schein's lucrative spin-off deal through which HSAH was spun off and merged with VFC, Henry Schein was able to divest its sprawling, low-margin, and ailing HSAH business in a tax-free transaction, while paying itself a massive dividend.  As part of the spin-off, Henry Schein saddled Covetrus with $1.2 billion in new long-term debt, of which $1.12 billion was paid to Henry Schein in the form of a special cash dividend and settlement of long-term intercompany debt.  Given the favorable economics for Henry Schein in executing the spin-off, Defendant Paladino benefited greatly through his ownership of over $10 million in Henry Schein stock.

30.     The merger was also personally lucrative for Defendant Shaw, who received a lavish "transaction bonus" of over ***$927,000*** for completing the transaction.  Moreover, the transaction created a large public market and early liquidation opportunity for Shaw's and the other VFC officers' and directors' large personal holdings of VFC shares.  Prior to Covetrus's creation, VFC was a relatively small company with approximately $200 million in annual revenues (about

12

5% of HSAH's annual revenues). As a result of the merger, Shaw was able to exchange his personal holdings of VFC stock – which was difficult to offload and not publicly traded – for shares in Covetrus valued at over **$55 million**.

31. Henry Schein and VFC began discussing the potential spin-off and merger in December 2017; the merger agreements were signed in April 2018; and, after more than one year of what executives described as "[s]ignificant planning and preparation" and "tremendous teamwork across the globe," Covetrus shares began regular public trading on the NASDAQ stock exchange on February 8, 2019.[5]

32. Given the striking differences between HSAH and VFC, there were substantial questions as to the reasons for the merger, the costs of the merger and required integration, and the combined companies' financial prospects. The market questioned how these two contrasting entities – "a multibillion dollar public company with eight decades in the veterinary industry and a private tech start-up with a reputation for aggressive sales tactics – would work together. They wondered which corporate culture would prevail."[6]

**B.    Defendants Recognized The HSAH Supply Chain Business, And The Integration Of Software And Sales Teams, As Concrete Lynchpins Of Covetrus's Success**

33. Given investor concern regarding the new entity, Defendants made a series of public statements to quell investor concerns and heavily promote Covetrus as a tremendous investment both before and after its public launch. For example, given the unusually close

---

[5] The Spin-Merger was effectuated through a tax-free transaction in which each shareholder of Henry Schein received a dividend of 0.4 shares of Covetrus common stock for each share of Henry Schein common stock held as of February 4, 2019, and each shareholder of VFC was issued approximately 0.4668 shares of Covetrus common stock for each share of VFC common stock held as of February 4, 2019. Following the Spin-Merger, shareholders of Henry Schein who received Covetrus shares as part of the distribution held a 63% ownership stake in the Company, while VFC's former shareholders owned the remaining 37% of the Company.

[6] https://news.vin.com/VINNews.aspx?articleId=56068

collaboration between Henry Schein and VFC for nearly a year before the merger concluded in February 2019, Defendant Henry Schein and VFC represented that "[i]mmediately following a spin-off from Henry Schein, HSAH will combine with Vets First Choice to form a new publicly traded company" that was "uniquely position[ed]" for "accelerated growth."

34. In particular, Defendants emphasized three key aspects of the integrated business as crucial to driving accelerated growth quickly.

35. First, Defendants promoted HSAH's purported "comprehensive service and technology platform and supply chain infrastructure," "significant supply chain infrastructure on a global basis," and "supply chain expertise," and claimed rapid sales growth by "leverag[ing] the infrastructure provided to Covetrus by the legacy Henry Schein Animal Health business." Defendants' representations regarding the status and quality of the HSAH supply chain business were highly material, as that business comprised some 95% of the Company's revenues.

36. Second, Defendants claimed that growth would soar rapidly given the integration of VFC's fast-growing prescription management software into HSAH's legacy practice management software, or PIMS. HSAH's PIMS had deep market penetration of approximately 50% of the veterinary practices in the United States. VFC's prescription management software had far less market penetration, but was a fast-growing software that, according to Defendants, promised to increase Covetrus's overall revenues substantially. Developing software that integrated VFC's prescription management software into HSAH's PIMS stood to vastly increase the utilization of the VFC prescription management software and thus elevate Company financial results.

37. Third, Defendants heavily emphasized the importance of merging the Company's sales teams to promote cross-selling of both HSAH and VFC products and services. HSAH came

into the merger with approximately 1,200 salespeople and with 90% of veterinary practices as HSAH customers – far exceeding VFC on both counts. The pitch to investors was that by integrating the sales teams and having the HSAH sales teams – which veterinary practices knew well and trusted – cross-sell VFC products and services, overall Covetrus sales would quickly rise. As Defendant Shaw stated during the M&A Call, "we expect accelerated adoption of the Vets First Choice prescription management platform, alongside Henry Schein Animal Health's scale and customer reach, will be significant." Indeed, the Registration Statements asserted that a "driver[]" of embedded growth" for Covetrus was "the ability to … cross-sell additional [VFC] capabilities" and that Covetrus's strategy was to "[l]everage the scale, reach and infrastructure of the Henry Schein Animal Health Business network to accelerate the adoption of the Vets First Choice platform" by using the largely-HSAH "combined sales and account management organization of over 1,200 sales professionals to drive adoption of the Vets First Choice platform by Customers of the Henry Schein Animal Health Business." In addition, on February 4, 2019 Covetrus held a Capital Markets Day during which it presented a PowerPoint presentation to which both VFC and Henry Schein contributed. The PowerPoint presentation emphasized the Company's "significant global cross-selling opportunity," citing "Nearly 100K [HSAH] Supply Chain Customers" and "~20K [HSAH] PIMS Customers" as ripe for cross-selling. The presentation highlighted "[p]latform cross-sell," and the "accelerating adoption of the Vets First Choice platform" by "leverag[ing] an established customer base and one of the premier sales teams in animal health to drive incremental enrollments and cross-sell portfolio of solutions."

    **C.**     **During The Class Period, Defendants Claimed The HSAH Supply Chain Business Was Successful, And The Integration Of Software And Sales Teams Had Been Achieved, Driving Strong Sales And Financial Results**

38.     During the Class Period, Defendants claimed success as to each of the three pillars of Covetrus's financial health and growth described above: supply chain health; software

integration; and sales team integration. Defendants unwaveringly cast the HSAH distribution business as strong; claimed that the prescription management software had been successfully integrated into PIMS; and represented that the Company's various sales teams had been fully integrated as well, driving higher sales. Indeed, Defendants proclaimed a complete integration of HSAH and VFC on "day 1." On the basis of such purported integration and supply chain strength, Defendants represented that revenues were already rising strongly in Q2 2019.

39.     For example, during the Class Period Defendants specifically promoted the purportedly **completed** integration of the HSAH PIMS software and the VFC prescription management software. On February 4, 2019, in discussing "what we're able to do," Shaw stated that Company's "**prescription management and analytics capabilities**" were already "**hardwired into practice management software.**" On May 15, 2019, Defendant Shaw emphasized that "we view PIMS to be the strategic enabler and an important on-ramp for Vets First Choice prescription management" and again claimed that the Company had already "**achieved a deep integration between our practice management software and our prescription management workflow.**"

40.     Defendants also asserted during the Class Period that they had successfully achieved full integration of the Company's sales teams as of March 2019 – or just one month after the merger. Indeed, during the February 4, 2019 Capital Markets Day, Covetrus's SVP and President, Global Prescription Management, emphasized how HSAH and VFC had already been collaborating on sales integration before the merger, stating that the "sales forces from both Henry Schein and Vets First Choice … [have] been very fortunate to be working together over the last couple of months" and focused on "readiness for day one" as well as "bring[ing] these forces together" at "a huge Covetrus national meeting coming up here in about a month's time," in March 2019. Then, in May 2019, Defendant Shaw repeatedly claimed that the sales forces had been fully

16

and completely integrated.  On May 15, when asked about the purported "ramp in year-over-year profit growth" that was built into the Company's guidance, Shaw stated that the Company had achieved "the integration of our sales team."  On May 29, Shaw again claimed full sales force integration, stating unequivocally that the sales organizations were "now tightly integrated" and that this "combined organization" would allow the Company to leverage "all of the unique assets of the organization":

> "*[I]n March … we brought our … 3 various sales organizations … together into a now tightly integrated, stood-up, aligned group that's now representing the total scope of our capabilities*.  *So that happened in March*.  And so we're talking about in Q1 those few weeks following March and we're really enthusiastic about the reception.  I mean for the first time, *our combined organization is able to leverage all of the unique assets of the organization* and we're coming to market with a very differentiated and unique value proposition that allows us to leverage our PIMS practice management software position around appointment and prescription management, have new insights and to tightly integrate that within office inventory management.[7]

41.     Finally, Defendants were unwavering in promoting the purported quality and strength of the legacy HSAH supply chain business during the Class Period.  For example, Covetrus's Registration Statements stated that one of the Company's "key strengths" was its "inventory management and supply chain services and technology."  Similarly, during the February 4, 2019 Capital Markets Day, Defendant Shaw stated "[w]e have significant supply chain infrastructure on a global basis supporting pretty much the entire active ecosystem in our space and a complete stack, a complete range of services, the ability to bring – to meet the total needs of our customers across … inventory management and other added value services."  Covetrus's Form 10-K filed on March 29, 2019 touted the Company's purported "comprehensive … supply chain infrastructure," "leading … supply chain businesses," and "supply chain expertise."  These false

---

[7] Shaw defined the three sales organizations as follows: "We have a software sales organization; we have a prescription management sales organization; we have a legacy distribution sales organization."

proclamations of strength in Covetrus's distribution business were exposed on August 13, 2019, when the Company admitted disastrous distribution performance and a slew of needed and already-occurring infrastructure investments to shore up the business. *See* ¶¶94-105, below.

42.     Given such factors as the purported software integration of the prescription management software into the PIMS, the purported integration of the sales teams, and the pre-existing strength of HSAH's legacy supply chain business, during the Class Period Defendants repeatedly represented that the integration of HSAH and VFC was successful from the Company's inception, creating a "unique… integrated offering to customers."  Defendants represented to investors that HSAH and VFC were well-integrated inside Covetrus on "day 1" after the February 2019 merger.  For example, addressing an analyst's question at the Stifel Dental & Veterinary Conference on May 29, 2019 about trends in "the revenue growth rates for the Schein legacy animal health business" and "what it was like bringing the [two] organizations together," Defendant Shaw responded that "I think it's important to understand that prior to the merger, that the Henry Schein legacy business was actually comprised of many different businesses," including "several dozen different operating businesses."  However, Shaw reassured investors that after the merger close, "***what we've achieved has been an integration of that value proposition.  We brought together these different business groups into a single face to customer around software, in insights and analytics around inventory management, appointment management and prescription management***."

43.     In particular, Defendant Shaw emphasized to investors that the integration was so complete that, on day one of the merger, the two companies were ***not*** operating as separate companies, or what he called "standalone legacy businesses."  This information was so material to investors that Defendant Shaw himself told them that it was "very important" for them to

18

understand that critical fact. As Shaw made clear, full integration had been achieved: HSAH's previous "80 distinct separate organizations" had become "one integrated organization," and that "it's the integration and kind of power of that connected ecosystem that we're delivering to customers. *So we're not managing the business day 1 or day 2 as standalone legacy businesses. I think that's a very important observation around sort of the structural changes we've been able to achieve in this*."

44.     Defendants also committed to and reaffirmed strong financial guidance during the Class Period. With the long lead time between the merger discussions beginning in 2017, the April 2018 merger announcement, and the February 2019 completion of the merger, Defendants had ample time and means to assess the combined Company's financial position. As explained further below (¶¶125-30, 137-50), in February 2019 Defendants projected their "confiden[ce]" in purported "double-digit" EBITDA gains through sales growth, then, in May 2019, provided two false updates of the Company's Q2 2019 financial progress as late as two-thirds of the way through the quarter.

### D.     Covetrus's New CEO Has Admitted That Defendants' Class Period Statements Promoting Achieved Integration Were False When Made

45.     As explained further below, shortly after the Class Period, Covetrus fired Defendants Shaw and Komola – the Covetrus executives responsible for the vast majority of the Company's Class Period statements representing achieved integration. ¶¶106, 108-11, 172. Defendant Shaw was replaced by Covetrus CEO Benjamin Wolin, who immediately pledged to "rebuild trust with investors" and use "a new approach where we are … being as transparent as possible with… our investors." ¶¶108, 112-17, 168, 172-73. As part of this effort to "rebuild trust," Wolin has admitted that Defendants' statements about integration were false when made. In March 2020, six months after the Class Period ended and more than a year after the merger's

19

finalization, Wolin came clean in a series of self-described "honest" and "frank" admissions that revealed the truth about the merger, and which explicitly contradicted Defendants' Class Period statements.

46. For example, while on May 29, 2019, Defendant Shaw stated that it was "very important" for investors to understand that "we're not managing the business day 1 or day 2 as standalone legacy businesses," Wolin stated the exact opposite. As Wolin admitted in March 2020, HSAH and VFC were in fact operating as completely separate businesses, as "*we are still transacting along the way that we did when [HSAH and VFC] were separate entities*" and the Company was only "focus[ed] on driving the *individual* value" of the separate entities. ¶113.

47. Similarly, while on May 29, 2019, Shaw told investors that "in March [2019] … we brought our … 3 various sales organizations … together into a now tightly integrated, stood-up, aligned group," Wolin again admitted that that was not true. He made clear that not only were the three sales forces *still* unintegrated a *full year* after when Shaw had said they had been integrated, but the Company had *still* not integrated even *two* of the three sales forces. As Wolin frankly admitted, "*[w]e're not trying to do all of that sales force integration in terms of pushing the 2 sales forces together*, distribution and prescription management. We're going to have *coordination, not integration* right now." ¶116.

48. In addition, Wolin explained how Defendant Shaw's Class Period statements promoting the purportedly completed integration of the HSAH PIMS software and the VFC prescription management software were similarly false when made. While on February 4, 2019, Shaw stated that Company's "*prescription management and analytics capabilities*" were already "*hardwired into practice management software*," and on May 15, 2019, Defendant Shaw again claimed that the Company had already "*achieved a deep integration between our practice*

20

*management software and our prescription management workflow*," Wolin stated that the opposite was true. In March 2020, Wolin stated unequivocally that it was *still* "*early days*" and "*early innings on that front*," as Covetrus was only now "*starting to see some integration of prescription management into PIMS*." ¶114-15.

49. Wolin even made clear that Defendants' false statements extended to excuses that they concocted to explain the Company's poor Class Period financial performance. As explained further below, on August 13, 2019, Covetrus reported disastrous financial performance, which Defendants Shaw and Komola attributed to external factors "not specific to us" that had unexpectedly "creat[ed] a delay" in Covetrus's financial success. ¶100. While analysts immediately noted that such claims were not credible, stating that "there was nothing in the 'macro environment' to account for the disappointing earnings" (¶¶102-04; *see* ¶105 (Defendants "blamed problems on external factors, and the investment community didn't buy that at all")), Defendants Shaw and Komola refused to come clean. The Company did not reveal the truth until March 4, 2020, when Wolin expressly admitted that Covetrus's poor performance was not a surprise inside the Company. Indeed, as Wolin stated, the market "wasn't that much different from '18 to '19," and Covetrus had only itself to blame. As Wolin succinctly stated, "a lot of the '19 challenges were frankly self-inflicted." ¶117.

**E.      Numerous Former Covetrus Employees Confirmed That, Unbeknownst To Investors, Covetrus's Supply Chain Infrastructure Was Antiquated And Deeply Fragmented, The Company Was Not Integrated, And The Company's Performance Suffered As A Result**

50. Numerous former Covetrus employees have further explained how Defendants' representations to investors during the Class Period were false and misleading when made. As these former employees explain, and unbeknownst to investors at the time, HSAH's legacy software platforms and distribution and supply chain business were highly fragmented and

required large, immediate, and recurring infrastructure expenditures just to create basic systems needed to run the business and to shore up flagging sales. In the absence of adequate supply chain infrastructure and interoperable software platforms, persistent supply chain failures and order delays caused customers to reduce or cancel orders. In addition, and also in stark contrast to Defendants' statements in 2019, HSAH and VFC remained fragmented and substantially unintegrated throughout the Class Period. Covetrus was unable to present to customers the integrated platform or sales team that Defendants represented, and the lack of integration, along with management in-fighting and a host of other factors, severely depressed Covetrus's sales at the same time that Defendants falsely promoted rising sales.

