# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNIVERSAL AMERICAN CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 13-1741-RGA |
| | ) | |
| PARTNERS HEALTHCARE SOLUTIONS | ) | |
| HOLDINGS, L.P., GTCR GOLDER | ) | |
| RAUNER II, L.L.C., GTCR PARTNERS IX, | ) | |
| L.P., GTCR FUND IX/A, L.P., GTCR FUND | ) | |
| IX/B, L.P., GTCR CO-INVEST III, L.P., | ) | |
| DAVID KATZ, GREGORY SCOTT, | ) | |
| JEROME VACCARO and JOHN | ) | |
| McDONOUGH, | ) | |
| | ) | |
| Defendants. | ) | |

**First Amended and Supplemental Complaint**

Plaintiff Universal American Corp. ("Universal"), for its Complaint against Defendants

Partners Healthcare Solutions Holdings, L.P. ("APSLP"), GTCR Golder Rauner II, L.L.C.

("GTCR"), GTCR Partners IX, L.P. ("GTCR Partners IX"), GTCR Fund IX/A, L.P. ("GTCR

Fund IX/A"), GTCR Fund IX/B, L.P. ("GTCR Fund IX/B"), GTCR Co-Invest III, L.P. ("GTCR

Co-Invest" and, together with GTCR, GTCR Partners IX, GTCR Fund IX/A, GTCR Fund IX/B,

and GTCR Co-Invest, the "GTCR Defendants"), David Katz ("Katz"), Gregory Scott ("Scott"),

Jerome Vaccaro ("Vaccaro"), and John McDonough ("McDonough," and together with Scott

and Vaccaro, the "APS Management Defendants"), states as follows:

**Summary of the Action**

1.     This case arises out of the fraudulent sale of Partners Healthcare Solutions, Inc.

("APS" or the "Company") by its owners, officers, and management to Universal in March 2012

for more than $220 million.  APS is a specialty healthcare company providing care management,

1

behavioral health, and disease management services to state Medicaid agencies and private health plans. Unaware of Defendants' fraudulent misrepresentations and their concealment of the true state of APS's business, Universal bought APS from GTCR, a multi-billion dollar private equity firm with a long history in healthcare. At the time of the acquisition (the "Transaction"), each of the GTCR Defendants, the selling entity APSLP, then-GTCR principal and APS board member David Katz, and the APS senior management team of Greg Scott, Jerry Vaccaro, and John McDonough (collectively, "Defendants") knew that APS habitually skirted and breached its contractual commitments, ultimately leading its customers (largely state governments) to cancel their contracts and seek to recoup penalties, fines, and overpayments from APS. Nonetheless, Defendants fraudulently induced Universal to purchase APS for $222.3 million by lying about APS's performance and otherwise camouflaging the truth about APS's grave risks of regulatory and contractual liabilities, its inability to maintain existing customer contracts and obtain new ones, and many other problems. Within less than two years after the Transaction closed, APS's value had vanished and Universal was forced to write off virtually the entire $220 million purchase price. Had Universal known the appalling truth, it never would have bought APS.

2. This action asserts claims for federal securities and common law fraud, as well as breach of contract and indemnification claims for the millions of dollars Universal has had to loan so that APS subsidiaries could defend and settle numerous litigations and government investigations regarding Defendants' illegal conduct prior to the Transaction. Defendants' intentional misrepresentations and omissions in connection with their fraudulent sale of APS to Universal included, among others: (a) contractual representations and warranties that APS did not have knowledge of facts, circumstances, or events that could reasonably be expected to give

2

rise to liability under applicable healthcare laws, including the Federal False Claims Act; (b) contractual representations and warranties that APS was not in default of any of its material contracts; (c) contractual representations and warranties that there had been no material adverse changes in APS's business; (d) contractual representations and warranties that APS owned outright a computer software program (the "Software") that it described as the "chassis" of its business; (e) a budget representing that APS would achieve 2012 earnings before interest, taxes, depreciation and amortization ("EBITDA") of $25.5 million from its existing contracts; and (f) a budget and other documents asserting that APS would achieve additional 2012 EBITDA of $19.3 million from a pipeline of contracts that had been "won" or that it was "highly likely" to win.

3.     Immediately after the Defendants received their payments for the deal, the ugly reality about APS's business began to emerge as *all* of these representations (and many others) turned out to be patently false and misleading.  In the weeks and months that followed the acquisition, Universal discovered that the Defendants – including Katz and his colleagues at GTCR who controlled the due diligence process – had concealed a pattern of corner-cutting, false statements, and breaches of contract that have led to a series of contract terminations, government investigations and whistleblower claims charging APS with unlawful conduct, fines, penalties and other material problems.

4.     Many of the most serious undisclosed problems involve regulatory and healthcare law compliance concerns.  As GTCR (with its long history of healthcare investments), Katz and the APS Management Defendants (each of whom was a seasoned healthcare professional) well knew, a clean regulatory record and reputation are critical to the success of healthcare companies such as APS.  But since the closing of the Transaction and extending to the present day, APS has been buried under an avalanche of complaints about regulatory and compliance problems that

3

were created while GTCR, Katz, Scott, Vaccaro and McDonough owned and ran the company. All of these issues, which involve conduct that occurred before the Transaction, generally arise from a common accusation: that APS knowingly did not perform the services it had contracted to perform and then fraudulently billed its customers for services not rendered. And Defendants utterly failed to disclose and in fact blatantly lied about such misconduct and other negative information during the due diligence process that led up to the fraudulent sale to Universal.

5. For example, within two weeks after the Transaction closed, Universal learned that APS's single largest customer (a Medicaid agency), representing 40 percent of the Company's revenues, had previously – and *in the midst of the sales process* – told Scott, Vaccaro, and another APS executive that APS was in default of its contract in multiple ways, including not providing services promised under its contract, and had threatened to terminate the contract and seek damages against APS for compliance failures. That customer later levied a $5 million fine against the Company, resulting in a $3 million settlement payment that APS made with GTCR's consent. But APSLP, under the direction and control of GTCR, wrongfully has refused to indemnify Universal for this loss even though it arises from conduct that occurred entirely before the sale to Universal.

6. Since the Transaction closed, APS subsidiaries have also been forced to defend three separate government investigations or whistleblower lawsuits regarding alleged overbilling in violation of federal and state healthcare laws, including the False Claims Act.

(a) First, after purchasing APS, Universal learned that Federal and state authorities had launched investigations into whether APS subsidiaries, prior to the Transaction, had engaged in fraudulent billing practices under a contract with Customer U. That contract – the success of which Scott, Vaccaro, McDonough and Katz had touted to Universal during the sales process –

4

had ended well before Universal acquired APS and had generated approximately $90 million in revenue and rich profits for the GTCR Defendants.  The Department of Justice has alleged that there was rampant fraud in connection with the Customer U contract, including billing for services that the APS subsidiaries never performed, billing for ineligible members, inflating membership numbers, and falsifying physician approval of plans of care for Medicaid patients.  The government has asserted damages of tens of millions of dollars, which are potentially subject to trebling under the False Claims Act.  The Department of Justice's allegation of rampant fraud implies that senior APS management was directly involved in the alleged misconduct.

(b)  Second, APS subsidiaries have incurred the multi-million dollar cost of defending and settling a whistleblower complaint raising similar allegations of fraudulent billing practices in connection with a contract with Customer T.  Because those subsidiaries had no funds, those costs were covered by loans from Universal, even though all of the alleged misconduct, primarily overbilling, occurred while GTCR owned and controlled APS.  The evidence shows that Scott, Vaccaro, McDonough and Katz were aware of the conduct giving rise to these claims.

(c)  Third, there is yet another pending government investigation regarding the contract with Customer D, a contract that was touted by Scott, Vaccaro, McDonough and Katz as one of their most important and profitable contracts.  That contract was expected to run through December 2015.  Instead, Customer D put the contract out for rebid in February 2012, after the Merger Agreement was signed but before the closing of the Transaction. Not only was the contract later awarded to an APS competitor, but the government is also investigating whether an APS subsidiary overbilled on that contract.

RLF1 10845625v.1

7.     Compounding its fraud on Universal, APSLP wrongfully has refused to pay for any of the undisclosed liabilities that arose on Defendants' watch despite Universal's repeated demands for the indemnification mandated by the plain language of the parties' Merger Agreement, dated as of January 11, 2012 (the "Merger Agreement"). APS subsidiaries have already settled and made restitution to several of the aggrieved state customers, but APSLP has refused to honor its indemnification obligations under the Merger Agreement. In the case of Customer T, APSLP, acting under GTCR's control, consented to the multi-million dollar settlement but has refused to pay. The defense costs for these investigations and lawsuit have already topped $4 million and are continuing to grow. Proper demand for indemnity has been made for all of these items and APSLP has refused to honor its contractual commitment to pay for the many serious undisclosed messes that Defendants created while they owned and operated APS.

8.     The risks of healthcare investigations and litigations were hardly the only concealed problems. GTCR and the other Defendants sold APS to Universal on the basis of their claim that APS was a profitable, savvy firm that had the personnel, systems, operations, and customer relationships to grow its business. In fact, however, within a few months after the closing, Universal learned that – as both APS, including Scott, Vaccaro, and McDonough, and GTCR, including Katz, well knew and concealed from Universal – APS routinely overpromised and underperformed on its contracts. Consequently, unbeknownst to Universal, many of APS's largest customers were terminating their contracts, had cut back on the services that APS would be providing to them, and were seriously dissatisfied with APS. In the words of one former APS officer who had worked for Scott, Vaccaro, and McDonough, in selling APS to Universal, Defendants dressed up a "pig with every shade of Neiman Marcus lipstick."

6

9. The Defendants not only concealed negative information from Universal, but they affirmatively lied about it. Significantly, during its due diligence and up through closing, Universal was given a series of so-called "new business pipelines" by Scott, Vaccaro, and McDonough – with the knowledge, participation, and approval of Katz and others at GTCR. These pipelines, which contained the names of each prospective client, the probability of winning the new contract, and the amount of revenue to be generated in 2012, were a brazen series of lies concocted by the APS Management Defendants and Katz to defraud Universal. Even though Universal asked for APS's real, internal pipeline, Defendants withheld it from Universal because, as McDonough said to Scott and Vaccaro just a month before the Transaction closed, that would "open up a hornet's nest." Within weeks of the acquisition, APS's purported pipeline of new business disintegrated. Of more than 30 potential contracts that Scott, Vaccaro, McDonough, Katz, and GTCR personnel Joshua Earl and John Kos assured Universal were likely to provide revenue in 2012, *only two* in fact generated revenue in that year, in the amount of $350,000 – an unimaginable 98.7% shortfall to the $26 million Defendants touted in the pipeline they gave to Universal just a month before closing. Notably, a new contract that Scott, Vaccaro, and McDonough told Universal had already been "won" by APS was in fact awarded to a competitor, while still several other likely "wins" touted by Defendants in their sham pipelines involved a customer that had previously told APS it did not want to continue doing business with the Company as a result of APS's poor performance.

10. Similarly, shortly before Universal signed the Merger Agreement, McDonough gave Universal a 2012 budget that he had prepared with Scott and Vaccaro (and that Katz and other GTCR employees had reviewed) claiming that APS would earn $44.8 million in EBITDA. McDonough assured Universal that APS was on target to hit that profit number only two days

7

before the merger closed. But within six weeks after closing, Scott, Vaccaro, and McDonough had slashed their fabricated EBITDA forecast by 40 percent, to $27.1 million; within four months after closing, the forecast was down 90 percent, at $4.1 million.

11. APS's loss of existing contracts, the disappearance of its new business pipeline, and crippling investigative and litigation costs have translated into abysmal financial results since the Transaction closed. In 2013, Universal wrote down APS assets totaling $189 million – more than 80 percent of the entire purchase price that Universal had paid for APS less than two years earlier. To make matters worse, the Company has lost money over this period, and its operations have generated a *negative* cash flow. As a result, Universal has been forced to dip into its own pocket to loan APS subsidiaries the funds to defend themselves against the investigations and litigation concerning activities that occurred when GTCR owned and ran the Company.

12. Individually and collectively, the telltale signs of fraud are powerful. The avalanche of bad news about APS's business that did not begin to come to Universal's attention until *just after* the March 2, 2012 closing, the complete evaporation of APS's profits within months, the many known (but undisclosed) risks of compliance liability associated with APS's contract performance, and the sheer number of misrepresentations and omissions in the Merger Agreement, during the sales process, and prior to the closing of the Transaction constitute compelling evidence of a calculated fraudulent scheme. In addition to this overwhelming circumstantial evidence of fraudulent intent, the facts alleged below detail Scott's, Vaccaro's, McDonough's, and Katz's actual knowledge that their respective representations and omissions were false.

8

13.     All of the Defendants are liable to Universal for their own fraud, or for aiding and abetting other Defendants' fraud, or as control persons.  In addition, Defendant APSLP is liable to Universal for breaches of the covenants, representations, and warranties in the Merger Agreement, and the GTCR Limited Guarantors are liable for those breaches to the extent APSLP does not live up to its contractual commitments.  This complaint also asserts a claim for declaratory relief with respect to an audacious claim for still more compensation from Vaccaro, one of the masterminds of the fraud.

## Parties

14.     Plaintiff Universal is a corporation organized under the laws of the State of Delaware, with its principal place of business in White Plains, New York.  Universal's common stock is publicly traded on the New York Stock Exchange.

15.     Defendant GTCR, a Delaware LLC, is a private equity firm with its principal place of business in Chicago, Illinois.  GTCR is general partner of Defendants GTCR Co-Invest and GTCR Partners IX.

16.     Defendant GTCR Partners IX is the general partner of Defendants GTCR Fund IX/A and GTCR Fund IX/B, and is a limited partnership organized under the laws of the State of Delaware.

17.     Defendants GTCR Fund IX/A, GTCR Fund IX/B, and GTCR Co-Invest (collectively, the "GTCR Limited Guarantors") are limited partnerships organized under the laws of the State of Delaware.  Under the Limited Guaranty provided for by the Merger Agreement, the GTCR Limited Guarantors guaranteed the indemnification obligations of Defendant APSLP, as described more fully in paragraphs 170 and 247, below.

9

RLF1 10845625v.1

18. At all times relevant to the facts underlying this Amended Complaint, Defendant David Katz was a Managing Director of Defendant GTCR and co-head of its healthcare group. Katz was a member of APS's Board of Directors before Universal acquired APS. He was also a member of the Board of Managers of APSLP. Upon completion of the sale to Universal, which Katz directed and oversaw in detail, Katz also was appointed as the first GTCR representative to the Universal board. On information and belief, Katz is a resident and citizen of the State of Illinois. Katz is no longer employed by any GTCR Defendant or any of their affiliates and has resigned from Universal's board.

19. Defendant APSLP is a Delaware limited partnership that was formed by the GTCR Defendants in 2007 to hold APS. Each of the GTCR Limited Guarantors and each of the APS Management Defendants is a limited partner of APSLP.

20. Non-party APS is a Delaware corporation with its principal place of business in White Plains, New York.

21. Defendant Gregory Scott was, before the acquisition of APS by Universal, the Chairman and Chief Executive Officer of APS. Scott also served as Chairman of the Board of Managers of APSLP. He signed the Merger Agreement on behalf of both APSLP and APS. After the Transaction, Scott became co-President of Universal. Scott is a resident and citizen of the State of California. Scott is no longer employed by either Universal or APS.

22. Defendant Jerome Vaccaro was, until June 2013, the President of APS and, until approximately March 2012, its Chief Operating Officer. Vaccaro also served as Vice President of APSLP. Vaccaro is a resident and citizen of the State of New York. Vaccaro is no longer employed by either Universal or APS.

23. Defendant John McDonough was at all times relevant to this Amended Complaint the Chief Financial Officer of APS. McDonough also served as Treasurer of APSLP. McDonough is a resident and citizen of the State of New Jersey. McDonough is no longer employed by either Universal or APS.

### Jurisdiction and Venue

24. This action includes claims arising under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, and 28 U.S.C. § 2201.

25. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1367(a) (supplemental jurisdiction), and Section 27 of the Exchange Act.

26. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 28 U.S.C. §1391(b), and the consent to jurisdiction and venue provisions in the Merger Agreement and related agreements.

27. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, interstate emails, or the facilities of the New York Stock Exchange, a national securities market.

28. In Section 8.8(a) of the Merger Agreement, APSLP agreed to submit to the jurisdiction of this Court for any action arising out of or relating to the Merger Agreement.

29. Under Section 16 of the Limited Guaranty provided to Universal at Closing, the GTCR Limited Guarantors agreed to submit to the jurisdiction of this Court for any action arising out of or relating to the Limited Guaranty.

11

RLF1 10845625v.1

## Background Facts

### The Businesses of Universal and APS

30.     Universal provides healthcare products and programs, including Medicare Advantage plans.  Through its family of healthcare subsidiaries, Universal provides insurance and health benefits primarily to people enrolled in the federal Medicare program, working together with healthcare professionals to improve the health and well-being of plan members.

31.     APS provides specialty healthcare solutions primarily to state Medicaid agencies. APS offers a broad range of healthcare solutions, including case management and care coordination, clinical quality and utilization review, and behavioral health services that enable its customers to improve the quality of care and reduce healthcare costs.  APS uses the Software to provide these services.

32.     A significant portion of APS's business involves serving as a contractor to public entities, primarily state Medicaid agencies.  In general, APS enters into these contracts as a result of competitive bidding processes, in which the state agencies issue requests for proposals ("RFPs") detailing the services they require.  APS also contracts with private health plans, often as a subcontractor when the private health plan contracts with public entities.

33.     Non-compliance with customer contract terms has especially serious legal and regulatory consequences for APS.  The federal False Claims Act and its state law counterparts provide for treble damages if false claims are submitted to a state Medicaid agency.  A poor operations and regulatory track record makes it more difficult to win new contracts and to keep existing contracts, as does the existence of an ongoing government investigation.  Additionally, many of APS's contracts with state agencies permit the counterparty to terminate the contract at its convenience, without cause, effectively permitting state agency counterparties to terminate APS's contracts whenever they are dissatisfied with its services.  Accordingly, as Defendants all

12

understood, maintaining high levels of regulatory compliance, contract performance, and customer satisfaction are essential to APS's continued business and financial health.

**GTCR's Private Equity Business**

34.     GTCR is a private equity firm with approximately $7 billion in assets under management.  GTCR invests in portfolio companies in the healthcare, financial services, and information services industries.  According to GTCR's website, it has invested more than $10 billion in over 200 portfolio companies since it was founded in 1980.

35.     On its website, GTCR emphasizes its so-called "The Leaders Strategy™ – finding and partnering with management leaders in core domains to identify, acquire and build market-leading companies through transformational acquisitions and organic growth."  GTCR is an active investor that claims to go "[b]eyond providing capital and financial acumen" and to "drive results to help companies grow into industry leaders" by supplying its portfolio companies with "an elite team of determined professionals" to assist in the management and development of their businesses.

36.     An integral part of GTCR's business strategy is to install its own personnel on the boards of its portfolio companies so that they may direct and supervise GTCR's hand-picked management leaders.  One of Katz's central responsibilities when he was a GTCR Principal and Managing Director was to keep close tabs on the portfolio companies for which he was responsible, including APS, and to steer those companies' strategic, business, and financial activities so that GTCR could cash out its investment within a few years.  As is also typical in private equity firms, more junior personnel of GTCR were also enmeshed in the management and operations of APS.

13

**GTCR Acquires APS**

37. GTCR acquired APS for $285 million in 2007. Katz spearheaded the deal, which was his first for GTCR, as he joined GTCR shortly before the APS acquisition. APSLP was formed to hold APS for the benefit of the GTCR Limited Guarantors or other GTCR affiliates. Upon information and belief, when the GTCR Defendants acquired APS, they intended to hold APS for only three to five years and then flip the Company at a profit.

