**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE XL FLEET CORP. SECURITIES LITIGATION | Case No. 1:21-cv-02002-JLR |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT <u>AND PLAN OF ALLOCATION</u>**

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ...................................................................................... 1

II.     FACTUAL AND PROCEDURAL BACKGROUND OF THE LITIGATION ................. 4

III.    ARGUMENT .................................................................................................................. 4

    A.   The Standards For Final Approval Under Rule 23(e) And *Grinell* ......................... 4

    B.   The Settlement Is Fair, Reasonable, And Adequate In Light Of The Factors Outlined By Rule 23(e)(2) And The Remaining *Grinnell* Factors ........................................ 5

        1.   Rule 23(e)(2)(A): Plaintiffs And Lead Counsel Adequately Represented The Class ................................................................................................................ 5

        2.   Rule 23(e)(2)(B): The Settlement Is The Result Of Arm's Length Negotiations .................................................................................................. 7

        3.   Rule 23(e)(2)(C): The Settlement Is An Excellent Result For The Class In Light Of The Benefits Of The Settlement And The Risks Of Continued Litigation .......................................................................................................... 8

            a.   Complexity, Expense, And Duration Of Litigation ......................... 8

            b.   Establishing Liability And Damages .............................................. 9

            c.   Risks Of Maintaining Class Action Status................................... 13

            d.   Range Of Reasonableness In Light Of The Best Possible Recovery And Attendant Risks Of Litigation ............................................... 14

            e.   Rule 23(e)(2)(C)(ii)-(iv)................................................................ 15

        4.   Rule 23(e)(2)(D): The Settlement Treats All Settlement Class Members Equitably Relative To Each Other ........................................................... 17

        5.   The Remaining *Grinnell* Factors Are Neutral Or Weigh In Favor Of Final Approval .................................................................................................... 17

IV.     THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED............................ 20

V.      THE NOTICE PROGRAM SATISFIES RULE 23 AND DUE PROCESS .................... 20

VI.     THE PLAN OF ALLOCATION IS FAIR AND REASONABLE.................................. 21

VII.    CONCLUSION................................................................................................................ 25

i

## TABLE OF AUTHORITIES

<u>CASES</u>

*Anixter v. Home-Stake Prod. Co.*,
   77 F.3d 1215 (10th Cir. 1996) ............................................................................ 13

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   222 F.3d 52 (2d Cir. 2000) ................................................................................... 6

*Beach v. JPMorgan Chase Bank, N.A.*,
   2020 WL 6114545 (S.D.N.Y. Oct. 7, 2020) ........................................................ 5

*Becker v. Bank of New York Mellon Trust Co., N.A.*,
   2018 WL 6727820 (E.D. Pa. Dec. 21, 2018) ..................................................... 15

*Celeste Neely*,
   2022 WL 17736350 (E.D. Tex. Dec. 16, 2022) .................................................. 12

*Chatelain v. Prudential-Bache Sec., Inc.*,
   805 F. Supp. 209 (S.D.N.Y. 1992) .................................................................... 13

*Christine Asia Co., Ltd. v. Yun Ma*,
   2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ............................................*passim*

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) ............................................................................ 5, 8

*City of Providence v. Aeropostale, Inc.,*
   2014 *WL 1883494* (S.D.N.Y. May 9, 2014) ..................................................... 19

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001) .................................................................................. 7

*Fishoff v. Coty Inc.*,
   2010 WL 305358 (S.D.N.Y. Jan. 25, 2010) ........................................................ 9

*Gross v. GFI Group, Inc.*,
   784 F. App'x. 27 (2d Cir. 2019) ....................................................................... 10

*In re "Agent Orange" Prods. Liab. Litig.*,
   597 F. Supp. 740 (E.D.N.Y. 1984) .................................................................... 14

*In re Advanced Battery Techs., Inc. Secs. Litig.*,
   298 F.R.D. 171 (S.D.N.Y. 2014) ....................................................................... 21

*In re AOL Time Warner, Inc.*,
2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ................................................................. 19

*In re BankAtlantic Bancorp, Inc.*,
2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) ............................................................. 13

*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012) ....................................................................... 18

*In re Blech Sec. Litig.*,
2000 WL 661680 (S.D.N.Y. May 19, 2000) ............................................................. 19

*In re China Med. Corp. Sec. Litig.*,
2014 WL 12581781 (C.D. Cal. Jan. 7, 2014) ............................................................. 7

*In re Citigroup, Inc. Sec. Litig.*,
965 F. Supp. 2d 369 (S.D.N.Y. 2013) ....................................................................... 17

*In re GSE Bonds Antitrust Litig.*,
414 F. Supp. 3d 686 (S.D.N.Y. 2019) ............................................................. 8, 9, 14

*In re IMAX Sec. Litig.*,
283 F.R.D. 178 (S.D.N.Y. 2012) .............................................................................. 21

*In re Marsh ERISA Litig.*,
265 F.R.D. 128 (S.D.N.Y. 2010) .............................................................................. 17

*In re Metlife Demutualization Litig.*,
689 F. Supp. 2d 297 (E.D.N.Y. 2010) ...................................................................... 19

*In re Mut. Funds Inv. Litig.*,
2010 WL 2342413 (D. Md. May 19, 2010) ............................................................... 21

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ................................................................................ 6

*In re Patriot Nat'l, Inc. Sec. Litig.*,
828 F. App'x 760 (2d Cir. 2020) ................................................................................ 6

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
330 F.R.D. 11 (E.D.N.Y. 2019) .................................................................................. 5

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005) ....................................................................... 21

iii

*In re XL Fleet Corp. Sec. Litig.*,
   2022 WL 493629 (S.D.N.Y. Feb. 17, 2022)................................................................ 2, 12

*Jones v. Singing River Health Servs. Found.*,
   865 F.3d 285 (5th Cir. 2017) ............................................................................................ 7

*Maley v. Del Global Tech. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002)........................................................................ 16, 18

*Marsh & McLennan*,
   2009 WL 5178546 .......................................................................................................... 21

*Morris v. Affinity Health Plan, Inc.*,
   859 F. Supp. 2d 611 (S.D.N.Y. 2012)............................................................................... 7

*Moses v. New York Times Co.*,
   79 F.4th 235 (2d Cir. 2023) .............................................................................................. 7

*Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*,
   575 U.S. 175 (2015)........................................................................................................ 10

*Robbins v. Koger Props., Inc.*,
   116 F.3d 1441 (11th Cir. 1997) ...................................................................................... 12

*Too v. Rockwell Medical, Inc.*,
   2020 WL 1023435 (E.D.N.Y. Feb. 26, 2020).................................................................. 25

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005).............................................................................................. 18

