**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE XL FLEET CORP. SECURITIES LITIGATION | Case No. 1:21-cv-02002-JLR |

**DECLARATION OF GREGORY B. LINKH IN SUPPORT OF: (I) PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF <u>LITIGATION EXPENSES</u>**

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................ 2

II.     PROCEDURAL HISTORY/DISCOVERY ............................................... 6

        A.      Initial Complaint and the Lead Plaintiff Process ...................... 6

        B.      Amended Pleadings and Defendants' Motion to Dismiss .................................... 7

        C.      Fact Discovery ............................................................................ 7

        D.      Class Certification....................................................................... 9

        E.      Settlement Negotiations.............................................................. 9

        F.      Preliminary Approval of the Settlement .................................. 10

III.    THE RISKS OF CONTINUED LITIGATION..................................... 11

        A.      Risks Faced In Obtaining And Maintaining Class Action Status........................ 11

        B.      Risks To Proving Liability........................................................ 12

        C.      Risks to Proving Damages ........................................................ 14

        D.      Other Risks, Including Trial And Appeals .............................. 15

IV.     PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL
        ORDER REQUIRING THE NOTICE PROGRAM....................................... 16

V.      ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT......................... 19

VI.     LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT
        OF LITIGATION EXPENSES.................................................................. 23

        A.      The Fee Application................................................................... 23

                1.      The Outcome Achieved is the Result of the Significant Time and Labor that
                        Lead Counsel Devoted to the Action ...................................... 24

                2.      The Significant Risks Borne by Plaintiffs' Counsel .................. 27

                3.      The Experience And Expertise Of Plaintiffs' Counsel And The Standing
                        And Caliber of Defendants' Counsel........................................ 28

                4.      Public Policy Interests, Including The Need To Ensure The Availability Of
                        Experienced Counsel In High-Risk Contingent Securities Cases............. 29

i

5.      The Reaction Of The Settlement Class Support Lead Counsel's Fee Request...................................................................................................... 30

B.      Reimbursement Of The Requested Litigation Expenses Is Fair And Reasonable 30

VII.    CONCLUSION ................................................................................................. 34

**TABLE OF EXHIBITS TO DECLARATION**

| EXHIBIT | TITLE |
|---|---|
| 1 | Declaration of Adam D. Walter Regarding: (A) Mailing of Postcard Notice; (B) Publication of Summary Notice; and (C) Report on Requests for Exclusion Received to Date |
| 2 | Firm résumé of Glancy Prongay & Murray LLP |
| 3 | Declaration of Delton Rowe |
| 4 | Declaration of Jeffrey Suh |
| 5 | Declaration of Carl Enslin |
| 6 | Declaration of Simone Heridis |
| 7 | Declaration of Soraya Heridis (née Matamoros) |
| 8 | True and correct excerpts from Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation*: 2023 Full-Year Review (NERA Jan. 23, 2024) ("NERA Report") |
| 9 | Table of Law Firm Billing Rates |
| 10 | *In re NYSE Specialists Sec. Litig.*, No. 03-cv-8264, ECF No. 38, slip op. (S.D.N.Y. June 10, 2013) |
| 11 | *In re Cnova N.V. Sec. Litig.*, No. 1:16-cv-00444-LTS-OTW (S.D.N.Y. Mar. 20, 2018) |
| 12 | *Levine v. Atricure, Inc.*, No. 1:06-cv-14324-RJH, ECF No. 85, slip op. at ¶6 (S.D.N.Y. May 27, 2011) |
| 13 | *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, No. 18-cv-00299, ECF No. 230 at 2 (S.D.N.Y. Feb. 14, 2022) |
| 14 | *In re Virgin Mobile USA IPO Litig.*, No. 07-cv-5619 (SDW), ECF No. 146 at ¶19 (D.N.J. Dec. 8, 2010) |
| 15 | Chart of Select Second Circuit Cases with 33% or Higher Fee Awards |

I, Gregory B. Linkh, declare as follows:

1.      I am a partner at Glancy Prongay & Murray LLP ("GPM" or "Lead Counsel"), Court-appointed Lead Counsel for lead plaintiff Delton Rowe ("Lead Plaintiff"), and additional named plaintiffs Jeffrey Suh, Carl Enslin, Simone Heridis and Soraya Heridis (née Matamoros) (collectively, with Lead Plaintiff, "Plaintiffs") in the above-captioned action (the "Action").[1] I am admitted to practice in this District. I have personal knowledge of the facts stated herein and, if called upon as a witness, I could and would testify competently thereto.

2.      I respectfully submit this declaration, together with the attached exhibits, in support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently filed memorandum in support thereof ("Final Approval Motion"). As set forth in the Final Approval Motion, Plaintiffs seek final approval of the $19,500,000 Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

3.      I also respectfully submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently filed memorandum in support thereof ("Attorneys' Fee Motion").[2] As set forth in the Attorneys' Fee Motion, Lead Counsel seeks an award of attorneys' fees in the amount of 33⅓% of the Settlement Fund (which, by definition, includes interest accrued thereon), and reimbursement of Litigation Expenses in the total amount of $597,900.92, which includes Plaintiffs' Counsel's out-

---

[1] All capitalized terms, unless otherwise defined herein, have the same meaning as set forth in the Stipulation and Agreement of Settlement dated December 6, 2023 (the "Stipulation"). ECF No. 182-1.

[2] Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses is made on behalf of all Plaintiffs' Counsel.

of-pocket litigation costs of $512,900.92, and awards of $25,000 to Lead Plaintiff and $15,000 to each of the other four named plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for their costs, including for time spent, incurred in connection with their representation of the Settlement Class.

4.    The Court preliminarily approved the proposed Settlement by Order dated January 18, 2024 (the "Preliminary Approval Order"), and thereby directed notice of the Settlement to be disseminated to the Settlement Class. *See* ECF No. 191. Pursuant to the Preliminary Approval Order, A.B. Data, the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and by publication. The details of the notice program are set forth in the Declaration of Adam D. Walter Regarding: (A) Mailing of Postcard Notice; (B) Publication of Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Walter Decl."), a true and correct copy of which is attached hereto as Exhibit 1.

5.    In total, notice of the Settlement has been disseminated to 235,278 potential Settlement Class Members, and thus far, no requests for exclusion have been received and no objections have been filed with the Court. *See* Walter Decl., ¶¶ 11, 18-19.