### 1. Covetrus's Supply Chain Infrastructure And Software Platforms Were Antiquated and Fragmented

51. Contrary to Defendants' statements, Covetrus's supply chain infrastructure was antiquated, fragmented, and needed immediate infrastructure investments. As CW 1[8] explained, HSAH's infrastructure was rudimentary and bore no resemblance to a fully integrated supply chain and logistics system.[9] An integrated system would involve the use of a singular platform to manage the products for all of a company's business lines. This system would log purchases of

---

[8] Former Covetrus, HSAH, and VFC employees are referred to herein as Confidential Witness "CW __" and are referenced in the feminine form to protect their confidentiality.

[9] CW 1 was employed by VFC and Covetrus from 2017 through September 2019. She began working for VFC as a contractor in 2017, and was hired as a full-time employee in February 2018. Prior to the merger, CW 1 reported to the Chief Operating Officer ("COO") of VFC, Jerry King, then, starting around August 2018, Georgia Wraight replaced King and CW 1 reported to Wraight. On certain projects, CW 1 unofficially reported into Tim Ludlow, then the CFO of VFC and currently Covetrus's Chief Transformation Officer. CW 1 remained with VFC through the company's merger with HSAH. She served as Senior Logistics Manager at Covetrus and worked out of the Company's headquarters in Portland, Maine. As Senior Logistics Manager, CW 1 was tasked with working on projects relating to the planned integration of the various VFC and HSAH business units. According to CW 1, Covetrus was a bucket of smaller businesses which had no supply chain or logistic systems in common. CW 1 stated that Covetrus had essentially "no infrastructure" and no roadmap for integrating its business units. CW1 was also responsible for developing and implementing projects relating to network design, logistics, distribution, and supply chain infrastructure. She was also responsible for other ad hoc operational projects, as requested. CW 1 sat at a desk just outside of the executive offices.

22

raw material and other inventory.  It would communicate the stock of products to the company's storefront for sales purposes and also for the benefit of customers who purchased product directly from a company's website.  Once orders were placed, the system would track the departure of goods from each company warehouse, so that the company could replenish goods in a timely manner.  This step would also allow the company to better track the demand for its products and prevent the overstocking of products.  Summarizing, CW 1 stated that a proper logistics system would manage all materials going in and out of a business, through a singular store front.

52.     CW 1 – who was directly responsible for projects relating to the planned integration of VFC and HSAH, and who reported directly to the COO – emphasized that HSAH and Covetrus had ***no such system***.  Instead, the Company maintained different product ordering and tracking systems.  The Company also maintained separate storefronts for each HSAH and VFC business of which it was comprised.  CW 1 stated that some of the HSAH businesses were so lacking in supply chain infrastructure that employees had to manually link up supply and order information.  In some cases, business units were using manual systems as basic as ***Excel spreadsheets*** to track supply chain data.  CW 2 similarly confirmed that HSAH was not integrated from a supply chain perspective even before the merger with VFC.[10]  She stated that she had trouble fulfilling customer orders because HSAH was a confederation of independent distribution centers, and not all the distribution centers were operating on the same fulfillment software platform.  CW 1 further explained that HSAH did not have anything resembling an integrated supply and logistics system.  CW 1 stressed the independent nature of the HSAH businesses, and noted that people from one HSAH business often could not cite the names of other HSAH businesses or their products.  The fragmentation of these businesses was even more jarring at the international level, where it seemed

---

[10] CW 2 was a Territory Manager salesperson at HSAH and Covetrus from June 2015 through August 2019.  She reported to Regional Manager Raymond Miller.

23

the HSAH businesses had no connections whatsoever.

53. As CW 1 further explained, HSAH's lacking infrastructure was readily apparent inside the Company and caused obvious practical difficulties on a day-to-day basis. For example, the HSAH businesses primarily relied on *UPS – i.e., United Parcel Service, Inc., the multinational package delivery and supply chain management company* – for supply chain and logistics services. This meant that shipment information was not automatically crossed with storefront information, warehouse information, or any other system that could easily gauge the supply and demand for company products. Additionally, if an HSAH or Covetrus employee wanted to find out the status of a shipment, be it materials or products, the employee had to *phone UPS or whatever other shipping service was being used by the pre-merger business unit* to which the shipment related. The inefficiencies were obvious inside the Company, and the lack of integration caused order delays and a mismatch between product supply and demand.

54. The lack of a unified logistics system was also readily apparent to Covetrus executives through regular Monday morning meetings. As CW 1 stated, every Monday morning, all of the top executives, including Shaw and Komola, had a meeting in the Portland, Maine office to discuss Company performance, including supply and demand for Company products. The meeting was held in a conference room on the second floor – the same floor where CW 1's office and the executive offices were located, as well as additional staff in finance and operations. Given the lacking integration and infrastructure, CW 1 was compelled to come into the office on Sundays and work with a number of other individuals in operations to compile data for the Monday meetings by piecing together data from the Company's various business units. Because there was no central platform at Covetrus, this was a manual, time consuming process. CW 1's reports were submitted to the COO, who presented them during the Monday morning meetings. CW 1 noted

that this process of report creation and presentation did not change during her tenure.

55.     VFC's logistics network was also fragmented, and while senior management considered investments to improve the well-recognized deficiencies and lack of integration of the Company's own supply chain infrastructure, they chose to put off the investments.  As CW 1 explained, in the lead-up to the merger, and during the summer of 2018, then-CFO Jerry King asked CW 1 to determine how much money VFC could save on logistics if it were to integrate its three business lines into a single platform.  As CW 1 stated, such integration would have entailed redesigning VFC's entire logistics network, as VFC lacked any singular logistics platform to which all of its products could be shifted.  CW 1 confirmed that there were no resources within VFC to build out such a platform.  Despite the challenges, CW 1 ultimately developed a plan that estimated VFC could save between $10 million and $18 million integrating the logistics of its three business lines.  CW 1 caveated that the savings did not account for the costs that would be involved with developing a singular logistics platform.  The plan also estimated that the Company would be able to lower shipping times by approximately three days.  The plan was presented to CFO Jerry King, but never implemented during CW 1's employment through September 2019.

56.     Covetrus also considered further needed investments to remedy the supply chain infrastructure, but again executives delayed them.  CW 1 recounted how, starting in Spring 2019, Covetrus considered developing and implementing a Transportation Management System (TMS), *i.e.*, a singular, integrated logistics and supply platform for all legacy VFC and HSAH businesses. Covetrus was interested in purchasing and utilizing the Manhattan Warehouse Management System (MWMS) as its TMS.  If implemented, MWMS would have tracked all Company products and served as an "end-to-end supply chain platform."  However, it was clear that it would take ***two to three years*** to fully implement a system like MWMS at Covetrus.  In addition, before Covetrus

25

could implement such a system, it ***needed to standardize the data and systems being used by each of its individual business units*** in a manner that would allow them to communicate with MWMS. This meant reviewing and tying together the Company's sales, finance, inventory, logistics, and other systems.

57. As CW 1 explained, prior to her departure from Covetrus in September 2019, Covetrus had dozens of logistics systems used by HSAH and VFC businesses, and there were Company projects relating to MWMS implementation, but those projects were ***halted*** in June or July 2019. Covetrus shelved the projects after Chief Information Officer Stephen Crowley "got into a fight" with Ken Weldon, Covetrus's vice president of operations. Crowley and Weldon could not agree on who should lead the MWMS project. Unable to chart a path forward, the two executives put their egos ahead of the integration efforts and decided to halt the project. Following the abandonment of the plan to purchase and implement MWMS, the executives made a decision to fall back on UPS as the sole shipping company for its products. CW 1 noted that this was ***not a substitute for an internal logistics platform*** and warned that the use of a sole shipping vendor represented a "***huge risk***" for the Company. For example, the reliance on UPS deprived Covetrus of having any end-to-end system to analyze the supply and demand for its products.

58. CW 1 also explained that another infrastructure integration project was considered but abandoned at Covetrus. Covetrus considered tying together the three legacy VFC businesses (Vets First Choice, Vet Pharmacies of America, and Roadrunner) into one platform using an "enterprise service bus." According to CW 1, an enterprise service bus would not actually house all of the data from the three businesses. Instead, it would extract data from the systems already in place and merge them into a manageable dataset. This project was to be completed under the direction of Sean Lague, director of enterprise business systems. CW 1 sat in on a few preliminary

26

meetings relating to this project, but ultimately, like the MWMS project, *no progress was made on this project* and it was *halted* around June or July 2019.

59.     CW 1 explained that, at the time of her departure in *September 2019*, Covetrus *still* had not decided on a supply and logistics platform, despite making public claims that the Company had the infrastructure in place to service the entire market within its space.

### 2.     After the Merger:  "We Were Working On A Veneer"

60.     Numerous former Covetrus employees each independently confirm that both before the merger and throughout the Class Period, Covetrus and its constituent units, HSAH and VFC, were highly fragmented and unintegrated.  For example, the various legacy HSAH businesses remained largely separate.   And contrary to Defendants' claims that VFC's prescription management software had been "hardwired" into HSAH's prescription management software, in truth there was no such integration throughout the Class Period.  Moreover, and again despite Defendants' contrary claims, HSAH's and VFC's salespeople were similarly unintegrated both before and after the merger.  Indeed, a "them versus us" mentality prevailed against VFC.  The Company's promises of full integration and leveraging the sales personnel for increased selling were illusory.

61.     As CW 3 explained, HSAH was a group of individual businesses that had been acquired and placed together.[11]  Each of the animal health businesses sold different products.  For example, the Company's AVImark and ImproMed businesses were responsible for selling software systems used by veterinarians for interactions with their customers and the logging of

---

[11] CW 3 was employed as an Inside Sales Representative for HSAH and Covetrus from 2013 through May 15, 2019. In that position, CW 3 took calls from veterinary clinics looking to order pharmaceuticals and other veterinary supplies.  CW 3 worked out of HSAH's Fort Worth, Texas call center and assisted customers in Iowa, Alabama, Oklahoma, Mississippi, Louisiana, and Missouri.  The head of the inside sales unit was Leslie Boesch, the national director of inside sales.

internal patient notes.[12]  The Animal Health business also included units responsible for the sale of actual animal health products in various countries.  CW 3 explained that there was no cross-selling or regular interaction between the businesses and they were "**basically different companies**."  In her role at HSAH, she sold only pharmaceuticals and veterinary supplies.  CW 3 was never trained to sell the Company's software products and she was unable to assist customers who were interested in those products.  She noted that there were times when her customers would ask her for assistance with their AVImark account (*e.g.*, paying a bill), but she could not assist them directly.  Instead, she would provide these customers with another telephone number where they could reach HSAH's AVImark representatives.  This unintegrated structure remained in place after the formation of Covetrus and persisted through the end of her tenure in May 2019.

62.     CW 3 stated that she was involved in three Schein-related integrations, the last of which was the integration of HSAH and VFC.  She described the first two integrations as "flawless," while stating that the integration of Covetrus was "nothing like the others," and agreed it was the exact opposite of flawless.  When asked if Defendant Shaw's May 29, 2019 statement that the Company's three sales organizations had been unified "into a now tightly integrated, stood-up, aligned group that's not representing the total scope of our capabilities," was accurate, (i) CW 3 responded that the merger was "**a mess**" and did not go as planned; and (ii) CW 4 made clear that "**that's not how it played out**."[13]

63.     CW 5 also explained how HSAH was fragmented and comprised of various

---

[12] AVImark and ImproMed are legacy HSAH prescription management software platforms.

[13] CW 4 was employed at Covetrus from November 2018 until September 2019 as a Director of Creative Services. CW 4 reported to Georgia Wraight, Executive Vice President Global Technology/Solutions.  She was responsible for managing the Company's creative services department.

28

"separate businesses," particularly in terms of the Company's software.[14] CW 5 worked on the software development team for AVImark, a veterinary practice software platform, and HSAH also had a separate team which handled ImproMed, another veterinary practice software acquired in 2011. As CW 5 explained, when Henry Schein initially purchased AVImark and ImproMed, the development teams from the acquired companies were "supposed to put their individual software aside and work on putting the business together as a whole." Instead, the two development teams were "kept isolated" from one another and continued to develop their products independently. Other unique developer teams within HSAH included a team based out of Atlanta, Georgia that was working on a cloud based veterinary practice platform and another team working on a separate product in Pennsylvania. Beyond the United States there were at least two other software development teams working on software products in the United Kingdom and Australia.

64. CW 5 explained that each of the teams generally worked on the software their former companies produced prior to being acquired by Henry Schein. CW 5 emphasized that the teams remained "pretty well siloed," and further noted that the software systems they managed were written in different developer languages. AVImark, for example, was written in a language known as Delphi. According to CW 5, there were no developers outside of the three person AVImark team that could work in this language within Henry Schein or Covetrus. Key HSAH products such as AVImark and ImproMed were developed and sold separately.

---

[14] CW 5 was employed as a software developer at McAllister Software from 2003 through HSAH's acquisition of McAlister Software in 2011. She remained HSAH's Software Developer until January 2016. Throughout this time, CW 5 worked on the development of AVImark, a veterinary practice management software. In January 2016, CW 5 was promoted to the position of Certified Scrum Master. As Scrum Master, CW 5 took on a management role and was responsible for helping the other developers coordinate with one another on different projects. CW 5 served as Scrum Master until July 2018, when the position was eliminated and CW 5's title was changed to Senior Software Developer. In this role, CW 5 continued to work on the enhancement and maintenance of HSAH's and Covetrus's AVImark software. CW 5 remained in the position until August 2019, when she left Covetrus. CW 5 indicated that Henry Schein's AVImark software development team contained CW 5 and two other individuals based out of Piedmont, Missouri. CW 5's team reported to Software Engineer Supervisor Marla Knott (aka Marla Cravens). Knott reported to Gene Miller, the Senior Director of Software Development.

29

65.     CW 6 similarly explained how, leading up to the merger, HSAH had not integrated its own software platforms.[15]  Instead, CW 6 explained, management was singularly focused on preparing the Company for its public listing on NASDAQ, stating "[e]verything we did was getting prepped for the NASDAQ and the IPO."  As a result, CW 6 confirmed, by the time Covetrus began public trading in February 2019, the Company was "**absolutely not integrated**," was not "even integrating [its software platforms] yet" and had not yet devised a **plan** to integrate.  CW 6 stated that within Covetrus, "**we thought it would take a year, or a year and a half to integrate**."

66.     Because HSAH was not integrated internally, there was massive dysfunction leading up to the February 2019 merger finalization.  CW 6 explained that many updates for the Company's software were late because Henry Schein "bought 45 companies before the rollout of Covetrus and [was] trying to rollout everything under one company, and it was bananas."  Moreover, CW 6 explained that HSAH's software products, AVImark and ImproMed, operated differently, and that VFC was developing software one way while Henry Schein was developing it another way.  Leading up to February 2019, there were conversations about all of the different software products and how to integrate them, but employees were busy "keeping up with the daily fires from the software side."  Commenting on Covetrus's integration efforts, CW 6 stated "[t]here was a lot of focus on the cool shit and not the foundational stuff.  They had a new logo, new brand, and a new look **but it was all papering, a veneer.  We were working on a veneer**."

67.     Like the HSAH business lines, VFC's business units were highly fragmented.  As CW 1 explained, VFC's business units operated autonomously from one another, maintaining

---

[15] CW 6 was a Senior Manager of Strategy at Henry Schein and Covetrus from December 2018 to February 2019, and one of the last employees to be hired to assist with the integration of VFC and HSAH.  She reported to Heather Ansell, Vice President, Commercial Operations Global Software Services, and Toby Marosszeky, Marketing Manager (APAC and EMEA) and Director of Marketing (US)-Software Services. CW 6 left the Company in February 2019 after realizing the integration of the different software platforms was going to be much more arduous than she had envisioned.

different platforms, products, sales teams, and leadership.  Before the merger, VFC operated three different companies off of multiple fragmented software platforms: Vets First Choice, Vet Pharmacies of America, and Roadrunner.[16]  These three companies shared no logistics or supply chain infrastructure, and each maintained separate websites, ordering systems, and logistic systems.  The products of these businesses were also independent of one another and sold by separate teams.