38. Consistent with its advertised business strategy, GTCR selected Scott and Vaccaro as APS's new top executives. In GTCR's press release publicizing its acquisition of APS, Katz proclaimed that "'[p]artnering with Greg [Scott], Jerry [Vaccaro] and the APS executives is an excellent fit with GTCR's strategy of backing exceptional management teams.'" For his part, Scott commented that he "'look[ed] forward to . . . working with GTCR'" and that "'GTCR's financial expertise, strong experience in healthcare and their commitment to growth companies in attractive industries will be invaluable to APS.'"

39. At all times relevant hereto, GTCR controlled and dominated APS and its board of directors. The Company's five-member board was comprised of Defendants Scott and Katz and non-defendants Joseph Nolan, Douglas Present, and Ruben King-Shaw. All five men were GTCR appointees. In addition to Scott and Katz (who was a Managing Director of GTCR), Nolan had been a Principal at GTCR since 1996. Douglas Present was the former Chairman and CEO of Managed Health Care Associates and, according to GTCR's website, was one of GTCR's "Management Leaders." GTCR appointed King-Shaw to the board in 2010.

40. Katz was an aggressive, hands-on manager of GTCR's portfolio companies. And he was especially so with APS, which was his first investment for GTCR after he joined the firm in 2006. Katz met formally with his fellow board members at least quarterly to review APS's

14

business and financial results, but he met much more regularly with APS management. From 2007 until GTCR sold APS to Universal, Katz chaired APS's Audit Committee. In 2009, he began serving on a newly created "Board Compliance Committee" that oversaw APS's compliance program. The following year, Katz began serving on a new Compensation Committee, which controlled the compensation paid to Scott, Vaccaro, McDonough, and other APS senior executives.

41. Throughout the period that GTCR owned APS, Katz personally immersed himself in the Company's day-to-day operations. Katz was under pressure to prove himself at GTCR, and he in turn pressed APS management to yield results. Scott, APS's CEO, effectively reported to Katz. Katz required APS to submit detailed financial packages to GTCR on a monthly basis, including, among other things, (a) monthly and year-to-date income statements showing actual and forecasted results; (b) balance sheets; (c) cash flow statements; (d) debt summaries; (e) contract-by-contract analyses of revenue, expense, and contribution; and (f) pipeline information. In addition to receiving formal reporting, Katz exchanged thousands of emails and had regular telephone conversations with Scott, Vaccaro, McDonough and others at APS regarding virtually every aspect of APS's day-to-day business. In fact, Scott often complained that Katz was a micromanager, who often called him to discuss APS's business on nights and weekends.

42. Katz regularly asked for and received information regarding key APS contracts, including the contract with Customer U that is now under investigation, and the Company's largest contract, with Customer A. Katz advised Scott and Vaccaro on the pricing and other aspects of APS's proposals for new contracts. For example, Katz was especially active in APS's efforts to expand its contract with Customer A. He reviewed and discussed with Scott the financial terms of APS's proposal to Customer A. He asked for and received regular updates

15

from Scott, McDonough, and others at APS about the proposal process, including timing and delays. And when significant developments occurred, such as when APS was selected to participate in further negotiations, he was notified the same day. Similarly, Katz played an active role when APS was bidding for a state contract with Customer F, including monitoring information on competing bidders. Scott, Vaccaro, and McDonough regularly updated Katz about newly awarded contracts, lost or terminated contracts, regulatory issues, and new business opportunities, including the associated amounts of current and expected revenues and earnings.

43.     In addition to keeping close tabs on APS's existing and prospective customer base, Katz took a hands-on approach to managing other aspects of APS's business. To give a few examples: (a) Katz participated in hiring APS managers, outside consultants and other advisors; (b) Katz oversaw APS's lending arrangements, including, as discussed below, when the Company defaulted on its loan covenants; (c) Katz arranged for a new equity investment in APS by King-Shaw, whom GTCR then appointed to the Company's Board; (d) Katz participated in government relations and regulatory issues; and (e) Katz scouted potential acquisition targets for APS.

44.     Katz was also actively involved in the Company's compliance program. When APS's Chief Compliance Officer ("CCO") unexpectedly resigned in October 2011 – in the midst of GTCR's efforts to unload APS on Universal – Katz took over the termination process, going so far as to interview the departing CCO to learn the reasons for his resignation and to review the state of APS's compliance program. During that interview, Katz, aware of many problems at APS, bluntly questioned the CCO as to whether he was considering becoming a whistleblower against the Company.

16

45. While Katz had overall responsibility for GTCR's nearly $300 million investment in APS, a team of other GTCR employees actively supported Katz's efforts to build APS's business and position it for an eventual sale. Those individuals included Earl, who became a GTCR Principal in 2012; Kos, who became a GTCR Vice President in 2011; and Patrick Nelli, then a GTCR associate. In exchange for the substantial management services rendered by Katz and his team to APS, GTCR charged the Company management fees of $500,000 per year.

**APS's Financial Performance Under GTCR**

46. APS was a disappointing acquisition for GTCR. The Company was unable to show consistent growth. When GTCR acquired APS for $285 million in 2007, the Company earned $26.9 million in EBITDA. APS managed to generate over $40 million EBITDA in 2008 and 2009, but that figure declined in 2010. For 2011, APS budgeted $332.3 million in revenue and $35.4 million in EBITDA but ultimately took in only $313.3 million in revenue, corresponding to $31.7 million in EBITDA.

47. GTCR's efforts to turn the Company around were not successful. The Company was losing contracts with existing customers. In fact, on November 30, 2011, in the midst of the fraudulent sales process, Katz privately acknowledged in an email to Scott that the "contract churn is killing us." Making matters worse, some of the new contracts that the Company was able to sign were not profitable. In early 2011, Scott, Vaccaro, McDonough, and Katz learned that APS had seriously underestimated the cost of performing a new contract for Customer D, which was the Company's third largest contract. As a result, the contract was far less profitable than budgeted, losing money by the end of 2011. By the end of the second quarter of 2011, the contract was $1.5 million behind budget for that quarter alone, as reflected in a July 28, 2011 financial report that McDonough presented to Katz, Scott, and the rest of the APS board. Under

17

pressure from Katz to turn things around, Scott, Vaccaro, and McDonough, in turn, pressured local managers to report better numbers. A government agency associated with Customer D is now investigating whether APS unlawfully inflated its bills as a result of those efforts.

48.     Private equity funds such as GTCR commonly hold their investments for a five-year period. But Katz acknowledged in a June 16, 2011 email to Scott, copying Nolan, that it had become apparent that GTCR's plan to sell APS by 2012, which would be five years after its initial investment, was "increasingly aggressive and unrealistic" given APS's inability to maintain its existing customer base or to show consistent growth. By that time, Katz stated that GTCR expected that it would have to hold its investment in APS for at least another two to four years. As a result, Katz and Nolan summoned Scott to a face-to-face meeting in Chicago to address their concerns. In his email to Scott, Katz noted that he had "spent lots of time recently trying to assess the business and investment outlook for APS." He raised a litany of issues that he wanted to discuss with Scott, including "pricing strategy," "[l]essons learned from recent customer losses," "additional avenues for growth," and "the right personnel plan."

49.     APS's situation was made even more precarious by its heavy debt burden. In 2011, APS had approximately $150 million of debt on its balance sheet. Beginning in September 2011, APS was in breach of certain of its loan covenants, a problem that was well known to Scott, Vaccaro, McDonough (who prepared monthly reports to APS's lenders), Katz, Nolan, and Kos. Katz repeatedly voiced his concerns about the covenant breaches with Scott and Nolan. If the banks were to declare a default on APS's loans and foreclose on GTCR's equity interest in APS, GTCR would lose its entire $285 million investment in the Company.

18

**APS's Minefield of Undisclosed Compliance Risk**

50.     Not only was APS not performing up to GTCR's expectations, but its flawed operations masked a grave risk of massive contractual and regulatory liabilities.  Universal was a government contractor, and therefore compliance was an area of particular concern and focus for Universal during due diligence.  But, as discussed below, APS and GTCR deliberately concealed APS's known risks of legal and regulatory liabilities from Universal.

51.     In general, APS's Medicaid contracts called for it to bill its state customers on a monthly basis.  Each invoice was calculated in accordance with the contract's specifications, based on metrics such as the number of members in the program during the invoice period, the categorization of those members, and the actual services delivered to those members.  Maintaining accurate records of these and other contract metrics for the tens or hundreds of thousands of plan members in each state was essential to proper invoicing.

52.     Several government authorities are now investigating, and a whistleblower lawsuit has alleged, that APS subsidiaries regularly and purposefully overbilled state customers during the period that GTCR owned and managed APS.  To give just two examples:

(a)     *Customer T.*  A former employee of an APS subsidiary filed a *qui tam* False Claims Act lawsuit alleging that APS subsidiaries repeatedly overcharged Customer T by billing for improperly enrolled members and contacts, or "touches," with members that had not actually occurred.  The suit alleged that the APS subsidiaries, among other things, (i) failed to obtain the necessary consents to enroll Medicaid members in the program; (ii) enrolled and billed for services for patients who had never consented and never received services under the contract; and (iii) failed to provide contractually required services.  Significantly, Scott, Vaccaro, McDonough, and the entire APS board (including GTCR's Katz and Nolan) were notified in July

19

RLF1 10845625v.1

2010, shortly after the Customer T contract ended, that a former employee of an APS subsidiary had lodged a complaint of "Medicaid fraud" with the "Attorney General" of Customer T in January of that year. Moreover, McDonough was aware of another employee raising similar concerns. These facts, which could reasonably be expected to lead to, and in fact led to, a whistleblower claim, were never disclosed to Universal.

      (b)     *Customer U.* From 2006 through 2010, a contract with Customer U was among APS's largest public contracts. The federal government has launched an investigation into possible overbilling of Customer U by APS subsidiaries during the time period of GTCR's management and control.

      (i)    The government has alleged rampant fraud by the APS subsidiaries, including billing for critical patient services such as assessments and plans of care that they never performed; charging for a higher number of members than the contract allowed, and falsifying physician approval of plans of care. The government has asserted damages of tens of millions of dollars, which are potentially subject to trebling under the False Claims Act.

      (ii)    The government's allegation of rampant fraud implies that senior APS management was directly involved in the alleged misconduct. Documents produced to the government in the Customer U investigation reflect that Defendants were well aware of risk that their conduct later would be called into question. The contract was initially unprofitable and, at Katz's direction, Scott, Vaccaro, and McDonough all devoted significant effort to boosting APS's billings under the contract. Those efforts succeeded; as McDonough wrote to Scott and Vaccaro on July 23, 2009, APS staff had become "creative in their approach to identifying new members." But employee surveys showed complaints of "unethical" practices and pressure to inflate customer billings, as did employee emails sent to Scott and Vaccaro. Moreover,

20

McDonough received a report in August 2008 showing only 20% to 50% compliance with various contract performance metrics (in other words, non-compliance rates of 50% to 80%). He was further informed in October 2008 that APS was billing for the total number of members served throughout the month, when the language of the written contract provided for billing based on the highest number of members served on one day. Knowing that APS's contract with Customer U was critical to GTCR's ability to sell APS, Katz and Nolan asked for and received frequent updates on the performance and profitability of the Customer U contract and, on information and belief, were fully aware of the steps Scott, Vaccaro, and McDonough had taken to make that contract a cash cow for APS. These facts, which were never disclosed to Universal, could also reasonably have been expected to lead to a whistleblower claim or a government investigation and in fact did.

**The Parties Engage in Merger Discussions in the Late Summer and Fall of 2011**

53. In the summer of 2011, Universal's Chairman, wholly unaware of APS's struggles and problems, suggested in a conversation with Scott that a strategic combination of APS and Universal might make sense. At the time, GTCR had all but abandoned hope of selling APS within its initial five-year target, and knew that it was at risk of losing its entire investment. The Defendants, led by Katz, immediately seized upon this lifeline and commenced discussions with Universal.

54. Katz personally directed and at all times controlled the sales process on the sellers' behalf. Over the course of the Transaction, Katz exchanged approximately 300 emails directly with Universal's top management and was included on scores of additional group emails among the parties. Katz coordinated nearly daily with Scott, Vaccaro, and McDonough during the critical stages of the deal process, exchanging over 700 emails with them and regularly

21

speaking on the phone with them. Specifically, on June 30, 2011, Katz wrote to Scott, copying Earl, that "we need to coordinate carefully on all of the external communication" regarding APS's finances. Cell phone records alone reflect nearly 100 cell phone calls between Katz and Scott alone during the sales process. Katz personally negotiated all material terms of the Transaction, including price, with Universal's Chairman. He participated in drafting sessions for the Merger Agreement and other Transaction documents with Universal's counsel. He vetted presentations and other information provided to Universal, participated in numerous meetings and calls with Universal, hired GTCR's advisors for the Transaction, and oversaw due diligence. At all times during the Transaction, Katz acted on behalf of the GTCR Defendants, APSLP, and APS, and Scott, Vaccaro, and McDonough acted on behalf of APS and APSLP.

55. As a kick-off to the sales process, Scott, Vaccaro, and McDonough collectively prepared and delivered a presentation to Universal senior management on August 18, 2011. Scott discussed what should be in the presentation with Katz and sent a copy of the written presentation to Katz before it was given to Universal. Katz also sent Scott written directions for making the presentation to Universal. GTCR's Earl attended this meeting and conveyed what had happened at the meeting to Defendant Katz and, on information and belief, Nolan. This presentation (the "August Presentation") included, among other things:

(a) projected income statements for 2012 through 2016, which forecast $52 million in EBITDA for 2012;

(b) the annual EBITDA contributions from APS's most significant contracts and the contracts' maturity dates, including a false assertion that the contract with Customer D generated millions of dollars of EBITDA annually, even though Scott, Vaccaro, McDonough, and Katz were all aware of that contract's unprofitability, as described in paragraph 47, above;

22

(c)     a bogus pipeline (the "August 18 Pipeline") of new business supposedly anticipated in 2012, which was falsely projected to generate $31.7 million in EBITDA in 2012;

(d)     false statements that APS expected to expand its contracts with multiple states, including Customer E and Customer F; and

(e)     a misrepresentation that the Software used to provide APS's services – the "chassis" of its service business – was a "proprietary, web-based and HIPAA compliant platform." In the course of their discussions with Universal, Defendants Scott, Vaccaro, McDonough, and Katz, and others at GTCR were told that this "chassis" was of interest to Universal not only as the foundation of APS's existing business, but also because Universal planned to modify the Software so that it could be used in Universal's other business lines.

56.     The August 18 Pipeline purported to be a good faith statement of APS's actual views of the Company's prospects for future business. It was, however, intentionally false. In fact, it bore no relationship to the internal projections prepared by APS's sales managers. APS's sales team kept track of new business opportunities by inputting data into a database program called "salesforce.com." Each month, a printout of the salesforce.com report was provided to APS's senior managers, including Scott, Vaccaro, and McDonough. The reports generated by salesforce.com included, among other data, entries for the level of confidence that the contract would be awarded to APS, expressed as a percentage. The sales representatives, who were in direct contact with the customers and prospective customers, were required to update the entries for their new business opportunities on a weekly basis.

57.     Defendants Vaccaro and McDonough prepared the August 18 Pipeline (and the other new business pipelines given to Universal, discussed below) by starting with the salesforce.com reports. However, instead of using the confidence levels assigned to the

23

prospective contracts in those reports, Vaccaro and McDonough, with the knowledge and approval of Scott, systematically and fraudulently inflated the probabilities of being awarded new business and the amount of that business in the pipelines given to Universal, without making any effort to reconcile their phony numbers with the dramatically different views of the sales representatives and APS's senior development executives. They also altered the revenue figures for those prospective contracts.

58. Following the August 18 meeting, the parties' discussions continued. On September 29, 2011, GTCR's Kos emailed Scott, copying Katz, Earl, and Nelli, a list of the talking points that GTCR wanted Scott to cover at a meeting with Universal scheduled for the next day, as well as a "cheat sheet" setting out the terms of a previous Universal acquisition.

59. On October 7, 2011, Scott, Vaccaro, and McDonough created and delivered a presentation to the Universal Board of Directors. The presentation (the "October Presentation") included all of the projections and other statements described in paragraph 55, above. In particular, the presentation projected the same $52 million in EBITDA for 2012 and $31.7 million in EBITDA from new business as had the August Presentation.

60. Scott, Vaccaro, and McDonough each knew, however, that APS's prospects had deteriorated since the presentation of the August 18 Pipeline. McDonough had prepared, and shared with Scott and Vaccaro, updated slides projecting only $26.5 million in EBITDA from new business, a decline of $5.2 million (or 17 percent) since the August Presentation six weeks earlier. These slides were not included in the October Presentation, purportedly because of a clerical error. But even though Scott, Vaccaro, and McDonough were alerted to the putative error before making the presentation, they still presented to Universal the incorrect and grossly overstated numbers and never told Universal of the putative error.

24

61. Scott, Vaccaro, and McDonough each had powerful motives to conceal the truth about APS's business from Universal. In a Universal transaction, they would be able to exchange their illiquid and worthless APS shares for valuable, publicly traded shares of Universal, as detailed in paragraph 152, below. They would also increase their personal compensation by as much as 40 percent, as detailed in paragraph 153, below. The GTCR Defendants and Katz had an even greater motivation – to avoid the loss of their entire investment in the event of a default, which would have been a serious problem for GTCR and a wipeout for Katz.

62. Based on the August and October Presentations, Universal expressed its interest in acquiring APS. Universal and GTCR (acting on behalf of APSLP) tentatively agreed upon a purchase price. In late October 2011, Kos of GTCR authorized GTCR's financial advisor to give Universal and its advisors access to a data room for due diligence purposes. Universal undertook a due diligence process in which it engaged a Medicaid consulting firm, a "Big Four" accounting firm and two prominent law firms to help it examine APS. Little did Universal know that both APS, including Scott, Vaccaro, and McDonough, and GTCR, including Katz, Nolan, Kos, and Earl, had embarked upon a scheme to conceal the truth about APS's unraveling business from Universal and its advisors.

**APS's Business Continues to Deteriorate**

63. After its discussions with Universal had commenced, APS learned of serious threats to its existing contracts. On November 16, 2011, Defendants Vaccaro and Scott received a message from a board member of Customer A – APS's largest customer, and a governmental entity – who also had been assigned by the Governor of Customer A to oversee Customer A's Medicaid operations. The message stated: "For the last few months we have been discussing

25

with your local management several areas of concern pertinent to APS's operations which I believe you should be aware of." The APS contract with Customer A generated $130.6 million in revenue, or 41.7 percent of the Company's total 2011 revenue of $313.3 million.

64. Vaccaro immediately recognized the gravity of the situation, writing to Scott, "[t]his is very concerning." Early on the morning of November 22, 2011, Defendants Scott and Vaccaro and another APS executive met in New York with the representative of Customer A.

65. Vaccaro's concern was justified. At the November 22 meeting, Customer A complained that APS was in breach of its contract because, among other things, APS had not provided on-site mental health services at one-third of the sites that were covered by the contract; did not have two in-patient facilities in each of the customer's geographic regions, as required by the contract; and was not properly handling either member calls or provider payments. The Customer A contract mandated professional support at every one of its sites. Defendants Scott and Vaccaro were told that Customer A intended to send APS a notice of deficiency and impose a substantial fine.

66. In fact, as Defendant Scott said in an email that he sent to Defendant Vaccaro and the head of APS's operations for Customer A on November 22, 2011, he understood Customer A to be threatening "the loss of our contract." He followed up by meeting with the Governor of Customer A on December 1, 2011. As discussed in paragraph 42, above, Katz regularly communicated with Scott and Vaccaro about APS's crucial contract with Customer A, and, on information and belief, Katz and Nolan were informed of both of these meetings with Customer A shortly after each occurred.