*Yang v. Focus Media Holding Ltd.*,
   2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014)..................................................................... 7

STATUTES

15 U.S.C. §78u-4(a)(4) ............................................................................................................ 17
15 U.S.C. § 78u–5.................................................................................................................... 10

RULES

Fed. R. Civ. P. 23 ............................................................................................................ *passim*

In accordance with Rule 23(e)(2) of the Federal Rules of Civil Procedure, Court-appointed lead plaintiff Delton Rowe ("Lead Plaintiff") and additional named plaintiffs Jeffrey Suh, Carl Enslin, Simone Heridis, and Soraya Heridis (née Matamoros) (collectively, with Lead Plaintiff, "Plaintiffs"), on behalf of themselves and the Settlement Class, respectfully submit this memorandum in support of their unopposed motion for: (i) final approval of the proposed Settlement resolving the above-captioned action (the "Action"); and (ii) approval of the proposed plan of allocation of the proceeds of the Settlement.[1]

## I.    PRELIMINARY STATEMENT

After nearly three years of hard-fought litigation, Plaintiffs and Defendants[2] have agreed to settle all claims in the Action in exchange for a non-reversionary, all cash payment of $19,500,000 (the "Settlement Amount") for the benefit of the Settlement Class.  This is a very favorable result for the Settlement Class, and it is both substantively and procedurally fair.

Substantively, the Settlement represents a recovery of approximately 3.9 to 7.8% of the ***potential maximum*** recoverable damages related to the pending claims.  Such a recovery is: (i) well above the 1.8% median recovery in securities class actions settled in 2023; and (ii) far higher than the 1.6-2.7% median recovery in securities cases with similar damages that settled between January 2014

---

[1] All capitalized terms, unless otherwise defined herein, have the same meaning as set forth in the Stipulation and Agreement of Settlement dated December 6, 2023 (the "Stipulation") (ECF No. 182-1), or the concurrently filed Declaration of Gregory B. Linkh in support of: (I) Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Linkh Declaration").  Citations herein to "¶__" and "Ex. __" refer, respectively, to paragraphs in, and exhibits to, the Linkh Declaration.

[2] Defendants are XL Fleet Corp. (now d/b/a "Spruce Power") ("XL Fleet"), and Dimitri Kazarinoff, Thomas J. Hynes III, Brian Piern, Jonathan Ledecky, James H.R. Brady and Kevin Griffin (collectively, the "Individual Defendants"; and, together with XL Fleet, the "Defendants"; and together with Plaintiffs, the "Parties").

and December 2023. *See* Ex. 8 (Edward Flores and Svetlana Starykh, Recent Trends in Securities

Class Action Litigation: 2023 Full-Year Review, at 26 (Fig. 22) (NERA Jan. 24, 2024) ("NERA

Report") (median recovery in securities class actions in 2023 was approximately 1.8% of estimated

damages); at 25, Fig. 21 (median recovery for securities class actions that settled between January

2014 and December 2023 was 2.7% for cases with estimated damages between $200-$399 million and

1.6% for those with estimated damages of $400-$599 million)). For this reason, and as further

discussed herein and in the Linkh Declaration, the Settlement is substantively fair.

Moreover, the process by which the Settlement was obtained evidences a lack of collusion

amongst the Parties and supports a finding of procedural fairness. By the time the Settlement was

reached, Plaintiffs and their counsel were well informed about the strengths and weaknesses of the

claims and Defendants' defenses. Prior to reaching the Settlement, Lead Counsel had, *inter alia*:

- filed an initial complaint that was based on, among other things, review and analysis of (a) filings with the U.S. Securities and Exchange Commission ("SEC") by both XL Fleet and Pivotal Investment Corporation II ("Pivotal"); (b) public reports, blog posts, research reports prepared by securities and financial analysts, and news articles concerning XL Fleet and Pivotal; (c) investor call transcripts by the management of XL Fleet and/or Pivotal; and (d) press releases published by and regarding XL Fleet and Pivotal;

- filed a contested motion for appointment of Lead Plaintiff and Lead Counsel pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA");

- conducted further investigation of the claims asserted in the Action by, among other things, consulting with an expert in market efficiency, loss causation and damages, and working with a private investigator to interview former XL Fleet and Pivotal employees;

- drafted and filed the 143-page (454-paragraph) Amended Complaint, which included, among other things: (a) evidence from four confidential witnesses garnered through the use of the private investigator; (b) allegations against additional defendants; (c) an expanded class period; (d) the addition of the three named plaintiffs as well as Lead Plaintiff Delton Rowe; (e) additional false statements; (f) new theories concerning the falsity behind Defendants' statements; and (g) an added count for "scheme" liability under Rule 10b-5(a) and (c);

- researched, drafted, and filed an opposition to Defendants' motion to dismiss the Amended Complaint, after which Judge Schofield denied Defendants' motion in its entirety (*see* ECF No. 97; *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629 (S.D.N.Y. Feb. 17, 2022));

- engaged in substantial discovery, which entailed, *inter alia*: (a) exchanging initial

2

disclosures; (b) negotiating a protective order and ESI protocol, both of which were subsequently entered by the Court; (c) serving and responding to document requests, interrogatories, and requests for admission; (d) identifying and issuing subpoenas to relevant third parties; (e) deposing 16 current or former XL Fleet, Pivotal and MGG Investment Group LP ("MGG") directors or personnel, including the Individual Defendants; (f) defending the depositions of Lead Plaintiff and the four other named plaintiffs; and (g) conducting a targeted review and analysis of over one million pages of documents produced by Defendants and third parties;

- engaged in a full-day, in-person mediation session overseen by a highly experienced third-party mediator of complex actions, Jed Melnick, Esq., of JAMS, which involved an exchange of written submissions concerning the facts of the case, liability, and damages, and did not result in a settlement agreement at that time;

- filed a motion for class certification, which included, *inter alia*, an expert report by Dr. Adam Werner on the efficiency of the market for XL Fleet Securities; and

- engaged in months of follow-up negotiations with Mr. Melnick and Defendants' Counsel following the initial mediation session, that ultimately resulted in a mediator's recommendation to settle the Action for $19.5 million.  ¶¶8, 12-35.

The Settlement is, therefore, the result of arms-length negotiations, conducted by informed and experienced counsel, in conjunction with an experienced neutral.

As discussed in greater detail below, Plaintiffs and their counsel believe that the proposed Settlement meets the standards for final approval and is in the best interests of the Settlement Class. Consequently, Plaintiffs respectfully request that the Court grant the Settlement final approval.