## I.    INTRODUCTION

6.    This is a securities class action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and Section 20(a) of the Exchange Act. On June 3, 2021, Judge Schofield appointed Delton Rowe as Lead Plaintiff and approved his selection of GPM to serve as Lead Counsel. ECF No. 60. Plaintiffs brought claims on behalf of XL Fleet Corp. ("XL Fleet") investors under Section 10(b) of the Exchange Act against Defendants XL Fleet, Dimitri Kazarinoff (XL Fleet's CEO), Thomas J. Hynes III (XL

2

Fleet's founder and Chief Strategy Officer), Brian Piern (XL Fleet's VP of Sales), Jonathan Ledecky (CEO and co-founder of Pivotal Investment Corporation II ("Pivotal")), James H.R. Brady (Pivotal's CFO), and Kevin Griffin (Pivotal's director and co-founder). Plaintiffs also brought control person claims against the individual defendants under Exchange Act Section 20(a).

7. The Settlement now before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $19,500,000 (the "Settlement Amount") for the benefit of the Settlement Class. As detailed herein, the proposed Settlement represents a fair and adequate result for the Settlement Class considering the case's procedural posture as well as the significant risks remaining in the Action.

8. As explained in greater detail herein, this Settlement was reached only after comprehensive inquiry into the merits of the claims alleged and the likely damages that could be recovered by the Settlement Class. Plaintiffs' Counsel's vigorous efforts involved, *inter alia*:

- filing an initial complaint, which was based on, among other things, review and analysis of (a) filings with the U.S. Securities and Exchange Commission ("SEC") by both XL Fleet Corp. ("XL Fleet") and Pivotal Investment Corporation II ("Pivotal"), (b) public reports, blog posts, research reports prepared by securities and financial analysts, and news articles concerning XL Fleet and Pivotal, (c) investor call transcripts by the management of XL Fleet and/or Pivotal, and (d) press releases published by and regarding XL Fleet and Pivotal;

- filing a contested motion for appointment of Lead Plaintiff and Lead Counsel pursuant to the PSLRA;

- conducting further investigation of the claims asserted in the Action, resulting in a 143-page (454-paragraph) Amended Complaint, which included, among other things: (a) evidence from four confidential witnesses garnered through the use of a private investigator; (b) allegations against additional defendants, (c) an expanded class period; (d) the addition of the three named plaintiffs as well as Lead Plaintiff Delton Rowe; (e) additional false statements; (f) new theories concerning the falsity behind Defendants' statements; and (g) an added count for "scheme" liability under Rule 10b-5(a) and (c);

- researching, drafting, and filing an opposition to Defendants' motion to dismiss the Amended Complaint, after which the Court denied Defendants' motion in its entirety;

3

- engaging in substantial discovery, which entailed, *inter alia*: (a) exchanging initial disclosures; (b) negotiating a protective order and ESI protocol, both of which were subsequently entered by the Court; (c) serving and responding to document requests, interrogatories, and requests for admission; (d) identifying and issuing subpoenas to relevant third parties; (e) deposing 16 current or former XL Fleet, Pivotal and MGG Investment Group LP ("MGG") directors or personnel, including the Individual Defendants; (f) defending the depositions of Lead Plaintiff and the four other named plaintiffs; and (g) conducting a targeted review and analysis of over one million pages of documents produced by Defendants and third parties;

- engaging in a full-day, in-person mediation session overseen by a highly experienced third-party mediator, Jed Melnick, Esq., of JAMS, which involved an exchange of written submissions concerning the facts of the case, liability and damages, and did not result in a settlement agreement at that time;

- filing a motion for class certification, which included, *inter alia*, an expert report by Dr. Adam Werner on the efficiency of the market for XL Fleet Securities;

- engaging in months of follow-up negotiations with Mr. Melnick and Defendants' Counsel following the initial mediation session, that ultimately resulted in a mediator's recommendation to the settle the Action for $19.5 million;

- working with a consulting damages expert to craft a plan of allocation that treats Plaintiffs and all other members of the proposed Settlement Class fairly;

- preparing the initial draft, and negotiating the terms, of the Stipulation (including the exhibits thereto) and the Supplemental Agreement;

- drafting the preliminary approval motion and supporting papers;

- preparing for and attended the preliminary approval hearing;

- working with the Court appointed Claims Administrator to provide notice to the Settlement Class; and

- drafting the final approval motion and supporting papers.

9.     Based on the foregoing efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of its members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

10.   In addition to seeking final approval of the Settlement, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Plaintiffs' consulting damages expert. The Plan of Allocation provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.

11.   Finally, Lead Counsel, on behalf of Plaintiffs' Counsel, seeks approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Attorneys' Fee Motion. As discussed in detail in the Attorneys' Fee Motion, the requested 33⅓% fee is within the range of percentage awards granted by courts in this Circuit in comparable securities class actions. Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check and warranted in light of the extent and quality of the work performed, the fully contingent nature of the representation, and the substantial result achieved. Likewise, the requested out-of-pocket litigation costs of $512,900.92, and the requested reimbursement of costs pursuant to the PSLRA, including lost wages and time, in the aggregate amount of $85,000 to Plaintiffs, are also fair and reasonable. Accordingly, for the reasons set forth in the Attorneys' Fee Motion and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of Litigation Expenses be approved.

II.      **PROCEDURAL HISTORY/DISCOVERY**

A.      **Initial Complaint and the Lead Plaintiff Process**

12.      On March 8, 2021, plaintiff Jeffrey Suh, represented by his counsel GPM, commenced an action in this Court styled *Suh v. XL Fleet Corp. et al.* 21-cv-2002 (S.D.N.Y.). ECF No. 1. On March 12, 2021, plaintiff Sourabh Kumar commenced the related action styled *Kumar v. XL Fleet Corp. et al*, 21-cv-2171 (S.D.N.Y.).

13.      In preparation for the filing of the original *Suh* complaint, GPM, who was not yet appointed Lead Counsel, conducted an extensive investigation of the claims asserted in the Action, which included, *inter alia*, reviewing and analyzing: (a) filings with the U.S. Securities and Exchange Commission ("SEC") by both XL Fleet and Pivotal; (b) public reports, blog posts, research reports prepared by securities and financial analysts, and news articles concerning XL Fleet and Pivotal; (c) investor call transcripts by the management of XL Fleet and/or Pivotal; and (d) press releases published by and regarding XL Fleet and Pivotal.

14.      Movant Delton Rowe filed a motion for appointment of Lead Plaintiff on May 7, 2021, with GPM as his choice of to serve as lead counsel. ECF No. 18. Mr. Rowe submitted further briefing on May 21, 2021, ECF No. 53, and submitted a letter to the Court on May 25, 2021, discussing his background information. ECF No. 56.

15.      After a contested leadership process, and following a telephonic conference on June 3, 2021, which was attended by my partner Kevin F. Ruf, Judge Schofield consolidated the two cases, appointed Delton Rowe as Lead Plaintiff, and approved his selection of GPM to serve as Lead Counsel. ECF No. 60.