68.     CW 6 described senior management's familiarity with the internal fragmentation of Covetrus's various software products, stating that "from a top level they were aware of the fact that the integration of the software was an ongoing issue."  CW 6 added that there "was a high level of disorganization on how [Covetrus's software] products were going to be integrated and one of the biggest issues was that a lot of those products offered the same services."  When asked about Defendant Shaw's statement that "we're not managing the business day 1 or day 2 as standalone legacy businesses," CW 6 stated that what Shaw described was not consistent with her experience at the Company, commenting "*[w]e were working under one name, Covetrus, but we were still working on the integration*."  She further stated "*[a]ll of these products were still separate.  We were trying to figure out how do we communicate with all of these different products to people*."  CW 7 similarly confirmed management's knowledge of the integration issues.[17]  CW 7 explained, for example, that Defendants Shaw and Komola, and other members of

---

[16] In the brief period leading up to Covetrus's formation, VFC had acquired three businesses.  In 2012, VFC acquired VetCentric, Inc., a privately held company headquartered in Maryland that offered home delivery of pharmaceuticals, compounded medications, and therapeutic and wellness diets to pet owners on behalf of veterinary practices.  In 2017, VFC acquired Roadrunner Pharmacy, a privately held company based in Arizona that provided veterinarians and their patients with compounded medications, including customized, back-ordered, and discontinued medications.  Also in 2017, VFC acquired Atlas Pharmaceuticals, a privately held provider of compounded sterile and non-sterile veterinary drugs for in-clinic use.

[17] CW 7 was employed at VFC and Covetrus as an Enrollment Specialist, from April 2016 to September 2019.  She worked within the sales department and directly with the internal sales staff.  The inside sales team sold VFC's

senior management, attended Company-wide meetings that were held after the end of each quarter, either on the same day or the day after the Company's earnings release. She confirmed that integration issues were among the topics discussed at these "town hall" style meetings. CW 7 recounted that in May 2019, during one such meeting after the end of the first quarter of 2019, Company engineers were asked technical questions about how to integrate the different platforms and software systems, which demonstrated the executives' awareness that the Company's platforms remained unintegrated even after the end of the first quarter.

69.     To illustrate the complete lack of progress with the integration and the fragmented nature of the Company, CW 6 referred to the below slide from a February 4, 2019 internal Company presentation. The presentation was created for a high-level integration "Planning Session," and as CW 6 explained, the slide below shows very clearly the "*logo soup*" and "*mess of different products*" that were offered by Covetrus at the time of its launch, but had yet to be integrated. As shown in the slide, no progress had been made on unifying and integrating these areas besides calling the new business the highly generic "NewCo." CW 6 underscored that, as set forth in presentation, "*from day one in February 2019, everything was still separate*."

---

prescription management platform to the veterinary practices. CW 7 also worked closely with outside field (sales) agents.



70.     CW 1 similarly confirmed that, following the formation of Covetrus, the Company appeared to have no roadmap for integrating the HSAH and VFC businesses.  Instead, Covetrus continued to operate each of its businesses independently from one another.  CW 5 similarly confirmed that no real attempts were made to integrate any of the Henry Schein or VFC software platforms before or after the formation of Covetrus.

71.     CW 4 similarly stated that HSAH and VFC essentially ran as two separate companies under the Covetrus umbrella.  CW 4 stated that there was "***absolutely no communication***" between the legacy HSAH and VFC businesses, adding "***in fact there was a wall***."  As CW 4 stated, the Company's software solutions were "***never a fully integrated system***"; the systems were ***not*** even "***talking to each other***"; they were not connecting; and they were not compatible.  CW 5 similarly stated that there were no significant changes or integration projects involving the development of AVImark when Henry Schein and VFC formed Covetrus.  Like the

companies Henry Schein had grouped together previously under the HSAH umbrella, VFC was just another "**separate business**" at Covetrus.  As CW 5 stated, VFC was "on the other end" of the veterinary market and handled a different area of veterinary health (prescription management) and focused on things like "direct mail orders."  Although VFC was based in the United States, the software development of VFC retained its own reporting structure.  To CW 5's knowledge, even at the time of CW 5's departure from Covetrus in August 2019, Covetrus's Senior Director of Software Development, Gene Miller, an HSAH employee since 2005, still did not have "anything to do with VFC yet."

72.     When asked if anyone at Covetrus ever provided her team with an integration plan relating to the various software systems and development teams operating under HSAH and VFC, CW 5 **laughed**.  CW 5 confirmed that there were **no plans** to integrate the Company's different software systems.

73.     Emblematic of Covetrus's abject failure to integrate was its failure to combine VFC's prescription management software with HSAH's practice management platform.  CW 8, for example, confirmed a complete lack of platform integration at Covetrus, and that Covetrus's prescription management and analytics capabilities were **not** hardwired into Covetrus's practice management software, supply chain business, or any other legacy HSAH platform.[18]  CW 8 stated that Covetrus was supposed to integrate the VFC prescription management and analytics capabilities into the practice management software (such as AVImark or ImproMed) in June 2019, but this integration did **not** occur by the time she left Covetrus at the end of May 2019.  CW 7

---

[18] CW 8 was employed at HSAH and Covetrus from January 2010 until May 2019.  As a Total Solutions Specialist, CW 8 was responsible for selling software and hardware to new and existing customers.  CW 8 sold software and hardware packages, including the Advantage Plus, AVImark, and ImproMed platforms.  CW 8 reported to Todd Sheets, North American Sales Manager-Practice Management Software Solutions.

similarly confirmed that by the time she left the Company in September 2019, VFC's prescription management platform was still not integrated or hardwired into the Company's practice management software, stating: "***It wasn't integrated yet.*** They were in the process of trying to do that. It was one of their goals, ***but it wasn't done***." CW 7 added that, based on her experience at Covetrus and role enrolling veterinarians on the Company's prescription management platform, the VFC prescription management platform had not been integrated with Henry Schein's supply chain or distribution business – nor any other Henry Schein business or platform – during her tenure at the Company. CW 7 noted, for example, that ***no beta testing had been done*** on the prescription management platform regarding any potential integration with HSAH's legacy practice management platform during her tenure at Covetrus. She stated that while it was a goal of Covetrus to integrate both the VFC software with Henry Schein's software and other platforms to provide a "full circle" product for their customers, VFC's pharmacy solution had not been integrated with any legacy Henry Schein platform while she was at the Company. As CW 7 stated, "***[i]t was business as usual for us after the merger and I wasn't aware of any integrations***."

74. The lack of integration continued to be discussed internally after the Class Period. CW 4 stated that after the Company's August 13, 2019 earnings release and stock drop, the various department heads spoke to voice concerns about the ongoing lack of integration. CW 4 spoke with the heads of different departments within the Company, including e-commerce, trying to come up with a way to integrate the Company's core systems.

### 3. Covetrus's Deficient Infrastructure, Systemic Fragmentation, And Lacking Integration Caused Immediate Sales Declines

75. During the Class Period, it was obvious internally at Covetrus that sales were suffering and Covetrus's financial guidance was unobtainable, for several reasons. First, Covetrus did not integrate its three various sales organizations (software sales; prescription management

sales; and supply chain/distribution sales) as part of or after the merger, which prevented Covetrus from achieving the "cross-selling" that Defendants promoted to investors as driving sales. Second, Covetrus's fragmented software platforms and supply chain resulted in delayed and often cancelled orders, leading to lost sales and customers. Third, after the merger, Covetrus immediately lost access to significant amounts of sales that HSAH had previously enjoyed as part of Henry Schein through cross-selling products from Henry Schein's other business segments, such as sales of dental and human health products used at veterinary practices. Fourth, because HSAH sales representatives knew before the merger that Covetrus would not be able to make such sales once the merger concluded in February 2019, the HSAH sales representatives boosted HSAH's sales of such products before the Class Period, artificially elevating HSAH's pre-Class Period sales figures (which in part formed the basis of the Company's false and misleading 2019 EBITDA guidance) and necessarily leading to declines in Class Period sales. Fifth, Covetrus intentionally changed the sales compensation policies that had prevailed for HSAH's salespeople – who were the vast majority of Covetrus's sales personnel – in a manner that emphasized "strategic" sales over profitable sales. Finally, cannibalization amongst HSAH's software platforms that had been ongoing before the merger continued to drive down aggregate Covetrus sales throughout the Class Period.

**Lacking Sales Force Integration And Software**
**Integration Immediately Depressed Covetrus Sales**

76. Covetrus's sales were significantly damaged because the Company failed to integrate its three separate sales organizations: distribution (*i.e.*, sales of physical products to veterinarians); software (commonly referred to as "technology" sales); and prescription

management.[19]  As CW 8 explained, the three separate sales organizations were "not cohesive at all" at Covetrus and it was a "cluster."  CW 8 further indicated that she continued to sell the same technology products at Covetrus that she had previously sold at HSAH, and that after the merger and creation of Covetrus, the three sales groups remained separate inside Covetrus.  CW 8 stated that she never sold prescription management software, for example, even as late as May 2019 when she left Covetrus.  CW 9 similarly confirmed the lack of integration of Covetrus's sales teams.[20]  When asked about Defendant Shaw's statement on May 29, 2019 that the Company brought together its various sales organizations "into a now tightly integrated, stood-up, aligned group that's now representing the total scope of our capabilities," CW 9 replied that the businesses were clearly not integrated at the time those statements were made.  She added that she never saw any integration as a sales representative in the field.  CW 10 also confirmed that HSAH and VFC sales teams were not integrated after the merger, "especially when it came to our knowledge and understanding of VFC."[21]  CW 10 stated that the sales reps at Henry Schein continued to sell the same products after the merger with VFC.

77.    Moreover, as was typical of Covetrus's lack of integration and infrastructure, the Company provided no significant amount of formal training of HSAH personnel to sell the VFC platform, further hampering sales.  For example, CW 6 stated that Covetrus was "*so disorganized*

---

[19] CW 8 explained that the distribution arm of the sales department was responsible for selling lab equipment, x-ray machines, products, and drugs for the veterinary hospitals.  The distribution team stocked veterinary practices with anything that they needed to treat animals.  The technology sales team sold veterinary practice management software such as AVImarkrk and ImproMed.  The prescription management side included online pharmacy sales.  CW 10 similarly confirmed the three-part division of sales teams that CW 8 described.

[20] CW 9 was employed as a Territory Manager for HSAH from January 2018 until the merger, then remained in the same role until September 2019.  She reported to Regional Sales Manager Shad Conn.

[21] CW 10 was employed at HSAH and Covetrus from April 1998 to April 25, 2019.  She was employed as an Inside Sales Supervisor, and also worked as Account Manager for the highly important VCA account, HSAH's largest customer before the merger.  Her title as Inside Sales Supervisor remained the same after HSAH was merged into VFC to form Covetrus.  CW 10 reported to Inside Sale Manager Bobbie Jo Riddle.

37

*that they didn't have trainings on the products*." She stated that there was no standard onboarding process for the marketing team regarding what the Company's various products did or the differences between the products. CW 6 noted that she had to do her own research on what the Company was selling, stating "*[w]e didn't even know what the hell we were selling*." She added that she did not even see VFC's platform until mid-January 2019. CW 6 asked the entire marketing team if they received training on the products that the Company was selling and was told that they had not been trained at all. CW 6 recalled discussing the lack of training with a colleague that worked on the Company's IT/software side, who responded by exclaiming "I can't believe that they don't have trainings on the software that we are selling!" CW 3 similarly commented that "*no one knew what the Vets First Choice platform was doing*."

78. CW 1 also noted the lack of cross-selling between HSAH and VFC under the Covetrus umbrella. CW 1 stated that although Covetrus claimed to have trained 500 salespeople in 2019 so that they could cross-sell products, salespeople from each business continued to sell the same product lines they were involved in prior to the merger. Further speaking to the fragmentation of the Company and lack of cross-selling, CW 4 stated that HSAH had no faith in VFC's system, and therefore nobody at HSAH sold it. CW 6 similarly stated that there was extensive infighting between sales representatives that sold different products. She stated that sales drove "everything" at Covetrus, and as a result, sales representatives that sold one type of software were not going to push other products, adding that it "was a mess trying to figure out who was doing what." CW 6 emphasized that "*[i]t was so sales driven that teams selling one platform did not want to integrate all of their shit together*," adding that the different sales groups were solely focused on selling their own product. She added that due to the fragmentation and disorganization within the Company, sales representatives "*couldn't get to the point of cross-*

38

*selling*" the VFC platform.

79.     CW 3 similarly stated that there was no team atmosphere at Covetrus and that it felt like a case of "*them versus us*" (with "them" referring to the VFC employees and "us" referring to the HSAH employees).  She stated that unlike previous Henry Schein integrations, HSAH and VFC never operated as "one big company" or "one big team," instead operating like "sister companies."  When asked if there was any real cross-selling going on at Covetrus, CW 3 agreed that the cross-selling "*just wasn't there*."

80.     Fragmentation between the Company's various software platforms also led to delayed orders, lost customers, and a decline in sales.  CW 9 stated that her sales numbers were affected by the merger, noting that she had experienced other mergers before, but found this one to be more problematic.  CW 9 indicated that the fragmentation of software platforms at Covetrus resulted in the Company being unable to deliver certain products to the customer, stating: "*When it came to the platforms and what would be available to the clients, such as medications or drugs, those medications weren't getting to the clients on time*."  Indeed, CW 9 recalled "*countless*" clients that the Company lost because they did not receive their products on time, stating "I had countless clients that ordered scripts and either did not get them on time or did not get them at all."  CW 9 observed delays of 7-10 days, although Covetrus sales representatives told customers that there was only a 2-3-day turnaround for medication orders.  CW 9 stated that Covetrus "over-promis[ed] and under-perform[ed] on many different occasions," adding that the Company made several promises as to what platforms would be available to clients after the merger.  CW 9 also stated that changes to the business after the merger resulted in lower sales numbers for her territory, and her territory's sales numbers were declining in the beginning of the second quarter.

**From The Start, Covetrus Lost Access To Whole
Categories Of Sales, Further Depressing Company Sales**

81. Defendants knew from Covetrus's inception that the Company would be unable to benefit from certain sales revenue streams that HSAH had long enjoyed. CW 3 explained that veterinary practices order both animal health and human health products. Typical human health products ordered by these practices include human medical gloves, crossover pharmaceuticals, and a variety of dental products that were developed for humans, but are considered safe for animals. Prior to the spin off, CW 3 was able to "special order" these products from Henry Schein's human health businesses for her customers. Following the spinoff, however, CW 3 lost access to all of these products (Covetrus could no longer special order these products from the human health businesses that remained a part of Henry Schein). This concerned CW 3 because there was a "***huge list of items***" she could no longer sell her customers. In anticipation of this change, CW 3 attempted to sell her customers extra stock of these items so that they would "have a cushion" of products until they could "find it someplace else." CW 3 noted that these products were "big" sellers prior to the spin off/merger and that the loss of access to these products equated to a loss of a significant amount of sales that HSAH previously enjoyed, commenting that losing the products "was definitely something to talk about." CW 3 was notified about the loss of access to these products via e-mail from Henry Schein's procurement department, stating that the email was distributed to Henry Schein's inside sales representatives prior to the merger. CW 3 understood the e-mail to mean that she needed to sell more human health products to her clients in the immediate term before she lost access to them after the merger.

82. CW 10 similarly confirmed that it was "***absolutely correct***" that after the merger, legacy Henry Schein sales representatives lost access to sell certain categories of products that HSAH had been allowed to sell previously such as human products and dental products. She stated

that prior to the merger, they were able to access the full line of Henry Schein products which included dental products and human products, but "[w]e lost the ability to have access to those products after the merger." She stated that before the merger, "[w]e sold these items with regularity to veterinary practices," but after the merger with VFC, they lost access to all the human products that they previously sold to veterinary practices. CW 10 also confirmed that at least as early as 2018 the sales representatives knew they would lose these sales after the merger. CW 10 recalled receiving email updates prior to the merger on what products were still available, and that employees looked for alternatives for some of the products that they were no longer going to be able to get. CW 10 further confirmed that there was a push to sell a higher quantity of the products "before we couldn't get it anymore" after the merger so that the veterinarian practices would be stocked up after the merger. CW 10 analogized that "It's like a girl knowing that a certain lipstick shade is going to be discontinued she is going to buy four of them because you don't want to be without it. At Henry Schein, it was more like we won't be able to supply this for you anymore so you should buy some more now to have it on hand."

**Covetrus's Sales Woes Were Documented In Real-Time And Well Known Internally**

83. Such poor sales performance was well known inside the Company, which had frequent sales reporting internally and noted "across the board" sales declines in an internal meeting in late April or early May 2019.