67. In October 2011, a private health plan customer, Customer B, informed Vaccaro in writing of material deficiencies in the performance of a contract for services in California.

26

Vaccaro met directly with Customer B on November 3, 2011 to discuss those breaches. Shortly thereafter, Customer B imposed a Corrective Action Plan on the Company. Scott and Katz also were well aware of the problem, which had been discussed during the December 5, 2011 meeting of APS's Audit Committee (attended by Scott and Katz) and at other meetings of APS's senior management (attended by Scott). Although Customer B had previously contemplated that the California contract, which began in June 2011, would be expanded to other states and APS had touted that plan to Universal, APS was notified in October 2011 that Customer B would not partner with APS in one of those states, South Carolina. Subsequently, in or around early November, APS was informed that Customer B would not award *any* new business to APS until the Company's performance improved. This information was included in multiple pipeline reports that Scott, Vaccaro, and McDonough each received. Likewise, Katz and the rest of the APS board received documents showing that APS no longer had any prospect of being awarded the South Carolina contract.

68.     Also around this time, APS learned that Customer F, where APS had its second-largest contract, was likely moving patients then served by APS's Primary Care Case Management ("PCCM") contract into managed care, which would result in a significant loss of revenue and profits. In a September 20, 2011 management report sent to Scott, Vaccaro, and McDonough, APS's Senior Vice President for the East Region estimated a "[p]otential loss of $8M in revenue" for APS due to Customer F's move to managed care.

69.     Additionally, at a November 2, 2011 board meeting, an APS Senior Vice President and APS's General Counsel made separate presentations on contract compliance and regulatory issues. Katz and the rest of APS's board knew from the November 2011 presentation that APS was non-compliant with many of its contracts, including, among others, contracts with

27

Customers A, C, E, F, G, I, and S. Katz and the rest of APS's board also knew that the review was incomplete, because it directed that further work be done to assess APS's contract compliance. Katz, Scott, and Nolan attended the meeting in person, and GTCR's Earl, Kos, and Nelli attended by telephone.

70. In addition to these threats to its existing contracts, APS's pipeline of new business was in free fall. On November 15, 2011, Defendant McDonough prepared another iteration of the new business pipeline for presentation to Universal at a meeting the following week. This draft pipeline, which was circulated to Scott and Vaccaro (but not to Universal), projected only $18.1 million in EBITDA from new business for 2012, a dramatic decline of 43 percent from the $31.7 million that had been shown to Universal in August and October.

71. By this time, APS was also in breach of its loan covenants. On September 30, 2011, APS went into default on its covenants regarding capital expenditures. By October 31, 2011, the Company was also in default of its covenants regarding the ratio of Adjusted Debt to EBITDA and the ratio of Senior Adjusted Debt to EBITDA. Scott, Vaccaro, and McDonough, as well as Katz and others at GTCR, were well aware of APS's defaults. In an email exchange between Scott and GTCR's Nolan on November 30, 2011, Scott acknowledged the gravity of a covenant default and its lethal impact on APS's future prospects: "[W]e probably cannot win another piece of business if we are in default, so the whole thing will then come crashing down."

**Discussions Between Universal and APS Break Down**

72. On November 22, 2011, Universal and APS held a meeting to discuss the potential acquisition (the "November Meeting"). Defendants Scott, Vaccaro and McDonough attended the meeting, as did Defendant Katz and Earl of GTCR. During this meeting, Scott, Vaccaro and McDonough made another written presentation to Universal, this time with updated

28

projections. McDonough had sent multiple versions of the presentation to Katz, Earl, and Kos of GTCR prior to the meeting. At the November Meeting, Scott, Vaccaro, and McDonough – with the knowledge and participation of Katz and GTCR – hid the truth about APS's deteriorating business from Universal.

73. For instance, Scott, Vaccaro, and McDonough concealed that the new business pipeline had plummeted from $31.7 million to $18.1 million, as McDonough had concluded just a few days earlier. Rather, after McDonough, Vaccaro and Scott had huddled over the numbers, they presented Universal with a new bogus version of the pipeline showing that APS projected $28.6 million EBITDA from new business and a budget showing that APS projected $46.7 million of total EBITDA in 2012. The sham increase is attributable in large part to three changes:

(a) adding four new or expanded contracts with Customer B. As discussed above, APS had previously received written notice of material deficiencies in its performance of its contract for Customer B and had been told it would not be awarded any new business unless it fixed those problems. Nonetheless, not only did Katz, Scott, Vaccaro, and McDonough not give the written notice of deficiencies to Universal, but the November 22 pipeline given to Universal projected several million dollars in EBITDA from Customer B contracts that were falsely assigned probabilities of 75% to 90%. As APS predicted internally (but fraudulently concealed from Universal), none of these contracts was awarded to APS;

(b) elevating the likelihood of a Dual Eligible contract for Customer F to "greater than 90%" from "less than 50%," even though Customer F had not yet even issued an RFP for that contract. Moreover, Customer F had, unknown to Universal, expressed dissatisfaction with APS's performance on its existing contract, and the internal salesforce.com documents continued

29

to show only a 10 percent chance of APS's winning the Dual Eligible contract. Customer F never awarded a Dual Eligible contract to APS; and

(c)     adding more than $1 million of EBITDA for a new contract with Customer R and assessing the probability of being awarded that contract as greater than 90%, even though the bid had been submitted only the day before, on November 21, 2011, and the APS sales representative was told that while the proposal "look[ed] good," the state "won't know anything definite until early next week." APS's Senior Vice President for Development forwarded this message to Vaccaro and McDonough, among others, and McDonough forwarded it to Scott. This contract was not awarded to APS.

74.     Nor did Scott, Vaccaro, McDonough, or Katz reveal at the November Meeting with Universal the bombshell meeting *earlier that day* among Scott, Vaccaro, and Customer A, in which APS had been told about substantial breaches in the performance of its contract and the potential for a fine and possible loss of the contract. They maintained their silence even though they knew that Universal was keenly interested in this important contract. In fact, Universal specifically had asked APS to come to the meeting prepared to address "provider disputes in [Customer A's location] and any reserves," as spelled out in a November 19, 2011 email from Universal's Chief Financial Officer to McDonough, which McDonough forwarded to Scott and Vaccaro. Scott, Vaccaro, and McDonough presented to Universal an estimate for 2012 EBITDA that included substantial earnings from the contract with Customer A, despite their knowledge that the contract was at risk and that APS faced, at the very least, a fine that would make a serious dent in APS's projected profitability.

75.     Scott, Vaccaro, and McDonough also tried to hide from Universal what they had learned about the potential for a significant reduction in APS's contract with Customer F, a state

30

agency. But Universal had independently learned about the potential move to managed care in that state, and confronted Scott, Vaccaro, McDonough, and Katz with this information at the November 22 meeting. The four individual Defendants, particularly Vaccaro, collectively downplayed the significance of the move and went so far as to suggest, without any basis for doing so, that APS would have other opportunities with Customer F, and that the income from Customer F might even increase. The discussion foundered and the meeting ended.

76. Shortly afterwards, Universal told Katz, the key negotiator for the sellers, that it was no longer willing to acquire APS at the price the parties had been discussing. Universal's Chairman explained to Katz on November 26, 2011 that, among other things, Universal was concerned about the significant effect that a reduction in the contract with Customer F would have on APS's business. In addition to the loss of revenue and income, as a result of this change APS would be even more heavily dependent on a single large customer, Customer A. Katz conveyed this information to Scott and GTCR's Nolan, Earl, and Kos. A few days later, on November 30, Nolan wrote to Scott that the breakdown in talks with Universal could "seriously complicate[]" any efforts to restructure APS's debt and that GTCR was considering taking a "below cost offer" because "there can be big unforeseen costs to being in covenant default especially with guys like [APS's lender]." The pressure on GTCR to close a deal with Universal was enormous.

**Universal Offers to Acquire APS at a Lower Price and Defendants Provide Bogus Financial Projections to Reel Universal In**

77. Desperate to salvage a deal and avoid the complete loss of GTCR's investment if the lenders foreclosed, Katz sent an email to Universal's Chairman seeking to revive the merger negotiations and suggesting that Universal make a reduced offer. APS and GTCR then gave Universal more financial information. In particular, on December 12, 2011, McDonough sent

31

Universal (copying Scott and Katz) various financial statements, including estimated 2011 revenue and EBITDA results and projected revenue and EBITDA for 2012 through 2016 (the "2012 Projections"). On December 30, 2011, McDonough sent Universal APS's 2012 budget (the "2012 Budget"), this time forecasting $44.8 million in total EBITDA in 2012. McDonough also sent Universal an updated new business pipeline (the "December 30 Pipeline").

78. Scott, Vaccaro, McDonough, and Katz (and his GTCR underlings Kos and Earl) lacked any reasonable basis to believe that APS could attain the revenue and EBITDA figures projected in the 2012 Budget and the December 30 Pipeline. The chart below shows some of the enormous and inexplicable discrepancies between the December 30 Pipeline and the internal salesforce.com pipeline at that time:

| Contract | Probability | | Annual Revenue ('000s) | |
|---|---|---|---|---|
| | Given to Universal | APS Internal | Given to Universal | APS Internal |
| Customer J (LA Duals) | 75% to 90% | 30% | $11,900 | $1,000 |
| Customer K | > 90% | 40% | $5,000 | $3,000/$3,000[1] |
| Customer F (Dual Eligibles) | > 90% | 40% | $14,400 | none listed |
| Customer B (IN) | 75% to 90% | 50% | $8,000 | $2,500 |
| Customer L (OH) | 75% to 90% | 30% | $6,000 | none listed |
| Customer B (SC)[2] | 75% to 90% | ----- | $700 | ----- |
| Customer M | > 90% | 30% | $4,000 | $1,000 |
| Customer B (VA) | 75% to 90% | 50% | $6,000 | $2,500 |
| Customer J (THM) | 75% to 90% | 30% | $10,000 | none listed |

79. Scott, Vaccaro, McDonough, and Katz knew that they were misrepresenting the probabilities of winning these opportunities, in particular the multiple opportunities with

---

[1] The Customer K opportunity was for two separate contracts; Scott, Vaccaro and McDonough knew that one of those contracts would not even be put out for bid until 2012.

[2] The Customer B contract for South Carolina listed in the December 30 Pipeline did not even appear on APS's salesforce.com pipeline at the time because Customer B already had said it would not be awarded to APS.

32

Customer B. Indeed, APS's internal business development reports described the potential contract with Customer B in South Carolina as "lost" and the contemporaneous presentations made to the APS board (including GTCR's Katz and Nolan) ceased listing it as a prospect. Nonetheless, the December 30 Pipeline given to Universal described that "lost" prospect in South Carolina as 75 to 90 percent "likely" to be awarded to APS. APS's internal documents also said that *no* new contracts would be awarded to APS by Customer B unless APS fixed the shortcomings in its performance in California. Yet Scott, Vaccaro, McDonough, and Katz concealed these facts and internal documents from Universal and instead fraudulently listed four separate opportunities with Customer B on the December 30 Pipeline.

80.    Reinforcing the misrepresentation in the December 30 Pipeline, Katz falsely represented to Universal's Chairman in a December 26, 2011 e-mail that "we expect" to "continue to do business" with Customer B after the Transaction.

81.    The 2012 Budget that McDonough sent to Universal on December 30 was equally baseless and misleading. That document assumed that all of APS's existing contracts would continue through their full term. The budget also reflected APS's purported expectation that a contract with Customer E covering Seniors and Persons with Disabilities ("SPD") would expand in 2012 to include 30,000 new rural members. The budget also assumed that APS would win the rebid of a contract for Population Health Management ("PHM") with Customer G, even though Scott, Vaccaro, and McDonough knew that was not going to occur because they had been notified in writing on October 17, 2011 that "APS received no communication/invitation for finalist interview." The fact that Customer G had cut APS out of the running for the contract was hardly a surprise to APS; that customer had recently completed a scathing evaluation in which it reported to APS that it was "Very Dissatisfied" – the lowest rating – with the "Overall

33

RLF1 10845625v.1

Quality" of APS's services. Universal was never informed of these abysmal performance ratings.

**The Defendants Continue to Lie and Conceal Adverse Information During Universal's Due Diligence**

82.     Universal learned in the course of its due diligence that the Software was subject to a Software License, Consulting and Maintenance Agreement, dated as of March 31, 2006, by and between Innovative Resource Group, LLC d/b/a APS Healthcare ("IRG") and the Licensor (the "Software License"). This fact was significant because Universal planned to modify the Software for use in its other businesses, which it could not do unless it owned the Software outright without restrictions. On December 28, 2011, during a due diligence conference call on intellectual property issues with Universal's counsel, an APS in-house lawyer stated that the software covered by the Software License was only a "small component" of APS's purportedly proprietary Software.

83.     In December 2011, Universal personnel visited APS facilities in Customer A's location as part of their due diligence for the Transaction. Concerned that Universal might discover that APS was in breach of its contract with Customer A, Defendant Katz wrote to Defendant Scott, "the less time there the better." Although Universal requested an opportunity to speak with Customer A personnel during that visit, Katz and Scott refused to arrange for a meeting, claiming that it was inappropriate to do so because Universal had not yet signed a contract. In fact, Katz's and Scott's real motivation was fraudulently to conceal Customer A's strained relationship with APS, its claim that APS was in breach of its contract, the impending fine, and the looming threat to terminate that contract. When Universal, unaware of this threat, insisted that it would not close the Transaction without Customer A's approval, Katz and Scott acknowledged to each other that this would be a tall order; on January 5, 2012, Scott wrote to

34

Katz, "[t]his could literally delay the closing months . . . *and all kinds of bad things could happen.*" Katz wrote back to Scott, "I share your concern."

**Universal Asks for and Receives Assurances About Regulatory Risks**

84.     Universal was aware that earlier in 2011, IRG had paid $13 million and had entered into a Corporate Integrity Agreement with the Department of Health and Human Services in connection with the settlement of allegations that IRG had fraudulently overbilled the state of Georgia for its services. As a result, Universal's due diligence paid close attention to APS's efforts to monitor compliance with its contracts.

85.     Universal also was aware of the resignation of APS's CCO in the midst of the sales process and repeatedly asked GTCR's financial advisors and APS, including Scott and McDonough, to meet with Katz regarding his interview of the outgoing CCO. Universal also asked to interview the outgoing CCO and the Office of Inspector General monitor assigned to the Corporate Integrity Agreement and a representative of the Independent Review Organization that APS had hired to perform certain compliance reviews required by the CIA.

86.     When GTCR's advisors and APS refused to schedule any of these interviews, Universal's Chairman voiced his concerns to Katz. On December 31, 2011, Katz promised Universal's Chairman that "[w]e'll get you whatever you need on the compliance front." A meeting was arranged at APS's offices for January 4, 2012.

87.     At that meeting, Scott and Vaccaro assured Universal's Chairman and General Counsel that APS had remedied shortcomings in its compliance programs that had been identified as part of the Georgia investigation and that APS was now in compliance with all its contracts and applicable laws. Katz, as well as GTCR's Earl and Kos, attended the meeting by telephone. Katz downplayed the CCO's departure to Universal's Chairman and General

Counsel, and said nothing about his own suspicions that the CCO might be a whistleblower. Moreover, Universal was not told of the known compliance risks for Customer A and for the former contracts with Customers T and U described in paragraphs 52 and 63-66, above.

88.     Throughout the due diligence process, including at the January 4 compliance meeting, APS, including Scott, Vaccaro, and McDonough, and GTCR, including Katz, further hid from Universal that APS was plagued by rampant information technology ("IT") and other operational problems that jeopardized its ability to perform and accurately bill for services under its contracts. APS's contracts often had very-detailed and customized rules for which members could be billed, when, for what services, and at what rate. Accordingly, maintaining accurate records was essential to contract compliance and proper invoicing. But APS was so desperate to replace lost contracts and prop up its faltering financial results that it overreached in taking on new contracts with new customers, making empty promises that it could perform as required, even as it knew that it did not actually have the IT or operational infrastructure in place to implement its contractual commitments. As a result, APS was perpetually scrambling to try to build the customized platforms it had promised to its customers, cutting corners and triaging one crisis after the next – resulting in errors, delays, and rising levels of customer dissatisfaction.

89.     By the Fall of 2011, the problem had reached crisis proportions. Reacting to news that APS allegedly had overbilled Customer G, APS's Senior Vice President for the East Region railed in a September 23, 2011 email, "We can no longer bury our head in the sand . . . Selling new business into this tsunami of constant unfinished and incorrect business will implode." APS's Senior Vice President for the West Region responded that she was experiencing the "same in the west" and noted that the Customer B contract was "off to a rocky start." These senior officers and others at APS repeatedly raised their concerns to Scott, Vaccaro, and McDonough,

36

including in monthly reports and at management meetings. For example, an October 17, 2011 management report highlighted that "IT issues continue to impact the business across the region" and contained detailed information about those problems. These issues were similarly discussed with Katz and others at GTCR in their regular communications and board meetings. But Katz, Scott, Vaccaro, McDonough and others painted a completely different – and false – picture of APS, including during the meetings with Universal on August 18, 2011, October 7, 2011, and November 22, 2011.

**The Merger Agreement**

90. Based on the false representations and omissions described above, on January 11, 2012, Universal, APSLP and APS entered into the Merger Agreement, pursuant to which APS was to be merged into a subsidiary of Universal. Scott signed the Merger Agreement on behalf of both APS and APSLP. The Agreement provided that $80 million of the $227.5 million purchase price was payable to APSLP in the form of shares of Universal common stock, while the rest was payable in cash. The Merger Agreement also provided for an additional payment should APS's 2012 EBITDA exceed $30 million.

91. As material inducements for Universal to enter into the Merger Agreement, the Company, by and through Scott, made extensive representations and warranties to Universal in Article 3 of the Merger Agreement. Among other things, APS and Scott represented and warranted that:

(a) the Company was not in material breach or default of any of its material contracts, except as disclosed in the Company Disclosure Letter, and that to its Knowledge, defined as the knowledge of Defendants Scott, Vaccaro and McDonough, and APS's General Counsel Joyce Tichy, none of its counterparties had "indicated to the Company or any of its Subsidiaries its

37

intent to cancel, terminate or modify . . . in a manner adverse in any material respect to the Company" any material contract. Merger Agreement § 3.17;

(b) more specifically, that there was no breach, violation or default of the contract with Customer A, except as disclosed in Section 3.29 of the Company Disclosure Letter, "and, to the Company's Knowledge, no event has occurred which with notice or lapse of time would constitute such breach, violation or default," and that APS had not "received written notice of any such breach, violation or default" of the contract with Customer A. Merger Agreement § 3.29. This representation was so critical to Universal that Universal insisted that it be subject to a heightened indemnification cap and a lengthened survival period. The Company Disclosure Letter, in turn, disclosed only that APS was "discussing the appropriate measure of network adequacy (for providers with multiple offices) with [Customer A]," without mentioning the other major contract deficiencies discussed during the November 22, 2011 meeting and without disclosing that Scott, Vaccaro, and another APS executive had been told at that meeting that APS would receive a notice of deficiency and, at a minimum, be assessed a substantial fine;

(c) the Company and its subsidiaries had not violated or incurred any material liabilities under any healthcare laws ("Healthcare Laws"),[3] and that to its Knowledge, there were no facts, circumstances or events that could reasonably be expected to give rise to such liability. Merger Agreement § 3.25(a). Like Section 3.29, this important representation was also subject to a heightened indemnification cap and a lengthened survival period; in addition, Universal

---

[3] "Healthcare Laws" is defined in Section 3.25(a) of the Merger Agreement as "(i) all federal, state and Puerto Rican fraud and abuse laws, including the Stark Law (42 U.S.C. §1395nn), the civil False Claims Act (31 U.S.C. §3729 et seq.), Sections 1320a-7a and 1320a-7b of Title 42 of the United States Code; (ii) Medicare (Title XVIII of the Social Security Act); (iii) Medicaid (Title XIX of the Social Security Act); (iv) prompt pay laws; (v) quality, safety and accreditation standards and requirements of all applicable state laws or regulatory bodies; (vi) licensure laws and regulations; and (vii) any other applicable health care Legal Requirements."