Plaintiffs also move for approval of the proposed Plan of Allocation of the Net Settlement Fund.  The Plan of Allocation was developed in conjunction with Plaintiffs' consulting damages expert and is designed to distribute the proceeds of the Net Settlement Fund fairly and equitably to Settlement Class Members. No Settlement Class Member is favored over another under the proposed Plan; rather, all Settlement Class Members—including Plaintiffs—are treated in the same manner. *See* Ex. 1-B at ¶¶56-87.  The Plan of Allocation is, therefore, fair and reasonable and, as such, it too should be approved.

3

## II.    FACTUAL AND PROCEDURAL BACKGROUND OF THE LITIGATION

The Linkh Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for a detailed description of, *inter alia*: the factual background and procedural history of the Action, and the nature of the claims asserted; the negotiations leading to the Settlement; the risks and uncertainties of continued litigation; and the terms of the Plan of Allocation of the Net Settlement Fund.

## III.    ARGUMENT

### A.    The Standards For Final Approval Under Rule 23(e) And *Grinell*

Rule 23(e) provides that the Court should grant final approval to a class action settlement if it is "fair, reasonable, and adequate."[3] Fed. R. Civ. P. 23(e)(2). Rule 23(e)(2)—which governs final approval—requires courts to consider the following questions in determining whether a proposed settlement is fair, reasonable, and adequate:

(A)    have the class representatives and class counsel adequately represented the class;
(B)    was the proposal negotiated at arm's length;
(C)    is the relief provided for the class adequate, taking into account:
   (i)    the costs, risks, and delay of trial and appeal;
   (ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
   (iii)  the terms of any proposed award of attorneys' fees, including timing of payment; and
   (iv)   any agreement required to be identified under Rule 23(e)(3); and
(D)    does the proposal treat class members equitably relative to each other.

Factors (A) and (B) "identify matters . . . described as procedural concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement," while factors (C) and (D) "focus on . . . a substantive review of the terms of the proposed settlement" (*i.e.*, "[t]he relief that the settlement is expected to provide to class members"). Advisory Committee Notes to 2018 Amendments (324 F.R.D. 904, at 919).

---

[3] Unless otherwise noted, all emphasis is added, and internal citations and quotation marks are omitted.

4

These factors are not, however, exclusive.  The four factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the courts, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."  Advisory Committee Notes to 2018 Amendments (324 F.R.D. 904, at 919); *see also In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019) (Rule 23(e)(2) factors "add to, rather than displace, the *Grinnell* factors"). The Second Circuit's *Grinnell* factors (certain of which overlap with Rule 23(e)(2)) are, therefore, still relevant:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974); *see also Beach v. JPMorgan Chase Bank, N.A.*, 2020 WL 6114545 (S.D.N.Y. Oct. 7, 2020) (evaluating settlement based on factors set forth in Fed. R. Civ. P. 23(e)(2) and *Grinnell*). As set forth below, the proposed Settlement satisfies the criteria for final approval under the Rule 23(e)(2) factors, as well as the relevant, non-duplicative *Grinnell* factors.

**B.    The Settlement Is Fair, Reasonable, And Adequate In Light Of The Factors Outlined By Rule 23(e)(2) And The Remaining *Grinnell* Factors**

**1.    Rule 23(e)(2)(A): Plaintiffs And Lead Counsel Adequately Represented The Class**

Rule 23(e)(2)(A) requires the Court to consider whether the "class representatives and class counsel have adequately represented the class." In assessing adequacy, "the primary factors are whether the class representatives have any 'interests antagonistic to the interests of other class

members' and whether the representatives 'have an interest in vigorously pursuing the claims of the class.'" *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 764 (2d Cir. 2020) (citing cases); *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) ("Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.").

First, Plaintiffs' claims are typical of and coextensive with the claims of the Settlement Class, and they have no antagonistic interests. Plaintiffs suffered substantial losses as a result of Defendants' allegedly wrongful conduct, and their interest in obtaining the largest possible recovery is aligned with the other Settlement Class Members. *See Patriot*, 828 F. App'x at 764 (finding adequacy where "lead plaintiffs were sufficiently motivated to recover as much as possible for each class member."). In addition, Plaintiffs diligently oversaw the litigation and communicated with Lead Counsel to discuss case developments, including settlement. *See* Exs. 3, ¶¶3-5, 13; 4, ¶¶3-5, 13; 5, ¶¶3-5, 13; 6, ¶¶3-5, 13; 7, ¶¶3-5, 7. Lead Plaintiff Delton Rowe even flew to New York from Nebraska to participate in the March 20, 2023, mediation. *See* Ex. 3 ¶5.

Second, Plaintiffs retained counsel that are highly experienced in securities litigation, and who have a long and successful track record of representing investors in such cases. *See* Ex. 2 (Glancy Prongay & Murray LLP firm résumé). As noted above, Lead Counsel vigorously prosecuted the Settlement Class's claims, and the Parties were acutely aware of the strengths and weaknesses of the case prior to settling the Action. *See* ¶¶8, 12-35) (detailing, *inter alia*, Lead Counsel's surviving a motion to dismiss, completing complex fact discovery, filing a class certification motion, and engaging in hard-fought mediation efforts); *see also In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D.

6

465, 474 (S.D.N.Y. 1998) (courts have consistently given "great weight . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.").

### 2.    Rule 23(e)(2)(B): The Settlement Is The Result Of Arm's Length Negotiations

Rule 23(e)(2)(B) requires that "the proposal was negotiated at arm's length."  In conducting this analysis, courts recognize that a "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001); *see also Jones v. Singing River Health Servs. Found.,* 865 F.3d 285, 295 (5th Cir. 2017) ("[t]he involvement of 'an experienced and well-known' mediator 'is also a strong indicator of procedural fairness.'" quoting *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 618 (S.D.N.Y. 2012)); *Moses v. New York Times Co.*, 79 F.4th 235, 243 (2d Cir. 2023) (arms-length negotiations support approval, though they do not give rise to a *presumption* of fairness).

Here, the Parties engaged in a full day mediation session with Jed Melnick, Esq. on March 20, 2023, several additional informal sessions with Mr. Melnick, as well as months of additional negotiations that included an in-person settlement meeting with Spruce Power's Chief Legal Officer, and the Settlement is the result of Mr. Melnick's mediator's proposal.  ¶¶31-35.  The arm's-length nature of the settlement negotiations, including the involvement of a mediator with substantial experience mediating complex securities class actions, supports the conclusion that the Settlement is fair and was achieved free of collusion.  *See Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014) (noting that "[t]he participation of this highly qualified mediator [Mr. Melnick] strongly supports a finding that negotiations were conducted at arm's length and without collusion.");  *In re China Med. Corp. Sec. Litig.*, 2014 WL 12581781, at *5 (C.D. Cal. Jan. 7, 2014) ("Mr. Melnick's involvement in the settlement supports the argument that it is non-collusive").