### B.   Amended Pleadings and Defendants' Motion to Dismiss

16.     On July 20, 2021, Plaintiffs filed their 454-paragraph, 143-page Amended Complaint. ECF No. 72. Lead Counsel bolstered the initial complaint with, among other things: (a) evidence from four confidential witnesses obtained by Lead Counsel's private investigator; (b) allegations against additional defendants; (c) an expanded class period; (d) the addition of the three named plaintiffs in addition to original plaintiff Jeffrey Suh and Lead Plaintiff Delton Rowe; (e) additional false statements; (f) new theories concerning the falsity behind Defendants' statements; and (g) an added count for "scheme" liability under Rule 10b-5(a) and (c).

17.     On August 26, 2021, Defendants moved to dismiss the Amended Complaint. ECF No. 85. On October 4, 2021, Plaintiffs opposed this motion in a brief addressing Defendants' arguments: (a) that the confidential witness testimony should be discredited; (b) that the Muddy Waters Report was unreliable; (c) that the statements made by Defendants were inactionable; and (d) that Plaintiffs failed to plead a strong inference of scienter. ECF No. 93. Judge Schofield denied the motion to dismiss in its entirety on February 17, 2022. ECF No. 97; *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629 (S.D.N.Y. Feb. 17, 2022).

### C.   Fact Discovery

18.     Following the denial of Defendants' Motion to Dismiss, the Parties initiated discovery. On March 7, 2022, the Court entered, with modifications, the Parties' proposed Civil Case Management Plan and Scheduling Order (ECF No. 103), which was amended on April 22, 2022. ECF No. 118.

19.     On April 8, 2022, the Parties filed proposed stipulations regarding ESI and a protective order. ECF Nos. 112, 113. These stipulations were so ordered on April 11, 2022. ECF Nos. 114, 115.

7

20.      On March 25, 2022, the Parties exchanged initial requests for production of documents. The Parties served their responses and objections to the requests for production on April 25, 2022.

21.      Pursuant to these requests, over the course of fact discovery, Defendants produced approximately 975,000 pages of documents, and Plaintiffs produced 756 pages of documents.

22.      Plaintiffs also served third-party subpoenas to various third parties, including: (a) the provider of XL Fleet's sales pipeline tracking software, Salesforce, Inc. (which produced 71 pages and 590 spreadsheet files); (b) Pivotal's financial advisors in connection with the XL Fleet merger, BTIG, LLC (which produced approximately 114,981 pages); and (c) certain affiliates of Pivotal including MGG (which collectively produced over 81,268 pages).

23.      Plaintiffs also served a FOIA request on the California Air Resources Board ("CARB"), which produced 493 pages of documents.

24.      On September 27, 2022, Plaintiffs served their first set of interrogatories to Defendants. Defendants answered these interrogatories on October 27, 2022. On December 16, 2022, Defendants served their first set of interrogatories to Plaintiffs. Plaintiffs answered these interrogatories on January 17, 2023. On January 13, 2023, Plaintiffs served their second set of interrogatories to Defendants. Defendants answered these interrogatories on March 8, 2023.

25.      On March 3, 2023, the Parties served their first sets of requests for admission on each other. On July 31, 2023, the Parties served their responses.

26.      Between December 5, 2022, and February 13, 2023, the Parties conducted deposition discovery. Plaintiffs' Counsel took the depositions of 16 current or former XL Fleet, Pivotal and MGG directors or personnel, including the Individual Defendants.

27.     Between December January 27, 2023, and February 9, 2023, Defendants' Counsel took the depositions of the five Plaintiffs.

28.     Throughout the course of discovery, the Parties exchanged correspondence and participated in meet and confer calls regarding various discovery issues.

**D.      Class Certification**

29.     On January 13, 2023, Plaintiffs filed their pre-motion conference letter regarding class certification. ECF No. 137. On January 23, 2023, the Court so-ordered the Parties' stipulated class certification briefing schedule. ECF No. 138. On March 10, 2023, Plaintiffs filed their motion for class certification and related documents. ECF Nos. 149-151. This motion was still pending when the Parties informed the Court of the Settlement.

30.     This motion included the expert report of Dr. Adam Werner, who performed detailed statistical analyses to demonstrate that: (a) XL Fleet stock traded in an efficient market throughout the putative class period; and (b) damages could be calculated using a common class-wide methodology. ECF No. 151-1.

**E.      Settlement Negotiations**

31.     On February 2, 2023, the Parties filed their eighth joint status letter (ECF No. 146), wherein they requested a continuation of the expert discovery and dispositive motion schedule relating to their March 20, 2023, mediation. The Court approved the requested continuation. ECF No. 147.

32.     On March 20, 2023, Lead Counsel, Lead Plaintiff Delton Rowe, and Defendants' Counsel participated in a full-day in-person mediation session before the mediator, Jed Melnick, Esq. of JAMS. In advance of that session, the Parties exchanged, and provided to Mr. Melnick, detailed mediation statements and exhibits, which addressed the issues of both liability and

damages, and further participated in discussions concerning the Parties' estimates of damages. This mediation session failed to produce a settlement.

33.    Over the next six months, the Parties continued to negotiate, including through additional discussions with Mr. Melnick. These months of additional negotiations included an in-person settlement meeting, at GPM's Los Angeles office, with Spruce Power Holding Corp.'s ("Spruce Power") Chief Legal Officer (following the end of the Settlement Class Period, XL Fleet changed its name to Spruce Power).

34.    On September 5, 2023, Mr. Melnick issued a mediator's proposal to settle the Action for $19.5 million. On September 7, 2023, the Parties accepted this proposal.

35.    The Parties thereafter memorialized the substantive terms of the settlement in a confidential Term Sheet (the "Term Sheet") dated September 29, 2023, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers. The Stipulation was executed on December 6, 2023. ECF No. 182-1.

**F.    Preliminary Approval of the Settlement**

36.    On December 8, 2023, Lead Plaintiff filed his Unopposed Motion for Preliminary Approval of Class Action Settlement.  ECF No. 180.

37.    On January 16, 2024, this Court held an in-person hearing concerning the Motion for Preliminary Approval.

38.    On January 18, 2024, the Court issued the Preliminary Approval Order.  ECF No. 191.

## III.   THE RISKS OF CONTINUED LITIGATION

39.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $19,500,000. As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals.

### A.       Risks Faced In Obtaining And Maintaining Class Action Status

40.     Had the Action not settled, Plaintiffs would have had to certify the class. While Lead Counsel researched and analyzed class certification and Plaintiffs are confident that the Court would have certified the proposed class, Plaintiffs bear the burden of proof on class certification, and Defendants may have raised arguments challenging the propriety of class certification.