84. As CW 2 explained, in contrast to the Company's antiquated supply chain business and fragmented technology platforms, Covetrus had extraordinarily up-to-the-minute sales reporting. "In my 15 years of animal health sales, I never had more real time information on the performance of my clients as I did when I was at Henry Schein." She explained that sales orders were routed through internal Company electronic systems within 60 seconds after they were

41

placed, so that CW 2 and management could see the sales as they happened, that there were "daily roll ups" of sales levels. CW 2 further stated that she could tell by the speed with which commission checks were paid to sales representatives that "executives knew about sales in real-time," including Tom Jimenez, who reported to the Company's President.

85. By April 2019, it was apparent inside Covetrus that the Company's sales figures were down significantly. As CW 2 explained, there was a lot of talk internally by April 2019 that sales were "*tanking*." She added, "By April 2019 it was quite apparent that we were not off to the rocket ship start that we were hoping for," and the message from senior management included "we are aware of this." CW 8 explained that HSAH was not making their sales numbers from either the hardware or software side. She stated that in late April 2019 or early May 2019, when the numbers were down "*across the board*," Covetrus held a teleconferenced sales meeting, and top executives regularly participated in such teleconferences.

86. CW 9 similarly stated that she attended regional and national sales meetings in which integration problems were discussed, adding that Defendant Shaw was present at some of the national meetings. Delays with shipping products and platform integration issues were among the topics discussed at the meetings. CW 7 similarly confirmed that the Company's senior management, including Shaw and Komola, attended Company-wide meetings that were held after the end of each quarter, on either the same day or the day after the Company's earnings release, in which integration issues were discussed.

87. These issues plagued the business even before the merger. CW 10 indicated that Henry Schein was notorious for having supply chain issues and backorder issues. She stated that "it was always an issue having the purchasing department get the right stock at the right time." CW 11 similarly confirmed that at HSAH, many products were constantly on backorder, and many

customers were cancelling orders due to inventory issues and delays.[22] She added that "[t]hings were always on backorder" and, "*[a]bsolutely, customers were leaving because of these inventory issues*." CW 11 also confirmed that the supply chain issues persisted throughout her tenure at HSAH through October 2018 and never improved. She commented, "I received complaints all of the time from customers, for sure." CW 10 confirmed that the backorder issues continued to plague the Company and they "*got worse after Covetrus was formed*." She stated that the issues persisted throughout her tenure, and that it "was something that was *always talked about but never got fixed*." The "stock was never what we needed, where it was needed," and there were discussions in 2018 and 2019 about updating the supply chain software, but there was no change to the software in 2018 or 2019 during CW 10's time at the Company. "*They always talked about upgrading the system and nothing ever got fixed*." CW 2 similarly confirmed that HSAH's complex supply chain and distribution caused order delays and customer frustration.

88. CW 10 confirmed that the supply chain and backorder issues at legacy HSAH negatively impacted sales. CW 10 stated that they drove down sales "in a huge way. Why would you sit on backorder when you could get it somewhere else?" She stated that it was very well known within the Company that they suffered from these backorder issues to the point where it was a common topic of conversation at the Company. She indicated that order delays persisted after the merger with VFC and into 2019. CW 10 classified as "*not accurate*" Defendant Shaw's May 29, 2019 statements that after the merger "we didn't miss a beat" and "[n]ot a single order was delayed. There was no disruption to the customer experience." She said that the issues "*never got better after the merger*." CW 4 similarly confirmed that supply chain and logistics issues resulted in lost sales.

---

[22] CW 11 was employed as an HSAH Territory Manager from November 2015 to October 2018.

89.     CW 9 also stated that Covetrus customers complained about the online platforms, noting clients had difficulties because the platforms were supposed to "talk to each other" and they were not doing so.  She stated this problem had not been fixed by the time she left Covetrus in September 2019.  The fragmented nature of the Company's online platforms caused her to ask "*[o]ur biggest selling point was that these systems were compatible, the question was when would they be?*"  CW 9 stated that while Covetrus touted their online platform and its ease of use, "I just know that a lot of the time that didn't come to fruition as it was supposed to."  CW 9 stated that the biggest issue in her territory was a lack of communication between the sales teams of the various platforms and the customers, stating that these problems "*[a]bsolutely*" started to occur right after the creation of Covetrus.  CW 9 added that "*[o]ur reputation was tarnished once the merger occurred and a lot of thing[s] started to fall through, and promises were broken*."

**F.     Covetrus Reports Poor Results For Its First Quarter As A Public Company, But Defendants Continue To Conceal Covetrus's Problems**

90.     On May 15, 2019, just three months after the merger, Covetrus reported disappointing financial results for the first quarter of 2019.  The results included a pro forma decline in revenue, net income, and EBITDA compared to the first quarter of 2018.  The Company's reported pro forma EBITDA of $50 million for the first quarter missed consensus estimates by more than $10 million and analysts were concerned by the "noisy" financial results, including weaker revenues, underlying profitability issues, and "slower-than-expected synergy ramp."

91.     Rather than acknowledge the Company's unrealistic EBITDA guidance and the fact that the Company's lacking integration and dilapidated supply chain were causing the poor financial results, Defendants instead made a series of misrepresentations regarding the Company's financial performance and prospects in order to reassure investors.  For example, Defendants told

investors that (i) the integration of HSAH and VFC had been a complete success; (ii) the Company had "improved top line performance," *i.e.*, revenues, thus far in Q2 2019, particularly in HSAH's distribution and supply chain business in North America; and (iii) the Company was reaffirming their guidance of "double-digit" adjusted EBITDA growth. *See* ¶¶137-44 below.

92.     Defendants continued to falsely represent the Company as integrated and experiencing strong sales performance later in the second quarter. For example, addressing an analyst's question at the Stifel Dental & Veterinary Conference on May 29, 2019 about trends in "the revenue growth rates for the Schein legacy animal health business" and "what it was like bringing the two organizations together," Defendant Shaw responded that "I think it's important to understand that prior to the merger, that the Henry Schein legacy business was actually comprised of many different businesses," including "several dozen different operating businesses." However, Shaw reassured investors that after the merger close, "***what we've achieved has been an integration of that value proposition. We brought together these different business groups into a single face to customer around software, in insights and analytics around inventory management, appointment management and prescription management***." Shaw promoted the complete structural integration of the Company's various sales organizations, stating that "***in March … we brought our … 3 various sales organizations … together into a now tightly integrated, stood-up, aligned group that's now representing the total scope of our capabilities***." Shaw emphasized that "it's the integration and kind of power of that connected ecosystem that we're delivering to customers. ***So we're not managing the business day 1 or day 2 as standalone legacy businesses. I think that's a very important observation around sort of the structural changes we've been able to achieve in this***."

93.     A securities analyst asked Shaw whether the sales momentum that Shaw had

promoted during the May 15, 2019 investor conference call, in March and "into April … has continued even more recently into the month of May?" Shaw responded "Yes…. The organization understood the power of the integrated capability set of the Company. And that's manifested itself in a ***very big pipeline, really strong engagement activity, and we see that coming into Q2***." In response to a securities analyst asking Shaw to "talk a little bit" about the integration, Shaw stated that Covetrus "is really a story of how 80 very special animal health organizations around the world, representing everything from software and distribution, manufacturing capabilities, insights, group purchasing capabilities, how 80 distinct separate organizations with different ownership structures, different governance structures now, for the first time, ***are part of one integrated organization***." Another securities analyst asked Shaw: "[A] typical investor would say, when do you start to realize that or where does that start to flow through the P&L or when do we start to see that with numbers?" Shaw responded that "[d]espite a very complex organization that include the carve out of financial systems and payroll services and licensure and accreditation and just a massive amount of disruption, the organization, we didn't miss a beat on the first hour of the first day. Not a single order was delayed. There was no disruption in customer experience."

G. **The Truth Emerges: Covetrus Reports Disastrous Results For Its Second Quarter, The Stock Price Plummets, Analysts Question Defendants' Credibility, And Covetrus Fires Defendants Shaw And Komola While Pledging To "Rebuild Trust With Investors"**

94. On August 13, 2019, Defendants' misrepresentations unraveled in dramatic fashion. On that date, Covetrus was forced to report lacking integration, awful performance in the Company's supply chain business, and disastrous financial results for Q2 2019. The disclosures, which came just six months after the merger's finalization, revealed that Defendants' numerous prior positive statements about achieved integration and resultant financial growth – many of which were made as late as two-thirds of the way through Q2 2019 – were materially false when

46

made. The shocking disclosures caused the Company's share price to drop precipitously, with an immediate *47% decline* in the entire Company's valuation over just two days – a $1.2 billion decline – that left the stock trading *70% lower* than its merger price. Deceptive to the end, Defendants Shaw and Komola attempted to blame outside factors for the Company's issues, but securities analysts saw through the fiction and openly questioned their credibility. Further, given the magnitude of Shaw's and Komola's false statements, Covetrus fired Shaw and Komola shortly after the end of the Class Period while repeatedly acknowledging the Company's "critical" need to "rebuild trust" with investors in the wake of the fraud.

95. Specifically, on August 13, 2019, Covetrus issued a press release reporting the Company's financial results for the second quarter of 2019. In the press release, Covetrus disclosed financial results that were the polar opposite of Defendants' prior guidance, including quarterly net sales that were 4.5% *lower* than pro forma net sales in the second quarter of 2018; and net income that swung from a $31 million pre-merger *gain* in Q2 2018 to a $10 million *loss* in Q2 2019. The Company also reported a 15% year-over-year *decline* in pro forma adjusted EBITDA for the quarter. The press release further disclosed "$10 million to $15 million" in "recurring" infrastructure expenses; millions of dollars in previously undisclosed infrastructure "investment[]" expenses that had already impacted the Company's performance in Q2 2019; and accelerated infrastructure expenses of $40 million for 2019.

96. The Company's press release explained that, along with horrendous sales results and prospects, "the inclusion and timing of infrastructure investments" caused Defendants to issue dramatically reduced EBITDA guidance. Indeed, the Company slashed its full-year adjusted EBITDA guidance to "at least" $200 million for 2019, representing a substantial $35-$50 million reduction from the range of $235 million to $250 million that Defendants had reaffirmed to

investors on May 15—*i.e.*, **half-way through the second quarter**. Now, rather than providing for "double-digit" earnings growth, the management's new EBITDA guidance provided for double-digit earnings declines and millions of dollars of "recurring" expenditures to fix the Company's outdated and fragmented infrastructure, systems, and operations.

97. Covetrus held an investor conference call on August 13 to discuss the disastrous results and lowered guidance. During the call, securities analyst David Michael Westenberg from Guggenheim Securities asked about the "slower volumes" in the "distribution business." In response, Defendant Shaw admitted lacking integration lie at the heart of the Company's poor results. He stated that "the integration of our supply chain and inventory management capabilities with practice management software" – *i.e.*, legacy HSAH businesses that were purportedly integrated as of the time of the merger – was still not complete. According to Shaw, and despite his prior statements, the Company had only "**started to roll out those capabilities**."

98. Given the lacking infrastructure and integration, Shaw disclosed that Covetrus had "**significantly accelerated investments**" tied to the Company's separation from Henry Schein and "the build-out of infrastructure that supports completion of the carve-out." Defendants were forced to disclose $40 million in infrastructure investments in 2019, including $10-$15 million in "**recurring**" operating expenses that directly reduced EBITDA. Komola further revealed that the Company's previously undisclosed and now-recurring "IT infrastructure investments of between $10 million to $15 million" also caused the lowered guidance, and that the Company's year-over-year decline in adjusted EBITDA for the second quarter of 2019 was "driven by continued investments in the platform," in addition to lower sales. Attempting to excuse the belated disclosure of these needed infrastructure investments, Defendant Shaw contradicted prior statements that the Company's infrastructure expenditures were "in the 2019 numbers already" by

claiming that it was only now, six months *after* the merger, that they were finally "at a point where we have detailed plans and understanding of the level of infrastructure investment we need to make."

99.     Next, Defendant Komola revealed that, far from the Company's North American business being strong as Defendants had represented half-way through the quarter, "the market [being] down in North America" was the "*primary driver*" of the Company's sharp $35-50 million downward revision in EBITDA guidance.  Shaw emphasized that the slowdown in North America was "*across the board*."

100.    Shaw and Komola both sought to deflect from the Company's lacking integration, massive infrastructure problems and dramatically lower sales by falsely blaming the Company's performance problems on external factors such as "near-term market dynamics," "slowing business… not specific to us," and "moderating foot traffic in veterinary practices."  Defendant Komola repeatedly and falsely tried to shift blame to market factors, claiming that it was "market dynamics" that had unexpectedly "creat[ed] a delay" in Covetrus's financial success.

101.    Investors reacted immediately to the Company's disclosures.  On August 13, 2019, the Company's shares plummeted *40% in a single day* on the *highest-ever trading volume* since the first day of regular trading on February 8, 2019.  The stock fell from a closing price of $23.19 per share on August 12, 2019 to close at $13.89 on August 13, 2019.  Covetrus shares continued to fall another 11% on August 14, closing at just $12.35 per share.  All told, Covetrus shares plummeted nearly *47%* over the two trading sessions, eliminating over *$1.2 billion* in market capitalization.  The August 14 closing price also represented a staggering *71%* decline from the stock's initial post-merger trading price of $42.96 on February 8, 2019.

102.    Securities analysts were shocked by the August 13, 2019 disclosures.  In a series of

49

reports, analysts attacked management's credibility and slashed their assessments of the Company's financial prospects.  For example, securities analysts at William Blair & Company published a report on August 14 stating that Covetrus had suffered "***Disappointing Distribution Performance Out of the Gate***" and concluding that "***there are now serious questions around the merger and management's credibility***."  The August 14 report noted that "***the legacy Henry Schein distribution business is faltering***"; "the rapid pace at which the legacy distribution business appears to have declined" was "***troubling***"; and the segment likely suffered from "***integration challenges***."  Given the disclosures regarding the "U.S. distribution business," the report concluded that investors still "***do not yet have sufficient clarity***" on the costs of the integration.  As a result, William Blair "materially lower[ed]" its EBITDA estimates for both 2019 and 2020, and slashed its EPS target nearly in half.

103.    Securities analysts at Credit Suisse published an August 13, 2019 report that similarly highlighted the Company's shortfall in revenues and profits, weak sales relative to other animal health constituents, and "expedited infrastructure investments."  Credit Suisse exclaimed that the Company was now projecting a 10% ***contraction*** to pro forma EBITDA, "at a minimum," which was "***a far cry from initial +DD [double digit] growth aspirations***."  Credit Suisse issued another report on August 16 which rejected management's claim that the weak sales were due to "end market softness," and concluded that the true cause for the reduced guidance was "***anemic growth across [Covetrus's] Supply Chain business***" and the "***expedited infrastructure investments***" as causes for the reduced EBITDA.[23]

---

[23] The Credit Suisse analysts explained that Defendants' attempt to blame the disappointing sales on market-wide factors was "***inconsistent*** with commentary from other industry constituents, based on the multiple animal health companies we track, as well as our survey work, suggesting potential market share loss to other distributors as well as alternative e-commerce channels."  Credit Suisse's August 16 report also questioned the Company's "steadfast" expectations of $100 million in overall infrastructure investments, noting that management "is now targeting $10-15 million of which will be recurring nature (vs. ... a one-time expense)."

104.    Securities analysts at G.research, LLC issued a report on August 13, 2019 titled, "*CVET in the Doghouse After Weak Q2 and Reduced Outlook*," that specifically attributed the 40% one-day decline in Covetrus's share price to "weaker-than-expected Q2 results" and the Company's reduction of full-year 2019 EBITDA guidance based on "weakness in North America and $10-15M in recurring infrastructure investments." Like Credit Suisse, the analysts at G.research rejected management's claim that weak sales were due to competitive pressures and general weakness in the veterinary market. The analysts at G.research noted the surprising "*magnitude of the weakness in [Covetrus's] traditional distribution business*" and explained that Defendants' excuse of industry-wide weakness was not true and "*runs counter to our views of the sector following Q2 earnings from companies across the companion animal landscape*." Under a subheading titled, "*Where did all the EBIT go?*," G.research underscored the shocking decline in the legacy HSAH business, estimating that annual operating income in the legacy HSAH business was "trending at approximately **half th[e] pace**" before it was spun-off – *i.e.*, $86 million for 2019 compared to $170 million for 2018 – based on figures provided by Henry Schein when the spin-off was announced. The G.research analysts also questioned whether the "higher than initially anticipated" separation and transition costs would result in Covetrus's already-lowered EBITDA guidance being cut even further, and stated that Covetrus's recent disclosures had "*raised [the analysts'] level of skepticism*."