38

insisted that the representation be made as to liabilities since January 1, 2006, before GTCR had even acquired the Company;

(d)     since March 23, 2011, the date of APS's prior audited financial statements, except as disclosed in the Company Disclosure Letter, there had "not been any fact, event, circumstance, change, occurrence, effect or condition that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect." Merger Agreement § 3.9;[4] and

(e)     "Section 3.16(a) of the Company Disclosure Letter sets forth a complete and correct list of the following categories of Intellectual Property Rights that are owned by the Company and its Subsidiaries: . . . (v) Software." In Section 3.16(a) of the Company Disclosure Letter, APS expressly warranted that the Software is "Owned Software." Section 3.16(a) of the Company Disclosure Letter separately lists "Licensed Software," thereby representing that software listed as "Owned Software" is not licensed.

92.     As the Merger Agreement explicitly confirms, Universal reasonably relied upon the representations and warranties in the Merger Agreement when it executed that agreement. *See* Merger Agreement § 3.34. Although the broad contours of APS's business and the nature of its customers were known to Universal, it was impossible for Universal to know the specific

---

[4]     A Company Material Adverse Effect is defined in Section 1.1 of the Merger Agreement as "any fact, event, circumstance, change, occurrence, effect or condition which, individually or in the aggregate (taking into account all other such facts, events, circumstances, changes, occurrences, effects or conditions), has had or would reasonably be expected to have a material adverse effect on (A) the financial condition, business or results of operations of the Company and its Subsidiaries, taken as a whole, or (B) the ability of the Company to timely consummate the transactions contemplated hereby." The definition explicitly provides that "any fact, event, circumstance, change, occurrence, effect or condition underlying any failure to meet any . . . projections, forecasts or revenue or earnings predictions [for any period ending on or after the date of this Agreement] shall be taken into account in determining whether a Company Material Adverse Effect has occurred or would reasonably be expected to occur."

39

information that APS and Scott, with the assistance of their co-conspirators, including Katz, Vaccaro, and McDonough, either misrepresented or concealed. Universal relied to its detriment on the basic business assumption – which unfortunately turned out to be unwarranted – that none of the Defendants was actively concealing information from Universal (such as material deficiencies in APS's operational infrastructure) or thwarting Universal's due diligence by refusing to give documents or access to customers under false pretenses (such as the internal pipelines that Scott, Vaccaro, and McDonough concealed from Universal and the refusal by Scott and Katz to let Universal speak to Customer A).

93. In addition to making these representations and warranties, the Company agreed to a number of covenants as to the conduct of its business, including information to be provided to Universal, during the period from January 11, 2012 through the closing. Those covenants included, among others, that prior to Closing, APS would "promptly" notify Universal if it obtained "Knowledge of any fact, event, circumstance, change, occurrence, effect or condition that [APS] believes would reasonably be expected to cause any of the conditions to Closing set forth in Section 6.1 or Section 6.2 to be not satisfied or fulfilled." Merger Agreement § 5.2(h).

94. As conditions to closing, Section 6.2 of the Merger Agreement required that: the representations and warranties of the Company be true and correct as of the date of closing (Merger Agreement § 6.2(a)); the Company shall have complied with all of its covenants under the Merger Agreement (Merger Agreement § 6.2(b)); and there shall have been no "event, development or occurrence of any condition that has had, or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect," on APS's business or financial condition (Merger Agreement § 6.2(c)). At closing, APS was obligated to provide "a

40

certificate of an officer of the Company, dated the Closing Date," certifying APS's compliance with each of these conditions. Merger Agreement § 6.2(h)(i).

**The Deterioration of APS's Business Between Signing and Closing**

95. After the Merger Agreement was executed, APS's customer relationships and business prospects accelerated their downward spiral. Except as otherwise noted below, none of these facts was disclosed to Universal as required by the Merger Agreement:

(a) At a meeting held on or about January 17, 2012, APS employees learned that Customer H had not mandated that physicians and other providers use the Company's web-based portal for "utilization management," *i.e.*, the submission of requests of approval for services. Scott, Vaccaro, and McDonough were told of this negative development in a January 2012 management report, which noted that Customer H's failure to require use of the portal "will restrict APS's ability to control costs and enact the vision of the contract." As a result, Scott, Vaccaro, and McDonough knew that APS would experience a significant shortfall in the net income that it had projected for the Customer H contract in 2012 but failed to inform Universal of this fact.

(b) One of APS's largest contracts was to provide services for Customer E's Adult Day Health Care ("ADHC") program. The 2012 budget contemplated that this contract would contribute over 10 percent of APS's projected 2012 budget of $44.8 million in EBITDA. Beneficiaries of ADHC sued Customer E; in a settlement announced in November 2011 and approved by the court in January 2012, after the Merger Agreement was signed, many participants in the program would be moved to managed care programs, and hence would no longer be served by APS. On or around November 29, 2011, Vaccaro and McDonough were notified by APS personnel that the settlement likely would result in a loss of business for APS.

41

After the settlement was approved, Vaccaro, McDonough, and Scott were again told about the adverse impact that this settlement would have on APS's business, including in January and February 2012 management reports. APS failed to inform Universal of these facts. To the contrary, McDonough fraudulently concealed the impact by falsely telling Universal that the settlement would give APS an opportunity to *expand* its programs with Customer E.

(c) On or about January 20, 2012, one or more members of APS's sales team, which reported up to Vaccaro, were told that a new contract with Customer E's County Medical Services Program ("CMSP"), with projected annual revenue of $4 million, would be reduced in scope to $2 million. Vaccaro, McDonough, and, on information and belief, Scott and Katz, were aware of the reduction but failed to inform Universal of this fact or to reduce the 2012 budget accordingly.

(d) By letter dated February 1, 2012, Customer B notified APS that it was terminating its California contract with APS. On February 15, 2012, Customer B sent APS a post-termination letter, addressed to Defendant Vaccaro, referring to the Company's "material deficiencies" in performance. Customer B's contract termination was specifically discussed in a February 2012 management report sent to Scott and McDonough. APS informed Universal of this termination but concealed from Universal the fact that the termination resulted from APS's defective performance. APS did not send Universal a copy of the February 15 letter citing APS's "material deficiencies." To the contrary, Scott, Vaccaro, and McDonough misrepresented to Universal in multiple meetings, some of which Katz attended, that Customer B had terminated the contract because it did not want to do business with a Universal-owned company.

(e) APS's contractual relationship with Customer C had begun in 2005, and was one of the Company's longest standing and most successful relationships. The 2012 budget

McDonough had given to Universal contemplated that a five-year renewal of the contract with Customer C would contribute more than five percent of the budgeted $44.8 million of EBITDA for 2012.  On February 1, 2012, Defendants Vaccaro and McDonough received written notice that, even though the five-year renewal had previously been awarded to APS, Customer C was nonetheless putting out a new RFP for it.  APS's Senior Vice Presidents for Development and Strategic Initiatives were told that the new RFP had been issued because the newly appointed director of Customer C did not want to hire APS in light of the Company's $13 million payment to settle the False Claims Act investigation in Georgia – illustrating why allegations of False Claims Act liability are so costly to APS's business.  Defendants Scott and Vaccaro knew of Customer C's concern about the Georgia settlement.  Under these circumstances, it was virtually certain that Customer C would not award the contract to APS.  Even though Scott, Vaccaro, McDonough and, on information and belief, Katz, knew that APS had lost the contract with Customer C, they failed to inform Universal of that fact or the new RFP, and again fraudulently failed to reduce the budget.

(f)     On or about February 6, 2012, APS's Executive Director for the contract with Customer G learned that one of APS's competitors had been selected for the renewal of the PHM contract with Customer G for a term beginning July 1, 2012 and, accordingly, that the projected revenue and income for that contract in APS's 2012 budget would have to be reduced.  APS's Executive Director informed APS's Senior Vice President for Development and other APS executives that the contract had been lost by email, and this email was forwarded to McDonough.  When he learned that the contract had been lost, McDonough immediately directed another APS employee to estimate the impact of the loss on APS's budget for 2012.  The estimate of a $500,000 loss of profits was never sent to Universal.  Moreover, Vaccaro and,

43

on information and belief, the other Defendants, were aware of this loss and the material impact it would have on APS's 2012 budget but failed to inform Universal of those facts.

(g)    On February 13, 2012, Customer D notified APS by a letter addressed to Vaccaro that Customer D would put APS's existing contract with Customer D out for rebid for the contract year starting January 1, 2013.  McDonough was also informed of the rebid.  APS's contract with Customer D, its third largest contract, would otherwise have lasted until 2015. APS's General Counsel did not forward this letter to Universal until February 29, 2012 – more than two weeks after receiving it, and only two days before the scheduled closing of the merger. Scott, Vaccaro, and McDonough were well aware that APS had run into extensive problems trying to implement the Customer D contract.  Yet these facts, which significantly reduced the chances that APS would be able to win the rebid, were not disclosed to Universal.  The contract with Customer D is now the subject of a government investigation into overbilling.

(h)    After the Merger Agreement was signed, in mid-January 2012, Scott, Vaccaro, and McDonough and, on information and belief, Katz and the GTCR Defendants, became aware that APS's 2012 EBITDA budget had been overstated by $1.5 million as a result of a purported error in calculating the earnings from APS's largest contract, Customer A.  Universal was not informed of this purported "error" or its negative impact on APS's 2012 budget.

96.    These events, individually and in the aggregate, had a material adverse effect on APS's business.  Scott, Vaccaro, McDonough, Katz and the GTCR Defendants hid almost all of these events from Universal.  For the few events they could not avoid disclosing, Universal was fed false explanations, such as McDonough's statement that Customer E's settlement of the ADHC litigation would have a positive impact on APS's business, or Scott's, Vaccaro's, and McDonough's statements that Customer B's termination of its California contract was due to its

44

unwillingness to work with Universal, rather than APS's own serious performance shortcomings. Had Universal known of these events, it never would have closed the Transaction.

97. Notwithstanding the torrent of undisclosed bad news, APS repeated its rosy projections for 2012 when it had no reasonable basis to do so. For example, on February 2, 2012, McDonough delivered to Universal the last new business pipeline that Universal would receive before Closing (the "February 2 Pipeline"). Since the time of the December 30 Pipeline, APS had lost the Customer B contract in California and could no longer pretend to have any prospect of winning contracts with Customer B in other states. In addition, many states had postponed the timing for their RFPs, delaying the dates on which APS could begin to see revenue from those contracts, even if they were awarded to APS after a highly competitive bidding process. As a result, the 2012 EBITDA projected on the December 30 Pipeline should have been reduced by at least $8 million, or almost 30%. A change of this magnitude would have triggered Universal's right to walk away from the Merger Agreement.

98. Instead of revealing this bad news to Universal, McDonough, Scott, and Vaccaro camouflaged these known losses of contracts that had previously been in the pipeline by preparing the February 2 Pipeline, which added eight new contracts that had not appeared on any previous pipeline, accounting for $4.7 million additional in projected 2012 EBITDA contribution. As a result of these bogus additions, the 2012 EBITDA projected on the February 2 Pipeline was only $2 million less than the 2012 EBITDA projected on the December 30 Pipeline. Most of the eight newly-added prospects had been known to APS for months, yet Scott, Vaccaro, and McDonough added them to the February 2 Pipeline even though (i) no objective event had occurred to make them more probable of being awarded to APS and (ii) APS's sales force did not view them as likely to be awarded to APS. On February 1, and 2,

45

Vaccaro, Scott, and McDonough discussed in internal emails that including these contracts was "risky," yet they chose to lie to Universal anyway. Only one of these eight new contracts was ever executed, resulting in 2012 EBITDA of $250,000.

99. The following chart shows some of the new irreconcilable differences between the February 2 Pipeline, given to Universal one month before the merger closed, and the internal salesforce.com figures, which were not given to Universal:

| Contract | Probability | | Annual Revenue ('000s) | |
|---|---|---|---|---|
| | Given to Universal | APS Internal | Given to Universal | APS Internal |
| Customer I (Dual Eligibles) | 75% to 90% | 10% | $5,500 | none listed |
| Customer E (Dual Eligibles) | > 90% | 10% | $14,000 | $12,600 |
| Customer N (Dual Eligibles) | 50% to 75% | 30% | $8,600 | none listed |
| Customer O (Dual Eligibles)[5] | 75% to 90% | --- | $10,000 | --- |
| Customer P (Dual Eligibles) | 75% to 90% | 20% | $8,600 | none listed |
| Customer Q | 50% to 75% | 30% | $10,000 | $6,000 |

100. In addition, the fraudulent February 2 Pipeline showed the same level of 2012 EBITDA contribution from the contract with Customer H as McDonough had provided to Universal in the December 30 Pipeline, even though the EBITDA contribution projection could no longer be valid after the January 17, 2012 meeting in which APS learned that Customer H would not mandate use of APS's web portal. McDonough's cost projections, created in consultation with Scott and Vaccaro, had assumed that physicians would use the web portal, but without the mandate, APS was forced to incur significant additional costs.

101. Notably, Scott, Vaccaro and McDonough continued to conceal the Company's real salesforce.com pipeline from Universal. In an email exchange on February 1, 2012, after Universal's Chairman had asked for a "pipeline report," McDonough told Vaccaro that he did

---

[5] The Customer O Dual Eligibles contract listed in the February 2 Pipeline did not even appear on APS's salesforce.com pipeline at the time.

46

not want to send Universal a salesforce.com printout because that would *"bring up more questions"* and *"open up a hornet's nest."* The salesforce.com report, which would have exposed Scott, Vaccaro, McDonough and Katz's lies, was never sent to Universal.

102. As intended, and as discussed below in paragraphs 162-164, Universal relied on Scott, Vaccaro, McDonough and Katz's false representations that APS's business and its relationships with existing and prospective customers were robust and unimpaired in deciding to close the merger.

103. The misrepresentations continued when, on or about February 14, 2012, Defendant McDonough spoke with Universal's Chief Financial Officer to discuss APS's January 2012 results. On that call, McDonough reaffirmed APS's 2012 Budget forecast. This affirmation implied that APS would see income from the Customer C contract, which was then subject to rebidding, and would receive all projected income from the Customer G contract for the rest of the year, and concealed the $1.5 million supposed error in the budget for the contract with Customer A. McDonough also assured Universal's Chief Financial Officer that APS's 2012 results would recover from a 14 percent shortfall ($293,000) in APS's January 2012 EBITDA.

104. On or about February 29, 2012, Universal's Chief Financial Officer spoke again with Defendant McDonough for a pre-closing update on APS's financial condition. During this call, McDonough again fraudulently reaffirmed APS's bogus 2012 Budget forecast of $44.8 million EBITDA.

105. Defendant McDonough's confirmations of the 2012 Budget were false, as he, Scott, Vaccaro and Katz well knew. The undisclosed material adverse effects regarding Customers A, B, C, E, and H alone would be expected to reduce APS's forecast of 2012

47

EBITDA by over $11 million, or 25 percent; this figure does not even account for the substantial fine that Customer A was threatening to impose.

106. The closing date for the merger was March 2, 2012 (the "Closing Date"). On that date, Defendant Scott, acting on behalf of APS and for the benefit of all Defendants, executed and filed a Certificate of Merger merging APS Merger Sub, Inc. with and into APS with the Secretary of State of the State of Delaware. Each of the Defendants knew or had reason to know that the Certificate of Merger would be filed in the State of Delaware. The filing of the Certificate of Merger in Delaware was a direct and foreseeable result of the Defendants' scheme to defraud Universal.

107. On March 2, 2012, APS delivered the Officer's Certificate required by Section 6.2(h)(i) of the Merger Agreement to Universal. Defendant Scott signed the Officer's Certificate expressly certifying on behalf of APS that all of the representations and warranties in Section 3 of the Merger Agreement were true, including, among other things, that there had been no material adverse changes in APS's business since January 11, 2012, and that it was not in breach of the contract with Customer A or its other material contracts. Scott was also acting as APSLP's agent in signing the Officer's Certificate, since he was APSLP's President and CEO and was performing an act that was a condition of Universal's obligation to close the transaction. The Officer's Certificate failed to disclose any of the facts described in paragraphs 95-105, above. All of these representations were false.

108. On March 2, 2012, Universal paid $147.8 million in cash, which was used to retire debt, and approximately 6.2 million shares of Universal stock, then worth $76.7 million. The total purchase price, after post-closing working capital adjustments, was $222.3 million.

48

**Post-Closing Revelations of APS's Actual Business Conduct**

109.    Immediately after the closing, Universal began to learn about the sad state of APS's customer relationships and business that Scott, Vaccaro, McDonough, Katz and others had previously known about but had hidden from Universal.  Among other things:

(a)    By a letter dated March 16, 2012, Customer A formally notified APS's local subsidiary ("APS Subsidiary A") that it was in default of its contract and demanded $1.88 million in penalties, precisely as Scott and Vaccaro had been told four months earlier.  When this letter arrived, the head of APS's operations for Customer A confessed to Universal that it had been "expected."  By letters dated May 18, 2012 and June 22, 2012, Customer A increased its demand to a $5 million fine.  On December 21, 2012, the dispute was settled, with the knowledge and consent of GTCR, and APS Subsidiary A paid $3 million to Customer A.  Additional expenses have been incurred to bring APS Subsidiary A into compliance with its obligations under the contract with Customer A.

(b)    The number of persons in APS's care in the ADHC program of Customer E plummeted from 37,000 to less than 1,400.  As a result, that contract fell 82 percent short of its projected EBITDA contribution to the 2012 Budget, a shortfall of several million dollars, reflecting the decline that Vaccaro, McDonough, and, on information and belief, Scott had expected as a result of the ADHC settlement.

(c)    Customer E did not expand membership in its SPD program.  As a result, that contract fell 83 percent short of its projected EBITDA contribution to the 2012 Budget, another seven-figure shortfall.

(d)    As Vaccaro, Scott, and McDonough knew but did not disclose, Customer H refused to mandate that healthcare providers use APS's web-based portal for APS's Utilization Management contract.  As a result, that contract's 2012 EBITDA contribution was actually

49

negative, falling nearly $2 million short of its projected contribution to APS's 2012 EBITDA budget.

(e)     Confirming what Scott, Vaccaro, and McDonough had anticipated prior to Closing, in May 2012, APS was formally informed that the Customer C contract had been awarded to one of its competitors. The loss of the Customer C contract ultimately accounted for another significant shortfall to the 2012 Budget.

(f)     Audits of APS contracts with Customer I and a contract with Customer E for the management of persons with Severe Mental Illness ("SMI") disclosed deficiencies in the performance of those two contracts.

(g)     In the year after the merger, APS failed to win all but *two* of the thirty contracts it had listed on pipelines given to Universal; those two contracts generated a mere $350,000 of EBITDA in 2012 out of $26 million predicted in the final pipeline given to Universal, a shortfall of nearly 99%.

(h)     APS failed to deliver on its representations that it could take over behavioral health services for Universal's Medicare Advantage business, something that Scott and Vaccaro, with Katz's knowledge and approval, had touted as one of the selling points for a potential merger, including at the August and October Presentations. For that to occur, APS needed to have a provider network that was compatible with Universal's own. But even though APS did not have such a network, Scott and Vaccaro promised Universal that the implementation would be completed by January 1, 2012. The implementation date was pushed to April 1, 2012, then to May 1, 2012, then to January 1, 2013, a full year after the initial date by which Universal had told Vaccaro it was critical that the service be operational. In short, Scott and Vaccaro lied about APS's operational capacity.