3.     **Rule 23(e)(2)(C): The Settlement Is An Excellent Result For The Class In Light Of The Benefits Of The Settlement And The Risks Of Continued Litigation**

Under Rule 23(e)(2)(C), the Court must also consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" along with other relevant factors. Fed. R. Civ. P. 23(e)(2)(C).[4]  Each of these factors supports final approval.

a.     **Complexity, Expense, And Duration Of Litigation**

This Action involved alleged violations of the federal securities laws, and Plaintiffs and Lead Counsel believe that the claims asserted against Defendants have merit. Plaintiffs acknowledge, however, the expense and length of continued proceedings necessary to pursue their claims against Defendants through trial and appeals, as well as the very substantial risks they would face in establishing liability, loss causation, and damages (as discussed in the sections below).

Assuming Plaintiffs' claims were certified under Rule 23 (and not successfully reversed on a Rule 23(f) interlocutory appeal), and survived summary judgment, litigating the Action through trial and post-trial appeals would have undoubtedly been a long and expensive endeavor.  Were the litigation to continue, a potential recovery—if any—would occur years from now, substantially delaying payment to the Settlement Class.  *GSE*, 414 F. Supp. 3d at 693 ("even if plaintiffs were to prevail at trial, post-trial motions and the potential for appeal could prevent the class members from obtaining any recovery for several years, if at all.").  By contrast, the Settlement provides an immediate

---

[4] Rule 23(e)(2)(C)(i) essentially incorporates six of the traditional *Grinnell* factors: the complexity, expense, and likely duration of the litigation (first factor); the risks of establishing liability and damages (fourth and fifth factors); the risks of maintaining class action status through the trial (sixth factor); and the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation (eighth and ninth factors). *See Grinnell*, 495 F.2d at 463; *see also In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 693 (S.D.N.Y. 2019) ("This inquiry overlaps significantly with a number of *Grinnell* factors, which help guide the Court's application of Rule 23(e)(2)(C)(i).").

and substantial recovery for the Settlement Class, without exposing the Settlement Class to the risk, expense, and delay of continued litigation.

### b.    Establishing Liability And Damages

In considering these factors, "a court should balance the benefits afforded the Class, including immediacy and certainty of recovery, against the continuing risks of litigation." *Id.* at 694. While Lead Counsel believes Plaintiffs' claims have merit, they also recognize that they faced substantial obstacles to proving liability, loss causation, and damages. When compared to the certainty of the significant benefit conferred by the Settlement, these risks militate against further litigation and support a determination that the Settlement is fair, reasonable, and adequate.

**Scienter:** Defendants would likely continue to argue that the alleged false and misleading statements were not made with the requisite state of mind (*i.e.*, scienter) to support the securities fraud claims alleged.  As such, Plaintiffs would not only have to prove that such statements were materially false, but that Defendants knew or were reckless in not knowing that the statements were false or misleading.  This is a high evidentiary bar that Plaintiffs would have to overcome both at summary judgment and at trial. Indeed, scienter is commonly regarded to be the most difficult element to prove in a securities fraud claim. *See, e.g.*, *Fishoff v. Coty Inc.*, 2010 WL 305358, at *2 (S.D.N.Y. Jan. 25, 2010) ("[T]he element of scienter is often the most difficult and controversial aspect of a securities fraud claim."), *aff'd*, 634 F.3d 647 (2d Cir. 2011).

While Plaintiffs believe that they would ultimately be able to demonstrate scienter, "Defendants would have marshalled substantial evidence in opposition." *Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *12 (S.D.N.Y. Oct. 16, 2019).  For example, while Plaintiffs could point to the fact that certain Individual Defendants' shares in Pivotal would be worthless if a de-SPAC transaction was not completed, that some of them participated in the PIPE Transaction, and that others stood to substantially increase their compensation following the Merger and owned XL Fleet stock

9

and options, Defendants would argue that that these motive allegations failed as a matter of law because they were shared by all corporate insiders, and that no Individual Defendant made any significant stock sales during the Settlement Class Period. Accordingly, proving scienter was far from a *fait accompli*. *See id*. ("Proving scienter is hard to do.").

**Falsity:** Defendants would also argue that many of the statements alleged by Plaintiffs to be misleading were not actionably false. For example,

- **Sales Pipeline and Revenue Projections:** A key component of Plaintiffs' case centered around Defendants' allegedly inflated sales pipeline and revenue projections—specifically, that such projections directly contradicted the information in XL Fleet's salesforce database. Defendants would likely claim that such statements were non-actionable forward-looking statements protected by the PSLRA safe harbor (15 U.S.C. § 78u–5) and statements of opinion protected by *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 186 (2015). Surviving a motion to dismiss and even summary judgment motion on the issue of falsity does not necessarily mean the statement(s) will survive later scrutiny. *See Gross v. GFI Group, Inc.*, 784 F. App'x. 27, 28 (2d Cir. 2019) (affirming grant of summary judgment against plaintiffs in securities fraud class action on the alternative ground that Defendant's "statement did not, as a matter of law, amount to a material misrepresentation or omission actionable under section 10(b)," despite Judge Pauley twice finding the statement actionable).

- **Certification by California Air Resources Board ("CARB"):** Defendants stated in their public filings that "XL has obtained a number of Eos for prior model years and is in the process of conducting testing against CARB issued test orders for future

10

products to be introduced into the Californian market." While Plaintiffs would argue that Defendants materially omitted to state that since January 2019 CARB had prohibited XL from obtaining new Eos, Defendants would likely argue that their statements were true and that they reasonably believed they would soon regain CARB approval.

- **MPG savings:** Defendants repeatedly touted that XL Fleet's hybrid systems would give customers up to 25% to 50% MPG improvements over the corresponding non-hybrid trucks. Plaintiffs would argue that this number is misleading because it was based on testing using a "city" drive cycle only, and real-world savings were often much less substantial. However, Defendants would likely argue that: (i) the 25-50% numbers were based on controlled dynamometer testing (*i.e.*, measuring fuel economy under controlled conditions in a laboratory where a vehicles drive wheels are placed on a machine called a dynamometer) that in fact showed these levels of MPG savings; (ii) XL qualified its description of the MPG results as being approximate ("~25% MPG gain") or the top end of what customers could expect to receive ("up to 50% MPG gain"); and (iii) XL Fleet's public filings had explicitly warned investors that "the estimated fuel savings and fuel economy of vehicles installed with XL Fleet's electrified powertrain solutions may vary depending on factors including, but not limited to, driver behavior, speed, terrain, hardware efficiency, payload, vehicle and weather conditions."[5] *See* ECF No. 1 at ¶23.