41.     Moreover, even if Plaintiffs' successfully obtained class certification, Defendants could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery. Certification of the Settlement Class Period (*i.e.*, September 18, 2020 - March 31, 2021, inclusive) was, by no means, a forgone conclusion.

42.     Additionally, a ruling by the United States Supreme Court has made obtaining class certification for Plaintiffs more difficult and could potentially provide additional challenges should the litigation against Defendants proceed. In *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113 (2021), the Supreme Court held, in part, that when defendants are seeking to rebut the presumption of reliance established under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), as modified by *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), courts may consider the generic nature of an alleged misrepresentation as evidence of lack of price impact. Accordingly,

11

courts are directed to consider "all evidence relevant to price impact" at the class certification stage, including the extent to which a corrective disclosure relates to a "generic" false statement. *Goldman Sachs Grp.*, 573 U.S. at 123.

### B.      Risks To Proving Liability

43.      In addition to the hurdle of obtaining and maintaining class action status, Plaintiffs and Lead Counsel faced numerous additional risks at summary judgment and trial, including establishing Defendants' liability. Defendants forcefully argued in their motions to dismiss—and undoubtedly would have continued to argue at summary judgment and/or trial—that Plaintiffs could not establish the required elements of their Exchange Act claims.

44.      Defendants would argue that many of the statements alleged by Plaintiffs to be misleading were not actionably false. For example:

- **<u>Sales Pipeline and Revenue Projections</u>:** A key component of Plaintiffs' case centered around Defendants' allegedly inflated sales pipeline and revenue projections—specifically, that such projections directly contradicted the information in XL Fleet's salesforce database. Defendants would likely claim that such statements were non-actionable forward-looking statements protected by the PSLRA safe harbor (15 U.S.C. § 78u–5) and statements of opinion protected by *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S, 175, 186 (2015).

- **<u>Certification by CARB</u>:** Defendants stated in their public filings that "XL has obtained a number of EOs for prior model years and is in the process of conducting testing against CARB issued test orders for future products to be introduced into the Californian market." While Plaintiffs would argue that Defendants materially omitted to state that since January 2019 CARB had prohibited XL from obtaining new EOs,

Defendants would likely argue that their statements were true and that they reasonably believed they would soon regain CARB approval.

- **MPG savings:** Defendants repeatedly touted that XL Fleet's hybrid systems would give customers up to 25% to 50% MPG improvements over the corresponding non-hybrid trucks. Plaintiffs would argue that this number is misleading because it was based on testing using a "city" drive cycle only, and real-world savings were often much less substantial. However, Defendants would likely argue that the 25-50% numbers were based on testing that in fact showed these levels of MPG savings.[3]

45.     Defendants would likely continue to argue that the allegedly false and misleading statements were not made with the requisite state of mind (*i.e.*, scienter) to support the securities fraud claims alleged. As such, Plaintiffs would have to prove, not only that such statements were materially false, but that Defendants knew or were reckless in not knowing that the statements were false or misleading. This is a high evidentiary bar that Plaintiffs would have to overcome both at summary judgment and at trial.

46.     Even if Plaintiffs' claims survived a motion for summary judgment, which was not guaranteed, there is a significant risk that they would not be able to prove their case before a jury. In this complex securities litigation relating to matters such as: (a) Defendants' interpretation and understanding of complex data in XL Fleet's Salesforce database; (b) nuanced issues concerning the specifics of CARB compliance; and (c) comparison of various methods of MPG testing, there is a risk that a jury would not understand Plaintiffs' theories of the case and the theories'

---

[3] As to the other main categories of false statements alleged by Plaintiffs, Defendants would likely continue to assert that their statements concerning XL Fleet's supply chain were not false because they had accurately disclosed such supply chain problems. And, as to Plaintiffs' allegation that customers featured in Defendants' statements were inactive, Defendants would likely argue that all of those customers had in fact previously purchased XL Fleet products.

intersection with economic and statistical analyses that undergird causation and damages issues. This is compounded by the fact that Plaintiffs would be forced to tell their story to the jury through Defendants' documents and adverse witnesses. Conversely, Defendants would be able to obtain testimony from the Individual Defendants themselves, as well as many other witnesses who are supportive of the Defendants.

### C.    Risks to Proving Damages

47.    Even if Plaintiffs were successful in establishing liability, they would still face substantial risks in establishing damages on a class wide basis. For example, Defendants would certainly have disputed damages by claiming that there was no causal connection between XL Fleet's allegedly misleading disclosures and drops in the Company's stock price, and even if there were such a connection, the damages suffered by the putative class were a mere fraction of the amount sought by Plaintiffs.

48.    More specifically, Plaintiffs would have also faced the significant risk that Defendants would argue that: (a) the stock price drops for the dates at issue were not statistically significant; and (b) some or all of the drops on those dates were due to confounding issues other than Defendants' alleged fraud. For instance, Defendants would likely argue that some or all of the April 1, 2021, drop was due, not to the alleged fraud, but to "ongoing impacts of the COVID-19 pandemic . . . including OEM delays amid microchip and other shortages." ECF No. 72 at ¶206. If Defendants were to prevail on these likely loss causation arguments, the amount of potentially recoverable damages would have been diminished significantly. Even if Plaintiffs were to overcome such arguments and prevail at trial, such a victory would not have guaranteed the Settlement Class an ultimate recovery larger than $19.5 million.

D.      Other Risks, Including Trial And Appeals

49.     Plaintiffs would have had to prevail at several stages of litigation, each of which would have presented significant risks. Lead Counsel knows from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured. For instance, in 2018, I personally, along with several other GPM attorneys, were lead trial counsel in a six-week antitrust jury trial in the Northern District of California. After five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs, the jury ruled for defendants. *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.). Put another way, complex litigation is uncertain, and success in cases like this one is never guaranteed. *See infra*, ¶ 64.

50.     Even if Plaintiffs succeeded in proving all elements of their case at trial and obtained a jury verdict, Defendants would almost certainly have appealed. An appeal not only would have renewed risks faced by Plaintiffs—as Defendants would have reasserted their arguments summarized above—but also would have resulted in significant additional delay and increased litigation costs. Given these significant litigation risks, Plaintiffs and Lead Counsel believe the Settlement represents a fair result for the Settlement Class.