105.    As *VIN News Service*, an independent veterinary news service and the largest online information service devoted to veterinary medicine summed it up: While Defendants tried to blame Covetrus's poor results on the "market environment," in truth, "there was **nothing in the 'macro environment' to account for the disappointing earnings**.... '[The company] blamed problems on external factors, and **the investment community didn't buy that at all**.'"

106. In the aftermath of the August 13, 2019 disclosures, Covetrus instituted an executive-level housecleaning and promised a new era of "accountability" to "*rebuild trust with our investors*." On October 22, 2019, Covetrus announced the immediate termination of Defendant Shaw. As part of the leadership change, Benjamin Wolin, an independent director, agreed to assume the role of acting CEO and President. That same day, analysts at Raymond James issued a report on Shaw's termination, which noted that Covetrus shares "hit a fresh low this morning following an out-of-the-blue announcement that Ben Shaw has stepped down as CEO and President of the company" amid "shareholder frustration, which has been mounting for months." Analysts at Guggenheim Securities also issued a report on October 22, 2019 that linked Defendant Shaw's termination to the HSAH "distribution and logistics business (the cash flow positive part of the business)." The following day, G.research reported that "CVET has struggled to successfully integrate the Henry Schein distribution business with the Vets First Choice platform," and reiterated that "*management's credibility was further damaged* by claims on the Q2 earnings call of broader veterinary market weakness that conflicted with the statements and results of other companies across the animal health landscape." G.research emphasized that "CVET shares have been a *nightmare* since the company went public."

107. On November 12, 2019, Covetrus reported its financial results for the third quarter of 2019. In a press release, the Company *again* reduced its EBITDA guidance. In addition, the Company announced that it was worth less than it had represented at the time of the merger. The Company recognized a *$939 million* impairment charge against the Company's "initial valuation at the time of the spin-off and acquisition in early February." The massive goodwill impairment charge resulted in a massive $906 million loss, or $8.09 per share, for the quarter, and demonstrated that the business was permanently impacted by Defendants' misrepresentations regarding the

Company's performance and value.

108.    During the Company's third quarter earnings call on November 12, 2019, Benjamin Wolin, the Company's new acting CEO, emphasized the need for "changing how we analyze and discuss the company and its progress going forward" and "*a new approach where we are … being as transparent as possible with… our investors*."  Wolin also stated that going forward, Covetrus would finally "*build a culture focused on… trust[] [and] transparency*."  Wolin acknowledged that it was "critical for the management team and the company to *rebuild trust with our investors and the analyst community*" and pledged to "promote *increased accountability* throughout the organization."  Indeed, Defendants Shaw's and Komola's false statements to investors were so diametrically opposed to the negative truths inside the Company that Wolin emphasized the need "to create a paradigm" in which investors could understand the basic fact of "what direction … we're driving in."  Given lacking sales force integration, Wolin also noted that client enrollments on the VFC prescription management platform were "obviously significantly lower than our original expectation" and the Company was only "starting to see some progress there."

109.    Five weeks later, on December 16, 2019, Covetrus announced the immediate termination of Defendant Komola.  The bloodletting continued on January 7, 2020, when Covetrus announced the termination of its North American President and Global Supply Chain Officer, Matthew Leonard.  During his less than nine months at the Company, Leonard served on the Company's executive leadership team and reported directly to Defendant Shaw.  In addition to Shaw, Komola, and Leonard, the Company also announced the "resignation[s]" of Chairman David Shaw (the father of Defendant Benjamin Shaw) and Betsy Atkins, a director who had served as Chair of the Compensation Committee since the spin-merger.

110.    As part of its effort to rebuild trust with investors, the Company felt there was such

53

an urgent need to terminate Defendants Shaw and Komola that it did so without having any replacements for them. Indeed, it was not until March 3, 2020 – over four months after Shaw's termination – that the Company announced that Benjamin Wolin was Shaw's permanent replacement. Similarly, five months elapsed between Komola's termination and the May 14, 2020 announcement of her replacement; and four months passed between Leonard's termination and the May 14, 2020 announcement of his replacement.

111. Several months after the Class Period and after the terminations of Defendants Shaw and Komola, industry observers continued to focus on the great disparity between Shaw's and Komola's Class Period misrepresentations to investors and the internal truth at Covetrus. A February 10, 2020 article in *The VIN News Service*, for example, noted that while Shaw claimed on May 15, 2019 that the merger had been a "very smooth transition" and Covetrus was "off to a fast start," in truth, "*[b]ehind the scenes, ... Covetrus was falling short of its projections, a situation that became public knowledge in August*."

H. **Covetrus's New Management Team Admits The Blatant Falsity Of Defendants' Class Period Misrepresentations And Fabricated Excuses**

112. In an ongoing effort to "rebuild trust" with investors, Covetrus's new management has continued to underscore how Defendants' statements during the Class Period representing achieved integration were clearly false when made.

113. On March 3, 2020, the Company held its Q4 2019 quarterly investor conference. During the call, securities analyst David Michael Westenberg from Guggenheim Securities, LLC asked "how things are going in terms of integration of legacy Vets First Choice with legacy Henry Schein?" In direct contrast to Defendant Shaw's May 29, 2019 statement that "we're not managing the business day 1 or day 2 as standalone legacy businesses" (¶¶145-46), Wolin responded unequivocally that, in fact, they *were*, more than one year after the merger's finalization, still

54

managing the businesses as standalone legacy businesses, stating "*we are still transacting along the way that we did when they were separate entities*. And that is my expectation for a lot of 2020 that *that will still remain the same* as we continue to focus on driving *the individual value*" of the separate entities. In direct contrast to Shaw's statement that Covetrus had "achieved … an integration of th[e] value proposition" for customers, with "a single face to customer" (*id.*), Wolin further acknowledged that the Company was *still* not "synchroniz[ing] those businesses" or "partner[ing] with our customers to unlock value," and admitted that "*we have a ways to go, to be honest, on both getting the value of a combined asset as it relates to our customers as well as deeply aligning with our customers, or integrating with our customers* in a way that is really unlocking new potential."

114. The next day, March 4, 2020, Wolin continued to emphasize the persistent lack of integration of VFC and HSAH even 13 months after the merger and nearly 7 months after the close of the Class Period. Indeed, Wolin detailed the non-integration of precisely those core operations that Defendant Shaw had claimed *were* fully integrated: sales team integration; and integration of PIMS and prescription management software. On March 4, 2020, Wolin, Interim CFO Stuart B. Gleichenhaus, and Vice President of Investor Relations Nick Jansen presented on behalf of the Company at the Raymond James Institutional Investors Conference in Orlando, Florida. In stark contrast to Defendant Shaw's Class period proclamations that prescription management and PIMS had achieved "deep integration" and were "hardwired" together (¶¶127-28, 137-38), Wolin responded to a question regarding the integration of the prescription management platform with PIMS by acknowledging that it was *still* "*early days*" and "*early innings on that front*," and Covetrus was, in March 2020, still only "*starting to see some integration* of prescription management into PIMS."

55

115. Wolin also made clear that it was obvious inside the Company that the prescription management software and practice management software had not been integrated because the lack of software integration was emblematic of a deeper and more widespread failure to integrate across all of VFC and HSAH. In explaining the lack of prescription management and PIMS integration, Wolin stated that "it's important to remember – to call out" that HSAH had a "*holdco model*" for PIMS – not any integration. As Wolin explained, "there is [sic] *lots of different platforms there*, often *competing with one another*" inside Covetrus, corroborating CW 6's account of how, leading up the merger, HSAH had not integrated its own software platforms and that by the time Covetrus began public trading in February 2019, the Company was "absolutely not integrated." ¶¶65-66, 68-69. Wolin stated that "[i]t's hard to integrate when you don't even have one person driving the direction of the business" so "[s]tep 1" after Wolin became interim CEO in October 2019 "was just unifying the group under one leader." Wolin went further still, underscoring how, contrary to Defendants' Class Period claims of a successful, achieved integration, in truth integration was not achieved and indeed – far from being complete during the Class Period – realistically required a "*three-to-five-year* period."

116. Wolin's statements also showed that Defendant Shaw's May 29, 2019 representation that "in March … we brought our … 3 various sales organizations … together into a now tightly integrated, stood-up, aligned group that's now representing the total scope of our capabilities" (¶¶147-48) was completely false when made. Wolin made clear that not only were the three sales forces *still* unintegrated a full year after when Shaw had said they had been integrated, but the Company had *still* not integrated even *two* of the three sales forces. Wolin frankly admitted that "*[w]e're not trying to do all of that sales force integration in terms of pushing the 2 sales forces together*, distribution and prescription management. We're going to

56

have **coordination, not integration** right now" – precisely the opposite of what Defendant Shaw told investors during the Class Period.

117.    Wolin also explained on March 4, 2020 how Defendants' attempts to blame "market forces" for the disastrous financial results reported on August 13, 2019 were obviously false when made, just as securities analysts had noted at the time.  While Defendant Komola claimed on August 13, 2019 that "market dynamics" had unexpectedly "creat[ed] a delay" in Covetrus's financial success and thus prevented Covetrus from meeting its financial guidance, and Defendants Shaw similarly cited "a slowdown in the North American Animal health market" as "undermining" Covetrus's financial results in its "distribution" business, Wolin made clear that – as analysts had already expressed (¶¶102-05) – these excuses were pure fiction.  As Wolin stated, "largely the dynamics that existed in the market and that frankly we expect to continue to exist **really wasn't [sic] that much different from '18 to '19** and '19 to '20."  He underscored that "what was going on from a distribution standpoint …, **all of that dynamic existed prior to the deal**, existed in '19 and will continue to exist."  Again completely contrary to Defendant Shaw's claim on May 29, 2019 that the Company was "in a share-gaining mode," (*see* ¶¶147-48), Covetrus's CEO Wolin further admitted that "[w]e certainly **weren't** on par with the market in 2019 from a growth standpoint."  Wolin acknowledged that Covetrus had no one to blame but itself, as "**a lot of the '19 challenges were frankly self-inflicted**."

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### The Registration Statements

118.    On December 26, 2018, Henry Schein, through Spinco, filed with the SEC a Registration Statement on Forms S-4 and S-1 for shares of Covetrus common stock that would be

distributed to shareholders of Henry Schein and VFC.[24]  The Registration Statement was signed by the Spinco Board of Directors, which was comprised of officers and directors of Henry Schein, including Defendant Paladino, Ettinger, Mlotek, and Siegel.  The Registration Statement stated that one of the Company's "key strengths" was its "inventory management and supply chain services and technology," and that one of the "key benefits" of the merger was "the complementary fit of Vets First Choice and the Henry Schein Animal Health Business, and the strategic benefits of a global, technology-enabled animal health business with a comprehensive service and technology platform and supply chain infrastructure."  The Registration Statement further stated that the Company is "well suited to compete in this market" based on, among other things, the Company's "global scale, comprehensive and integrated capabilities and expertise."  The beginning of the Registration Statement contained the following graphic depicting each of the Company's "Integrated Solutions," including the purported integration of "inventory management and supply chain services," "veterinary practice management software," and "proactive prescription management and pharmacy services":

---

[24] Henry Schein acknowledged filing the Registration Statement (and prior drafts of the Registration Statement) on several occasions.  For example, speaking to Henry Schein shareholders on November 13, 2018, Defendant Paladino stated "[w]e have filed a confidential registration statement."  Similarly, on November 28, 2018, speaking to shareholders of Henry Schein, Paladino stated "[w]e've filed the initial registration statement… on a confidential basis."  Furthermore, on January 8, 2019, again speaking to Henry Schein shareholders, Paladino stated "[w]e also, this morning, refiled the registration statement."

58



119. On January 8, 2019, Henry Schein, through Spinco, filed Amendment No.1 to the Registration Statement filed on December 26, 2018. The amended Registration Statement was filed with the SEC on Forms S-1 and S-4. The amended Registration Statement was signed by Defendant Paladino, Ettinger, Mlotek, and Siegel and contained the same false and misleading statements alleged in ¶118 above.

120. On January 15, 2019, Henry Schein, through Spinco, filed Amendment No. 2 to the Registration Statement filed on December 26, 2018. The amended Registration Statement was filed with the SEC on Forms S-1 and S-4. The amended Registration Statement was signed by Defendant Paladino, Ettinger, Mlotek, and Siegel and contained the same false and misleading statements alleged in ¶118 above.

121. On February 7, 2019, Covetrus filed a Prospectus with the SEC on Form 424B3 in connection with the Covetrus shares registered pursuant to the Registration Statements filed on

December 26, 2018, January 8, 2019, and January 15, 2019. The Prospectus contained the same false and misleading statements alleged in ¶118 above.

122. Also on February 7, 2019, Covetrus filed a Registration Statement with the SEC on Form S-1 registering certain shares of Covetrus common stock for resale. The Registration Statement was signed by Defendants Paladino, Shaw, and Komola and contained the same false and misleading statements alleged in ¶118 above.

123. On February 13, 2019, Covetrus filed a Prospectus with the SEC on Form 424B3 in connection with the Covetrus shares registered pursuant to the Registration Statement filed on February 7, 2019. The Prospectus contained the same false and misleading statements as the February 7, 2019 Registration Statement.

124. The statements referenced in ¶¶118-23 above, including the excerpted graphic promoting purportedly "Integrated Solutions," were false and misleading when made. HSAH's and Covetrus's "inventory management and supply chain services and technology" were not one of the Company's "key strengths." Contrary to Defendants' statements, there was no "comprehensive service and technology platform and supply chain infrastructure" at Covetrus and the Company did not have "comprehensive and integrated capabilities and expertise." *E.g.*, ¶¶51-80 (CW accounts describing antiquated supply chain and lack of integration), 115. Instead, HSAH's supply chain, distribution, and software businesses were in disarray and deeply fragmented, leading to lower sales and requiring immediate investments to shore up the ailing businesses. *Id.* The graphic specifically identifying each of the Company's "Integrated Solutions" was also demonstrably false because (i) the "veterinary practice management software" was not integrated with the "proactive prescription management and pharmacy services" throughout the Class Period (¶¶48, 73, 114-15; *see generally* ¶¶63-73); and (ii) as Defendants revealed on August

60

13, 2019, the practice management software had not even ***begun*** to be integrated with the Company's "supply chain and inventory management capabilities." ¶97.

**Statements During The February 4, 2019 "Capital Markets Day"**

125.    On February 4, 2019, Covetrus held its "Capital Markets Day" investor conference in advance of the Company's listing on NASDAQ later that week for regular public trading. During the conference, Defendant Shaw promoted the legacy HSAH distribution and supply chain platform as well as the integration of HSAH and VFC, stating that "***[w]e have significant supply chain infrastructure on a global basis supporting pretty much the entire active ecosystem in our space*** and a complete stack, a complete range of services, the ability to bring – ***to meet the total needs of our customers across practice management, prescription management, appointment management, inventory management and other added value services***." Shaw added that "[b]eing able to leverage and combine the infrastructure and relationships" was "very helpful" in the "short term."

126.    The quoted statements in ¶125 above were false and misleading when made. In truth, Covetrus did not have the supply chain infrastructure to meet the needs of its customers, and the HSAH supply chain "infrastructure" and software platforms were fragmented, causing sales declines, and in need of immediate and substantial infrastructure investments. ¶¶50-80; *see* ¶113 (Wolin stating that "we have a ways to go, to be honest, on both getting the value of a combined asset as it relates to our customers as well as deeply aligning with our customers, or integrating with our customers in a way that is really unlocking new potential"). Indeed, as CW 1 explained, HSAH did not have anything resembling an integrated supply and logistics system, and it was clear "that it would take ***two to three years*** to fully implement" a "singular logistics and supply platform for all legacy VFC and HSAH businesses." ¶¶51-59; *see* ¶115 (per Wolin, three to five

61

years needed for integration). At the time of these statements both HSAH and VFC were highly fragmented and it was clear inside the companies that integration at Covetrus would be delayed given the internal state of affairs. ¶¶56, 65, 115; s*ee generally* ¶¶51-74.

127. In response to a question from Steve Valiquette, a securities analyst at Barclays, about what separates Covetrus from its competition, Defendant Shaw promoted the Company's "integrated offering" of technology solutions. Specifically, Shaw highlighted the Company's "*unique… advanced prescription management and analytics capabilities*… put … into the context of an integrated offering to customers, where it is *hardwired into practice management software*. It's interfaced and coordinated with appointment management capabilities, and it's coordinated with in-office inventory management."