50

110.     The combined effect of these and other events was catastrophic.  By April 10, 2012 – less than six weeks after Defendant McDonough's reaffirmation of the 2012 budget of $44.8 million EBITDA – Scott, Vaccaro, and McDonough slashed their forecast to only $27.1 million EBITDA for the year, a decline of 40 percent.   In discussing these disastrous results, Scott wrote to Katz that it was "[m]ore of the same" and that "if it can go wrong it has gone wrong for the last 30 days (three years)."  Of course, virtually none of what had "gone wrong" for the last three years had been disclosed to Universal.

111.     By July 13, 2012, just four months after the closing, Scott, Vaccaro, and McDonough informed Universal that they were forecasting only $4.1 million EBITDA for the year, a calamitous decline of more than 90 percent.  It was only after making unplanned corporate expense reductions that APS was able to salvage a scant $8 million of EBITDA in 2012.  Universal had initially allocated $164.8 million of APS's purchase price to goodwill; as of year-end 2013 – less than two years after purchasing APS – Universal had written off that entire $164.8 million in goodwill.  Universal also wrote down an additional $16.1 million in intangibles and $8.5 million in fixed assets associated with its acquisition of APS.

112.     The onslaught of revelations in the weeks and months after Universal acquired APS was no accident; as detailed above, Scott, Vaccaro, McDonough, Katz, and others knew of these material adverse facts at the time the Merger Agreement was executed on January 11 and at the time it was consummated on March 2 and withheld their knowledge from Universal so that Defendants could secure the benefit of the more than $220 million that Universal paid to obtain APS, as well as lucrative compensation packages for Scott, Vaccaro, and McDonough.

113.     In addition to the implosion of APS's business and business prospects, APS has paid or been asked to pay penalties or restitution on multiple customer contracts, has been served

51

with whistleblower claims and been made the subject of separate government investigations regarding its compliance with Healthcare Laws with respect to its contracts with Customer D, Customer T and Customer U. These claims and inquiries concern both contracts that were in force at the time of the merger and former contracts that had been in effect after 2006. Of course, none of the risks associated with these contracts was disclosed to Universal. Because APS is operating with a negative cash flow, Universal has been forced to loan APS subsidiaries the money to defend themselves in the investigations and lawsuit, which concern liability for alleged overbilling that happened on GTCR's watch. APSLP's contractual obligation to indemnify such defense costs, the settlement of the whistleblower lawsuit, and any potential resolution of the government investigations is crystal clear, yet APSLP, at GTCR's direction, has steadfastly refused to pay a penny for these matters, even though it insists on being permitted to participate in defending them.

114. In particular, on June 28, 2012, IRG and other APS subsidiaries were served with a *qui tam* complaint alleging violations of the False Claims Act brought by a former APS employee. As noted, the lawsuit alleged that the APS subsidiaries fraudulently overbilled Customer T; the contract with Customer T ended in 2010, so all of the alleged wrongful conduct took place before Universal acquired APS. As discussed in paragraph 52(a), above, Scott, Vaccaro, McDonough, and Katz failed to disclose known facts regarding the potential for legal and regulatory liability involving Customer T. The APS subsidiaries have spent more than $1.8 million in counsel, consultant, and expert fees defending the litigation and an additional $3 million to settle the lawsuit; because these APS subsidiaries did not have the funds to make these payments themselves, those payments were made from the proceeds of loans from Universal. Notwithstanding its obligations under the Merger Agreement, APSLP has refused to indemnify

52

Universal for its considerable defense costs or for the settlement that APSLP has consented to and acknowledged in writing is reasonable.

115. In September 2013, IRG and other APS subsidiaries were served with a subpoena issued by the Office of the Inspector General of the Department of Health and Human Services regarding their billing practices under a contract with Customer U. The contract with Customer U ended in 2010, and had been described to Universal during the sales process as one of APS's biggest success stories. All of the allegedly unlawful billing practices now under scrutiny took place before Universal acquired APS. As discussed in paragraph 52(b)(ii), above, Scott, Vaccaro, McDonough, and Katz failed to disclose known facts regarding the potential for legal and regulatory liability involving Customer U. Universal has loaned more than $2.3 million so that the APS subsidiaries could pay for the counsel, consultant, and expert fees incurred defending the investigation. APSLP has refused to abide by its indemnification obligations with respect to this matter, too.

116. In August 2013, Universal became aware of a wrongful termination lawsuit in which a former APS employee alleged that she had been instructed to overbill Customer D. Universal also learned that a government agency requested documents from, and deposed, a former APS employee regarding allegedly illegal billing practices with respect to the Customer D contract. On June 10, 2014, the agency served a Civil Investigative Demand seeking documents directly from IRG relating to possible violations of the state's False Claims Act. Scott, Vaccaro, McDonough, and Katz were aware of potential billing issues involving Customer D, but failed to disclose them to Universal. IRG has already incurred several hundred thousand dollars in counsel fees defending this investigation, fees that can be paid only by virtue of loans from Universal. APSLP has refused indemnification for this investigation as well.

53

117. APS's representations about the technical backbone of its business turned out to be false, as well. Several months after the merger closed, APS began to develop plans for a new version of the Software. In the course of this development, Universal was told that the software subject to the Software License was not, in fact, a "small component" of the Software, as the APS in-house lawyer had represented on December 28, 2011. Rather, Universal has learned that the Software License provides the "nucleus" of the Software and covers at least 50 percent of its code, as Scott, McDonough, and others at APS knew from their review of correspondence relating to a dispute with the licensor. APS personnel have estimated that it would cost Universal additional millions of dollars to design the Software without reliance on the code that is subject to the Software License.

**Defendants' Perpetuation of the Fraud**

118. In the first quarter of 2013, Universal began an investigation to determine whether the Defendants had committed fraud in connection with Universal's purchase of APS. In the course of conducting its investigation, Universal's counsel interviewed Scott, Vaccaro and McDonough, each of whom continued to lie and conceal his role in the fraud. For example, during a February 15, 2013 interview regarding various problems with APS's customers and contracts, Vaccaro falsely claimed that he had nothing to do with APS's inflated pipeline projections and feigned ignorance as to how the probabilities that went into those projections were determined. In fact, Vaccaro had been intimately familiar with the design of APS's internal pipelines, had received copies of them every month and had participated in creating and determining the contents of the sham pipelines that were fed to Universal.

119. Still unaware of the totality of Defendants' fraud, Universal permitted Scott and McDonough to resign from the Company with respective effective dates of March 1, 2013 and

54

March 29, 2013. Vaccaro continued to represent to Universal that his client relationships could result in significant new business for APS that he had been promising would materialize. Universal, still hoping to realize some value from its investment in APS, agreed to give him another chance to do so. Accordingly, on April 25, 2013, Universal and Vaccaro executed an amendment to Vaccaro's existing employment agreement with APS, dated January 11, 2012 (the "Vaccaro Employment Agreement"), whereby he agreed to continue to work at APS for an additional 60 days, through June 28, 2013, and to assist with the orderly transition of his duties to new management in return for a potential additional payout in connection with a prospective new customer contract.

120. The terms of that agreement were memorialized in an amendment to the Vaccaro Employment Agreement dated April 25, 2013 (the "Vaccaro Separation Agreement"). The Vaccaro Separation Agreement provides that Vaccaro would receive a severance payment only if he "remain[ed] continuously employed by [Universal] through the Termination Date" of June 28, 2013, without being terminated for "Cause" and "perform[ed] [his] duties in a reasonably satisfactory manner, including without limitation, planning for the orderly transition of his duties."

121. Vaccaro continued to collect an APS paycheck through June 28, 2013. He did not, however, perform his duties in a reasonably satisfactory manner. He was regularly absent from the office in the weeks leading up to his termination, failed to keep Universal informed about material developments, failed to perform the responsibilities of a senior manager, and failed to plan for the orderly transition of his duties. Nor did he provide Universal with the proper release required by the Vaccaro Separation Agreement. Accordingly, he did not receive any severance payment upon termination of his employment.

**Defendants' Material Misrepresentations and Omissions**

122. As summarized below, APS, APSLP, Scott, Vaccaro, McDonough, Katz and the GTCR Defendants made many material misrepresentations to Universal before execution of the Merger Agreement, in the Merger Agreement itself, and afterwards, omitted to disclose material facts necessary to prevent other representations from being misleading, and affirmatively concealed adverse facts concerning the true state of APS's business. Where a contractual provision imposed an obligation on APS to disclose certain facts in the Company Disclosure Letter, the failure to disclose those facts was both a material omission and a material misrepresentation that such facts did not exist.

123. Scott, Vaccaro, McDonough, APS, and APSLP made the following material misrepresentations and omissions in the Merger Agreement and Company Disclosure Letter as to Customer A (collectively, the "Customer A Violations"):

(a) The Merger Agreement and Company Disclosure Letter misrepresented in §§ 3.17 and 3.29, as described in paragraphs 91(a) and 91(b), that APS was not in material breach or default of its contract with its largest customer, Customer A; that to the Company's Knowledge, Customer A had not indicated an intent to cancel, terminate, or modify its contract; and that to the Company's Knowledge, no event had occurred which with notice or lapse of time would constitute a breach, violation, or default of the contract. Scott, APS, and APSLP further misrepresented in § 3.9 of the Merger Agreement and Company Disclosure Letter that no Material Adverse Effect ("MAE") had occurred, and omitted any reference to several of the deficiencies discussed during Defendants Scott and Vaccaro's meeting with Customer A on November 22, 2011, in which Customer A stated its intent to send APS a deficiency letter and impose a fine. The Company Disclosure Letter also misleadingly stated that APS was "discussing the appropriate measure of network adequacy (for providers with multiple offices),"

56

when in fact Customer A had complained about many more and far more serious breaches of the contract.

(b) As described in paragraphs 63-66, 74, and 109(a), above, the Customer A Violations were materially false and misleading and made with scienter because Scott, Vaccaro, and McDonough, as well as Katz and Nolan, knew that Customer A had stated clearly at the November 22 meeting between Customer A, Scott, Vaccaro, and another APS executive that APS was in breach of numerous contract provisions. The statement that APS was "discussing the appropriate measure of network adequacy (for providers with multiple offices)" with Customer A was deliberately misleading given Customer A's clear statements that APS was in breach of its contract with Customer A, that Customer A would impose a large fine, and that APS's very contract was threatened. These misrepresentations and omissions were material, and disclosure of the meeting with Customer A was necessary to make other disclosures not misleading, because, among other things, Universal had asked McDonough – who forwarded that request to Scott and Vaccaro – for them to be prepared to talk about any problems with respect to the Customer A contract at the November 22 meeting among APS, GTCR, and Universal. However, as Katz directed in furtherance of the Defendants' fraud, a concerted effort was undertaken to restrict Universal's ability to learn the actual facts regarding Customer A.

124. Scott, Vaccaro, McDonough, APS, and APSLP made the following material misrepresentations and omissions in the Merger Agreement and Company Disclosure Letter as to Customer B (the "Customer B Violations"):

(a) The Merger Agreement and Company Disclosure Letter misrepresented in § 3.17, as described in paragraph 91(a), that APS was in compliance with its material contract with Customer B and in § 3.9, as described in paragraph 91(d), that no MAE had occurred, and

57

omitted any reference to certain of the material breaches and deficiencies identified by Customer B in its Corrective Action Plan for APS (the "Customer B Deficiencies"). The Merger Agreement and Company Disclosure Letter misrepresented that no such conditions existed and omitted to disclose the Customer B Deficiencies.

(b) As described in paragraphs in 67 and 79, above, the Customer B Violations were materially false and misleading and made with scienter because Scott, Vaccaro, and McDonough knew that Customer B had provided written notice of numerous breaches by APS and was so dissatisfied with APS that Customer B explicitly told APS that it would not be given any new business until the many problems with the existing program were fixed. APS had an obligation to provide this information under the Merger Agreement. Instead of disclosing the Customer B Deficiencies, Scott, Vaccaro, and McDonough, on behalf of APS and APSLP, fed Universal the false story that APS was going to get additional business from Customer B.

125. Scott, Vaccaro, McDonough, APS, and APSLP made the following material misrepresentations and omissions in the Merger Agreement and Company Disclosure Letter as to the Company's compliance with Health Care Laws ("the Healthcare Laws Violations"):

(a) The Merger Agreement and Company Disclosure Letter misrepresented in § 3.25, as described in paragraph 91(c), that to the Company's Knowledge, there were no facts, circumstances or events that could reasonably be expected to give rise to liability under any Healthcare Laws.

(b) As described in paragraphs 52, 85-87, and 113-116, above, the Healthcare Laws Violations were materially false and misleading and made with scienter because Scott, Vaccaro, and McDonough were aware of facts and circumstances at the heart of a whistleblower lawsuit and two pending government investigations concerning Healthcare Law issues regarding

58

Customers T, U, and D.  In addition, as described in paragraphs 88-89, above, Scott, Vaccaro, and McDonough knew that APS had widespread IT and operational deficiencies that could give rise to other similar Healthcare Law matters.  None of these facts and circumstances was disclosed in the Merger Agreement or Company Disclosure Letter.

126.    Scott, Vaccaro, McDonough, APS, and APSLP made the following material misrepresentations and omissions in the Merger Agreement and Company Disclosure Letter as to Customer D (the "Customer D Violations"):

(a)      The Merger Agreement and Company Disclosure Letter misrepresented in § 3.9, as described in paragraph 91(d), that no MAE had occurred and did not disclose the adverse effect of Customer D's interpretation of its contract with APS, including requirements for member "touches," which eviscerated the profitability of that contract (the "Customer D Shortfall").

(b)      As described in paragraph 47, above, the Customer D Violations were materially false and misleading and made with scienter because Scott, Vaccaro, McDonough, Katz, Nolan, Earl, and Kos knew of the Customer D Shortfall, which, both individually and together with the other events alleged herein, had a Material Adverse Effect on APS's business.

127.    Scott, Vaccaro, McDonough, APS, and APSLP made the following material misrepresentations and omissions in the Merger Agreement and Company Disclosure Letter as to Customer E's ADHC program (the "Customer E ADHC Violations"):

(a)      The Merger Agreement and Company Disclosure Letter misrepresented in § 3.9, as described in paragraph 91(d), above, that no MAE had occurred and did not disclose the adverse effect of the settlement Customer E had reached with private plaintiffs regarding its ADHC program (the "Customer E Settlement").

59

(b)     As described in paragraph 95(b), above, the Customer E ADHC Violations were materially false and misleading and made with scienter because McDonough and Vaccaro were told by other APS personnel on or around November 29, 2011 that APS was likely to lose business as a result of the settlement.  APS had an obligation to provide this information under the Merger Agreement, but instead misrepresented in the Merger Agreement and Company Disclosure Letter that no such conditions existed.

128.     Scott, Vaccaro, McDonough, APS, and APSLP made the following material misrepresentations and omissions in the Merger Agreement and Company Disclosure Letter as to Customer 1 (the "Customer 1 Violations"):

(a)     The Merger Agreement and Company Disclosure Letter misrepresented in § 3.17, as described in paragraph 91(a), that APS was not in material breach or default of its contract with Customer I (the "Customer 1 Breach").

(b)     The Customer I Violations were materially false and misleading and made with scienter because there were, in fact, numerous deficiencies in APS's performance under the Customer 1 contract, as later found by an external audit, shared with Customer I.  APS had an obligation to disclose these deficiencies under the Merger Agreement.  As described in paragraphs 88-89, above, Scott, Vaccaro, and McDonough knew that APS had widespread IT and operational deficiencies and therefore knew of or recklessly disregarded the Customer I Breach.  For example, Scott, Vaccaro, and McDonough received a management report dated October 17, 2011 notifying them of "[Customer 1] [Software] issues unresolved to the point of contract risk" and that the "client [had] threatened contract sanction."

60

129. Scott, Vaccaro, McDonough, APS, and APSLP made the following material misrepresentations and omissions in the Merger Agreement and Company Disclosure Letter as to Customer E's SMI contract (the "Customer E SMI Violations"):

(a) The Merger Agreement and Company Disclosure Letter misrepresented in § 3.17, as described in paragraph 91(a), that APS was not in material breach or default of its SMI contract with Customer E (the "Customer E SMI Breach").

(b) The Customer E SMI Violations were materially false and misleading and made with scienter because there were, in fact, material deficiencies in APS's performance under the SMI contract with Customer E, as later found by an external audit that Universal shared with Customer E. APS had an obligation to disclose these deficiencies under the Merger Agreement. As described in paragraphs 88-89, above, Scott, Vaccaro, and McDonough knew that APS had widespread IT and operational deficiencies and therefore knew of or recklessly disregarded the Customer E SMI Breach. For example, Vaccaro and McDonough received a copy of a lengthy memo prepared by APS's Executive Director for Customer E detailing the Company's widespread IT deficiencies in Customer E's location. The Executive Director's memo highlighted, among other things, that the Software's "requirements do not meet the current business needs;" that there was a "[l]ack of dedicated IT project support" to fix the problems; and that "with every layer we peel back, there seems to be another bad spot that needs to be resolved." As a result of the Customer E SMI Breach, APS refunded money to Customer E after the Universal merger.

130. Scott, Vaccaro, McDonough, APS, and APSLP made the following material misrepresentations and omissions in the Merger Agreement and Company Disclosure Letter as to Customer S (the "Customer S Violations"):

61

(a)     The Merger Agreement and Company Disclosure Letter misrepresented in § 3.17, as described in paragraph 91(a), that APS was not in material breach or default of its Disease Management and Case Management contract with Customer S (the "Customer S Breach").

(b)     The Customer S Violations were materially false and misleading and made with scienter because there were, in fact, material deficiencies in APS's performance under its contract with Customer S, as uncovered by an internal audit performed by APS after the merger closed. As a result of the audit, Universal discovered that IRG had erroneously billed Customer S for services not rendered and voluntarily returned more than $500,000. APS had an obligation to disclose these material deficiencies under the Merger Agreement. As described in paragraphs 88-89, above, Scott, Vaccaro, and McDonough knew that APS had widespread IT and operational deficiencies and therefore knew of or recklessly disregarded the Customer S Breach. For example, Scott, Vaccaro, and McDonough received a management report identifying "IT" as a "Challenge" that the Company faced with respect to the Customer S contract and highlighting that "monthly eligibility [was] not consistent with [the Software]." Determining member eligibility is essential to accurate billing. As a result of the Customer S Breach, APS refunded money to Customer S post-merger.

131.     Scott, Vaccaro, McDonough, APS, and APSLP made the following material misrepresentations and omissions in the Merger Agreement and Company Disclosure Letter as to the Software (the "Software Misrepresentation"):

(a)     The Merger Agreement and Company Disclosure Letter misrepresented in § 3.16, as described in paragraph 91(e), that APS owned the Software that formed the core of its business.

62

(b)     As described in paragraphs 2, 55(e), 82, and 117, above, the Software Misrepresentation was materially false and misleading and made with scienter because over half of the code in the Software is subject to the Software License.

132.    Scott, Vaccaro, McDonough, APS, and APSLP made the following material misrepresentations and omissions in the Company Disclosure Letter (the "Compliance Violations"):

(a)     Section 3.17(b) of the Company Disclosure Letter, which was incorporated by reference into Merger Agreement § 3.17, as described in paragraph 91(a), misrepresented that APS was not in breach of any of its Company Material Contracts, except as disclosed in a December 5, 2011 presentation to APS's board, and that the breaches disclosed in that presentation were not material.