---

[5] As to the other main categories of false statements alleged by Plaintiffs, Defendants would likely continue to assert that their statements concerning XL Fleet's supply chain were not false because they had accurately disclosed such supply chain problems. And, as to Plaintiffs' allegation that customers featured in Defendants' statements were inactive, Defendants would likely argue that all of those customers had in fact previously purchased XL Fleet products.

11

It is also important to note that while Plaintiffs alleged five categories of misstatements, Judge Schofield *addressed only one* in her decision denying the motion to dismiss, and explicitly declined to address Plaintiffs' allegations regarding the four other topics. *See XL Fleet Corp.*, 2022 WL 493629, at *3 ("At least one of these categories – statements about XL Fleet's sales pipeline and revenue projections – is sufficiently alleged and warrants denial of the motion to dismiss. That category, but not the others, is discussed below."). Thus, considerable uncertainty remained as to whether Plaintiffs could prevail on (at least) four-fifths of their case at summary judgment and trial.

**Loss Causation and Damages:** Plaintiffs would have also faced the significant risk that Defendants would argue that: (i) the stock price drops for the dates at issue were not statistically significant; and (ii) some or all of the drops on those dates were due to confounding information other than Defendants' alleged fraud. For example, Defendants would likely argue that some or all of the April 1, 2021 drop was due, not to the alleged fraud, but to the "ongoing impacts of the COVID-19 pandemic . . . including OEM delays amid microchip and other shortages." ECF No. 72 at ¶ 206. If Defendants were to prevail on these likely loss causation arguments, the amount of potentially recoverable damages could have been greatly diminished. *See Celeste Neely*, 2022 WL 17736350, at *6 (E.D. Tex. Dec. 16, 2022) (weighing towards settlement was the court's consideration that "it is likely that [Defendant] would vigorously dispute the connection between its alleged wrongdoing and the drop in its stock price.").

Finally, even if Plaintiffs were to overcome Defendants' arguments and prevail at trial, such a victory would not have guaranteed the Settlement Class an ultimate recovery larger than the $19.5 million Settlement. *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of

12

$81 million for plaintiffs against an accounting firm reversed on appeal and judgment entered for defendant).[6]

**Additional Considerations:** Even if Plaintiffs' claims survived a motion for summary judgment, which was not guaranteed, there is a significant risk that they would not be able to prove their case before a jury. In this complex securities litigation relating to matters such as (i) Defendants' awareness of complex data in XL Fleet's Salesforce database, (ii) nuanced issues concerning the specifics of CARB compliance, and (iii) comparison of various methods of MPG testing, there is a risk that a jury would not understand Plaintiffs' theories of the case and how the theories intersect with economic and statistical analyses that undergird causation and damages issues. *See* ¶¶44-45. This risk is compounded by the fact that Plaintiffs would be forced to tell their story to the jury through incriminating documents and adverse witnesses. Conversely, Defendants would be able to obtain testimony from the Individual Defendants themselves, as well as many other witnesses who are friendly to the Individual Defendants.

### c.    Risks Of Maintaining Class Action Status

While Plaintiffs and Lead Counsel are confident that the Settlement Class meets the requirements for certification (*see* ECF No. 181, Sec. V.B.), the class had not yet been certified, and Plaintiffs are aware there is a risk the Court could disagree with their arguments. Even if the Court were to certify the class, there is always a risk that the certified class could be decertified at a later stage in the proceedings. *See Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 214 (S.D.N.Y. 1992) ("Even if certified, the class would face the risk of decertification."). Thus, the risks

---

[6] *See also In re BankAtlantic Bancorp, Inc.*, 2011 WL 1585605, at *20-*22 (S.D. Fla. Apr. 25, 2011) (following a jury verdict in plaintiffs' favor on liability, the district court granted defendants' motion for judgment as a matter of law), *aff'd*, *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (Tenth Circuit overturned securities fraud class action jury verdict for plaintiffs in case filed in 1973 and tried in 1988 on the basis of 1994 Supreme Court opinion).

and uncertainty surrounding class certification also support approval of the Settlement. *See GSE*, 414 F. Supp. 3d at 694 ("Although the risk of maintaining a class through trial is present in [every] class action . . . this factor [nevertheless] weighs in favor of settlement where it is likely that defendants would oppose class certification if the case were to be litigated.").

### d. Range Of Reasonableness In Light Of The Best Possible Recovery And Attendant Risks Of Litigation

The adequacy of the amount offered in settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prods. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987). Here, the proposed Settlement provides an all-cash payment of $19.5 million for the benefit of the Settlement Class.[7] This is an outstanding result given the significant risks of continued litigation. Plaintiffs' damages expert estimates that if Plaintiffs had fully prevailed on all their claims at summary judgment and after a jury trial, and if the Court and jury accepted Plaintiffs' damages theory—*i.e.*, ***Plaintiffs' best-case scenario***—the total ***maximum damages potentially available*** in this Action would be approximately $250 to $495 million. Thus, the $19.5 million Settlement represents a recovery of 3.9% to 7.8% of maximum potential damages. This recovery is well above the 1.8% median recovery of estimated damages in all securities class actions settled in 2023, and it is also approximately ***two and a half times*** higher than the 1.6%-2.7% median recovery in securities cases with similar damages that settled between January 2014-December 2023. *See* Ex. 8 (NERA Report at 26 (Fig. 22)); *see also id.* at 25 (Fig. 21) (median recovery for securities

---

[7] After the Parties accepted the mediator's proposal to resolve this Action for $19.5 million (*see* ¶9), the SEC and XL Fleet announced an agreed civil penalty of $11 million in a parallel SEC enforcement action. *See* S.E.C. Release No. 2023-208, "SEC Charges Electric Vehicle Co. for Misleading Revenue Projections Ahead of SPAC Merger," *available at* https://www.sec.gov/news/press-release/2023-208 (last visited December 6, 2023).

class actions that settled between January 2014-December 2023 was 2.7% for cases with estimated damages between $200-$399 million and 1.6% for those with estimated damages of $400-$599 million).

> e.      **Rule 23(e)(2)(C)(ii)-(iv)**

Under Rule 23(e)(2)(C), courts also must consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors supports approval of the Settlement.