51.     In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages. If Plaintiffs had fully prevailed in their claims at the trial stage, and if the Court and jury accepted Plaintiffs' damages theory, including proof of loss causation as to the stock price drop dates alleged in this case—*i.e.*, Plaintiffs' best-case scenario—estimated total maximum aggregated damages would be approximately $250 to $495 million. Thus, the $19.5 million Settlement represents a recovery of

15

3.9% to 7.8%, which falls well above the median recovery of 1.8% of estimated damages for all securities class actions settled in 2023, and is also significantly higher than the 1.6%-2.7% median recovery in securities cases with similar damages that settled between January 2014-December 2023. *See* Exhibit 8 (NERA Report at 26 (Fig. 22) (median recovery of 1.8% of estimated damages for all securities class actions settled in 2023); and 25 (Fig. 21) (median recovery for securities class actions that settled between January 2014 and December 2023 was 2.7% for cases with estimated damages between $200-$399 million and 1.6% for those with estimated damages of $400-$599 million)).

## IV.    PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING THE NOTICE PROGRAM

52.    The Preliminary Approval Order directed that the postcard notice highlighting key information regarding the proposed Settlement (the "Postcard Notice") be disseminated to the Settlement Class, in addition to the online posting of the Notice and Claim Form, and the publication of the Summary Notice.[4] ECF No. 191. The Preliminary Approval Order also set a deadline of April 9, 2024 (21 calendar days prior to the final fairness hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Attorneys' Fee Motion or to request exclusion from the Settlement Class, and set a final fairness hearing date of April 30, 2024 (the "Settlement Hearing").

53.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed A.B. Data, the Court-approved Claims Administrator, to begin disseminating copies of the Postcard Notice and publish the Summary Notice. Contemporaneously with the mailing of the Postcard Notice, Lead Counsel instructed A.B. Data to post downloadable copies of the Notice of (I) Pendency of Class Action, Certification of Settlement Class, and Proposed Settlement; (II) Settlement Fairness

---

[4] A copy of the Postcard Notice is attached as Exhibit A to the Walter Decl., which is Ex. 1 hereto.

Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and Proof of Claim and Release Form (the "Claim Form") online at www.xlfleetsecuritiessettlement.com (the "Settlement Website").[5] Upon request, A.B. Data mailed copies of the Notice and/or Claim Form to Settlement Class Members and will continue to do so until the deadline to submit a Claim Form has passed.

54.     The Postcard Notice directed Settlement Class Members to the Settlement Website to obtain additional information on the Settlement, including how to file a claim and access to downloadable versions of the Notice and Claim Form. The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of a Settlement Class Member's right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Attorneys' Fee Motion, or to exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $726,000, which may include an application for reimbursement of the reasonable costs and expenses incurred by Plaintiffs related to their representation of the Settlement Class.

55.     On December 1, 2023, A.B. Data received the names and addresses of potential Settlement Class Members from Defendants, as required by ¶7(a) of the Preliminary Approval Order (the "Record Holder List"). Walter Decl. ¶ 3.

---

[5] Copies of the Notice and Claim Form are attached, respectively, as Exhibits B and C to the Walter Decl.

56.     In addition, A.B. Data maintains a proprietary database with names and addresses of the largest and most common banks, brokers, and other nominees ("Broker Mailing Database"). *Id.* at ¶ 7. On February 15, 2024, A.B. Data caused the Postcard Notice to be sent by first class mail to the combined 5,210 addresses whose mailing records were contained in the Record Holder List and the Broker Mailing Database. *Id.* at ¶ 4.

57.     Through March 18, 2024, A.B. Data received an additional 45,442 names and addresses of potential Settlement Class Members from individuals or brokerage firms, banks, institutions, and other nominees. A.B. Data also received requests from brokers and other nominee holders for 24,820 Postcard Notices to be forwarded by the nominees to their customers. *Id.* at ¶ 9.

58.     Additionally, A.B. Data provided a link to the Notice and Claim Form to Broadridge Financial Solutions, which has confirmed that it emailed the link to159,255 individuals who are potential Settlement Class Members. *Id.* at ¶ 9.

59.     In sum, as of March 18, 2024, notice of the Settlement has been disseminated to 235,278 potential Settlement Class Members and nominees. *Id.* at ¶ 11.

60.     On February 26, 2024, in accordance with the Preliminary Approval Order, A.B. Data caused the Summary Notice to be published in INVESTOR'S BUSINESS DAILY and to be transmitted once over the PR NEWSWIRE. *Id.* at ¶12; Exs. 1-E and 1-F (copies of publication confirmations).

61.     Lead Counsel also caused A.B. Data to establish the Settlement Website, which became operational on February 15, 2024, and maintained a toll-free telephone number to provide Settlement Class Members with information concerning the Settlement, submit a claim online, download copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and the Amended Complaint. As of March 18, 2024, A.B. Data has received a

18

total of 31 calls to the toll-free number, all promptly responded to, and there have been 1,947 unique visitors to the Settlement Website. Walter Decl. at ¶¶ 13-16.

62.   The deadline for Settlement Class Members to object to the Settlement, Plan of Allocation, and/or to the Attorneys' Fee Motion or to request exclusion from the Settlement Class is April 9, 2024. To date, no requests for exclusion have been received. *Id.* at ¶ 18. A.B. Data will file a supplemental affidavit after the April 9, 2024, opt-out deadline addressing whether any requests for exclusion have been received. In addition, to date, no objections to the Settlement or the Plan of Allocation have been entered on this Court's docket or have otherwise been received by Plaintiffs' Counsel. Lead Counsel will file reply papers by April 23, 2024, that will address any objections that may be received.

## V.   ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

63.   Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $19.5 million Settlement Amount, plus interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court (which may include reimbursement to Plaintiffs for costs and expenses incurred in representing the Settlement Class); and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than June 14, 2024. *See id.*, Ex. B (Notice), p. 3 & ¶45. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court. *Id*. at ¶47.

64.   The proposed Plan of Allocation is detailed in the Notice. *Id*. at ¶¶ 56-87. The Notice is posted online on the Settlement Website, is downloadable, and upon request, will be mailed to any potential Settlement Class Member. The objective of the Plan of Allocation is to

equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a proximate result of the alleged violations of the Exchange Act, as opposed to losses caused by market, industry, Company-specific factors, or factors unrelated to the alleged violations of law, and takes into consideration when each Authorized Claimant purchased and/or sold XL Fleet securities. *Id*. at ¶ 56.

65.      As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *See id*. at ¶ 57.

66.      The Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act and reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action. More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the prices of XL Fleet Common Stock, Warrants, Units and Call Options were artificially inflated, and the price of XL Fleet Put Options was artificially deflated, during the Settlement Class Period due to Defendants' alleged materially false and misleading statements and omissions. Plaintiffs allege that the corrective disclosures removed the artificial inflation in the prices of XL Fleet Securities on the following dates: March 3, 2021, March 4, 2021, and April 1, 2021 (the "Corrective Disclosure Dates").[6]  *Id*. at ¶ 59. At the time of the Corrective Disclosure Dates, the

---

[6] The XL Fleet call Options and Put Options are derivative securities whose prices depended, in large part, on the prices of XL Fleet Common Stock.   Thus, the removal of the alleged artificial inflation in the price of XL Fleet's Common Stock upon the Corrective Disclosure Dates would

only XL Fleet Securities that remained outstanding were the XL Fleet Common Stock, Call

Options, and Put Options.[7]

67.     Under the proposed Plan of Allocation, each Authorized Claimant will receive his,

her, or its, *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro

rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of

Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net

Settlement Fund. *Id*. at ¶¶ 71, 84.