128. The quoted statements in ¶127 above were false and misleading when made. Defendants' claim that the Company's "advanced prescription management and analytics capabilities" were "hardwired into practice management software" was demonstrably false, as there was *no such integrated software platform* in place at Covetrus at this time and through the end of the Class Period. ¶73; *see generally* ¶¶60-80, 89. Covetrus CEO Wolin has since reinforced this point, noting that even as late as March 2020 the Company was only "*starting to see* some integration of prescription management into PIMS." ¶¶48, 114. Covetrus has similarly admitted that Defendants' claim that the Company's "inventory management" and practice management software were integrated was false when made. Indeed, on August 13, 2019, the Company admitted that it had only "*started* to roll out those capabilities." ¶97.

129. Also during the investor conference call, Defendant Komola acknowledged that EBITDA was the Company's "critical [financial metric] from the bottom line" and represented that the Company had an adjusted EBITDA base of $225 million for 2019. Komola stated that for

2019, "[w]e plan for double-digit growth off of the adjusted $225 million EBITDA, and feel confident in our ability to execute against that." Komola instructed investors and analysts to "work off of" these EBITDA figures in "building your models" for 2019, and added that "[w]e expect our EBITDA numbers to continue to grow at double-digit rates" in 2020.

130. The quoted statements in ¶129 above were false and misleading when made. In truth, at the time of Defendants' statements it was clear inside the Company that these growth figures were unachievable, given among other things Defendants' lack of a comprehensive integration plan, prolonged length of time required to fully integrate the companies, and as-yet-undisclosed infrastructure expenses that were necessary to remedy longstanding deficiencies. ¶¶51-80; *see* ¶115 (per Wolin, three to five years needed for integration). Indeed, far from boosting revenues, the combination of VFC and HSAH led to *decreased* EBITDA and *decreased* sales given the internal fragmentation and additional factors, including the loss of HSAH's ability to sell whole categories of products. ¶¶75-89. When the truth emerged, investors were stunned and securities analysts – who, as Defendants explicitly recognized, had "buil[t] the[ir] models" on Defendants' misstatements – questioned management's credibility and concluded that owning Covetrus stock after Defendants' misrepresentations had been a "nightmare." ¶¶94-106.

**Statements in March 2019**

131. On March 18, 2019, Animal Pharm Agribusiness published an interview of Defendant Shaw, which Covetrus posted on its website and filed with the SEC on Form 8-K. In the interview, Defendant Shaw promoted Covetrus's infrastructure as key to a purported "$100[ million] in value-capture opportunities," including stating that "[o]ne example of [the value-capture opportunities] will be to leverage the infrastructure provided to Covetrus by the legacy Henry Schein Animal Health business."

132. The quoted statements in ¶131 above were false and misleading when made.

63

Defendants promoted the Company's purported ability to "leverage the infrastructure provided to Covetrus by the legacy Henry Schein Animal Health business" as a "value-capture opportunit[y]." In truth, there was no such opportunity. HSAH's supply chain infrastructure and software platforms were fragmented and in need of immediate and substantial infrastructure **investments**. ¶¶51-80, 115. Moreover, Covetrus was highly fragmented internally and the various businesses were not integrated, preventing the same "leverag[ing]" and collaboration that Defendants were falsely promoting. *Id.*

133. On March 29, 2019, Covetrus filed with the SEC its annual report for the fiscal year ended December 29, 2018 on Form 10-K ("2018 Form 10-K"). The 2018 Form 10-K was signed by Defendants Shaw, Komola, and Paladino. The 2018 Form 10-K stated that the Company had an "integrated prescription management platform solution" and the Company's "technology platform encompasses and integrates the core functionality of pharmacy service and prescription and inventory management in a single… system. The underlying core of the platform is its real-time integration with veterinary practice management software systems …."

134. The quoted statements in ¶133 above were false and misleading when made. The 2018 Form 10-K's statements that the Company had an "integrated prescription management platform solution" and its software "integrates the core functionality of pharmacy service and prescription and inventory management in a single… system. The underlying core of the platform is its real-time integration with veterinary practice management software systems" were demonstrably false, as there was *no such integrated software platform* in place at Covetrus at this time and through the end of the Class Period. ¶¶63-73, 89; *see generally* ¶¶51-80. Covetrus CEO Wolin has reinforced this point, noting that even as late as March 2020 it was still "early days" as the Company was only "*starting to see* some integration of prescription management into PIMS,"

64

and that instead of having one integrated platform, "there is [sic] *lots of different platforms* there, often *competing with one another*" inside Covetrus.  ¶¶48, 114-15.

135.    The 2018 Form 10-K also represented that Covetrus had "br[ought] together leading practice management software and supply chain businesses with a platform approach based on technology-driven insights, [that]… [l]ink[s] the power of insight and analytics, client engagement, practice management software and supply chain expertise into a multi-channel platform."  Defendants also highlighted the Company's purported "comprehensive service and technology platform and supply chain infrastructure" and identified "inventory management and supply chain services" as one of its "key strengths" and "[k]ey [c]apabilities."

136.    The quoted statements in ¶135 above were false and misleading when made. Covetrus had not "br[ought] together leading practice management software and supply chain businesses" and "[l]ink[ed] … practice management software and supply chain expertise."  As Defendants has admitted, even as of August 13, 2019, the Company had only "*started* to roll out" "the integration of our supply chain and inventory management capabilities with practice management software."  ¶97.  In addition, Covetrus did not have a "comprehensive service and technology platform and supply chain infrastructure," and it was misleading to identify the Company's "inventory management and supply chain services" as one of its "key strengths" and "[k]ey [c]apabilities." ¶¶51-80, 89, 115.  At the time of the statements, Covetrus's systems and businesses remained fragmented and unintegrated; the Company's supply chain infrastructure remained rudimentary and in disarray; and the Company's various softwares were written in different developer languages, and could not even "talk to each other." *Id.*

**Statements On May 15, 2019**

137.    Before the market opened on May 15, 2019, Covetrus issued a press release announcing its financial results for Q1 2019 (the quarter ending on March 31, 2019).  The

Company reported disappointing revenue, net income, and EBITDA. To assuage investors, on the investor conference call that followed the issuance of the press release, and in the weeks that followed, Defendants made a series of materially false statements about the status of the Company's integration and purportedly "strong" second-quarter results. For example, during the May 15 call, Defendant Shaw referred to the merged HSAH and VFC entities, stating that "we're aligned, we're focused as one team armed with a powerful platform that provides differentiated compelling capabilities for our customers" and that after "a very smooth transition and carve-out process," the Company was "off to a fast start towards executing against both our short-term priorities and our long-term strategies." As to the purportedly integrated nature of the platform, Shaw referenced "a single integrated online and in-office platform" that "brings together practice management software, insights and analytics, proactive prescription management and pharmacy services, client communications and appointment management, inventory and supply chain services, all together in a coordinated and integrated approach." Shaw specifically represented that the Company had "***achieved a deep integration between our practice management software and our prescription management workflow***." Shaw claimed that this was "another important benefit and differentiator of our unique capabilities to the platform. And we're just pleased that we're able to launch this important innovation just a few weeks following completion of the merger."

138. The quoted statements in ¶137 above were false and misleading when made. First, Shaw's statement that Covetrus had already "achieved a deep integration between our practice management software and our prescription management workflow," was manifestly false, as the Company has now admitted that Covetrus had ***not*** achieved any such "deep integration" and in fact there was ***no such integrated software platform*** in place at Covetrus at this time and through

66

the end of the Class Period. ¶73; *see generally* ¶¶51-80, 89. Indeed, Covetrus CEO Wolin has reinforced these points, noting that even as late as March 2020 the Company was only "***starting to see*** some integration of prescription management into PIMS," and that instead of having one integrated platform, "there is [sic] ***lots of different platforms there***, often ***competing*** with one another" inside Covetrus. ¶¶48, 114-15; *see* ¶¶63-73 (corroborating CW accounts concerning lack of software integration). Moreover, Covetrus did not have integrated software, supply chain, or sales teams; the software remained unintegrated, and it was obvious inside the Company that integration would take years. ¶¶56, 65, 68, 70-72, 115; s*ee generally* ¶¶51-80, 89. As CEO Wolin has admitted, even as late as March 2020 the Company was "***still transacting*** along the way that we did when [HSAH and VFC] were ***separate entities***." ¶¶46, 113; *see* ¶¶73, 76 (corroborating CW accounts, *e.g.*, "business as usual after the merger"). Finally, far from there being a "fast start" after a "very smooth transition and carve out" to form Covetrus as a standalone company, HSAH and VFC remained unintegrated after the spin-merger and antiquated systems, incompatible platforms, management in-fighting, and a host of other issues prevented the Company from effecting the needed integration. ¶¶51-80; *see* ¶¶46-48, 112-16 (Wolin admitting to such persistent characteristics of lacking integration).

139. With the Company already half-way through its Q2 2019, Defendant Shaw also made a series of false statements devised to assure investors that the Company would report "strong" results for that quarter. To that end, Defendant Shaw reassured investors that while the Q1 2019 results were disappointing, "***we've been pleased with the improved top line performance in Q2 thus far in North America***" and "we're encouraged by the early start in Q2." Shaw further represented that "***[o]ur sales pipeline of qualified opportunities is strong with April growth meaningfully ahead of the pace seen in the first quarter***. In addition to this strong pipeline, we

67

also have won multiple new corporate accounts that will enroll during the balance of the second quarter."

140. The quoted statements in ¶139 above were false and misleading when made. Defendants' statements that the Company had experienced "improved top line performance in Q2 thus far in North America" with an "early start in Q2" and "April growth meaningfully ahead of the pace seen in the first quarter," were false. In reality, in Q2 2019 the Company was experiencing *declining* sales and missed all major financial guidance by wide margins, and the "across the board" declines were openly discussed inside the Company in late April and early May. ¶¶75-89. And while on May 15, 2019 Defendants specifically promoted growth in "North America," on August 13, 2019, Defendants admitted just the opposite: that "the market [being] down in North America" was the "*primary driver*" of the Company's sharp "across the board" financial *decline*. ¶99. As the Company was ultimately forced to reveal, Covetrus suffered significant *declines* in numerous major financial categories in Q2 2019 – which was half over at the time of the May 15 statements – including net sales, net income, and adjusted EBITDA. ¶¶94-106.

141. On the May 15, 2019 call, securities analyst David M. Larsen from SVB Leerink LLC asked Shaw to further discuss "the lift in revenue that … you've seen in … April and May" and "[w]hat in your mind is driving that?" Shaw responded that "really immediately following closing of the transaction, we stood up and aligned a strong North American commercial organization," that "this has really allowed us to have one face to the customer, where *we have strong account management organizations who now can pull on integrated and aligned teams of specialists* to have expertise in prescription management or have expertise in practice management software." When asked about the purported "ramp in year-over-year profit growth" that was built into the Company's guidance, Shaw stated that the Company *had achieved "the*

68

*integration of our sales team*."  Also during the question-and-answer period, Shaw reiterated a purported "really robust pipeline in April that was much greater year-over-year growth than what we experienced in the first quarter."  Shaw further stated during the conference call that new enrollments on the VFC prescription management platform were higher than expectations – specifically, that "conversion from these new leads is exceeding our expectations" in Q2 2019.

142.    The quoted statements in ¶141 above were false and misleading when made. Defendants' statements that they had "achieved the integration of our sales team" was false; as CEO Wolin has admitted, no such integration had occurred, and even as late as March 2020 the Company was "*not trying to do all of that sales force integration in terms of pushing the 2 sales forces together* …. We're going to have *coordination, not integration* right now."  ¶¶47, 116; *see* ¶¶76-79 (corroborating CW accounts regarding sales team non-integration).  Similarly, Defendants' assertions that "really immediately following closing of the transaction, we stood up and aligned a strong North American commercial organization," and that "this has really allowed us to have one face to the customer," were false.  As CEO Wolin has admitted, there was no such integration at this time, and in reality the two companies were operating as if they were still "separate entities."  ¶¶46, 113; *see* ¶¶60-79 (corroborating CW accounts).  And quite the opposite of Defendant Shaw's claim that enrollments on the VFC platform were "exceeding our expectations," Wolin has made clear that enrollments were "*obviously significantly lower* than our original expectation."  ¶108.

143.    In the May 15, 2019 press release, Covetrus also issued a favorable full-year 2019 financial outlook that reaffirmed Defendants' initial guidance of "double-digit" annual EBITDA growth and provided greater specificity.  In the press release, Covetrus provided full year 2019 adjusted EBITDA guidance of "$235 to $250 million," compared to $223 million of realized

69

EBITDA in 2018, amounting to growth of 12% at the top end of the range. During the May 15, 2019 investor conference call, Defendant Komola reiterated the EBITDA guidance and reassured investors that the EBITDA growth accounted for the Company's investments, stating that the "range incorporates funding of new investments in innovation to support our long-term growth initiatives, including a year-over-year increase of $5 million in software and prescription management R&D investments, many of which are a onetime step-up in expenditures."

144. Defendants' statements quoted in ¶143 above were false and misleading when made. Built on the false representation of strong growth to-date in Q2 2019, *i.e.*, in April and May 2019, Defendants' statements raised the Company's projected 2019 EBITDA growth from the prior guidance of "double-digit" growth to up to "12%" in growth, or $250 million of EBITDA. Defendants accompanied that new specificity with increased particularization in quantifying Company expenditures, including that the adjusted EBITDA guidance "incorporates funding of new investments," including an "increase of $5[ million] in software and prescription management R&D investments, many of which are a one-time increase in expenditures." In truth, at the time of Defendants' statements it was clear inside the Company that the EBITDA guidance was unachievable, given the Company's already-*declining* sales and multi-million-dollar, as-yet-undisclosed infrastructure expenses that were necessary to remedy longstanding deficiencies and that the Company was already making in Q2 2019. ¶¶51-59; 75-89. As the Company was forced to disclose on August 13, 2019, at the time of Defendants' misrepresentations the Company was suffering *declining* sales – thus reducing EBITDA – and was already spending millions of dollars in undisclosed infrastructure investments. ¶¶94-96, 98-99. In addition, as Defendants well knew, the Company required tens of millions of dollars more to remedy Covetrus's ailing supply chain and distribution infrastructure and fragmented software businesses. *Id.* The reduced sales and

increased investments directly reduced EBITDA far below the Company's purported range of "$235 to $250 million" in 2019 EBITDA. ¶¶94-106.

**Statements On May 29, 2019**

145.    On May 29, 2019, Defendant Shaw presented at the Stifel Dental & Veterinary Conference in New York, New York. The first question from a securities analyst at the conference pointed out that "the revenue growth rates for the Schein legacy animal health business did seem to decelerate in North America sort of late in 2018, call it 4Q '18 and 1Q '19" and asked Shaw to "talk to us about those trends and what it was like bringing the 2 organizations together." Defendant Shaw responded by stating that "I think it's important to understand that prior to the merger, that the Henry Schein legacy business was actually comprised of many different businesses," including "several dozen different operating businesses." However, Shaw reassured investors that after the merger close, "***what we've achieved has been an integration of that value proposition***. We brought together these different business groups into a single face to customer around software, in insights and analytics around inventory management, appointment management and prescription management." Shaw further stated that "it's the integration and kind of power of that connected ecosystem that we're delivering to customers. ***So we're not managing the business day 1 or day 2 as standalone legacy businesses***. I think that's a very important observation around sort of the structural changes we've been able to achieve in this."

146.    The quoted statements in ¶145 above were false and misleading when made. In truth, VFC and HSAH remained unintegrated; the Company had not implemented any significant integration via "structural changes"; and the Company did not have "a single face to customer" and was not "delivering to customers" the represented integration given, among other things, the fragmentation in the Company's sales teams and software development teams. ¶¶51-80; *see* ¶68

(CW account specifically disputing Shaw's false claims). In addition, the Company's new CEO has made clear that even as of March 2020, rather than not being managed "day 1 or day 2 as standalone legacy businesses," Covetrus was "***still transacting*** along the way that we did when [HSAH and VFC] were ***separate entities***." ¶¶46, 113; *see generally* ¶¶60-74. Moreover, in direct contrast to Shaw's statement that Covetrus had "achieved … an integration of th[e] value proposition" for customers, and was "delivering to customers" the represented integration with "a single face to customer," Wolin admitted that "***we have a ways to go, to be honest, on both getting the value of a combined asset as it relates to our customers as well as deeply aligning with our customers, or integrating with our customers*** in a way that is really unlocking new potential." ¶113; *see* ¶¶114-16.