(b)     The Compliance Violations were materially false and misleading and made with scienter because, as discussed above in paragraphs 122-124 and 127-130, APS, through Scott, Vaccaro, McDonough, Katz, and others, knew of, or at a minimum recklessly disregarded, breaches of APS's contracts with Customers A, B, I, E, and S and the compliance program issues described above.

133.    Scott, Vaccaro, McDonough, APS, and APSLP made additional material misrepresentations and omissions in the Officer's Certificate signed by Defendant Scott and delivered to Universal at Closing on March 2, 2012 pursuant to the Merger Agreement. Specifically, Scott certified on behalf of APS and APSLP that the Company's representations and warranties were true and correct as of the date of the Closing. *See* Merger Agreement §§ 6.2(a), 6.2(h)(i). This representation was materially false and misleading for the following reasons:

63

(a)     The Officer's Certificate failed to disclose the ongoing Customer A Violations. The failure to disclose these facts was materially false and misleading and made with scienter for the reasons stated in paragraph 123, above.

(b)     The Officer's Certificate failed to disclose the ongoing Customer B Deficiencies and the fact that Customer B's post-termination letter on or about February 15, 2012 confirmed that such deficiencies were material, as described in paragraph 95(d) above. The failure to disclose these facts was materially false and misleading and made with scienter for the reasons stated in paragraph 124, above.

(c)     The Officer's Certificate failed to disclose the ongoing Healthcare Laws Violations. The failure to disclose these facts was materially false and misleading and made with scienter for the reasons stated in paragraph 125, above.

(d)     The Officer's Certificate failed to disclose the Customer D Shortfall. The failure to disclose this fact was materially false and misleading and made with scienter for the reasons stated in paragraph 126, above.

(e)     The Officer's Certificate failed to disclose the expected adverse effect of the Customer E Settlement, which had been approved by the court in January 2012 after the Merger Agreement had been signed. The failure to disclose this fact was materially false and misleading and made with scienter for the reasons stated in paragraph 127, above.

(f)     The Officer's Certificate failed to disclose the ongoing Customer I Breach. The failure to disclose this fact was materially false and misleading and made with scienter for the reasons stated in paragraph 128, above.

64

(g)     The Officer's Certificate failed to disclose the ongoing Customer E SMI Breach. The failure to disclose this fact was materially false and misleading and made with scienter for the reasons stated in paragraph 129, above.

(h)     The Officer's Certificate failed to disclose the ongoing Customer S Breach. The failure to disclose this fact was materially false and misleading and made with scienter for the reasons stated in paragraph 130, above.

(i)     The Officer's Certificate failed to disclose the ongoing Software Misrepresentation. The failure to disclose this fact was materially false and misleading and made with scienter for the reasons stated in paragraph 131, above.

(j)     The Officer's Certificate failed to disclose the ongoing Compliance Violations. The failure to disclose these facts was materially false and misleading and made with scienter for the reasons stated in paragraph 132, above.

134.    Scott, Vaccaro, McDonough, APS, and APSLP also made material misrepresentations and omissions in the Officer's Certificate regarding the absence of any MAEs. Specifically, the Officer's Certificate represented that no "event, development or occurrence of any condition" had occurred between the signing of the Merger Agreement and the Closing of the Transaction "that has had, or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect." Merger Agreement § 6.2(c). It further certified that APS had complied with its obligation to notify Universal "promptly" if APS obtained "Knowledge of any fact, event, circumstance, change, occurrence, effect or condition that [APS] believes would reasonably be expected to cause [the MAE condition to Closing] . . . to be not satisfied or fulfilled." Merger Agreement §§5.2(h), 6.2(b), 6.2(c), 6.2(h)(i). These representations were materially false and misleading for the following reasons:

65

(a)     The Officer's Certificate failed to disclose that on or about January 20, 2012, APS was informed that Customer E would cut the revenue for its CMSP contract in half from $4.1 million to $2 million (the "CMSP Reduction"). As described in paragraph 95(c), above, the failure to disclose this material loss of expected revenue was made with scienter because Vaccaro and McDonough, among others at APS, were specifically aware of it prior to the Closing.

(b)     The Officer's Certificate failed to disclose that APS had learned in a meeting with Customer H during the week of January 17, 2012 that the implementation of its contract with Customer H was not proceeding according to APS's expectations or the RFP (the "Customer H Implementation Problems") and that as a result the Company would experience a significant shortfall relative to the earnings for the Customer H contract that it had projected in its budget for 2012 (the "Customer H Shortfall"). The 2012 budget's projection of the cost of performing the Customer H Utilization Management contract was based on an assumption that Customer H had mandated that providers use APS's web portal, which was false (the "False Customer H Portal Assumption"). As described in paragraph 95(a), above, the failure to disclose these material problems with this new contract was made with scienter because Scott, Vaccaro, and McDonough knew of such problems before the Closing.

(c)     The Officer's Certificate failed to disclose that on or about February 6, 2012, APS learned that one of its competitors had been selected for the renewal of a PHM contract with Customer G for a term beginning July 1, 2012 (the "Customer G Termination"), and that, because that contract had been included in APS's 2012 Budget, this event would cause APS to experience another shortfall to its 2012 Budget. As described in paragraph 95(f), above, the

66

failure to disclose this material customer loss was made with scienter because Vaccaro and McDonough, among others at APS, knew of the customer loss before the Closing.

(d) The Officer's Certificate failed to disclose that the 2012 Budget was no longer accurate because it assumed income throughout the year from the Customer C contract that had been set for rebid (the "Customer C Rebid") even though the rebid was made under circumstances that ensured APS would not win it. As described in paragraph 95(e), above, the failure to disclose the imminent loss of this longstanding customer was made with scienter because Scott and Vaccaro knew, before the Closing, of the rebid and of Customer C's concerns over continuing to do business with APS in light of the $13 million payment made to Georgia to resolve an investigation into violations of the False Claims Act.

(e) The Officer's Certificate failed to disclose that the Company had overstated the 2012 Budget by $1.5 million (the "Customer A Budget Error"). As described in paragraph 95(h), above, the failure to disclose this material difference was made with scienter because Scott, Vaccaro, and McDonough knew of the putative "error" before the Closing.

135. The Officer's Certificate failed to disclose that the foregoing matters in paragraphs 133 and 134, above, individually and collectively, could have a material adverse effect on the Company's business, and affirmatively misrepresented the absence of a material adverse effect.

136. With Katz's approval, Scott, Vaccaro, and McDonough, on behalf of APS and APSLP, made material misrepresentations and omissions in their August Presentation, as described in paragraphs 55-57, above, including the following:

(a) The pipeline intentionally overstated the revenues and probabilities shown in APS's own internal records for many of the listed contracts, and was not a good-faith assessment

67

of the likelihood of specific contracts' ability to generate 2012 EBITDA contributions, as described in paragraphs 55(c), 56-57, and 109(g) above. Scott, Vaccaro, and McDonough deliberately omitted and concealed APS's internal records from Universal to create a false picture of APS's business prospects and, as McDonough explained, to "avoid open[ing] up a hornet's nest."

(b) The pipeline was intentionally overstated because it contemplated several new contracts with Customer B, while Scott, Vaccaro, McDonough, and Katz knew that APS's existing contract with Customer B in California was in serious trouble.

(c) The presentation intentionally misrepresented that the contract with Customer D provided APS with millions of dollars in annual EBITDA. This was materially false and misleading because Scott, Vaccaro, McDonough, and Katz knew that APS had seriously underestimated the cost of performing its contract for Customer D, and of the resulting Customer D Shortfall, as described in paragraph 47, above.

137. With Katz's approval, Scott, Vaccaro, and McDonough, on behalf of APS and APSLP, made material misrepresentations and omissions in their October Presentation, as described in paragraph 59, above, including the following:

(a) The pipeline intentionally concealed Scott, Vaccaro, and McDonough's actual view that APS would see at least $5.2 million less in EBITDA in 2012 from its new business pipeline than had been projected in the August Presentation, as described in paragraph 60, above.

(b) The pipeline intentionally overstated the revenues and probabilities shown in APS's own internal records for many of the listed contracts, and was not a good-faith assessment of the likelihood of specific contracts' ability to generate 2012 EBITDA contribution, as described in paragraphs 55(c), 56-57, and 109(g) above. Scott, Vaccaro, and McDonough

deliberately omitted and concealed APS's internal records from Universal to create a false picture of APS's business prospects and, as McDonough explained, to "avoid open[ing] up a hornet's nest."

(c)     The pipeline was intentionally overstated because Customer B was dissatisfied with APS's performance on its existing contract and had already told APS that it would not partner with APS in South Carolina, as described in paragraph 67, above.

(d)     The October Presentation also intentionally misrepresented that the Customer D contract provided APS with several million dollars in annual EBITDA.  This representation was materially false and misleading because of the Customer D Shortfall, as described in paragraph 47, above.

138.     With Katz's knowledge and approval, Scott, Vaccaro, and McDonough, on behalf of APS and APSLP, made material misrepresentations and omissions at the November Meeting, as described in paragraphs 72-75, above, including the following:

(a)     They omitted any disclosure of Scott's and Vaccaro's meeting with Customer A or the Customer A Violations, as described in paragraphs 63-66, 74, and 109(a), above.  Their silence on this critical issue at the November Meeting was part of a larger campaign, coordinated with Katz, to conceal Customer A's discontent, including blocking Universal from meeting with Customer A.

(b)     The pipeline provided to Universal at the November Meeting intentionally overstated the revenues and probabilities shown in APS's own internal records for many of the listed contracts, and was not a good-faith assessment of the likelihood of specific contracts' ability to generate 2012 EBITDA contribution, as described in paragraphs 56-57, 70, and 73 above.  Scott, Vaccaro, and McDonough deliberately omitted and concealed APS's internal

69

records from Universal to create a false picture of APS's business prospects and, as McDonough explained, to "avoid open[ing] up a hornet's nest."

(c)     The pipeline was intentionally overstated because it contemplated several new contracts with Customer B, while APS knew that Customer B was dissatisfied with APS's performance on its existing California contract, that Customer B had declined to partner with APS in South Carolina, and that Customer B would not award any more contracts to APS until APS had remedied its deficient performance in California, as described in paragraphs 67 and 73(a), above.

(d)     The pipeline was intentionally overstated because it elevated the likelihood of a Dual Eligible contract for Customer F to "greater than 90%" from "less than 50%," even though Customer F had not yet even issued an RFP for that contract, Customer F had expressed dissatisfaction with APS's performance on its existing contract, and the internal salesforce.com documents continued to show only a 10 percent chance of APS's winning the Dual Eligible contract, as described in paragraph 73(b), above.

(e)     The pipeline was intentionally overstated because it stated that a contract with Customer R was "Highly Likely" to be awarded to APS when APS had not received any response to its bid, which had been submitted just one day earlier, as described in paragraph 73(c), above.

(f)     After being confronted with Customer F's decision to move to managed care, which they did not disclose to Universal, Scott, Vaccaro, McDonough, and Katz asserted without any basis that APS would see increased revenues from Customer F, as described in paragraph 75, above.

RLF1 10845625v.1

139. Defendant McDonough, on behalf of APS and APSLP, misrepresented to Universal on December 13, 2011, that the Customer E Settlement had only upside potential for APS. This was materially false and misleading and made with scienter because, as McDonough had been told, APS employees anticipated that the Customer E Settlement would decrease APS's income, as described in paragraph 95(b), above.

140. On December 26, 2011, Defendant Katz, on behalf of the GTCR Defendants, APS, and APSLP, misrepresented to Universal's Chairman that GTCR and APS expected that APS would retain its business with Customer B after the Transaction, as described in paragraph 80, above. This was materially false and misleading and made with scienter because Katz knew or recklessly disregarded that Customer B was severely dissatisfied with APS's performance, had imposed a Corrective Action Plan, and would not agree to any further contracts until the existing program was fixed.

141. On December 28, 2011, an APS in-house lawyer, acting on behalf of APS, misrepresented to Universal's counsel that the software covered by the Software License was only a "small component" of APS's purportedly proprietary Software. This was materially false and misleading and made with scienter because APS knew or recklessly disregarded that the Software License in fact provides the "nucleus" of the Software and covers at least 50 percent of its code.

142. Scott, Vaccaro, and McDonough, on behalf of APS and APSLP, made material misrepresentations and omissions in the December 30 Pipeline, as described in paragraphs 77-80, above, including the following:

(a) The December 30 Pipeline intentionally overstated the revenues and probabilities shown in APS's own internal records for many of the listed contracts, and was not a good-faith

71

assessment of the likelihood of specific contracts' ability to generate 2012 EBITDA contribution, as described in paragraphs 56-57 and 78-79, above. Scott, Vaccaro, and McDonough deliberately omitted and concealed APS's internal records from Universal to create a false picture of APS's business prospects and, as McDonough explained, to "avoid open[ing] up a hornet's nest."

(b) The December 30 Pipeline was intentionally overstated because it contemplated several new contracts with Customer B, while APS knew that Customer B was dissatisfied with APS's performance on its existing California contract, that Customer B had declined to partner with APS in South Carolina, and that Customer B would not award any more contracts to APS until APS had remedied its deficient performance in California, as described in paragraphs 67, 78, and 79, above.

143. Scott, Vaccaro, and McDonough, on behalf of APS and APSLP, made material misrepresentations and omissions in the 2012 Budget, as described in paragraph 77, above, including the following:

(a) The 2012 Budget failed accurately to reflect the adverse effect of the Customer E Settlement on the revenue and EBITDA from the ADHC contract with Customer E, as described in paragraph 95(b) above.

(b) The 2012 Budget assumed that APS would retain the PHM contract with Customer G, notwithstanding that Scott, Vaccaro, and McDonough had already been informed that APS was not a finalist for the rebid on that contract, as described in paragraph 81, above.

(c) The 2012 Budget incorporated the intentionally overstated December 30 Pipeline misrepresenting that APS would achieve $19.3 million EBITDA from new business.

72

144.    On December 31, 2011, Katz, on behalf of the GTCR Defendants, APLSP, and APS, misrepresented to Universal's Chairman that "[w]e'll get you whatever you need on the compliance front." This misrepresentation was materially false and misleading and made with scienter because Katz had no intention of providing accurate and complete disclosures in response to Universal's compliance requests. For example, Universal's Chairman specifically asked Katz to share the details of Katz's interview with APS's outgoing CCO. Instead of providing a full and accurate account of the interview, Katz deliberately concealed his own concerns about the reasons for the CCO's abrupt departure and failed to disclose that he suspected the CCO might become a whistleblower. Katz further concealed his own knowledge of potential legal and regulatory liabilities, as discussed above in paragraphs 85-87.

145.    On or about January 4, 2012, Defendants Scott and Vaccaro, on behalf of APS and APSLP, misrepresented to Universal that APS had remedied the shortcomings in its compliance programs identified in connection with the Georgia False Claims Act settlement and that APS was in compliance with its contracts and all applicable laws. Defendant Katz participated in this meeting by telephone and had a duty to correct these misrepresentations. Indeed, he had personally reassured Universal's Chairman days before that Universal would get all of the compliance information it needed. These material misrepresentations and omissions were knowingly false because Scott, Vaccaro, and Katz were aware of specific facts and circumstances that could give rise to potential legal and regulatory liability, as described in paragraphs 52 and 85-88, above.

146.    Scott, Vaccaro, and McDonough, on behalf of APS and APSLP, made material misrepresentations and omissions in the February 2 Pipeline, as described in paragraphs 97-102, above, including the following:

73

(a)     The February 2 Pipeline intentionally overstated the revenues and probabilities shown in APS's own internal records for many of the listed contracts, and was not a good-faith assessment of the likelihood of specific contracts' ability to generate 2012 EBITDA contribution, as described in paragraphs 56-57 and 97-102, above.  Scott, Vaccaro, and McDonough deliberately omitted and concealed APS's internal records from Universal to create a false picture of APS's business prospects and, as McDonough explained, to "avoid open[ing] up a hornet's nest."

(b)     Scott, Vaccaro, and McDonough intentionally failed to disclose adverse developments that were known to them or reflected in the salesforce.com pipelines that they had received.  For instance, the salesforce.com pipeline in early February 2012 shows that on or about January 20, 2012, APS was informed that the revenue for the CMSP contract with Customer E would be cut in half, as described in paragraph 95(c), above, but the pipeline they provided to Universal still reflected the old (and higher) revenue figure.

(c)     Scott, Vaccaro, and McDonough inflated the February 2 Pipeline by adding several new prospective contracts without justification, to cover up the fact that the projected EBITDA from new business would otherwise have dropped dramatically because of the loss of APS's existing and prospective contracts with Customer B, as described in paragraphs 97-98, above.

147.     In two separate phone calls on or around February 14, 2012 and February 29, 2012, Defendant McDonough, on behalf of APS and APSLP, made the following material misrepresentations and omissions among others:

(a)     Defendant McDonough reaffirmed all of the false and misleading statements and omissions in the 2012 Budget, and knowingly failed to disclose the changes in circumstances described in paragraph 95, above, that rendered prior statements inaccurate.

(b)     Defendant McDonough knowingly omitted and concealed the Customer C Rebid, as described in paragraphs 95(e) and 134(d), above.

(c)     Defendant McDonough knowingly omitted and concealed the Customer H Implementation Problems, the Customer H Shortfall, and the False Customer H Portal Assumption, as discussed in paragraphs 95(a) and 134(b), above.

(d)     Defendant McDonough knowingly omitted and concealed the Customer G Termination and the Customer G Budget Shortfall, as discussed in paragraph 95(f) and 134(c), above.

(e)     Defendant McDonough knowingly omitted and concealed that the 2012 Budget contained a $1.5 million overstatement of earnings from Customer A, despite the fact that such disclosure was required to make the previous disclosure of the budget not misleading, as discussed in paragraph 95(h), above.

148.    Defendants Scott, Vaccaro, and McDonough knowingly misrepresented to Universal that Customer B had terminated its contract with APS because it did not want to do business with a Universal-owned company when, in fact, Customer B had terminated the contract because of APS's "material deficiencies" in performance, as described in paragraph 95(d), above.

149.    Scott, Vaccaro, and McDonough had an obligation to disclose the Customer C Rebid because they had represented to Universal in the August Presentation, the October

75

Presentation and the 2012 Budget that APS had won the Customer C contract. Their failures to correct these statements constitute a material omission.

**Defendants' Material Misrepresentations and Omissions Were Made with Scienter**

150.    As described above, each of foregoing misrepresentations and omissions were made knowingly and intentionally. In the alternative, the misrepresentations and omissions were made with reckless indifference as to their truth or falsity because Scott, Vaccaro, McDonough, and Katz disregarded known problems with APS's business and operations and failed to obtain sufficient information about the Company's operations to prepare an accurate 2012 Budget, new business pipelines, or an accurate description of the Company's ongoing business.

151.    As described below, all of the Defendants also had the motive and opportunity to defraud Universal.

152.    As a result of the sale of APS to Universal, Scott, Vaccaro, and McDonough exchanged their illiquid shares of APS for valuable and liquid Universal stock, receiving the following consideration:

(a)    Scott received a total of 175,370 shares of Universal stock, valued at more than $2 million on the Closing Date. He also obtained 319,800 stock options.

(b)    Vaccaro received a total of 56,983 shares of Universal stock, valued at more than $654,000 on the Closing Date. He also obtained 196,800 stock options.

(c)    McDonough received a total of 24,148 shares of Universal stock, valued at more than $277,000 on the Closing Date. He also obtained 83,400 stock options.

153.    Scott, Vaccaro, and McDonough each also signed new Employment Agreements that provided for significant increases in their annual compensation:

76

(a)     Scott's base salary increased from $375,000 to $530,000 per year, an increase of 41 percent.

(b)     Vaccaro's base salary increased from $335,000 to $475,000 per year, an increase of 42 percent.