**Rule 23 (e)(2)(C)(ii):** The method for processing Settlement Class Members' claims and distributing relief to eligible claimants includes well-established, effective procedures for processing claims and efficiently distributing the Net Settlement Fund. Here, A.B. Data, the Claims Administrator selected by Lead Counsel and approved by the Court (*see* ECF No. 191, ¶7), will process claims under the guidance of Lead Counsel, allow claimants an opportunity to cure any claim deficiencies or request the Court to review their claim denial, and, lastly, mail or wire Authorized Claimants their *pro rata* share of the Net Settlement Fund (per the Plan of Allocation) after Court approval. Claims processing, like the method proposed here, is standard in securities class action settlements. It has been long found to be effective, as well as necessary, insofar as neither Plaintiffs nor Defendants possess the individual investor trading data required for a claims-free process to distribute the Net Settlement Fund. *See Becker v. Bank of New York Mellon Trust Co., N.A.*, 2018 WL 6727820, at *7 (E.D. Pa. Dec. 21, 2018) (holding that "[t]he requirement that class members submit documentation to substantiate their

15

holdings of the bonds as of the record date will facilitate the filing of legitimate claims, yet is not overly demanding given the range of permissible documentation.").[8]

**Rule 23(e)(2)(C)(iii):** As disclosed in the Notice, Lead Counsel will be applying, on behalf of themselves and additional counsel, for a percentage of the common fund fee award in an amount not to exceed 33⅓% to compensate them for the services they have rendered on behalf of the Settlement Class. A proposed attorneys' fee of up to 33⅓% of the Settlement Fund (which, by definition, includes interest earned on the Settlement Amount) is reasonable in light of the work performed and the results obtained. It is also consistent with awards in similar complex class action cases. *See Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) ("Petitioners' request [for 33⅓% of the Class Settlement Fund] falls comfortably within the range of fees typically awarded in securities class actions."). More importantly, approval of the requested attorneys' fees is separate from approval of the Settlement, and the Settlement may not be terminated based on any ruling with respect to attorneys' fees. *See* Stipulation ¶16.

**Rule 23(e)(2)(C)(iv):** The Parties have entered into a confidential agreement that establishes certain conditions under which Defendants may terminate the Settlement if Settlement Class Members who collectively purchased more than a certain percentage of XL Fleet Securities traded during the Settlement Class Period request exclusion (or "opt out") from the Settlement. "This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement." *Christine Asia*, 2019 WL 5257534, at *15.

---

[8] This is not a claims-made settlement. If the Settlement is approved, Defendants will not have any right to the return of a portion of the Settlement based on the number or value of the claims submitted. *See* Stipulation ¶13.

4.    **Rule 23(e)(2)(D): The Settlement Treats All Settlement Class Members Equitably Relative To Each Other**

Rule 23(e)(2)(D) requires courts to evaluate whether the settlement treats class members equitably relative to one another. The Settlement easily satisfies this standard. Under the proposed Plan of Allocation, detailed in ¶¶56-87 of the Notice (Ex. 1-B), each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund.  Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.  Courts have repeatedly approved similar plans.  *See In re Citigroup, Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 386-87 (S.D.N.Y. 2013); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145-46 (S.D.N.Y. 2010).[9]

5.    **The Remaining *Grinnell* Factors Are Neutral Or Weigh In Favor Of Final Approval**

*Grinnell* also outlined several factors that are not co-extensive with Rule 23(e)(2)'s new factors.  These factors, viewed in light of the Rule 23(e)(2) factors identified above, also support or are neutral with respect to final approval.

**The Reaction of the Settlement Class:**  The second *Grinnell* factor—the reaction of the class—overlaps with Rules 23(c)(2)(B)(vi), on the opportunity for exclusion, and 23(e)(5), on the opportunity to object.  As required by Rule 23(c)(2)(B)(vi) and I(5), the Settlement affords Settlement Class Members the opportunity to request exclusion from, or object to, the Settlement.  Ex. 1-B (Notice) at ¶¶89-92, 93-101.  In total, as of March 18, 2024, 235,278 potential Settlement Class Members were either notified by mailed Postcard Notice or emailed a link to the Notice and Claim Form.  Ex. 1 (Declaration of Adam D. Walter Regarding: (A) Mailing and Emailing of Notice; (B)

---

[9] Pursuant to the PSLRA, Plaintiffs may separately seek reimbursement of costs (including lost wages) incurred as a result of their representation of the Settlement Class.  *See* 15 U.S.C. §78u-4(a)(4).

Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Walter Decl.")), ¶¶5-11.  To date, not a single request for exclusion has been received, and no objections have been filed with the Court.  ¶5.[10]  The Settlement Class's universally positive reaction strongly supports final approval of the Settlement.  *See, e.g.*, *Maley*, 186 F. Supp. 2d at 362 ("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy."); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.").

**The Stage of the Proceedings and the Amount of Discovery Completed:**  The third *Grinnell* factor examines "whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement."  *In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*, 909 F. Supp. 2d 259, 267 (S.D.N.Y. 2012).  Here, the Settlement was entered into only after the Court denied Defendants' motion to dismiss, fact discovery had been completed, Plaintiffs' class certification motion had been filed, and there had been an unsuccessful mediation, a direct in-person settlement meeting, and months of post-mediation negotiations overseen by Mr. Melnick.  ¶¶12-35.  Thus, Plaintiffs and their counsel had sufficient information to evaluate the strengths and weaknesses of the case at the time of settlement.  There can be no question that this factor supports final approval.  *See Bear Stearns,* 909 F. Supp. 2d at 267 (parties had requisite knowledge to "gauge the strengths and weaknesses of their claims and the adequacy of the settlement" where they "conducted extensive investigations, obtained and reviewed

---

[10] The deadline to request exclusion from, or to object to any aspect of, the Settlement is April 9, 2024. If any objections or opt-outs are received after the date of this filing, they will be addressed on reply.

millions of pages of documents, and briefed and litigated a number of significant legal issues"); *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494 at *6 (S.D.N.Y. May 9, 2014) (finding that conducting "extensive formal discovery, including the review and analysis of over 1.3 million pages of documents from Defendants and various third parties as well as substantially completing fact depositions" demonstrated that "Lead Plaintiff and Lead Counsel have developed a comprehensive understanding of the key legal and factual issues in the litigation").

**The Ability of Defendants to Withstand a Greater Judgment (*Grinnell* Factor Seven):** "Courts have recognized that the defendant's ability to pay is much less important than other factors, especially where the other *Grinnell* factors weigh heavily in favor of settlement approval." *In re Metlife Demutualization Litig.*, 689 F. Supp. 2d 297, 339 (E.D.N.Y. 2010). While Defendants have limited amounts of D&O insurance available to contribute to towards a settlement of this Action, the amount was rapidly wasting as a result of an SEC investigation (which resulted in its own $11 million settlement that was announced after this case was settled in principle), another class action pending in the Delaware Court of Chancery, and several shareholder derivative actions. Furthermore, as to the substantial portion of the Settlement Amount not funded by Defendants' D&O insurance, XL Fleet, both before and after it merged with Spruce Power, has incurred substantial losses. If the litigation continued for several more years through trial and appeals, there is a possibility that Spruce Power would be in a more dire financial situation and would have even less of an ability to fund the Settlement. *See In re Blech Sec. Litig.*, 2000 WL 661680, at *5 (S.D.N.Y. May 19, 2000) ("While additional years of litigation might well have resulted in a higher settlement or verdict at trial, continued litigation could also have reduced the amount of insurance coverage available and not necessarily resulted in a greater recovery."). Under these circumstances, ability to pay is not a factor in the Settlement and does not weigh either for or against approval. *In re AOL Time Warner, Inc.*,

19

2006 WL 903236, at *12 (S.D.N.Y. Apr. 6, 2006) ("the mere ability to withstand a greater judgment does not suggest that the Settlement is unfair.").