68.     An individual Claimant's recovery under the Plan of Allocation will depend on

several factors, including the number of valid claims filed by other Claimants and the quantities

and types of XL Fleet Securities the Claimant purchased, acquired, or sold during the Settlement

Class Period and when that Claimant bought, acquired, or sold the securities. If a Claimant has an

overall market gain with respect to his, her, or its overall transactions in XL Fleet Securities during

the Settlement Class Period, or if the Claimant purchased securities during the Settlement Class

Period, but did not hold any of those securities through at least one of the alleged corrective

disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered

would not have been caused by the revelation of the alleged fraud. Lead Counsel believes that the

---

have likewise caused the removal of the alleged artificial inflation on the prices of the Call Options, and the alleged artificial deflation in the prices of the Put Options.

[7] Prior to the business combination between Pivotal and XL Fleet on December 21, 2020 (the "Business Combination"), Pivotal common stock, Pivotal warrants and Pivotal Units (each consisting of one share of stock and one-third of a warrant) were quoted on the New York Stock Exchange ("NYSE") under the symbols "PIC," "PIC WS" and "PIC.U," respectively. Following the Business Combination, the Pivotal Units automatically separated into the component securities and, as a result, no longer traded as a separate security and were delisted from the NYSE. On December 22, 2020, XL Fleet Common Stock and XL Fleet Warrants began trading under the symbols "XL" and "XL WS," respectively. On March 1, 2021, the Company redeemed all outstanding publicly held XL Fleet Warrants, and the holders of those warrants were entitled to receive $0.01 per XL Fleet Warrant.

Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members who submit valid claims. *Id*. at ¶¶ 59, 83-84.

69.     If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant. *Id*. at ¶ 84. Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater. *Id*. In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost prohibitive.[8]

70.     In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in XL Fleet Securities that were attributable to the conduct alleged in the Amended Complaint. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

71.     As noted above, as of March 18, 2024, notice of the Settlement has been disseminated to 235,278 potential Settlement Class Members and nominees, which includes 76,023 mailed Postcard Notices, and 159,255 emailed links to copies of the Notice and Claim Form. *See* Walter Decl. at ¶ 11. To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket.

---

[8] If any funds remain after an initial distribution to Authorized Claimants, as a result of uncashed or returned checks or other reasons, subsequent distributions will be conducted as long as they are cost effective. *Id*. at ¶ 85. At such time as it is determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance shall be contributed to the Public Justice Foundation or such other non-sectarian, not-for-profit organization(s), as may be recommended by Lead Counsel and approved by the Court.

## VI.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

72.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying for a fee award of 33⅓% of the Settlement Fund (or $6,500,000, plus interest earned at the same rate as the Settlement Fund). Lead Counsel also requests reimbursement of Litigation Expenses in the amount of $597,900.92, which includes $512,900.92 in out-of-pocket expenses that Lead Counsel incurred in connection with the prosecution of the Action, and an aggregate of $85,000 to Plaintiffs for their costs, including for time spent, incurred in connection with their representation of the Settlement Class.[9] The total Litigation Expense amount of $597,900.92 is well below the maximum expense amount of $726,000 set forth in the Notice.[10] The legal authorities supporting a 33⅓% fee award are set forth in the accompanying Attorneys' Fee Motion, which is being filed contemporaneously herewith. The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A.    The Fee Application

73.    Lead Counsel is applying for a percentage-of-the-common-fund fee award to compensate Plaintiffs' Counsel for the services they rendered on behalf of the Settlement Class. As set forth in the accompanying Attorneys' Fee Motion, the percentage method is the best method for determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class in achieving the maximum recovery. The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances. This paradigm minimizes unnecessary drain on the Court's resources. Notably,

---

[9] The Law Offices of Howard G. Smith is not seeking reimbursement of expenses.

[10] These amounts to not include claims administration expenses. Plaintiffs will provide updated claims administration expense numbers both in the reply brief and at the final approval hearing.

the percentage-of-the-fund method has been recognized as appropriate by the Supreme Court and the Second Circuit for cases of this nature.

74.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is fair and reasonable and should be approved. As discussed in the Attorneys' Fee Motion, a 33⅓% fee award is well within the range of percentages awarded in securities class actions with comparable settlements in this Circuit.

### 1.    The Outcome Achieved is the Result of the Significant Time and Labor that Lead Counsel Devoted to the Action

75.    GPM's total lodestar is $4,653,954,[11] consisting of $4,569,171 for attorney time and $84,783 for professional support staff time.  The following chart ("Lodestar Chart") sets forth the amount of time GPM attorneys and professional support staff billed from inception of the Action through and including March 18, 2024, and the lodestar calculation for those individuals based on GPM's current billing rates:

| TIMEKEEPER/CASE | STATUS | HOURS | RATE | LODESTAR |
| --- | --- | --- | --- | --- |
| ATTORNEYS: | | | | |
| Robert Prongay | Partner | 240.80 | 1,050.00 | 252,840.00 |
| Joseph Cohen | Partner | 93.00 | 1,195.00 | 111,135.00 |
| Greg Linkh | Partner | 1,226.70 | 1,095.00 | 1,343,236.50 |
| Jason Krajcer | Partner | 245.60 | 1,050.00 | 257,880.00 |
| Garth Spencer | Partner | 988.70 | 925.00 | 914,547.50 |
| Christopher Fallon | Senior Counsel | 1,051.60 | 795.00 | 836,022.00 |
| Holly A. Heath | Associate | 936.60 | 600.00 | 561,960.00 |
| Diarra Porter | Staff Attorney | 686.00 | 425.00 | 291,550.00 |

---

[11] The lodestar figure contains only the time of GPM attorneys and professional staff that billed more than ten hours to the Action.  Lead Counsel intends to share a portion of any attorneys' fees awarded by the Court with The Law Offices of Howard J. Smith, 3070 Bristol Pike, Suite 112, Bensalem PA 19020, in accordance with its level of contribution to the initiation, prosecution, and resolution of the Action.