147. Asked about "legacy distribution in some of the market share," Shaw stated that the Company was "in a share-gaining mode in the market." He represented that "***in March … we brought our … 3 various sales organizations … together into a now tightly integrated, stood-up, aligned group that's now representing the total scope of our capabilities***" and that "for the first time, our combined organization is able to leverage all of the unique assets of the organization and we're coming to market with a very differentiated and unique value proposition that allows us to leverage our PIMS practice management software position around appointment and prescription management, have new insights and to tightly integrate that within office inventory management."

148. The quoted statements in ¶147 above were false and misleading when made. Shaw's statement that "in March … we brought our … 3 various sales organizations … together into a now tightly integrated, stood-up, aligned group that's now representing the total scope of our capabilities" was false. As the Company has admitted, and multiple CWs corroborate, there was no such sales team integration. ¶¶47 & 116 (Wolin admitting sales force non-integration), 62

72

& 76 (CWs specifically disputing Shaw's false claim); *see also* ¶¶76-79 (further explaining lack of sales force integration). Indeed, not only were the sales organizations unintegrated as of the May 29, 2019 statements, but even as late as March 4, 2020, CEO Wolin reconfirmed that the Company was *not* even "*trying to do all of that sales force integration*," as "[w]e're going to *have coordination, not integration* right now." ¶¶47, 116. Covetrus also did not have a "combined organization" that was "coming to market with a very differentiated and unique value proposition that allows us to leverage our PIMS practice management software position around appointment and prescription management, have new insights and to tightly integrate that within office inventory management." As the Company has admitted and its former employees confirmed: (i) there was no such integration of PIMS and prescription management (¶¶48, 73, 114-15); (ii) the integration of HSAH's inventory management capabilities with practice management software was still not complete (¶97); and (iii) as the Company's new CEO has made clear, even as of March 2020, it was "*still transacting* along the way that we did when [HSAH and VFC] were *separate entities*" and "we have a *ways to go*, to be honest, on both getting the value of a combined asset as it relates to our customers as well as deeply aligning with our customers, or integrating with our customers in a way that is really unlocking new potential" (¶¶46, 113). Defendant Shaw's statements that Covetrus was "in a share-gaining mode" in the "legacy distribution" business were also false and misleading. In truth, and as the Company was forced to admit on August 13, 2019, Covetrus suffered significant *declines* in major financial categories in Q2 2019, including net sales, net income, and adjusted EBITDA. ¶¶94-106. The causes of these declines were longstanding and well known to Defendants, including the loss of sales categories for Covetrus (¶¶81-82), a lack of integration (*e.g.*, ¶¶60-74), and Covetrus's ailing supply chain and distribution business (¶¶51-59). Indeed, in March 2020, CEO Wolin admitted that contrary to Shaw's assertions of Covetrus

being in "share-gaining mode," "*[w]e certainly weren't on par with the market in 2019* from a growth standpoint." ¶117.

149. A securities analyst asked Shaw whether the purported sales momentum that Shaw had promoted during the May 15, 2019 investor conference call, in March and "into April … has continued even more recently into the month of May?" Shaw responded "Yes…. The organization understood the power of the integrated capability set of the Company. And that's manifested itself in a very big pipeline, really strong engagement activity, and we see that coming into Q2." In response to a securities analyst asking Shaw to "talk a little bit" about the integration, Defendant Shaw stated that Covetrus "*is really a story of how 80 very special animal health organizations around the world*, representing everything from software and distribution, manufacturing capabilities, insights, group purchasing capabilities, how 80 distinct separate organizations with different ownership structures, different governance structures *now, for the first time, are part of one integrated organization*." A securities analyst followed up by asking Shaw: "[A] typical investor would say, when do you start to realize that or where does that start to flow through the P&L or when do we start to see that with numbers?" Shaw responded that "[d]espite a very complex organization that include the carve out of financial systems and payroll services and licensure and accreditation and just a massive amount of disruption, the organization, we didn't miss a beat on the first hour of the first day. Not a single order was delayed. There was no disruption in customer experience."

150. The quoted statements in ¶149 above were false and misleading when made. Far from having "one integrated organization" of the previous "80 distinct separate organizations" inside Covetrus, VFC and HSAH remained thoroughly unintegrated. ¶¶51-80, 112-16. Indeed, the Company's new CEO has made clear that even as of March 2020, Covetrus was "*still*

*transacting* along the way that we did when [HSAH and VFC] were *separate entities*" and "we have a *ways to go*, to be honest, on both getting the value of a combined asset as it relates to our customers as well as deeply aligning with our customers, or integrating with our customers in a way that is really unlocking new potential." ¶113. Defendant Shaw's statements promoting purported growth in April and May 2019, flowing through to the P&L in real-time because "we didn't miss a beat on the first hour of the first day," were also false and misleading. In truth, and as the Company was forced to admit on August 13, 2019, Covetrus suffered significant *declines* in major financial categories in Q2 2019, including net sales, net income, and adjusted EBITDA. ¶¶94-106; *see* ¶88 (CW account specifically disputing Shaw's false claim). The causes of these declines were longstanding and well known to Defendants, including the loss of sales categories for Covetrus (¶¶81-82), a lack of integration (*e.g.*, ¶¶60-74), and Covetrus's ailing supply chain and distribution business (¶¶51-59). Indeed, in March 2020, CEO Wolin admitted that contrary to Shaw's assertions of Covetrus's real-time financial success, "*[w]e certainly weren't on par with the market in 2019* from a growth standpoint." ¶117.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

151. As set forth above, numerous facts demonstrate that Covetrus, Henry Schein, and the Individual Defendants each knew or were severely reckless in disregarding how false and misleading their Class Period statements to investors were. In addition, the following significant facts further amply demonstrate Defendants' scienter.

152. <u>The Individual Defendants prepared for the merger for over a year, giving them ample time to understand the businesses' fragmentation and lack of infrastructure.</u> As early as December 2017, Henry Schein contacted VFC about a potential merger and later in the month, Henry Schein and VFC executives met to discuss the combination of the two companies. In the

ensuing months leading up to the April 2018 merger announcement, Defendants performed significant due diligence with Henry Schein's and VFC's "respective legal and financial advisors continu[ing] their ongoing due diligence reviews." Defendants thoroughly assessed each company's business operations, service and technology platforms, "valuation ranges" of both HSAH and VFC, and the "value of the pro forma Combined Company and the potential strategic and financial merits of a combination." Defendants continued to expend considerable time and resources through February 2019 planning and preparing for the merger completion and Covetrus's transition to becoming a standalone public company.

153.    These efforts intensified further still in late 2018 as the merger completion date neared. For example, at the Capital Markets Day conference in February 2019, Defendant Komola stated that the companies had "spent the past several months" planning Covetrus's transition and growth strategies. During the Company's first quarter earnings call in May 2019, Defendant Shaw again highlighted the "[s]ignificant planning and preparation *over the last year*," "great planning effort," and "tremendous teamwork across the globe" when assuring investors regarding the purportedly successful integration and "day 1 launch" of Covetrus.[25] As a result of their direct, extensive, and lengthy involvement in the merger preparation, each Individual Defendant was well aware of HSAH's and VFC's business operations, including basic issues such as the companies' systemic fragmentation, deficient infrastructure, and lack of integration.

154.    Defendants Shaw and Komola were intensely focused on the merger-integration and repeatedly spoke to investors in specific and unequivocal terms about its purported progress and completion. In Defendant Shaw's own words, "bringing [the Company] together as one

---

[25] In addition, according to CW 6, Defendants worked with a branding company for over a year leading up the merger to develop a strategy for combining VFC and HSAH into Covetrus.

integrated value proposition" was his "most important job coming to the new organization." However, rather than telling the truth about the Company's systemic fragmentation and antiquated infrastructure that required tens of millions of dollars in immediate, recurring investments, Defendants Shaw and Komola led investors to believe that the Company had achieved a smooth and comprehensive integration and was in fact delivering to customers a connected platform of technologies and services.

155. Indeed, Komola assured investors on May 15, 2019, that the Company's financial guidance reflected its "early integration efforts," and, as a result, the Company was "on track for the delivery" of its financial goals. Two weeks later, Shaw reiterated that while HSAH "was actually comprised of many different businesses… we've achieved… an integration of that value proposition," adding that "[w]e brought together these different business groups into a single face to customer around software, in insights and analytics around inventory management, appointment management and prescription management." Shaw specifically represented that Covetrus was in fact "delivering to customers" "the integration and… power of that connected ecosystem," and was "not managing the business day 1 or day 2 as standalone legacy businesses." Shaw even went so far as to specifically misrepresent that sales teams had been "tightly integrated," when they had not been, and that the Company had "hardwired" "unique… advanced prescription management and analytics capabilities ... into practice management software," when it had not. Covetrus's dramatic August 13, 2019 revelations that, among other things, the integration was not as represented, has remained a focus of securities analysts. Even months after the August 13 disclosures, securities analysts continued to emphasize that, far from Defendants' claims of a successful integration, in truth, Covetrus had "struggled to successfully integrate." ¶106. Indeed, on March 3 and 4, 2020, the new CEO of Covetrus, who took the helm after Defendant Shaw had

77

been terminated, explained in no uncertain terms how Defendant Shaw's Class Period claims of achieved integration were manifestly false when made. ¶¶112-16.

156. Defendant Shaw's and Komola's repeated emphasis and admitted focus on the integration underscores that they were aware of the truth regarding the utter lack of integration or were deliberately reckless in not knowing about it.

157. <u>The supply chain business constituted the Company's core operation, accounting for nearly 95% of the Company's sales.</u>  The legacy HSAH supply chain business accounted for nearly all of Covetrus's revenues and earnings.  Prior to the merger, HSAH had approximately $3.8 billion in net sales for 2018 – nearly **fourteen times** VFC's net sales of $203 million – with **over 97%** of HSAH's net sales derived from the supply chain segment.  From a bottom-line perspective, HSAH had adjusted EBITDA of approximately $222 million in 2018, whereas VFC reported tens of millions of dollars in **losses**.  The Company's near-total reliance on the supply chain segment continued during the Class Period.  For the first two quarters of 2019, the legacy HSAH business continued to comprise in excess of 93% of the Company's total net sales.  Because the legacy HSAH business (and the supply chain segment in particular) was the critical cornerstone to Covetrus's financial results, Defendants Shaw and Komola were particularly focused on the business's deficient infrastructure, fragmented operations, and sluggish sales, or were deliberatively reckless in not knowing about these basic issues concerning the Company's core business.  Similarly, Defendant Paladino was intimately familiar with these same issues given his multi-year management of the business and multiple roles that each provided him access to information substantiating the supply chain business's multiple operational deficiencies.

158. <u>Defendants Shaw and Komola Were Apprised Of Weak Second Quarter Sales From Meetings And Internal Reporting.</u>  Covetrus's sluggish U.S. sales during the second quarter were

well known inside the Company and regularly reported to the Company's senior management.  It was obvious internally that revenue was "tanking" (¶85; *see generally* ¶¶81-89) and by April 2019, it was apparent inside Covetrus that the Company's sales figures were down significantly, and management acknowledged their awareness of the declines (¶85).  Indeed, as CW 8 stated, in late April 2019 or early May 2019, when the numbers were down "across the board," Covetrus held a teleconferenced sales meeting to discuss the issues (*id.*), yet nonetheless, on May 15 and May 29, 2019, falsely represented the opposite to investors, *i.e.*, that sales were ***rising*** (¶¶137-44).

159.    Moreover, Covetrus's regular internal reporting and meetings showed that Defendants Komola and Shaw were amply apprised of the sales declines in real time.  As CW 2 explained, Covetrus had extraordinarily up-to-the-minute sales reporting, including reporting of sales as they happened, and daily sales roll-ups.  "In my 15 years of animal health sales, I never had more real time information on the performance of my clients as I did when I was at Henry Schein."  ¶84.  CW 8 similarly described regular internal sales reporting processes at Covetrus, which required her and other sales representatives to submit their sales forecasts on a weekly basis, and to participate in monthly sales meetings in which sales performance was examined, both in terms of sales force personnel and specific products and services, and whether the sales reps were meeting their forecasts.  CW 8 stated that all of the project managers and sales reps participated in these monthly meetings.  CW 9 also described how the Company held regional and national sales meetings in which integration problems and delays in product shipment were discussed, and stated that she attended these meetings and confirmed that Defendant Shaw was present at a number of them.  As a result of these reporting procedures and their participation in national sales meetings, Defendants Shaw and Komola were informed of the low and declining sales during the second quarter of 2019, including the first half of the quarter before May 15, 2019.

160. <u>Defendants Shaw and Komola were intensely focused on the "critical" EBITDA performance metric.</u> Even before Covetrus's launch as a public company, Defendant Komola emphasized on February 4, 2019 that adjusted EBITDA would be the Company's "critical" performance metric for investors, and instructed analysts to "build the[ir] models" based off of the Company's adjusted EBITDA "baseline." Komola acknowledged that analysts were "feverishly building" their models as she spoke, stating "You're watching me, probably building your models, right?" During the Company's May 15, 2019 earnings call, Defendant Komola again stressed the importance of adjusted EBITDA in measuring the Company's performance, telling investors she was "focus[ed] … on our adjusted measures to provide insights into the underlying trends of our business."

161. Defendant Shaw also repeatedly acknowledged the importance of adjusted EBITDA for investors. For example, on May 29, 2019, when speaking to investors about business synergies purportedly created by the formation of Covetrus, Shaw stated "I know you're more interested in the impact this will have on EBITDA and we all are." Defendants Shaw and Komola also knew that adjusted EBITDA was key to the Company's investment grade and ability to manage its substantial debt load. For example, at the Capital Markets Day conference, Komola avowed that "we are going to generate a lot of EBITDA dollars" in order "to be investment grade" and that the "EBITDA dollars that we generate are ... going to go into paying down the debt."

162. Defendants Shaw and Komola's repeated emphasis and focus on the "critical" importance of adjusted EBITDA both to investors, and to the Company as a whole, underscores how they knew that the false EBITDA guidance that they issued to investors during the Class Period lacked an adequate basis in fact, or they were deliberately reckless in not knowing its falsity.

163. <u>Defendants Komola and Shaw were focused on Covetrus's necessary infrastructure</u>

investments. Defendants Komola and Shaw were keenly focused on, and spoke in detail to investors regarding, the nature and size of Covetrus's infrastructure investments. They repeatedly emphasized their focus on infrastructure costs, claiming among other things that expenses for infrastructure investments were "one-time" in nature. They also emphasized their focus on the investment levels by citing particularized investment figures, giving investors the impression that they personally understood the necessary investments and such costs were fully accounted for. For example, on May 15, 2019 they stated that "[u]nderlying expenses were well managed in the quarter," and that a "year-over-year increase of $5[M] in software and prescription management R&D" investments was "incorporate[d]" into the Company's adjusted EBITDA guidance. In truth, however, and as they knew, the Company was already expending millions of dollars in emergency infrastructure investments in Q2 2019 that were basic to the Company – qualifying as "recurring" "operating expenses" – and caused an immediate reduction in EBITDA.

164. The temporal proximity between Defendants' misstatements and the revelations of the truth further demonstrates the Individual Defendants' scienter. Defendants' integration failures were immediately apparent inside the Company, and the declining sales manifested themselves immediately following the merger close, resulting in disappointing Q1 2019 results that the Company reported less than three months after the merger. The same poor Company performance continued in the second quarter, but Defendants Shaw and Komola assuaged investors with a series of false assurances on May 15, 2019.

165. The ongoing undisclosed decline forced Covetrus to disclose shocking results on August 13, 2019 – an extraordinary about-face in which the Company reported results that bore no resemblance whatsoever to Defendants' recent reassurances on May 15 and May 29, 2019 that sales were strong and rising. Indeed, halfway through the second quarter of 2019, Defendants

Shaw and Komola reassured investors that the Company was on track to meet or exceed their guidance, stating that Covetrus had experienced "improved top line performance" in Q2 thus far and that the Company had a "strong pipeline" for the second quarter and beyond. ¶139. As late as May 29, 2019, a securities analyst asked Shaw whether the sales momentum that Shaw had promoted during the May 15, 2019 investor conference call, in March and "into April … has continued even more recently into the month of May?" Shaw responded "Yes…. The organization understood the power of the integrated capability set of the Company. And that's manifested itself in a very big pipeline, really strong engagement activity, and we see that coming into Q2." ¶149.