(c)     McDonough's base salary increased from $285,000 to $350,000 per year, an increase of 23 percent.

154.    The GTCR Defendants had the motive and opportunity to defraud Universal because they were at risk of losing their entire investment in APS if the Company were to default on its debt.  Under the terms of Company's loans, which Katz, Nolan, Earl, Kos, and Nelli renegotiated at the same time as they were trying to sell APS to Universal, APS would have again gone into default of its loan covenants if 2012 EBITDA dropped below $29 million.  Given the material adverse effects that occurred in the fall of 2011 and the first two months of 2012, such a decline was a near certainty.

155.    Instead of losing their entire investment by reason of a default and subsequent foreclosure on their equity interest in APS, the GTCR Defendants were the beneficiaries of the $222.3 million purchase price, including approximately $77 million in Universal common stock, which in turn provided substantial benefits not only to the GTCR Defendants' investors but also to the GTCR Defendants and their affiliates, including Katz, who stood to gain personally from the sale of APS to Universal.  The GTCR Defendants have also received nearly $16 million in dividends on their Universal stock since the closing.

156.    Pursuant to a letter agreement entered as part of the merger, Defendant Katz was designated by GTCR Fund IX/A to serve as a member of Universal's Board of Directors.  In connection with his election to the Universal Board, Katz received valuable compensation, as

well as the prestige of serving as a director of a publicly traded company. In particular, Katz received a total of $172,000 in fees, stock awards, and options awards during 2012 in connection with his membership in Universal's Board of Directors. Katz directed Universal to pay these benefits directly to him personally, rather than instructing Universal to pay them to a GTCR affiliate, as GTCR policy required.

**The Role of Katz and the GTCR Defendants in the Fraud**

157. Katz had ultimate authority over and culpably participated in the fraud committed by APSLP, APS, Scott, Vaccaro, McDonough and others because, among other things:

(a) Katz was regularly apprised of APS's business, prospects and compliance efforts at board meetings, in monthly management reports submitted by APS, and in thousands of emails and regular telephone calls he had with Scott, Vaccaro and McDonough. As a result, he knew the true condition of APS's failing business, including its IT and operational challenges, yet he concealed that information from Universal;

(b) Katz reviewed and approved drafts of the false presentations made to Universal;

(c) Katz attended virtually all of the meetings with presentations made to Universal, including without limitation the meetings on August 18, 2011, November 22, 2011 and January 4, 2012;

(d) Katz dealt directly with APS's lenders, knew that they were nervous about the Company's future and knew that another loan covenant default would spell the death of APS and the loss of GTCR's investment;

(e) Katz directed and controlled the due diligence process and led nearly all of the due diligence calls and meetings with Universal regarding the Transaction;

78

(f)     Katz led and was directly involved in every aspect of the negotiation of the Merger Agreement and its representations and warranties, including negotiating the material terms directly with Universal's Chairman and hiring APS's advisors for the Transaction; and

(g)     As reflected in his emails regarding Customer A, the loss of APS contracts, the litany of things "gone wrong" over a multi-year period and other matters described in paragraphs 47, 48, 83, and 110, above, as well as his false characterization of APS's business and compliance efforts, Katz actively and directly participated in the fraudulent misrepresentations and concealments that were intended to and did deceive Universal;

(h)     Katz personally misrepresented and concealed material facts regarding Customer A, Customer B, the critical issue of APS's compliance with customer contracts and Healthcare Laws, and a litany of things "gone wrong" over a multi-year period as described in paragraphs 80, 83-88, and 110, above.

158.     The GTCR Defendants culpably participated in the fraud committed by APSLP, APS, Scott, Vaccaro, McDonough and others because, among other things:

(a)     Katz, Nolan, and Earl were regularly apprised of APS's business, prospects and compliance efforts at board meetings, in monthly management reports submitted by APS, and in thousands of emails and regular telephone calls they had with Scott, Vaccaro and McDonough, and therefore knew the true condition of APS's failing business;

(b)     Katz, and other GTCR personnel, including Nolan, Earl, and Kos, reviewed and approved drafts of the false presentations made to Universal that they knew were false and misleading or were reckless in not knowing were false or misleading;

RLF1 10845625v.1

(c)     Katz and Earl attended virtually all of the meetings with presentations made to Universal, including without limitation the meetings on August 18, 2011, November 22, 2011 and January 4, 2012;

(d)     Katz, Nolan, Earl, Kos, and Nelli dealt directly with APS's lenders, knew that they were nervous about the Company's future and knew that another loan covenant default would spell the death of APS and the loss of their investment;

(e)     Katz, Earl, Kos, and Nelli directed and controlled the due diligence process and led or participated in nearly all of the due diligence calls and meetings with Universal regarding the Transaction and approved the use of false presentations during the calls and meetings; and

(f)     Katz, Earl, Kos, and Nelli were directly involved in every aspect of the negotiation of the Merger Agreement and its representations and warranties.

159.    The GTCR Defendants' conscious participation in the fraud is evidenced by their knowledge of misrepresentations to Universal in written and oral presentations and in the Merger Agreement.  For example:

(a)     As members of the APS board, Defendant Katz and Nolan received reports that the Customer D contract was losing money, but reviewed and approved the August and October Presentations to Universal that claimed the contract generated millions of dollars of EBITDA per year.

(b)     Katz and Nolan had also received a written report to APS's Audit Committee disclosing that a former APS employee had lodged a complaint with the "Attorney General" of Customer T regarding alleged "Medicaid fraud."

(c)     Katz and Nolan also sought and received detailed information about APS's contracts with Customer U, which they viewed as key to GTCR's ability to sell the Company.

80

As discussed above, the Customer D, Customer T, and Customer U contracts later became the subjects of federal investigations and lawsuits.

(d)     Katz further concealed materials facts regarding his interview of APS's resigning CCO, including Katz's own suspicions that the CCO would be a whistleblower.

(e)     Katz and Nolan also received reports to the APS board showing that a potential contract with Customer B in South Carolina was no longer a prospect, but reviewed and approved new business pipelines given to Universal showing that APS had a 75 to 90 percent chance of being awarded that contract.

(f)     As described in paragraph 66, above, Defendant Katz and Nolan concealed from Universal the threat that Customer A would fine APS and possibly terminate the Customer A contract. In fact, because of GTCR's concerns about the Customer A contract, Katz directed that Universal's due diligence of Customer A be circumscribed as far as possible ("the less time there the better") and rejected Universal's requests to meet directly with Customer A, as described in paragraph 83, above.

160.     The GTCR Defendants also stood to gain substantial compensation in the merger, including valuable and publicly traded Universal shares (which they had reason to expect, based on Universal's historical practices and cash flow projections, would yield – and did yield – substantial dividends), as well as the right to designate a representative to serve on the Universal Board of Directors. Defendant Katz was the direct beneficiary of that designation, which brought with it stock awards, options awards and director fees. On information and belief, Katz was also compensated at GTCR based on the investments he directed, such as APS. By contrast, if the GTCR Defendants had not sold APS to Universal, they would have lost their entire investment, and Katz would have personally suffered financially.

81

82

161. Katz and the GTCR Defendants knew that the undisclosed material adverse effects that occurred *before* the merger closed necessarily would have caused APS's 2012 EBITDA to fall below $29 million, resulting in a breach of its loan covenants, and a default on its $150 million of debt. The actual results were far worse – only $8 million of EBITDA. When GTCR fraudulently unloaded APS on Universal, it knowingly and intentionally dodged a bullet. Katz and the GTCR Defendants aided and abetted the fraud perpetrated by Scott, Vaccaro, McDonough, APS, and APSLP with full knowledge of the grave harm they would cause Universal and with reckless indifference to the rights of Universal.

**Universal Reasonably Relied on the Misrepresentations and Omissions**

162. Universal reasonably relied on the contractual representations and omissions detailed above in (a) the Merger Agreement, (b) the Company Disclosure Letter explicitly incorporated by reference into the Merger Agreement, and (c) the Officer's Certificate delivered by Scott pursuant to the Merger Agreement. As Section 3 of the Merger Agreement makes plain, Universal explicitly bargained for the representations in that section. Pursuant to Section 6.2 of the Merger Agreement, moreover, the accuracy of those representations was a condition to Universal's obligation to close the Transaction. Likewise, pursuant to Section 6.2 of the Merger Agreement, the absence of any MAEs between signing and closing was a condition to Universal's obligation to close the Transaction. Accordingly, the contractual representations were an essential part of the bargain that Universal negotiated and an essential part of the consideration for which Universal paid nearly a quarter of a billion dollars.

163. Universal also reasonably relied on the extra-contractual misrepresentations and omissions detailed above.

RLF1 10845625v.1

(a)    Universal relied upon all extra-contractual misrepresentations and omissions occurring before execution of the Merger Agreement by continuing to devote resources and energy to a possible APS transaction, including the time of senior Universal executives and the expense of engaging professionals to perform due diligence upon APS and to negotiate the Merger Agreement and related documents.  These misrepresentations and omissions include the August and October Presentations, the presentation and oral statements at the November Meeting, the 2012 Budget, the December 30 Pipeline (as well as the pipelines given to Universal in August, October and November), McDonough's oral misrepresentation that the Customer E Settlement had only upside potential for APS, Scott and Vaccaro's oral representations that APS had no material compliance risk following the $13 million Georgia settlement, and Katz's misstatements and omissions regarding compliance.  Universal also reasonably relied on each of these misrepresentations and associated omissions because they reinforced the representations in the Merger Agreement, Company Disclosure Letter, and Officer's Certificate that APS was a healthy company with good relationships with its customers, that it was in compliance with its contracts and applicable laws, and that there were no MAEs affecting its business.

(b)    Universal relied upon all extra-contractual misrepresentations and omissions made after execution of the Merger Agreement when it agreed to consummate the acquisition of APS.  Had it known the truth, Universal would have exercised its right to terminate the Merger Agreement on the ground of MAEs.  These misrepresentations and omissions include the February 2 Pipeline, McDonough's oral reconfirmations of the 2012 Budget in February 2012, Scott's oral misrepresentation that Customer B had terminated its contract with APS because it did not want to do business with Universal, and the omission by Scott, Vaccaro and McDonough to disclose the Customer C Rebid.  Universal also reasonably relied on each of these material

83

misrepresentations and associated omissions because they reinforced the representations in the Merger Agreement, Company Disclosure Letter and Officer's Certificate that APS was a healthy company with good relationships with its customers, that it was in compliance with its contracts and applicable laws, and that there were no MAEs affecting its business.

164.    Throughout the sales process, Universal reasonably relied on the commercially reasonable expectation that Scott, Vaccaro, McDonough, Katz, and others at APS and GTCR were not actively impeding Universal's due diligence or deliberately concealing the true state of APS's business.  For instance, Universal reasonably expected to receive good faith projections that were grounded in fact.  What it got instead were knowingly phony budgets and pipelines designed to give Universal a false and misleading picture of APS's business and prospects.  As discussed above, Scott, Vaccaro and McDonough prevented Universal from seeing APS's real internal pipeline, out of fear it would "open up a hornet's nest."  Similarly, Katz and Scott conspired to prevent Universal from learning the truth about Customer A's dissatisfaction and threat of termination by not only failing to make required disclosures but refusing to arrange for a meeting between Universal and Customer A under false pretenses.  Katz also revealed his goal of pulling the wool over Universal's eyes by telling Scott (with respect to Universal's onsite due diligence of the Customer A contract) that "the less time there, the better" and by concealing material facts on the critical issue of compliance.

**Misrepresentations and Omissions Caused Significant Losses to Universal**

165.    Universal would not have purchased APS if it had known the truth about the numerous material misrepresentations and omissions described above.

166.    Defendants' misrepresentations, omissions and breaches of the Merger Agreement have caused Universal to suffer actual losses, including without limitation:

84

(a)     the $222.3 million purchase price paid for APS;

(b)     expenses incurred in the acquisition of APS, including over $4 million in professional fees;

(c)     undisclosed liabilities, penalties, performance guarantees and fines;

(d)     expenses incurred to bring APS into compliance with customer contracts;

(e)     attorneys' fees, expenses and settlement costs for lawsuits and investigations, including without limitation the Customer T litigation and the ongoing Customer U and Customer D investigations that collectively have cost more than $7.5 million;

(f)     expenses for developing new software that would not have been incurred if APS owned the Software as represented; and

(g)     cash dividends of nearly $16 million paid to GTCR on the Universal shares issued in the Transaction.

167.    Scott, Vaccaro, McDonough, APS, APSLP, Katz, and the GTCR Defendants perpetrated their fraud with full knowledge of the grave harm they would cause Universal and with reckless indifference to the rights of Universal.  This outrageous, deceptive conduct constitutes aggravated and gross fraud.  The conduct of all Defendants justifies an award of punitive damages to punish their willful deception, to deter similar misconduct by them and by others in the future, and to assure that GTCR does not treat liability for fraud claims as a mere cost of doing business.

**Indemnification Under the Merger Agreement and the Limited Guaranty**

168.    In Section 8.2 of the Merger Agreement, APSLP agreed to indemnify Universal for breaches of the representations, warranties, and covenants in the Merger Agreement.  Pursuant to Section 8.2 of the Merger Agreement and under Delaware law, Universal is also

85

entitled to recover its attorneys' fees and other costs of enforcing its indemnification rights under the Merger Agreement.

169. Each of the misrepresentations and omissions identified in paragraphs 123-135, above, also constitutes a breach of the representations, warranties and covenants in the Merger Agreement.

170. The parties recognized that APSLP would hold only limited assets after its shares of APS had passed to Universal as part of the Transaction. Therefore, "[t]o induce Parent to enter into the Merger Agreement," the Merger Agreement and associated Limited Guaranty provide that the GTCR Limited Guarantors "absolutely, unconditionally and irrevocably guarantee[]" APSLP's indemnification obligations to Universal. Limited Guaranty ¶ 1.

171. In Section 8.2(a)(vi) of the Merger Agreement, APSLP also agreed to indemnify Universal for any Excess Performance Guarantee Amounts, which the Merger Agreement elsewhere defined as 50 percent of the amount by which APS paid performance guarantees above the amount previously accrued or reserved. Universal agreed to pay $195,000 in excess of the amount previously accrued or reserved with respect to a performance guarantee assessed by Customer T.

172. On March 1, 2013, Universal delivered a demand for indemnification on APSLP, alleging breaches of various representations, warranties and covenants set forth in the Merger Agreement, thereby triggering its right to indemnification under the Merger Agreement and the Limited Guaranty.

173. On August 22, 2013, September 19, 2013, and April 24, 2014, Universal delivered supplemental demands for indemnification on APSLP, identifying additional breaches

86

it had discovered. On June 13, 2014, Universal served a supplemental demand for indemnification identifying additional damages it had incurred.

### Count I – Securities Fraud under Section 10(b) of the Exchange Act
### (Against Scott, Vaccaro, McDonough and APSLP)

174. Universal repeats each and every allegation contained above as if set forth fully herein.

175. As set forth above, Scott, Vaccaro, McDonough and APSLP made a number of material misstatements and omissions of material fact to Universal's officers and agents in the course of negotiating and signing the Merger Agreement and related documents.

(a) Scott, APSLP, and non-party APS made material misrepresentations and omissions in the Merger Agreement, Company Disclosure Letter, and Officer's Certificate, as described in paragraphs 123-135, above.

(b) Scott, on behalf of APSLP and non-party APS, made additional material misrepresentations and omissions, as described in paragraphs 136-138, 142-143, 145-146, and 148-149, above.

(c) Vaccaro, on behalf of APSLP and non-party APS, made additional material misrepresentations and omissions, as described in paragraphs 136-138, 142-143, 145-146, and 148-149, above.

(d) McDonough, on behalf of APSLP and non-party APS, made additional material misrepresentations and omissions, as described in paragraphs 136-139, 142-143, 146-149, above.

176. These material misstatements and omissions of material fact were made in connection with the sale of Universal securities, which are publicly traded on a national securities exchange.

177.	Scott, Vaccaro, McDonough, APSLP, and non-party APS made these material misrepresentations and omissions with scienter, as described in paragraphs 123-156, above.

178.	These material misrepresentations were conveyed by means of the mails and interstate telecommunications networks.

179.	As described in paragraphs 162-164, above, Universal acquired APS in reliance on material representations and omissions made in the course of negotiations and set forth in the Merger Agreement.  Universal's reliance was reasonable because the misstatements by Scott, Vaccaro, McDonough, APSLP, and non-party APS concerned material financial and operational information about APS that Scott, Vaccaro, and McDonough, as senior officers, were in a position to know and had a duty to know and to which Universal did not have independent access.  Indeed, Scott, Vaccaro and McDonough purposefully concealed material adverse information from Universal, including material negative developments they learned both before the Merger Agreement was signed and after it was signed and before closing.  Absent these misrepresentations and omissions by Scott, Vaccaro, and McDonough, acting on behalf of APSLP and non-party APS, and others acting on their behalf, Universal would not have acquired APS.

180.	These misstatements are not subject to the Safe-Harbor for Forward Looking Statements provision of the Exchange Act, 15 U.S.C. § 78u-5(c), because the misstatements concerned both known facts and future predictions that Scott, Vaccaro, McDonough, APSLP, and non-party APS knew were baseless and material, and were not accompanied by meaningful cautionary language.

181.	As a direct and proximate result of these fraudulent misrepresentations, Universal sustained actual damages well in excess of $200 million.

RLF1 10845625v.1

## Count II – Control Person Liability under Section 20(a) of the Exchange Act
### (Scott, Vaccaro, McDonough, and APSLP)

182. Universal repeats each and every allegation contained above as if set forth fully herein.

183. Non-party APS committed a primary violation of Section 10(b) of the Exchange Act with respect to the material misrepresentations and omissions in the Merger Agreement, the Company Disclosure Letter, and the Officer's Certificate, as set forth in paragraphs 123-135, above, and made further misrepresentations as set forth in paragraph 141, above.

184. Scott, Vaccaro, McDonough, and APSLP acted as controlling persons of APS within the meaning of Section 20(a) of the Exchange Act.

(a) By reason of their positions as the senior officers of APS, Scott, Vaccaro, and McDonough had the power and authority to cause APS to engage in the wrongful conduct alleged herein and culpably participated in such conduct.

(b) By reason of its ownership of APS, APSLP had the power and authority to cause APS to engage in the wrongful conduct alleged herein and, through its agents Scott, Vaccaro, and McDonough, culpably participated in such conduct.

185. Pursuant to Section 20(a), Scott, Vaccaro, McDonough, and APSLP are liable for non-party APS's material misstatements and omissions as control persons of APS.

186. As a direct and proximate result of the conduct of Scott, Vaccaro, McDonough and APSLP, Universal sustained actual damages well in excess of $200 million.

89

**Count III – Control Person Liability under Section 20(a) of the Exchange Act**
**(Against Katz and the GTCR Defendants)**

187. Universal repeats each and every allegation contained above as if set forth fully herein.

188. A majority of the members of the APS Board of Directors were employed by or agents of one or more of GTCR, GTCR Partners IX, or the GTCR Limited Guarantors, and all were selected and appointed by a GTCR entity.

189. GTCR was general partner of GTCR Co-Invest and GTCR Partners IX.

190. GTCR Partners IX was general partner of GTCR Fund IX/A and GTCR Fund IX/B.

191. APSLP held APS for the benefit of the GTCR Limited Guarantors.

192. Defendants Katz, GTCR, GTCR Partners IX, and the GTCR Limited Guarantors were regularly informed by APS regarding APS's business, and Defendants Katz, GTCR, GTCR Partners IX, and the GTCR Limited Guarantors directed APS's activities.