* * *

Accordingly, the aforementioned factors militate heavily in favor of final approval of the Settlement.

## IV.   THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED

The Court's January 18, 2024 Preliminary Approval Order certified the Settlement Class for settlement purposes only under Fed. R. Civ. P. 23(a) and (b)(3). *See* ECF No. 191, ¶¶1-3. There have been no changes to alter the propriety of class certification for settlement purposes. Thus, for the reasons stated in Plaintiffs' Preliminary Approval Motion (*see* ECF No. 181, at Sec. V.B), Plaintiffs respectfully request that the Court affirm its determinations in the Preliminary Approval Order certifying the Settlement Class under Rules 23(a) and (b)(3).

## V.   THE NOTICE PROGRAM SATISFIES RULE 23 AND DUE PROCESS

The Court approved the proposed notice program in the Preliminary Approval Order, and Plaintiffs executed the notice program in accordance with the provisions therein. ¶¶52-62. Notice was given to potential Settlement Class Members via mail, email, the Settlement Website (www.XLFleetSecuritiesSettlement.com), and publication.[11] Walter Decl. at ¶¶5-12, 14. As of March 18, 2024, either a copy of the Postcard Notice was timely mailed, or a link to the Notice and Claim Form was emailed, to 235,278 potential Settlement Class Members. *Id*. at ¶11.

On February 26, 2024, the Court-approved Summary Notice was published in *Investors' Business Daily* and transmitted once over the *PR Newswire*. Walter Decl. ¶12 & Exs. E-F. The

---

[11] The Settlement Website was established on February 15, 2024. Ex. 1 (Walter Decl.) at ¶14. From this website, potential Settlement Class Members can, *inter alia*, download copies of the Notice and Claim Form and submit claims online. *Id*. at ¶¶14-15.

20

published Summary Notice clearly and concisely provided information concerning the Settlement and the means to obtain a copy of the Notice. *See id*.

Finally, the Claims Administrator posted the Notice, Claim Form, Stipulation, Amended Complaint and other relevant documents online at the Settlement Website, and provided a toll-free telephone number for Settlement Class Members to call with any questions concerning the Settlement. *Id*. at ¶¶13-14.  Courts routinely find that comparable notice programs meet the requirements of due process and Rule 23.  *See In re Advanced Battery Techs., Inc. Secs. Litig.*, 298 F.R.D. 171, 182-83 n.3 (S.D.N.Y. 2014) (collecting cases and stating that "[t]he use of a combination of a mailed post card directing class members to a more detailed online notice has been approved by courts."); *In re Mut. Funds Inv. Litig.*, 2010 WL 2342413, at *6-7 (D. Md. May 19, 2010) (approving combination of postcard notice, summary notice, and detailed notice available online as "the best notice practical").

## VI.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

"To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized – namely, it must be fair and adequate." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005).  "As numerous courts have held, a plan of allocation need not be perfect." *Christine Asia*, 2019 WL 5257534, at *15.  Rather, "[w]hen formulated by competent and experienced counsel, a plan for allocation of net settlement proceeds need have only a reasonable, rational basis." *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012); *see also Christine Asia,* 2019 WL 5257534, at 15-16.  Thus, "[i]n determining whether a plan of allocation is fair, courts look largely to the opinion of counsel." *Marsh & McLennan*, 2009 WL 5178546, at *13.

The proposed Plan of Allocation, developed by one of Plaintiffs' economic expert consultants working in conjunction with Lead Counsel, is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects an assessment of the damages that Plaintiffs

contend could have been recovered under the theories of liability and damages asserted in the Action.[12]

More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the prices

of XL Fleet Common Stock, Warrants, Units and Call Options were artificially inflated, and the price

of XL Fleet Put Options was artificially deflated, during the Settlement Class Period due to

Defendants' alleged materially false and misleading statements and omissions.[13]  Plaintiffs allege that

corrective disclosures removed the artificial inflation in the prices of XL Fleet Securities on the

following dates: March 3, 2021, March 4, 2021, and April 1, 2021 (the "Corrective Disclosure

Dates").[14]  *Id*. at ¶59.  At the time of the Corrective Disclosure Dates, the only XL Fleet Securities that

remained outstanding were XL Fleet Common Stock, Call Options, and Put Options.[15]

Plaintiffs' consulting damages expert reviewed publicly available information regarding XL

Fleet and performed statistical analyses of the price movements of XL Fleet Common Stock relative

---

[12] The Plan of Allocation is detailed in the Notice.  *See* Ex. 1-B (Notice) at ¶¶56-87).

[13] The following definitions are used in the Stipulation, Notice and here.  "XL Fleet Securities" means, collectively, publicly traded XL Fleet and Pivotal common stock ("XL Fleet Common Stock"), publicly traded XL Fleet and Pivotal warrants (collectively, "XL Fleet Warrants"), publicly traded Pivotal units ("Pivotal Units"), publicly traded XL Fleet and Pivotal call options (collectively, "XL Fleet Call Options"), and publicly traded XL Fleet and Pivotal put options (collectively, "XL Fleet Put Options").

[14] The XL Fleet Call Options and Put Options are derivative securities whose prices depended, in large part, on the price of XL Fleet Common Stock.  Thus, the removal of the alleged artificial inflation in the price of XL Fleet's Common Stock upon the Corrective Disclosure Dates would have likewise caused the removal of the alleged artificial inflation on the prices of the Call Options, and the alleged artificial deflation in the prices of the Put Options.