24

| TOTAL ATTORNEY | TOTAL | 5,469.00 | | 4,569,171.00 |
|---|---|---|---|---|
| **PARALEGALS:** | | | | |
| Michael Cheiken | Law Clerk | 51.50 | 325.00 | 16,737.50 |
| Harry Kharadjian | Senior Paralegal | 52.50 | 350.00 | 18,375.00 |
| Paul Harrigan | Senior Paralegal | 33.40 | 325.00 | 10,855.00 |
| Alexia Shiri | Paralegal | 13.10 | 350.00 | 4,585.00 |
| John D. Belanger | Research Analyst | 41.70 | 365.00 | 15,220.50 |
| Michaela Ligman | Research Analyst | 20.40 | 400.00 | 8,160.00 |
| Gabrielle Zavaleta | Research Analyst | 31.00 | 350.00 | 10,850.00 |
| **TOTAL PARALEGAL** | TOTAL | 243.60 | | 84,783.00 |
| **TOTAL LODESTAR** | TOTAL | 5,712.60 | | 4,653,954.00 |

76.     The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted by other Courts, including in the Second Circuit in the context of a lodestar cross-check in other securities litigation. *See Lea v. Tal Education Group*, 2021 WL 5578665, at *12 (S.D.N.Y. Nov. 30, 2021) (finding GPM's *2021* rates of "$600 to $995 for partners, and $500 to $750 for associates … comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude." (citation omitted)); *In re Akazoo S.A. Sec. Litig.*, 2022 WL 14915812, at *2 (E.D.N.Y. Oct. 7, 2022) (awarding 33⅓% of the Settlement Fund and noting lodestar); *In re Eros International PLC Sec. Litig.*, 2023 WL 8519091, at *2 (D.N.J. Nov. 28, 2023) (same). Additionally, Lead Counsel's rates (ranging from $925 to $1,195 per hour for partners, and $425 to $795 per hour for associates) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude. *See* Ex. 9 (table of peer law firm billing rates).

77.     The Lodestar Chart was prepared from contemporaneous daily time records regularly prepared and maintained by GPM. Time expended on the Attorneys' Fee Motion has not been included in this request. Nor does the lodestar include any of the time that will be spent preparing for and attending the final approval hearing, overseeing the claims administration

25

process, responding to Settlement Class Members inquiries, and briefing the Motion for Class Distribution Order. No additional compensation will be sought for this work.

78. The requested fee amount of 33⅓% of the Settlement Fund equals $6,500,000 (plus interest earned at the same rate as the Settlement Fund), which equates to a modest multiplier of 1.4 on Lead Counsel's lodestar. I respectfully submit that the 1.4 multiplier is fair and reasonable based on, *inter alia*, the risks of the litigation, the quality of the representation, the wholly contingent nature of the representation, and the results obtained. As discussed in further detail in the Attorneys' Fee Motion, the requested multiplier is well-within the range of fee multipliers often awarded in comparable securities class actions and in other complex litigation involving significant contingency fee risk in this Circuit.

79. As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action. Lead Counsel maintained control of, and monitored the work performed by, lawyers and other personnel on this case. I personally devoted substantial time to this case and oversaw and/or was personally involved in drafting or reviewing and editing of almost all pleadings, court filings, various discovery-related materials, meditation statements, and other correspondence prepared on behalf of Plaintiffs, communicating with Plaintiffs on a regular basis, engaging with Defendants' counsel on a variety of matters, and was intimately involved in settlement negotiations. Other experienced attorneys were involved with drafting, reviewing and/or editing pleadings, court filings, various discovery-related materials, and the mediation submissions, communicated with Plaintiffs, the mediation process, negotiating the terms of the Stipulation, and other matters. More junior attorneys, staff attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, Lead Counsel

maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

80.    I respectfully submit that given the time and labor invested in this case by Plaintiffs' Counsel, the requested fee is reasonable under either a percentage-of-the-fund or lodestar analysis and should be approved.

### 2.    The Significant Risks Borne by Plaintiffs' Counsel

81.    This prosecution was undertaken by Plaintiffs' Counsel on an *entirely* contingent-fee basis. From the outset, this Action was an especially difficult and highly uncertain securities case. There was no guarantee that Plaintiffs' Counsel would ever be compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a case like this one were covered. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel have received no compensation since they filed the initial complaint in this Action more than three years ago, and Lead Counsel has incurred $512,900.92 in hard out-of-pocket litigation-related expenses in prosecuting the Action.

82.    Additionally, Plaintiffs and Plaintiffs' Counsel developed and then alleged the Exchange Act claims without information gained through subpoena power and hindered by the PSLRA's automatic discovery stay.

83.    Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured. Plaintiffs' Counsel know from experience

27

that the commencement of a class action does not guarantee a settlement. *See supra*, ¶ 47; *see also Gross v. GFI Group, Inc.*, 784 Fed. App'x. 27, 28 (2d Cir. Sept. 13, 2019) (affirming grant of summary judgment against plaintiffs in securities fraud class action where GPM served as one of Lead Plaintiff's counsel following approximately five years of hard-fought, fully contingent litigation on the alternative ground that Defendant's "statement did not, as a matter of law, amount to a material misrepresentation or omission actionable under section 10(b)," despite the trial court twice finding the statement actionable). On the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint, overcome summary judgment, or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

84.     Plaintiffs' Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class. In circumstances such as these, and in consideration of the hard work and the result achieved, I respectfully submit that the requested fee is reasonable and should be approved.

### 3.     The Experience And Expertise Of Plaintiffs' Counsel And The Standing And Caliber of Defendants' Counsel

85.     As demonstrated by the firm résumé attached hereto as Exhibit 2, GPM consists of highly experienced and skilled lawyers that focus their practices on securities and other class action litigation. Indeed, Lead Counsel have substantial experience in litigating securities fraud class actions and have negotiated scores of other class settlements, which have been approved by courts throughout the country. Lead Counsel enjoys a well-deserved reputation for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters. I believe Plaintiffs' Counsel's experience added valuable leverage in the settlement negotiations.

28

86.    Additionally, the quality of the work performed by Plaintiffs' Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by: (a) Wilmer Cutler Pickering Hale and Dorr LLP; (b) Willkie Farr & Gallagher LLP; (c) Troutman Pepper Hamilton Sanders LLP; (d) McDermott Will & Emery LLP; and (e) Ropes & Gray LLP, each prestigious and well-respected defense firms that vigorously and ably defended the Action. In the face of this experienced and formidable opposition, Lead Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that were highly favorable to the Settlement Class.

### 4.    Public Policy Interests, Including The Need To Ensure The Availability Of Experienced Counsel In High-Risk Contingent Securities Cases

87.    Courts consistently recognize that it is in the public interest to have experienced and able counsel to enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly large investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, courts should award fees that adequately compensate Plaintiffs' Counsel, taking into account the risks undertaken in prosecuting a particular securities class action. Relatedly, it is long-recognized public policy that settlement is to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements on behalf of litigants who—absent the class action mechanism—would be economically unable to prosecute such actions.