166. However, as the Company revealed on August 13, 2019, the truth about Covetrus's financial performance in Q2 2019 – which was two-thirds over by the time of Defendants' May 29, 2019 statements – was the polar opposite of Defendants' representations. In effect, the Company blew up just six months after the merger, revealed declining sales and massive, "accelerated" infrastructure expenses that crushed the Company's earnings and EBITDA. ¶¶94-106. The close temporal proximity between the Individual Defendants' false statements regarding Company performance, the end of Q2 2019, and the corrective disclosures following the close of Q2, is further evidence that the Individual Defendants were well aware that their statements were false when made.

167. Defendants' financial reporting obscured the truth inside Covetrus. During the Class Period, Defendants Shaw and Komola chose to obscure what portion of Covetrus's revenues were due to the legacy HSAH business versus the legacy VFC business. This reporting tactic forced investors and analysts to heavily rely on Defendants' misrepresentations regarding the Company's financial condition and made it easier for Defendants to obscure the decline in the HSAH supply chain and distribution business. As securities analysts noted, this was a

"disappointing dynamic" that prevented investors from verifying the accuracy of Defendants' representations—including the critical adjusted EBITDA figures. This deliberate choice in financial reporting further underscores that Defendants Shaw and Komola knowingly obscured the truth about the decline in the distribution business while promoting strong sales performance in Q2 2019.

168. Having pledged to "rebuild trust with our investors" and finally be "transparent" with investors, Covetrus's new management has removed Defendants Shaw's and Komola's obfuscation. As Wolin put it, in working to "rebuild trust" following Shaw's tenure, Covetrus has changed "how we analyze and discuss the Company and its progress going forward, focusing … on … openness for our business." The Company's Form 10-K filed on March 3, 2020 now provides details on annual net sales for the Company's distinct business lines, including supply chain, software, and prescription management – an important point that Wolin and the Company's new CFO, Gleichenhaus, emphasized on the accompanying March 3, 2020 investor conference call.

169. <u>Henry Schein, Defendant Paladino, and Defendant Shaw were financially incentivized to complete the merger and inflate the price of Covetrus shares.</u> The spin-merger was extremely lucrative for Henry Schein, VFC, and Defendants Shaw and Paladino. As an initial matter, the transaction allowed Henry Schein to divest its sprawling, low-margin, and ailing Animal Health business in a tax-free transaction, while paying itself a massive dividend and offloading significant liabilities. Indeed, as part of the spin-off, Henry Schein saddled Covetrus with $1.2 billion in new long-term debt, of which $1.12 billion was paid to Henry Schein in the form of a special cash dividend and settlement of long-term intercompany debt. In sharp contrast, before the spin-off, the HSAH business had a mere $23 million in long-term debt. The merger

was also personally lucrative for Defendant Shaw, who received a lavish "transaction bonus" of over **$927,000** for completing the transaction.  Given the favorable economics for Henry Schein in executing the spin-off, Defendant Paladino benefited greatly through his ownership of over $10 million in Henry Schein stock.

170.    Moreover, the transaction created a large public market and early liquidation opportunity for Shaw's and the other VFC officers' and directors' large personal holdings of VFC shares.  Prior to Covetrus's creation, VFC was a relatively small company with less than $200 million in annual revenues (about 1.5% of HSAH's annual revenues).  As a result of the merger, Shaw was able to exchange his personal holdings of VFC stock – which was difficult to offload and not publicly traded – for shares in Covetrus valued at over **$55 million**.[26]  In total, VFC's officers and directors received shares and options as a result of the merger that were valued in excess of **$175 million** as of the close of trading on February 8, 2019.

171.    Defendants Shaw's and Komola's credibility has been widely questioned by securities analysts, and irreparably denounced by CEO Wolin.  After the August 13, 2019 disclosures, and given the stark divergence between Defendants Shaw's and Komola's Class Period statements and the undisclosed truth, virtually every securities analyst that covered Covetrus openly called into question Defendants Shaw's and Komola's credibility or sharply questioned their claim that external factors were to blame for the Company's disastrous financial results.  ¶¶102-05.  For example, analysts at William Blair and G.research concluded that "there are now serious questions around the merger and management's credibility" and "management credibility was … damaged" by Shaw's and Komola's claim of industry-wide softness.  Multiple

---

[26] Shaw did not sell Covetrus shares during the Class Period because he was prohibited from doing so pursuant to a "lock-up" provision that barred him from selling any shares until approximately one week before the end of the Class Period.

additional analysts pointed out that the Company's disclosures were a "far cry" from their prior representations, and Defendants' excuses were "largely inconsistent" with and "run[] counter to" the analysts' extensive observations of the broader market, showing a "disconnect" between reality and Defendants' excuses. *Id.*

172. Given Defendants Shaw's and Komola's egregious misrepresentations and lack of transparency, Covetrus terminated them and pledged to "rebuild trust with our investors." After the Class Period, the Company terminated Defendants Shaw and Komola and committed to "promote ***increased accountability*** throughout the organization." ¶¶106-11. Specifically, on October 22, 2019, approximately six weeks after Defendant Shaw's father stepped down as Chairman of the Board, Covetrus announced the immediate termination of Defendant Shaw as Covetrus's CEO. Securities analysts noted that Shaw had been "fired" and "shanked." Analysts also cited problems with "management's credibility" while discussing Shaw's termination. Then, on December 16, 2019, Covetrus announced the immediate termination of Defendant Komola. Securities analysts at G.research reported that Komola was fired due to the new CEO's "desire to establish a new culture" and that the "CFO transition marks the third major departure of a former VFC executive in the past 3+ months." On January 7, 2020, Covetrus announced the termination of Matthew Leonard, its Global Supply Chain Officer, Executive Vice President, and President, North America. On January 15, 2019, Wolin acknowledged that these "leadership changes" were part of a "significant reboot for this business."

173. Significantly, in conducting this executive-level housecleaning, Covetrus frankly recognized the need for greater transparency and for management to be held accountable. In November 2019, after Defendant Shaw was fired, the Company's new CEO, Benjamin Wolin, cited "the very difficult and challenging entry and early life we have had as a public company"

and emphasized the need for "a new approach where we are … being as transparent as possible with… our investors." Addressing the Company's lower EBITDA guidance, Wolin acknowledged that it was "critical for the management team and the company to rebuild trust with our investors and the analyst community." In subsequent statements, Wolin has continued emphasizing that Covetrus "didn't get it right" and is now "focused on… rebuilding trust with investors." As detailed above, Wolin has explained in detail, in self-described "frank" and "honest" Company admissions, how Defendants Shaw's and Komola's Class Period statements, as well as their excuses aimed at avoiding culpability once the truth was revealed, were blatantly false when made. ¶¶112-17.

## VII. LOSS CAUSATION

174. During the Class Period, Defendants made a series of false and misleading statements and omissions that artificially inflated the prices of Covetrus common stock and maintained inflation in the stock price. When the truth about Defendants' misrepresentations was disclosed, the price of Covetrus common stock fell precipitously as the prior inflation came out of the prices of the Company's stock.

175. Furthermore, Defendants' false and misleading statements served to conceal the risks created by the Company's fragmented business operations, deficient infrastructure, and lacking integration. It was foreseeable that these undisclosed structural problems would lead to negative financial consequences for Covetrus, including decreased revenues, accelerated and increased infrastructure expenditures, and reduced EBITDA and/or EBITDA guidance. The materialization of any one or more of these consequences would obviously lead to a significant decline in the price of Covetrus common stock.

176. As a result of their purchases of Covetrus common stock at artificially inflated

86

prices during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss. Covetrus's common stock reached a price of $43.83 on February 8, 2019, then lost approximately 72% of its value to close at $12.35 per share at the end of the Class Period.

177. On August 13, 2019, Covetrus made a series of disclosures that both corrected Defendants' prior misrepresentations and represented the materialization of risks inherent in Defendants' material misrepresentations and omissions. *See* ¶¶94-99. For example, Covetrus disclosed abysmal financial results for the second quarter of 2019, large, previously undisclosed, and "recurring" IT infrastructure investments, and drastically reduced guidance for the remainder of 2019. The disclosures caused the Company's stock price to decline. The stock price plummeted ***40% in a single day*** on the highest trading volume since the first day of regular trading on February 8, 2019. The stock fell from a closing price of $23.19 per share on August 12, 2019 to close at $13.89 on August 13, 2019. Covetrus shares continued to fall another ***11%*** on August 14, closing at $12.35 per share. All told, Covetrus shares plummeted nearly 47% over the two trading sessions.

178. The decline in the price of Covetrus common stock after the truth came to light was a direct result of the nature and extent of the Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the Company's stock price decline negates any inference that the losses suffered by Lead Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The following graphic shows the performance of a $100 investment in Covetrus common stock from February 8, 2019 through the end of the Class Period as compared to a market index and a peer group index.

87



$100 Investment in Covetrus Compared to
Industry Group Index and Russell 3000

Class Period: 2/8/19 to 8/12/19

×  Corrective Disclosure    —— Common Stock    ----- Russell 3000 Index    ----- Industry Group Index[1]

[1]FactSet Pet Care Index PR

## VIII.    CLASS ACTION ALLEGATIONS

179.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Covetrus common stock from the start of regular-way trading on February 8, 2019 through August 12, 2019, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Covetrus or Henry Schein, and the directors, officers and employees of Covetrus, Henry Schein, or their respective subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

180.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiffs at this

88

time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Starting on February 8, 2019, Covetrus's common stock was actively traded on the NASDAQ (an open and efficient market) under the symbol "CVET." Millions of Covetrus shares were traded publicly during the Class Period on the NASDAQ. As of August 12, 2019, Covetrus had approximately 112 million shares of common stock outstanding. Record owners and the other members of the Class may be identified from records maintained by Covetrus and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

181. Lead Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

182. Lead Plaintiffs will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in prosecuting class actions and securities litigation.

183. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b) whether Defendants participated in and pursued the common course of conduct complained of herein;

c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of Covetrus;

d)      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Covetrus;

e)      whether the market price of Covetrus common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

184.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.     **UNDISCLOSED ADVERSE FACTS**

185.    The market for Covetrus common stock was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and omissions described herein, Covetrus shares traded at artificially inflated prices during the Class Period.  Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Covetrus common stock relying upon the integrity of the market price of the Company's stock and market information relating to Covetrus, and have been damaged thereby.

186.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Covetrus common stock and maintaining inflation in the stock price, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-

public information and misrepresented the truth about the Company, as well as its business and operations, as alleged herein.

187. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Covetrus's business operations and financial prospects.

188. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock price to be overvalued and artificially inflated and/or maintained at artificially inflated levels at all relevant times. Defendants' materially false and misleading statements made during the Class Period resulted in Lead Plaintiffs and the other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE

189. At all relevant times, the market for Covetrus common stock was efficient for the following reasons, among others:

190. Covetrus common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient and automated market;

191. As a public company, Covetrus filed periodic reports with the SEC and the NASDAQ;

192. Covetrus was followed by numerous securities analysts employed by major firms who wrote reports which were distributed to the sales force and certain customers of their

respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

193. Covetrus regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

194. As a result of the foregoing, the market for Covetrus common stock reasonably promptly digested current information regarding Covetrus from all publicly available sources and reflected such information in the price of Covetrus common stock. Purchasers of Covetrus common stock during the Class Period suffered similar injury through their purchases of Covetrus common stock at artificially inflated prices, and a presumption of reliance applies.

195. A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Covetrus's business operations and financial performance — information that Defendants were obligated to disclose during the Class Period but did not — positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## XI.    NO SAFE HARBOR

196. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this

Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

197. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Covetrus or Henry Schein who knew that the statement was false when made.

## XII. COUNTS

### COUNT I
### For Violations Of Section 10(b) Of The Exchange Act
### And SEC Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

198. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

199. This Count is asserted on behalf of all members of the Class against Defendants Covetrus, Henry Schein, Paladino, Shaw, and Komola for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

200. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

201.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Covetrus common stock during the Class Period.

202.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Covetrus common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, Covetrus's business and operations; (b) artificially inflate and maintain the market price of Covetrus common stock; and (c) cause Lead Plaintiffs and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

203.    Defendants Covetrus, Henry Schein, Paladino, Shaw, and Komola are liable for all materially false and misleading statements made during the Class Period, as alleged above.

204.    As described above, Defendants acted with scienter throughout the Class Period, in

94

that they acted either with the intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers of Covetrus stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

205. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Covetrus common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the Class would not have purchased Covetrus common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

206. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Covetrus common stock during the Class Period.

**COUNT II**
**For Violations Of Section 20(a) Of The Exchange Act**
**(Against the Individual Defendants)**

207. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

208. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

209. Defendants Shaw and Komola were and acted as controlling persons of Covetrus within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, Defendants Shaw

95

and Komola had the power to influence and control, and did actually influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. Each of Defendants Shaw and Komola was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

210. In their capacities as senior corporate officers and/or directors of the Company, and as more fully described above, Defendants Shaw and Komola had direct involvement in the day-to-day operations of the Company. Defendants Shaw and Komola signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and approving the false statements disseminated by Covetrus during the Class Period. As a result of the foregoing, Defendants Shaw and Komola as a group, and individually, were controlling persons of Covetrus within the meaning of Section 20(a) of the Exchange Act.

211. Defendant Paladino was and acted as a controlling person of Defendant Henry Schein within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position at Henry Schein, participation in and/or awareness of Henry Schein's operations and/or intimate knowledge of Henry Schein's actual performance, Defendant Paladino had the power to influence and control, and did actually influence and control, directly or indirectly, the decision-making of Henry Schein, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. Defendant Paladino was provided with or had unlimited access to copies of Henry Schein's statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the

96

ability to prevent the issuance of the statements or cause the statements to be corrected.

212.    In his capacity as a senior corporate officer and/or director of Henry Schein, and as more fully described above, Defendant Paladino had direct involvement in the day-to-day operations of Henry Schein.  Defendant Paladino signed Henry Schein's SEC filings, and was directly involved in providing false information and certifying and approving the false statements disseminated by Henry Schein.  As a result of the foregoing, Defendant Paladino was a controlling person of Henry Schein within the meaning of Section 20(a) of the Exchange Act.

213.    In his capacity as a director of Covetrus, and as more fully described above, Defendant Paladino had direct involvement in the day-to-day operations of Covetrus.  Defendant Paladino was a director of Spinco – Covetrus's corporate predecessor – as well as its President, Treasurer, and CFO.  He signed the three Registration Statements filed by Henry Schein through Spinco containing false and misleading statements alleged herein (*see* ¶¶118-20), signed Covetrus's March 29, 2019 Form 10-K, and was directly involved in providing false information and certifying and approving the false statements disseminated by Covetrus.  As a result of the foregoing, Defendant Paladino was a controlling person of Covetrus within the meaning of Section 20(a) of the Exchange Act.

214.    As set forth above, Covetrus and Henry Schein violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.

215.    By virtue of their controlling positions of Covetrus and Henry Schein and as a result of their own aforementioned conduct, Defendants Shaw, Komola, and Paladino are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, Covetrus and Henry Schein are liable under Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Covetrus common stock. Moreover, as detailed above, each of the Individual Defendants culpably participated in the material misstatements and omissions alleged herein.

216. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIII. **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs, individually and on behalf of the Class, pray for judgment as follows:

a) Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Lead Plaintiffs and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c) Awarding Lead Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d) Awarding such other relief as this Court deems appropriate.

## XIV. **JURY TRIAL DEMANDED**

Lead Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: May 21, 2020                    Respectfully Submitted,

                                       **SAXENA WHITE P.A.**

                                       By: */s/ Brandon Marsh*

                                       David R. Kaplan
                                       Brandon Marsh
                                       Hani Y. Farah (*pro hac vice* forthcoming)

12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com
bmarsh@saxenawhite.com
hfarah@saxenawhite.com

**SAXENA WHITE P.A.**
Steven B. Singer
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

**SAXENA WHITE P.A.**
Joseph E. White, III (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
jwhite@saxenawhite.com

*Counsel for Lead Plaintiffs*

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner (*pro hac vice* forthcoming)
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Plaintiff City of Hollywood Police Officers' Retirement System*

99

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 21, 2020, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system. This system will send electronic notice of filing to all counsel of record by operation of the Court's electronic filing system.

/s/ <em>Brandon Marsh</em><br>Brandon Marsh