193. The GTCR Defendants, by and through Defendant Katz, Nolan, Earl, Kos, and other individuals, were heavily involved in the negotiations over the Transaction, controlled the terms of the due diligence and the deal, and reviewed drafts of the false presentations to Universal and approved them, as described in paragraphs 54, 55, 58, 72, 76-77, 80, 83, 85-88, and 157-159, above.

194. Katz was a micromanager of APS and the other portfolio companies for which he was responsible. Katz was also on APS's Board and Chair of APS's Audit Committee, which also served as APS's Compliance Committee. He regularly met, spoke, and corresponded with Scott, Vaccaro, and McDonough about the business condition of APS, its specific contracts, strategy, finances, and personnel matters as described in paragraphs 40-44 and 48, above.

RLF1 10845625v.1

195.    As a result, the GTCR Defendants and Katz were controlling persons of APS and APSLP within the meaning of Section 20(a) of the Exchange Act.  The GTCR Defendants and Katz were able to and did control the content of statements made by APS and APSLP, by and through Scott, Vaccaro, McDonough, and others, to Universal.

196.    As more fully described above, the GTCR Defendants and Katz were aware that APS misrepresented and omitted material information about its financial and operational viability, and the GTCR Defendants and Katz actively and substantially participated in, and encouraged, those material misstatements and omissions, as described in paragraphs 55, 66, 67, 69, 74, 78-80, 83, 75-88, 110, and 157-161, above.  In fact, Katz directed the concealment from Universal of the truth about the contract with Customer A and other customers and about the pipelines, budget and other material facts.

197.    Although it is not named as a Defendant herein, APS, through its officers and agents, including Scott, Vaccaro and McDonough, knowingly violated Section 10(b) of the Exchange Act by its material misstatements and omissions, as alleged in Count I of this Amended Complaint, and in paragraph 141, above.

198.    Universal relied on the material misrepresentations and omissions by Scott, Vaccaro, McDonough, and Katz acting on behalf of APS and APSLP, in deciding to acquire APS.  The GTCR Defendants and Katz are responsible for APS's material misstatements and omissions as control persons of APS.

199.    As a direct and proximate result of the GTCR Defendants and Katz's conduct, Universal sustained actual damages well in excess of $200 million.

91

## Count IV – Fraud: Contractual Misstatements
### (Against Scott, Vaccaro, McDonough and APSLP)

200. Universal repeats each and every allegation contained above as if set forth fully herein.

201. Scott, Vaccaro, McDonough, APSLP, and non-party APS made material misrepresentations and omissions in the Merger Agreement, Company Disclosure Letter, and Officer's Certificate, as described in paragraphs 123-135, above.

202. Scott, Vaccaro, McDonough, APSLP, and non-party APS knew that the representations contained in the Merger Agreement, Company Disclosure Letter, and Officer's Certificate were false or were misleading half-truths, as described in paragraphs 123-135, above.

203. Scott, Vaccaro, McDonough, APSLP, and non-party APS fraudulently concealed the truth about APS from Universal, both within the Merger Agreement, Company Disclosure Letter and Officer's Certificate and in the course of the parties' negotiations.

204. Scott, Vaccaro, McDonough, APSLP, and non-party APS intended for Universal to rely and Universal in fact reasonably relied on the misrepresentations and omissions regarding APS in deciding whether or not to acquire APS and in deciding the appropriate consideration to pay for APS, including compensation that flowed to Scott, Vaccaro and McDonough.

205. As a direct and proximate result of the fraudulent representations and omissions, Universal sustained damages well in excess of $200 million.

## Count V – Aiding and Abetting Fraud: Contractual Statements
### (Against Vaccaro and McDonough)

206. Universal repeats each and every allegation contained above as if set forth fully herein.

92

207.    As described above, Scott, APSLP, and non-party APS committed fraud against Universal by making numerous material misrepresentations and omissions in the Merger Agreement, Company Disclosure Letter, and the Officer's Certificate.

208.    Vaccaro and McDonough knew that Scott, APSLP, and non-party APS were committing fraud against Universal and fraudulently concealing the truth from Universal.

209.    Vaccaro and McDonough provided substantial assistance to Scott, APSLP, and non-party APS by, among other things, making false statements to Universal and by failing to correct statements made to Universal that they knew were false. Given that Scott, APSLP, and non-party APS represented in the Merger Agreement, Company Disclosure Letter, and Officer's Certificate that neither Vaccaro nor McDonough had knowledge of a certain fact or event, Vaccaro and McDonough each either failed to convey their knowledge to Scott, while knowing that Scott would misrepresent that knowledge to Universal, or knew that Scott was making misrepresentations to Universal concerning Vaccaro's and McDonough's own knowledge.

210.    As a direct and proximate result of the fraudulent representations and omissions, Universal sustained damages well in excess of $200 million.

**Count VI – Aiding and Abetting Fraud: Contractual Statements**
**(Against Katz and the GTCR Defendants)**

211.    Universal repeats each and every allegation contained above as if set forth fully herein.

212.    As described in further detail above, Scott, Vaccaro, McDonough, APSLP, and non-party APS committed fraud against Universal by making numerous material misrepresentations and omissions in the Merger Agreement, Company Disclosure Letter, and Officer's Certificate.

93

213. The GTCR Defendants and Katz knew that Scott, Vaccaro, McDonough, APSLP, and non-party APS were committing fraud against Universal and fraudulently concealing the truth from Universal.

214. The GTCR Defendants and Katz provided substantial assistance to Scott, Vaccaro, McDonough, APSLP, and non-party APS by, among other things, making false statements to Universal and by failing to correct statements made to Universal that the GTCR Defendants and Katz knew were false, as described in paragraph 157-161, above.

215. As a direct and proximate result of the fraudulent representations and omissions, Universal sustained damages well in excess of $200 million.

### Count VII – Fraud: Extra-contractual Statements and Omissions
### (Against Scott, Vaccaro, McDonough, Katz and APSLP)

216. Universal repeats each and every allegation contained above as if set forth fully herein.

217. As described in paragraphs 136-140 and 142-149, above, Scott, Vaccaro, McDonough, Katz, and APSLP made material misrepresentations and omissions during the merger negotiations and in the period between signing and closing involving deliberate acts of concealment.

218. Scott, Vaccaro, McDonough, Katz, and APSLP fraudulently concealed the truth about APS from Universal by, among other things, withholding and concealing APS's internal salesforce.com pipeline reports; concealing the truth about the problems with its contracts, including with Customer A and Customer B; keeping Universal from doing direct due diligence with Customer A; failing to disclose MAEs that the Merger Agreement required them to disclose at or in advance of the Closing; and concealing known compliance risks, including but not

94

limited to, the contract with Customer U, which is now the subject of a federal government investigation regarding Defendants' alleged rampant fraud.

219. Scott, Vaccaro, McDonough, Katz, and APSLP intended for Universal to rely and Universal in fact reasonably relied on the material misrepresentations and omissions regarding APS in committing resources to the exploration of an acquisition of APS, in deciding whether or not to acquire APS, in deciding the appropriate consideration to pay for APS, including compensation that flowed to Scott, Vaccaro, McDonough, and Katz, and in deciding whether to close the Transaction.

220. As a direct and proximate result of the fraudulent representations and omissions, Universal sustained damages well in excess of $200 million.

### Count VIII – Fraud: Aiding and Abetting Extra-contractual Statements and Omissions (Against Scott, Vaccaro McDonough, Katz, and APSLP)

221. Universal repeats each and every allegation contained above as if set forth fully herein.

222. As described in paragraphs 136-139 and 142-149, above, Scott, Vaccaro, McDonough, Katz and APSLP each made material misrepresentations and omissions during the merger negotiations and in the period between signing and closing involving deliberate acts of concealment.

223. Each of Scott, Vaccaro, McDonough, Katz and APSLP knew that the others were committing fraud against Universal and fraudulently concealing the truth from Universal.

224. Each of Scott, Vaccaro, McDonough, Katz and APSLP provided substantial assistance to the others in carrying out the fraud, including by collectively preparing the budgets and pipelines discussed above, by making false statements about APS to Universal, by failing to

RLF1 10845625v.1

correct statements by the others that they each knew were false and intended to conceal the truth, and by actively concealing negative facts from Universal, all as detailed above.

225. As a direct and proximate result of the fraudulent representations and omissions, Universal sustained damages well in excess of $200 million.

## Count IX – Aiding and Abetting Fraud: Extra-contractual Statements and Omissions (Against Katz and the GTCR Defendants)

226. Universal repeats each and every allegation contained above as if set forth fully herein.

227. As described in paragraphs 136-139, 142-143, and 145-149, above, Scott, Vaccaro, McDonough, and APSLP made material misrepresentations and omissions during the merger negotiations and in the period between signing and closing involving deliberate acts of concealment.

228. The GTCR Defendants and Katz knew that Scott, Vaccaro, McDonough, and APSLP were committing fraud against Universal and fraudulently concealing the truth from Universal.

229. The GTCR Defendants and Katz provided substantial assistance to Scott, Vaccaro, McDonough, and APSLP by, among other things, reviewing and/or approving the budgets and pipelines discussed above, by making false statements to Universal, by failing to correct statements made to Universal that the GTCR Defendants and Katz knew were false, and by actively concealing the actual facts regarding the problems with Customer A's contract, including fraudulently stopping Universal from doing direct due diligence of Customer A.

230. As a direct and proximate result of the fraudulent representations and omissions, Universal sustained damages well in excess of $200 million.

RLF1 10845625v.1

## Count X – Fraud in the Inducement
### (Against Scott, Vaccaro, McDonough, Katz, and APSLP)

231. Universal repeats each and every allegation contained above as if set forth fully herein.

232. As described in paragraphs 123-149, above, Scott, Vaccaro, McDonough, Katz, and APSLP made numerous contractual and extra-contractual material misrepresentations and omissions to Universal.

233. Scott, Vaccaro, McDonough, Katz, and APSLP knew that their respective statements were false or were misleading half-truths.

234. Scott, Vaccaro, McDonough, Katz, and APSLP fraudulently concealed the truth about APS from Universal, within the Merger Agreement and in the course of the parties' negotiations, as described above.

235. Scott, Vaccaro, McDonough, Katz, and APSLP intended for Universal to rely on the material misrepresentations and omissions regarding APS in deciding whether or not to acquire APS and Universal did in fact reasonably rely on those material misrepresentations and omissions.

236. As a direct and proximate result of the fraudulent representations and omissions, Universal was fraudulently induced to enter into the Merger Agreement and to close the Transaction. Universal would not have acquired APS if it had known the truth. Universal is entitled to rescission or rescissory damages as a result of having been fraudulently induced to enter into the Transaction.

97

## Count XI – Aiding and Abetting Fraud in the Inducement
### (Against Katz and the GTCR Defendants)

237. Universal repeats each and every allegation contained above as if set forth fully herein.

238. As described in further detail above, Scott, Vaccaro, McDonough, APSLP, and non-party APS committed fraud in the inducement against Universal by making numerous material misrepresentations in the Merger Agreement, Company Disclosure Letter and Officer's Certificate and/or during the merger negotiations.

239. The GTCR Defendants and Katz knew that Scott, Vaccaro, McDonough, APSLP, and non-party APS were committing fraud in the inducement against Universal.

240. The GTCR Defendants and Katz provided substantial assistance to Scott, Vaccaro, McDonough, APSLP, and non-party APS by, among other things, making false statements to Universal, by failing to correct and concealing the truth about statements made to Universal that the GTCR Defendants and Katz knew were false, and by limiting and misleading Universal in the due diligence process led by Katz.

241. As a direct and proximate result of the fraudulent representations and omissions, Universal was fraudulently induced to enter into the Merger Agreement and to close the Transaction. Universal would not have acquired APS if it had known the truth. Universal is entitled to rescission or rescissory damages as a result of having been fraudulently induced to enter into the Transaction.

## Count XII – Breach of Contract
### (Against APSLP and the GTCR Limited Guarantors)

242. Universal repeats each and every allegation contained above as if set forth fully herein.

98

243. Subject to and in the alternative to the fraud in the inducement claims above, the Merger Agreement and related documents including the Limited Guaranty and the Company Disclosure Letter constitute a valid, binding, and enforceable contract by and among Universal and APSLP and the GTCR Limited Guarantors.

244. As described in paragraphs 122-129, APSLP breached the representations and warranties set forth in Sections 3.9, 3.16, 3.17, 3.25, and 3.29 of the Merger Agreement. For purposes of this Count XII, each of these representations and warranties are read as if all qualifications as to materiality were deleted therefrom. Merger Agreement § 8.2(a).

245. In addition to the above-described breaches of the representations and warranties set forth in Sections 3.9, 3.16, 3.17, 3.25 and 3.29 of the Merger Agreement, the foregoing conduct also breached the covenants set forth in Sections 5.2(a)(iii), 5.2(a)(iv), and 5.2(h) of the Merger Agreement.

246. APSLP has breached its obligations to Universal under Section 8.2(a) of the Merger Agreement by failing to indemnify Universal for losses it has incurred arising out of the above-described breaches of the representations and warranties set forth in Sections 3.9, 3.16, 3.17, 3.25 and 3.29 of the Merger Agreement, and in the certificate delivered pursuant to Section 6.2(h)(i) of the Merger Agreement, as well as for losses Universal has incurred arising out of the breach of the covenants made in Sections 5.2(a)(iii), 5.2(a)(iv), and 5.2(h) of the Merger Agreement.

247. The GTCR Limited Guarantors are conditionally liable for the above-discussed breaches of contract to the extent APSLP does not have sufficient assets to satisfy its indemnification obligations under the Merger Agreement.

99

248. Additionally, APSLP is liable to Universal for the Excess Performance Guarantee Amount identified in its March 1, 2013 demand for indemnification.

249. In the aggregate, the facts alleged above had, or would reasonably be expected to have, a Company Material Adverse Effect, constituting a breach of the representations and warranties made in Section 3.9 of the Merger Agreement and in the Officer's Certificate delivered pursuant to Section 6.2(h)(i) of the Merger Agreement.

250. Universal has complied in all material respects with its obligations under the terms of the Merger Agreement.

251. As a direct and proximate cause of APSLP and the GTCR Limited Guarantors' breaches of the Merger Agreement, Universal has sustained substantial damages.

252. Pursuant to Section 8.2 of the Merger Agreement and under Delaware law, Universal is also entitled to recover its attorneys' fees and other costs of enforcing its indemnification rights under the Merger Agreement.

## Count XIII – Conspiracy to Commit Fraud
### (Against All Defendants)

253. Universal repeats each and every allegation contained above as if set forth fully herein.

254. As alleged above, the Defendants are liable for fraud and fraud in the inducement.

255. The Defendants purposefully conspired and combined with one another for the unlawful purpose of defrauding Universal.

256. Universal has suffered substantial damage as a result of Defendants' fraud and unlawful conspiracy to commit fraud.

RLF1 10845625v.1

## Count XIV – Unjust Enrichment and Constructive Trust
### (Against All Defendants)

257.  Universal repeats each and every allegation contained above as if set forth fully herein.

258.  The Defendants obtained Universal shares through the fraudulent and deceptive acts described above.

259.  Since the Defendants obtained the Universal shares by fraud, Universal has issued dividends to record owners of its common stock.

260.  Because the Defendants obtained their Universal shares and dividend payments through fraudulent, unfair, and unconscionable conduct, they have been unjustly enriched at Universal's expense.

261.  Imposition of the constructive trust is necessary to prevent Defendants from unfairly profiting as a result of their fraudulent acts.

262.  This Court should impose a constructive trust in favor of Universal on the Universal shares obtained by each of the Defendants, and upon all proceeds derived therefrom, including dividend payments received by the Defendants as owners or beneficial owners of Universal shares.

## Count XV - Declaratory Judgment
### (Against Vaccaro)

263.  Universal repeats each and every allegation contained above as if set forth fully herein.

264.  On May 9, 2014, Vaccaro filed a complaint in the Delaware Court of Chancery asserting claims for breach of the Vaccaro Employment Agreement and Vaccaro Separation

101

Agreement, fraud, and reformation (the "Vaccaro Complaint"). *See* Complaint, *Vaccaro v. APS Healthcare Bethesda,* Inc., C.A. No. 9637-VCG.

265.    The Vaccaro Complaint seeks $475,000 and other benefits purportedly due to Vaccaro under the Vaccaro Separation Agreement. The Vaccaro Complaint also asserts claims of reformation and unilateral mistake, on the theory that the written terms of the Vaccaro Separation Agreement incorrectly captured the parties' agreement.

266.    On July 26, 2014, Universal filed a motion to dismiss the Vaccaro Complaint, asserting, among other things, that the case should be stayed or dismissed because this litigation constitutes a prior-filed action addressing the same nucleus of operative facts.

267.    An actual controversy exists between Universal and Vaccaro as to the legal effect of the Vaccaro Separation Agreement. The parties dispute, among other things:

(a)    Whether the Vaccaro Employment Agreement, which was entered into in connection with the Merger Agreement and was conditioned upon the closing of the APS acquisition, was fraudulently induced.

(b)    Whether Vaccaro performed his duties "in a reasonably satisfactory manner" from April 25, 2013 through June 28, 2013, as required by the Vaccaro Separation Agreement.

(c)    Whether Vaccaro has satisfied all conditions precedent to receipt of a severance payment, including the execution of a general release, as required by the Vaccaro Separation Agreement.

(d)    Whether the Vaccaro Separation Agreement accurately sets forth the terms of the parties' agreement regarding Vaccaro's rights to severance and other post-termination benefits.

(e)    Whether Vaccaro is entitled to any payment or other benefit under the Vaccaro Separation Agreement.

102

268.   A declaratory judgment from this Court would conclusively define and clarify the parties' respective rights and obligations under the Vaccaro Separation Agreement and the Vaccaro Employment Agreement.

269.   A declaratory judgment from this Court would also serve the practical purpose of resolving the parties' dispute regarding Vaccaro's legal right to severance and moot Vaccaro's resort to piecemeal litigation before the Delaware Court of Chancery.

WHEREFORE, Universal prays for relief and judgment, as follows:

a.   awarding all damages, including rescissory damages, expectation damages, and compensatory damages, and other remedies set forth in the Exchange Act, in favor of Universal in an amount to be proven at trial, including interest thereon;

b.   imposing a constructive trust upon the Universal shares obtained by the Defendants as a consequence of the Merger Agreement, and upon all dividends paid or payable with respect to those shares;

c.   rescinding the Merger Agreement and related agreements entered with the Defendants in the Transaction;

d.   in the alternative, awarding rescissory damages because Universal was fraudulently induced to enter the Transaction but rescission would be impractical at this point in time;

e.   indemnifying Universal for all losses resulting from any breach of the Merger Agreement;

f.   awarding punitive damages in an amount to be determined at trial;

g.   awarding attorneys' fees and costs;

h.   declaring that Vaccaro is not entitled to any payment or other benefit under the Vaccaro Separation Agreement or the Vaccaro Employment Agreement; and

i.   awarding such other and further relief as the Court may deem just and proper.

103

*Of Counsel:*

Andrew J. Levander
Linda C. Goldstein
Paul C. Kingsbery
Dechert LLP
1095 Avenue of the Americas
New York, New York 10036
212-698-3500
andrew.levander@dechert.com
linda.goldstein@dechert.com
paul.kingsbery@dechert.com

Stuart T. Steinberg
Elisa T. Wiygul
Dechert LLP
2929 Arch Street
Philadelphia, Pennsylvania 19104
215-994-4000
stuart.steinberg@dechert.com
elisa.wiygul@dechert.com

Dated: September 22, 2014

*/s/ Blake Rohrbacher*
Blake Rohrbacher (# 4750)
Kelly E. Farnan (# 4395)
Katharine C. Lester (# 5629)
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
rohrbacher@rlf.com
farnan@rlf.com
lester@rlf.com

*Attorneys for Plaintiff Universal American Corp.*

104