[15] Prior to the business combination between Pivotal and XL Fleet on December 21, 2020 (the "Business Combination"), Pivotal common stock, Pivotal warrants and Pivotal Units (each consisting of one share of stock and one-third of a warrant) were quoted on the New York Stock Exchange ("NYSE") under the symbols "PIC," "PIC WS" and "PIC.U," respectively.  Following the Business Combination, the Pivotal Units automatically separated into the component securities and, as a result, no longer traded as a separate security and were delisted from the NYSE.  On December 22, 2020, XL Fleet Common Stock and XL Fleet Warrants began trading under the symbols "XL" and "XL WS," respectively.  On March 1, 2021, the Company redeemed all outstanding publicly held XL Fleet Warrants, and the holders of those warrants were entitled to receive $0.01 per XL Fleet Warrant.

to the price performance of market and peer indices during the Settlement Class Period. From this data, she calculated the alleged artificial inflation by isolating the losses in XL Fleet Common Stock that resulted from the alleged violations of the federal securities laws, eliminating losses attributable to market factors, industry factors, or alleged Company-specific factors unrelated to the alleged violations of law. The amount of artificial inflation in XL Fleet Common Stock on each day of the Settlement Class Period is set forth in Table 1 in the Notice. *See* Ex. 1-B (Notice) at ¶60.

In order for a Settlement Class Member to have a Recognized Loss under the Plan of Allocation with respect to XL Fleet Common Stock and Call Options, the securities must have been purchased or acquired during the Settlement Class Period and held at the opening of trading on at least one of the Corrective Disclosure Dates; and, with respect to XL Fleet Put Options, those options must have been sold (written) during the Settlement Class Period and not closed immediately prior to at least one of the Corrective Disclosure Dates. *Id*.

Under the Plan of Allocation, a Recognized Loss will be calculated for (i) each share of XL Fleet Common Stock purchased or otherwise acquired during the Settlement Class Period (including shares acquired through the exercise of an XL Fleet Warrant or publicly traded option, and shares acquired through the separation of Pivotal Units purchased during the Settlement Class Period), (ii) each XL Fleet Call Option purchased or otherwise acquired during the Settlement Class Period, and (iii) each XL Fleet Put Option sold (written) during the Settlement Class Period. *Id*. at ¶59. The calculation of Recognized Loss will depend upon several factors, including when the securities were purchased or otherwise acquired during the Settlement Class Period, and in what amounts, and whether those securities were sold, and if sold, when they were sold, and for what amounts.[16] The Recognized

---

[16] Settlement proceeds available for XL Fleet Call Options purchased during the Settlement Class Period and XL Fleet Put Options written during the Settlement Class Period shall be limited to a total

23

Loss is not intended to estimate the amount a Settlement Class Member might have been able to recover after a trial, nor to estimate the amount that will be paid to Authorized Claimants pursuant to the Settlement. *Id*. at ¶57. The Recognized Loss is the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants. *Id*.

In general, the Recognized Loss for XL Fleet Common Stock acquired during the Settlement Class Period will be the difference between the estimated artificial inflation on the date of acquisition and the estimated artificial inflation on the date of sale, or the difference between the actual purchase price and sale price, whichever is less.[17] The Recognized Loss calculation also incorporates the "90-day look back" provision of the PSLRA. *See id.* at ¶¶62, 65. The Recognized Loss for XL Fleet Call Options acquired during the Settlement Class Period and XL Fleet Put Options sold during the Settlement Class Period is based on the actual losses an Authorized Claimant incurred when the relevant truth was allegedly revealed on the Corrective Disclosures Dates. *See id.* at ¶¶66, 68.

The sum of a Claimant's Recognized Loss is the Claimant's "Recognized Claim," and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims, subject to a $10 *de minimis* provision. *See id.* at ¶¶71, 84. More precisely, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total

---

amount equal to 4% of the Net Settlement Fund. Ex. 1-B (Notice) at ¶70. XL Fleet Call and Put Option trading accounted for less than 4% of total dollar trading volume for XL Fleet Securities during the Settlement Class Period. As such, claims for XL Fleet Call and Put Option transactions are allotted 4% of the Net Settlement Fund pursuant to the Plan of Allocation.

[17] With respect to XL Fleet Common Stock purchased or sold through the exercise of an XL Fleet Warrant or publicly traded option, the purchase/sale date of the stock shall be the exercise date of the warrant/option and the purchase/sale price of the stock shall be the exercise price of the warrant/option. Pivotal Units purchased during the Settlement Class Period that were subsequently separated into their component securities (*i.e.*, XL Fleet Common Stock and Warrants) shall be treated as a purchase of the securities received at a per-security purchase price equal to the closing price of each security received on the date of separation.

amount in the Net Settlement Fund. *Id*. at ¶84. If a Claimant has an overall market *gain* with respect to his, her, or its transactions in XL Fleet Securities during the relevant period, the Claimant is not entitled to recover under the Plan of Allocation. *Id*. at ¶¶82-83.

If any funds remain after an initial distribution to Authorized Claimants, as a result of uncashed or returned checks or other reasons, subsequent distributions will be conducted as long as they are cost effective. *Id*. at ¶85. At such time as it is determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance shall be contributed to non-sectarian, not-for-profit organization(s), to be recommended by Lead Counsel and approved by the Court. *Id*.

Lead Counsel believes the Plan of Allocation will result in a fair and equitable distribution of the Settlement proceeds among Settlement Class Members who submit valid claims. *See Too v. Rockwell Medical, Inc.*, 2020 WL 1023435, at *1 (E.D.N.Y. Feb. 26, 2020) (approving substantially similar plan of allocation); *Christine Asia*, 2019 WL 5257534, at *15-16 (same). To date, no objections to the Plan of Allocation have been filed on this Court's docket. ¶71. Accordingly, Plaintiffs respectfully request that the Court approve the proposed Plan of Allocation.

## VII.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate, and certify the Settlement Class for the purposes of settlement.[18]

Dated: March 26, 2024                    **GLANCY PRONGAY & MURRAY LLP**

By: *s/ Gregory B. Linkh*
Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169

---

[18] A proposed Final Judgment and Order of Dismissal with Prejudice and a proposed Order Approving Plan of Allocation will be submitted with Plaintiffs' reply papers on April 23, 2024, after the deadline for objecting to the motion and requesting exclusion from the Settlement Class has passed.

Telephone: (212) 682-5340
glinkh@glancylaw.com

Robert V. Prongay
Joseph D. Cohen (*admitted pro hac vice*)
Garth Spencer (GS-7623)
Christopher Fallon (*admitted pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
rprongay@glancylaw.com
gspencer@glancylaw.com

*Lead Counsel for Lead Plaintiff Delton Rowe,
additional Plaintiffs Jeffrey Suh, Carl Enslin,
Simone Heridis, and Soraya Heridis, and the
Settlement Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867
hsmith@howardsmithlaw.com

*Additional Counsel for Lead Plaintiff Delton Rowe,
additional Plaintiffs Jeffrey Suh, Carl Enslin,
Simone Heridis, and Soraya Heridis, and the
Settlement Class*

26