**5.      The Reaction Of The Settlement Class Support Lead Counsel's Fee Request**

88.      As noted above, notice has been provided to 235,278 potential Settlement Class Members or their nominees informing them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund. Walter Decl. ¶ 11, Exs. A (Postcard Notice), B (Notice). In addition, the Court-approved Summary Notice has been published in INVESTOR'S BUSINESS WEEKLY and transmitted over the PR NEWSWIRE. Walter Decl. at ¶ 12, Exs. E, F (confirmation of Summary Notice publication). To date, no objections to the maximum potential attorneys' fees request set forth in the Postcard Notice or Notice have been received or entered on this Court's docket. Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers to be filed by April 23, 2024.

**B.      Reimbursement Of The Requested Litigation Expenses Is Fair And Reasonable**

89.      Lead Counsel seeks a total of $597,900.92 in Litigation Expenses to be paid from the Settlement Fund. This amount includes: $512,900.92 in out-of-pocket expenses reasonably and necessarily incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action; as well as an aggregate award of $85,000 to Lead Plaintiff and the four class representatives, pursuant to the PSLRA (15 U.S.C. § 78u-4(a)(4)), for time spent prosecuting the Action on behalf of the Settlement Class.

90.      Lead Counsel is seeking reimbursement of a total of $512,900.92 in out-of-pocket costs and expenses (exclusive of $85,000 PSLRA awards to Plaintiffs). The following is a breakdown by category of all expenses incurred by Lead Counsel:

30

| CATEGORY OF EXPENSE | AMOUNT PAID |
|---|---|
| COURIER AND SPECIAL POSTAGE | 215.73 |
| COURT FILING FEES | 1,202.00 |
| DEPOSITION VENDOR CHARGES (Transcripts, Video Services) | 37,933.66 |
| E-DISCOVERY VENDOR CHARGES | 115,500.39 |
| EXPERTS - ECONOMETRICS (Market Efficiency, Damages, Plan of Allocation) | 272,109.00 |
| MEDIATOR | 37,933.68 |
| ONLINE RESEARCH | 21,389.14 |
| PRIVATE INVESTIGATOR FEES | 17,696.50 |
| PSLRA-MANDATED PRESS RELEASE | 100.00 |
| SERVICE OF PROCESS | 1,522.29 |
| TRAVEL AIRFARE* | 2,682.41 |
| TRAVEL AUTO | 1,076.36 |
| TRAVEL HOTEL* | 3,228.67 |
| TRAVEL MEALS | 311.09 |
| **Grand Total** | **512,900.92** |

*Includes coach class airfare for one person, and an estimated $700 for two nights hotel, in conjunction with the Settlement Hearing.

91.    The Postcard Notice and long-form Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $726,000. The total amount requested by Lead Counsel and Plaintiffs, $597,900.92 (inclusive of $85,000 PSLRA awards to Plaintiffs), falls well below the $726,000 that Settlement Class Members were advised could be sought. To date, no objections have been raised as to the maximum amount of expenses set forth in the Postcard Notice and Notice. If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in its reply papers.

92.    From the beginning of the case, Lead Counsel were aware that they might not recover their out-of-pocket expenses. Lead Counsel also understood that, even assuming the case

was ultimately successful, reimbursement for expenses would not compensate them for the lost use of funds advanced to prosecute this Action. Accordingly, Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

93.    The largest component of expenses, $272,109, or approximately 53% of the total out-of-pocket expenses, was expended on the retention of experts in the fields of market efficiency, loss causation and damages. These experts were consulted at different points throughout the litigation, including on matters related to the preparation of the Amended Complaint, a report on market efficiency in support of Plaintiffs' motion for class certification, on matters relating to the negotiation of the Settlement, and on preparation of the proposed Plan of Allocation.

94.    Additionally, Lead Counsel paid $115,500.69 to CS Disco for hosting a large document database for approximately 18 months, which is approximately 22.5% of the total expenses out-of-pocket incurred.

95.    Additionally, Lead Counsel paid $37,933.68 in mediation fees to Mr. Melnick for the services Mr. Melnick provided in connection with the mediation and subsequent negotiations of the Settlement, which is approximately 7.4% of the total out-of-pocket expenses incurred.

96.    Lead Counsel also paid $37,933.66 for court reporting and videographer fees in connection with the 21 depositions they took or defended, which is approximately 7.4% of the total out-of-pocket expenses incurred. (The fact that the mediation fees and court reporting/videographer fees are within two cents of each other is pure coincidence.)

97.    The other litigation expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These litigation expenses included, among other things, court fees, service of process

costs, travel costs, postage and delivery expenses, private investigator expenses, and the cost of online legal research.

98. Finally, each of the Plaintiffs were highly involved in the litigation and communicated regularly with Lead Counsel. Each made themselves freely available to perform their representative functions, including often speaking and emailing with Lead Counsel. The tasks performed by them in executing their duties and responsibilities as Plaintiffs in this Action included, among others: (a) reviewing the relevant court papers in the case; (b) communicating with Lead Counsel via email and telephone about case developments and litigation strategy; (c) providing documents and responses to Defendants' discovery requests; (d) preparing and sitting for deposition; (e) preparing for the mediation session, including discussing with Lead Counsel the Parties' mediation statements, as well as mediation strategy; (f) considering the mediator's recommendation, conferring with counsel, and ultimately approving the Settlement; and (g) communicating with counsel regarding the process of finalizing the Settlement.

99. In addition, Lead Plaintiff Delton Rowe: (a) traveled from his home in Plattsmouth, Nebraska to New York to meet with Lead Counsel on March 19, 2023, and attend the first mediation session on March 20, 2023; and (b) engaged in extensive discussions of damages and mediation strategy with Lead Counsel, including analysis of damages calculations, in preparation for mediation.

100. A true and correct copy of each Declaration attesting to these facts is attached hereto as Exhibits 3 to 7.

101. To date, no objections to the Litigation Expenses have been filed on the Court's docket. In my opinion, the Litigation Expenses incurred by Lead Counsel and Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement.

Accordingly, I respectfully submit that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII.   CONCLUSION

102.   In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Motion, I respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and the proposed Plan of Allocation should be approved as fair and reasonable. I further submit that the requested fee in the amount of 33⅓% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of $512,900.92 in Litigation Expenses, including PSLRA reimbursement in the aggregate amount of $85,000 to Lead Plaintiff ($25,000) and the four other class representatives ($15,000 each), should also be approved.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed this 26th day of March 2024, in Brooklyn, New York.

*/s/ Gregory B. Linkh*
Gregory B. Linkh

34